1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WADITH STOCKINGER NADER and ) Case No. 8:17-cv-83
STACEY NICHOLE NADER,          )
                               )
            Plaintiffs,        )
                               )
      v.                       )
                               )
THE CITY OF PAPILLION; SARPY   )
COUNTY; BRYAN SVAJGL;          )
BENJAMIN IVERSEN; SCOTT A.     )
LYONS; L. KENNETH POLIKOV;     )
and JENNIFER MIRALLES,         ) TAKEN IN BEHALF OF
                               ) DEFENDANTS SARPY
            Defendants.        ) COUNTY, POLIKOV &
      _____              ) MIRALLES

DEPOSITION OF WADITH STOCKINGER NADER,

912 Hickory Hill Road, Papillion, NE 68046, taken

at 9:17 a.m. on July 10, 2017, by Deanna L.

Maley, RPR, CRR, and General Notary Public in and

for the State of Nebraska, at 2120 South 72nd

Street, Suite 1500, Omaha, Nebraska.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

---

2

APPEARANCES:

Mr. Christopher J. Tjaden        For Plaintiffs
Attorney at Law
GROSS & WELCH
2120 South 72nd Street
Suite 1500
Omaha, NE 68124

Mr. Vincent Valentino            For Defendants
Attorney at Law                  Sarpy County,
VALENTINO LAW OFFICE             Lee Polikov &
130 South 13th Street #300       Jennifer Miralles
Nebraska Telephone Building
Lincoln, NE 68508

Mr. Ryan M. Kunhart              For Defendants
Attorney at Law                  City of Papillion,
ABRAHAMS, KASLOW & CASSMAN       Bryan Svajgl,
8712 West Dodge Road             Benjamin Iversen &
Suite 300                        Scott A. Lyons
Omaha, NE 68114

Ms. Karla R. Rupiper
Ms. Amber L. Rupiper
City Attorneys
CITY OF PAPILLION
122 East Third Street
Papillion, NE 68046

Also Present:  Stacey Nichole Nader
               Bryan Svajgl
               Benjamin Iversen
               Scott A. Lyons
               Bob Lausten
               Adam Kost

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

---

3

I N D E X

| EXAMINATION: | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| WADITH STOCKINGER NADER | | | |
| By Mr. Valentino: | 5 | | 153 |
| By Mr. Kunhart: | | 96 | |

E X H I B I T S

| Ex. No. | Pg. Ref. No. | Description |
|---|---|---|
| 1 | 108 | Amended Complaint, Demand for Jury Trial, and Designation of Place of Trial |
| 2 | 28 | Plaintiffs' Answers to Interrogatories and Responses to Requests for Production of Documents of Sarpy County, Polikov and Miralles |
| 3 | 20 | Record of Medical Care by Dr. Joseph Stankus (Nader 0038-85) |
| 4 | 52 | Criminal Complaint (Nader 0365-67) |
| 5 | 86 | Probable Cause Detention Order (Nader 0374-78) |
| 6 | 93 | Incident Report (Nader 0393) |
| 7 | 88 | Affidavit of Probable Cause for Warrantless Arrest (Nader 0395-98) |
| 8 | - | Affidavit and Application for Issuance of a Search Warrant (Nader 0451-61) |

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

---

4

E X H I B I T S (cont'd)

| Ex. No. | Pg. Ref. No. | Description |
|---|---|---|
| 9 | 63 | Search Warrant (Nader 0447-50) |
| 10 | - | CyberTipline Report 3184694 (Nader 0399-410) |
| 11 | - | ECD Technical Assistance Request (Nader 0426-35) |
| 12 | - | Assignment Information (Nader 0486, 484, 485, 489, 487) |
| 13 | 81 | WOWT.com Story (Nader 0507) |
| 14 | 35 | Nebraska State Patrol Forensics Investigation Report (COUNTY 00140-149) |
| 15 | 111 | Employment History for Wadith Nader (Nader 0036) |
| 16 | 118 | Handwritten Diary (Nader 0318-64) |
| 17 | 133 | Plaintiffs' Initial Disclosures |
| 18 | 136 | 2017 Military Pay Tables (Nader 0305-17) |

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

5

1    (Deposition Exhibit Numbers 1 through
2  14 were marked for identification.)
3    WADITH STOCKINGER NADER
4    Of lawful age, being first
     duly cautioned and solemnly
5    sworn as hereinafter certified,
     was examined and testified as
6    follows:

7    MR. VALENTINO: Gentlemen and ladies,
8  what do you want to do for stipulations? Form
9  and foundation?
10    MR. TJADEN: Form and foundation and
11  we also need to do that --
12    MR. VALENTINO: The new federal rule,
13  that one.
14    MR. TJADEN: Form and foundation,
15  Ryan?
16    MR. KUNHART: That's fine.
17    MR. VALENTINO: Good? Okay.
18    DIRECT EXAMINATION
19  BY MR. VALENTINO:
20    Q.   Mr. Nader, you and I had met a little
21  earlier when your attorney and your wife came
22  downstairs. My name is Vincent Valentino. I
23  represent the defendants County of Sarpy, Lee
24  Polikov, and Jennifer Miralles.
25    Have you ever had your deposition

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

6

1  taken before?
2    A.   No.
3    Q.   Let me give you just a few ideas and
4  rules and protocols that we like to use. This is
5  obviously a question-and-answer type of format.
6  I like to make sure it's more of a conversation
7  about things that you know and things that I want
8  to ask you about. If I ask you a question, make
9  sure that I've finished my question, because if
10  you jump in she's going to have a difficult time
11  listening to two people talk over one another.
12    Secondly, if I ask you a question
13  you're not clear on, I want to make sure we get
14  on the same page. So if you want me to clear
15  something up or clarify something, I will. I
16  want you to understand the question that I'm
17  asking.
18    Thirdly, uh-huhs and huh-uhs and
19  shakes of the head will never show up on a
20  transcript. Well, they do but they don't know
21  what they -- you don't know what they mean.
22  It'll say U-H-U-H and we won't know if that's
23  uh-huh or huh-uh. So answer the question
24  verbally out loud and don't use uh-huh, huh-uh
25  and shakes of the head, they don't show up well.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

7

1    Also if there comes a time where we
2  need a break, either you, me, Mr. Kunhart, your
3  attorney, we'll ask the court reporter just to go
4  off the record and we can take our break for
5  whatever purpose we need to, okay?
6    A.   Okay.
7    Q.   All right. Can you give me your full
8  name?
9    A.   Wadith Stockinger Nader.
10    Q.   And you go by a nickname Paul?
11    A.   I go by Paul, yes.
12    Q.   Where did that come from, just out of
13  curiosity?
14    A.   I was born in South America. Paul
15  was supposed to be my middle name. When my
16  mother registered me with the American Embassy,
17  they switched her maiden name in as my middle
18  name.
19    Q.   Okay.
20    A.   But in the United States my name is
21  Wadith Stockinger Nader.
22    Q.   Okay. And that was your -- your
23  mother's maiden name was Stockinger?
24    A.   Correct.
25    Q.   I understand that protocol, actually,

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

8

1  because I've seen some different A-Files for
2  folks that have come from South America where
3  they end up as their mother's name as their --
4  maiden name as their middle name.
5    Go ahead and tell me what your, what
6  your spouse and any children that you have from
7  your marriage.
8    A.   My spouse is Stacey Nichole Nader,
9  she goes by Nikki. My children,
10                          .
11    Q.   And you have one daughter and one
12  son?
13    A.   I do.
14    Q.   What was your address at the time of
15  the incident in March?
16    A.   My address was and is still 912
17  Hickory Hill Road in Papillion.
18    Q.   Is that your present address then
19  also?
20    A.   Yes, it is.
21    Q.   I saw some reference in some of the
22  things that I read about moving to New Jersey.
23  Were you relocated at some point in time?
24    A.   We have not.
25    Q.   Okay. Was that a discussion that was

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

THIBAULT, SUHR & THIBAULT
(402) 981-9500

9

1   being had at one point?

2       A.   No, it was not.

3       Q.   Okay.  What previous addresses have

4   you lived at?  And I know you were in the Air

5   Force, so you might be reciting maybe five or

6   six.  If you can give me the cities, I'll be fine

7   with that.

8       A.   Alexandria, Virginia, from 2006 to

9   2010.  In that time frame in 2008, I lived in

10  London for six months, it was a military

11  deployment.

12      Q.   Is there an Air Force base associated

13  with either Alexandria or London?

14      A.   I was -- there is not -- there's the

15  Pentagon in Alexandria.

16      Q.   Okay.

17      A.   And in London I was an exchange

18  officer with Her Majesty's Government.  I worked

19  at MOD headquarters.

20      Q.   And then after that?

21      A.   Well, prior to that -- after that was

22  here.

23      Q.   Okay.  Prior to that?

24      A.   Prior to that I lived in Bury St.

25  Edmunds in Suffolk, United Kingdom.  Prior to

10

1   that I lived in Saudi Arabia at the air base

2   there.  The name escapes me right now.  Prince

3   Sultan.  Prince Sultan Air Base.

4       Q.   Is that in Riyadh?

5       A.   That is in Al Kharj, about an hour

6   south of Riyadh.

7       Q.   All right.

8       A.   An hour from Riyadh.

9       Q.   Prior to that?

10      A.   Prior to that I lived in -- I lived

11  here for three years, from 1999 to 2002.

12      Q.   Were you in the Air Force at that

13  point?

14      A.   I was, yes.

15      Q.   So you were stationed at Offutt?

16      A.   We were -- I was, yes.

17      Q.   Okay.  And then prior to that?

18      A.   Prior to that I lived in Oklahoma,

19  1997 to 1999.  Prior to that I was in training in

20  Pensacola, Florida -- sorry.  I was in training

21  at Goodfellow Air Force Base in Texas.  Prior to

22  that I was in training at Pensacola Naval Air

23  Station in Florida.  Prior to that I was at home

24  in New Jersey going to college.

25      Q.   And was that -- do you consider New

11

1   Jersey kind of your home state?

2       A.   My mom still lives there, my brother

3   still lives there, my sister-in-law, yes.

4       Q.   So you have family there?

5       A.   I do.

6       Q.   How old are you now?

7       A.   I'm 43.

8       Q.   And your spouse Nikki?

9       A.   Is also 43.

10      Q.   When did you folks get married?

11      A.   We were married in 2000.

12      Q.   So you've got 17 years in?

13      A.   To the marriage, yes.

14      Q.   Okay.  Not quite a deployment.

15      A.   No.

16           MR. TJADEN:  Easy.

17      A.   There is a point of note.

18      Q.   Go ahead.

19      A.   We were actually married twice,

20  because the military was trying to station me in

21  a different location.  So we were married here in

22  1998 and then we had the formal ceremony in North

23  Carolina in 2000.

24      Q.   Okay.

25      A.   So you may find two records.  We've

12

1   never been divorced.

2       Q.   All right.  I understand that.  As

3   far as your Air Force career is concerned, I

4   understand you had 15 years or 15-and-a-half

5   years in the Air Force before you mustered out;

6   is that true?

7       A.   That's correct.

8       Q.   Is there a reason you left before

9   your 20 years?

10      A.   Yes.

11      Q.   Can you tell us what that is, please?

12      A.   In 20 -- sorry.  I'm trying to get

13  the year right.  In 2009 I was accused of a

14  security violation.

15      Q.   Okay.

16      A.   There was an investigation.  The

17  investigation accused me of a security violation.

18  I was then given a referral performance report

19  which means a substandard performance report and

20  I continued with my career.

21           In 2010 the Air Force began to draw

22  down and the Air Force needed to remove

23  personnel.  So I was selectively discontinued.

24  So typically as a major you would continue to 20

25  years.  In this case they purchased me out of my

**Exhibit B to V. Valentino Affd.**

13

1  contract.
2      Q.  All right.
3      A.  Now, I am --
4      Q.  Go ahead.
5      A.  I'm currently in the process of
6  attempting to get back in.  The referral
7  performance report has been removed after I
8  proved that I did not commit a security
9  violation.  The general who stopped my career
10 actually became my proponent and has now actually
11 made -- taken steps to help me recover my career.
12     Q.  You want to reenter the Air Force and
13 get your 20 or 22 years in?
14     A.  I want to continue, yes.
15     Q.  Okay.  What were your -- what was
16 your, what was your primary skill set for your 15
17 years or so?
18     A.  I was a 14N which is an intelligence
19 officer.
20     Q.  And in that capacity what kind of
21 tasks did you perform?
22     A.  I was an analyst.  I analyzed
23 intelligence.
24     Q.  And did you give briefings in various
25 theatres?
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

14

1      A.  I did.
2      Q.  And were you given certain awards for
3  those briefings and your intelligence operations?
4      A.  Yes.
5      Q.  I saw a whole scan of different Air
6  Force awards that you were provided with during
7  that time.  Congratulations, by the way, I've
8  seen some of those before.  Thank you for your
9  service too, by the way.
10         Tell me, tell me if you can what your
11 dealings were with this F-A-R-C or FARC
12 organization that was in South America.  I saw
13 your dissertation was based on some of this
14 stuff.  What -- was that when you were in the Air
15 Force that you did that --
16     A.  No.
17     Q.  -- or was that something else that
18 you decided to do?
19     A.  The -- when you go for a doctorate,
20 it's very important to have something different
21 than other people.  Everybody right now is doing
22 Al-Qaeda.  Everyone is doing ISIS.  And I
23 actually have a particular skill set that helps
24 me with the FARC.  The FARC is a communist
25 terrorist group in my home country of Colombia.
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

15

1  In 1983 I left the country because I was on their
2  kidnapping list, so I have a connection.
3      Q.  Was that due to you or your parents?
4      A.  That was due to the fact that my
5  parents were affluent and they were attempting to
6  find some way to strong-arm the government.
7      Q.  Extort money?
8      A.  Correct.  Well, correct, and put
9  pressure on the government.
10     Q.  Go ahead.
11     A.  So I -- when it took me -- when I had
12 to look at what I could do, I speak the language,
13 I understand the culture, I understand what some
14 of these people are going through, it kind of
15 made sense for me to work for -- to work and look
16 at the FARC.
17     Q.  And that's totally unrelated to any
18 Air Force assignment that you had?
19     A.  Correct.
20     Q.  So that's something you did on the
21 side, so to speak, as you try to advance your
22 career as far as education was concerned?
23     A.  That's correct.
24     Q.  Okay.  So what university were you
25 associated with to get your PhD?
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

16

1      A.  Henley-Putnam University, California.
2      Q.  You want to spell that out for her?
3      A.  H-E-N-L-E-Y dash P-U-T-N-A-M.
4      Q.  I never would have thought so.
5          Okay.  And have you completed that or
6  are you in the process of having it reviewed or
7  what's your status on that?
8      A.  I am currently finishing the
9  dissertation.  I'm in the very final steps.  I
10 expect to have it completed no later than
11 November.
12     Q.  You have an advisor associated with
13 that?
14     A.  I have -- yes, I have three.
15     Q.  And who would they be?
16     A.  Dr. Guggenberger, Dr. Klein, and
17 Dr. -- we can get you the names.
18     Q.  Okay.  In any event, when do you
19 think you'll have that completed, the review
20 process?
21     A.  No later than November.  I have to
22 defend the dissertation.
23     Q.  Right.  I understand that.  So what
24 languages are you able to speak besides English
25 and Spanish?
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-9000

**Exhibit B to V. Valentino Affd.**

17

1    A.    That's it.
2    Q.    Okay.  Did you go to any other
3 language courses when you were in the Air Force?
4    A.    No.  I took Russian in college.
5    Q.    All right.  Let's, let's start -- one
6 other question I want to go to before I get off
7 the college education.  Where'd you get your
8 master's degree from?
9    A.    Air University, Maxwell Air Force
10 Base, Alabama.
11    Q.    And when you say Air University, is
12 that A-I-R?
13    A.    Yes.
14    Q.    Okay.  Is that affiliated with the
15 Air Force?
16    A.    It is.
17    Q.    Okay.  And it's an accredited
18 program?
19    A.    Absolutely.
20    Q.    And then you decided to apply to the
21 university you just mentioned in California.  Is
22 that affiliated with the Air Force in any way?
23    A.    It is not.
24    Q.    That was a private college?
25    A.    It is.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

18

1    Q.    When did you start that dissertation
2 process?
3    A.    The dissertation process or the
4 degree?
5    Q.    Well, when did you start to get your
6 PhD and then I'll ask you the dissertation
7 process.
8    A.    In 2011 I believe I began it, and
9 it's a roughly four- to five-year program.  And I
10 started the dissertation in -- the way the
11 program works, you take classes.  Once you're
12 done with the classes, you do comprehensive
13 examinations.  I took my comprehensive
14 examinations in November of 2014, if my memory
15 serves me correctly.
16    Q.    Were those orals?
17    A.    They were not.  They were -- they
18 were not.
19    Q.    Written?
20    A.    Correct.
21    Q.    Okay.
22    A.    I was given an obscure question, I
23 had to answer it based on my knowledge.  Once I
24 passed those, and I did, I began the dissertation
25 itself.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

19

1    Q.    My dissertation program hinged upon
2 some interviews that I had conducted in 2012 with
3 some former FARC revolutionaries.  I had actually
4 created a journal entry on some of the initial
5 interviews.  And the in-depth analysis was what
6 I -- what has taken so long.  I had to transcribe
7 about I think it was 200 pages.
8    Q.    But you had to translate too, didn't
9 you?
10    A.    Yes.
11    Q.    Okay.  Because they spoke Spanish and
12 you spoke Spanish, so you'd be translating and
13 transcribing?
14    A.    Correct.
15    Q.    And that's why it would have taken
16 you longer?
17    A.    Correct.
18    Q.    Now, I understand from reading some
19 of the materials that I've looked at that you
20 originally had this material -- these interviews
21 and part of your dissertation on an iPad?
22    A.    That is incorrect.
23    Q.    Well, we'll go back to that, because
24 I saw a note in your psychological data that said
25 you found it on an iPad.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

20

1    A.    That would be a mistake.
2    Q.    We'll talk about that.  I just saw it
3 in a note and I want to make sure.  So if it's in
4 a note, it's wrong?
5    A.    Okay.
6    Q.    Is that right?
7         MR. TJADEN:  Well, I'm going to
8 object to the form of the question.
9         MR. VALENTINO:  Let me get --
10 let's --
11         MR. TJADEN:  Identify what the note
12 is.
13         MR. VALENTINO:  Yeah, I'll get there
14 right now actually.  There is an exhibit, it's
15 Number 3, it'd be your Nader 0038 Bates stamped.
16         MR. TJADEN:  What is the document?
17         MR. VALENTINO:  It's called
18 chronological record of medical care.  It's Nader
19 0076 Bates stamped.
20         MR. TJADEN:  I don't have my Bates
21 stamped numbers.
22         MR. VALENTINO:  That's what I used
23 off of your -- you want to go get them?
24         MR. TJADEN:  Yeah, let me go get the
25 Bates numbers.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

21

1          MR. VALENTINO:  It's 38 through 85.
2          (An off-the-record discussion was
3    held.)
4    BY MR. VALENTINO:
5          Q.    Mr. Nader, I'm going to refer you to
6    Exhibit 3, and it's Bates stamped O072 and I've
7    highlighted that.  Why don't you have your
8    attorney and you look at what I've highlighted on
9    Exhibit Number 3.  Does that refresh your
10   recollection, Mr. Nader, that you had part of
11   your dissertation saved on an old iPad?
12         A.    I've never owned an iPad.
13         Q.    Why would that -- do you have any
14   idea why that would be written?
15         A.    I do.
16         Q.    Okay.  Can you explain that, please?
17         A.    And this is a -- when was this?
18   November 2015.  Okay.  He mixed certain things.
19   After I received back all of my items, I found
20   the recordings of the interviews that I had
21   conducted on an iPod.
22         Q.    Okay.
23         A.    Not an iPad.  There were no
24   pornographic images on the iPod that I'm aware
25   of.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

22

1          Q.    I didn't ask you about pornographic
2    images.  I asked about your dissertation.
3          A.    The recordings were on the iPod.
4          Q.    Okay.  Why don't you read what I've
5    highlighted, and you can -- at least we'll have
6    that for the record.
7          A.    It states, "Thankfully, however, he
8    stated that he discovered that part of what was
9    on the computers that had been confiscated by the
10   legal authorities, he was able to discover were
11   actually on an old I-pad that he had in his
12   house.  In the process of reviewing the contents
13   of what was on the I-pad, he said that he found
14   some pornographic images."
15         Q.    All right.  So the only thing that
16   you -- what you're saying to us right now is that
17   you didn't see any pornographic images on the
18   iPod?
19         A.    Not that I recall.
20         Q.    Okay.  So if he's -- if he dictated
21   that after he would have had your meeting, that's
22   just incorrect?
23         A.    That's correct.
24         Q.    Okay.  Now, there's another reference
25   I've flagged and I want to go through that
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

23

1    regarding the dissertation, and that is
2    Exhibit 3, Bates stamp O076.  And I'm only
3    interested in the top two lines.  If you will
4    review those, please.  The date is at the top
5    again.
6          MR. TJADEN:  All right.
7          Q.    See the date?
8          A.    Correct.
9          Q.    Give us the date for the record.
10         A.    This was a record from 13 January
11   2016 at 1400.
12         Q.    And you would have seen -- is it
13   Dr. Stankus --
14         A.    It is.
15         Q.    -- is that who it is?
16         And the top two lines, would you read
17   those, please?
18         A.    That are highlighted?
19         Q.    Yes.
20         A.    "The pt. stated that he was finally
21   able to get most of his computer materials back
22   from the police department in Papillion,
23   Nebraska.  Thankfully, this included, he said,
24   information related to his doctoral dissertation,
25   as well as many music recordings that he had
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

24

1    saved."
2          Q.    Is that true?
3          A.    Yes.
4          Q.    Okay.  And so what, what was missing
5    from your doctoral dissertation that you claim
6    has not been returned to you?
7          A.    The first two years of my schoolwork.
8          Q.    Which is what?
9          A.    The first two years of classes.
10         Q.    But what's that have to do with your
11   dissertation that you're writing?
12         A.    A dissertation is a continual
13   process.
14         Q.    I understand that.  But I'm -- right
15   now if I asked you to produce your dissertation,
16   did you get what you needed from your
17   dissertation back?
18         A.    No.  I found the recordings --
19         Q.    Yes.
20         A.    -- on the iPod.  I had to re-create
21   all of the transcripts.
22         Q.    Okay.  So what you didn't get was the
23   translations of the recordings --
24         A.    Correct.
25         Q.    -- is that correct?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-9580

**Exhibit B to Valentino Affd.**

25

1          Because you had done those somehow or
2  another previously?
3      A.   That was what I was working on when
4  the police came to my house that day.
5      Q.   Okay.  And you, you are saying to me
6  right now I think that what you didn't get was
7  the translated interviews of the individuals you
8  spoke with from FARC; is that true?
9      A.   Correct.
10     Q.   But you got the rest of whatever your
11 dissertation writings were; is that true?
12     A.   Correct.
13     Q.   Okay.  How long did it take you to
14 retranslate the writings that you allege that you
15 didn't receive, the interviews?
16     A.   That's requiring speculation.  Is
17 that okay?
18     Q.   Well, yeah, give me your best
19 estimate.
20     A.   About eight months.
21     Q.   It took you eight months to
22 translate --
23     A.   You have to understand --
24     Q.   -- five interviews?
25     A.   You have to understand, these folks

26

1  don't speak the same Spanish that I speak.  So a
2  lot of their slang terminology I have to search
3  for.  I don't understand.  So, for example, they
4  were using a term for hanging bridge they were
5  saying was a hammock.  So it took me an hour to
6  try to figure out what they were trying to say
7  just for that.
8      Q.   But if you had translated it before,
9  wasn't it a lot easier the second time around to
10 figure it out?
11     A.   For that part, yes.
12     Q.   Okay.  So there were parts of the
13 interviews you hadn't even done; is that true?
14     A.   Correct.
15     Q.   Okay.  So it wasn't like you were
16 re-creating the -- I mean, it wasn't like you
17 had -- how do I want to put this?  You had
18 translated a percentage of the interviews, is
19 that true, at the time that the police showed up
20 on March, was it 15th, 16th?
21     A.   17th.
22     Q.   17th.  St. Patty's Day of 2015?
23     A.   Yes.
24     Q.   Okay.  How much percentage do you
25 think you had already typed out?

27

1      A.   Maybe 30, 35 percent.
2      Q.   Okay.  So the other 65 percent was
3  untranslated in any event; correct?
4      A.   That is correct.
5      Q.   Okay.  So how much did it take you to
6  re-create the 35 percent that you had already
7  translated before and knew what they were saying?
8      A.   Probably -- here's the thing, it
9  wasn't just that I was translating, I was also
10 adding footnotes into it.  For example, casa
11 verde, the green house, was actually an area that
12 the FARC was -- that the FARC actually used, and
13 when it was described in the translations, I had
14 to search for the references to that again to
15 refresh my memory of what it was.  So it probably
16 took me still about three to four months for that
17 beginning part because it was heavy with all of
18 the references.
19     Q.   So am I understanding then the claim
20 regarding your dissertation was that the
21 interviews that you had translated 35 percent of
22 were missing when you got the hard drives
23 returned to you?
24     A.   The 35 percent plus the references,
25 correct.

28

1      Q.   Okay.  As I understand the record in
2  this case, Mr. Petersen worked out some kind of
3  agreement between your computer specialist and
4  the State of Nebraska to return portions that
5  were not otherwise confiscated and determined to
6  be illegal; is that true?
7      A.   That is correct.
8      Q.   Okay.
9      A.   Unfortunately, what I was working on
10 was only on my laptop.
11     Q.   Okay.  And so the portion we're
12 talking about as far as your claim is concerned
13 were the translations?
14     A.   The transcriptions --
15     Q.   The transcriptions of the
16 translations?
17     A.   -- of the translations, correct.
18     Q.   Okay.  So you basically had to
19 re-create the translations?
20     A.   Correct.
21     Q.   Okay.  I understand that now.  Now,
22 there is also in Exhibit Number 2, that is your
23 answers to interrogatories and responses to
24 request for production of documents, and I'm
25 going to hand you what has been marked as Exhibit

**Exhibit B to Valentino Affd.**

29

1  Number 2.  And since they're not verified under
2  oath, I'm going to ask you now, have you had an
3  opportunity to review those responses that were
4  prepared by your counsel given your input?
5      A.   I have.
6      Q.   Is there any inaccuracies in your
7  responses that you would like to correct now?
8      A.   No.
9      MR. TJADEN:  Which ones are we
10  looking at?  Your set?  Correct?
11      MR. VALENTINO:  Yes.  Exhibit 2.
12      MR. TJADEN:  Go ahead.
13  BY MR. VALENTINO:
14      Q.   So there's no corrections you want to
15  make to that; is that true?
16      A.   No.
17      Q.   Okay.  So I'm going to ask that you
18  sign the last -- I think it's the
19  second-to-the-last page.
20      A.   (The witness complied.)
21      Q.   And do you now swear under oath that
22  those answers are correct and true?
23      A.   Yes.
24      MR. TJADEN:  For the record, we had
25  prepared the signature page Wadith Paul Nader.
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

30

1  He took out Paul and put his middle name
2  Stockinger in there.
3      Q.   Okay.  If you want to correct that,
4  go ahead and do so.
5      MR. TJADEN:  Just on the signature
6  page.
7      Q.   Yeah.  It's the second-to-the-last
8  page?
9      A.   Okay.
10      Q.   Thank you.  Now, Mr. Nader, I want to
11  talk to you now about the criminal case.  And
12  before I do that I want to talk to you about what
13  obviously you've identified I believe in your
14  meetings with Dr. Stankus as an obsession or
15  addiction, is that true, to pornography?
16      A.   Yes.
17      Q.   And I know this is maybe
18  uncomfortable for you to talk about this in the
19  midst of people, but you and I are having this
20  conversation.  So I want you to think of --
21  nobody else is in this room except you and I and
22  your attorney, okay?
23      A.   Okay.
24      Q.   All right.  One of the things I noted
25  in the interviews with Dr. Stankus was that you
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

31

1  told him you had over 2 million images on your
2  computer involving pornography; is that true?
3      A.   That is correct.
4      Q.   Okay.  And that you would go to a
5  certain website in order to download these
6  things; is that true?
7      A.   That is correct.
8      Q.   Okay.  Do you know the name of that
9  website or the letters for it?
10      A.   I do not recall.  I have not been to
11  that website since before I was arrested.
12      Q.   I understand.  I saw something
13  about -- something MG maybe.  Does that ring a
14  bell at all?
15      A.   (The witness shook head side to
16  side.)
17      Q.   Go ahead.
18      A.   Wow.
19      MR. TJADEN:  If you can recall.
20      A.   I can't, but I'm surprised I can't.
21      Q.   Well, I thought the last -- let me
22  just check here and see.  When was the last time
23  you would have seen Dr. Stankus?
24      A.   Should be in the record.
25      Q.   Would it be April 14th of 2016?
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

32

1      A.   That sounds about right.  I think I
2  recall.  I think it was ImageFap.com.
3      Q.   I read that somewhere.  Image?
4      A.   ImageFap.
5      Q.   F-A-P?
6      A.   I think that's what it was or
7  something along those lines.
8      Q.   Okay.  And that rings a bell with me.
9  It might even be in your --
10      A.   Police report.
11      Q.   Yeah, I think that's right.
12      A.   Because I'm pretty sure I told
13  Detective Svajgl.
14      Q.   Now, can you kind of explain what
15  that website is?  I mean, is it a situation
16  where -- it's not a paid website, is it?
17      A.   It is not.
18      Q.   Okay.  People can put anything
19  involving pornography into that website; is that
20  true?
21      MR. TJADEN:  Well, object to
22  foundation.  Go ahead and answer if you can.
23      Q.   If you know.
24      A.   As far as I know, the website on the
25  very bottom says all models are over 18.
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

33

1    Q.   I didn't ask you that.  I'm just
2  asking you, people can contribute to that
3  website?
4    A.   I have never done it.  I assume so.
5    Q.   Okay.  Because I got the impression
6  from reading some of the things between you and
7  your attorney that -- Mr. Petersen, Tom
8  Petersen -- that it was a legal website?
9    A.   Correct.
10   Q.   But that people could contribute any
11  images they wanted to?
12   A.   I believe so.
13   Q.   Okay.  Which is obviously where the
14  child images showed up when you downloaded
15  whatever mass things you did?
16        MR. TJADEN:  Well, I'm going to
17  object to the form of the question, assumes --
18   Q.   Let me ask it a different way for
19  you.  You tell me how those images ended up on
20  your computer.
21        MR. TJADEN:  I'm going to object to
22  the form of the question.
23   A.   The images weren't on my computer.
24   Q.   What were they on?
25   A.   I have no idea.  I've never seen the

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

34

1  images.  I don't have any images of a child
2  nature.
3    Q.   Well, then who put them in the
4  recycle bin?
5    A.   They weren't in the recycle bin.
6    Q.   Did you read the Nebraska State
7  Patrol investigative report in this matter?
8    A.   I did.
9    Q.   Do you realize that they analyzed
10  your computer images?
11   A.   I do.
12   Q.   Do you realize that they found those
13  images in your recycle bin?
14   A.   I'm at a loss.
15   Q.   For what?
16   A.   I never had any child pornography
17  that I'm aware of.  I don't like children.
18   Q.   That's not what I'm asking.
19        MR. TJADEN:  No, just answer the
20  question.
21   Q.   I'm trying to figure out how those
22  images got on your computer because they were
23  found on your computer by the Nebraska State
24  Patrol forensics lab.
25        MR. TJADEN:  I'm going to object to

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

35

1  the form of the question.  I think that assumes
2  evidence -- or facts not in evidence.  Go ahead
3  and answer if you can.
4        MR. VALENTINO:  Yet anyway.
5    A.   I don't know.
6        MR. TJADEN:  Well, yet is today.
7    A.   I don't know.
8    Q.   You haven't read the report?
9    A.   I have read the report.
10   Q.   Okay.  Well, then let's talk about
11  that.  I'm referring you to what is marked as now
12  Exhibit 14 which is county Bates stamped 140.
13        MR. VALENTINO:  Do you have it?
14        MR. TJADEN:  Well, I've got a lot
15  of -- I don't have the -- what's Nebraska
16  State Patrol technical crimes unit?
17        MR. VALENTINO:  It's 140 on the Bates
18  stamp.
19        MR. TJADEN:  August 18th, okay.
20        MR. VALENTINO:  You got it?
21        MR. TJADEN:  Yeah.
22  BY MR. VALENTINO:
23   Q.   Okay.  Mr. Nader, I'm going to hand
24  you what has been marked as 140.
25   A.   Okay.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

36

1    Q.   And I've highlighted several things.
2  Have you reviewed this report before?
3    A.   I have.
4    Q.   Okay.  So let's go to the blue tabs,
5  the first blue tab.  There you go.
6    A.   Okay.
7    Q.   Let me just flip this around here.
8  The first blue tab is right here.  I want you to
9  read the highlighted portions of that report,
10  please, which are 000143 of Exhibit 14.
11        MR. TJADEN:  Moved to a different
12  page.
13   A.   Page 4.  "According to CVIP report
14  #84278, images '1773334201.jpg' and
15  '409277812.jpg' contain child victims who have
16  been identified by law enforcement as the 'Blue
17  Pillow' series and the 'Colorful Bedroom' series,
18  respectively."  And then it skips down.  "While
19  all of these images were located in the Recycle
20  Bin, all were previously located in the 'arely'
21  folder of the Administrator user account."
22   Q.   Do you know what the "arely" folder
23  is?
24   A.   I do.
25   Q.   What is it?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

37

```
1       A.    It was a folder that I had.
2       Q.    Okay.  And was it supposed to have a
3  "B" in front of it?
4       A.    It was.
5       Q.    So it'd be a "barely" folder?
6       A.    Correct.
7       Q.    Barely what?
8       A.    Barely legal.
9       Q.    Okay.  And do you know from reading
10 this report how those images got into your
11 recycle bin?
12      A.    I do not.
13      Q.    Is it possible that you saw them,
14 were offended by them, and deleted them and they
15 went to your recycle bin?
16            MR. TJADEN:  Objection.  Form of the
17 question.
18            THE WITNESS:  Do I answer?
19            MR. TJADEN:  Yeah, you can answer.
20 BY MR. VALENTINO:
21      Q.    That was the other thing I didn't
22 tell you.  He can object all he wants to.
23 There's no judge here today so he's just making
24 that for the record.
25      A.    That is correct.
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

38

```
1       Q.    That you were offended by them?
2       A.    I may have been.  I could have been.
3       Q.    Okay.
4       A.    I still to this day have never seen
5  the images.
6       Q.    Okay.  But they ended up in your
7  recycle bin according to this report; is that
8  true?
9       A.    According to the report.
10      Q.    Okay.  Do you deny that happened,
11 that they ended up in your recycle bin?
12            MR. TJADEN:  Objection to foundation.
13      A.    I can't say.
14      Q.    Okay.  The next page is page 5 of 10
15 of the report which is county Bates stamped
16 000144 in Exhibit 14.  Would you read the
17 highlighted portions of that report, please?
18      A.    I will.  "I used X-Ways to copy out
19 necessary registry hives and ntuser.dat files and
20 examined them using Registry Browser.  The
21 computer name was PAULS and last shutdown date
22 was 3/16/2015 at 22:22 hours.  The machine was
23 running Windows 8.1 with a registered owner being
24 wadith@hotmail.com.  There was one user created
25 account called Paul."
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

39

```
1       Q.    Does that describe your computer?
2       A.    It does.
3       Q.    One more reference here, perhaps two.
4  The next page is page -- the one that's marked as
5  page 7 of the report, Exhibit 15.  Would you
6  read, please, the highlighted portions?
7       A.    Beginning at the top?
8       Q.    Yes, beginning at the top.
9       A.    "I performed a search for c:/Other in
10 X-Ways.  I received many text hits including
11 filenames '1773334201.jpg', '409277812.jpg',
12 '1600471024.jpg', and '1766201396.jpg' from a
13 file called WetTransferInfo.dat with a creation
14 date of 12/09/2013."
15      Q.    Do you recognize this
16 WetTransfer.dat?
17      A.    I believe it is a Windows transfer.
18      Q.    What does that allow you to do on
19 your computer?
20      A.    It transfers things from one computer
21 to another when you're upgrading.
22      Q.    And is it done with this Windows Easy
23 Transfer feature?
24      A.    I assume.
25      Q.    Does that feature guide a user
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

40

```
1  through the process of transferring files and
2  settings from one computer to another?
3             MR. TJADEN:  Foundation.  Go ahead
4  and answer.
5       A.    I assume.
6       Q.    Provide that back to me, please.
7  Handing you back what has been marked as
8  Exhibit 14 of 000146.  Mr. Nader, would you read
9  the next highlighted portion of that exhibit,
10 page 7?
11      A.    A total of 157 --
12      Q.    I think you just missed the "There
13 were six folders in this directory...."
14            MR. TJADEN:  Whoa, whoa, whoa.  What
15 are you asking him to read, the highlighted
16 portion?
17      Q.    The paragraph right above it.
18      A.    I'm sorry.
19      Q.    Yes, sir.
20      A.    "There were six folders in this
21 directory dating from 12/5 to 12/10/13.  The
22 WetTransferInfo.dat file that lists these hits
23 were located in folder '2013-12-10' with a
24 created date of 12/9/2013 at 23:47 and modified
25 date of 12/10/13 at 08:06."
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

THIBAULT, SUHR & THIBAULT
(402) 331-2500

**Exhibit B to V. Valentino Affd.**

41

1    Q.    And the next sentence is a
2 conclusion, is it not?
3           MR. TJADEN:  Objection as to the
4 foundation.
5    Q.    Would you read that, please?
6    A.    "Based on these test results, it
7 appears the above named files existed on the
8 machine as of 12/09-10/2013."
9    Q.    Do you have any specific recollection
10 of that, sir?
11   A.    No.
12   Q.    Now, the next paragraph that starts
13 with "A total of."
14   A.    "A total of 157,432 files were
15 transferred with 47,618 of those files being
16 copied to C:/Other and 2,905 of those files being
17 copied to C:/Other/arely."
18   Q.    Should that read "barely"?
19         MR. TJADEN:  Objection as to
20 foundation.
21   A.    No.
22   Q.    Okay.  Go ahead.
23   A.    "At the time of the transfer, there
24 were 36 folders located in C:/Other/arely to
25 include notable folder names listed below.  This

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

42

1 does not include the folders created within these
2 subfolders."  An Excel spreadsheet of the
3 transferred folders can be found in the Windows
4 Artifacts section of this report.
5         MR. TJADEN:  Transferred files.
6    Q.    Transferred files.
7    A.    Transferred files.
8    Q.    Okay.  Now, listed below are certain
9 categories.  Did you create those categories for
10 your computer?
11   A.    Maybe.
12   Q.    Okay.  Well, is that a maybe yes or a
13 maybe no?
14   A.    It's a maybe I don't recall.
15   Q.    Okay.  Maybe you don't recall.  Well,
16 would you have categorized different types of
17 porn on your computer, the main images you had?
18   A.    Yes.
19   Q.    And would some of those include these
20 categories involving teens?
21   A.    Yes.
22   Q.    The page before that, sir.  And just
23 let me grab that from you.  On page 6 of the
24 report there is a "Search History" category.  I
25 want you to take a look at that, please.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

43

1    A.    Okay.
2    Q.    Do you see the paragraph b of "Search
3 History"?
4    A.    Yes.
5    Q.    Okay.  And according to this report
6 from Shelby Mertins from the Nebraska State
7 Patrol technical crimes unit, it says she used an
8 Internet Evidence Finder to extract keywords and
9 phrases used to conduct Internet searches.
10   A.    Okay.
11   Q.    Do you see that?  Under Section 1(b)
12 under that she apparently parsed search inquiries
13 using Bing and Bing Videos in Firefox and Opera
14 Browsers.  Do you recognize any of the dates or
15 the titles of things that you might have been
16 reviewing or looking at that were listed in that
17 particular website that you told us about?
18   A.    Only one stands out.
19   Q.    Which is?
20   A.    Rainbow party.
21   Q.    Okay.  And that would be the one
22 dated 1-1-15?
23   A.    Correct.
24   Q.    Do you recall having any of these
25 searches done on your computer by you for these

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

44

1 various categories listed on 1(b) of the search
2 history?
3    A.    I do not recall.
4    Q.    Do you deny that you did this?
5    A.    I do not.
6    Q.    One other thing, Mr. Nader, I want to
7 go through with you.  I'm going to hand you what
8 has been marked again as Exhibit 14.  We're now
9 on page 8 which is county Bates stamped 000147.
10 Would you please review what Ms. Mertins
11 performed a visual examination of the remaining
12 images and videos?
13   A.    Do you want me to read it out loud?
14   Q.    Yes.
15   A.    "I performed a visual examination of
16 the remaining images and videos and classified 3
17 additional" videos in violation --
18   Q.    Images.
19         MR. TJADEN:  Slow down.
20   Q.    Yeah.  Additional images.
21   A.    Additional "...images and videos and
22 classified 3 additional images as in violation of
23 state statute §28-813.01.  Hash values for the
24 images were submitted to the National Center for
25 Missing and Exploited Children for possible

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

45

1  matches to a child or children previously
2  identified by law enforcement.  The results are
3  shown below.  The NCMEC report can be found in
4  the 'NCMEC' section of this report.
5           "The image file named '405401360.jpg'
6  depicts a nude female who appears to be 12-14
7  years of age sitting outdoors with her legs
8  closed and displaying her underdeveloped breasts.
9  This image was located at 'Others/arely' and
10  'Other/Awesome'.  Per NCMEC, this image has not
11  been identified by Law Enforcement.
12           "The image file named '656469771.jpg'
13  depicts a nude female who appears to be 12-14
14  years of age standing outdoors.  The female has
15  underdeveloped breasts and no apparently
16  developing pubic hair.  This image was located at
17  'Other/arely'.  Per NCMEC, this image has not
18  been identified by Law Enforcement.
19           "The image file named '772074859.jpg'
20  depicts a female who appears to be 12-14 years of
21  age wearing only a pink skirt lying on a bed with
22  colored pillows.  Her legs spread exposing her
23  vagina.  She has underdeveloped breasts,
24  developing hips and some pubic hair.  This image
25  was located at 'Other/arely'.  Per NCMEC, this
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

46

1  image has not been identified by Law Enforcement.
2           "111 images and 1 video were
3  classified as Age Difficult.  The images depict
4  age difficult females in various states of dress
5  including nude and engaging in sexual situations.
6  None of the files came back as identified by Law
7  Enforcement."
8       Q.  Now, the two categories that stand
9  out to me that I want to talk to you about is
10  this other/arely.  That was one of the names you
11  attributed to one of your files regarding your
12  pornography; is that true?
13       A.  Correct.
14       Q.  And the other one says other/awesome.
15  Is that another name you used for another group
16  of files?
17       A.  It could be.
18       Q.  Okay.  Well, can you tell us if it
19  was?
20       A.  I'm assuming yes.
21       Q.  Okay.  At the very bottom and under
22  number 3 it says, "Files obtained from Microsoft
23  for the wadith@hotmail.com account."  Before I
24  ask you about that, the images that are reported,
25  was your e-mail wadith@hotmail.com?
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

47

1       A.  It was.
2       Q.  Okay.  At that time?
3       A.  No.  At the time of the arrest?
4       Q.  Yes.
5       A.  It was not.
6       Q.  Okay.  Prior to that?
7       A.  Yes.
8       Q.  And when did you have that file or
9  have that e-mail address locked up, shut down, or
10  otherwise discarded?
11       A.  I believe it was sometime in December
12  of 2014.
13       Q.  And do you recall how that happened?
14       A.  Hotmail told me I violated their user
15  agreement.
16       Q.  Okay.  Did you know what that meant?
17       A.  I knew that there were many different
18  things on the user agreement.
19       Q.  But I mean did you know specifically
20  why they locked your account?
21       A.  They told me, if I recall, I think
22  they said something about child pornography.
23       Q.  And did you call Microsoft?
24       A.  I did.
25       Q.  And was it -- was there a security
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

48

1  number for them to be contacted on?
2       A.  There wasn't.  I had to create a new
3  account and e-mail them.
4       Q.  All right.  And what would that
5  account have been?
6       A.  I think it was
7  paulnader33@hotmail.com.
8       Q.  Did you download any pornographic
9  images on that e-mail account?
10       A.  Not that I'm aware of.
11       Q.  Do you still have that e-mail
12  account?
13       A.  I think I could probably access it.
14       Q.  Okay.
15       A.  I haven't used it in a long time.
16       Q.  When was the last time that you would
17  have used it?
18       A.  Probably January, maybe February
19  of 2015.  I used a Gmail account.  Gmail seems
20  more secure.
21       Q.  And the last, the last questions I
22  want to ask you deal with section number 3 of
23  page 8 of the Mertins report from the Nebraska
24  State Patrol technical crimes unit.
25       A.  Okay.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-9900

**Exhibit B to V. Valentino Affd.**

49

1    Q.   Can you tell us what the
2    investigation showed for the images that they
3    obtained?
4    A.   Do you want me just to read it?
5    Q.   Yes, sir.
6    A.   "Using EnCase 7, I created a case
7    called Microsoft Search Warrant on the TCL
8    network server.  I added each of the folders to
9    the case and performed pre-processing including a
10   keyword search for '1773334201.jpg',
11   '1850260232.jpg', '409277812.jpg',
12   '829555945.jpg', '864858517.jpg',
13   '1600471024.jpg', and '1766201396.jpg'.  This
14   produced hits on all 7 images being located at
15   'Documents/Other/arely' in Skydrive.  The path,
16   'Other/arely', is consistent with the location
17   files with the same name that were stored on the
18   HP Envy laptop (lab reference number
19   2005-27-1-1-HD1) and on the HP Pavilion laptop
20   (lab reference number 2015-27-1-3-HD2).  Also
21   located in 'Documents/Other/arely',
22   '368391694.jpg', '1894962318.jpg' and
23   '219432669.jpg' that depicted children previously
24   identified by Law Enforcement.  These images were
25   also located on the HP Pavilion laptop (lab
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

50

1    reference number 2015-27-1-3-HD2).  Please see
2    section E. 1. b. i."
3    Q.   Now, did you own this HP Envy laptop
4    that is referenced in the section under images?
5    A.   If it is my HP Envy laptop, then yes.
6    Q.   And how about the HP Pavilion laptop?
7    A.   We had an HP Pavilion laptop, yes.
8    Q.   And would the laptops -- what was
9    returned to you by the authorities?
10   A.   External hard drives, several -- a
11   box of broken hard drives, a transformer, ASUS
12   Transformer laptop, that's it --
13   Q.   Okay.
14   A.   -- that I recall.  There may have
15   been more.
16   Q.   Were the hard drives from the HP Envy
17   laptop or the HP Pavilion laptop?
18   A.   I'm sorry?
19   Q.   Were the hard drives that were
20   returned to you from the HP Envy laptop or the HP
21   Pavilion laptop?
22   A.   No, I don't believe so.
23   Q.   In any event, your attorney had
24   worked out with the county attorney's office the
25   return of everything else except for the things
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

51

1    determined to be pornographic?
2    A.   No.
3    Q.   And other than the -- other than the
4    transcripts that you've talked about, was
5    anything else other than that otherwise returned
6    to you?
7    A.   I'm sorry, can you ask the question
8    again?
9    Q.   Yeah.  What was returned to you was
10   everything but the pornographic images; is that
11   true?
12   A.   No.
13   Q.   Okay.  Was that returned to you?
14   A.   Some of them were, yes.
15   Q.   The ones that were considered to be
16   adult?
17        MR. TJADEN:  Objection.  Form,
18   foundation.
19   A.   I don't know.
20   Q.   Okay.  Well, you had images returned
21   to you?
22   A.   There was a hard drive that had many
23   images on it.
24   Q.   Okay.
25   A.   And I didn't know what they were
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

52

1    going to return.  They returned this, I destroyed
2    it.
3    Q.   Okay.  But it had the -- some
4    pornography on it apparently?
5    A.   It did.
6    Q.   Okay.  The only other thing that was
7    not returned to you, as I understand from your
8    dissertation and our questions regarding that,
9    was the transcribed interviews and footnotes that
10   you had put together?
11   A.   That is correct.
12   Q.   Okay.  So the images that are
13   mentioned in the report of -- on page 8 and 9,
14   did that culminate in the filing of Exhibit
15   Number 4, the criminal complaint, that is Nader
16   exhibit --
17        MR. TJADEN:  I'm going to object as
18   to form and foundation.  If you know what the
19   county attorney was thinking, go ahead and answer
20   that.
21   Q.   That's not what the county attorney
22   was thinking.  Do you know of any other images
23   other than what were listed in this report that
24   you were charged with?
25        MR. TJADEN:  I'm going to object as
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

THIBAULT, SUHR & THIBAULT
(402) 961-0360

**53**

1  to form and foundation.
2      A.   No.
3      Q.   Didn't your attorney explain those to
4  you?
5      A.   Possibly.
6      Q.   Possibly? Mr. Petersen that you paid
7  a $10,000 retainer for never told you what those
8  seven counts related to?
9      A.   Yes, he did. I haven't seen this
10  paper to my knowledge.
11      Q.   You never saw the criminal complaint
12  that was filed against you?
13      A.   I don't recall seeing this.
14      Q.   So Mr. Petersen never gave you a copy
15  of what you were charged with?
16      A.   He may have. It didn't look like
17  this.
18      Q.   Okay. If we take Mr. Petersen's
19  deposition, do you think he's going to say that
20  he never gave you a copy of that complaint?
21      A.   I'm not saying I wasn't made aware.
22  I'm saying this -- right now sitting here today,
23  I don't -- this doesn't look familiar to me.
24      Q.   Do you realize that's an official
25  record?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**54**

1      A.   Okay. I understand.
2      Q.   Okay.
3      A.   I'm sure we spoke about it.
4      Q.   Comes right off of JUSTICE.
5      A.   Okay.
6           MR. TJADEN:  You might have to
7  explain what JUSTICE is.
8      Q.   JUSTICE is a court filing record
9  system.
10      A.   Okay.
11      Q.   Any attorney that's licensed that has
12  access password-wise can get into your official
13  file.
14      A.   Okay.
15      Q.   All right. That complaint came from
16  the official court file.
17      A.   Okay.
18      Q.   All right. And what you're telling
19  us, you're not sure if Mr. Petersen actually went
20  over those charges with you?
21           MR. TJADEN:  I think that misstates
22  his testimony.
23      Q.   Well, you tell me what you're trying
24  to tell me.
25      A.   I'm sure we spoke about what the

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**55**

1  charges were. I don't recall seeing it in this
2  way. I don't think he sat there and read me this
3  piece of paper, but we did talk about the
4  charges, yes.
5      Q.   Didn't the Court explain the charges
6  to you when you went for your first bond setting?
7      A.   I have to apologize. Most of those
8  days are a blur.
9      Q.   Okay.
10           MR. TJADEN:  What's your question,
11  Counselor? Did the Court explain his charges, or
12  did they show him this document? Because you're
13  asking about the document. He's told you he's
14  been explained the charges.
15      Q.   Okay. Well, let's do it this way:
16  Do you know there's a recording by the Court of
17  all your proceedings?
18      A.   Uh-huh.
19      Q.   Yes?
20      A.   Yes.
21      Q.   Did the Court read to you the
22  official charges that were lodged against you at
23  a hearing?
24      A.   Yes.
25      Q.   Okay.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**56**

1      A.   I believe so.
2      Q.   And do you recall if he read all
3  seven counts against you?
4           MR. TJADEN:  As best you can recall.
5      A.   I don't.
6      Q.   You don't recall?
7      A.   I'm sorry, I don't remember much of
8  those days.
9      Q.   How much -- I don't want -- I didn't
10  want to ask you that one.
11      A.   I'm sorry.
12           MR. TJADEN:  Answer the question.
13           THE WITNESS:  I'm trying.
14  BY MR. VALENTINO:
15      Q.   You recall the bond hearings that you
16  had, yes?
17      A.   I recall standing there.
18      Q.   Numerous times?
19      A.   I do.
20      Q.   Trying to get your bond lowered and
21  they kept raising it?
22      A.   Yes. No.
23      Q.   Well, didn't Mr. Perlman actually get
24  into it over some Russian box that they thought
25  you were keeping hidden passports and things like

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

THIBAULT, SUHR & THIBAULT
(402) 981-5300

57

1   that in?
2       A.   Yes.
3       Q.   And didn't he -- didn't Perlman tell
4   you or didn't he tell your attorney that we think
5   he's a flight risk, we're going to ask for a bond
6   increase?
7       A.   I recall something along those lines.
8       Q.   Okay.
9       A.   I don't recall that they -- I
10  remember verbiage that that was going to happen.
11  I don't remember whether or not he actually did
12  that.
13      Q.   Okay.  Might have been that your
14  attorney fended that off?
15      A.   Possibly.
16      Q.   Did your bond ever change?
17      A.   Yes, it did.
18      Q.   To what?
19      A.   It went down to 50,000.
20      Q.   Okay.  It was set at what?
21      A.   200,000 initially.
22      Q.   All right.  And you folks raised the
23  money to post that?
24      A.   We had the money liquid, but we
25  didn't know what my legal fees were going to be.

58

1       Q.   Okay.  And apparently the money was
2   kept in this Russian box, wasn't it?
3            MR. TJADEN:  Object to the form of
4   the question.
5       Q.   Well, it's a fair question.  I can go
6   back to a lot of references of it if you want to.
7   I mean, I listened to all your recordings between
8   you and your wife, so let's not play a game.
9       A.   No, no, no.  Let me clarify.  I don't
10  know where my wife put the money.
11      Q.   Okay.
12      A.   But the key to whatever box it was in
13  was in a little Russian icon box on her
14  nightstand.
15      Q.   Okay.  And is that what's referenced
16  in these recordings that the county attorney's
17  office was listening to?
18      A.   I imagine so.
19      Q.   Well, if you actually said it in the
20  transcript that they screwed up and thought about
21  this Russian box being some deal that you were
22  going to get your passport and flee to Russia who
23  has no extradition treaty with the United States,
24  isn't that why they were talking about raising
25  your bond?

59

1            MR. TJADEN:  Objection to foundation
2   as to why --
3       A.   I don't know why they wanted to do
4   that.  I know they said I was a flight risk.  I
5   don't know if it was that they thought I was
6   going to Russia.
7       Q.   Okay.  Do you recall having those
8   discussions with your wife?
9       A.   Yes.
10      Q.   Okay.
11      A.   I recall having some discussions
12  along those lines.
13      Q.   Okay.  All right.  Fair enough.  Did
14  you ever have any photos provided to you
15  regarding the search of your premises that you
16  recall?
17      A.   No.
18      Q.   Okay.  Do you know if they
19  photographed any?
20      A.   My house?
21      Q.   Yes.
22      A.   You mean the police?
23      Q.   Yes.
24      A.   The only one -- possibly.  I don't
25  know.  I have no idea.

60

1       Q.   You didn't see anybody photographing
2   things in your house; is that true?
3       A.   That's correct.
4       Q.   Okay.
5       A.   The only, the only image I can think
6   of, I think in the police report there's a
7   picture of the house.
8       Q.   Yeah, I think they got that off the
9   county assessor's website.
10      A.   Okay.
11      Q.   As part of a search warrant.  Were
12  you given a copy of the search warrant, by the
13  way?
14      A.   Yes, I think I was.
15      Q.   Okay.  So why don't we run through
16  the actual St. Patty's Day escapade on March 17th
17  of 2015.  What were you doing that morning?  Was
18  it in the morning?
19      A.   It was.
20      Q.   Okay.  Tell us what you were doing
21  that morning before the local authorities came to
22  your house.
23      A.   I don't remember when I woke up,
24  8:30, 9-ish which is when I usually do.  My wife
25  was not there.  So actually I stand corrected.  I

61

1  would have woken up earlier because my wife was
2  on temporary duty at a different base.  I took my
3  children to school.  I came back.  I may have had
4  breakfast along the way.  If not, then I made
5  myself something at home.  I turned on some
6  music.  I turned on my computer and I started --
7  to my recollection I started transcribing.
8  School is expensive and I'm trying -- I was
9  trying to get it done as expeditiously as
10 possible.
11     Q.   Do you know what computer you were
12 using on that?
13     A.   I was using the Envy, if I remember
14 correctly.  Yeah, I'm pretty sure it would have
15 had to have been the Envy, that's what I did all
16 my work on.
17          I listened to the words.  I
18 changed -- I wrote them in Spanish, changed them
19 into English.  And then I think around 10:30,
20 11-ish I expected the mail which usually comes
21 around 11.  There was a knock at the door
22 somewhat forceful.  I opened the door and it was
23 a raid.
24     Q.   Okay.  The SWAT team show up at your
25 door?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

62

1     A.   There were many, many officers.  I
2  don't know if any of them were SWAT.
3     Q.   Were any of them FBI?
4     A.   FBI came later.
5     Q.   Okay.  Was that with the bomb tech
6  squad?
7     A.   That's correct.
8     Q.   All right.  Let me -- let's walk
9  through this then.  You were still in your
10 pajamas?
11     A.   Correct.
12     Q.   And after the knock on the door, did
13 they announce who they were?
14     A.   They did.  Papillion police is what I
15 heard.
16     Q.   Did they say they had a search
17 warrant?
18     A.   They did.
19     Q.   Okay.  And did they give you a copy
20 of the search warrant at some point in time
21 during that process?
22     A.   I'm sure they probably did.  We
23 obtained it somehow, so I'm sure they probably
24 did.
25     Q.   I'm going to hand you a couple of

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

63

1  exhibits here, Mr. Nader.  First of all --
2          MR. TJADEN:  I don't want to steal
3  your exhibits.
4          MR. VALENTINO:  Oh, you sure you
5  don't like to take my stuff?
6          MR. TJADEN:  I only want your stuff
7  that you have your personal notes on.
8          MR. VALENTINO:  Okay.  I'll give
9  those to you in a minute.
10 BY MR. VALENTINO:
11     Q.   Mr. Nader, I'm going to hand you what
12 has been marked as Exhibit 9 which is a search
13 warrant.
14     A.   Okay.
15     Q.   And then there's an affidavit and
16 application for issuance of the search warrant.
17 I want you to tell me which of these documents
18 that you recall being given at the time of this
19 March 17th raid on your house versus when you
20 might have obtained the affidavit possibly later,
21 or was that at the same time?
22     A.   I recall as soon as they came into my
23 house, I got pushed up against my closet.  My
24 hands were held behind my head -- or behind my
25 back, sorry.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

64

1     Q.   Were you cuffed?
2     A.   I don't believe so.  I think it was a
3  zip tie maybe.
4     Q.   All right.
5     A.   Later on they took them off while
6  they were speaking to me.  I was up against my
7  closet.  They then said we're Papillion police,
8  do you know why we're here, and I said no.  And
9  then they showed me a piece of paper while I'm
10 like this, while -- my hands behind my head, and
11 they said this is a search warrant.  So I don't
12 know whether it was the affidavit and application
13 or if it was the search warrant itself.
14     Q.   The search warrant is actually signed
15 by a judge, is it not, on the last page?
16     A.   Yes, this one is signed.
17     Q.   Okay.  Is that what you would have
18 seen?
19     A.   Probably.
20     Q.   Okay.  You weren't aware at the time
21 of their affidavit to get that search warrant
22 issued though, were you?
23     A.   I had no idea.
24     Q.   Okay.
25     A.   I had no idea.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**
THIBAULT, SUHR & THIBAULT
(402) 981-9580

65

1    Q.    Now, going back to Microsoft and the
2   wadithnader@yahoo.com.  When you had those
3   discussions with Microsoft and they told you you
4   had violated the terms of their user agreement,
5   did they tell you what those terms were?
6    A.    I seem to recall them saying
7   something about child pornography.
8    Q.    Okay.  Now, did that send any bells
9   off in your head about, oh, my God?
10   A.    No.
11   Q.    Okay.
12   A.    I responded back letting them know
13  that pictures of my children in the bathtub,
14  which is what I assumed it was, I didn't see
15  why -- I had no idea.
16   Q.    Okay.  And what you're telling me I
17  think is you did not knowingly or purposely
18  download child pornography?
19   A.    That is correct.
20   Q.    Okay.  And that was your defense for
21  the trial that was going to take place, was it
22  not?
23   A.    We hadn't talked about a defense.
24   Q.    You did with your attorney?
25   A.    We talked about what could happen.
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

66

1   He asked me questions.  I've never, I've never --
2   I've never intentionally downloaded any kind of
3   child pornography.  I'm not interested in
4   children --
5    Q.    Okay.
6    A.    -- in that way.
7        MR. TJADEN:  Just answer the
8   question.
9    Q.    Well, my question really goes to
10  whether or not your defense for the trial was
11  going to be that you didn't knowingly download
12  child pornography?
13   A.    I don't recall.  I'm assuming it --
14  well, no.
15   Q.    You looked at the statute, didn't
16  you?
17   A.    I did.
18   Q.    You saw the word "knowingly," didn't
19  you?
20   A.    I did.
21   Q.    Okay.
22   A.    I'm assuming.
23   Q.    Didn't you and your wife talk about
24  the fact that you didn't knowingly do this?
25   A.    Possibly.  I don't recall
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

67

1   conversations I had with my wife three years ago.
2    Q.    Okay.  Well, there's, there's a disk
3   of them.
4    A.    Okay.
5    Q.    You haven't listened to it yet, have
6   you?
7    A.    That's fine.
8    Q.    Have you?
9    A.    I have not.  I have not.
10   Q.    Okay.  All right.
11   A.    If you say they're on the recordings,
12  I --
13   Q.    Okay.  And you can satisfy yourself
14  if you want to listen to all 36 hours like I did.
15   A.    Can you give us a copy?
16   Q.    You have one.  You have one.
17   A.    Okay.
18   Q.    And you also apologize to your wife
19  for putting her in the predicament that you put
20  her in, didn't you?
21   A.    I did, probably.
22   Q.    But you also said you were addicted
23  to porn, didn't you?
24   A.    I'm sure I probably did.
25   Q.    And you also said that you needed
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

68

1   help; isn't that true?
2    A.    Probably so.
3    Q.    Okay.  Because you recognize that
4   there was some significant issues that you had
5   going on in your life that stress caused you to
6   engage in behavior that you ordinarily wouldn't
7   have been engaged in; is that true?
8    A.    That's correct.
9    Q.    Okay.  And your Dr. Stankus
10  identified that for you, didn't he?
11   A.    He said he believed it was an
12  addiction if I remember our --
13   Q.    I think he called it obsessive
14  compulsive disorder?
15   A.    Correct, obsessive compulsive.
16   Q.    And you had an outside psychiatrist
17  put you on some kind of antidepressant as well,
18  did you not?
19   A.    That's correct.
20   Q.    It began with an L.  What was the
21  name of the drug?
22   A.    I don't recall.  I took it once.  It
23  made me feel very strange and I --
24   Q.    Well, I think Stankus --
25   A.    -- quit taking it.
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

69

1    Q.   -- told you to go back to your
2    psychiatrist and modify that drug --
3    A.   I -- right.
4    Q.   -- didn't he?
5    A.   I did not.
6    Q.   But you didn't take it again after
7    that, did you?
8    A.   I didn't see him again.
9    Q.   Okay.
10   A.   I didn't see the psychiatrist again.
11   I saw him one time.
12   Q.   Right.  I understand that.  You lost
13   confidence in him in terms of the drug he gave
14   you?
15   A.   I lost confidence in him because when
16   I explained why I was there and why I was under
17   stress, he didn't seem to understand.  And to me
18   if you don't understand your patient, can't
19   really help them.
20   Q.   Well, and there were several times
21   when you -- after you saw Dr. Stankus for help
22   that you told him that you relapsed, didn't you?
23   A.   Correct.
24   Q.   Okay.  And by relapse I'm assuming
25   you meant you got stressed to a point where you

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

70

1    went back to a habit that you had basically given
2    up at one point?
3    A.   That's correct.
4    Q.   Okay.  Called an addiction, isn't it?
5    A.   Yes.
6    Q.   Okay.  And you've tried to fight
7    that --
8    A.   I have.
9    Q.   -- ever since, haven't you?
10   A.   I have.
11   Q.   Do you think you have control of it
12   now?
13   A.   I think I have control of it at
14   times, yes.
15   Q.   Okay.  You're not on any medication
16   today as we speak, are you?
17   A.   The only medication I've ever taken
18   for any of this was the one prescribed by the
19   psychiatrist.
20   Q.   Was it Lexapro?
21   A.   I have no idea.
22   Q.   Yeah, it's in your medical --
23   A.   It's in the record.
24   Q.   Yeah, I saw it.  Okay.  I also noted
25   something and I -- in your conversations that you

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

71

1    had that were being apparently recorded by the
2    jail and listened to by either the county
3    attorney's office or jail staff or somebody in
4    the county attorney's office, you seem to have a
5    fixation that Mr. Perlman was somehow Jewish and
6    you were Middle Eastern.  You recall those
7    conversations?
8    A.   I think so.
9    Q.   Okay.  And you were paranoid about
10   that, weren't you?  You thought it was somebody
11   setting you up to put you against a Jew, isn't
12   that what you called him?
13   A.   You have to understand, half my
14   family is Jewish.
15   Q.   I get that.
16   MR. TJADEN:  Just answer the
17   question.
18   Q.   I heard that.
19   A.   Yes, I believe that that may have
20   been a motivator.
21   Q.   Okay.  You don't know if it was just
22   a random assignment from the county attorney's
23   office opposed to something intentional?
24   A.   I'm hoping it was.  I don't think it
25   was intentional.  I don't know that it was.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

72

1    Q.   All right.  I think you referred to
2    Mr. Perlman as either stressed or that his body
3    language indicated to you that he was stressed?
4    A.   Potentially.
5    Q.   Okay.
6    A.   He seemed flustered.
7    Q.   Perhaps a lot of cases, that kind of
8    the impression you had?
9    A.   I did get that feeling.  But also he
10   was dressed down by the judge one time.
11   Q.   Okay.  Maybe overzealous in the
12   courtroom?
13   A.   Potentially.
14   Q.   Okay.  In any event, he was the one
15   that dismissed your charges, wasn't he?
16   A.   That's correct.
17   Q.   But he dismissed them without
18   prejudice, didn't he?
19   A.   That's correct.
20   Q.   So, I mean, you weren't, quote, found
21   not guilty, were you?
22   A.   I was not.
23   Q.   And you weren't acquitted of the
24   charges; correct?
25   A.   That's correct.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 331-2500

**Exhibit B to Valentino Affd.**

73

```
 1    Q.   Okay.
 2    A.   The charges were just dropped.
 3         MR. TJADEN:  You answered the
 4  question.
 5    Q.   I understand.  We talked about
 6  dismissal, same thing.
 7         You, you -- your attorney hired a
 8  fellow to kind of be the computer expert
 9  reviewer?
10    A.   That's correct.
11    Q.   What was his name, do you remember?
12    A.   I have his card.
13    Q.   Wasn't he a convicted felon?
14         MR. TJADEN:  Foundation.  If you
15  know.
16    A.   I believe he was.
17         MR. VALENTINO:  He does know.
18    A.   I believe he may have been.
19    Q.   Okay.  I think Mr. Petersen explained
20  that to you so that it was a full disclosure that
21  this guy was a pretty sharp cookie but he did
22  have a past anyway.
23    A.   Correct.  Correct.
24    Q.   And wasn't the county attorney's
25  office hesitant to let him review some of the
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

74

```
 1  things that were on your computer?
 2    A.   Yes.
 3    Q.   Okay.  But eventually they got to
 4  review those things?
 5    A.   No.
 6    Q.   Okay.  Then it was totally based on
 7  Mr. Perlman's view that he couldn't prove that
 8  you knowingly downloaded this child porn; is that
 9  correct?
10    A.   I don't know what Mr. Perlman was
11  thinking.
12    Q.   Okay.  So if -- you didn't see the
13  notes from Mr. Perlm that we disclosed to your
14  attorney, have you?
15    A.   I don't believe so.
16    Q.   On the file, the file notes of why he
17  dismissed?
18    A.   I have -- no.
19    Q.   Okay.  Let's talk about the FBI and
20  this bomb squad that showed up.  Do you know --
21         MR. VALENTINO:  You want to take a
22  break?
23         MR. TJADEN:  No, not yet.
24         MR. VALENTINO:  We're going to get
25  close.
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

75

```
 1         MR. TJADEN:  Get close to a break or
 2  get close to --
 3         MR. VALENTINO:  No, get close to a
 4  break.
 5         MR. TJADEN:  I like it when you say
 6  getting close to finished.
 7         MR. VALENTINO:  You're dreaming.  No,
 8  I'm within half an hour probably.
 9         MR. TJADEN:  Of again finishing or
10  break?
11         MR. VALENTINO:  To both.
12         MR. TJADEN:  All right.  We can take
13  a break then.  I was figuring 11 o'clock would be
14  your two hours.
15         MR. VALENTINO:  You're right on
16  target.
17  BY MR. VALENTINO:
18    Q.   Tell me what the deal was with that.
19  Well, let me -- what the deal was.  You
20  apparently had nitric acid.
21    A.   That's correct.
22    Q.   And you are aware that that is a
23  component for bomb-making materials?
24    A.   I am now, yes.
25    Q.   Okay.  You didn't know that at the
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

76

```
 1  time?
 2    A.   No, I did not.
 3    Q.   But you were using it, as I
 4  understand it, to strip gold out of the
 5  computers?
 6    A.   Correct.
 7    Q.   The hard drives?
 8    A.   Correct.  Hard drives have platinum
 9  in them.
10    Q.   Okay.  That would strip the platinum?
11    A.   No.
12    Q.   Where's the gold at in the computers?
13  I'm always interested in recycled computers.
14    A.   The gold is actually in the chips.
15    Q.   Okay.
16    A.   All of the connectors have gold on
17  them.
18    Q.   So you would put the chips into the
19  nitric acid?
20    A.   Uh-huh.
21    Q.   Yes?
22    A.   Yes.  Sorry.
23    Q.   Okay.  And what were -- the gold, it
24  would rise to the surface or go to the bottom?
25    A.   No.  The whole process -- and I
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

77

1  haven't done it in a while, so forgive me if my
2  memory is foggy.  Basically you take it, you put
3  it into weak nitric acid.  Nitric acid eats
4  everything away.  Okay.  And then you sprinkle
5  sodium metabisulfate, if I remember correctly.
6  Sodium metabisulfate then clings to the gold
7  molecules, and the only thing that comes out is
8  gold dust at the bottom.
9       Q.   So you have to empty the nitric acid
10 out to get to the gold?
11      A.   You neutralize it, yes.
12      Q.   Neutralize it so that you don't stick
13 your arm in there and have it eaten off?
14      A.   Correct.
15      Q.   Okay.  So how much gold do you
16 collect out of so many chips?
17      A.   I actually never sent any gold
18 anywhere, so I don't know.  I was playing around
19 with it.  I couldn't figure the process out very
20 well.  I would get some gold dust at the bottom,
21 but then it was kind of difficult to try to fish
22 it out.
23      Q.   There wasn't any process that you
24 were aware of to turn it into --
25      A.   Not that I was aware of.
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

79

1       Q.   Buckets out there with --
2       A.   With a lid on it and, I mean, they
3  were neutralized.
4       Q.   Computer parts in it of some type?
5       A.   Correct.
6       Q.   Chips?
7       A.   Correct.
8       Q.   So, then I guess you had, what,
9  some books on terrorism which was kind of your
10 main --
11      A.   That's correct.
12      Q.   -- Air Force designations --
13      A.   That's correct.  Counterterrorism.
14      Q.   -- assignment?
15           So they kind of put two and two
16 together and came up with a five?
17      A.   I don't know what they did --
18           MR. TJADEN:  Objection as to form of
19 the question.
20           MR. VALENTINO:  I kind of like that
21 question.
22           MR. TJADEN:  Who's the "they" you're
23 talking about?  The people that were there first
24 or the followers?
25           MR. VALENTINO:  I'll get to it.
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

78

1       Q.   -- to something that would be
2  sellable?
3       A.   No, not like that.  I mean, there is
4  a process, but I was working on my degree and I
5  didn't put too much time to it.
6       Q.   So this was just kind of a part-time
7  thing?
8       A.   It was a hobby, something neat to try
9  to do.
10      Q.   Was it in your garage?
11      A.   It was -- no.  It was in my -- the --
12      Q.   The nitric acid.
13      A.   The nitric acid --
14      Q.   I heard something about a barrel or
15 barrels or something.
16      A.   There were -- no.  There were
17 buckets, 5-gallon buckets --
18      Q.   Okay.
19      A.   -- that I had in the backyard.
20      Q.   Oh, okay.  Is that where they found
21 them?
22      A.   I believe so.
23      Q.   Okay.  So did they have some kind of
24 connectors to them in some fashion?
25      A.   No.  No, they were just --
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

80

1           MR. TJADEN:  All right.
2  BY MR. VALENTINO:
3       Q.   So somebody decided that -- did you
4  tell them it was nitric acid?
5       A.   They asked what was there and, yes, I
6  explained.
7       Q.   Okay.  So bells went off at that
8  point?  Did they call the FBI, the bomb squad?
9           MR. TJADEN:  Again, foundation.
10      A.   I assume so.  I assume that's what
11 caused them to call.
12      Q.   Okay.  Well, they showed up --
13      A.   I don't know when they called for
14 what reason.
15      Q.   At what point in time did the FBI and
16 the bomb squad show up?
17      A.   It was a couple hours after they got
18 there if I had to estimate.
19      Q.   So how long were they there
20 approximately, Mr. Nader?
21      A.   I don't know.
22      Q.   I mean, the officers that were doing
23 the original search.
24      A.   The officers that were there.  I
25 think I was arrested around 4:30, so probably
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

THIBAULT, SUHR & THIBAULT
(402) 981-9900

81

1  five-and-a-half hours.
2      Q.   Okay.  What time do you think the
3  bomb tech and the FBI showed up?
4      A.   I believe maybe around 1:30,
5  2 o'clock.
6      Q.   In the meantime, somewhere along the
7  line the news media shows up, don't they?
8      A.   Correct.
9      Q.   And they have their cameras rolling
10 to take pictures and talk to your neighbors and
11 so forth?
12     A.   Correct.  I never saw them.
13     Q.   All right.  Well, I haven't either,
14 so on even steel there.  They did run your
15 picture though, didn't they, KETV, and put a
16 bunch of other stuff in there with the words
17 "child porn" and so forth?
18     A.   That's correct.
19     Q.   One of the things I saw which is
20 Exhibit 13, is that your mug photo with WOWT or
21 KETV or whatever other stations ran the story?
22     A.   Yes.  This is WOWT's story.
23     Q.   Okay.  So you had that to contend
24 with; true?
25     A.   Yes.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

82

1      Q.   The bad publicity?
2      A.   Correct.
3      Q.   Now, I saw in your, in your notes --
4  not your notes, Dr. Stankus's notes, that you had
5  intended to file a lawsuit against Microsoft and
6  the press.  Didn't decide to do that?
7      A.   After I realized that the press
8  didn't really do anything wrong, a lawsuit would
9  be a moot point.
10     Q.   Okay.  So if you had come to the
11 conclusion that any of the defendants hadn't done
12 anything wrong, you would have waived off on a
13 suit as well?
14     A.   I believe so.
15     Q.   Did Mr. Petersen ever explain the
16 definition of probable cause to you or reasonable
17 suspicion?
18     A.   He may have.  I don't recall at this
19 moment.
20     Q.   Okay.  How long were you
21 incarcerated, Mr. Nader?
22     A.   Twenty-eight days.
23     Q.   And did you ever see your children
24 during that time frame?
25     A.   No.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

83

1      Q.   Did you see your wife during that
2  time frame?
3      A.   Through glass, yes.
4      Q.   Did you see Father Schmitt during
5  that time frame?
6      A.   I don't know Father Schmitt.
7      Q.   Isn't there a Catholic priest that
8  you requested?
9      A.   There's an Orthodox priest and that's
10 Father Novak.  Yes, I saw him.
11     Q.   Okay.  What parish did you belong to
12 or do you belong to now?
13     A.   I did and still do belong to Holy
14 Cross Orthodox parish in Ralston.
15     Q.   And who was the pastor there?
16     A.   At the time and continually it's
17 Father Novak.
18     Q.   Okay.  I thought it was Father
19 Schmitt.
20     A.   Sorry.
21     Q.   I'm sorry, I had a name in my head.
22          I also saw that you had applied for
23 and received some kind of a license to be a
24 minster to jail ministry or something?
25     A.   I had applied to volunteer at the
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

84

1  jail.
2      Q.   For jail ministries?
3      A.   That's correct.
4      Q.   Okay.
5      A.   I saw the need while I was there.
6      Q.   And I gather that there were a number
7  of individuals there that you saw that were
8  charged with crimes that weren't doing well --
9      A.   That's correct.
10     Q.   -- with their lives and what was
11 happening to them; is that true?
12     A.   That's correct.
13     Q.   And that's what motivated you to
14 decide to do that?
15     A.   That's correct.
16     Q.   Okay.  Did that bear any fruit for
17 you at all at this point?
18     A.   It has not.
19     Q.   Okay.  Are you still inclined to do
20 that?
21     A.   Absolutely.
22     Q.   What do you think your chances are of
23 getting back into the Air Force?
24     A.   I think they're extremely good.
25     Q.   Okay.  And you said that the fellow
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

85

1  that initially -- the general that initially
2  preferred charges against you or found you in
3  violation of security clearance issues is now
4  your proponent?
5      A.  Correct.
6          MR. TJADEN:  Objection to the form of
7  the question.  Charges?  I don't know if there's
8  been any discussion about charges.
9      A.  It wasn't charges.
10     Q.  Oh, it was -- well, they call it a
11 policy --
12     A.  It was allegation.
13     Q.  A policy allegation violation?
14     A.  Security violation.
15     Q.  Okay.  They didn't file any formal
16 charges in a court-martial proceeding.
17     A.  That's correct.
18     Q.  Okay.  I understand it now.
19         MR. VALENTINO:  Thank you, Tim -- or
20 Chris.  I had a friend of mine who was named Tim.
21     Q.  Let's finish up with some of these
22 exhibits I've got here.  I'm going to hand you
23 what has been marked as Exhibit Number 5 which is
24 a probable cause detention order signed by Judge
25 Robert Wester.  Did you have any contact with
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

86

1  Judge Robert Wester?
2      A.  Yes, I did.
3      Q.  And was he the one that would have
4  explained to you the charges that were pending
5  against you?
6      A.  He was the first judge.  I'm assuming
7  he probably would have.
8      Q.  Okay.
9      A.  I don't recall him sitting there
10 doing it but....
11     Q.  Were you aware that he signed an
12 order saying that there was probable cause for
13 your detention?
14     A.  I am now.  I may have this.  This
15 looks familiar.
16     Q.  Okay.  And I'm assuming that either
17 you would have seen it as handed to you by the
18 clerk or your attorney, Mr. Petersen, would have
19 done that?
20     A.  That's correct.
21     Q.  Although you did have an attorney for
22 a couple of days before Mr. Petersen, didn't you?
23     A.  That's not -- that's incorrect.
24     Q.  Wasn't there a Mr. Fitzpatrick or
25 something --
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

87

1      A.  I met with him --
2      Q.  -- or Fitzgerald?
3      A.  Fitzpatrick I think it was.
4      Q.  Okay.  You met with him several
5  times?
6      A.  I met with him once.
7      Q.  Okay.
8      A.  And immediately right afterwards
9  Mr. Petersen came in because my wife had hired
10 him.
11     Q.  Right.  I understood that from the
12 conversations.  Do you know if you had a meeting
13 with Mr. Fitzpatrick regarding any of the
14 documents that were -- we've been going over
15 today?
16     A.  I don't recall.  Possibly.  I don't
17 recall -- I don't remember what he looks like.  I
18 don't remember what he brought with him.  I know
19 we did discuss the charges and what was
20 happening.
21     Q.  Okay.
22     A.  But at the time he was not on
23 retainer.
24     Q.  I understand.  But you didn't have
25 any problems with him?
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

88

1      A.  No.
2      Q.  I mean, apparently your wife Nikki
3  made a decision to hire Mr. Petersen because of
4  his expertise in computer crimes?
5      A.  I believe -- yes, I believe so.
6      Q.  Okay.
7      A.  That's why we went with Mr. Petersen.
8      Q.  All right.  I actually sectioned out
9  an exhibit that's duplicative, Exhibit Number 7,
10 which is actually the affidavit that was attached
11 to the probable cause detention order or would
12 have accompanied it.  That affidavit was
13 apparently done by the detective, Brian Svajgl.
14     A.  Okay.
15     Q.  Do you see that?
16     A.  I do.
17     Q.  Signed under oath by him?
18     A.  Yes.
19     Q.  Okay.  Do you know if you had seen
20 that before?
21     A.  I have seen this before.  I don't
22 know what time.  I think I received it when we
23 received the entire police report.
24     Q.  Okay.  From your attorney?
25     A.  Correct.
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

THIBAULT SUHR & THIBAULT
(402) 981-9300

89

```
 1    Q.   Mr. Petersen?
 2    A.   Correct.
 3    Q.   Because he asked for discovery, did
 4 he not?
 5    A.   I believe he did.
 6    Q.   He asked for a number of items also
 7 that be provided to him regarding the various
 8 techniques and state lab information?
 9    A.   Certifications.
10    Q.   And there was a hearing in front of
11 the judge regarding those issues?
12    A.   I believe so.
13    Q.   And you would have been present for
14 that?
15    A.   I think so, yes.
16    Q.   And Mr. Perlman I think was rather
17 vocal in objecting to some of those?
18    A.   He was.
19    Q.   Was that when he was dressed down?
20    A.   No.
21    Q.   Okay.
22    A.   I don't -- possibly.  I don't think
23 so.
24    Q.   Okay.
25    A.   I think it was before -- no, it was
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

90

```
 1 while I was still in jail.
 2    Q.   All right.  Did you ever see the
 3 Microsoft CyberTipline report made by Microsoft?
 4    A.   By the National Center for Missing
 5 and Exploited Children?
 6    Q.   Yes.
 7    A.   Yes, I have seen this.
 8    Q.   Now, are you aware of the process,
 9 Mr. Nader, regarding if, if there is, like for
10 instance, Yahoo that says you violated the terms
11 of our agreement, are you aware now of the
12 process where reports are then made to that
13 Center for Exploited Children?
14    A.   From Yahoo?
15    Q.   From Microsoft.
16    A.   From Microsoft.  I am.
17    Q.   Okay.  And did you have any contact
18 with Microsoft after your account was locked in
19 December of 2014?
20    A.   Just those several times when I was
21 trying to get them to open it.
22    Q.   Okay.  And do you recall who you
23 spoke with from Microsoft?
24    A.   I typed.  And I think it was just
25 the -- I think it was signed by, like, the
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

91

```
 1 Microsoft security desk.
 2    Q.   Okay.  Do you have those e-mails that
 3 you retained?
 4    A.   I don't think so.  I don't think so.
 5    Q.   Okay.  You haven't retrieved those?
 6    A.   I think -- I don't know.  I don't
 7 know.  I may.
 8    Q.   All right.
 9         MR. TJADEN:  We can certainly look.
10    A.   We can look.
11    Q.   I'm just curious if you -- did you
12 communicate at all by phone with them?
13    A.   No.
14    Q.   Okay.  Do you know they were making a
15 report?
16    A.   No, I did not.
17    Q.   You know that now?
18    A.   I do.
19    Q.   And do you know that those reports
20 are then turned over to local law enforcement?
21    A.   I know that now.
22    Q.   Okay.
23    A.   Of course.
24    Q.   You were unaware of that at the time?
25    A.   Correct.
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

92

```
 1    Q.   So when the local police showed up at
 2 your doorstep on March 17th of 2015, you were
 3 unaware that this process had been going on for
 4 several months with the reporting and then the
 5 transmission of that information?
 6    A.   That's correct.  I had no idea.
 7    Q.   Or that affidavits were being
 8 prepared for that search warrant because of
 9 those, of those tips?
10    A.   That's correct.
11    Q.   Okay.
12    A.   I had no idea.
13    Q.   All right.  At the time of your
14 arrest and incarceration, your wife was afforded
15 an opportunity to go to Rota, Spain, to take
16 command of an Air Force base there?
17    A.   That's inaccurate.
18    Q.   Okay.  What was --
19    A.   She was given a job with NATO at --
20 in Madrid.
21    Q.   Okay.  Why did I think Rota?
22    A.   There's a Navy base in Rota.
23    Q.   Yeah, okay.  I apologize.  Was she
24 going to be a commanding officer of a division or
25 do you know?
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

93

1    A.    You'll have to ask her --
2    Q.    Okay.
3    A.    -- what the position was.
4    Q.    All right.  In any event, did you
5  folks have friends or relatives in Spain?
6    A.    My cousin is a dentist in Madrid.  My
7  aunt lives in Marbella which is down south.  And
8  my cousins, my cousin lives in Barcelona.
9    Q.    Was that assignment, to your
10 knowledge, eventually canceled by her commanding
11 officer?
12   A.    Yes, it was.
13   Q.    And was that at her request?
14   A.    It was at her request because of my
15 arrest.
16   Q.    I understand.  Now, there's one other
17 thing I want you to identify if you can.  I think
18 I've covered all the exhibits.  That's Exhibit
19 Number 6, it's a page from a report prepared by
20 the Papillion Police Department Detective Ryan
21 Svajgl.
22   A.    Okay.
23   Q.    And I've highlighted the area that I
24 think you in your complaint have listed as -- I
25 think you called it an order to have you

              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

94

1  arrested.  Did you ever meet Jennifer Miralles
2  while you were in your -- while you were being
3  prosecuted?
4    A.    I have never met her.
5    Q.    You never saw her appear in the
6  courtroom?
7    A.    I never did.  She may have.  I don't
8  know what she -- I didn't know what she looked
9  like.
10   Q.    Okay.  Am I correct in assuming that
11 that language that is contained in Exhibit
12 Number 6 -- I think it's 6 --
13   A.    It is.
14   Q.    -- is the language that you are
15 relying on to involve her in this process?
16   A.    Yes.
17   Q.    Okay.  Do you know of any other
18 reason to have involved her in that process?
19   A.    No.
20   Q.    Is there any reason that -- let me
21 ask it this way:  Did you have any contact at all
22 with the county attorney, Lee Polikov?
23   A.    No.
24   Q.    Did he ever appear in court when you
25 were there, to your knowledge?

              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

95

1    A.    Possibly.  Not to my knowledge.
2    Q.    Okay.  You never had any
3  conversations with your attorney regarding
4  Mr. Polikov or his involvement in this case, have
5  you?
6    A.    I don't think so.
7    Q.    Okay.  And were you shown any kind of
8  document other than the one page of the police
9  report on Exhibit 6 to lead you to believe that
10 Mr. Polikov was somehow behind the actions of
11 Ms. Miralles?
12   A.    No.
13   Q.    Let me just make sure I got all the
14 exhibits talked about here.  Make sure I retrieve
15 all the exhibits here for us in order.
16         The last question I have for you is:
17 Did you also talk about wanting to include
18 Microsoft in this lawsuit?
19         MR. TJADEN:  Objection as to the form
20 of the question.  Talk about with whom?
21   Q.    Did you tell, did you tell
22 Dr. Stankus that you wanted to include Microsoft
23 in this lawsuit?
24   A.    At the time, yes, I believe I did.
25   Q.    Okay.  And you decided that that

              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

96

1  would be fruitless?
2          MR. TJADEN:  Objection as to form of
3  the question.
4    Q.    Why didn't you?
5    A.    I believe they are --
6          MR. TJADEN:  I'm going to object to
7  the extent that the ultimate decision may involve
8  attorney/client communications.
9    Q.    He can tell me his own reasons.  I'm
10 not asking you about what you told your attorney
11 or what he told you.  Do you have your own
12 impression of why you told Dr. Stankus that you
13 did not want -- that you wanted to include them
14 and then changed your mind?
15   A.    Yes.  I think it would be fruitless.
16         MR. VALENTINO:  Okay.  Thank you.  I
17 have nothing further.
18         MR. TJADEN:  All right.
19         (A short recess was taken.)
20              CROSS-EXAMINATION
21 BY MR. KUNHART:
22   Q.    Good morning, Mr. Nader.  My name's
23 Ryan Kunhart and I represent the City of
24 Papillion, Bryan Svajgl, Benjamin Iversen, and
25 Scott A. Lyons in the lawsuit that you filed

              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 331-2500

**Exhibit B to Valentino Affd.**

97

1  against Sarpy County and those defendants.
2          What I'm going to try and do here,
3  I'm going to try and stay somewhat organized, but
4  the questions that Mr. Valentino asked you, I
5  have some follow-ups on those issues and then I
6  also have some other questions about his exhibits
7  and some additional exhibits.
8          So starting off, there was an *Omaha*
9  *World-Herald* article about when you filed the
10 present lawsuit against the defendants.  And in
11 that article it had stated that you had moved to
12 New Jersey.
13     A.    That's correct.
14     Q.    Why is that?
15     A.    I don't know.  I never spoke to the
16 reporter.
17     Q.    You've never talked to the *Omaha*
18 *World-Herald*?
19     A.    I never have.
20     Q.    Has your wife?
21     A.    Not to my knowledge.
22     Q.    Do you know how the *World-Herald*
23 found out about your lawsuit, this present
24 lawsuit?
25     A.    I can only speculate.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

98

1      Q.    What's your guess?
2      A.    I am a resident of New Jersey because
3  of the military, so maybe that's where they got
4  it.  I have no idea otherwise.
5      Q.    So do you have a New Jersey driver's
6  license?
7      A.    I do not.
8            MR. TJADEN:  Counselor, maybe we can
9  clear this up a little bit.  I think the
10 complaint does allege that Mr. Nader -- the
11 Naders are residents of --
12           MR. KUNHART:  Yeah, it does.
13 Paragraph 6 and 7.
14           MR. TJADEN:  So we've alleged their
15 residency and that is their residency.  And it's
16 based upon Air Force rules that you can have a
17 residency in any state.  And their residency has
18 always been -- Mr. Nader's residency has always
19 been in New Jersey.
20 BY MR. KUNHART:
21     Q.    When your Microsoft account was shut
22 down in December of 2014, did you tell your wife?
23     A.    I believe I did, yes.
24     Q.    Do you remember what you told her?
25     A.    I told her what they had told me.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

99

1      Q.    Which is that you had violated the
2  user agreement?
3      A.    Correct.
4      Q.    Do you remember what her response
5  was?
6      A.    Well, I seem to recall something
7  along the lines of, well, this is again -- my
8  account had been hacked prior in I think 2012, so
9  we assumed that maybe something had happened.
10     Q.    That Hotmail account that you talked
11 about earlier had been hacked?
12     A.    That's correct.
13     Q.    Did you tell her that Microsoft told
14 you that it had been shut down due to child
15 pornography?
16     A.    I don't recall.  I probably did.
17     Q.    So if you were hacked in 2014 -- I'm
18 sorry, 2012 and you had concerns about being
19 hacked again, did you do any follow-up to see if
20 you were hacked?
21     A.    Microsoft is who told me that I was
22 hacked.
23     Q.    In 2012?
24     A.    Correct.
25     Q.    So you were concerned in 2014 that
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

100

1  you might have been hacked again?
2      A.    Correct.
3      Q.    Did -- were you ever able to confirm
4  that you were or were not hacked in 2014?
5      A.    I didn't have access to the account.
6  So, no, I couldn't figure it out.
7      Q.    Once it was shut down in December
8  of 2014, you had no further access to the
9  account?
10     A.    That's correct.
11     Q.    Talking --
12     A.    To the best of my knowledge.  But let
13 me clear something up.  I seem to recall that
14 even though the account was shut down on my
15 computer, my laptop, I believe I could still
16 access it for a little bit, maybe for like a
17 month more, on my cell phone.  Which if it was
18 truly shut down, I shouldn't be able to access it
19 at all.  Does that make sense?
20     Q.    Yeah.  So --
21     A.    So I thought it was some kind of
22 weird hack thing.  So as I talked to Microsoft, I
23 still kind of had access through probably January
24 of 2015.
25     Q.    Only through your cell phone?
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

**Exhibit B to Valentino Affd.**

Page 97 to 100 of 167

```
                                              101
1       A.   Through my cell phone.
2       Q.   Was that cell phone seized by the
3  Papillion Police Department?
4       A.   It was.
5       Q.   What was the e-mail account
6  associated with the account that was shut down?
7       A.   Wadith@hotmail.com.
8       Q.   And then a month later you just
9  couldn't access it, it was shut down, or how did
10 that end?
11      A.   My phone -- if I remember correctly,
12 my phone did a software upgrade that requires the
13 phone to shut down and turn back on.  Once it
14 turned back on, I had no access.
15      Q.   On your phone could you still access
16 the Skydrive?
17      A.   I never used Skydrive, so maybe.
18      Q.   So you could only access the e-mail?
19      A.   Correct.  That's all I used that
20 e-mail address for.
21      Q.   Talking about the ImgFap website,
22 were you a member?
23      A.   No.
24      Q.   Were -- was it a -- do you remember,
25 was it a subscription service?
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

```
                                              102
1       A.   It was not.  It's just a -- like a
2  bulletin board.
3       Q.   So anyone can go on, you don't have
4  to pay $20 a month to have access to the images?
5       A.   I seem to recall that there was a
6  login part to it.  I never needed -- I never did
7  it.
8       Q.   Are you aware what the difference
9  between a logged-in member and a nonlogged-in
10 member was with the website?
11      A.   I am not.
12      Q.   When your -- when you go to the
13 website ImgFap.com, how does it work?  Do you
14 have to click on an image, see if you want to
15 download it and download it, or you download it
16 in groups?
17      A.   You don't download it -- to my
18 knowledge you don't download it in groups.  You
19 click a link of, like, one picture and then it
20 shows you the rest of the pictures.  And then you
21 click on each picture that you want to see, it
22 gets big, and then if you want to save it, you
23 right click and you save it.  That's why all of
24 these file names have numbers.  It's something
25 random I suppose that they did.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

```
                                              103
1       Q.   So you actually see each image that
2  you download?
3       A.   Yes.
4       Q.   On the ImgFap website are the images
5  organized or foldered in any way?
6       A.   They may be now.  As I said, I
7  haven't been on the site since before I was
8  arrested.
9       Q.   When you were on it in -- when did
10 you start using the website?
11      A.   I don't recall.  Somewhere maybe
12 2013.
13      Q.   You were -- were you still using the
14 website up until your arrest in March of 2015?
15      A.   Yes.
16      Q.   So during that time frame how were
17 the images organized?
18      A.   The front page has the banner at the
19 bottom all models are over 18.  Then they have
20 different pictures.  If you're interested in that
21 one picture, that person, you click on it.  Off
22 to the right hand -- or to the left-hand side
23 there's different groupings.  So if you like
24 blondes, there's blondes.  If you like feet,
25 there's feet.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

```
                                              104
1       Q.   So they're foldered based on --
2  they're foldered based on certain preferences?
3       A.   Correct.
4       Q.   What browser or browsers would you
5  use when you were searching for porn to download?
6       A.   At the time I think I was using
7  Firefox, possibly Opera.
8       Q.   Did you have any specific add-ons or
9  any sort of software that allowed you to, I
10 guess, go behind the scenes of these websites and
11 just download a bunch of pictures without looking
12 at each one?
13      A.   No.
14      Q.   Earlier when you were talking to
15 Mr. Valentino you mentioned that you had a porn
16 addiction.  When would you say that that
17 addiction began?
18      A.   Probably -- I guess I'm going to have
19 to ask for a little clarification.  Porn
20 addiction to Internet-based?  Porn addiction to
21 just naked people?
22      Q.   Let's start with naked people.
23      A.   I started seeing images as a child,
24 so probably seven or eight years old.  I wouldn't
25 necessarily call it an addiction at the time.  As
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500
```

Exhibit B to V. Valentino Affd.

105

1  I grew from -- as I went through puberty and I
2  was able to procure *Playboy* magazines, that type
3  of thing, then it seemed a little bit easier to,
4  I guess, nurture the addiction.
5       Q.   And then did -- go ahead.
6       A.   And so it just kind of went from
7  there.  It got larger.
8       Q.   And then eventually with the Internet
9  you started looking at porn on the Internet?
10      A.   Correct.
11      Q.   Did you ever talk to your wife about
12  your -- and are you okay with me calling it a
13  porn addiction?  Is that word okay?
14      A.   It is.  It's okay because it is.
15      Q.   Okay.
16      A.   I don't like it, but....
17      Q.   Is there a word that you prefer me to
18  use?
19      A.   No.  That's fine.
20      Q.   Did you ever discuss your addiction
21  with your wife?
22      A.   Quite often.
23      Q.   Did -- when did you say you got
24  married?  Was it 1998?
25      A.   1998, yes, in Sarpy county.  2000 in
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

106

1  North Carolina.
2       Q.   Did she know about your porn
3  addiction back when you got married in 1998?
4       A.   I don't recall.  Possibly.  You'll
5  have to ask her.
6       Q.   What sort of discussions would you
7  have with her about this?
8       A.   No, I explained that I had this
9  compulsion, I'm interested in seeing pictures of
10  naked women.  And so we would kind of talk about
11  that.  She would try to give me pointers.  That's
12  where it mostly came from.  A lot of times I was
13  just complaining about it.  It took up a lot of
14  time.
15      Q.   Going back before you were arrested,
16  had you ever sought counseling or therapy for the
17  porn addiction?
18      A.   I had not.
19      Q.   If you take a look at Exhibit
20  Number 14 which is the Nebraska State Patrol
21  report, the -- I think it's Bates stamped, the
22  page that I showed you there, county -- is it
23  144?
24      A.   Yes.
25      Q.   To county 145.  There's discussion on
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

107

1  those pages that you went through with
2  Mr. Valentino about specific images that were
3  found on your computer.
4       A.   Yes.
5       Q.   Do you remember talking to
6  Mr. Valentino about that?
7       A.   I do.
8       Q.   Do you dispute that those images were
9  found on your HP Envy?
10      A.   I don't know that they were because
11  we -- our expert was never able to do that search
12  on his own.
13      Q.   But do you dispute that those images
14  were found on your computer?
15           MR. TJADEN:  Objection.  I mean,
16  asked and answered.  If you're asking did he --
17  does he dispute that the person who wrote this
18  report says they were there, that's a different
19  question.  He's already answered the question.
20      Q.   Were you ever able to uncover any
21  evidence that those images were not found on your
22  computer?
23      A.   No.
24           MR. TJADEN:  Objection.  Form of the
25  question.
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

108

1       Q.   Do you know as we sit here today if
2  there's a mirror image of your computer with the
3  Nebraska State Patrol?
4       A.   I do not.
5           MR. TJADEN:  You mean at this time?
6           MR. KUNHART:  Correct.
7  BY MR. KUNHART:
8       Q.   Do you know currently if the Nebraska
9  State Patrol has a mirror image of your laptop?
10      A.   I do not.
11      Q.   I'd like to show --
12           MR. TJADEN:  Hang on just a second.
13      Q.   I'd like to show you what's been
14  marked as Exhibit 1 which is a copy of the
15  complaint that you filed, the present lawsuit.
16  And that's kind of more for reference.  I'm
17  specifically looking at page 10, count III.
18      A.   Okay.
19      Q.   The conspiracy claim is what I want
20  to talk about.  If you look at Exhibit Number 2
21  which is -- which are your answers to Sarpy
22  County's interrogatories.  I'd like you to look
23  at your answer to interrogatory number 7 where
24  you talk about -- specifically about the
25  conspiracy claim.
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

109

1     A.   Okay.

2     Q.   In your answer to interrogatory

3 number 7, you talk about a conspiracy between the

4 detectives, County Attorney Miralles and their

5 respective employers, the City of Papillion and

6 Sarpy County, specifically Detectives Svajgl and

7 Iversen.  You go on to say the conspiracy started

8 on or about December of 2014.  What's your basis

9 for that statement?

10    A.   My understanding is that's when they

11 received the information from NCMEC or from the

12 State.

13    Q.   And what's that understanding based

14 on?

15    A.   The police report.

16    Q.   Any -- what other evidence do you

17 have regarding a conspiracy that started in

18 December of 2014?

19    A.   That is what I have.

20    Q.   Okay.  Then if you go on to the next

21 sentence it states, I'm looking at interrogatory

22 number 7, "The specific nature of the agreement

23 was to make an arrest of Mr. Nader regardless of

24 Mr. Nader's actual guilt."  What's the basis for

25 making that statement?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

110

1     A.   I was arrested with very minimal,

2 very minimal proof.

3     Q.   Any other basis for that statement

4 that the agreement was to make an arrest of you

5 regardless of your actual guilt?

6     A.   The -- not at this time, but

7 discovery still continues.

8     Q.   When the police came to your house on

9 March 17th, there were a number of guns found

10 throughout the house.

11    A.   That's correct.

12    Q.   Where did all those guns come from?

13    A.   Some were mine.  Some were my wife's.

14 Some were my wife's father's who's passed away

15 and he had an extensive collection.  So we were

16 holding them for my mother-in-law.

17    Q.   Are you and your wife both

18 collectors?

19    A.   Our collection has dwindled, but,

20 yes, I would probably say that we're collectors.

21    Q.   How many -- I guess how many guns

22 would you estimate you had in your house in March

23 of 2015?

24    A.   At the time I think we took probably

25 in the order between 35 and 40 to the base

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

111

1 armory.  So probably along -- about that number.

2     Q.   Thirty-five or 40 in the house?

3     A.   Correct.

4     Q.   How many of those guns were loaded?

5     A.   Probably only three or four.

6     Q.   Where were those three or four

7 located?

8     A.   They were located in areas that were

9 difficult for the children to get to.  So the top

10 of the closet, they were top of my chest of

11 drawers, that type of thing.

12    Q.   Were you aware that one of the guns

13 was found to be used in an armed robbery?

14    A.   No.

15         (Deposition Exhibit Number 15 was

16 marked for identification.)

17    Q.   Mr. Nader, I'm showing you what's

18 been marked as Exhibit Number 15.

19    A.   Okay.

20    Q.   Did you prepare this?

21    A.   Yes, I believe I did.

22    Q.   When did you prepare it?

23    A.   A couple weeks ago.

24    Q.   Did you just -- did you do it on an

25 Excel spreadsheet?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

112

1     A.   Yes.

2     Q.   So you have not been employed since

3 2011?

4     A.   That's correct.

5     Q.   Have you applied for any jobs since

6 2011?

7     A.   No.  That's not true.  I have applied

8 for some federal jobs, FBI and one of the analyst

9 jobs at StratCom.

10    Q.   What jobs -- walk me through for all

11 those jobs that you've applied for when did you

12 apply for them, what was the job?

13    A.   In -- right around the time I left

14 the Air Force, about 2012, I applied for a job

15 that was opening at StratCom.  There were over a

16 hundred applicants, two of them with PhDs, if my

17 memory serves correctly.  Needless to say I

18 didn't get that job.

19         Then I applied for a job with the FBI

20 as an analyst because I still had a clearance.

21 And I took their -- they actually had a test.  I

22 made the cut and I moved on to the next level,

23 but to my understanding, if my memory serves

24 correctly, and maybe I'm wrong, but they at the

25 time just did this in case an analyst position

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

Exhibit B to V. Valentino Affd.

THIBAULT, SUHR & THIBAULT
(402) 961-0000

113

1  opened up and there weren't any.
2      Q.   So it was just kind of a we don't
3  have an open job but if one opens up we want to
4  have someone in line that they can step right in?
5      A.   Correct.
6      Q.   When -- do you remember when you
7  applied for that job?
8      A.   I don't.
9      Q.   Was it before or after you were
10 arrested?
11     A.   It was before.  Well before.
12     Q.   What other jobs have you applied for
13 since --
14     A.   That's it.  That's it.  I've been
15 focusing on my doctorate work.
16     Q.   So since your arrest you have not
17 applied for any jobs?
18     A.   I have applied for volunteer work and
19 I've been turned down.
20     Q.   What sort of volunteer work?
21     A.   Chaplaincy at Papillion, chaplaincy
22 at Pottawattamie, chaplaincy at Cass County.
23     Q.   Is that kind of what we talked about
24 earlier, the jail?
25     A.   Correct.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

114

1      Q.   Why were you turned down?
2      A.   They told me because I had been
3  arrested and I still had an arrest record.  They
4  told me this through the Pottawattamie County
5  chaplain -- or sorry, the Sarpy County chaplain,
6  he does both.
7      Q.   But that was all volunteer work?
8      A.   It was.
9      Q.   And currently you're trying to get
10 back into the Air Force?
11     A.   Correct.
12     Q.   Has anyone, has anyone told you -- I
13 guess where do you sit in that application
14 process?
15     A.   They made a decision allegedly on the
16 6th of June or thereabouts, and so right now
17 they're adjudicating it.  So there is motion.  So
18 a no would have been a direct letter saying no.
19 But since they're adjudicating it, it means
20 there's some motion in some manner.
21     Q.   Have you, have you had any
22 face-to-face interviews or conversations
23 regarding your application?
24     A.   I have not.
25     Q.   How -- I guess how has the
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

115

1  application proceeded?
2      A.   It is a form.  And I pushed forward
3  the form, and then they get a chance to rebut.
4  They're rebutted in November of 2016.  I then
5  responded to the rebuttal and sent it forward.
6      Q.   When you say they rebut, the Air
7  Force rebuts your --
8      A.   The Air Force, correct.
9      Q.   Okay.  On that form did you have to
10 disclose your arrest?
11     A.   No.
12     Q.   So the Air Force -- I'm talking about
13 the reapplying to the Air Force -- they don't
14 even know that you were -- about this arrest?
15          MR. TJADEN:  Objection.  Form and
16 foundation.
17     A.   I don't know.
18     Q.   But on the form that they rebutted,
19 you did not have to disclose --
20     A.   On the form I did not have to
21 disclose it, correct.
22     Q.   If you go back to, I think you have
23 it in front of you, Exhibit Number 2, the answers
24 to interrogatories.  If you look at interrogatory
25 number 10 which starts on page 5.  If you just
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

116

1  take a minute and review that specific
2  interrogatory.
3      A.   Okay.
4      Q.   Go ahead and let me know when you're
5  done.
6      A.   Okay.
7      Q.   Looking at your answer you talk about
8  how the undue hardships, emotional distress,
9  humiliation and embarrassment, so on, comes from
10 statements made by the arresting officers.
11 What -- I just want to talk right now about the
12 statements made by the arresting officers.  Which
13 officers specifically?
14     A.   The -- where are you?  Sorry.
15     Q.   I'm on the bottom of page 5.  It's
16 the second, it's the second-to-last line where it
17 talks about the damages in interrogatory
18 number 10 come from statements made by the
19 arresting officers.
20     A.   The news reports actually had an
21 interview with one of the police officers.
22     Q.   Who was that?
23     A.   His name escapes me right now.  We
24 could get you a copy if you need.
25     Q.   Is it Officer Iversen?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

117

1    A.    No.
2    Q.    Chief Lyons?
3    A.    No.
4    Q.    Detective Svajgl?
5    A.    No.  It was, I believe, Detective
6  Svajgl's boss.
7    Q.    But his name escapes you?
8    A.    I think it was Lieutenant Orin
9  something.
10    Q.    Looking at interrogatory number 10,
11  you state about statements made by arresting
12  officers.  Besides that statement that we just
13  talked about, what other statements are you
14  talking about in your answer to interrogatory
15  number 10?
16    A.    Those are the statements that I was
17  talking about.
18    Q.    Just the ones in the news article?
19    A.    Correct.
20    Q.    Do you remember who the reporting
21  agency was for that article?
22    A.    I do not.
23    Q.    Did you ever ask that news agency for
24  a retraction?
25    A.    I have not talked to the news.
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

118

1    Q.    Do you know how the news media was
2  made aware of this present lawsuit?
3    A.    I do not.
4          (Deposition Exhibit Number 16 was
5  marked for identification.)
6    Q.    I'd like to show you what's been
7  marked as Exhibit Number 16.
8    A.    Okay.
9    Q.    And ask you some questions about
10  this.
11    A.    Okay.
12    Q.    If you look at the bottom you'll see
13  the page numbers that we've been referring to
14  today.  I'd like you to flip to page it's Nader
15  0321.
16    A.    Okay.
17    Q.    And if you look towards the bottom of
18  the page there's a -- I guess, did your -- who
19  drafted this journal?
20    A.    This is my wife's journal.
21    Q.    And throughout this journal she
22  refers to P.  Is that Paul?
23    A.    I believe so, yes.
24    Q.    So when she says P, she's referring
25  to you?
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

119

1    A.    You'll have to ask her.  I believe
2  that's what it is.
3    Q.    Have you reviewed this diary prior to
4  today?
5    A.    I think I've glanced through it.
6    Q.    If you look at Nader 0321 under the
7  June 2nd entry, the third line from the bottom
8  where it reads, "P doing a lot of research.  So
9  many holes in the cop's investigative process."
10  Do you see that?
11    A.    I do.
12    Q.    What research had you been doing?
13    A.    I don't recall.
14    Q.    You don't recall any of the research
15  you'd been doing?
16    A.    No.  I think what I was doing was
17  research about child pornography.
18    Q.    What specifically?
19    A.    Well, how it gets on a computer, why
20  it would get on a computer, the fact that there's
21  usually -- there's production, there's
22  distribution, there's possession, what it all
23  meant.
24    Q.    Did you do -- if you look at the
25  next --
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

120

1    A.    And again, that is just an
2  assessment.  I don't know what she was thinking
3  when she wrote this.
4    Q.    But she says there that you've been
5  doing a lot of research.
6    A.    I can only assume that's what it was.
7  I didn't have a computer.  So I was going to the
8  library during that time frame.
9    Q.    Did you have access to a computer
10  there?
11    A.    No.  Maybe, but, I mean, I never used
12  one.
13    Q.    So --
14    A.    The judge ordered me not to have any
15  electronic.
16    Q.    So the -- when you say the library,
17  you're talking about the jail library?
18    A.    This is June 2nd.  I was out of jail.
19    Q.    Okay.  Which library would you have
20  gone to?
21    A.    I went to the Omaha Public Library
22  downtown.  I went to the Bellevue library,
23  Papillion library, the La Vista.
24    Q.    Did you ever -- to the best of your
25  recollection, you looked at books on how child
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 991-5500

**Exhibit B to Valentino Affd.**

121

```
1  pornography gets on a computer?
2       A.   They didn't have much.  I think I
3  recall psychological books.
4       Q.   Did you ever do any research on the
5  investigative tools that the defendants used?
6       A.   No.  I didn't do research, however,
7  my wife purchased a book that was like a
8  handbook, I guess, for -- this is well after I
9  was out of jail.  A handbook about the
10  investigations of child pornography.  And that
11  kind of gave me a frame of reference of how a
12  good investigation is supposed to occur.
13       Q.   That was well after you were out of
14  jail?
15       A.   Correct.
16       Q.   Do you know what the name of that
17  book is?
18       A.   I don't, but we can get you, we can
19  get you that name.
20       Q.   Do you still have that book?
21       A.   I do.
22       Q.   If you flip to page Nader 0354.
23       A.   354?
24       Q.   Correct.
25       A.   Okay.
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500
```

122

```
1       Q.   And I'll represent to you if you want
2  to take the time to go back a page or so if you
3  look -- but if you look at the -- I guess what I
4  want to talk about at the top of page 354 on the
5  fifth to sixth line from the top.
6       A.   Okay.
7       Q.   Towards the middle it says, "It's
8  obvious they're trying to hide something but
9  there's so much omitted."
10      MR. TJADEN:  Where are we looking at?
11      MR. KUNHART:  It's on page 354, the
12  fifth and sixth lines from the top.
13       Q.   Do you see that sentence where it
14  says, "It's obvious they're trying to hide
15  something but there's so much omitted"?
16       A.   I do.
17       Q.   And like I said, go back a page or
18  two, there's a lot of talk about the Nebraska
19  State Patrol report --
20       A.   Okay.
21       Q.   -- that we looked at earlier.
22       A.   Okay.
23       Q.   When your wife says, "It's obvious
24  they're trying to hide something but there's so
25  much omitted," do you know the basis for that
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500
```

123

```
1  statement?
2       A.   I do not.
3       Q.   Did you ever have any discussions
4  with your wife about problems or deficiencies
5  with the Nebraska State Patrol report?
6       A.   It was -- yeah, I remember it being
7  poorly written.  It didn't say too much.
8       Q.   What -- poorly written, what does
9  that mean?
10       A.   It was not -- it was very difficult
11  to make sense of it.
12       Q.   But did you ever have any discussions
13  about the content of the report?
14       A.   Probably.
15       Q.   Did you ever mention any deficiencies
16  with the actual content and findings of the
17  report?
18       A.   Probably.  I don't recall right now.
19       Q.   Do you remember specifically what
20  deficiencies you would have discussed?
21       A.   I don't.
22       Q.   If you look at the same page at the
23  very bottom, the last three lines there's a
24  statement that says, "Big Hole:  So the cops
25  arrested him based on the verbal orders of the
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500
```

124

```
1  Co. attorney & the 1 known pic of CP they found
2  on his HP Envy."
3       A.   Okay.
4       Q.   What -- is it your belief that the
5  police, that the Papillion police, arrested you
6  based on the verbal orders of the county
7  attorney?
8       A.   I don't know why the police arrested
9  me.  I know that that was in the report.  So I'm
10  assuming that was one of the reasons that I was
11  arrested.  But I don't know -- I don't know.
12       Q.   Okay.  If you flip the page to
13  page 356.  Towards the middle of the page there's
14  some numbered sections.  Do you see where there's
15  a number 1 and it's circled?
16       A.   I do.
17       Q.   And then after that it says, "Every
18  cop who touches this has a different version.
19  Can't go to court w/ different versions (esp
20  using the same software...."
21       A.   Okay.
22       Q.   Did you have any discussions with
23  your wife about that statement that every cop who
24  touches this, your case, had a different version?
25       A.   I believe so.
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500
```

**Exhibit B to V. Palatino Affd.**

125

1    Q.    Walk -- what were those discussions?
2    A.    If you walk through the different
3  parts of the police report, the ages change.
4    Q.    The what?
5    A.    The ages change.
6    Q.    Of the girls that were depicted in
7  the pictures on your computer?
8    A.    Of the alleged pictures, yes.
9    Q.    Besides the ages, what else -- I want
10  to know the basis for your statement that every
11  cop has a different version.
12    A.    This isn't my statement.
13    Q.    Okay.  Do you believe that the police
14  had a different version, that different police
15  officers had different versions of your arrest?
16    A.    I think that it just changed overall.
17    Q.    How?
18    A.    Well, initially I was told I was
19  being arrested on the three images that they
20  found on my computer, but if you read the police
21  report, they only allegedly found one image.  The
22  one image that they found they never discuss what
23  it is.  They never discuss where it was located.
24  So then in the police report later on after I was
25  arrested, Detective Svajgl says he's amending the
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

126

1  charges to seven instead of six but I was
2  arrested on three -- correction, to six instead
3  of seven but I was originally arrested on three.
4    Q.    Okay.  If you flip to page 362.
5  Looking towards the bottom.  The seventh line
6  from the bottom towards the end there's a
7  statement that says, "Ben said he was reviewing
8  the case too & they really don't have a case."
9    A.    Okay.
10    Q.    Are you refer -- do you know, is your
11  wife referring to Benjamin Perlman?
12    A.    I don't know.  Probably, but I don't
13  know.
14    Q.    And if you continue on it says, "In
15  the end the cops just really screwed the case
16  up."
17    A.    Okay.
18    Q.    "Ha!  An admission!"
19    A.    Okay.
20    Q.    Did -- are you -- did Ben Perlman
21  ever tell you that the cops, police officers,
22  screwed up this case?
23    A.    No.
24    Q.    Are you aware of Ben Perlman telling
25  anyone else that the cops screwed up this case?
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

127

1    A.    No.
2    Q.    If you look at Exhibit 3, looking
3  right around there.
4        MR. TJADEN:  Okay.  What are we
5  looking at?
6        MR. KUNHART:  It's page 76.
7        MR. TJADEN:  Of?
8        MR. KUNHART:  The Exhibit 3.
9        MR. TJADEN:  Which was the -- oh,
10  okay.  You know what, I think I now have that.
11        MR. KUNHART:  I have one.
12        MR. TJADEN:  No, I got it here.
13  Nader number 76?
14        THE WITNESS:  Correct.
15  BY MR. KUNHART:
16    Q.    I'm looking at a sentence there that
17  says -- and just for the record, 76 is a health
18  record from January 13th of 2016 when you saw
19  Dr. Stankus?
20    A.    Correct.
21    Q.    Looking in that second-to-last
22  paragraph there's a sentence that says, "This is
23  because, from the information that the patient
24  has gathered" -- referring to you -- "it appears
25  that some of the evidence against him may have
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

128

1  been planted."
2    A.    I'm sorry, where is this?
3    Q.    It's the second-to-last paragraph.
4    A.    Okay.  Okay.
5    Q.    Walk me through that statement.
6  What -- did you tell Dr. Stankus that you thought
7  some of the evidence against you was planted?
8    A.    I don't recall doing that.
9    Q.    Do you think some of the evidence
10  against you is planted?
11    A.    I think there's an inconsistency.
12    Q.    What inconsistency?
13    A.    The image I was arrested on is never
14  seen again.
15    Q.    What image is that?
16    A.    It's the image in the police report.
17  There's one image that allegedly is found in my
18  home on my computer.  That one image is never
19  seen again.  So I'm not saying it was planted.
20  I'm saying there's a major inconsistency.
21    Q.    But that's -- that image is the basis
22  for you telling Dr. Stankus that evidence against
23  you may have been planted?
24    A.    He wrote this.  I don't know what he
25  was thinking when he wrote it.
          THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

Exhibit B to Valentino Affd.

THIBAULT, SUHR & THIBAULT
(402) 981-5500

129

1      Q.    Okay.  But besides that image that
2  you just talked about --
3      A.    Correct.
4      Q.    -- do you have any other basis to
5  think that any evidence against you was planted?
6      A.    No.
7      Q.    If you continue on in that document
8  on page 80, I'm in the third-to-last paragraph
9  kind of towards the middle.
10      A.    Okay.
11      Q.    There's a statement which I'm looking
12  at the middle of the sentence where it says
13  "...which is the crime lab for the State of
14  Nebraska in Lincoln Ne, he discovered" -- I think
15  this is a typo -- "his not certified to
16  investigate computer computers and computer
17  software."
18          MR. TJADEN:  Counselor, for the
19  purposes of clarity, can we read the whole
20  sentence?
21          MR. KUNHART:  Yeah.
22          MR. TJADEN:  Instead of jumping in?
23  BY MR. KUNHART:
24      Q.    Why don't you read that sentence for
25  me going back up to "One."

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

130

1      A.    It's a very big run-on.
2      Q.    That's why I was just trying to limit
3  it.
4      A.    "One factor that could help him
5  greatly, he explained, is that the crime
6  laboratory that had investigated his computers
7  and alleged that he had such unacceptable images
8  on his computer, which is the crime lab for the
9  State of Nebraska in Lincoln Ne, he discovered
10  his not certified to investigate computer
11  computers and computer software."
12      Q.    And is Dr. Stankus referring you
13  discovered that the crime lab was not certified
14  to investigate computers and computer software?
15      A.    Actually, I believe my wife found
16  that.
17      Q.    Okay.  Then why does the record say
18  he discovered?
19      A.    The -- it's also not written very
20  well.  I think Dr. Stankus was rushing.
21      Q.    Did -- what did your wife tell you
22  about her discovery that the crime lab was not
23  certified to investigate computers and computer
24  software?
25      A.    She told me that the crime lab wasn't

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

131

1  certified.  They had just gone through a major
2  certification program, and they were certified on
3  many other things but computers and computer
4  software was not one of them.
5      Q.    Who issued the certification?
6      A.    I don't recall.
7      Q.    Do you know, the certification, is it
8  an annual certification?
9      A.    I do not.
10      Q.    Do you know what, what the crime lab
11  was certified in?
12      A.    I seem to recall fingerprints.  I
13  don't recall the other ones.
14      Q.    If the crime lab wasn't certified,
15  why didn't you name them in the lawsuit?
16      A.    Because we decided that they weren't
17  the ones that arrested me.  They weren't the ones
18  that kind of put my name and damaged my
19  reputation.
20      Q.    Who's Benjamin Iversen?
21      A.    I don't know.  I think it's Detective
22  Iversen.
23      Q.    Do you know what -- what was his
24  involvement with your arrest?
25      A.    My understanding, according to the

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

132

1  police report, is he was the computer technician,
2  scanned the computer.
3      Q.    Did you ever have any discussions
4  with Detective Iversen?
5      A.    No.
6      Q.    Are you aware if your wife ever had
7  any discussions with Detective Iversen?
8      A.    No.
9      Q.    And who is Scott Lyons?
10      A.    I believe Scott Lyons is the chief of
11  police.
12      Q.    With Papillion?
13      A.    Correct.
14      Q.    What was his involvement with your
15  arrest?
16      A.    He was the chief of police at the
17  time that I was arrested.
18      Q.    But he personally was not on scene
19  when you were arrested?
20      A.    I do not know.  I was sequestered in
21  my front office.  He may have been.
22          (Deposition Exhibit Number 17 was
23  marked for identification.)
24      Q.    Show you what's been marked as
25  Exhibit Number 17.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

133

1      A.    Are we done with this?

2      Q.    Yeah.  Which are copies of the

3  initial disclosures that you provided in this

4  case.

5      A.    Okay.

6      Q.    Looking at page 3, subparagraph (l)

7  where it talks about Dr. Stankus and how you saw

8  him up until mid-2016.

9      A.    Uh-huh.

10     Q.    Might have talked about this earlier,

11 but why did you stop seeing Dr. Stankus in 2016?

12     A.    I felt I was getting better and I

13 felt he wasn't helping me anymore, so I didn't

14 really see the need.

15     Q.    Have you seen anyone for those issues

16 since 2016?

17     A.    I have not.

18     Q.    I guess there's a time gap there.  So

19 we talked about how you hadn't seen anyone prior

20 to your arrest, but what about from the time of

21 your arrest up until the time of your release

22 from prison?  Did you see any psychologist or

23 counseling?

24     A.    I never went to prison.  You mean

25 jail.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

134

1      Q.    Jail.

2            MR. TJADEN:  And that's our typo.

3  It's written prison in the --

4      Q.    No, I guess what I'm asking for is

5  from the time that you were arrested until your

6  release, I believe it was 21 days, did you see

7  anyone --

8      A.    Twenty-eight days.

9      Q.    -- did you see anyone in, in the jail

10 for -- any psychologist or therapist?

11     A.    No, I did not.  My attorney and I

12 spoke about getting a psychological profile, and

13 so as soon as I got out I saw Dr. Delaet.

14     Q.    Okay.  Looking at the same document,

15 page 4.  If you look at -- looking at the bolded

16 part, section 3, the alleged damages in this

17 case.

18     A.    Okay.

19     Q.    3(c) where it talks about your lost

20 wage claim.

21     A.    Okay.

22     Q.    Stacey -- "Mr. Nader's loss of wage

23 claim, which at this time is not specifically

24 known, but is believed to be a minimum of

25 $420,000.00 not adjusted to inflation."  How did

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

135

1  you arrive at that $420,000 figure?

2      A.    That is based off of -- that was

3  based off of a couple different calculations.  I

4  don't have them in front of me right now.

5      Q.    Can you provide us those

6  calculations?

7      A.    I think we probably can.

8      Q.    What were -- even though you don't

9  have them in front of you, what was the basis for

10 those calculations?

11     A.    It was my earning potential of my

12 last rank and it was other things along those

13 lines.

14     Q.    What was your last rank?

15     A.    I was a major.

16     Q.    And what would your rank be if you

17 receive this new job with the Air Force?

18     A.    I would be either a major or

19 lieutenant colonel.  More than likely lieutenant

20 colonel.

21     Q.    And then on the military hierarchy,

22 is a lieutenant colonel higher than a major?

23     A.    Yes.

24     Q.    Are you paid according to pay tables?

25     A.    Yes.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

136

1            (Deposition Exhibit Number 18 was

2  marked for identification.)

3      Q.    Show you what's been marked as

4  Exhibit Number 18.

5      A.    Okay.

6      Q.    Where -- and I know these are 2017

7  pay tables, but just for a point of reference,

8  when you left the military back in 2012 where

9  were you on these pay tables?

10     A.    I would have been as an O-4.

11     Q.    What page are you looking at?

12     A.    First page.

13     Q.    What's the number on that?

14           MR. TJADEN:  You can barely see it.

15 305.

16     Q.    So when -- so you were an O-4?

17     A.    Correct.  O-4 with over 15.  So it

18 would have been here over 14.

19     Q.    Was it over 15 -- O-4 over --

20     A.    Over 14.

21     Q.    Over 14, okay.

22     A.    The bump happens every two years.

23     Q.    And then if you receive this job as a

24 major, would you be on that same -- is it based

25 on years of service?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-9800

**Exhibit B to V. Valentino Affd.**

137

```
 1      A.   It is, yes.
 2      Q.   So would you be in that same pay
 3 grade?
 4      A.   I would be in the same pay grade,
 5 yes.  It'd be over 20 years though.
 6      Q.   It would jump from over 14 to over 20
 7 immediately?
 8      A.   Well, it's retroactive.
 9      Q.   Explain that.
10      A.   My request to go back into service is
11 retroactive, which means I would have never left
12 service.  So all of the years that I've been gone
13 I would still accrue.
14      Q.   Okay.  So you would bump up from an
15 over 14 to an over 20?
16      A.   Correct.
17      Q.   And then if you -- and that was as a
18 major?
19      A.   Correct.
20      Q.   What if you were a lieutenant
21 colonel?
22      A.   Same thing.  It would bump up to over
23 20 as lieutenant colonel.
24      Q.   So there's no different pay table for
25 a major or lieutenant colonel?
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

139

```
 1      A.   Correct.
 2      Q.   Who makes that decision if you are a
 3 major or lieutenant colonel?
 4      A.   The Air Force.
 5      Q.   Do you have any input or say on that?
 6      A.   In what manner?
 7      Q.   Well, I mean, do you have any -- can
 8 you, I guess, petition them or can you say I
 9 think that I should be a lieutenant colonel, not
10 a major based on my years of service, performance
11 record?
12      A.   You go to a promotion board.  The Air
13 Force selects you.
14      Q.   Okay.  So it's solely in the Air
15 Force's discretion?
16      A.   Correct.
17      Q.   If you flip the page to 308.  I guess
18 what I want to do with the rest of these is walk
19 me through just those same three questions, where
20 were you back in 2012 with these benefits and
21 where would you be if you come back in as a major
22 and as lieutenant colonel.
23      A.   Okay.  As a -- for BAS, which is
24 basic allowance for subsistence I would be -- as
25 an officer $253.63.  Family separation allowance
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

138

```
 1      A.   No.  But you do know this is just
 2 base pay.
 3      Q.   Correct.  So whatever -- go ahead.
 4      A.   That doesn't include housing
 5 allowance.  That doesn't include other benefits.
 6      Q.   Okay.  So if you flip the page
 7 there's an allowance for housing.
 8      A.   Okay.
 9      Q.   Where were you back in 2012?
10      A.   I would have been an 0-4.
11      Q.   Okay.
12      A.   So I would have been an 0-4 with
13 dependent.
14      Q.   So just for reference it would have
15 been $1,557.60?
16      A.   Correct.
17      Q.   Okay.  And then if you, if you get
18 this job as a major, where would you be?
19      A.   As a major I would be at $1,557.60.
20 You mean as a lieutenant colonel?
21      Q.   Both.  I want to know as a major and
22 as a lieutenant colonel.
23      A.   As a lieutenant colonel it'd
24 $1,767.30.
25      Q.   So you're looking at the 0-5?
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

140

```
 1 only occurs if you're away from your family
 2 deployed, so that would not occur.  Subsistence
 3 would depend if they're still doing that.  Then
 4 we've got on personal money allowance $166.67, I
 5 don't really know what that is.
 6      Q.   That's what the amount would be?
 7      A.   I don't know.  A lot has changed
 8 since I left and I don't do the finances in the
 9 house.
10      Q.   Okay.  What about clothing
11 allowances?
12      A.   Officers don't get clothing
13 allowance.
14      Q.   Incentive and special pays?  What
15 about back in 2012?
16      A.   In 2012 I was an intelligence
17 officer.  I wouldn't have gotten incentive pay.
18      Q.   Would you now as a major or
19 lieutenant colonel?
20      A.   It depends what position I'm in.  If
21 I'm flying I'll get incentive pay to fly.  So if
22 they put me on the base here and I fly the
23 aircraft, then I would get incentive pay.
24      Q.   But if not you don't get incentive
25 pay?
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

141

1      A.    Correct.  It depends on what
2  position -- typically depends on what position
3  you're in.
4      Q.    Okay.  And then --
5      A.    But also incentive pay is for --
6  sometimes like pilots get an incentive pay to
7  stay in the military instead of leave and go to
8  the airlines.
9      Q.    Okay.  Flipping through I know
10 there's some monthly career sea pay.  Are there
11 any other benefits here or incentive pays that
12 applied to you back in 2012 or would apply to you
13 if you get this new job as a major or lieutenant
14 colonel?
15     A.    Possibly.  They could post me
16 anywhere.  So if I'm posted on a Navy base and I
17 wind up doing something crazy like submarine
18 duty, then it's possible.
19     Q.    So a lot of these other tables really
20 depend on where you're assigned, what your duties
21 are?
22     A.    Correct.  Correct.  More than likely
23 not though.  But, yeah, they would depend.
24     Q.    So let's go back to the other
25 document that I gave to you, those initial

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

142

1  disclosures.  How did you come up -- walk me
2  through the formulas for that $420,000 figure.
3      A.    Like I said, I don't have those
4  numbers on me.  I don't recall how I did that.
5      Q.    But you'll get us a copy of that?
6      A.    We will.
7      Q.    Okay.  And then d, looking at 3(d) --
8      A.    Okay.
9      Q.    -- on that same page, what's the
10 basis for that $300,000 figure?
11     A.    Being in jail.
12     Q.    Just came up with a round number
13 and --
14     A.    There was another lawsuit that was
15 going forward that I seem to read in the news and
16 the woman was asking $25,000 a day.  If I
17 remember correctly, that stretched approximately
18 to 280,000.
19     Q.    Do you remember what the name of that
20 lawsuit was?
21     A.    I don't.
22     Q.    It was in the newspaper?
23     A.    It was.
24     Q.    Do you remember where she was
25 being --

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

143

1      A.    Omaha.  She was confined for three
2  days because her name matched a name that was
3  very, very similar except they had a different
4  initial in the middle.
5      Q.    Do you remember when that happened?
6      A.    I don't, not off the top of my head.
7  It happened after I was -- it was after I was
8  arrested.
9      Q.    Okay.  And then 3(e) for the cost,
10 $36,386.17.
11     A.    Okay.
12     Q.    Is that -- what's the basis for that
13 cost?
14     A.    That was all my legal defense.  That
15 was everything relating to being incarcerated.
16 So I had to buy a flip phone because I couldn't
17 have a regular phone because it had Internet, so
18 the service for that.  Gas to go and give drug
19 tests every week, mileage.  My attorney's fees
20 are in there, our expert fees are in there, and
21 other things along those lines.
22     Q.    Did you keep spreadsheets of the --
23 it's 10 miles for the drug test there, 10 miles
24 back, did you keep spreadsheets to show the cost
25 of that?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

144

1      A.    I did not.
2      Q.    But do you have spreadsheets that
3  show that?
4      A.    I don't recall the cost of gas.  We
5  just claimed mileage, not the gas.
6      Q.    Just the 54, 55 cents per mile?
7      A.    Right.
8      Q.    So all those damages are
9  quantifiable?
10     A.    Correct.
11     Q.    3(f), damages to your credibility,
12 $750,000.  How did you arrive at that figure?
13     A.    That's an assessment right now.
14     Q.    Based on what?
15     A.    Well, the fact that -- where's that
16 picture you had?  Anybody today does any kind of
17 a search on anybody, and that's what's going to
18 come up.
19     Q.    You're talking about Exhibit
20 Number 13?
21     A.    I am.
22     Q.    Have you talked to the news media,
23 Google, Microsoft, anyone about getting those
24 stories down?
25     A.    I have not once I found out about

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

Exhibit B to V. Valentino Affd.

THIBAULT, SUHR & THIBAULT
(402) 991-5500

145

1  something called the Wayback Machine.  And
2  evidently there's archives around the world of,
3  like, snapshots of the Internet.  So just because
4  the news takes it down, there's no guarantee that
5  no one will be able to find anything about me.
6  And that's a problem, especially in my line of
7  work.  I mean, when you're dealing with national
8  security, that is a big red flag.
9        Q.   Then how did you come up with the
10  $750,000 figure?
11       A.   As I said, that's an assessment.
12       Q.   Based on what?
13       A.   Based on understanding of loss of
14  income over the next 15 years or so, 10 years.
15       Q.   And is that loss of income based on
16  those calculations that we talked about earlier?
17       A.   My civilian salary would be very
18  different than that.  Civilian salary for an
19  intel analyst as a GS-14 or GS-15 plus working
20  for a company, if I was working for a company I'd
21  probably be making approximately 105,000 or more
22  a year.  So as I said, that's an assessment.
23       Q.   Okay.  But this working -- that's new
24  the working with the company $105,000, that's
25  different than if you go back in as a major or

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

146

1  lieutenant colonel?
2        A.   Absolutely.  Yes.
3        Q.   So if you don't get the job as a
4  major or lieutenant colonel, you're considering
5  going back in on the civilian side?
6        A.   I would have to try.  I can't not
7  work.
8        Q.   Have you applied for any civilian
9  jobs as backup?
10       A.   I am waiting until I'm done with my
11  doctorate.
12       Q.   Did you say -- June 6th sticks in my
13  mind, was there --
14       A.   That was the Air Force's decision.
15       Q.   So you're waiting to hear back on
16  that?
17       A.   I'm waiting to hear back.
18            MR. KUNHART:  Let's take a couple
19  minutes and I might be done.
20            (A short recess was taken.)
21  BY MR. KUNHART:
22       Q.   I just have a couple follow-up
23  questions.  When you were talking about how you
24  discussed your porn addiction with your wife and
25  you said that she gave you pointers.  What did

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

147

1  you mean by pointers?
2        A.   She gave me discussions.  Told me
3  kind of how to ratchet it down or try to ratchet
4  it down.
5        Q.   Anything else?
6        A.   No.
7        Q.   What would she say?
8        A.   Well, she would tell me if you feel
9  the addiction, then, you know, instead of doing
10  it for three hours at a time, do it for less
11  time.  Common-sense stuff that spouses typically
12  help with.
13       Q.   And I know in your interview with
14  Detective Svajgl and then the -- it's the
15  Nebraska State Patrol report there was some
16  discussions about your preferences and interests
17  when you looked at porn.
18       A.   Correct.
19       Q.   Did those -- and I know you started
20  looking at -- you said you started looking at
21  pictures when you were seven, eight years old.
22  Did those interests change over time and have
23  your interests changed over time?
24       A.   I don't think so.
25       Q.   After your Microsoft account was shut

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

148

1  down in December of 2014, you said you had about
2  a month of time where you were still able to get
3  the e-mails on your phone.
4        A.   Correct.
5        Q.   Was that through -- what kind of
6  phone did you have?
7        A.   Samsung Galaxy S6 I think it was or
8  S4.  It was a Samsung phone.
9             MR. VALENTINO:  I got an S5.
10            THE WITNESS:  It wasn't a 5.
11  BY MR. KUNHART:
12       Q.   So was that --
13       A.   It was a 4.
14       Q.   Were you able to access the e-mail
15  through, like, a Hotmail app or the Samsung mail
16  app?  Does that make sense?
17       A.   It does.  Hotmail doesn't have an app
18  I don't think on Samsung.  I think I just used
19  the mail app on Samsung.
20       Q.   So kind of like an exchange server,
21  so you hooked up your Hotmail and then --
22       A.   Correct.
23       Q.   -- it went through that Samsung?
24       A.   When I -- yeah, no, that's right.
25       Q.   Did you use that -- so your account

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

149

```
 1   shut down in December of 2014, they talk about --
 2   Microsoft tells you, violated the user
 3   agreement --
 4        A.   Right.
 5        Q.   -- potential child porn, then you
 6   still have access to your e-mail for a month.
 7        A.   Correct.
 8        Q.   Did you use that month as an
 9   opportunity to figure out if you'd been hacked or
10   what -- why Microsoft said -- or shut down your
11   account?
12        A.   No, because you know what, I started
13   thinking that it was too unstable.  This is now
14   I've been hacked twice or something crazy has
15   happened twice in a matter of years, so I decided
16   to move to Google which is what my Samsung phone
17   is, Android.  So I started migrating over.
18        Q.   You'd been hacked twice?
19        A.   I'd been hacked once before --
20        Q.   In 2012?
21        A.   -- in 2014 -- 2012, correct.  So this
22   is now a second incident.  I lost trust.
23        Q.   But you didn't -- Microsoft in
24   December tells you potential child porn, violated
25   user agreement, in your head you're thinking
```
THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

150

```
 1   might have been hacked again, you didn't use that
 2   month when you still had access to the account to
 3   figure out what happened?
 4        A.   No.
 5        Q.   Looking at the time period from March
 6   of 2015 going back a year.  Besides the ImgFap
 7   website, did you use any other websites to
 8   download porn?
 9        A.   I used Bing.
10        Q.   The search engine?
11        A.   Yes.
12        Q.   Would you just google certain
13   preferences?
14        A.   Yeah.
15        Q.   Then it would bring up a --
16        A.   Whole bunch of images.
17        Q.   And then you go to specific websites
18   to download those images?
19        A.   I'd download them on Bing.  I mean,
20   the picture pops up right there, I can just
21   download it.  I don't have to go to the website.
22        Q.   So you'd type in something on Bing,
23   then go to images and download the image right
24   from Bing?
25        A.   Yes, I believe so.
```
THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

151

```
 1        Q.   What I was trying to get at is you
 2   didn't have to -- you do a search for something
 3   and then the Bing search results come out, then
 4   have you to click on a specific website?
 5        A.   If you want to go to the website, you
 6   can go to the website.  If I remember
 7   correctly -- again, I haven't done this in a long
 8   time.  If I remember correctly, if I'm searching
 9   for a blue tie and it pops up a whole bunch of
10   pictures of blue ties, I can click on it to
11   expand that one picture.  And if I want to go to
12   the website, there's a link but I don't have to.
13        Q.   You can just download the picture
14   directly there?
15        A.   Correct.  If my memory serves, that's
16   how -- I don't know if that's how it is now.
17        Q.   Okay.  But back --
18        A.   I believe that's how -- yes.
19        Q.   And then earlier you said you had
20   about 35 percent of your interviews transcribed
21   and you had to retranscribe those after your
22   arrest?
23        A.   Correct.
24        Q.   You said that took about eight
25   months?
```
THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

152

```
 1        A.   I was -- I'm guessing.
 2        Q.   And of -- so --
 3        A.   No, no, no.  I'm sorry.  That eight
 4   months was for I think the entire thing.  The
 5   retranscribing of that, of that 35 percent, I
 6   mean, I'm assessing, I don't remember how quickly
 7   I did it.
 8        Q.   So you're -- just so the record's
 9   clear.  So when the police showed up on
10   March 17th, you had about 35 percent of the
11   transcription done, and then once you got
12   everything back it took you about eight months to
13   get it a hundred percent done?
14        A.   Correct.
15        Q.   Okay.  Can you estimate of that eight
16   months how long it took you to redo that
17   35 percent?
18             MR. TJADEN:  Counselor, I think that
19   was asked by Mr. Valentino, the response was
20   given.  It may or may not.
21        Q.   I don't remember the response.  Can
22   you say it again?
23             MR. TJADEN:  Whatever you recall.
24        A.   I don't really recall.  The problem
25   is you have to understand since I'm doing this
```
THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 331-2500

**Exhibit B to Valentino Affd.**

153

1  and I'm also picking up my children and dropping
2  them off at school, there's other parts of life
3  that get into it.  So if I would have done it in
4  one part where I have complete free time and I
5  would have done it another time where I don't,
6  then obviously that time is going to get
7  elongated.
8      Q.   And that's kind of what I was getting
9  at.  Three months I think of, okay, I was sitting
10 there solid for three months trying to get this
11 back to normal.  Is it spent one or two hours
12 a day or eight hours a day?  That was more where
13 my question was going.
14     A.   I wouldn't have taken eight hours a
15 day, I would have -- because I had to get my kids
16 at 3 p.m.
17     Q.   Did you ever upload any pictures to
18 ImgFap or any other --
19     A.   No.  I've never uploaded any images.
20     MR. KUNHART:  I don't have any other
21 questions.
22              REDIRECT EXAMINATION
23 BY MR. VALENTINO:
24     Q.   Mr. Nader, I have some that I want to
25 cover with you, and that's specifically regarding

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

154

1  some phone calls between you and your wife Nikki.
2  I'm going to give you and your counsel some
3  specific references on some things because I want
4  to make sure that we understand each other, that
5  I'm trying to be fair with you in my question.
6      On March 17th when you were arrested,
7  you made a phone call or a series of phone calls
8  to your wife, did you not?
9      A.   Yes, I believe I did.
10     Q.   And she was in Georgia at the time,
11 was she not?
12     A.   I believe that's where she was.
13     Q.   Okay.  Do you recall telling her that
14 there were seven pics of known victims downloaded
15 or uploaded from your IP address?
16     A.   No.  I believe what -- maybe I
17 misspoke in the phone call, but that's what the
18 cops told me.
19     Q.   Okay.  And then you told her maybe
20 seven counts of felony possession of child porn
21 images will be coming to be filed.  Do you
22 recall telling her that?
23     A.   That sounds probably correct.
24     MR. VALENTINO:  Okay.  And that
25 reference, Counsel, is to a 3-17-15 file number

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

155

1  2031.
2      Q.   Do you recall talking to your wife on
3  March 19th of 2015, discussing the bond issues
4  for your court appearance and then you telling
5  her they can't prove intent on my downloading
6  child porn as you did not knowingly or
7  intentionally possess it?  Do you recall that
8  conversation?
9      A.   I don't recall it, but if you say
10 that I said it, I don't dispute it.
11     MR. VALENTINO:  Counsel, that file
12 number is 8032.
13     Q.   Do you recall talking to her again on
14 March 19th of 2015 and telling her that the cops
15 found nothing from their search warrant and
16 arrested him anyways based on what they knew from
17 other information?
18     A.   I'm sorry, ask that question again.
19     Q.   Do you recall telling your wife --
20     A.   Right.
21     Q.   -- that the cops found nothing from
22 their search warrant and arrested him anyways
23 based on what they knew from other information?
24     A.   Him who?
25     Q.   Pardon?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

156

1      A.   Him who?  Arrested him anyway, him
2  who?
3      Q.   You.
4      A.   Oh, okay.  I don't recall saying
5  that.  But, I mean, if it's in the transcript....
6      Q.   Now, the other information would have
7  been the Microsoft tips, would they not?
8      MR. TJADEN:  Foundation.
9      Q.   Do you know?
10     A.   I don't know.
11     Q.   You know now, don't you?
12     A.   I know now that Microsoft sent the
13 tips to -- yes.
14     Q.   And that's because they locked your
15 account like four months before, isn't it?
16     A.   Correct.  I know that now.
17     Q.   Okay.  You recall talking to your --
18     MR. VALENTINO:  Did I give you a
19 reference on that, Chris?
20     MR. TJADEN:  No, I did not.
21     MR. VALENTINO:  Chris, that is
22 reference 0859 is the file number -- I'm sorry,
23 1026 is the file number on that one.
24 BY MR. VALENTINO:
25     Q.   On March 20th of 2015 -- this is file

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

157

1  number 1736, Chris -- you told your wife that the
2  DA is arrogant and claims he knows more than
3  Microsoft does about their systems. You also
4  said that you should have scrubbed your computers
5  and that the website he went to download -- that
6  you went to download adult pornography is legit.
7  You recall saying that?
8      A.  No.
9      Q.  Do you recall on March 26th of
10  2015 --
11          MR. TJADEN:  What was the date?  I'm
12  sorry.
13      Q.  -- March 26th of 2015, file number
14  1302, that you apologized to your wife Nikki for
15  messing up her assignment in Spain?
16      A.  I believe I did say something along
17  those lines.
18      Q.  Do you recall her responding by
19  saying that's okay, I want to stay here and
20  retire here quietly, if I have to I'll take the
21  job and I'll retire when I'm done?
22      A.  I don't recall her saying that.  I
23  think at the time we were just kind of trying to
24  understand everything.
25      Q.  Do you recall that same day talking
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

158

1  to her -- this is file number 1602, counsel --
2  Nikki said they are not going to Madrid and the
3  promotion is being turned off so the assignment
4  is gone?
5      A.  What promotion?
6      Q.  Her promotion to going to Madrid.
7      A.  That would just be a reassignment.  A
8  promotion would be in rank, so that's why I don't
9  understand the question.
10      Q.  It says the assignment is gone.
11      A.  Right.
12      Q.  You said it's good the assignment is
13  being turned off instead of her refusing it and
14  her general did that for Nikki as Nader will be
15  dealing with this issue for about a year.  You
16  recall that conversation?
17      A.  It sounds familiar.
18      Q.  Do you recall your wife telling you
19  that she had a whole year to plan but was close
20  to terminal already though, she was going to take
21  a language class and work for your dad?
22      A.  What?  No.
23      Q.  What did your dad do for work?
24      A.  My father owns a hotel.
25      Q.  Okay.  Why would she take a language
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

159

1  class to work for your dad?
2      A.  I have no idea.
3      Q.  Did he speak something that she
4  didn't speak or --
5      A.  He speaks Spanish, she does too.
6      Q.  -- is his clientele something that he
7  has other people that needed to have a translator
8  or something?
9      A.  I don't know.  I don't think so.  I
10  don't recall that conversation.
11      Q.  Now, you denied to Mr. Kunhart that
12  one of your guns was used in a robbery according
13  to the police department.
14          MR. TJADEN:  I'm going to object to
15  the form of the question.  I don't think it was a
16  denial.  I think he indicated he was not aware of
17  that or did not understand that, but....
18          THE WITNESS:  Can I clarify?
19          MR. VALENTINO:  Wait a minute.
20          MR. TJADEN:  Just wait until the
21  question comes.
22          MR. VALENTINO:  Chris, the previous
23  file number is 2002 on 3-26.
24          MR. TJADEN:  Thanks.
25  BY MR. VALENTINO:
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

160

1      Q.  On March 28th of 2015, your wife
2  talked to you about putting all of your 77 guns
3  in the Air Force armory.  You recall that?
4      A.  Yes.
5      Q.  And that there are a lot of antique
6  firearms from your parents -- her parents, your
7  parents?
8      A.  Okay.
9      Q.  You said apparently one older gun was
10  used in some robbery according to the police
11  department.  Do you recall making that statement?
12      A.  I don't, but I can clarify.
13      Q.  Okay.  Have at it.
14      A.  I think this is what this gentleman
15  was saying -- alluding to earlier.  When we first
16  moved to this base, we had weapons which we
17  brought with us from Virginia.  We had to -- you
18  cannot bring firearms onto a federal
19  installation, so we had to take them to the
20  armory.  As part of the background checks, the
21  armory checks all of the guns and runs the serial
22  number.  The serial number for a gun that was
23  used by my grandfather during World War II that
24  was handed to me when he passed away, that gun
25  came up as supposedly used in some crime.  I
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 991-5820

**Exhibit B to Valentino Affd.**

161

1  don't recall it being a robbery, but if that's
2  what I said, then sure.  The -- obviously the
3  police run the armory.  They're looking at it and
4  they say, well, this is obviously not the same
5  gun.  The gun supposedly used in the -- although
6  it's the same make and the same serial number,
7  the gun used in the crime, if my memory serves
8  correctly, had different barrel lengths.
9       MR. TJADEN:  Give the date.  Do you
10 know the date of the crime?
11      A.  The date of the crime?  I don't know.
12 It was like in 1930.  A long, long time ago.
13      Q.  Okay.
14      A.  And it also had different chambers.
15 One had a cylinder for five, if my memory serves
16 correctly, and one had six.  So obviously when
17 the police looked at it, they explained to us
18 that manufacturers back then didn't put serial
19 numbers on it but they put a production run
20 number.  And so that number could have been the
21 exact same as the one used in the crime but of a
22 different year.  So that's....
23      Q.  That's the explanation?
24      A.  That's as I understand it.  If that's
25 the gun, if that's the gun that we're talking
           THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

162

1  about.
2       Q.  That's what you said.
3       MR. VALENTINE:  That's file number
4  1003, Counsel.
5       Q.  And you also said in that
6  conversation that they were all investment-grade
7  guns; is that true?
8       A.  For the most --
9       MR. TJADEN:  All what?
10      Q.  Investment-grade guns; is that true?
11      A.  For the most part.
12      Q.  Okay.  Go -- don't volunteer
13 something unless I got a pending question.
14      On April 4th of 2015 -- file number
15 1848, Counsel -- you said if the county attorney
16 came in today and asked you to pull up the seven
17 pics from the website that you visited, that you
18 would have no idea where to even look.  Did you
19 say that?
20      A.  It sounds familiar.  Sure.
21      Q.  You also said that they could have
22 easily determined your intent if they had asked
23 CenturyLink, your Internet provider, to find out
24 what history was on your computer for websites
25 that you were visiting to determine your intent.
           THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

163

1  You recall saying that?
2       A.  That sounds probably correct, but
3  they did that.
4       Q.  Yeah, they did that.  You saw the
5  subpoena that was issued to the -- by the county
6  attorney to CenturyLink, but you didn't know it
7  at the time you said this?
8       A.  I did not, no.
9       Q.  And on April 9th of 2015 -- file
10 number 1830, Counsel -- you told your wife after
11 reading the statute that you were charged with
12 that you felt a whole lot better now.  Do you
13 recall saying that?
14      A.  Yes.
15      Q.  And that's because you saw the word
16 "knowingly" in there; isn't that true?
17      A.  I don't recall why.  I think it
18 was -- I don't recall why.
19      Q.  And do you recall a conversation with
20 your wife on April 12th of 2015 -- file number
21 2104, Counsel -- that you said the county
22 attorney has some proof but not all the proof he
23 needs to convict you.  You recall saying that?
24      A.  Possibly.
25      Q.  Have you done any research or
           THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

164

1  surveillance on any of the named defendants in
2  this case?
3       A.  What do you mean by "surveillance"?
4       Q.  Well, you're a guy that is an
5  intelligence officer at one time in your career.
6  I can't imagine you haven't done a search or some
7  kind of informational check or possible viewing
8  whatever information you might have gathered up
9  about any of the defendants.  Have you done
10 anything like that?
11      A.  I googled them, that's it.
12      Q.  Okay.  What have you found out, if
13 anything?
14      A.  I found out Chief Lyons is looking
15 for a job.  I found out Ms. Miralles was arrested
16 last week.  I think that's it.
17      MR. VALENTINO:  Okay.  Thank you.  I
18 have nothing further.
19      MR. KUNHART:  I don't either.
20      MR. TJADEN:  Nothing.  You've
21 answered the one question on the gun that I had,
22 so I'll reserve everything else.
23      All right.  You've got a right to
24 read and sign.  We discussed this.  I want you to
25 tell the court reporter how you wish to proceed.
           THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

**165**

```
1    You can waive if you want.
2             THE WITNESS:  Do whatever I need to
3    do.
4             MR. TJADEN:  You have to tell her to
5    waive, go ahead.
6             THE WITNESS:  I waive.
7             (The deposition was concluded at the
8    hour of 12:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

THIBAULT, SUHR & THIBAULT, INC.

Omaha, Nebraska  (402) 331-2500

**167**

```
1         IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEBRASKA
2
   WADITH STOCKINGER NADER and ) Case No. 8:17-cv-83
3  STACEY NICHOLE NADER,       )
                               )
4       Plaintiffs,            )
                               )
5       v.                     )
                               )
6  THE CITY OF PAPILLION; SARPY)
   COUNTY; BRYAN SVAJGL;       )
7  BENJAMIN IVERSEN; SCOTT A.  )
   LYONS; L. KENNETH POLIKOV;  )
8  and JENNIFER MIRALLES,      )
                               )
9       Defendants.            )
   _____)
10
             CERTIFICATE OF REPORTER
11
        I, Deanna L. Maley, RPR, CRR, and General
12  Notary Public, do hereby certify that I served as
    the Court Reporter at the deposition of WADITH
13  STOCKINGER NADER on July 10, 2017, at 2120 South
    72nd Street, Suite 1500, Omaha, Nebraska, in
14  which the costs of reporting and transcribing the
    deposition were $ _____, and that such costs are
15  to be paid by counsel for defendants Sarpy
    County, Polikov & Miralles.
16      I further certify that the original and
    copies were sent to:  Original and 1 copy to
17  Mr. Vincent Valentino; 1 copy to Christopher J.
    Tjaden; 1 copy to Mr. Ryan M. Kunhart.
18      Dated this 20th day of July, 2017.
19      Delivered: _____
20
21          _____
               GENERAL NOTARY PUBLIC
22          Deanna L. Maley, RPR, CRR
            Thibault, Suhr & Thibault, Inc.
23          6818 Grover Street, Suite 300
            Omaha, Nebraska  68106
24            (402) 331-2500
25
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**166**

```
1            - C E R T I F I C A T E -
2
3  STATE OF NEBRASKA  )
                      ) ss.
4  COUNTY OF DOUGLAS  )

5        I, Deanna L. Maley, RPR, CRR, and
6  General Notary Public in and for the State of
7  Nebraska, do hereby certify that WADITH STOCKINGER
8  NADER was by me duly sworn to testify the truth,
9  the whole truth and nothing but the truth, and that
10 the deposition by him as above set forth was
11 reduced to writing by me.
12       That the within and foregoing
13 deposition was taken by me at the time and place
14 herein specified and in accordance with the within
15 stipulations, the reading and signing of the
16 witness to his deposition having been waived.
17       That I am not counsel, attorney or
18 relative of either party or otherwise interested in
19 the event of this suit.
20       IN TESTIMONY WHEREOF, I have placed my
21 hand and notarial seal this 20th day of July, 2017.
22
23          _____
24          GENERAL NOTARY PUBLIC
25 COST:  $ _____
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 331-2500

**Exhibit B to V. Valentino Affd.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WADITH STOCKINGER NADER and ) Case No. 8:17-cv-83
STACEY NICHOLE NADER, )
)
Plaintiffs, )
)
vs. )
) **PLAINTIFFS' ANSWERS**
THE CITY OF PAPILLION; SARPY ) **TO INTERROGATORIES**
COUNTY; BRYAN SVAJGL; ) **AND RESPONSES TO**
BENJAMIN IVERSEN; SCOTT A. ) **REQUESTS FOR PRODUCTION**
LYONS; L. KENNETH POLIKOV; and ) **OF DOCUMENTS OF SARPY**
JENNIFER MIRALLES, ) **COUNTY, POLIKOV AND MIRALLES**
)
Defendants. )

COME NOW the plaintiffs and for their Answers to Interrogatories and Responses

to Requests for Production of Documents served upon them by Sarpy County, Polikov and

Miralles state:

**INTERROGATORY NO. 1:**

Did you have any land line, cell phone, or internet address available to you or your

immediate family members from January 1,2014, up to and including October 31,2015? If

so, please list each web email address you had or used; phone number associated with

any land line(s) or cell phone(s); and the name of any internet provider and/or phone

company or companies to which fees were paid in connection with the use of any land line,

cell phone number, or internet address/email account listed by you.

**ANSWER:** Objection as to relevance. Plaintiff will not supply information
pertaining to the email addresses of Stacey Nader, or any of the children of
the Naders without waiving, and subject to said objection, Plaintiffs state the
following: The home phone number for the Naders is (402) 505-3684; Stacey
Nader's cell phone number is (703) 909-5581; Wadith Nader's cell phone numbers
are (703) 909-0551 and (402) 709-0369. The Naders' address is 912 Hickory Hill
Road, Papillion, Nebraska 68046. The Naders' internet service provider service is
CenturyLink.

1

**Exhibit B to V. Valentino Affd.**



EXHIBIT
2
7-10-17   dm

The Naders had several email address used by members of the household. Wadith Nader had a total of five email addresses. They are (1) wadith@hotmail.com; (2) paul.nader2@hotmail.com; (3) paulnader33@hotmail.com; (4) wadith3@gmail.com; (5) paul.nader.us@gmail.com.

**INTERROGATORY NO. 2:**

Did you possess any computer program or other software application that would allow you to delete, overwrite, scrub, erase or wipe any data or images from any computer hard drive you owned or had access to from January 1, 2014, up to and including March 17,2015?

**ANSWER:** Since 2010 the Naders have been customers of a service known as IOIO System Mechanic. The service provides a virus protection and computer optimization software. The software tools were known as "Drive Scrubber" and "Incinerator." The Naders do not use either of those tools to their knowledge. The Naders obtained the software through an internet purchase and download, and said software is in the Naders' possession to the extent that their computers currently have the IOIO System Mechanic software.

**INTERROGATORY NO. 3:**

If the Answer to Interrogatory No. 2 is in the affirmative, please identify such computer program by name, including the name of the publishing software company, and the location of such software now, and whether the same is in your possession or control.

**ANSWER:** See Answer to Interrogatory No. 2 above.

**INTERROGATORY NO. 4:**

If you have used any computer program or software application that is identified in Interrogatory Nos. 2 or 3, please state the circumstances under which such application was used to delete any materials from your hard drive, and when the same was used.

**ANSWER:** To their knowledge, neither Wadith nor Stacey have used the scrubbing tools which were purchased as a part of their ordinary anti-virus

2

**Exhibit B to V. Valentino Affd.**

protection.

**INTERROGATORY NO. 5:**

With respect to those allegations you have made in your Amended Complaint at paragraphs 55 through 57, please state each and every fact of which you have personal knowledge that leads you to believe that: 1) Jennifer Miralles "ordered" the arrest of the Plaintiff Wadith Nader; and, 2) that "no reasonable County Attorney would have made the same decision," if in fact you personally heard her state such "order."

**ANSWER:** Miralles is a County Attorney who is familiar with the rules regarding probable cause, and warrantless arrests. Miralles was familiar in this case with the search warrants issued, as well as the affidavits provided to obtain said search warrants. Miralles was contacted by Detective Svagl while the search of the Nader residence was occurring, and Miralles was advised that no images were found, and nonetheless Miralles ordered the arrest of Mr. Nader. Detective Svagl in his internal report wrote: "I had contact with Sarpy County Attorney Jennifer Miralles and briefed her on the circumstances revolving around this case. She agreed to take custody of Wadith Nader based on the previous confirmed photographs that were reported to be uploaded to Microsoft SkyDrive. Miralles advised that the County Attorney's Office would amend additional counts after the analysis of the digital evidence was complete if needed." No reasonable County Attorney would authorize the arrest of an individual where no probable cause existed, or where no evidence of any crime being committed was found during a search.

**INTERROGATORY NO 6.**

With respect to those allegations you have made in your Amended Complaint at paragraphs 61 through 66, please state: 1) whether you are familiar with the statute at Neb. Rev. Stat. §13-910(7) that provides political subdivisions with immunity for false arrest, abuse of process, and malicious prosecution claims; and, 2) If you are aware of these immunities, please state why have you asserted such claims in your Amended Complaint.

**ANSWER:** Plaintiffs are familiar with said defenses, however, believe that under § 1983 of the United States Code, the immunity is not a protection for a violation of

3

**Exhibit B to V. Valentino Affd.**

civil rights.

**INTERROGATORY NO: 7:**

With respect to those allegations you have made in your Amended Complaint at paragraphs 68 through 73, please describe in detail the alleged "conspiracy"; who the participants were in such alleged "conspiracy"; when the "conspiracy" started, and the dates thereof; what was the specific nature of the agreement made; and what specific actions each alleged conspirator took in furtherance of such alleged "conspiracy", by detailing each act taken by any specific party, who otherwise were "acting in concert" to violate your rights as alleged.

**ANSWER:**    The participants of the conspiracy are Detectives Svagl, Iversen, County Attorney Jennifer Miralles, and their respective employers, the City of Papillion and Sarpy County.   The conspiracy started on or around December of 2014.   The specific nature of the agreement was to make an arrest of Mr. Nader regardless of Mr. Nader's actual guilt.    The specific actions taken by each conspirator in furtherance of the conspiracy were carried out on the day Mr. Nader was arrested, March 17, 2015, when the detectives searched the Nader home, found no evidence of any crime, and nonetheless contacted the County Attorney to make an arrest of Mr. Nader.   Discovery continues and Plaintiffs will supplement as additional information becomes available.

**INTERROGATORY NO.8:**

With respect to those allegations you have made in your Amended Complaint at paragraphs 76 through 77, please identify what policies, customs, or practices existed by the Defendant Sarpy County that you allege, and can otherwise prove, was a "moving force" behind any right you claim was violated, and, further, that caused you any damage.

**ANSWER:**   The policies, customs and practices of the County Attorney which were a moving force behind the violation of Mr. Nader's rights are the policies which related to a lack of training of Ms. Miralles leading to her advising police officers to make an arrest, when it was clear that no probable cause existed.   Discovery

4

**Exhibit B to V. Valentino Affd.**

continues and Plaintiffs will supplement as additional information becomes available.

**INTERROGATORY NO. 9:**

With respect to those allegations you have made in your Amended Complaint at paragraphs 78 through 79, please identify the alleged deficiencies in the "training" provided by Sarpy County; or the training failures by the Sarpy County Attorney's Office, that you allege, and can prove, was a "moving force" behind any right you claim was violated, and further, that caused you any damage.

ANSWER:    It's not clear specifically what deficiencies in training occurred by the County of Sarpy, or the Sarpy County Attorney's Office; however, it is clear that a lack of training did occur as an agent of the County Attorney, Jennifer Miralles, made an order to arrest based on a lack of probable cause where any reasonable person should have realized that there was no probable cause present.    Discovery continues and Plaintiffs will supplement as additional information becomes available.

**INTERROGATORY NO 10:**

You allege in your Amended Complaint that you have suffered a loss of earning capacity, undue hardship, great emotional distress, humiliation, embarrassment, inconvenience, loss of enjoyment of life, loss of consortium, and damage to your reputation, both personal and professional, and otherwise entitles you to damages. With respect to each category of damage that is listed above, please state in detail how you have been affected by all acts allegedly done to you that you claim to have suffered, and please identify and state with as much particularity as possible each item of damage suffered, and the amounts that you believe can be proved at trial for any compensatory, special, and general damages.

ANSWER:    The undue hardship, emotional distress, humiliation and embarrassment, as well as loss of enjoyment of life and loss of consortium and damages to Mr. Nader's reputation come from the statements made by the arresting officers, as well as the existence of news reports regarding Mr. Nader.   As Wadith

5

**Exhibit B to V. Valentino Affd.**

Nader has a fairly uncommon name, it is very easy to find Internet information regarding Mr. Nader. An Internet search of the name "Wadith Nader" leads to several articles regarding the arrest of Mr. Nader, and specifically what charges he had been arrested with, however, it leads to no results regarding the fact that the charges were ultimately dropped and Mr. Nader was not found guilty. This creates an appearance that Mr. Nader is still either actively being prosecuted, or at a minimum that no resolution of the case has been created. Ultimately this hinders Mr. Nader's ability to obtain a job, and leads to embarrassing searches by Mr. Nader, his prospective employers, his children, and any other party who happens to be searching his name. The embarrassment, loss of enjoyment of life, and reputation damages, humiliation, and emotional distress can all be seen in comments on various news articles, specifically comments made on Facebook which were discussing Mr. Nader's arrest.

The damages related to Ms. Nader's earning capacity and loss of consortium can be seen based upon the fact that Ms. Nader's assignment to Spain and non-promotion in the ranks in the military are tied to the actions of the County Attorney and detectives. Ms. Nader had been selected for an assignment in Spain which would have been prestigious, and paved the way for further advancements in her career. Because Mr. Nader was in jail at the time when a decision had to be made to accept or decline, Ms. Nader's assignment was canceled per military policy. Because Ms. Nader's assignment was canceled, she stayed in one place for an extended period of time, which to the military, has a clear appearance of a defect in an officer's capabilities. The appearance of this defect ultimately cost Ms. Nader a promotion.

**INTERROGATORY NO. 11:**

Please state your education and employment history as fully as possible. For each such category, list the highest grade in school you have completed; any diplomas, certificates, or other academic achievements earned; as well as each and every job you have held in chronological sequence, by identification of the employer, years and dates employed, job title, approximate monthly wages earned, and any promotions obtained in

6

**Exhibit B to V. Valentino Affd.**

any of the employment so listed.

**ANSWER:** A list of diplomas, certificates, academic achievements, and Mr. Nader's doctoral transcript is attached as are the employment histories of Mr. and Ms. Nader.

**INTERROGATORY NO. 12:**

Please identify any writings, letters, reports, journals, or other documents of which you have custody, control, or possession, that were written by, drafted, recorded, or otherwise authored by Plaintiffs, or others, that demonstrate your state of mind, injury, or damage that relates in any way to the claims asserted in your Amended Complaint.

**ANSWER:** Attached please find journals which were written by Ms. Nader throughout the course of Mr. Nader's prosecution.

**INTERROGATORY NO. 13:**

In your Amended Complaint, you allege you were incarcerated in the Sarpy County jail on March 17, 2015, to April 13, 2015, for a period of approximately 38-39 days. With respect to those time periods, please identify:

a) the names (or if name unknown, physical description) of all individuals you were confined with in the Sarpy County jail facility that you recall interacting with; or if you were held in segregation, without any interaction with anyone;

b) the names (or if name unknown, physical description) of all guards you recall interacting with, on what days each interaction(s) occurred, and approximate duration of the interaction(s); and if any interactions were of a significant nature to you;

c) If any of the interactions you had in detention were ones that you documented, or filed any grievances, requests, or kites over.

**ANSWER:**

(a) The names of a majority of inmates are not known, however, the following are known: Mark (possibly Marco) Cane; Tyler Weakly; Ryan Blair, Ty (possibly Tyler) Smith; David Morrison; Gary Burton; Richard Orleanas

7

**Exhibit B to V. Valentino Affd.**

(possibly Orlenas); Adam Tim; Daniel Hernandez; Norm Handly (last name potentially was also Haley or Harley).

(b)     Mr. Nader is not able to remember the names of any guards specifically except for potentially Sergeant Kodak, however, Mr. Nader is not certain of any other names of guards.

(c)

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST NO. 1:

With respect to your Amended Complaint and the allegations made, and your Answers to Interrogatories herein, please produce true and accurate copies of any and all documents supporting your claims; bottled chemicals retrieved or returned to you by law enforcement; treatises or books seized or returned to you by law enforcement; medical records; copies of statements made by you or others in the investigation; reports, text messages, social media posts made by or about you; electronic messages, emails, computer images, or recordings referred to in your Amended Complaint or Answers to the above Interrogatories; any additional documents, materials, expert reports, physical items, denials of promotions or employment, applications made for promotion, employment or entrance to academic colleges or universities, military fitness reports or evaluations, or photographic evidence you believe constitute evidence of any of your liability claims or damage claims made in your Amended Complaint.

**RESPONSE:** Responsive documents are attached.

### REQUEST NO. 2:

Please produce a copy of both your federal and state tax returns for the past 5 years along with supporting schedules, including any W-2 or 1099 documents for those years, including the 2016 tax year.

**RESPONSE:** Responsive documents are attached.

DATED this _____ day of July, 2017.

**Exhibit B to V. Valentino Affd.**

WADITH STOCKINGER NADER AND
STACEY NICHOLE NADER, Plaintiffs

By: _____

Christopher J. Tjaden, #18413
Zachary Lutz-Priefert, #25902
GROSS & WELCH, P.C., L.L.O.
1500 Omaha Tower
2120 South 72nd Street
Omaha, NE 68124
(402) 392-1500
Attorneys for Plaintiffs


STATE OF NEBRASKA  )
                   ) s.s.
COUNTY OF DOUGLAS  )

    The undersigned, being first duly sworn upon oath, deposes and states that he is the plaintiff, that he has read the above and foregoing, knows the contents thereof, and they are true and correct as he verily believes.

_____
Wadith Paul Nader
    Stockinger

    SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public this _____ day of July, 2017.


_____
                    Notary Public

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing was served upon the following individual(s) by e-mail or by regular United States Mail, postage prepaid, this _6_ day of July, 2017 and addressed as follows:

Ryan M. Kunhart
Jeffrey J. Blumel
8712 West Dodge Road #300
Omaha, NE 68114
rkunhart@akclaw.com
jblumel@akclaw.com

9

**Exhibit B to V. Valentino Affd.**

Vincent Valentino
130 South 13th Street #300
Lincoln, NE   68508
vince@nrmainc.info

Christopher J. Tjaden

12913-1/6C56725

10

**Exhibit B to V. Valentino Affd.**