1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEBRASKA
 2
    WADITH STOCKINGER NADER and ) Case No. 8:17-cv-83
 3  STACEY NICHOLE NADER,        )
                                 )
 4         Plaintiffs,           )
                                 )
 5      v.                       )
                                 )
 6  THE CITY OF PAPILLION; SARPY )
    COUNTY; BRYAN SVAJGL;        )
 7  BENJAMIN IVERSEN; SCOTT A.   )
    LYONS; L. KENNETH POLIKOV;   ) TAKEN IN BEHALF
 8  and JENNIFER MIRALLES,       ) OF DEFENDANTS CITY
                                 ) OF PAPILLION,
 9         Defendants.           ) SVAJGL, IVERSEN, &
                                 ) LYONS
10  _____                    )
11
12
13
14
15
16
17
18         DEPOSITION OF STACEY NICHOLE NADER,
19   912 Hickory Hill Road, Papillion, NE 68046, taken
20   at 1:55 a.m. on July 10, 2017, by Deanna L.
21   Maley, RPR, CRR, and General Notary Public in and
22   for the State of Nebraska, at 2120 South 72nd
23   Street, Suite 1500, Omaha, Nebraska.
24
25
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

---

2

```
 1  APPEARANCES:

 2  Mr. Christopher J. Tjaden       For Plaintiffs
    Attorney at Law
 3  GROSS & WELCH
    2120 South 72nd Street
 4  Suite 1500
    Omaha, NE 68124
 5
    Mr. Vincent Valentino          For Defendants
 6  Attorney at Law                Sarpy County,
    VALENTINO LAW OFFICE           Lee Polikov &
 7  130 South 13th Street #300     Jennifer Miralles
    Nebraska Telephone Building
 8  Lincoln, NE 68508

 9  Mr. Ryan M. Kunhart            For Defendants
    Attorney at Law                City of Papillion,
10  ABRAHAMS, KASLOW & CASSMAN     Bryan Svajgl,
    8712 West Dodge Road           Benjamin Iversen &
11  Suite 300                      Scott A. Lyons
    Omaha, NE 68114
12
    Ms. Karla R. Rupiper
13  Ms. Amber L. Rupiper
    City Attorneys
14  CITY OF PAPILLION
    122 East Third Street
15  Papillion, NE 68046

16  Also Present:  Wadith Stockinger Nader
                   Bryan Svajgl
17                 Benjamin Iversen
                   Scott A. Lyons
18                 Bob Lausten
                   Adam Kost
19
20
21
22
23
24
25
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

---

3

```
 1                  I N D E X
 2  EXAMINATION:           DIRECT   CROSS   REDIRECT
 3  STACEY NICHOLE NADER
 4  By Mr. Kunhart:          5               91
 5  By Mr. Valentino:                58
 6
 7                  E X H I B I T S
 8  Ex.  Pg. Ref.
    No.  No.           Description
 9
10  19    6      Employment History for Stacey
                 Nader
11               (Nader 0037)
12  20   19      MajCom Statistics
                 (Nader 0288)
13
14  21   25      2017 Officer Performance
                 Report
                 (Nader 0236-37)
15
16  22   25      2016 Officer Performance
                 Report
                 (Nader 0238-39)
17
18  23   58      Chronological Record of
                 Medical Care for Stacey Nader
                 (Nader 0139, 0149, 0152, 0204,
                 0213, 0214, 0227)
19
20          Exhibits Previously Marked
21  Ex.  Pg. Ref.
    No.  No.
22
23  1     7
24  2    22
25  3    42
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

---

4

```
 1      Exhibits Previously Marked (cont'd)

 2  Ex.  Pg. Ref.
    No.  No.
 3
 4  10   50
 5
    11   50
 6
    12   17
 7
    16   44
 8
    17   55
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

**5**

1      STACEY NICHOLE NADER
2          Of lawful age, being first
           duly cautioned and solemnly
3          sworn as hereinafter certified,
           was examined and testified as
4          follows:

5          DIRECT EXAMINATION
6  BY MR. KUNHART:
7      Q.   Good afternoon, Mrs. Nader.  As you
8  know, I'm Ryan Kunhart.  I represent some of the
9  defendants in this case.  I won't go through a
10 lot of the ground rules that we talked about
11 earlier.  You were sitting here through your
12 husband's deposition; correct?
13     A.   Correct.
14     Q.   Walk me through your educational
15 background.
16     A.   Graduated from high school in 1991.
17 Bachelor of science from North Carolina State in
18 1996.  Received my master's in I think 2009 from
19 Air University, Maxwell Air Force Base.  And a
20 lot of other military training in between.
21     Q.   Where are you from originally?
22     A.   North Carolina.
23     Q.   And then when did you -- and I guess
24 let me -- when did you first join the military?
25     A.   19 --
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

**6**

1      Q.   Let me show you something that might
2  make us --
3      A.   Sure.  I know what you're getting at.
4      Q.   -- skip some questions here.
5          (Deposition Exhibit Number 19 was
6  marked for identification.)
7      Q.   Show you what's been marked as
8  Exhibit Number 19.  Did you prepare this, Exhibit
9  Number 19?
10     A.   Yes, I did.
11     Q.   When did you prepare that?
12     A.   A few weeks ago.
13     Q.   And does this reflect your employment
14 history going all the way back to 1991?
15     A.   Yes, it does.
16     Q.   So did you join the military in 1991?
17     A.   Yes, I did.
18     Q.   What branch?
19     A.   Air Force.
20     Q.   Have you been in the Air Force the
21 entire -- your entire history with the military?
22     A.   No.  I was in the Air Force from 1991
23 until 1993.  Then I had a break and so I went
24 back in again in 1996.
25     Q.   With the Air Force?
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

**7**

1      A.   Yes.
2      Q.   Okay.  And then you've been with the
3  Air Force since 1996?
4      A.   Correct.
5      Q.   How long have you lived in Omaha?
6      A.   This time we've lived here since
7  October of 2010.
8      Q.   Where did you -- and then you got
9  married in 1998?
10     A.   Correct.
11     Q.   Where did you live before 1998?
12     A.   Well, part of 1998 I lived here and
13 then part of that I lived in Pensacola, Florida.
14 Prior to that I lived in Raleigh, North Carolina;
15 then Charlotte, North Carolina; then Colorado
16 Springs, Colorado; and then I guess the final one
17 would be Charlotte, North Carolina, where I grew
18 up.
19     Q.   Let's take a look at Exhibit Number 1
20 which is a copy of the amended complaint that you
21 filed in this action on May 19th of 2017.  Walk
22 me through -- if you look at paragraphs 19 and 20
23 where you state that you were selected for a
24 permanent change of duty station which would have
25 required you and your family to move to Spain.
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

**8**

1  Was that a promotion or how -- the move to Spain?
2      A.   No, it was not a promotion.
3      Q.   What was it?
4      A.   It was simply that I had served here
5  at Offutt the prescribed time, the amount of
6  time.  It was time for the military to move me.
7      Q.   To what?
8      A.   It was time for the military to move
9  me.
10     Q.   Okay.  And then how long is a typical
11 assignment?
12     A.   It depends on your career field.  It
13 can be anything as short as one year up to five,
14 six, seven years.  It just depends.
15     Q.   What about -- what's your career
16 field personally?
17     A.   I'm an electronic warfare officer.
18     Q.   So how long are your assignments
19 typically?
20     A.   Probably three to, three to five
21 years --
22     Q.   Okay.
23     A.   -- generally.
24     Q.   What assignment were you on in March
25 of 2015?
           THIBAULT, SUHR & THIBAULT, INC.
           Omaha, Nebraska  (402) 331-2500

**Exhibit C to Valentino Affd.**

9

1    A.    Here at Offutt Air Force Base.
2    Q.    And how long had you been on that
3 assignment?
4    A.    Since October 2010.
5    Q.    What was that assignment?
6    A.    I was an officer here at -- I was
7 just an officer here at the base.
8    Q.    Okay.  And then walk me through, how
9 does that work when the assignment changes?  Do
10 you have to apply for a new assignment or do they
11 just assign you to a new place?
12    A.    For officers, you know when your time
13 for reassignment is coming up.  That is
14 coordinated with you through your supervisor and
15 the Air Force Personnel Center.  So there is a
16 form that you fill out saying what your
17 preferences are.  The Air Force tries to match
18 you to those preferences, but there are no
19 guarantees because the needs of the Air Force
20 always trump everything.
21    Q.    And the preferences, is that location
22 and job assignment?
23    A.    Yes, it can be.
24    Q.    What -- do you remember when you
25 filled out that form for that March 20th job

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

10

1 assignment to Spain?
2    A.    Let me think about that for just a
3 moment.  That would have to have been
4 sometime in the fall of 2014.
5    Q.    Okay.  And then what did you put for
6 your preferences for the job assignment and then
7 locations?
8    A.    I don't remember exactly.  I remember
9 vaguely putting some European assignments on
10 there.  I asked for some staff assignments, you
11 know, like the next level above where I was
12 currently working.  I think I might have put
13 Florida down.  That's about all I can remember.
14    Q.    And then you received an assignment
15 to Spain?
16    A.    Correct.
17    Q.    Then why did you not take that
18 assignment?
19    A.    The assignment was canceled because
20 of my husband being in jail and his perceived
21 ongoing legal problems.
22    Q.    Who requested that the assignment be
23 canceled?
24    A.    I contacted my supervisor and told
25 him the situation and asked if he could help, and

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

11

1 then he ultimately got it canceled.
2    Q.    He ultimately --
3    A.    He ultimately got it canceled, yes.
4    Q.    How does that -- so it's canceled
5 then were you -- did you stay in your same job
6 assignment or were you reassigned after it was
7 canceled?
8    A.    I stayed in -- I stayed in the job I
9 was in at Offutt then immediately, but I had been
10 in that job for a bit.  And so I ultimately was
11 moved about two months later to a different job.
12    Q.    So you were an officer?
13    A.    Yeah, still on Offutt, just different
14 daily duties.
15    Q.    Okay.  Was that a different job
16 assignment or the same job with just different
17 duties, same job assignment just with different
18 duties?
19    A.    Same job assignment in that it was at
20 Offutt Air Force Base.  Different duties.
21    Q.    Did you have to fill out the form or
22 apply for that new job assignment?
23    A.    No, you don't, you don't fill out a
24 form when you just move around a base.
25    Q.    Okay.  Who changed your job duties at

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

12

1 Offutt?
2    A.    Brigadier General Guillot.
3    Q.    Did they have the discretion to do
4 that or is it more of I've been doing these job
5 duties for a pretty good amount of time, I want
6 them changed, will you change them, or do they
7 have complete discretion to change the job
8 duties?
9    A.    They have complete discretion to
10 change the job duties.
11    Q.    So you requested that the job
12 assignment to Spain be canceled; correct?
13    A.    Correct.
14    Q.    And that was in March of 2015?
15    A.    Yes.
16    Q.    So the new job duties that you
17 received after March of 2015, how long have you
18 been -- how long did you perform those jobs after
19 March of 2015?
20    A.    I'm still performing them.
21    Q.    You're still with the Air Force?
22    A.    Yes, I am.
23    Q.    Did you submit a retirement
24 application?
25    A.    Yes, I have.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

13

1    Q.    Where does that stand?
2    A.    It's approved.
3    Q.    So how does, how does that work, you
4    can retire whenever you want?
5    A.    I've served 20 years, so I can --
6    I've served over 20 years so I can apply whenever
7    I want.
8    Q.    And then do you have to give -- when
9    was it approved?
10    A.    March of this year.
11    Q.    Do you remember --
12    A.    Actually, no, I think maybe April.
13    Q.    Why did you apply for retirement?
14    A.    Because I was passed over for
15    promotion and I really have no future in the Air
16    Force now.  I was just stagnant.
17    Q.    Why were you passed over for
18    promotions?
19    A.    The key reason is because I've been
20    at Offutt Air Force Base too long and I've not
21    shown progression as an officer.
22    Q.    Who's told you that that's the
23    reasons that you're being passed over for
24    promotions?
25    A.    My daily supervisor, for one.
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

14

1    Q.    What's his or her name?
2    A.    Colonel Matthew Joganich.
3    Q.    And you've been at Offutt since 2010?
4    A.    Correct.
5    Q.    Since 2015 after the Spain request,
6    have you requested any different assignments
7    outside of Offutt?
8    A.    No.
9    Q.    Why not?
10    A.    Well, at first I didn't because, you
11    know, my husband's ongoing legal trouble through
12    the fall later of that year.  And then after that
13    it was not beneficial with the timing of my
14    promotion board.
15    Q.    Why is that?
16    A.    Because when you're promoted, one of
17    the things you're promoted off of is a promotion
18    recommendation form.  And it is -- it's signed by
19    your current general and that's who recommends
20    you for promotion.  It is not advantageous to be
21    a new person at a new base to you with new duties
22    and potentially have that form signed by someone
23    who doesn't know you very well.  You could
24    inadvertently not be ranked as high as you
25    deserve.
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

15

1    Q.    Despite your husband's legal
2    troubles, you still could have taken the Spain
3    assignment in 2015; correct?
4         MR. TJADEN:  Objection.  Form of the
5    question, foundation.  Answer it if you know.
6    A.    I'm not sure I understand the
7    question.  What capacity?
8    Q.    What?
9    A.    In what capacity?  I don't think I
10    understand what you're asking.
11    Q.    You still -- no one in the Air Force
12    told you because of your husband's legal troubles
13    you cannot take the Spain assignment?
14    A.    No one came out directly and said
15    like that.
16    Q.    Did anyone ever -- anyone in the Air
17    Force ever tell you due to your husband's legal
18    troubles you cannot take this Spain assignment or
19    we've decided to reject you for consideration
20    from the Spain assignment?
21    A.    No.  It was more like the discussion
22    was the Air Force wouldn't want to put that
23    burden on me to go to a foreign country with two
24    children.  The assignment was an accompanied
25    assignment, not an unaccompanied.
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

16

1    Q.    What does that mean?
2    A.    That means that there are assignments
3    in the military, the military knows going in that
4    it's unaccompanied, we will send you by yourself,
5    it is a remote assignment, and they give you
6    certain provisions to, like, deal with that
7    hardship while you're gone and help support you.
8         If the military gives you an
9    accompanied assignment, you are expected to take
10    your family.  And if you don't for some reason,
11    then you are taking on a huge responsibility on
12    your own that the military would never ask you to
13    do.  And the assignment will be much more
14    difficult for you in a way they never intended.
15    Q.    What's your basis for -- is that your
16    opinion?
17    A.    No.  That's in an Air Force
18    regulation the differences in assignments.  They
19    even pay you different for assignments like that.
20    Q.    Can you go accompanied or
21    unaccompanied at your own discretion?
22    A.    I'm not sure.  I think -- I'm almost
23    positive that I would have to sign some sort of
24    paperwork or waiver.  I have -- I think that it's
25    not just that clean, I just say okay, I'll go.
         THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-5899

**Exhibit C to V. Valentino Affd.**

17

1    Q.   I'd like to show you what's been
2  marked as Exhibit Number 12, specifically at
3  page 2 -- or on page 2 which is Nader -- page
4  number Nader 484.
5    A.   Uh-huh.
6    Q.   You just gave me a pretty long answer
7  about how it would have been difficult to take
8  the assignment and the problems and differences
9  between accompanied and unaccompanied
10 assignments.  If you look at page 484 there,
11 that's an e-mail from you to -- is it Major
12 Brigadier General Gregory Guillot?
13   A.   Brigadier General Guillot.
14   Q.   Guillot?
15   A.   Guillot.
16   Q.   Guillot.  Why didn't you raise any of
17 those issues with him when you, when you said
18 that you were not going to take the assignment?
19   A.   Which issues in particular?
20   Q.   Well, all the issues with going
21 accompanied versus unaccompanied and -- why
22 didn't you explain that to him that this was an
23 accompanied assignment and therefore I'm going to
24 turn it down?
25   A.   He got the job for me.  He knew that
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

18

1  it was accompanied.
2    Q.   But what I'm saying is -- read your
3  e-mail there too on page 484.
4    A.   Okay.
5    Q.   Isn't it true that in that e-mail you
6  focus on your husband's legal issues as the only
7  reason why you are not going to take the
8  assignment in Spain?
9    A.   That's true, I didn't mention
10 anything that you said.
11   Q.   Then if you flip to the -- let me see
12 that for a minute.  If you flip to the last page
13 which is page number 489, what -- and that's
14 dated February 7th of 2017.  What promotion was
15 that for?
16   A.   To colonel.
17   Q.   And why didn't you get that
18 promotion?
19   A.   I think, as I said, I didn't show
20 progression as an officer.
21   Q.   Did anyone ever tell you that that's
22 the reason that you didn't get the promotion?
23   A.   As I said, my daily supervisor,
24 Colonel Joganich.
25   Q.   Did anyone else tell you that?
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

19

1    A.   Not that I can think of, if I
2  remember right now.
3         (Deposition Exhibit Number 20 was
4  marked for identification.)
5    Q.   I'd like to show you -- if you keep
6  out that page that we were just on.
7    A.   Sure.
8    Q.   And I'd like to show you -- the page
9  numbers are kind of off.  Some of the stuff that
10 you gave to your attorney that he gave to us,
11 there's duplicates.  And so I'd represent to you
12 that that letter that you're looking at, in my
13 binder that's 489.  What I just gave you as
14 Exhibit Number 20 right there, that's right
15 behind that letter in my binder.
16   A.   Okay.
17   Q.   Which -- I guess, so looking at
18 Exhibit Number 20, is that the breakdown of
19 people who applied for that promotion in 2017?
20   A.   Yes, it is.
21   Q.   Where, where do you fit within this
22 chart?
23   A.   Okay.  So starting at the top I would
24 be in the IPZ category, in promotion zone.  And
25 then tracking downward I'm in the line, the
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

20

1  category that says line.
2    Q.   Okay.
3    A.   That's my category.
4    Q.   So am I reading that right that 731
5  people were considered for the promotions?
6    A.   Correct.
7    Q.   And only 386 were selected?
8    A.   Correct.
9    Q.   And then what about that, just that
10 top part of the chart applies to you, the bottom
11 part where it talks about MajCom statistics, that
12 does not apply to you?
13   A.   It does.
14   Q.   Okay.  How does that apply to you?
15   A.   In the same manner, it's just that
16 the second chart breaks it down into only my
17 command that I'm in.
18   Q.   Okay.  Who's in your command?
19   A.   I'm in air combat command.  It's the
20 largest command in the continental U.S.
21   Q.   And then who's all -- and so there's
22 350 were considered and 158 were selected;
23 correct?
24   A.   Correct.
25   Q.   Okay.  And then who all fits in that
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

21

1 top line?  Is it people outside of your command
2 then?
3      A.    I'm sorry, which top line?
4      Q.    The top part where it says Air Force
5 statistics, who's all included in that 731?
6      A.    It's all Air Force worldwide.
7      Q.    Okay.  Are these charts provided with
8 every promotion?
9      A.    Yes, to my knowledge.  It was
10 provided with the letter.
11     Q.    Okay.  So you didn't request this, it
12 was stapled -- or it was provided --
13     A.    No, sir.  It was in the same
14 envelope.
15     Q.    Okay.  So I was looking at the job
16 history that I gave you.  So looking at page
17 number 37 there which is Exhibit 19.  On this
18 page -- on this chart that you prepared it says
19 in 2014 you were the inspector general, and then
20 2015 to present deputy commander, 55th mission
21 support group.  Is that the different day-to-day
22 duties that we were talking about before?  Does
23 that carry a different title with it?
24     A.    Yes.  Those are my day-to-day duties
25 that we spoke of.
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

22

1      Q.    So before you were inspector general
2 you had day-to-day duties associated with
3 inspector general, and then in 2015 you became
4 deputy commander, and have different day-to-day
5 duties?
6      A.    Correct.
7      Q.    How long will this job assignment
8 last?
9      A.    I think until I retire.
10     Q.    When do you plan on retiring?
11     A.    1 April of '18.
12     Q.    What's that based on?  I guess why
13 April 1 of 2018?
14     A.    Oh, because when you apply for
15 retirement, you can -- there's like a maximum and
16 a minimum you can apply for.  And that was the
17 maximum at the time, you can do like a year out.
18     Q.    Okay.  If you -- I'd like to show you
19 what's been marked as Exhibit Number 2 which are
20 your responses to interrogatories.  If you look
21 at page 6.  I'm looking at the bottom of the
22 answer to interrogatory number 10 where it talks
23 about "Because Ms. Nader's assignment was
24 canceled, she stayed in one place for an extended
25 period of time, which to the military, has a
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

23

1 clear appearance of a defect in an officer's
2 capabilities."
3           Did anyone ever specifically tell you
4 that you had a defect in your capabilities?  Or
5 what's the basis for the statement that there's
6 an appearance of a defect in your capabilities?
7      A.    I think, just as I said before, I
8 haven't shown progression as an officer, as a
9 leader.
10     Q.    But did anyone ever tell you that
11 you -- since you weren't moving, you didn't get a
12 different job assignment, that there was a defect
13 in your capabilities?
14     A.    There's definitely a defect in my
15 ability to progress.
16     Q.    But what about a defect in your
17 capabilities?
18     A.    Not that I remember anyone saying
19 like that.
20     Q.    But since 2015, March of 2015 you've
21 only applied for one promotion, that one that we
22 discussed in February of 2017?
23     A.    I'm only allowed to.
24     Q.    How often are you allowed to apply
25 for promotions?
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

24

1      A.    It's a one-shot deal for each rank.
2      Q.    How often though?  I'm not familiar
3 with the promotional process.
4      A.    It depends on the rank and where
5 you're moving up to.  Trying to think -- sorry,
6 math in public.
7      Q.    Let me ask it this way, so --
8      A.    So I'd have to have served I guess
9 five years as lieutenant colonel before you can
10 apply to be promoted to colonel.
11     Q.    Okay.  So did you first apply to be
12 colonel in 2015, the Spain assignment?
13     A.    No, I wasn't eligible -- well, it was
14 too early.
15     Q.    Okay.  So when would you have been
16 eligible to apply for colonel?  2017 assignment?
17     A.    My application -- my promotion
18 recommendation form was due I think September
19 of '16 and the board was in October of '16.
20     Q.    And then they made the decision in
21 February?
22     A.    They let you know the decision.  They
23 made the decision in October.  They don't tell
24 the member until February.
25     Q.    But -- okay.  So then from, from
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 331-2500

**Exhibit C to Valentino Affd.**

25

1  March of 2015 to that late fall of '16, early '17
2  you could not -- you didn't have the ability to
3  apply for any other promotions?
4      A.   No.  No ability.
5      Q.   Okay.  And then since that one in
6  2017 --
7      A.   Uh-huh.
8      Q.   -- you have not applied for any other
9  promotions; correct?
10     A.   No, I have not.
11     Q.   Is there any -- besides the
12  statements that were made to you, is there any
13  documentation that I can obtain that shows why
14  you didn't get the promotion in February of 2017
15  besides that letter?
16     A.   Not that I'm aware of, no.
17          (Deposition Exhibit Numbers 21 and 22
18  were marked for identification.)
19     Q.   Just want to get some clarification
20  on a couple of the abbreviations there.  Show
21  you -- I'll just show you them together, they're
22  Exhibits 21 and 22.  If you look at the -- if you
23  look at the -- it's Section IV, the rater overall
24  assessment category on both pages, the last line
25  there it says, "gets to 'yes' for tm Offutt--send

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

26

1  to SDE & key COCOM job next!"  What does that
2  mean?
3      A.   Gets to yes, like answer yes, for
4  team Offutt, send to senior developmental
5  education and key combatant command job next.
6      Q.   So is that -- and if you look at 21.
7          MR. TJADEN:  That was 21.
8      Q.   Yeah, if you look at 21, that was
9  your officer performance report from December
10  of 2015 through December of 2016?
11     A.   Correct.
12     Q.   So then with that COCOM, does that
13  mean that you're ready to apply for that
14  promotion that you applied for in 2017?  What
15  does that mean?
16     A.   This, as you see the date, 28
17  December 2016, this report was written after the
18  promotion board of October 2016.
19     Q.   Okay.  So then --
20     A.   This was just my annual report.
21     Q.   So it had nothing to do with that
22  promotion that you applied for?
23     A.   The promotion board never saw this
24  piece of paper.  It was after the fact.
25     Q.   So then what -- so this is after the

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

27

1  fact and then they make a decision in -- or they
2  let you know the decision in February of 2017.
3  What does, what does this mean where it says
4  COCOM job next?  That you should apply for that
5  promotion?
6      A.   No.  That means that he thinks that
7  if I were to move or the Air Force were to give
8  me an assignment, they should consider giving me
9  a job in combatant command.
10     Q.   Is that a promotion or is that just a
11  certain job assignment?
12     A.   It's just a certain job assignment.
13  When you're a more senior officer the way I am,
14  it's a staff job.  It's just I think he was
15  trying to maybe be nice, because most combatant
16  commands are overseas, so you get to be stationed
17  overseas.
18     Q.   Okay.  So it was kind of a
19  performance review saying --
20     A.   It was maybe help me live somewhere
21  nice maybe.
22     Q.   Is there a date in an exact date when
23  you said -- you put in your retirement
24  application I think it was in March or April
25  of 2017.  Was there a date when you said, okay,

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

28

1  I'm done, I'm going to retire?  Was it -- or was
2  it just kind of more of a process?
3      A.   I think it was more of a process.
4      Q.   Is there a time frame when you had a
5  hard decision, okay, I'm going to retire?
6      A.   Yeah, I mean, probably sometime --
7  well, I think thinking about it leading up to the
8  promotion board results.  And then I got the
9  results and they weren't in my favor.  And then
10  just kind of became what am I sticking around
11  for.
12     Q.   And I know you were here for your
13  husband's testimony, but did you know that he
14  watched or looked at pornography?
15     A.   Yes.
16     Q.   When did you first become aware of
17  that?
18     A.   Probably when we were dating.
19     Q.   You were married in 1998?
20     A.   Correct.
21     Q.   How long did you date -- or how
22  long -- when did you first meet Mr. Nader?
23     A.   That would have been 1995.
24     Q.   Where did you meet him?
25     A.   In McConnell Air Force Base, Kansas.

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska  (402) 331-2500

Exhibit C to Valentino Affd.

29

```
1      Q.    Then you dated for about three years?
2      A.    Thereabouts.
3      Q.    Did you know -- when did you first
4  know -- you heard your husband's testimony and
5  the documents that show that he estimated he had
6  over 2 million pornography pictures on his
7  computer?
8      A.    Yes.
9      Q.    When did you know the extent of his
10 pornography addiction or problem?
11     A.    Do you mean in relation to the number
12 or just that he had an addiction?
13     Q.    Well, I guess if -- so you start
14 dating him, you know that he looks at porn.  Was
15 it just kind of he looks at a little bit of porn
16 every so often or did you know the extent of it
17 back in the mid '90s?
18     A.    I don't think he had what most people
19 would call maybe an addiction to how it
20 progressed the same in 1990s.
21     Q.    So how did it progress?
22     A.    You'd have to ask him.  I don't know
23 all the ins and outs.  But I think like a lot of
24 times with addiction, I mean, kind of maybe a
25 slow ramping-up process over years.
```

                THIBAULT, SUHR & THIBAULT, INC.
                 Omaha, Nebraska  (402) 331-2500

30

```
1      Q.    Are there any time frames or
2  landmarks where you can remember, okay, it's
3  gotten worse or I see him watching more on a
4  daily basis?  Does anything stick out in your
5  mind?
6      A.    I think maybe when there was the
7  first allegation of him committing a security
8  violation just being, like, stressed out and
9  everything, I remember there was kind of an
10 uptick then.  And I think, like a lot of times
11 with addiction, things ebb and flow.
12     Q.    That was back in 2011?
13     A.    No.  That was, like, 2009.
14     Q.    Back then how -- and how many hours a
15 day would you estimate he watched or looked at
16 pornography?
17          MR. TJADEN:  Foundation.
18     A.    I honestly don't know.  I'm not with
19 him all day long.
20     Q.    Did he ever look at pornography in
21 front of you?
22     A.    Not that I recall, no.
23     Q.    Ever?
24     A.    No, not that I remember.
25     Q.    So how did you know that he looked at
```

                THIBAULT, SUHR & THIBAULT, INC.
                 Omaha, Nebraska  (402) 331-2500

31

```
1  it?
2      A.    Because I think he's honest to a
3  fault sometimes.  And, again, just sometimes
4  people with addiction, they don't like what
5  they're doing.
6      Q.    Did you ever tell him that he should
7  seek counseling or psychological help or therapy?
8      A.    Not that I remember.
9      Q.    When his -- when did you first become
10 aware that your husband's Microsoft Hotmail
11 account had been shut down?
12     A.    That would have been somewhere around
13 the beginning of December 2014.
14     Q.    Did -- how did you find out?
15     A.    I was actually on temporary duty in
16 the United Kingdom at the time.  And I think I --
17 I think I sent some e-mails or something and they
18 bounced back.  Obviously there was something
19 wrong with the account.
20     Q.    From what time frame were you on
21 temporary duty in the United Kingdom?
22     A.    I was only there like a week.
23     Q.    And it was -- so you're there,
24 e-mails bounce, did you call your husband?
25     A.    Right.  When the time got right, time
```

                THIBAULT, SUHR & THIBAULT, INC.
                 Omaha, Nebraska  (402) 331-2500

32

```
1  change, yes.
2      Q.    But you noticed it because your
3  e-mails weren't going through?
4      A.    Exactly.
5      Q.    When you talked to him, what did he
6  say?
7      A.    He said, he said, yeah, there's
8  something, you know, wrong with the e-mail, you
9  know, I don't know what.  This was like the day
10 that it happened, you know.  I don't think he had
11 a lot of answers, it was just, you know -- he
12 wasn't having a lot of success with his own
13 e-mail account either.
14     Q.    So then did you -- did he -- you
15 follow -- have any follow-up conversations with
16 him about the Skydrive -- or the Hotmail account
17 getting shut down?
18     A.    Yes.
19     Q.    Did he ever tell you why Microsoft
20 told him the account was shut down?
21     A.    Yes.
22     Q.    What did he tell you?
23     A.    He told me that he had somehow --
24 they said that he had violated their user
25 agreement.
```

                THIBAULT, SUHR & THIBAULT, INC.
                 Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-1899

**Exhibit C to Valentino Affd.**

33

1    Q.    Did he ever mention anything about
2  child porn, child pornography being the violation
3  of the user agreement to you?
4    A.    No, not until a lot later.
5    Q.    When?
6    A.    Let me think.  I think sometime after
7  he was arrested.
8    Q.    So December 2014 he tells you it shut
9  down because I violated the user agreement and
10  that was it; correct?
11    A.    That I remember, yes.
12    Q.    And then after -- to the best of your
13  recollection, after he was arrested that's when
14  he mentioned they shut me down because of child
15  pornography?
16    A.    It was sometime after he was
17  arrested.  I don't mean to imply immediately.  I
18  just know that that was the demarcation line, it
19  was sometime after that.
20    Q.    Okay.  Did he tell you even after his
21  Hotmail account was shut down he was able to
22  access his Hotmail from his phone?
23    A.    Yes.
24    Q.    What did he tell you about that?
25    A.    I think that came out even that week
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

34

1  while I was still in the UK, because he was able
2  to see some of my e-mails on his phone, but, you
3  know, he couldn't see them on the laptop.
4    Q.    So he could still receive new e-mails
5  on the phone?
6    A.    Yes, to my knowledge.
7    Q.    Did you -- are you aware, did your
8  husband ever do any follow-up with Microsoft to
9  see why he had been shut down?
10    A.    Yes.
11    Q.    What was that?
12    A.    I know that he contacted them, you
13  know, numerous times or he attempted to via
14  e-mail, because that's the only way you can, and
15  it was always very cryptic.  They would not
16  answer a lot of questions.  They would just not
17  say anything specific.  It was very hard to get
18  to the heart of what they perceived as wrong.
19    Q.    Did he ever get an answer?
20    A.    Not -- to my knowledge I don't think
21  so.  Nothing specific.
22    Q.    Did you ever tell him or advise him,
23  hey, I think you should do this to see if you can
24  figure out what's going on here?
25    A.    I don't think I said anything to him
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

35

1  that he wasn't already doing.  Like have you
2  called them, what did they say, those sorts of
3  things.
4    Q.    So you were on temporary duty in the
5  United Kingdom for about a week and then did you
6  return to Omaha?
7    A.    Yes, I did.
8    Q.    And then how long were you in Omaha?
9    A.    I was in Omaha until March 16th.  I
10  don't remember -- I don't think I went on
11  temporary duty anywhere in between.
12    Q.    So then you left Omaha on March 16th
13  or March 17th?
14    A.    I left on the 16th.
15    Q.    And then this incident -- your
16  husband was arrested on March 17th?
17    A.    Correct.
18    Q.    How did you first hear about your
19  husband's arrest?
20    A.    He called me.
21    Q.    From jail?
22    A.    Yes.
23    Q.    What did he tell you?
24    A.    He told me that the cops had come to
25  the house, we've been searched and he was then
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

36

1  arrested because he was accused of possessing
2  child pornography.
3    Q.    Did you ever use his HP Envy laptop?
4    A.    Nope.
5    Q.    What about there's an HP Pavilion
6  computer, did you ever use that computer?
7    A.    Not that I remember.
8    Q.    And you were in Atlanta at the time
9  on March 17th?
10    A.    Actually, I was not.  I was in Macon,
11  Georgia.
12    Q.    Is there an Air Force base there?
13    A.    There is.
14    Q.    After you had that discussion with
15  your husband with the incident, I'm talking
16  generally about the investigation, his arrest,
17  what's the next thing that you remember about the
18  incident?  And did you receive any other phone
19  calls?  Did Detective Svajgl call you?
20    A.    Later that day, yes.
21    Q.    What did he tell you?
22    A.    Well, he told me that they -- being,
23  I assume, Papillion police -- had received tips
24  from Microsoft that my husband had been -- well,
25  he possessed child pornography and that he had
                THIBAULT, SUHR & THIBAULT, INC.
                Omaha, Nebraska  (402) 331-2500

**Exhibit C to V. Palantino Affd.**

37

```
 1  been uploading it on the Internet and that they
 2  searched the house and they had arrested him.
 3       Q.   What was your response to Officer
 4  Svajgl?
 5       A.   I'm trying to remember.  I think I
 6  just had -- I think I just had like a lot of
 7  questions for him being unfamiliar with these
 8  sorts of processes and things.
 9       Q.   Did you talk about those questions
10  with him?
11       A.   Yes, I did.
12       Q.   What specifically do you recall?
13       A.   Well, as simplistic as it sounds, I
14  remember asking, like, what does that mean.  I
15  mean, when you say seven counts of child
16  pornography, not belittling it, but how serious
17  is that, like what level of crime is this,
18  what -- I didn't, like, understand the scope, if
19  that makes sense, of what we were dealing with.
20       Q.   What was -- what did Officer Svajgl
21  tell you about the severity or the scope of what
22  you were dealing with?
23       A.   He said that it was very serious,
24  that this was a felony, it was very serious and
25  that each of the -- each of the pictures are each
```
                THIBAULT, SUHR & THIBAULT, INC.
                  Omaha, Nebraska  (402) 331-2500

38

```
 1  their individual own count and that each count
 2  carries its own, you know, like, jail sentence,
 3  like they're separate from each other.  And I
 4  asked him what are we talking about.  And he
 5  said, like, up to 10 years per charge.
 6       Q.   Anything else you recall about that
 7  conversation?
 8       A.   Yes.  I mean, he asked me a lot of
 9  general things about what had gone on at the
10  house that day and they had searched.
11       Q.   What was your thought when you heard
12  that your husband allegedly had child pornography
13  on his computer?
14       A.   The worst thing that can ever happen
15  in your entire life.
16       Q.   How long were you on temporary duty
17  in Georgia?
18       A.   I was supposed to have been there for
19  a week.  I was only there a few more hours.
20       Q.   Then were you able to catch a flight
21  back --
22       A.   Yes.
23       Q.   -- to Omaha?
24       A.   I did.
25       Q.   When did you arrive back in Omaha?
```
                THIBAULT, SUHR & THIBAULT, INC.
                  Omaha, Nebraska  (402) 331-2500

39

```
 1       A.   The next morning, the 18th.
 2       Q.   Backing up a little bit.  During that
 3  conversation you had with Detective Svajgl on the
 4  17th, did he say anything about the search that
 5  the police officers had performed on your house
 6  that day?
 7       A.   Yes.
 8       Q.   What did he say about that?
 9       A.   Well, again, he just -- he commented
10  on different things that they found.  I remember
11  he talked about -- he actually apologized for the
12  media attention, because he talked about the bomb
13  squad getting called out.
14       Q.   What did he specifically say about
15  the media attention?
16       A.   He said that going in they knew that
17  we're a military family and they, they respect
18  that, they try to honor that.  And they tried to
19  keep -- out of deference they tried to keep it as
20  quiet as possible.  But he said that he guessed
21  when they made the call to request the bomb squad
22  and it went out over the radio or the police net
23  or whatever, that that must have been when the
24  news media heard and figured it out.
25       Q.   Did you have any other conversations
```
                THIBAULT, SUHR & THIBAULT, INC.
                  Omaha, Nebraska  (402) 331-2500

40

```
 1  with the detective in general?
 2       A.   Yes.
 3       Q.   When were those?
 4       A.   He called me as soon as I landed in
 5  the Omaha airport.
 6       Q.   On the 18th?
 7       A.   Yes, he did.
 8       Q.   What, what was said during that
 9  conversation?
10       A.   He asked me -- he knew I was coming
11  back, so I think he asked me like if I had
12  arrived.  And I told him yes, I'd just landed.
13  And mostly he wanted to discuss when I was going
14  to take our children to Project Harmony.
15       Q.   Any other conversations?
16       A.   I think I asked him about the status
17  of my husband's charges, because he was being
18  held but had not actually been charged.
19       Q.   What did he tell you about that?
20       A.   He acted like he knew that, that he
21  had not been charged.  And said, well, you know,
22  we can hold him I think he said 72 hours I think.
23  But, you know, he assured me that the charges
24  were going to come.
25       Q.   Do you recall any other conversations
```
                THIBAULT, SUHR & THIBAULT, INC.
                  Omaha, Nebraska  (402) 331-2500

**Exhibit C to Valentino Affd.**

**41**

1 with Detective Svajgl?
2    A.  We spoke again I think really
3 briefly.  And I don't remember what day it was,
4 but what it was is he was the one contacting
5 Project Harmony to get the appointment for the
6 kids.  So he called, like, to tell me what the
7 date and the time was.  And I don't remember
8 talking about much else that time.
9    Q.  Any other conversations?
10    A.  Yes.  We talked at Project Harmony.
11 He was there and we talked then.
12    Q.  Any other ones?
13    A.  That was the last one to my
14 knowledge, to my recollection.
15    Q.  Have you had any discussions with
16 Detective Benjamin Iversen?
17    A.  No, sir.
18    Q.  Have you had any conversations with
19 police chief Scott Lyons?
20    A.  No, sir.
21    Q.  Have you had any conversations with
22 Sarpy County Attorney Jennifer Miralles?
23    A.  No.
24    Q.  Any conversations with Sarpy County
25 Attorney Lee Polikov?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

**42**

1    A.  No.
2    Q.  Were you ever placed on leave
3 following your husband's arrest?
4    A.  I took leave somewhere around end of
5 March, beginning of April because the kids were
6 out of school for spring break and I had no one
7 to care for them now that my husband was in jail.
8 So I took leave to provide child care.
9    Q.  Were you ever investigated by the
10 military due to your husband's arrest?
11    A.  Not that I know of.
12    Q.  I'd like to show you page --
13 Exhibit 3 and what's been flagged as -- or marked
14 as Nader 08 -- 0080.  If you look at the
15 third-to-last paragraph, there's a statement
16 that -- it's a long sentence we talked about
17 during your husband's deposition, but there's a
18 statement in here that your husband made to
19 Dr. Stankus that the crime lab for the State of
20 Nebraska is not certified to investigate
21 computers and computer software.  Do you -- and
22 your husband testified that you found out that
23 the State lab was not certified; is that correct?
24    A.  I found out it was not accredited.
25    Q.  How did you find that out?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

**43**

1    A.  Well, I was reading the local news
2 and it just happened to be a news story that the
3 Nebraska State Crime Lab had just gotten their
4 reaccreditation, general news story.  And I read
5 it just like, oh, well, I guess that makes sense,
6 you know, things are accredited and things are
7 certified so I just didn't really know what that
8 meant.  They named a couple things in the news
9 article that they had been accredited for and I
10 noticed that one thing that was not mentioned was
11 anything to do with computers or anything like
12 that.  But that doesn't mean that the media
13 always has it right.  Things like that are
14 usually posted for public consumption, so I
15 looked.
16    Q.  Okay.  Do you remember what news
17 outlet?  Were you watching TV or was it on the --
18    A.  It was on the Internet.
19    Q.  Do you remember what news outlet you
20 were looking at?
21    A.  It was one of the local ones, sorry.
22    Q.  Like a KETV, WOWT?
23    A.  Sure.  Yeah, something like that,
24 exactly.
25    Q.  So then after you saw that article,
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

**44**

1 you went out and did independent research?
2    A.  Yeah, I just looked it up on the
3 State Crime Lab website.
4    Q.  What specifically did you look at on
5 the website?
6    A.  Well, they have their accreditation
7 and stuff listed and the last time they were
8 accredited and, you know, what it said and
9 everything.  I think just for citizens'
10 knowledge.
11    Q.  And it said that they were not
12 accredited for computers and computer software?
13    A.  No.  It didn't discuss it one way or
14 the other.  It said what they were accredited
15 for, and those things were not listed.
16    Q.  I'd like to ask you some questions
17 about Exhibit 16.  Is that a journal that you
18 kept?
19    A.  Yes.
20    Q.  Do you usually -- outside of this
21 incident or this case, do you usually journal?
22    A.  No.
23    Q.  What made you want to start
24 journaling?
25    A.  I was advised to by another lawyer.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

**Exhibit C to Valentino Affd.**

Page 41 to 44 of 95

45

1    Q.    Which lawyer was that?
2    A.    My husband's military lawyer,
3 Mr. J.W. Kastl.
4    Q.    So you started journaling on
5 May 27th, 2015, on that first page there?
6    A.    No.
7    Q.    When did you start?
8    A.    When my husband was arrested.
9    Q.    So there's -- I guess if you look at
10 that packet in front of you, what we have starts
11 on May 27th of 2015.  So you're saying there's
12 more pages out there?
13    A.    Yes.
14    Q.    Can you -- have you given those to
15 your attorney?
16    A.    Yes.
17          MR. TJADEN:  I believe you guys
18 should have everything.  Is it in order here?
19          THE WITNESS:  It looks like it's in
20 order.
21          MR. VALENTINO:  What are we missing,
22 if anything?
23          MR. KUNHART:  Let's go off the record
24 for a second.
25          (An off-the-record discussion was
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

47

1          MR. TJADEN:  All right.  And I don't
2 have a handwritten note prior to May 26th.
3          THE WITNESS:  We can get -- we can
4 make sure you have it.  Yeah, absolutely make
5 sure you have it.
6          MR. TJADEN:  We can get it to you for
7 comparison purposes if you like.
8 BY MR. KUNHART:
9    Q.    So just from the date of arrest
10 through October, you have a handwritten journal
11 and a typed written journal?
12    A.    Actually, not to be confusing, but
13 there is actually a typed version of this one
14 too.
15    Q.    Okay.  That's what I --
16          MR. TJADEN:  There's a typed version
17 of this as well?
18          THE WITNESS:  Yeah.
19          MR. TJADEN:  Okay.  So somehow I
20 wound up with partial typed --
21          THE WITNESS:  Exactly.
22          MR. TJADEN:  -- partial handwritten.
23 BY MR. KUNHART:
24    Q.    Yeah, that's what I was wondering.
25 Okay.  So looking at 321, the third-to-last line,
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

46

1 held, and a short recess was taken.)
2 BY MR. KUNHART:
3    Q.    I have a couple questions about
4 Exhibit 16 there.
5    A.    Sure.
6    Q.    If you look at page Nader 0321, the
7 third-to-last line where it says -- when you --
8 in your journal where you say P, are you
9 referring to your husband?
10    A.    Yes.
11    Q.    Then what made you decide to start
12 hand writing a journal after you had been typing
13 it?
14    A.    Oh, no, I hand wrote it all the way
15 through.  It's just that I later typed it to help
16 transcribe it.  Just because I write it doesn't
17 mean someone can read my writing or whatever.
18 But the typed version, it's, like, literal word
19 by word.  I didn't change --
20    Q.    Of this?
21    A.    Yes.  I didn't change anything.
22    Q.    Is the typed version the entire --
23          MR. TJADEN:  No.  The typed version
24 ends on May 26th.
25          MR. KUNHART:  Okay.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

48

1 "P doing a lot of research.  So many holes in the
2 cop's investigative process."  What did you mean
3 when you wrote that?
4    A.    If you don't mind, give me a minute
5 to get a little bit of context in here.
6    Q.    Yeah.
7    A.    I think what I'm referring to is a,
8 is a book that had been purchased and my husband
9 was doing a lot of reading in that book about
10 child pornography crimes and things like that.
11    Q.    When you were present during your
12 husband's deposition, you heard him talk about a
13 book that you purchased?
14    A.    Yes.
15    Q.    Is that the book that you're
16 referring to now?
17    A.    Yes.
18    Q.    What -- do you know the title of that
19 book?
20    A.    I don't.
21    Q.    You still have the book though?
22    A.    I'm pretty sure he still has it.  I
23 haven't seen it in a long time.
24    Q.    Okay.  So you can get a copy of the
25 book or the title to your attorney for us?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-9500

**Exhibit C to Valentino Affd.**

49

1      A.    Yes, we could.
2      Q.    Specifically from this book do you
3  remember any -- you say there's "So many holes in
4  the cop's investigative process."  What
5  specifically are you referring to?
6      A.    I think just in reading that book and
7  beginning to understand, you know, like, the
8  definitions of child pornography, like, literally
9  what that constitutes and possession,
10 distribution and all these different terms in
11 comparison with what had happened and what we
12 were going through.  There were some things that
13 didn't seem to add up or there were maybe holes
14 or gaps.
15     Q.    More with the definitions of child
16 pornography?
17     A.    Uh-huh.
18     Q.    Is that a yes?
19     A.    Yes.  Sorry.  Like legally, you know,
20 what is considered.
21     Q.    Child pornography?
22     A.    Exactly.
23     Q.    Not the investigative tools that were
24 used by the Papillion Police Department?
25     A.    I don't know what investigative tools
               THIBAULT, SUHR & THIBAULT, INC.
               Omaha, Nebraska  (402) 331-2500

50

1  the Papillion Police Department used.
2      Q.    Do you know the basis for the arrest
3  of your husband, what evidence the Papillion
4  Police Department had when they arrested -- or
5  when it arrested your husband?
6      A.    At which point in time?  Do you mean
7  like as in now or....
8      Q.    Yeah, now.
9      A.    Okay.  So now what I understand by
10 reading the police report is that they -- it was
11 really one image.  They didn't really say what
12 was in it or what it was.
13     Q.    Have you reviewed -- just want to ask
14 you a quick question.  Keep that in front of you,
15 I'll just ask you a couple quick questions.
16 Showing you Exhibits 10 and 11, have you seen
17 those before?
18     A.    Yes, I've seen this before.
19     Q.    When did you first see those?
20     A.    I'd say sometime after my husband got
21 out of jail but sometime before the charges were
22 dropped.
23     Q.    Going back -- looking at -- in that
24 Exhibit 16, Nader 0354.  If you look at the --
25 it's the top paragraph, the second dash there's a
               THIBAULT, SUHR & THIBAULT, INC.
               Omaha, Nebraska  (402) 331-2500

51

1  sentence there talking about the Nebraska State
2  Patrol report?
3      A.    Uh-huh.  Yes.
4      Q.    You state, "it's obvious they're
5  trying to hide something but there's so much
6  omitted."  Do you see that?
7      A.    Yes, I do see that.
8      Q.    Why did you say that?
9      A.    If you don't mind, let me read up and
10 down a little bit.
11     Q.    Yep.
12     A.    Well, I also wrote it in quotes, so
13 those were thoughts conveyed to me from our
14 attorney as were relayed to him.
15     Q.    Tom Petersen?
16     A.    Yes, that is.
17     Q.    So that -- starting with the word --
18 or the sentence, "what is this trash" and then
19 going through "I can't tell what it is they're
20 trying to hide," that's a quote that Tom Petersen
21 said?
22     A.    No.  Before that it said he had a
23 friend read it and the friend said.
24     Q.    Tom Petersen had a friend read it --
25     A.    Yes.
               THIBAULT, SUHR & THIBAULT, INC.
               Omaha, Nebraska  (402) 331-2500

52

1      Q.    -- and the friend said?
2      A.    Yes.  Correct.
3      Q.    So that's not your independent
4  thought that they're trying to hide something?
5      A.    That's why I put it in quotes.  I was
6  just relaying and recording discussions.
7      Q.    Looking at the -- staying on page 354
8  and looking at the last three lines you wrote,
9  "Big Hole:  So the cops arrested him based on the
10 verbal orders of the Co. attorney & the 1 known
11 pic of CP they found on his HP Envy."  Who told
12 you that?
13     A.    If you don't mind again, let me read
14 up a bit.  Okay.  I'm sorry, if you don't mind,
15 can you ask me the question again now that I
16 read?
17     Q.    Yep.  Who told you that the cops
18 arrested him based on the verbal orders of the
19 county attorney and the one known pic of CP they
20 found on his HV Envy?
21     A.    No one told me that.
22     Q.    Are those your -- is that your
23 opinion as to what the basis for the arrest was?
24     A.    Based on the police report.
25     Q.    Okay.  So you read the police report
               THIBAULT, SUHR & THIBAULT, INC.
               Omaha, Nebraska  (402) 331-2500

53

1  and then the sentence that we just discussed,
2  that was your conclusion?
3      A.   Yes.
4      Q.   And then if you go -- I guess moving
5  back to that sentence, did you ever discuss that
6  conclusion with anyone?
7      A.   I mean, I think it probably got
8  discussed with my husband.  It may have been
9  discussed with Mr. Petersen.  I don't remember
10 specifically.
11     Q.   In forming that opinion, did you only
12 look at the police report?
13     A.   Maybe.  I mean, I don't know.  That
14 was quite a long time ago.  But I know the police
15 report kind of stands out in my head.
16     Q.   Okay.  If you turn to page Nader
17 0356.  If you look towards the middle of the
18 page, there's a number 1 that's circled and if
19 you read that it says, "Every cop who touches
20 this has a different version.  Can't go to court
21 w/ different versions."  What's the basis for
22 that statement that "Every cop who touches this
23 has a different version"?
24     A.   I think you'd have to ask
25 Mr. Petersen, because right above the number 1
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska   (402) 331-2500

54

1  I'm referring to "Says we have them on 3 things."
2      Q.   Okay.  So those -- numbered 1, 2, and
3  3 on Nader 356 were three things that
4  Mr. Petersen told you?
5      A.   Yes, sir.
6      Q.   You didn't -- you did not
7  independently think that the different law
8  enforcement officers had different versions of
9  the story?
10     A.   Well, I think that I had concerns
11 reading the various police reports as they
12 trickled in over that summer that none of them
13 seemed to say the same thing.
14     Q.   In what respects?
15     A.   There was just -- seemed to be a lot
16 of shifting on, you know, is this image there or
17 not, what is in this image or not, or what's the
18 age of the person or not.  It's just -- it was
19 very confusing and there didn't seem to be a lot
20 of consistency.
21     Q.   If you could turn to page Nader 0362.
22 The -- it's the seventh-from-the-last line,
23 starts with "Tom asked why."
24     A.   Uh-huh.
25     Q.   Then as it keeps going on it says,
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska   (402) 331-2500

55

1  "Ben said he was reviewing the case too & they
2  really don't have a case.  In the end the cops
3  just really screwed the case up.  Ha!  An
4  admission!"  What's the basis for that statement?
5  Did Ben -- I guess is Ben referring to Ben
6  Perlman --
7      A.   Yes.
8      Q.   -- the county attorney?
9      A.   Yes, it is.
10     Q.   Did you have this -- a discussion
11 with Ben Perlman when he said that the cops
12 screwed this case up?
13     A.   No, I did not.
14     Q.   Who had that discussion?
15     A.   It's my understanding that
16 Mr. Petersen did.
17     Q.   So Tom Petersen told you the
18 statement that we just talked about?
19     A.   Yes, sir, he relayed it to me.
20     Q.   And then that "Ha!  An admission," is
21 that your commentary on that statement?
22     A.   Yes, that would be my commentary.
23     Q.   Show you what's been marked as
24 Exhibit Number 17 which are your initial
25 disclosures in this case.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska   (402) 331-2500

56

1          (An off-the-record discussion was
2  held.)
3  BY MR. KUNHART:
4      Q.   Looking at, it's Exhibit -- what's
5  the number in the corner?
6      A.   Seventeen.
7      Q.   Seventeen, thanks.  Page 4.  If you
8  look at number 3(b) where you talk about your
9  general damages, do you see that?
10     A.   Yes.
11     Q.   How did you arrive at that number
12 of -- or the figure where it's believed to be in
13 excess of $420,000, how did you arrive at that
14 specific figure?
15     A.   I think we just looked at wages and
16 then wages potentially lost and then of course I
17 think we probably looked at how that affects
18 retirement too.
19     Q.   Did you -- do you have any notes or
20 Excel spreadsheets or calculations on how you
21 arrived at that figure?
22     A.   Maybe.  If I do we can provide it.
23     Q.   Okay.  Thanks.  You mentioned earlier
24 that your -- I can't remember his name but your
25 husband's military attorney told you to start
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska   (402) 331-2500

**Exhibit C to Valentino Affd.**

---

**57**

1 journaling.
2    A.   Yes.
3    Q.   What was his name?
4    A.   Mr. J.W. Kastl.
5    Q.   Did you reach out to him after your
6 husband's arrest?
7    A.   I did only because they'd been in
8 close communication the days prior to his arrest
9 about the ongoing Air Force proceedings.  And I
10 knew that J.W. would wonder why there was the
11 cone of silence all of a sudden.
12    Q.   What do you mean by "Air Force
13 proceedings"?
14    A.   Well, with -- he has a military
15 lawyer to help him with his case to get back into
16 the Air Force.
17    Q.   And so after your husband was
18 arrested, you reached out to him?
19    A.   Right, just to let him know that
20 there's a reason Paul hasn't called you --
21    Q.   And then he suggested --
22    A.   -- the last few days.
23    Q.   -- starting to journal?
24    A.   Yes, he did.
25       MR. KUNHART:  All done for now.  Want
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

---

**58**

1 to talk to my clients before I totally wrap up.
2       MR. TJADEN:  We'll take another
3 break.
4       MR. KUNHART:  Do you want to go?
5       MR. TJADEN:  Have you had a chance to
6 read through that?
7       MR. VALENTINO:  No.
8       MR. TJADEN:  Okay.  You want to just
9 jump in right now, you want to --
10      MR. VALENTINO:  I mean I can --
11      MR. TJADEN:  It's up to you.
12      MR. VALENTINO:  If you guys want to
13 break.
14      MR. KUNHART:  I don't care.  You can
15 go.
16      MR. VALENTINO:  Let me go ahead and
17 if you have something to pick up, I will let you
18 do that.
19      (Deposition Exhibit Number 23 was
20 marked for identification, and an off-the-record
21 discussion was held.)
22           CROSS-EXAMINATION
23 BY MR. VALENTINO:
24    Q.   Ms. Nader, I'm going to hand you what
25 has been marked as Exhibit 23.  That was produced
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

---

**59**

1 and provided by your attorneys and it deals with
2 your medical history I think.  And it's under
3 Nader Bates stamped O139 is page 1 of it, O149 is
4 page 2 of it, O152 is page 3 of it, O204 is
5 page 4 of it, O213 is page 5 of it, O214 --
6       MR. TJADEN:  Wait a minute.  I'm
7 sorry.  You said O139 was page 1 of it?
8       MR. VALENTINO:  O139.
9       MR. TJADEN:  I'm showing O139 is page
10 6 of it.
11      MR. VALENTINO:  Well, actually this
12 is what it is.  It may be, it may be not the
13 entire record, I don't know.  It's not the entire
14 record.
15      MR. TJADEN:  You're talking about
16 page 1 of your --
17      MR. VALENTINO:  Yeah.
18      MR. TJADEN:  Okay.  You're picking
19 out individual pages?
20      MR. VALENTINO:  I am.
21      MR. TJADEN:  Okay.
22      MR. VALENTINO:  I'm selectively doing
23 things.
24      MR. TJADEN:  That's fine.  You want
25 to identify it by the page number on the report?
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

---

**60**

1       MR. VALENTINO:  Well, no, I'll have
2 her identify it by date as a matter of fact.
3       MR. TJADEN:  Okay.
4 BY MR. VALENTINO:
5    Q.   The first page of this Exhibit 23 is
6 dated March 16th of 2017; is that correct?  It's
7 at the top, health record, upper left.
8    A.   It is, but that date is not correct.
9    Q.   It's not correct?  You mean the
10 military actually issues papers that are not
11 correct?
12    A.   I think because of when you print it
13 and when it was added to the medical record.
14 This questionnaire was filled out in January
15 of '17.
16    Q.   So it's possible that --
17      MR. TJADEN:  Are we looking at the
18 same thing?  Yeah, we're looking at the same
19 thing.
20    Q.   It says health record 16 March 20 --
21    A.   Yeah, I agree it absolutely does, but
22 I'm not --
23    Q.   Yeah, the first page of it says it.
24      MR. KUNHART:  134.
25    A.   That's interesting.
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

---

**Exhibit C to Valentino Affd.**

61

```
 1      Q.   Well, anyway.
 2      A.   They might not -- you know, what it
 3 may be is that I completed this questionnaire in
 4 another, another computer system and they may not
 5 have extracted it from that computer system to
 6 include it in the medical record until 16 March.
 7      Q.   Well, and maybe, maybe they didn't
 8 have you fill out an entirely different history
 9 and used the older history.
10      A.   Not for, not for the reason this was
11 taken, no, sir.
12      Q.   Okay.
13      A.   They do an entirely new one.
14      Q.   All right.  So if you have medical
15 conditions that affect or may affect your
16 performance or your ability to be reassigned,
17 what regulations does the Army -- the Air Force
18 have regarding whether or not there are certain
19 medical issues that they will, they will put you
20 on some kind of report, if you will?
21      A.   Well, there are regulations.
22      Q.   Right.
23      A.   I'm not familiar with them because
24 I'm not a medical person, that's not my career
25 field.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500
```

62

```
 1      Q.   Correct.
 2      A.   I'm not sure what you mean by placing
 3 me on report.
 4      Q.   Well, that they report your military
 5 medical condition to your commander.
 6      A.   Sure.
 7      Q.   In other words, do not deploy her
 8 because she has X, Y, Z problems.
 9      A.   Right.
10      Q.   Okay.  Now, the X, Y, Z problems that
11 I've been reading in your record of medical care
12 involve kidney stones; true?
13      A.   Yes, sir.  Yes, sir.
14      Q.   And you've had several kidney stone
15 removals, I'm gathering.
16      A.   Yes, sir.
17      Q.   Can you give me an estimate of how
18 many you've had?
19      A.   How many removals or how many stones?
20      Q.   Well, let's go through how many
21 stones.  Because usually you might pop two at a
22 time or more but....
23      A.   I can't be for certain.  Definitely
24 double digits.
25      Q.   Okay.  And as far as hospitalizations
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500
```

63

```
 1 or going to the ER to get some kind of hypo in
 2 order to handle the pain, how many times have you
 3 had to have medical care itself for the kidney
 4 stone issues?
 5      A.   Numerous.
 6      Q.   Okay.  Now, I see that they, that
 7 they've listed that as a -- as apparently a
 8 recurring problem, is that fair to say that?
 9      A.   Yes, it is.
10      Q.   Okay.  They also have an issue about
11 your lipids, your cholesterol; is that true?
12      A.   No, not really.
13      Q.   Okay.  You have high blood pressure?
14      A.   I do.
15      Q.   Okay.  You did or you do?
16      A.   I do.
17      Q.   Okay.  And what kind of medication do
18 you take for that?
19      A.   A diuretic.
20      Q.   Losartan?
21      A.   No.  Hydrochlorothiazide.
22      Q.   You want to spell that for her.
23      A.   H-Y-D-R-O-C-H-L-O-R-O-T-H-
24 I-A-Z-I-D-E.
25      Q.   There's also a question here about
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500
```

64

```
 1 whether or not are you on a temporary profile or
 2 limited duty and it's marked Y, does that mean
 3 yes?
 4      A.   Yes, it does mean yes.
 5      Q.   And 12.b. says why and it says
 6 recurring kidney stones?
 7      A.   Yes.
 8      Q.   And then it says, "During the PAST 2
 9 years, how many times have you been placed on a
10 temporary profile or on limited duty?"  It says
11 five; is that true?
12      A.   True.
13      Q.   And that's over what period, just a
14 two-year period?
15      A.   Yes.
16      Q.   Okay.  It also has that you wear
17 glasses; correct?
18      A.   Yes, I do.
19      Q.   Where's your glasses today?
20      A.   Contact lenses.
21      Q.   Okay.  Said you had two pair or more,
22 I guess.  Do you have regular glasses like I
23 do --
24      A.   Yes.
25      Q.   -- as well?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500
```

THIBAULT, SUHR & THIBAULT
(402) 981-1600

**Exhibit C to Valentino Affd.**

**65**

1          Okay.  Are you allowed to wear
2  contacts when you are in military readiness?
3      A.  Yes.
4      Q.  It also has a listing of your
5  behavioral health.  It says none under over the
6  past month, what major life stressors have you
7  experienced.  Is that correct?
8      A.  I'm sorry, which line are you at,
9  sir?
10     Q.  I'm at number VI, behavioral health
11 (MHA).
12     A.  Okay.
13     Q.  1.a, over the past month.
14     A.  Okay.  Over the past month, yes, it
15 says none.
16     Q.  And in the past year it asks did you
17 receive any mental health condition or concern
18 such as, but not limited to, PTSD, depression,
19 anxiety disorder, alcohol abuse, or substance
20 abuse, is that a no?
21     A.  It says no.
22     Q.  Okay.  And you weren't taking any
23 over-the-counter medications for sleep, pain,
24 combat stress, or a mental health problem, that's
25 true?
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

**66**

1      A.  True.
2      Q.  Okay.  Now, the next page which is a
3  record from I think it says December 20th of 2015
4  and it was refreshed it says by Larson -- or
5  Bridget Larson.  Is there a date on here that's
6  more specific than -- it says date April 6th,
7  2017, do you see that?
8      A.  I think, I think that is the date,
9  April 6th, 2017.
10     Q.  That makes sense.
11     A.  The other date you're referring to, I
12 think it must -- the 20 December has to reference
13 something else, I don't know what though.
14     Q.  I don't understand the codes on that.
15     A.  I don't understand all of them
16 either.
17     Q.  Okay.  And this one it had your chief
18 complaint was anxiety?
19     A.  Yes.
20     Q.  But it didn't affect your
21 concentrating ability apparently according to
22 this record; is that true?
23     A.  Where are you at now, sir?
24     Q.  Right below "History of present
25 illness."  You were seen 30 minutes, IBHC
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

**67**

1  appointment, second visit to the IBHC clinic.
2  What does that stand for, by the way?
3      A.  Ehrling Bergquist Health Clinic.
4      Q.  Okay.  It sounded -- it appears that
5  some of your lack of sleep has to do with the
6  blood pressure medication that was changed, am I
7  reading that correctly?  Patient worked
8  through --
9      A.  Just a moment if you don't mind if I
10 read it.
11     Q.  "The only thing that complicated
12 adherence was that the timing of when to take her
13 blood pressure med was changed and this led to
14 more frequent nighttime urination, which added to
15 her sleep difficulties and overall lethargy."  Is
16 that true?
17     A.  Not exactly.
18     Q.  Okay.
19     A.  What she's referring to is I had not
20 had trouble going to sleep but I would have
21 trouble staying asleep.
22     Q.  You'd wake up?
23     A.  Right, I would wake up.  So then when
24 I woke up to go to the bathroom, because I was
25 anxious I would have a hard time going back to
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

**68**

1  sleep and completing my night's sleep.  So they
2  thought that one thing that could help would
3  maybe change the timing of the pill and maybe I
4  wouldn't have to go to the bathroom in the middle
5  of the night and then perhaps I would sleep
6  through.
7      Q.  In the next paragraph it indicates
8  that you had not previously discussed all the
9  major stressors in your life in the last session
10 due to time constraints, but it does say "The
11 patient discussed ongoing work stress amongst
12 supervisors as well as related to her application
13 for retirement, long-standing stressors connected
14 to her husband and his ability to enlist in the
15 AF which they should hear about any day, the
16 ongoing civil case, and her mother's failing
17 health."  Is that pretty much what that
18 discussion involved on that particular April 6th
19 of 2017 regarding your major stressors?
20     A.  To my recollection, yes.
21     Q.  Okay.  Did you have supervisors that
22 were giving you a hard time?
23     A.  Yes.
24     Q.  Okay.  They would be people that were
25 your rank or above your rank?
             THIBAULT, SUHR & THIBAULT, INC.
             Omaha, Nebraska  (402) 331-2500

**Exhibit C to Valentino Affd.**

69

1    A.  Both.
2    Q.  Okay.  And then you had put in for
3  your retirement at that point in time?
4    A.  Let me look at the date.
5    Q.  "...as well as related to her
6  application for retirement...."
7    A.  I think that I had applied for my
8  retirement, but I'm pretty sure it had not been
9  approved by this date.
10   Q.  Right.  And now it's been approved,
11 and you said you're going to be out of the
12 service as of April of 2018?
13   A.  Yes.  1 April, yes, sir.
14   Q.  You'll have, what, 22 years or 21
15 years at that time?
16   A.  Almost 22 years.
17   Q.  Okay.  At 22 years -- if you get 22
18 years, that gives you your full retirement, does
19 it not?
20   A.  I get my full retirement at 20.
21   Q.  Okay.  Twenty-two adds to that?
22   A.  It does, adds a little bit.
23   Q.  Okay.  The next page which is 0152, I
24 think one of the suggestions that were apparently
25 made is that you adhere to some kind of work-out
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

70

1  routine?
2    A.  That sounds familiar, yes.
3    Q.  And also I think maybe encouraged you
4  to have down time or quiet time?
5    A.  Yes.
6    Q.  So that you would be perhaps more at
7  peace with whatever your stressors were?
8    A.  Yes.
9    Q.  Okay.  Now, I know lawsuits cause
10 stress in people, it simply does.  But I
11 understand from reading this that you were
12 excited about your retirement package had finally
13 been accepted and you and your husband had booked
14 a cruise for the entire family the beginning of
15 June and that your work stress ebbs and flows
16 apparently due to supervisors that were causing
17 you some difficulties but you've been able to
18 work through that, is that a fair statement?
19   A.  With the supervisors?
20   Q.  Yes.
21   A.  Mostly, yes.
22   Q.  Okay.  Your kidney issues are
23 something that is permanent for you, is it not?
24   A.  In what sense, sir?
25   Q.  Well, I read somewhere that -- and I
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

71

1  think it was in your husband's report -- that you
2  have some kind of acidic issue?
3    A.  Yes, sir.
4    Q.  And that that causes your kidney
5  stone production?
6    A.  Yes.
7    Q.  Okay.  Do they tell you what not to
8  drink or do they keep you away from certain types
9  of beverages?
10   A.  They did at first and now they've
11 figured out exactly what the problem is and I
12 just take a couple pills.
13   Q.  Okay.  So the acidic condition wasn't
14 caused because you drink iced tea like me?
15   A.  No.  It's a metabolic defect.
16   Q.  All right.  Is that something that
17 the Army would -- the Army.  Is that something
18 that the Air Force would disqualify you from duty
19 assignments for?
20   A.  No.  Actually, the Air Force made a
21 determination about that after that diagnosis was
22 made, and they went and met a medical evaluation
23 board and they decided to keep me.
24   Q.  Would you be able to continue to fly
25 with that condition?
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

72

1    A.  Yes.  On the previous -- one of the
2  previous pages where it said medical profile --
3    Q.  Flight status?
4    A.  -- it said Y, that means yes.  "Are
5  you on temporary profile or limited duty?"  12.a.
6  that's what they are referring to.  I have a
7  waiver -- I'm on profile and have a waiver to
8  fly.
9    Q.  Have you ever had situations when you
10 were, when you were -- and I gather in your
11 flight crew you were the warfare specialist?
12   A.  One of them, yes.
13   Q.  Okay.  Did you ever have any
14 situation where your kidney stones had begun to
15 drop into your ureters and caused you such pain
16 that you had to discontinue your operation as a
17 warfare officer?  You understand what I'm asking
18 you?
19   A.  Like I had to stop being an EWO?
20   Q.  Because the pain over -- it was so
21 great with the kidney stone trying to drop
22 through your --
23   A.  No.  I've never experienced that on a
24 mission or anything.
25   Q.  You've never had to go to the
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-9500
Exhibit C to Valentino Affd.

73

1  hospital and get a hypo to reduce the pain from
2  the condition?
3      A.   I have.
4      Q.   Okay.  What do you do when you're in
5  a flight status and that overtakes you?
6      A.   So what happens is, like any other
7  illness, you go on what's called DNIF.  And I
8  know you're going to ask me what that stands for,
9  D-N-I-F, and I forget what it stands for.  But it
10 basically means that you can't fly until they
11 sort out what's wrong with you.  And you get that
12 if you have a sinus infection.
13     Q.   Okay.
14     A.   And you get your procedure done
15 and -- for the kidneys, like you said, and get
16 them busted up and they clear out and they'll put
17 you back up on status.
18     Q.   How many operations have you had
19 actually where they had to go in and take the
20 stones out?
21     A.   At least six.
22     Q.   Okay.  So a chronic condition for
23 you?
24     A.   Yes, it is.
25     Q.   All right.  I know when they try
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

74

1  to -- have they ever tried to use ultrasound to
2  break the stones?
3      A.   Yes, they have.
4      Q.   Has that been successful at all?
5      A.   Oh, yes, they come out, I just make
6  more, well, that is until they figured out what
7  was wrong.
8      Q.   What was the largest one you've ever
9  passed?  Pea size?  Marble size?
10     A.   That I ever passed?
11     Q.   Yeah.
12     A.   Typical, I mean most people can't
13 pass anything larger than a 5-millimeter.
14     Q.   Right.  So what were the ones they
15 removed, how big were they?
16     A.   I've had ones up to 2 centimeters.
17     Q.   Larger than the top of that bottle
18 cap in front of you?
19     A.   Two centimeters.
20     Q.   About twice that size?
21     A.   I've never had -- to clarify, I've
22 never had an open kidney surgery to remove a
23 2-centimeter stone.  What they do is you go to
24 the hydrotherapy, they bust it into a lot of
25 smaller ones and then they all get to come out.
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

75

1      Q.   Unless they do a stent and try to
2  drag it out; right?
3      A.   It's standard that you get a stent
4  when you have a surgery like that.
5      Q.   Page 204 of the Bates-stamped
6  Exhibit 23, that was apparently an August 14th,
7  2015, report; is that true?
8      A.   Well, looks like it was somehow
9  printed then.  Actually, if you look lower it
10 says 27 May 15.  That's a little more accurate to
11 when this was -- when this visit was.
12     Q.   Okay.  Why would they have a print
13 date that's different than your date time?
14     A.   I don't work in that in the Air
15 Force.  I have no idea.
16     Q.   Okay.
17     A.   Sorry.
18     Q.   I mean, if you -- is it possible that
19 you asked for this record before and they printed
20 it before?  I mean, your attorney produced these.
21 I'm curious if this is something that was
22 obtained back in August?
23     A.   I don't remember.  I do know that our
24 clinic on base, all the different specialties are
25 stovepiped and they don't necessarily feed in
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

76

1  automatically to your primary care manager.  So
2  sometimes it has to do with if your primary care
3  manager is smart enough to go to that clinic and
4  say, hey, give me this record so I can include it
5  in her larger medical file.  I'm guessing that.
6      Q.   I see that they -- in the summary of
7  care they did psychological testing.  I was
8  gathering that was the -- a written series of
9  questions that was provided?
10     A.   I did it on the computer actually.
11     Q.   Okay.  I get that.
12     A.   Yeah.
13     Q.   Is that the MMPI test that you're --
14     A.   Maybe.  I don't know the name of it.
15     Q.   Okay.  And in any event, it looked
16 like there was no significant concerns they
17 identified; is that true?
18     A.   Sure.
19     Q.   You weren't placed on profile?
20     A.   No, I was not.
21     Q.   Says you remain suitable for flight
22 status, the last sentence of that paragraph?
23     A.   I think at that time -- yes, I guess
24 so.
25     Q.   It says you weren't --
            THIBAULT, SUHR & THIBAULT, INC.
            Omaha, Nebraska  (402) 331-2500

77

1      A.    I guess I was.
2      Q.    -- added to the HIL so it says "She
3  remains suitable for flight status."  True?
4      A.    That's what they say, so, yes, I was
5  on flight status.
6      Q.    Okay.  The next document that we have
7  is the O213 of Exhibit 23 which says the health
8  record of May 26, 2015.  Is there another date
9  that appears that maybe this was printed that
10  date or do you -- would it make sense that you
11  would have --
12      A.    Yes.
13      Q.    -- you would have been in there on
14  that date of --
15      A.    That sounds about right, that time.
16      Q.    -- May 26th?
17      A.    Yeah, May of '15.
18      Q.    I'm sorry, May 26th of 2015?
19      A.    Yes.
20      Q.    Okay.  And they have apparently
21  looked -- I mean, as I read this says, you have
22  no obsessions on thought content.  "No
23  obsessions/compulsions; no delusions; no evidence
24  of perceptual disturbances."  And apparently no
25  suicidal or homicidal ideations.  That's good to
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

78

1  know.  So on May 26th, it continues to the next
2  page I believe, there we are, says you
3  "...completed the MMPI-2 and MCMI-III to assess
4  for any abnormal personality characteristics and
5  psychological distress.  Testing results were
6  valid for interpretation and no biased response
7  styles were identified.  Member's testing does
8  not indicate any significant psychological
9  distress or concerns."  That sound correct?
10      A.    That's what it says.
11      Q.    All right.  And it said -- the last
12  sentence actually says, the last two sentences,
13  "Overall, testing results demonstrate that the
14  member does not meet criteria for any psychiatric
15  diagnosis at this time.  She is psychologically
16  healthy and of a clear mind."  So you were --
17  continued to perform all duties of your command?
18      A.    Yes.
19      Q.    Okay.  The last document of this is
20  labeled O227 and it says the intake time was
21  May 4th of 2015.  Does that tie to the previous
22  document perhaps?
23      A.    No.  I think it was -- I think they
24  were different visits.
25      Q.    Okay.  One is -- okay.  So actually
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

79

1  the O227 precedes the previous record, does it
2  not, by about two weeks?
3      A.    It seems that it does.
4      Q.    Okay.  So actually the preceding
5  document, O214, where they actually gave you the
6  testing is probably the most current of the 2015
7  series?
8      A.    I think so.
9      Q.    Okay.
10      A.    I assume so.
11      Q.    Good enough.  Ms. Nader, would you
12  agree that your husband Paul Nader suffers from
13  an obsessive compulsive disorder?
14      A.    Yes.
15          MR. TJADEN:  Objection.  Foundation.
16  You can go ahead.
17      A.    That's what --
18      Q.    The psychiatrist and psychologist
19  have found that?
20      A.    That's what they said, and they
21  probably know better than me.
22      Q.    Did they bring you into the sessions
23  at all?
24      A.    I think I sat in on one session with
25  Dr. Stankus.
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

80

1      Q.    And did you find Dr. Stankus to be
2  thorough and thoughtful in his analysis of what
3  he felt your husband's deficits or positive
4  attributes were?
5      A.    I don't really -- we didn't really
6  discuss diagnosis that day with Dr. Stankus.  I
7  can't remember what we did discuss that day.  But
8  I think we just talked about his general
9  well-being and stuff.  I didn't hear from
10  Dr. Stankus that day on what his professional
11  opinion was.
12      Q.    Did you ever ask him?
13      A.    No.  He wasn't my doctor.
14      Q.    I understand that, but you're the
15  spouse of a man who was seeing a psychologist and
16  a psychiatrist, certainly you'd be concerned
17  about his welfare, wouldn't you?
18      A.    Sure, but that's HIPAA.  They won't
19  even tell me.
20      Q.    Yeah.  Well, if you're sitting -- if
21  you're sitting in on the patient's visit, I think
22  there's a thing called a waiver --
23      A.    They did.
24      Q.    -- that applies to a spouse who wants
25  to know her husband's medical condition unless he
          THIBAULT, SUHR & THIBAULT, INC.
          Omaha, Nebraska  (402) 331-2500

Exhibit C to Valentino Affd.

**81**

1  said I don't want her to know.  And he never said
2  that, did he?
3      A.    I don't know.  You'd have to ask him.
4      Q.    He never said it to you, did he?
5      A.    No, he never said it to me.
6      Q.    Okay.  So is it fair to say that when
7  you found out, either from him or from his
8  doctor, that he suffered from obsessive
9  compulsive disorder, you didn't disagree with
10 that opinion based on your living with the man
11 for 18-plus years, have you?
12         MR. TJADEN:  Same objection,
13 foundation.  Go ahead and answer if you can.
14     A.    Not a doctor, but in my
15 understanding, yes.  I mean, I think so.  I
16 agree.  I mean, I think so.
17     Q.    It made sense to you based on what
18 you were observing about your husband; true?
19     A.    Yeah, it didn't seem like out of left
20 field or something that they would say that.
21     Q.    The doctor also talked about him
22 having these certain hobbies, aside from the
23 pornography thing, certain hobbies about watches
24 and repairing those and that he considered to
25 be -- going to yard sales that he thought was
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

**82**

1  obsessive for your husband.  Did you have any
2  discussion about that issue with your husband?
3      A.    I don't remember.  I don't remember
4  discussing -- I don't think we discussed that
5  that day with Dr. Stankus.
6      Q.    Well, not only that day.  Didn't Paul
7  actually cut back on some of those kinds of
8  activities?
9      A.    I'm trying to remember.  It's been a
10 long time.  Maybe.  I honestly don't remember.
11     Q.    He wasn't selling these watches on
12 Etsy all the time, was he?
13     A.    Do you mean as in, like, listing
14 stuff every day or....
15     Q.    Well, some people horde things.  Was
16 he selling the watches or would he just keep
17 buying them and then trying to repair them and
18 not selling them?
19     A.    He would sell some, I mean....
20     Q.    But do you know if Dr. Stankus
21 identified that as part of his obsessive
22 compulsive disorder?
23     A.    The watches you mean?
24     Q.    Yes.
25     A.    I'm not sure.  I mean, I don't
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

**83**

1  remember Dr. Stankus saying that to me.
2      Q.    Okay.  So let's talk about the
3  standards that you said that were not I think
4  adhered to or not certified by the Nebraska State
5  Patrol.  Have you ever heard of an organization
6  called the Commission on Accreditation for Law
7  Enforcement Agencies or CALEA, C-A-L-E-A?
8      A.    I think I have heard of that.
9      Q.    The Nebraska State Patrol didn't get
10 recertified until 2016.  Do you recall whether or
11 not that was what you had read about them not
12 being accredited by that agency?
13     A.    You mean read, read where?  Sorry.
14     Q.    You said you either read it online or
15 you saw it somewhere.  What I'm asking you is, is
16 that the reference that you have is that they
17 were not CALEA, C-A-L-E-A, accredited in 2015,
18 they got reaccredited -- or accredited in 2016?
19     A.    I don't remember that the news
20 article said anything about them previously not
21 being accredited.  I just remember the news
22 article, like, had a little bit more of a
23 positive spin, kind of like, hey, Nebraska just
24 got its accreditation again.
25     Q.    Okay.  And do you know that's a
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

**84**

1  voluntary organization to belong to?
2      A.    Yes, I do.
3      Q.    Okay.  And the last time they were
4  accredited before 2016 was in 2013?
5      A.    I think I knew that.
6      Q.    Okay.  Didn't mean that their lab is
7  crap, does it?
8      A.    I don't know.  I haven't been to
9  their lab, sir.
10     Q.    Well, you saw the reports that were
11 generated from them, did you not?
12     A.    Yes, sir, I did.
13     Q.    Okay.  I want to shift gears just a
14 little bit and I'm going to be done.  You are
15 aware from my questions to your husband Paul that
16 your conversations were being recorded as you
17 folks talked over the phone; correct?
18     A.    Yes, sir.
19     Q.    And in fact you expressed that
20 awareness several times in your talking with
21 Paul, did you not --
22     A.    Yes.
23     Q.    -- during that course?
24         Do you recall in March 18th of
25 2015 -- counsel, it's file number 1324 -- that
        THIBAULT, SUHR & THIBAULT, INC.
        Omaha, Nebraska  (402) 331-2500

**Exhibit C to Valentino Affd.**

85

1  you advised your husband that you had hired a new
2  attorney for him named Tom Petersen with a
3  $10,000 retainer that was paid by you?
4      A.   I'm sure I told him that.
5      Q.   And do you recall you telling Paul
6  that the cops were pitting you and he against one
7  another over the number of pictures that were on
8  the HP computer as to whether or not it was three
9  or seven?
10     A.   Yes, I do.
11     Q.   Okay.  And that you also complained
12  about the media coverage because you thought --
13  or he thought it was the Arab card being played
14  by the media?
15     A.   If that's what it says.  I don't
16  remember that specifically.  If that's what the
17  transcript says, sure.
18     Q.   Well, wasn't that actually a point of
19  the conversation several times over the 30-some
20  days that Paul spent in jail, that there was
21  something with his ethnicity that was leading to
22  various things that you felt or he felt were
23  unfair in the process?
24     A.   Yes, I think we discussed that a
25  couple times.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

86

1      Q.   Okay.  And in fact this conversation
2  about Perlman being the Jew assigned to his case
3  was also a point of contention in those
4  conversations, was it not?
5      A.   I don't know if I remember it being a
6  point of contention, but I do remember discussing
7  that Mr. Perlman was Jewish.
8      Q.   When your children were set up to
9  meet with the Project Harmony people, during
10  interviews you were segregated from your children
11  while they were being asked questions; is that
12  true?
13     A.   Yes, it is.
14     Q.   And who else was with you in the room
15  that you were watching on closed circuit?
16     A.   I was never allowed to watch closed
17  circuit.
18     Q.   How were you informed of what their
19  answers were or weren't?
20     A.   I wasn't.
21     Q.   Okay.  So if you would have told your
22  husband that they did really well, where would
23  you have heard that from?
24     A.   Well, what happened is is that at the
25  end of the children being questioned, I was
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

87

1  called back into the room like with a panel of
2  folks from Project Harmony and they gave me,
3  like, an executive summary, shall we say, their
4  opinion generally of what they observed.
5      Q.   Okay.  Do you recall telling Paul on
6  March 19th of 2015, which is file number 1624,
7  that you felt your underwear drawer had been gone
8  through -- underwear drawer had been gone through
9  by the police and all your underwear was checked
10  by cops and you called them perverts?
11     A.   Yes, I did.
12     Q.   Did you advise your children before
13  the Project Harmony interview that they should
14  tell the truth and that those -- that your
15  daughter is not responsible if her dad made poor,
16  sinful decisions?
17     A.   I definitely told my children to tell
18  the truth because that interview was very
19  important.
20     Q.   Right.
21     A.   I have no recollection of that second
22  part.
23     Q.   Okay.  Well, on March 22nd of 2015,
24  file number 1442, it says that you told your
25  daughter, because she was concerned and worried
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

88

1  about this interview coming up, that she is not
2  responsible if her dad made poor, sinful
3  decisions.  Do you recall saying that?
4      A.   I have no recollection of that.
5      Q.   You don't deny that you said it, do
6  you?
7      A.   If you say it's in the transcript,
8  it's in the transcript.
9      Q.   You haven't listened to the
10  recordings yourself, have you?
11     A.   No, sir.  I haven't.
12     Q.   All right.
13     A.   That doesn't even sound like
14  something I would say but --
15     Q.   Really?
16     A.   -- if you have it written there.
17     Q.   Now, is it correct that you would
18  have sent an e-mail to your commanding officer
19  over your options so that you wouldn't be forced
20  to retire for refusal of any assignment?
21     A.   Yes, I sent him an e-mail.
22     Q.   Okay.  Do you recall on March 30th of
23  2015, file number 1840, that your husband
24  admitted to you that porn is sinful but that you
25  told him it's normal in our society today?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

THIBAULT, SUHR & THIBAULT
(402) 981-1500
**Exhibit C to Valentino Affd.**

89

1    A.    I don't specifically remember that.
2    Q.    You're not denying you said it?
3    A.    I could have said it.
4    Q.    Do you recall also telling him that
5 some images may appear to be younger women but
6 you really can't tell that they are younger
7 teens?
8    A.    I may have said that.
9         MR. VALENTINO:  Same file, Counsel.
10    Q.    Do you recall telling your husband on
11 March 31st of 2015 at file number 1300 that you
12 said to Paul that Investigator Svajgl had told
13 you that Paul is a liar, as there were always
14 seven pics, not three, on his computer and he
15 knew it?
16    A.    Detective Svajgl did say that to me.
17    Q.    Okay.  And he called your husband a
18 liar because there were seven pics, not three?
19    A.    His exact words were I'm sorry,
20 Mrs. Nader, he's lying to you.
21    Q.    Because you told them that Paul told
22 you there are only three?
23    A.    Yeah, I think I mentioned that in the
24 conversation, that's how we got into that.
25    Q.    Do you recall on April 6th of 2015 at
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

90

1 file number 1920 that you told Paul that the
2 prosecution is going to make up shit and then
3 Paul told you, well, that's just something good
4 for a countersuit.  And that Paul said to you
5 people like us don't get arrested because we
6 don't do stupid things like I'm accused of.
7 Recall that conversation?
8    A.    Not specifically.
9    Q.    You don't deny you said it or that he
10 said it?
11    A.    If it's in the transcript, I'm sure
12 we did.  I just don't remember that particular
13 conversation.
14    Q.    Do you recall on April 6th of 2015
15 that you told Paul that the possession of
16 possible criminal material has not kept up with a
17 real technology view of what constitutes Internet
18 possession?
19    A.    I'm sorry, if you don't mind, could
20 you read that to me again?
21    Q.    I will.
22    A.    I was trying to digest that.
23    Q.    The possession of possible criminal
24 material has not kept with the real technology
25 view of what constitutes Internet possession.
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

91

1    A.    I may have said that.
2    Q.    In other words, downloading something
3 from the Internet is different than having it in
4 your hands?
5         MR. TJADEN:  Objection.  Form of the
6 question.
7    Q.    Is that the thought being processed?
8    A.    I think I was maybe referring to,
9 like, sexting, you know.  There's been --
10 unfortunately a lot of jurisdictions have had
11 trouble with prosecuting that.  There's no laws
12 on the books.
13         MR. VALENTINO:  Okay.  I have nothing
14 further.  Thank you.
15         MR. KUNHART:  Take a quick break.
16         (A short recess was taken.)
17              REDIRECT EXAMINATION
18 BY MR. KUNHART:
19    Q.    I just have a couple follow-up
20 questions.  The -- so you have the handwritten
21 notes and then I think it was Exhibit 16, the
22 handwritten diary.  Was that -- and they're
23 dated.  Did you each night go and write or did
24 you say, okay, once the kids go to bed, I'm going
25 to journal what happened today?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

92

1    A.    That's generally how I did it, yes.
2    Q.    So it was -- everything was made the
3 day that it occurred?
4    A.    Yes.
5    Q.    And then how long after the
6 handwriting would you go back and type up the
7 notes?
8    A.    Oh, that didn't happen until a lot
9 later.  I mean, like -- I think after everything
10 was done, so to speak, after the charges were
11 dropped and it was later.
12    Q.    Then you just sat down in one sitting
13 and typed it all out?
14    A.    No, there was a lot.  It took a
15 while.
16    Q.    And then have you done any research
17 or ordered any surveillance on any of the
18 individual defendants?
19    A.    No.  I mean, I think maybe a google,
20 but that's it.
21    Q.    What did you, what did your google
22 search uncover about each of the parties?
23    A.    Trying to think.
24    Q.    You want me to run through them?  Do
25 you want their names?
              THIBAULT, SUHR & THIBAULT, INC.
              Omaha, Nebraska  (402) 331-2500

93

```
 1        A.    No, no, that's okay.  I think I
 2   googled -- I think I googled Miralles and I saw
 3   the recent arrest.  And then I looked at googling
 4   my husband when we heard about Mr. Lyons looking
 5   for another job.
 6        Q.    Anything else?
 7        A.    Not that I can remember, no.
 8             MR. KUNHART:  I don't have any other
 9   questions.
10             MR. TJADEN:  Are you asking if we
11   googled your name?
12             MR. KUNHART:  Go for it.  All right.
13   No news stories that I know of.  I don't have
14   anything else.
15             MR. TJADEN:  Vince, anything?
16             MR. VALENTINO:  No, I don't.  Thank
17   you.
18             MR. TJADEN:  You bet.  You have the
19   right to read it when she prepares the
20   transcript, you also have a right to waive
21   reading and signing.
22             THE WITNESS:  I can waive it.
23             (The deposition was concluded at the
24   hour of 4:01 p.m.)
25

              THIBAULT, SUHR & THIBAULT, INC.

                Omaha, Nebraska  (402) 331-2500
```

95

```
 1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEBRASKA
 2
 3   WADITH STOCKINGER NADER and )  Case No. 8:17-cv-83
     STACEY NICHOLE NADER,        )
 4                                )
          Plaintiffs,             )
 5                                )
          v.                      )
 6                                )
     THE CITY OF PAPILLION; SARPY )
 7   COUNTY; BRYAN SVAJGL;        )
     BENJAMIN IVERSEN; SCOTT A.   )
 8   LYONS; L. KENNETH POLIKOV;   )
     and JENNIFER MIRALLES,       )
 9                                )
          Defendants.             )
10   _____)

11            CERTIFICATE OF REPORTER

12        I, Deanna L. Maley, RPR, CRR, and General
     Notary Public, do hereby certify that I served as
13   the Court Reporter at the deposition of WADITH
     STOCKINGER NADER on July 10, 2017, at 2120 South
14   72nd Street, Suite 1500, Omaha, Nebraska, in
     which the costs of reporting and transcribing the
15   deposition were $ _____, and that such costs are
     to be paid by counsel for defendants Sarpy
16   County, Polikov & Miralles.
          I further certify that the original and
17   copies were sent to:  Original and 1 copy to
     Mr. Ryan M. Kunhart; 1 copy to Christopher J.
18   Tjaden; 1 copy to Mr. Vincent Valentino.
          Dated this 20th day of July, 2017.
19
          Delivered:  _____
20
                      _____
21                    GENERAL NOTARY PUBLIC
                      Deanna L. Maley, RPR, CRR
22                    Thibault, Suhr & Thibault, Inc.
                      6818 Grover Street, Suite 300
23                    Omaha, Nebraska  68106
                          (402) 331-2500
24
25
       THIBAULT, SUHR & THIBAULT, INC.
         Omaha, Nebraska  (402) 331-2500
```

94

```
 1            - C E R T I F I C A T E -

 2
 3   STATE OF NEBRASKA  )
                        ) ss.
 4   COUNTY OF DOUGLAS  )

 5        I, Deanna L. Maley, RPR, CRR, and
 6   General Notary Public in and for the State of
 7   Nebraska, do hereby certify that STACEY NICHOLE
 8   NADER was by me duly sworn to testify the truth,
 9   the whole truth and nothing but the truth, and that
10   the deposition by her as above set forth was
11   reduced to writing by me.
12        That the within and foregoing
13   deposition was taken by me at the time and place
14   herein specified and in accordance with the within
15   stipulations, the reading and signing of the
16   witness to her deposition having been waived.
17        That I am not counsel, attorney or
18   relative of either party or otherwise interested in
19   the event of this suit.
20        IN TESTIMONY WHEREOF, I have placed my
21   hand and notarial seal this 20th day of July, 2017.
22
23             _____
24             GENERAL NOTARY PUBLIC
25   COST:  $ _____

       THIBAULT, SUHR & THIBAULT, INC.

         Omaha, Nebraska  (402) 331-2500
```

THIBAULT, SUHR & THIBAULT
(402) 981-9900

Exhibit C to V. Valentino Affd.