IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WADITH STOCKINGER NADER and STACEY NICHOLE NADER, | ) ) ) | Case No. 8:17-CV-00083 |
| Plaintiffs | ) ) ) | **AFFIDAVIT OF ZACHARY LUTZ-PRIEFERT** |
| vs. | ) ) | |
| THE CITY OF PAPILLION; SARPY COUNTY; BRYAN SVAJGL; BENJAMIN IVERSEN; SCOTT A. LYONS; L. KENNETH POLIKOV; and JENNIFER MIRALLES, | ) ) ) ) ) ) | |
| Defendants. | ) | |

COMES NOW Zachary Lutz-Priefert, being first duly sworn under oath, hereby states and alleges as follows:

1.    I am of lawful age and competency to execute this Affidavit.  I have personal knowledge of the facts set forth in this Affidavit.

2.    I am an attorney licensed in the State of Nebraska.

3.    I represent Wadith Stockinger Nader, and Stacey Nicole Nader in the above-captioned matter.

4.    On September 8, 2017, the deposition of Benjamin Iversen was taken on behalf of the Plaintiffs.

5.    On September 14, 2017, the deposition of Bryan Svajgl was taken on behalf of the Plaintiffs.

6.     Attached hereto as Exhibit A is a genuine and accurate certified copy of the transcription of the deposition of Benjamin Iversen, along with all exhibits contained therein.

7.     Attached hereto as Exhibit B is a genuine and accurate certified copy of the transcript of the deposition of Bryan Svajgl along with all exhibits contained therein.

FURTHER AFFIANT SAYETH NOT.

_____
Zachary Lutz-Priefert

SUBSCRIBED AND SWORN TO before me this _____ Day of September, 2017.

GENERAL NOTARY - State of Nebraska
MARY J. BARKER
My Comm. Exp. October 18, 2019

_____
Notary Public

12913-1/6CN7054

2

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEBRASKA
 2
    WADITH STOCKINGER NADER    )    Case No. 8:17-CV-00083
 3  and STACEY NICHOLE NADER,  )
                               )
 4            Plaintiffs,       )
                               )
 5  vs.                         )
                               )
 6  THE CITY OF PAPILLION;      )    DEPOSITION OF
    SARPY COUNTY; BRYAN SVAGL;  )    BEN IVERSEN
 7  BENJAMIN IVERSEN; SCOTT A.  )    TAKEN ON BEHALF
    LYONS; L. KENNETH POLIKOV;  )    OF PLAINTIFFS
 8  and JENNIFER MIRALLES,      )
                               )
 9            Defendants.       )
    _____ )
10

11

12

13

14

15             DEPOSITION OF BEN IVERSEN, taken before

16  Pamela G. Weyant, a Shorthand Reporter within and for the

17  State of Nebraska, beginning at the hour of 8:59 a.m.,

18  September 8, 2017, at 13625 California Street, Omaha,

19  Nebraska, pursuant to the within stipulations.

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:

 3           Christopher J. Tjaden
             Gross & Welch, PC, LLO
 4           2120 South 72nd Street
             1500 Omaha Tower
 5           Omaha, Nebraska  68124

 6
     FOR THE DEFENDANTS THE CITY
 7   OF PAPILLION, BRYAN SVAJGL,
     BENJAMIN IVERSEN, and SCOTT A. LYONS:
 8
             Ryan M. Kunhart
 9           Dvorak Law Group, LLC
             13625 California Street
10           Suite 110
             Omaha, Nebraska  68154
11

12   FOR THE DEFENDANTS SARPY COUNTY
     AND JENNIFER MIRALLES:
13
             Brandy Johnson
14           Attorney at Law
             Nebraska Telephone Building
15           130 South 13th Street
             Suite 300
16           Lincoln, Nebraska  68508

17
     Also present:
18           Wadith Nader
             Stacey Nader
19           Bryan Svajgl

20

21

22

23

24

25
```

```
 1                    INDEX - TESTIMONY

 2                                                  Page

 3      Direct - Mr. Tjaden                          4

 4      Cross - Ms. Johnson                         148

 5

 6

 7                    INDEX - EXHIBITS

 8      Exhibit       Identification       Introduced on page

 9       24           Incident Detail              103

10

11                         *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        MR. TJADEN:  Can we agree to stipulate that we're
2   all comfortable with Pam giving the oath?  Are we all okay
3   with that?
4        MR. KUNHART:  Yeah.
5
6                    BEN IVERSEN,
7         being first duly sworn, was examined
8              and testified as follows:
9
10              DIRECT EXAMINATION
11  BY MR. TJADEN:
12      Q.  Good morning, sir.
13      A.  Good morning.
14      Q.  Can I have you, first of all, go ahead and state
15  your name and spell your last name into the record?
16      A.  Ben Iversen, I-V-E-R-S-E-N.
17      Q.  Mr. Iversen, what's your present address, personal
18  residential address?
19      A.  552 North First Street, Missouri Valley, Iowa.
20      Q.  So you're an Iowa resident?
21      A.  Yes.
22      Q.  All right.  Now, you understand why we're here
23  today, don't you?
24      A.  Yes.
25      Q.  You are a defendant in a lawsuit filed in the

Iversen - Direct (Tjaden)

1    federal court?

2        A.  Yes.

3            (Discussion off the record.)

4        Q.  (By Mr. Tjaden)  So you understand you're a

5    defendant in a lawsuit in the federal court here in the

6    federal district court of Nebraska.  This process that

7    we're doing today is we're taking your deposition.  You

8    understand what a deposition is?

9        A.  Yes, I do.

10        Q.  Have you ever been deposed before?

11        A.  Yes.

12        Q.  Can you give me --  You're a police officer; right?

13        A.  Yes.

14        Q.  Detective.  Give me some idea, if you can, how many

15    times you've been deposed before.

16        A.  Just one time.

17        Q.  Okay.  And what was the context of that?

18        A.  Kind of a similar scenario.  I was a party to a

19    search warrant and --

20        Q.  In relation to this deposition, can you tell me

21    what it is that you've done in preparation?  And I assume

22    you had a conversation with Mr. Kunhart, your attorney.

23    I'm not interested in the specifics of that conversation,

24    but what did you do in preparation for this?

25        A.  I read my report, kind of brushed up on some

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    definitions in case you'd ask some of those questions, and

2    my training, brushed up on what my training was, and then I

3    had a brief meeting with Mr. Kunhart yesterday.

4         Q.  Did you read any transcripts of the previous

5    depositions?

6         A.  No.

7         Q.  Did you read the pleadings?

8         A.  No.

9         Q.  Did you review your discovery responses,

10   interrogatory answers?

11        A.  Yeah, I believe so, yeah.

12        Q.  You said you brushed up on some definitions and

13   brushed up on your training.  Did that involve reviewing

14   material?

15        A.  Yes.

16        Q.  With respect to the definitions, what material did

17   you review to brush up on those?

18        A.  I have a -- I just have a list of definitions for

19   words and terms that are used commonly in computer forensic

20   investigations.

21        Q.  Did you compile that list?

22        A.  No.  It was another detective gave it to me a while

23   ago to --

24        Q.  Who was that?

25        A.  Detective Roy Howell.  Well, actually, let me state

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                          7

1   that more correctly.  He was going to e-mail it to me, and

2   then I was speaking to a prosecutor who had one of his

3   reports, and he gave me a copy of it off of one of his

4   reports.  So I didn't have to get it directly from him, but

5   the intent was for me to get it from him.

6       Q.  It was your understanding that it was something he

7   had drafted?

8       A.  Yes.

9       Q.  All right.  Before we go any further, I skipped the

10  usual steps.  You understand your deposition is being taken

11  in connection with that lawsuit and the claims that are

12  being raised by my client and then the defense that will be

13  put up on your behalf; correct?

14      A.  Yes.

15      Q.  Okay.  I'm going to have you do three things for me

16  during this deposition.  First of all, any question that

17  calls for a response of either a yes or a no, I'm going to

18  ask that you give such a response.  That's opposed to a

19  shake or a nod of the head or some other utterance

20  intending to be a yes or a no but is going to be difficult

21  to take down on the recorder; okay?

22      A.  Yes.

23      Q.  Secondly, if at any time you don't understand my

24  question, either directly or through Mr. Kunhart have me

25  rephrase the question.  If you don't do that, then I'm

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                    8

1   going to assume you understood the question as it was

2   posed, and the answer you give will stand against the

3   question as posed; okay?

4       A.  Okay.

5       Q.  And then finally, if you could afford me the

6   opportunity to finish my question before you jump in with

7   your answer, in exchange, I'm going to let you finish your

8   answer before I jump in with my next question.  And that's

9   going to prevent us from speaking over one another, again,

10  helping to ensure a nice clear record; okay?

11      A.  Yes.

12      Q.  Okay.  You've talked about the things that you've

13  done in preparation, brushed up on definitions, considered

14  a list of terms that are commonly used in computer

15  forensics; is that correct?

16      A.  Yes.

17      Q.  The terms that were on that list, are they related

18  to general computer forensics or are they specific toward

19  any crime?

20      A.  They're related to just general computer forensics.

21  There's an A-to-Z list of forensics, several pages' worth.

22      Q.  Several-page list?

23      A.  Yes.

24      Q.  Okay.  And do any of the terms specifically refer

25  to a crime such as possession of child pornography?

Iversen - Direct (Tjaden)

1    A.  Yes.

2    Q.  What terms do you recall having seen on that list

3 and having reviewed that you believe would be related

4 directly to a forensic analysis of a computer involving a

5 crime of possession of child pornography?

6    A.  Hash values and keywords.

7    Q.  Okay.  When you say "hash values," that was one of

8 the terms on the list?

9    A.  Yes.

10    Q.  All right.  And then you say "keywords."  Is

11 keywords a term on the list, or is keywords your use of a

12 description of many words on that list?

13    A.  Yeah, there's a -- I think on that list there's

14 maybe two or three keywords that are defined that are

15 related to child pornography.

16    Q.  Okay.  So is the term "keywords" used, or you're

17 just --

18    A.  No.

19    Q.  -- using that collectively?

20    A.  Yes.

21    Q.  Okay.  What were the keywords that you recall

22 having seen on this list?

23    A.  "R@ygold" is a keyword that's used for people who

24 trade child pornography to identify each other.  It's

25 commonly used in defining a file.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    Q.  Raygold, R-A-G-O-L -- R-A-Y-G-O-L-D?

2    A.  Well, the way it is written is "R" as in Robert and

3    then the at symbol and then "Y" as in young and then gold.

4    Q.  Okay.  Is there a space or a dash or anything?

5    A.  No.

6    Q.  All right.  What other words do you recall seeing

7    on this list?

8    A.  You know, now that I think about it, I don't think

9    there are any other specific keywords, but I just kind of

10   brushed up in my mind the other keywords that I've seen

11   just so if it was asked I could talk about them, so --

12   Q.  Well, we may ask about them, so --

13   A.  Okay.

14   Q.  Was "hash value" on that list, or was that one you

15   just thought up in your mind?

16   A.  No, it was on the list.

17   Q.  So the two you recall being on the list are "hash

18   value" --

19   A.  Yes.

20   Q.  -- and "r@ygold"?

21   A.  Yes.

22   Q.  What is -- you've explained what r@ygold is.  What

23   is hash value?

24   A.  Hash value is -- it's a 32- to a 44- alpha- --

25   -digit alphanumeric number that is used as a digital

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    fingerprint or digital signature for a file.

2        Q.   Does every file have a digital signature?

3        A.   Yes.

4        Q.   And so when there's a hash value which is the

5    digital signature, does a particular file, when created --

6    does it have a hash value itself, then, of 100 percent of

7    itself?  Is it a comparative tool?

8        A.   Yes.

9        Q.   All right.  So if -- for an example, if I'm

10   comparing the two photos behind you or if you're comparing

11   photos of the gentleman next to me and a separate photo of

12   myself, his photo would have a hash value, and would my

13   photo have a separate hash value if you're comparing them?

14   Or would you just get a value of my comparison to his

15   photo?

16       A.   So just so that I have it right, are you talking

17   about two individual pictures, one of you and one of --

18       Q.   Individual pictures, yeah.

19       A.   Each one would have a different hash value.

20       Q.   Same background.

21       A.   Each one would have a different hash value for a

22   digital picture.

23       Q.   All right.  But when you compare the two together,

24   do you draw comparison to them?  I mean, is mine a certain

25   percentage the same as his?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                12

1    A.  I don't know.

2         MR. KUNHART:  Objection.  Form.

3    Q.  (By Mr. Tjaden)  And I guess what I'm getting at is

4  if you're trying to see two photos that are very similar --

5  one may be pornographic and one may not -- how do you

6  compare the two of them?

7    A.  They'll have a different hash value.

8    Q.  Okay.  So a hash value, then, according to your

9  understanding, isn't a comparison of one photo to another?

10        MR. KUNHART:  Objection.  Form.

11        MS. JOHNSON:  I join in the objection.

12        MR. TJADEN:  What's the problem?

13        MR. KUNHART:  Compared to what?

14        MR. TJADEN:  I was talking about two photos.

15   Why don't you repeat the question?

16    (Record read.)

17        MR. KUNHART:  If you know, you can answer.

18    A.  I would say that it's -- the hash value is a

19  comparison of one hash value to another.

20    Q.  (By Mr. Tjaden)  Okay.

21    A.  So it's like a fingerprint for -- your picture

22  would have a fingerprint and that would be kind of -- that

23  would be identified -- I think is the best way to identify

24  the hash value for your picture, and his would have a

25  fingerprint, which would be this hash value.  And they're

Iversen - Direct (Tjaden)                                    13

1    unique.

2        Q.  And is a hash value given a number?

3        A.  Yeah, yes, like a -- it's a alphanumeric 32- or

4    64-digit number.

5        Q.  All right.  And so what determines whether it was a

6    32- or 64-digit number?

7        A.  I'm not sure.

8        Q.  Do you know what those numbers mean?

9        A.  No.

10       Q.  Okay.  In addition, then, to the two that you

11   recall having been on this list, you said you kind of

12   brushed up, in your own mind, on a number of other terms.

13       A.  Uh-huh.

14       Q.  What other terms do you recall giving thought to?

15       A.  These are keywords that would be used to search a

16   computer, such as Baby J is a series of child pornography

17   images that have been identified as child pornography.

18   Desi and D is a series of images that are commonly seen on

19   computers with child pornography.  "Lolita" is a search

20   term that's used.  Just the word "young" is a search term

21   that's used.

22       Q.  "Young"?

23       A.  Yeah, just "young."

24       Q.  Y-O-U-N-G?

25       A.  Yes.

Iversen - Direct (Tjaden)                                    14

1    Q.  So these are search terms that, when you are

2    running a computer analysis, you plug in those terms and

3    ask the computer to look for those terms?

4    A.  Well, usually -- in this case, the terms are

5    already loaded into the program.

6    Q.  The program you use to conduct the analysis?

7    A.  Yes.

8    Q.  Okay.  Who does that?  Who loads it in?

9    A.  The creator of the program.

10   Q.  Okay.  Do you have a list of the terms that are

11   loaded -- preloaded into that program?

12   A.  No.

13   Q.  Do you know what those terms are that identify them

14   anyway?

15   A.  No.  Well, maybe.  I don't know --

16   Q.  Okay.

17   A.  -- for sure, though.

18   Q.  Is it your understanding that this particular

19   program that you used had, for example, the term "Lolita"

20   preloaded?

21   A.  I would assume so, yes.

22   Q.  Something very standard?

23   A.  Yes.

24   Q.  All right.  Do you add to those when you're running

25   the program, or do you have the ability to add to those

Iversen - Direct (Tjaden)

1    when running the program?

2        A.   Yes, I do have the ability, and no, I don't add to

3    those.

4        Q.   All right.  When -- what is your understanding when

5    a keyword is loaded into the program and a computer is

6    scanned with that program -- the keyword, it's looking for

7    the keywords on the computer?

8        A.   Yes.

9        Q.   And so if the term "Lolita" is a keyword, is it

10   your understanding anywhere on that computer that's being

11   scanned, if the word "Lolita" appears, it's going to

12   trigger a hit of that keyword?

13       A.   Yes.

14       Q.   So if a high school junior is doing a book report

15   on Lolita or a book report that discusses -- because I

16   think there's a movie or a book called Lolita, if I'm not

17   mistaken.  Are you familiar with that?

18       A.   It sounds familiar, yes.

19       Q.   Yeah.  That's going to trigger a hit?

20       A.   Yes.

21       Q.   All right.  And the same with "young"?

22       A.   Yes.

23       Q.   If anybody writes an e-mail that said -- uses the

24   term "young" on their computer, it's going to trigger a

25   hit; is that correct?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1      A.   Yes.

2      Q.   When that's triggered -- when -- to your

3  understanding, when you're looking through a computer with

4  your program and you're looking for keywords, does it look

5  throughout the entire keyword -- I'm sorry -- the entire

6  computer, or is it looking for just a file name with either

7  "young" or "Lolita," for example, in it?

8      A.   I believe it's just looking for file names.

9      Q.   File names?

10     A.   Yes.

11     Q.   Okay.  So if the word "young" is contained in a

12  letter that's being written on the computer, that's not

13  necessarily going to trigger it?

14     A.   I don't know.

15     Q.   You don't know?

16     A.   No.

17     Q.   Okay.  We'll get to the program you used shortly

18  and go through that more in-depth, but --

19     A.   Okay.

20     Q.   -- other than, going through your mind, over terms

21  and having looked at this list, what else did you review?

22     A.   That was it.  That was all.

23     Q.   Okay.  You talked about -- you did say you brushed

24  up on your training.  What did you do to brush up on your

25  training?  Did you review anything in that regard?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1     A.  I just -- specifically, I just wanted to see the

2  date that I went through that -- the training for that

3  program and other computer forensic or, you know, child

4  pornography-related classes that I've attended.

5     Q.  Okay.  What are you looking at to determine these

6  dates?  A personnel file?  Or what are you looking at?

7     A.  Yeah, I recently filled out an application for --

8  to teach at a regional academy, and I already had a list on

9  my computer of dates and training, so I just went through

10 that document.

11         MR. TJADEN:  Can I get a copy of that?

12         MR. KUNHART:  Yeah.

13         MR. TJADEN:  Why don't you get me a copy of that.

14     Q.  (By Mr. Tjaden)  What regional school are you

15 asking to teach at?

16     A.  We are -- in the metro, the Papillion, La Vista,

17 Sarpy County, Douglas County, are all putting together a

18 regional academy rather than sending police officers to

19 Grand Island for training.  So it's just a local academy

20 that we'll do.

21     Q.  Okay.  All right.  So you're not going to teach,

22 for example, a criminal justice class at UNO; you're

23 talking about a police academy situation?

24     A.  Yes.

25     Q.  All right.  Well, are you married?

1      A.   Yes.

2      Q.   What's your wife's name?

3      A.   Jennifer.

4      Q.   And how long have you been married?

5      A.   Since 2004.

6      Q.   Don't pause.

7      A.   I know.  I'm glad she's not here.

8      Q.   Any children?

9      A.   Yeah, two.

10     Q.   Okay.  What -- you've given us your present

11   address.  How long have you been at that address?

12     A.   Twelve or 13 years.

13     Q.   What is your educational background?  Why don't we

14   just start with high school.  Where did you graduate from

15   high school?

16     A.   Maple Valley-Anthon Oto in Mapleton, Iowa.

17     Q.   Now, you said you live in Iowa.  And you're, I

18   assume, employed with the La Vista Police Department?

19     A.   Yes.

20     Q.   You don't have to be a resident of the state to be

21   employed with their police department?

22     A.   No.

23     Q.   After high school, what did you do education-wise?

24     A.   I became a police officer.  I went to the Iowa

25   Lakes Community College for a semester.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1      Q.  Iowa Lakes?

2      A.  Iowa Lakes.

3      Q.  Where is that?

4      A.  Estherville, Iowa.

5      Q.  For how long?  I'm sorry.

6      A.  Just a semester.

7      Q.  And what did you study during that semester?

8      A.  Sociology.  Then when I came home for my first

9  summer, I applied for a job in Missouri Valley and got

10  hired, so I started.

11      Q.  As a police officer?

12      A.  Yes.

13      Q.  You said you were in Iowa Lakes for one semester?

14      A.  Yes.

15      Q.  Did that end with your having received a

16  certificate of any sort, or did you not complete the

17  coursework?

18      A.  No, I didn't complete -- I didn't get a degree.  I

19  didn't go through the entire two years.

20      Q.  Was that a junior college?

21      A.  Yes.  I did go to -- I worked for a small agency

22  called Fonda, Iowa, which is close to that area, and I

23  received a reserve certificate there.

24      Q.  What does Fonda do?

25      A.  Fonda's a police department.  It's a small-town

1    police department.  And they hired me as a reserve officer,

2    which is basically like an auxiliary police officer where

3    you ride along with another officer to help out.

4        Q.  What year did you graduate from high school?

5        A.  '95.

6        Q.  And did you immediately, the following fall, start

7    in Iowa Lakes?

8        A.  Well, let me -- so I graduated midterm.  I started

9    college at Western Iowa Tech in Denison first for plumbing,

10   heating, and sheet metal, decided --  So I don't know how

11   specific you want me to get here.

12       Q.  Yeah, no, I want to know what your educational

13   experience is regardless of the area it is.  So you say you

14   graduated high school in midterm, so you graduated after

15   the December break?

16       A.  Yes.

17       Q.  All right.  And then you immediately enrolled in,

18   was it, Iowa --

19       A.  Western Iowa Tech in Denison, Iowa.

20       Q.  Okay.

21       A.  It's a trade school for plumbing and heating.

22       Q.  And that was in a plumbing and heating role?

23       A.  Yes.

24       Q.  Did you complete a semester there?

25       A.  I did a semester there, yes.

Iversen - Direct (Tjaden)

1    Q.   And did you receive a certificate or degree or

2   anything from there?

3    A.   No.

4    Q.   And that semester, then, would have ended in the

5   spring of --  I'm sorry.  You said you graduated in '95?

6    A.   Yes.

7    Q.   So the spring of '96?

8    A.   Yes.

9    Q.   All right.  So spring of '96, then --

10    A.   Well, actually would have been spring of '95,

11   because I graduated in December --

12    Q.   '94?

13    A.   -- '94.  So '95, started my first semester of

14   college.

15    Q.   All right.  And so that ended in the spring, May

16   time frame?

17    A.   Yes.

18    Q.   When you left at the end of that May time frame,

19   was it your intention to return to continue and obtain the

20   certificate or training in plumbing?

21    A.   No.  It was my intention then to get involved in

22   law enforcement.

23    Q.   What caused that?

24    A.   A close family friend who was my roommate and chief

25   of police in Mapleton.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                    22

 1      Q.  Roommate -- well, in college?

 2      A.  No.  He was -- after I did my first semester of

 3  college, I moved back to Mapleton, and he was the chief of

 4  police there, needed a roommate.  My mother was a

 5  dispatcher, so he was a family friend.  So I moved in with

 6  him and started doing ride-alongs and decided law

 7  enforcement was for me.

 8      Q.  And then you talked about a auxiliary program.

 9  Where was that again?

10      A.  Fonda, Iowa.

11      Q.  Okay.  And when was that started and completed?

12      A.  That was started that summer.  I started doing

13  ride-alongs there.  Then I started school at Iowa Lakes

14  Community College and attended a reserve certification

15  program.

16      Q.  Started in the fall?

17      A.  Yes.

18      Q.  Attended through December?

19      A.  Yes.

20      Q.  All right.  And was it during that fall, winter --

21  and we're still in '95; right?

22      A.  Yes.

23      Q.  Was that when you became this auxiliary officer

24  with Fonda?

25      A.  Yes.

1    Q.  So then spring of '96, what do you do then?  Is

2    that when you leave and seek to become a full-time officer?

3    A.  Yes.

4    Q.  And what group was that with?

5    A.  Missouri Valley.

6    Q.  What was the process of you making an application

7    for the police officer's job?  Was it advertised?  You saw

8    it?

9    A.  It was -- I don't recall if it was advertised.  So

10   the chief of police who I lived with had moved to that

11   department and become a sergeant.  I believe he told me

12   there was an opening there, so I applied.

13   Q.  You hadn't been through police training other than

14   the auxiliary?

15   A.  Not an academy, no.

16   Q.  All right.  So when were you hired at Missouri

17   Valley?

18   A.  In -- would have been around September of '96.

19   Q.  So what happened, then -- if you finished the

20   program in Fonda -- or Iowa Lakes, rather, in December of

21   '95, what do you do between December of '95 and September

22   of '96, nine months?

23   A.  I'm trying to recall.  I think I might have got off

24   on my dates.  I'd have to look at the -- I'd have to look

25   at one of my old resumes to see where I'm at.

Iversen - Direct (Tjaden)                                    24

1    Q.  Just to the best of your recollection.

2    A.  I went straight from going to Iowa Lakes and

3    working on weekends in Fonda to -- I worked a summer as a

4    city maintenance person for Morehead, Iowa.  Then during

5    that summer I applied for the job in La Vista.  So I may

6    have got off a little, but --

7    Q.  May be off a semester with Iowa Lakes?

8    A.  Yeah.

9    Q.  In any event, in September you start with Missouri

10   Valley?

11   A.  Yes.

12   Q.  Okay.  And then when you start, what's the --

13   what's the procedure?  How do you get to be an officer with

14   them?  What's the academy --

15   A.  Back then you just started working, because I

16   already worked, you know, in Fonda for a little while.  So

17   I think I had a couple of days of field training, and then

18   they sent me on my own until June of '97, when I graduated

19   the academy.

20   Q.  When did you start the academy?

21   A.  Would have been three months, so --

22   Q.  March?

23   A.  March.

24   Q.  Of '97?

25   A.  March of '97.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1      Q.   Where did you do the academy?

2      A.   The Iowa Law Enforcement Academy in Des Moines.

3      Q.   And describe for me the experience there, the

4  classes offered, the resources studied.

5      A.   Just general law enforcement studies, traffic law,

6  criminal law, accident investigations, patrol techniques.

7      Q.   When you talk about criminal law, what do you

8  recall having been taught in that regard?  I mean, the

9  entire program, the academy program, is three months long;

10  correct?

11      A.   Yes.

12      Q.   And you mentioned a number of different topics that

13  are taught to you during that period --

14      A.   Yes.

15      Q.   -- one of which was criminal law.  So what did that

16  entail?  What topics were discussed?

17      A.   Constitutional law, they just -- you know, basically

18  basically breaking down statutes and their elements and

19  recognizing the elements of a crime and whether or not it

20  met probable cause.

21      Q.   Of this three months at the academy, how much time

22  would have been spent on each of the areas that you talked

23  about, you know, traffic investigation, criminal law, you

24  know?  What was the breakdown?  Strike that.

25           Was it segregated to each of those units?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1      A.   If I remember correctly, yes.  I think a couple of

2   weeks for each topic.

3      Q.   And so the topic of criminal law you believe may

4   have encompassed a couple of weeks?

5      A.   Yeah, maybe.

6      Q.   Do you recall what materials you were provided in

7   that studying?

8      A.   I think we got an Iowa law book and then we had a

9   big -- we had a bunch of binders that were full of all the

10   material that we had to study for everything.  It was,

11   like, four or five huge binders.

12      Q.   Did you have a test, then, on each unit?

13      A.   Yes.

14      Q.   You said you studied constitutional law.

15      A.   Yes.

16      Q.   And again, this is within that two-week period?

17      A.   Yeah, possibly.  It might have been a little more.

18   I don't remember.  It's been a long time ago.

19      Q.   And you were given statutes?

20      A.   Yes.

21      Q.   Were you given -- were they Iowa statutes that you

22   were given, or were they federal law statutes?

23      A.   Iowa.  It was specific to Iowa, yeah.

24      Q.   And did these include -- I assume in Iowa there's

25   also a statute that prohibits possession of child

1   pornography?

2       A.   You know, back then there might not have been.  I

3   don't recall.  That wasn't really a -- not, I guess, as we

4   use it today.  I don't recall that, though.

5       Q.   Well, whether there was one or wasn't, do you

6   recall being given instruction on a crime dealing with

7   possession of child pornography?

8       A.   No.

9       Q.   But in that study when you were talking about a

10  statute, what can you -- can you give me an example of a

11  crime that you do recall having received material on and

12  studying?

13      A.   I think we covered assault.

14      Q.   Okay.  So you were given the elements of that?

15      A.   Yes.

16      Q.   And you were instructed on what was necessary to

17  look for in your investigation --

18      A.   Yes.

19      Q.   -- and determine whether or not a crime had been

20  committed?

21      A.   Yes.

22      Q.   And with respect to probable cause, you were

23  instructed on that; am I correct?

24      A.   Yes.

25      Q.   What materials do you recall receiving on probable

Iversen - Direct (Tjaden)                                    28

1    cause?

2        A.  I don't recall.

3        Q.  All right.  But again, when you're studying a crime

4    such as assault, do you get instruction on what probable

5    cause would be necessary -- or what probable -- how you

6    would have probable cause to arrest somebody on an assault,

7    what you would need to look for?

8        A.  That it met the elements of the statute.

9        Q.  Right.  Okay.  So how long did you remain at

10   Missouri Valley?

11       A.  Oh, I think a little over eight years.

12       Q.  And what was your rank?  Do they use ranks?  Is

13   that what they use?

14       A.  Yeah.  I was a sergeant, I think, for -- I can't

15   remember when I was promoted, but I was sergeant when I

16   left.

17       Q.  What do you go in as?

18       A.  Officer, patrolman.  I don't --

19       Q.  And at some point -- you don't recall how long, but

20   at some point after leaving eight years after starting, you

21   were promoted as sergeant.

22       A.  Yeah.  I think it was about four years in.

23       Q.  When you get promoted to sergeant, does that

24   involve any additional training?

25       A.  No.

Iversen - Direct (Tjaden)                                      29

1    Q.  During those four years as an officer -- we, on the

2    legal side here, have now in Nebraska, but longer in Iowa,

3    continuing legal education requirements.

4    A.  Uh-huh.

5    Q.  Do you have that as a police officer -- at the time

6    back in Missouri Valley, did you have a requirement of

7    continuing education?

8    A.  Yes.

9    Q.  And what was that?

10   A.  I don't remember.

11   Q.  Did you complete all that?

12   A.  Yes.

13   Q.  Did it involve classwork?

14   A.  Yeah, some of it.  We were required to do firearms,

15   of course, every year.  And I don't think it was specific

16   to any type of law enforcement, just as long as you had

17   taken some certain -- so many hours of training a year.  I

18   don't remember what that was.

19   Q.  Sure.  I can choose to take any continuing

20   education course in criminal law or, you know, business

21   law.  It's not required to be specific.  Is that what

22   you're telling me?

23   A.  Yes.

24   Q.  Do you recall, during your period of securing your

25   continuing education requirements in Missouri Valley,

Iversen - Direct (Tjaden)

1   taking any classes with respect to child pornography?

2       A.   No.

3       Q.   Have you ever taken any classes on child

4   pornography?

5       A.   Yes.

6       Q.   All right.   We'll just get to those later.

7       A.   Yes.

8       Q.   Okay.   So eight years.   Now, during that period of

9   time, were you ever subjected to any disciplinary measures?

10      A.   No.

11      Q.   Whether or not you were subjected to any

12  disciplinary measures, are you aware of whether there had

13  been any complaints lodged against you by anybody?

14      A.   You know, I'm sure some traffic stops.   I believe I

15  had --

16      Q.   People call and bitch?

17      A.   Yeah.

18      Q.   I'm sorry.   Complain.

19      A.   Yeah.   I had some of that, but --

20      Q.   Okay.

21      A.   -- nothing that launched a formal investigation or

22  anything.

23      Q.   So eight years after nineteen-ninety-, I think,

24  -seven -- so we're about 2005 now when you leave?

25      A.   2004.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    Q.   And why do you leave?

2    A.   Just for more opportunities, bigger agency.

3    Q.   Were you looking to leave and therefore looking for

4    other opportunities, or did another opportunity find you

5    and then you decided to leave because of -- it was a bigger

6    opportunity?

7    A.   I was looking for other opportunities.

8    Q.   Did you make applications for other places?

9    A.   Yeah.  I tested for multiple agencies through --

10   well, there's a process through MAPA, the Metro Area

11   Planning Agency.  You apply for -- it's one application,

12   one test, and you check a box for numerous agencies.  And I

13   applied for Bellevue, Council Bluffs, La Vista.

14   Q.   Missouri Valley.  Is that over near Underwood?

15   A.   No.  It's north of Omaha, probably about 30 minutes

16   across the interstate from Blair.

17   Q.   I know a farmer out in that area, Curt Wall.  Know

18   him?

19   A.   Know that -- last name sounds familiar.

20   Q.   You may have known Curt professionally.

21        So how many places did you apply for?

22   A.   You know, I want to say those I had mentioned,

23   Council Bluffs, La Vista, Bellevue.  I think those were the

24   three.

25   Q.   And in the process of making those applications,

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1   typically, do they follow up having you interview with

2   them?

3       A.   Yeah.   I interviewed with all three.

4       Q.   Do you have to test before -- do you have to take

5   any tests before you have that interview or before they

6   make a decision on hiring you?

7       A.   Yeah, there's one test.   So normally, back in the

8   old days when you applied, you had to take the test for

9   each agency and you take that time off.   This was an

10  opportunity -- you take one test, do one physical agility

11  test as well.   And the list of qualified people went out to

12  each agency and then they picked who they --

13      Q.   Have a clearinghouse on the testing, and then they

14  distribute to --

15      A.   Yes.

16      Q.   You were given an interview at all three agencies?

17      A.   Yes.

18      Q.   I trust you were hired by La Vista?

19      A.   Yes.

20      Q.   What about Bellevue and Council Bluffs?   What was

21  their decision?

22      A.   Number one on the list for both.   Bellevue was on a

23  hiring freeze.   They were just creating a list for when

24  they were off of hiring freeze, and Bellevue, they weren't

25  hiring right away.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                    33

1    Q.  Bellevue, you said, had a hiring freeze.

2    A.  Sorry.  Council Bluffs had a hiring freeze and they

3  weren't hiring.  They were just establishing a list.  And

4  Bellevue wasn't hiring immediately.  La Vista was offering

5  immediately, so I took La Vista.

6    Q.  Okay.  What did you go in as when you joined

7  La Vista?

8    A.  Patrol officer.

9    Q.  Would that have been a step down from your

10  sergeant?

11    A.  Yes, in rank.

12    Q.  And we're talking now again still 2004 or '5?

13    A.  2004, yeah.

14    Q.  Have you remained, then, an employee of La Vista

15  Police Department continuously since that time?

16    A.  Yes.

17    Q.  No leaves of absences or anything?

18    A.  No.

19    Q.  What's your current rank?

20    A.  Detective.

21    Q.  And when did you get that rank?

22    A.  2008, I believe.

23    Q.  Between 2004, when you joined, and 2008 -- you

24  joined as a patrol officer, you became a detective in

25  '08 -- were there other rank changes and promotions in

Iversen - Direct (Tjaden)

1    between there?

2        A.    No.

3        Q.    You went from an officer directly to a detective?

4        A.    Yes.

5        Q.    And what did you do to allow that to happen?

6        A.    I made my intentions known to my supervisors, and

7    just basically in my body of work, when we would respond to

8    burglaries and investigations, I, you know, made diligent

9    attempts to follow them on my own and do fingerprinting and

10   all those things to show them that that was something I was

11   interested in.  And then I had to interview and got

12   selected for it.

13       Q.    So there was a detective opening that you applied

14   for --

15       A.    Yes.

16       Q.    -- after having done all these things to make

17   yourself more -- look better for the job?

18       A.    Yes.

19       Q.    All right.  During your time as patrol officer the

20   first four years you were there, again, is there a

21   requirement, a continuing education requirement?

22       A.    Yes.

23       Q.    When you went -- how does that -- because now

24   you're in Nebraska as opposed to Iowa; right?

25       A.    Yes.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    Q.  How did the programs compare, the continuing

2   education requirement programs, in Iowa versus Nebraska?

3    A.  It's similar, so many hours per year of continuing

4   education.

5    Q.  Do they require it be done in a specific area --

6    A.  No.

7    Q.  -- of Nebraska?  No?

8        When you came over to La Vista, did you have to

9   undergo any further training?

10    A.  Yeah.  I had to do -- well, like the reserve

11   officer training that I talked about in Iowa, Nebraska had

12   a reserve officer training program which also doubled as

13   their -- they called it an in lieu of.  So if you were

14   certified from another state, you went through the process.

15    Q.  As opposed to the academy?

16    A.  Yes.

17    Q.  Which is out where?  Grand Island?

18    A.  Grand Island, yes.

19    Q.  So --

20    A.  So I did go to Grand Island, I think, two weekends,

21   and then there were some online classes I had to take.

22    Q.  With respect to that reserve officer, that's the

23   program you took in Fonda; is that right?

24    A.  Yeah, Iowa Lakes and Estherville before Fonda, yes.

25    Q.  And because you had been certified as a police

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                        36

1    officer with another agency, when you come over to

2    La Vista, just so I understand, you don't have -- you're

3    not required to go through Grand Island; you can take the

4    reserve officer program here in Nebraska?

5        A.   That's correct.

6        Q.   Okay.  How long of a program is that?

7        A.   It's -- like I said, it's a couple of weekends.

8    You have to go to Grand Island for, I think it was, two

9    weekends and then there was some online study you had to do

10   and testing.

11       Q.   All right.  So I was a little confused there.  When

12   you said you went to Grand Island a couple weekends and did

13   some online, I thought that was over and above the reserve

14   officer program.  That is the reserve --

15       A.   That is the reserve, yes, sir.

16       Q.   And describe for me the weekends in Grand Island.

17   What did they involve?  Classroom?  Field work?  What?

18       A.   Yes, classroom.  We went over criminal law.  We had

19   to get certified for preliminary breath test.  I don't

20   recall if there was field sobriety.  Just general law

21   enforcement.

22       Q.   You say you went over criminal law.

23       A.   Yes.

24       Q.   What did you do in that regard?  Talk about

25   specific crimes?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    A.  I believe so.  I don't really recall specifics.

2    Q.  Do you recall talking about child pornography?

3    A.  No.

4    Q.  You did not?

5    A.  Did not at all.

6    Q.  Not you don't recall; you just did not?

7    A.  We did not talk about child pornography.

8    Q.  And this is as part -- any part of the reserve

9    officer program?

10    A.  No.

11    Q.  Okay.  Including the online stuff?

12    A.  Yes.

13    Q.  Okay.  And how --  I know how long two weekends

14    would take.  The online stuff, was that something you did

15    at your own pace?

16    A.  Yes.  I think there was deadlines, but I don't --

17    but, yeah, I --

18    Q.  So how long were you given to complete the reserve

19    officer program?

20    A.  I don't recall.  I want to say around three months

21    or something, coupled with the two weekends.

22    Q.  Any additional training required of you when going

23    from Missouri Valley to La Vista?

24    A.  No.

25    Q.  All right.  And then the requirements would

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    continue during those first four years of that continuing

2    education?

3         A.  Could you repeat that?  I'm sorry.

4         Q.  You're now over here.  You've completed the reserve

5    officer.  But now for the next four years you're a patrol

6    officer.

7         A.  Yes.

8         Q.  And you have continuing education each year?  Or

9    what are your requirements in that regard?

10        A.  I believe it's each year.

11        Q.  How long?  How many hours?

12        A.  I have no idea.

13        Q.  During those four years, did you take classes in

14   child pornography?

15        A.  No.  Excuse me.  No.

16        Q.  Okay.  At any point in time -- we'll go back in the

17   Missouri Valley days even present to today, you're a

18   full-time officer?

19        A.  Yes.

20        Q.  And so how often, then, does that require you to

21   work?  What are your shifts?

22        A.  Well, for La Vista it's 12-hour shifts and it

23   rotates, so every other weekend's off.  So you would work a

24   Monday-Tuesday, you would have a Wednesday-Thursday off,

25   and then you would work Friday, Saturday, Sunday.  Then

1    you'd have Monday-Tuesday off, work Wednesday and Thursday,

2    and then work Friday, Saturday, Sunday.

3        Q.  And had they -- do they allow you to work part-time

4    employment outside of the agency?

5        A.  Yes.

6        Q.  Of any nature?

7        A.  No.  It has to be approved.

8        Q.  Have you held part-time jobs?  Strike that.  Do you

9    currently hold a part-time job?

10       A.  No.

11       Q.  Back in 2015, did you hold a part-time job?

12       A.  No.

13       Q.  Have you ever held a part-time job?

14       A.  Yes.

15       Q.  What were those?

16       A.  Well, Embassy Suites hires security, and that's an

17   authorized part-time job, so worked out there maybe two

18   times since we've been, I guess, approved to work out

19   there.

20       Q.  When you are talking about a part-time job in that

21   regard, such as Embassy Suites, is that like a special -- I

22   hate to call it an assignment, but is it just like a

23   special deal where they may need security or an event one

24   weekend and you do it, or is it a situation where you get

25   hired by them to do every Friday night?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)                                    40

1    A.  You get hired by them.  They actually pay.  And

2    then, actually, our agency maintains the schedule to have

3    officers out there.  I think every night they have them out

4    there.

5    Q.  And you could be part of that program that places

6    your officers out on that property?

7    A.  Yes.

8    Q.  Any other part-time opportunities --  Generally,

9    are the part-time opportunities related in some fashion or

10   another related to security?

11   A.  Yes.  And no, I didn't have any.  Since I've been

12   with La Vista, I think Embassy Suites is the only part-time

13   thing I've ever done.

14   Q.  Okay.  So now that you become a detective in

15   two-thousand- -- four years -- we're going to go -- that's

16   probably -- let's see -- was it seven you went over there,

17   so it was, like, 2011 you went over there?

18   A.  Well, it was 2004 when I -- so it was 2008.

19   Q.  2008 you became a detective.  You described what

20   you did to make yourself more qualified for the job, and

21   you've described that you then interviewed for it.  When

22   getting that promotion, did you have to undergo any

23   additional training?

24   A.  Yes.

25   Q.  And what did that additional training involve?

1    A.  I immediately started taking several classes

2  through the Internet Crimes Against Children Task Force for

3  online enticement investigations, which also encompassed

4  child pornography.

5    Q.  And was that because that was an area that you were

6  interested in, or was that the detective slot open in a

7  task force of that nature?

8    A.  The -- yeah, the detective spot -- back then they

9  segregated our investigations for general criminal and

10  child crimes.  So when I went to investigations, I handled

11  all child crimes, to include child abuse, sexual assault.

12  Then we joined with the task force and we were doing the

13  online child enticement with chatting.  So then I started

14  getting the training for that.

15    Q.  All right.  What -- briefly, what -- describe the

16  training for your work in online child enticement.

17    A.  The first class that I took was a week-long class

18  where we actually had computers and we were online and we

19  set up profiles and -- be kind of like how to catch a

20  predator.

21    Q.  Television series?

22    A.  Yeah.  So we would sit and create a profile, get

23  into a chat room and, you know, start chatting as a 13-,

24  14-year-old girl and eventually be contacted and then the

25  process in making an arrest from there.

1    Q.  Was it just like the show?

2    A.  Essentially, yes.

3    Q.  Okay.  So you know you're talking to somebody who's

4    interested in that and you have their IP address and you

5    arrange a physical meeting?

6    A.  Yes.

7    Q.  Okay.  As a detective on that task force, then,

8    were you also charged in assisting in the investigations of

9    crimes involving possession of child pornography?

10   A.  Yes.

11   Q.  And what training were you given in that regard?

12   A.  Well, the Internet Crimes Against Children training

13   also covered child pornography.  Then shortly after going

14   into investigations, I was also assigned to the FBI cyber

15   crimes task force where we worked on -- a lot of our work

16   there was the peer-to-peer child pornography downloading

17   investigations.

18   Q.  Peer to peer.  A couple of people sexting?  That

19   sort of thing?

20   A.  Well, it's a little more complicated.  I mean, that

21   could be one way, but also through a peer-to-peer network,

22   so like LimeWire, BearShare.  They're programs where,

23   typically, people would share music back and forth from

24   computer to computer.  But that's where a lot of the people

25   who traded child pornography ended up going was to these

Iversen - Direct (Tjaden)

1    peer-to-peer sites to trade their child pornography.  And

2    they'd share it on an open source.  So if I was looking for

3    a song that you had on your computer and you had the same

4    -- you know, LimeWire, it would --

5         Q.  LimeWire was like a sharing thing?

6         A.  Yes.

7         Q.  There was another one big back then, not LimeWire.

8    What was it called?

9         A.  Well, Napster was the big one.

10        Q.  Napster, yeah.

11        A.  Napster was different because everything on Napster

12   was on a single server.  So that's why it was easy to shut

13   down, because all you had to do was shut down the one

14   server.

15        Q.  But LimeWire was --

16        A.  LimeWire, everybody's computer shares throughout

17   the world.

18        Q.  Okay.

19        A.  So you would have to shut down every computer in

20   the world to --

21        Q.  So if I'm on LimeWire just trying to look for

22   songs, because it's shared by every server, somebody else

23   can jump on LimeWire and download a pornographic image --

24        A.  Yes.

25        Q.  -- and it can find its way to my computer?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1     A.  The image can't, no.  It would have to be -- you

2  would have search for that image and then you would have to

3  select that image to be downloaded from.  So if you and I

4  were sitting here with computers, you had a song that I

5  wanted, I could download that directly from you.

6     Q.  You could download the song directly from me?

7     A.  Yes, or if it was a porn image or whatever.

8     Q.  Can you attach a porn image to a song?

9     A.  I don't believe so.

10     Q.  Okay.  Now, in downloading that song, am I looking

11  at it by file name?

12     A.  Yes.

13     Q.  So those could be changed; right?

14     A.  Yes.

15     Q.  So somebody could have a pornographic picture and

16  put a song's file name on it and I could download it?

17     A.  Well, the file extension would be different because

18  there would be MP3, you know, so --

19     Q.  All right.  When you -- these are individual items,

20  songs, or -- and they don't have to be pornographic, just

21  images could be shared as well?

22     A.  Yeah.  It could be a movie, could be a legitimate

23  movie.

24     Q.  Okay.  So a legitimate movie would have the same

25  extension as a pornographic movie?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1      A.  Yes.

2      Q.  Okay.  So somebody could change the name on a

3  pornographic movie on the file to a legitimate movie that

4  I'm looking for and I could wind up with child pornography

5  on my computer --

6      A.  Yes.

7      Q.  -- and not knowing I had done that?

8      A.  Yeah, not until you view it, yes.

9      Q.  Not until I open it and view it?

10     A.  Yes.

11     Q.  Okay.  When you downloaded those individual

12  folders, do you download -- or the items, can you download

13  the entire folders?

14     A.  Yeah, you could download -- you know, if you wanted

15  Guns and Roses' entire album, you could highlight the

16  entire album and download the whole thing all at once.

17     Q.  Or all of the Indiana Jones movies?

18     A.  Yes.

19     Q.  Okay.  And this is all stuff that you learned

20  through that Internet Crimes Against Children class?

21     A.  Yes.  And I went through several classes that were,

22  you know, through Internet Crimes Against Children task

23  force as well as through the FBI cyber crimes task force.

24  And yeah, those classes were where I learned about file

25  sharing and chatting and all that stuff.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    Q.  And this is all stuff you did back in 2008-2009

2  time frame?

3    A.  Yeah, 2008 is when I started doing that, and then

4  gradually throughout the year I picked up training.

5    Q.  So you had completed a fair share of this training

6  prior to 2017 -- or '15?

7    A.  Yes.

8    Q.  Do they train you --  Strike that.

9        If you find on a computer an Indiana Jones movie

10 that really isn't an Indiana Jones movie --  Strike that.

11 I'm going to go back.

12       Let's say you find on a computer a child

13 pornographic title file or a movie and it's under a file

14 name of an Indiana Jones movie.  You don't know that until

15 you open it up?

16   A.  Yes, that's correct.

17   Q.  All right.  Do you do that when you're running your

18 forensics right there, or do you have to do it later?

19   A.  Well, and I don't do computer forensics on a -- you

20 know, on a -- like the official forensic examination.

21   Q.  You don't do the official forensic examination?

22   A.  No.

23   Q.  Who does that in your department?

24   A.  Well, nobody on our department does that.

25   Q.  Who does that, to your knowledge, in the Papillion

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    Police Department?

2        A.   Well, currently, Stigge, Detective Stigge, but I'm

3    not sure what his credentials were at that time.

4        Q.   Okay.  Are you trained at doing that in any

5    fashion?

6        A.   Just previewing computers.

7        Q.   What do you mean by "previewing" computers?

8        A.   Well, previewing is I'm not looking for deleted

9    files; I'm just looking for, basically, the data that you

10   could look at -- that any of us could look at by either

11   opening a phone and thumbing through it or opening a

12   computer and opening up folders.  Essentially, that's what

13   I do is look at the data that's on there.  I don't dig for

14   deleted files.

15       Q.   Okay.  So -- and that's what you did throughout the

16   course of this investigation?

17       A.   Yes.

18       Q.   When you say just opening up the computer, I mean,

19   you don't just open up the computer and look.  You have

20   equipment with you?

21       A.   Yes.

22       Q.   And when you open it up, are you opening it up and

23   looking through the folders?

24       A.   No.  Well, on a live computer that's running, so

25   for instance, this computer, if I was going to run --

Iversen - Direct (Tjaden)                                    48

1     Q.  This computer here?

2     A.  Yes.

3     Q.  Okay.

4     A.  If I found this computer in an investigation and I

5  wanted to run my OS Triage program, I would just plug it

6  into the USB, launch the program.  The program does all the

7  searching and then gives me, you know, results at the end.

8     Q.  So what are you doing while that's running?

9     A.  Waiting.

10    Q.  I'm not going to make a doughnut joke here.

11    A.  Waiting.

12    Q.  So you're waiting.

13    A.  Yes.

14    Q.  Okay.  Are you watching a OS Triage screen or are

15 you watching the computer screen?

16    A.  I'm not -- I'm letting the program do its scan of

17 the computer.

18    Q.  Okay.

19    A.  So I'm --

20    Q.  So is it pulling up and showing you images?

21    A.  No, absolutely -- no.

22    Q.  Absolutely or --

23    A.  Absolutely not, no images.

24    Q.  Okay.  All right, all right.  So that -- we

25 understand, then, what your training is as you're becoming

Iversen - Direct (Tjaden)                          49

1     the detective.  And again, your interest -- and I mean this

2     in a professional sense -- your interest is children's

3     crimes?

4         A.  Yes.

5         Q.  Okay.  As you are going through this training and

6     -- I mean, you're interested in children's crimes because

7     that's how you got started and that's what position was

8     available?  Or is that something that, since you've been

9     involved in police work, you just want to stop this stuff?

10        A.  I wanted to get into investigations and that was

11    the opening that was there.  And I kind of found a knack

12    for it, I guess.

13        Q.  All right.  So the detective position, then, or the

14    additional training, are you giving -- given any

15    instructional manuals on child crimes that you can refer to

16    if you need to?

17        A.  Yeah.  Each class I took, there was, you know, a --

18        Q.  Okay.  Are you familiar with the Tanner

19    methodology?

20        A.  No, I'm not.

21        Q.  Okay.  Never heard of that?

22        A.  No.

23        Q.  You're now a detective in 2008.  Is that your

24    current rank?

25        A.  Yes.

1    Q.  You say that with a little hesitation.

2    A.  Well --

3    Q.  Are there levels of detective?

4    A.  In our agency, it's not a rank, technically, by our

5    structure.  I don't get paid more money.  I don't supervise

6    anybody.  I'm just an investigator or detective.  So it's

7    not really a designation as like a sergeant or a corporal

8    or --

9    Q.  Okay.  You have the title "detective"?

10   A.  Yes.

11   Q.  All right.  And have you retained that title, then,

12   ever since 2008 when you first received it?

13   A.  Yes.

14   Q.  All right.  During that period of time up till

15   present, any disciplinary measures taken against you?

16   A.  I think I had a verbal discussion --  Since I've

17   been in investigations?

18   Q.  Yeah.

19   A.  Okay.  No.

20   Q.  All right.  Then what's the one you were talking

21   about?

22   A.  I was involved in a pursuit and didn't turn my

23   camera on, so I had a verbal discussion a long time ago.

24   Q.  Other than this lawsuit, any other problems with

25   the public?

Iversen - Direct (Tjaden)

1    A.  No.

2    Q.  All right.  Ever been sued before?

3    A.  Well, a party to a suit similar to this in Missouri

4    Valley like we talked about I had been deposed.

5    Q.  You said you had been deposed one time.

6    A.  Yes.

7    Q.  And you did say it was somewhat similar to this.

8    A.  Yes.

9    Q.  So, now, talking about that more specifically, that

10   was in your Missouri Valley police officer days?

11   A.  Yes.

12   Q.  What was the claim brought in that lawsuit?

13   A.  It was a search warrant that was sought by my chief

14   that I assisted in.  It was a computer -- you know, it was

15   early on during -- we had received an e-mail and were

16   suspicious of some computer hacking, so my chief applied

17   for a search warrant and then I assisted in service of a

18   search warrant.

19   Q.  Okay.  And somebody objected to that --

20   A.  Yes.

21   Q.  -- and filed suit?  How did that turn out?

22   A.  I think the insurance company paid 5,000 to the

23   person.  That's all I remember.

24   Q.  Okay.  So it was resolved without a trial?

25   A.  Yes.

Iversen - Direct (Tjaden)                                    52

1    Q.   Okay.  What -- in your -- La Vista, what's the

2    hierarchy?  I mean, you mentioned chief.  Chief of police

3    is the top dog?

4    A.   Yes.

5    Q.   And who's below him?

6    A.   Captain -- we have three captains -- and then

7    sergeant.

8    Q.   All right.  And you don't have rankings, but where

9    does a detective fall into that?

10   A.   Technically, on our structure, I'm the same level

11   as an officer.

12   Q.   Okay.  And so your next one would be sergeant?

13   A.   Yes.

14   Q.   Have you applied to be a sergeant in the period of

15   time since you've been there?

16   A.   Yes.

17   Q.   How many times?

18   A.   Once.

19   Q.   When was that?

20   A.   Just last year.

21   Q.   You didn't get it?

22   A.   No.

23   Q.   Do you know why?

24   A.   No, I don't.

25   Q.   Do you think it has anything to do with this deal

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    that we're in here today for?

2        A.   No.

3        Q.   They're aware of it; right?

4        A.   Yes.

5        Q.   Okay.  When this happened, you were an employee of

6    La Vista Police Department; is that accurate?

7        A.   Yes.

8        Q.   All right.  You weren't working for La Vista, were

9    you, on March 17th, 2015?  I'm going to get into what I'll

10   call a loan program or --

11       A.   Okay.

12       Q.   -- officer sharing program or whatever, but on

13   March 17th, 2015, you were still an employee of the

14   La Vista Police Department?

15       A.   Yes.

16       Q.   Okay.  And have maintained that employment since

17   you first started with them?

18       A.   Yes.

19       Q.   No extended leaves of absences?

20       A.   No.

21       Q.   You're still subject to see continuing education

22   requirements; correct?

23       A.   Yes.

24       Q.   When was the last one of those you completed?

25       A.   Oh, I think probably I went to a rifle instructor

1    certification class is probably the last class I went to.

2    It was a week-long training.

3        Q.  Okay.  One thing I didn't say when we started, if

4    at any time you need a break, you just tell me.

5        A.  Okay.

6        Q.  Now, I did reference March 17th, 2015, and this

7    case is about a situation in which a search warrant was

8    served on my client, Paul Nader; you understand that?

9        A.  Yes.

10       Q.  And you were present during that time?

11       A.  Yes.

12       Q.  The Papillion Police Department, I understand, was

13   the department that executed that warrant; is that correct?

14       A.  Yes.

15       Q.  What were you doing with the Papillion Police

16   Department?

17       A.  Assisting.

18       Q.  All right.  Is that something that you would do for

19   other agencies frequently?

20       A.  Yes.

21       Q.  How frequently would you do that?

22       A.  I really don't know.  I couldn't put a number on

23   it.  But anytime an agency asks, we have an interlocal

24   agreement with every agency in the metro area, so if

25   they're -- if another agency asks for our assistance and my

Iversen - Direct (Tjaden)                                                55

1   sergeant allows it, then I go assist.

2       Q.   So have you worked with -- while working on

3   La Vista-related matters, have you worked with officers

4   from other agencies?

5       A.   Yes.

6       Q.   Have you worked with Scott Lyons?

7       A.   Yes.

8       Q.   Do you know him to be involved in this instance as

9   well?

10      A.   No.

11      Q.   He was not, or you don't know that he was?

12      A.   I don't know that he was.

13      Q.   Do you recall him being there during the search

14  warrant execution?

15      A.   No, I don't.

16      Q.   Okay.  So what have you worked with Scott Lyons on?

17      A.   When he first got appointed chief, we got into a

18  foot pursuit together.

19      Q.   You know he's the chief of police?

20      A.   Yes.

21      Q.   Do you know how long he's been the chief over at

22  Papillion?

23      A.   Maybe two years, three years maybe.

24      Q.   When you worked with him, it was prior to him

25  becoming a chief; correct?

Iversen - Direct (Tjaden)

1    A.  No, he wasn't chief.  He was --

2    Q.  He was out there doing the work?

3    A.  -- brand-new chief.  Well, I met him to discuss

4  some training at Panera, and some shoplifters ended up in

5  our area.

6    Q.  I got to warn you, I watch "Cops", like, every

7  night for, like, hours.  I get bored late at night.  So I

8  almost consider myself a certified police officer; all

9  right?

10   A.  Yeah.

11   Q.  And then Sergeant Svajgl -- I'm sorry, Sergeant --

12       MR. SVAJGL:  Huh-uh.

13       MR. TJADEN:  Captain.

14       MR. SVAJGL:  Detective.

15   Q.  (By Mr. Tjaden) Detective Svajgl, have you worked

16 with him interagency-wise other than on this date in

17 question here?

18   A.  Yes.

19   Q.  Prior to?

20   A.  Yes.

21   Q.  Can you give me an idea of the nature of the

22 situations in which you were assisting him?

23   A.  No, I can't -- I don't remember.  I just know we

24 worked with Papillion a lot and I know I've worked with him

25 on different things.

Iversen - Direct (Tjaden)

1    Q.  The investigations you do, are they pretty much

2  involving, in one form or another, crimes involving

3  children?

4    A.  Usually, yes.

5    Q.  I mean, would you assist in a crime that doesn't

6  involve a child?

7    A.  Yes.

8    Q.  What would an example of that be?

9    A.  If they had a search warrant for burglary, for

10  anything they needed assistance for, we work together back

11  and forth.  So it doesn't matter the type of crime.  If

12  they need an extra person to help out, whether it be

13  searching or to go do a -- knock on the door and talk to

14  somebody as security, I mean, we'd help out whenever they

15  needed it.

16    Q.  And how does this whole process -- to your

17  knowledge, how does this process of assisting work?  You

18  are part of an interlocutory agreement, you said,

19  interagency agreement, or whatever you said; right?

20    A.  Yes.

21    Q.  Okay.  And are you somebody who would be in a

22  position where you would determine that you need additional

23  people to help and make a request of another agency?

24    A.  Yes.

25    Q.  Okay.  So it's not the chief who does that or a

Iversen - Direct (Tjaden)                                    58

1    captain or a sergeant who does that; you can say, I need

2    somebody else?

3        A.  Yes.

4        Q.  What makes you make that decision?

5        A.  I believe our policy allows me to.

6        Q.  But, I mean, what do you base the decision on?  You

7    just don't have enough officers available?

8        A.  Yes.  In our investigations, we have three officer

9    -- or three detectives -- three detectives and two

10   narcotics.  And if you're serving a search warrant and you

11   don't know how many people are in the house, you know, it

12   just depends on the circumstances --

13       Q.  Have you made requests in the past for additional

14   manpower to help you?

15       A.  Yes.

16       Q.  When you do so, who's all -- what agencies are

17   members of this agreement?

18       A.  Omaha PD, Ralston, La Vista, Papillion, Sarpy

19   County, Douglas County --

20       Q.  Bellevue?

21       A.  -- Bellevue.

22       Q.  When you -- how do you determine who to ask to

23   help?

24       A.  Just -- well, sometimes it depends on what you

25   need, but Detective Roy Howell, for instance, is a computer

Iversen - Direct (Tjaden)

1  examinator -- excuse me -- computer examiner, so he would

2  be a person I would reach out to if I needed a, you know,

3  examination on the computer.

4      Q.  Who is he with?

5      A.  Bellevue.

6      Q.  Roy Howell?

7      A.  Yes.

8      Q.  Okay.  Was he present on March 17th?

9      A.  No.

10     Q.  So when you've done this, reached out and -- it

11  sounds like you make a determination specifically what you

12  need --

13     A.  Uh-huh, yes.

14     Q.  Do you make a decision specifically with respect to

15  who you need?

16     A.  Yes.

17     Q.  All right.  So you're targeting an individual to

18  come and have help rather than call the agency and say --

19  the other agency and say, Send somebody over?

20     A.  Usually, yes.

21     Q.  Do you know, in this particular instance, who

22  requested your presence there?

23     A.  I don't.

24     Q.  Who would you have -- I mean --

25     A.  I seem to recall Detective Stigge.  I had helped

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    him out on some computer crime cases before and I seem to

2    recall maybe Detective Stigge contacting me and saying that

3    Detective Svajgl was working a case and may need my

4    assistance.  I don't remember exactly how --

5        Q.  Okay.  Was Stigge present on March 17th at the

6    house of the Naders?

7        A.  I don't recall.  I don't think so.

8        Q.  When you request somebody from a different agency

9    -- and this is a request made by you to have somebody come

10   over, and let's say you needed another computer examiner,

11   so you ask for Detective Howell -- what do you do to ensure

12   that whoever it is you're requesting has had the

13   appropriate training?

14       A.  I just know, I guess.  I've worked with Detective

15   Howell.  I've been to training with him before.  I guess

16   I --

17       Q.  Have you ever done anything other than maybe appear

18   at a training with Detective Howell to look into his

19   background and see what training he's had?

20       A.  No, other than him telling me that he's --

21       Q.  Were you asked what your training was when you went

22   on this assignment?

23       A.  No, I don't believe so.

24       Q.  All right.  Were you given any new training on this

25   particular assignment?

1    A.  I don't understand the question.

2    Q.  Well, at some point you think maybe Stigge may have

3    referred you.  How did you first find out you were going to

4    be assisting on this investigation?

05   5    A.  I can just assume that Detective Svajgl and I had a

6    conversation at some -- and I don't recall exactly,

7    though -- that a search warrant was going to be done and my

8    assistance was needed for a preview.

9    Q.  Would -- do you believe, then, that Svajgl would

05   10   have reached out -- I'm sorry -- Detective Svajgl would

11   have reached out to you?

12   A.  Yes.

13   Q.  Okay.  The training, then, with --  Strike that.

14       The training that you've received at any point in

06   15   time, you mentioned that you've talked about constitutional

16   law, criminal law, et cetera.  You received training on

17   getting search warrants?

18   A.  Yes.

19   Q.  And you've received training on getting arrest

06   20   warrants?

21   A.  Yes.

22   Q.  Have you received training on warrantless arrests?

23   A.  Yes.

24   Q.  And what is your understanding of -- what was

06   25   taught to you about warrantless arrests?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    A.   Essentially, if you have probable cause and that a

2    person committed a crime and it meets, you know, the

3    definition -- or meets the elements of the crime, you can

4    make an arrest by filling out an affidavit.

5    Q.   So probable cause, then, would include probable

6    cause of each of the elements of the crime had been met?

7    A.   Yes.

8    Q.   And if you don't have evidence of each of the

9    elements of the crime having been met, would you agree you

10   don't have probable cause?

11   A.   Yes.

12   Q.   So, then, does it matter, with respect to the level

13   of the crime on warrantless arrests, whether it's a felony

14   or misdemeanor?

15   A.   No.

16   Q.   Doesn't matter?

17   A.   No.

18   Q.   Again, I think I know that from the "Cops" show.

19   So at some point in time, then, if you're going to be

20   determining, on a specific crime, whether it's the assault

21   investigation that you mentioned, if you're going to be

22   considering arresting somebody, for example, you're going

23   to need to know the elements of the crime?

24   A.   Yes.

25   Q.   Do you know the elements of possession of child

1    pornography?

2        A.   Probably not off the top of my head.

3        Q.   Okay.

4        A.   I would have to review the statute just to be sure.

5        Q.   And that's understandable.  All right.  So, then,

6    with respect to, again, this investigation, you may have

7    had a conversation with Detective Svajgl in which he told

8    you what was going to -- that there was a search warrant

9    that needed to be executed?

10       A.   Yes.

11       Q.   Do you recall specifically him telling you the

12   nature of the crime that was involved?

13       A.   Not specifically, no, but I knew it was a child

14   pornography or a cyber tip investigation, so --

15       Q.   How would you have known that?

16       A.   Probably through him telling me.

17       Q.   And when you say "cyber tip investigation," what do

18   you mean by that?

19       A.   The National Center For Missing and Exploited

20   Children, they receive cyber tips from, you know, Apple,

21   Microsoft, if they identify an image as being in possession

22   of either somebody's, like, iCloud or One Drive in this

23   case or it's being traded through their network.

24       Q.   Being traded and being in possession are two

25   different things; right?

Iversen - Direct (Tjaden)                                                      64

1        A.  Yes.

2        Q.  All right.  And did you understand this to be a

3   situation that was initiated with a tip?

4        A.  Yes.

5        Q.  From Microsoft?

6        A.  I believe so, yes.

7        Q.  Have you worked on cases prior to this in which it

8   was initiated with tips from microwave -- Microsoft?

9        A.  I don't know specifically Microsoft but, yeah,

10  other -- you know, for sure, other companies.

11       Q.  And they -- I don't -- these other companies and

12  Microsoft, they control, like, search engines?

13       A.  Yes.

14       Q.  And is that where they get this stuff up into the

15  cloud, do you know?

16       A.  Well, it's my understanding they have a database of

17  the hash values and they're running their computers against

18  the hash values that are loaded into their drives.  And

19  that's how they identify images that have been tagged as

20  child pornography or that have been --

21       Q.  What they do is they identify hash values that are

22  similar?

23       A.  Yes.

24       Q.  All right.  But that doesn't necessarily mean the

25  photos are exact; is that correct?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    A.  No.  Well, it doesn't mean that the photo meets the

2   definition of child pornography.

3    Q.  It doesn't mean that it meets the definition of

4   child pornography?

5    A.  No.

6    Q.  Okay.  In this situation, then, you're asked to

7   provide assistance in the execution of a warrant.  Are you

8   told when the warrant will be executed?

9    A.  Yes.

10    Q.  Do you recall when you were first approached and

11   asked to provide assistance on this matter?

12    A.  No, I don't.

13    Q.  You came to learn it was going to be executed on

14   March 17th?

15    A.  Yes.

16    Q.  Prior to March 17th, what did you do in preparation

17   for the execution of this warrant?

18    A.  I have a kit that has write blocks and things that

19   I use to view external hard drives and flash drives.  And

20   then --

21    Q.  Let's go -- slow down.

22    A.  Okay.

23    Q.  You have a kit?

24    A.  Yes.

25    Q.  This is a physical kit?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    A.  Yes.

2    Q.  And you said it has write blocks?

3    A.  Yeah, write blocks.  They're write blocks that

4    block me from writing to a drive so I can't change the data

5    on a drive but I can look at it.

6    Q.  What does a write block look like?

7    A.  It's a square, probably a little bit bigger than

8    the power cord thing over there.  But basically, I plug my

9    computer into one side, I plug the device into the other,

10   and it keeps me from deleting or putting my own content on

11   that drive.

12   Q.  Okay.  And that's contained in the kit?

13   A.  Yes.

14   Q.  What else is in the kit?

15   A.  Well, then, the other thing, I -- this was the

16   first time using this OS Triage that I've been trained on

17   recently.  And I don't know if it was in preparation for

18   this case but just in preparation for using OS Triage, I

19   used it on, I think, three computers in my office just to

20   make sure it worked the way it worked in training, and I

21   didn't have any problems with it.

22   Q.  And this is something that's in the kit as well?

23   A.  No.  The OS Triage is an executable program that's

24   on a dedicated thumb drive.

25   Q.  So you have a thumb drive.  Is the thumb drive in

Iversen - Direct (Tjaden)                                    67

1    the kit?

2        A.   No.

3        Q.   Where is that kept?

4        A.   That's separate.  I downloaded that to the thumb

5    drive at the training.

6        Q.   Who provided the training on OS Triage?

7        A.   It was the Internet Crimes Against Children Task

8    Force in Denver.

9        Q.   Did you go out to Denver for it?

10       A.   Yes.

11       Q.   How long did you spend out there?

12       A.   A whole week.

13       Q.   When was the training given?

14       A.   It was in 2014, I believe.

15       Q.   Is this a program that you referred to earlier that

16   was used out here that day?

17       A.   Yes.

18       Q.   And was this a program that had the preloaded

19   keywords?

20       A.   Yes.

21       Q.   Were those given to you when you were out in

22   Denver?

23       A.   The keywords?

24       Q.   Yeah.  I mean, did they say these were the keywords

25   that this program looks for?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    A.  No.  I mean, I know there was a -- I believe

2    there's a manual that was downloadable in a PDF.  I don't

3    know if --

4    Q.  Did you review it?

5    A.  No.  I mean, we went through, I guess, what we

6    needed to in the class, but I didn't independently review

7    the manual.

8    Q.  Anybody else from this area present at the training

9    with you?

10   A.  No.

11   Q.  Do you know of anybody else in this area that has

12   undergone that training?

13   A.  No.

14   Q.  Would a computer analyst -- forensics analyst such

15   as yourself -- that's kind of your expertise in your

16   detective work; is that correct?

17   A.  Yes.

18   Q.  And within the La Vista Police Department, how many

19   of you are there?

20   A.  Well, there was one that -- there was one officer

21   that he went and got all the training for computer

22   forensics.

23   Q.  Who's that?

24   A.  Brad Wood.  But he's no longer assigned to

25   investigations.  He's working uniform patrol.  So I had

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                              69

1    taken over his job, essentially.

2         Q.  Was he a detective?

3         A.  No.  He was -- his status would have been an

4    officer, but his job initially when I started in

5    investigations was just to do computer forensics.

6         Q.  So other than him and now yourself, who else within

7    the La Vista department would be a computer forensics

8    expert?

9         A.  I wouldn't even call myself an expert.

10        Q.  That's fine.

11        A.  But just the two of us are the only ones that would

12   have knowledge of computer forensics.

13        Q.  What about in the Papillion Police Department?  To

14   your knowledge, who over there at this time in March of

15   2017 -- '15, '15?

16        A.  I don't believe anybody.

17        Q.  Do you believe that's why you were asked to come

18   over to assist?

19        A.  Yes.

20        Q.  Okay.  So you -- have we talked about everything in

21   the kit?

22        A.  Yeah, yeah.  It's just a -- there's write blocks

23   for flash drives, for the external hard drives, USB, and

24   there's a write block for SD cards as well.

25        Q.  Now, the write blocks serve the same function; it's

Iversen - Direct (Tjaden)

1    just when you say one's for a SD card and one's for the

2    flash drive, it's just the connecting parts?

3        A.  Yes.

4        Q.  So when you are looking at a computer such as the

5    one in front of you with your OS Triage, you have the

6    computer, you hook it to the write block, and then you hook

7    the write block to your OS Triage thumb drive?

8        A.  No.

9        Q.  How does it work?

10       A.  The thumb drive goes directly into the computer.

11       Q.  The computer?

12       A.  Yes.

13       Q.  So what are we hooking through the write block?

14       A.  Well, in this case there were several USB external

15   hard drive -- or, you know, storage devices --

16       Q.  Okay.

17       A.  -- and then flash drives or thumb drives and I

18   believe some SD cards as well.

19       Q.  All right.  And those are what you hook through the

20   write block?

21       A.  Yes.

22       Q.  And what's the connection, then?  Those external

23   hard drives, for example, that you're talking about through

24   the write block, and where does the write block connect to?

25       A.  To my computer.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    Q.  To your computer.  Something with a keyboard that

2    they're stopping you from using?

3    A.  Yes, yes.

4    Q.  Okay.  Other than looking at this kit, then, what

5    did you do in the days leading up to March 17th to prepare

6    for this?

7    A.  I don't believe anything else.

8    Q.  And when you say you looked through this kit, are

9    you just looking to make sure everything was in there that

10   you might need?

11   A.  Yes.

12   Q.  All right.  Now, you had undergone this OS Triage

13   training.  When, in relation to March 17th, did you

14   complete that training?

15   A.  The OS Triage?

16   Q.  Yes.

17   A.  Would have been, I think, August of 2014 I think I

18   went out to Denver for that.

19   Q.  Okay.  And did you say Wood was with you?

20   A.  No.

21   Q.  Was there anybody from this area with you?

22   A.  No.

23   Q.  And being the only -- or I'm sorry -- believing

24   that there was -- your understanding, there was nobody with

25   your training in Papillion, do you know of anybody who's

1    had this training that works for Papillion?

2        A.  No.

3        Q.  So, now, you talked about prior to going out there

4    on the 17th you did something with Triage to make sure it

5    worked.  What did you do?

6        A.  I plugged it into our office computers and ran it

7    the way we were taught in the class just to be sure that it

8    worked.

9        Q.  Okay.  And it ran a full forensic analysis; is that

10   -- did it?

11       A.  Yeah, I don't know if I would call it a forensic

12   analysis, but, I mean, it runs the keyword searches and --

13       Q.  Did you get any hits on your computer?

14       A.  On my work -- yeah, my child porn computer that I

15   use to view child porn, yes, but the other computers, no,

16   thank goodness.

17       Q.  The one you used to view, you got hits; the other,

18   you didn't get any hits?

19       A.  No.

20       Q.  And again, the keywords that Triage uses, you don't

21   -- you can't specifically tell us what those keywords are?

22       A.  No.

23       Q.  Do you know how many keywords it looks for?

24       A.  No.

25       Q.  Does it look for them in files or in file names?

1       A.  I think just file names.

2       Q.  That's what the training -- that's what you

3   understand from the training on OS Triage?

4       A.  I think so.  I'm not 100-percent certain, though.

5       Q.  Where's the -- the OS Triage training that you

6   took, I trust it trained you on the capabilities and what

7   it is that the program is supposed to do --

8       A.  Yes.

9       Q.  -- is that accurate?

10          Did it train you on procedures for using it?

11      A.  Yes.

12      Q.  Securing the equipment, for example, first of all?

13      A.  I'm not sure what you mean.

14      Q.  Well, I mean, you want to take -- yeah, you want to

15  -- you want to get the computer away from anybody else's

16  control; right?

17      A.  Yes.

18      Q.  And that's what you did in this instance?

19      A.  Yes.

20      Q.  You used the triage program on a laptop you found

21  in the kitchen?

22      A.  Yes.

23      Q.  The Envy, HP Envy?

24      A.  I believe so, yes.

25      Q.  Did anybody else conduct any analysis on that

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    computer at the scene?

2        A.   Not at the scene, no.

3        Q.   Okay.  Later somebody did, to your knowledge?

4        A.   I believe so, yes.

5        Q.   Was that you or a different agency?

6        A.   It was a different agency.

7        Q.   You plug in OS Triage and it's just doing its job

8    while you're waiting for it to finish?

9        A.   Yes.

10       Q.   And then it's on a thumb drive?

11       A.   Yes.

12       Q.   All right.  So how do you know the results?

13       A.   When it's completed, a screen comes up showing that

14   it's completed.

15       Q.   On the computer?

16       A.   On the computer, showing that it's completed.  And

17   then it gives you just a summary of what was located.

18       Q.   Does it give you the browser history at that time?

19       A.   You're not allowed -- you can't go through it.  It

20   just gives you -- no, it doesn't give you the history.

21       Q.   Okay.  Does it give you recent search terms that

22   you're allowed to look at at that time?

23       A.   It's been a while since I've seen it.  I know that

24   it tells you there's been keywords -- I think, like, just

25   how many keyword hits --

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1      Q.   Sure.

2      A.   -- and then if there was any hash values identified

3   with child pornography is the only -- it just shows you

4   what was found, but it doesn't show you the image and you

5   can't browse through it to see what it is at that point.

6      Q.   Can you click on -- when it says keywords -- 22, 23

7   keywords detected, does it tell you what those keywords

8   are?

9      A.   Not on that screen.

10     Q.   How do you find out what they are?

11     A.   It creates a folder on the thumb drive that -- and

12   generates a report that shows you what they are.

13     Q.   And you later look at it?

14     A.   Yes.

15     Q.   Do you look at it on site when you're doing the

16   investigation?

17     A.   No, because I have an Apple, and you have to have a

18   Windows computer to view it.  So I wasn't able to look at

19   it on site.

20     Q.   So you can't look at a specific keyword that popped

21   up and look at the specific context that it came in?

22     A.   No.

23     Q.   And it tells you that a keyword is there.  It

24   doesn't necessarily tell you that anything was child

25   pornography?

Iversen - Direct (Tjaden)

1    A.  No.

2    Q.  And you talk about hash values.  And so in this

3    particular instance, I believe there was one hash value of

4    suspected child pornography; is that your recollection?

5    A.  Yes.  I think it was found twice but, yeah, it was

6    the same one.

7    Q.  Same one.  And that pops up on the printout -- or

8    not the printout but on the screen that's showing you the

9    results?

10    A.  It just shows me there were two hits for child

11    pornography, for suspected child pornography.  The hash

12    value doesn't show, you know, on that initial screen.  You

13    have to look at the report created by the program on the

14    thumb drive, which I had to do later.

15    Q.  Okay.  Two hits of suspected?

16    A.  Yes.

17    Q.  Doesn't tell you that they are?

18    A.  No.

19    Q.  You don't know that they are at that time?

20    A.  No.

21    Q.  Is that correct?

22    A.  Yes.

23    Q.  So you don't know that -- when you get that hit of

24    suspected child pornography, you don't know that there's

25    child pornography on that computer?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    A.  No.

2    Q.  Is that accurate?

3    A.  That is accurate.

4    Q.  So you don't know that a crime has been committed

5  at that time; is that accurate?

6    A.  Yes.

7    Q.  I'm sorry?

8    A.  Yes.

9    Q.  Okay.  Now, you say there were two.  In looking at

10  the report you completed -- you did complete a report,

11  didn't you, an incident report?

12    A.  Yes, I did.

13    Q.  In looking at the report you completed -- and I'm

14  going to -- I'll ask you some questions -- I'll give you a

15  -- I'll let you look at it here in a second, but -- it said

16  when the Triage program completed a scan, it identified 23

17  keyword hits and one hash value of interest.

18    A.  Yes.

19    Q.  All right.  You say there were two.  Is it two

20  instances of the same hash value?

21    A.  Yes.

22    Q.  Okay.  And you can't plug into the keywords to see

23  what they were?

24    A.  No, not on site.

25    Q.  So the 23 keyword hits, they don't tell you a crime

1    has been committed, do they?

2        A.  No.

3        Q.  All right.  Now, there's something else called

4    Tableau.

5        A.  Yeah.

6        Q.  What is that?

7        A.  Well, it's -- that's the write block.  That's the

8    brand name of the write block, Tableau write block.

9        Q.  Okay.

10       A.  And then I think I put the serial number in the

11   report of the one I used.

12       Q.  And you did.  And I was going to ask you what that

13   identifying number was.

14       A.  Yeah.  That's the serial number of that particular

15   write block.

16       Q.  Okay.  And that is the separate piece of equipment

17   that you used not on the Envy?

18       A.  No, not on the Envy.

19       Q.  But on the external hard drives and any flash

20   drives that they had there?

21       A.  Yes.

22       Q.  And there were a number of them?

23       A.  Yes.

24       Q.  And what were the results of you running the

25   Tableau through those?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1      A.  I located a large amount of adult pornography.

2  From what I could see, there was a large amount of it, so I

3  couldn't go through it all there and --

4      Q.  Okay.  I'm going to ask you about that.  I mean,

5  there were a number of -- and I think during the interview

6  there Mr. Nader said he views pornography.

7      A.  Yes.

8      Q.  And you'll agree with me there's nothing illegal

9  about anybody viewing pornography?

10      A.  Yes, that's correct.

11      Q.  And you identified this as adult pornography?

12      A.  Yes, what I saw, yes.

13      Q.  Can you give me an idea what we're talking about

14  here?

15      A.  For amount?

16      Q.  For amount.

17      A.  There was too much to -- too much for me to open

18  each file and look, so then I kind of went to just browsing

19  the file names just to see if there were any of those

20  keywords that we talked about.  And if -- I think there

21  were some words -- some of the files were named, I think,

22  Underage or -- no, not Underage.  Barely Legal I think

23  was --  So if I saw something like that, I would open it up

24  and take a look and see if that was child pornography.  And

25  through the ones I looked (sic), I did not find anything.

26 (left margin)
27 (left margin)
27 (left margin)
27 (left margin)
27 (left margin)

Iversen - Direct (Tjaden)

1   Q.  Barely legal -- are you familiar with that term,
2   "barely legal"?
3   A.  Yes.
4   Q.  Barely legal is still legal; right?
5   A.  Yes.
6   Q.  It --
7   A.  I believe it's a website.
8   Q.  What's that?
9   A.  I believe it's a website that you can go to.
10  Q.  Oh, is it?
11  A.  Yeah.
12  Q.  It seems like it's kind of an enticing term, come
13  look at your college coeds that are barely legal.  What's
14  that other show that I don't watch, guys, girls gone crazy.
15  A.  Yeah, it's --
16  Q.  All right.  So this analysis of all -- this is
17  being done on all other equipment besides the Envy; is that
18  right?
19  A.  Yes.
20  Q.  And if I'm not mistaken, that analysis turned up
21  zero child pornography?
22  A.  Yes.
23  Q.  So there were a number -- the inventory taken from
24  Mr. Nader's home gives us a number of different pieces of
25  equipment that were removed.  Do you know that?

Iversen - Direct (Tjaden)

1      A.  Yes.

2      Q.  Did you remove the equipment?

3      A.  No.

4      Q.  Did you remove any of the equipment?

5      A.  No.

6      Q.  While you were looking at the Envy, did you not

7   leave with the Envy?

8      A.  No.

9      Q.  Okay.  So of all of the equipment, did you run the

10   computer analysis on all of the equipment?

11      A.  No.

12      Q.  Who else was there to run the computer analysis on

13   the equipment?

14      A.  Well, could you re-ask that question?  I'm sorry.

15      Q.  Well, your job --  Well, let's strike that.  Let's

16   back up.  I got ahead of myself.  Want to take a break

17   first?

18      A.  I'm fine if you want to keep going.

19      Q.  Let's take a break.

20         (Brief recess.)

21      Q.  (By Mr. Tjaden)  And again, I think we were talking

22   about at the Nader home.

23      A.  Yes.

24      Q.  We know there's a vast number of things that you

25   have to look through, the external hard drives, flash

1    drives, and the computers, such as the Envy.

2        A.   Yes.

3        Q.   And you did the Envy?

4        A.   Yes.

5        Q.   And you ran the Tableau, the write blocks, through

6    all of the other flash drives and hard drives?

7        A.   I think all of them.  I'm not sure if we got to all

8    of them or not, but I would say the majority.

9        Q.   Well, those that maybe you didn't do, if you did

10   the majority of them, did somebody else do the others or

11   did you wait and do those later?

12       A.   I would assume later they were done by somebody

13   else.

14       Q.   All right.  Was there anybody else at the site that

15   day that had the same equipment you had?

16       A.   No.

17       Q.   So nobody else had the capability of doing that?

18       A.   No.

19       Q.   Do you know, did anybody else run any sort of

20   analysis on the equipment being taken that day?

21       A.   Prior to it being taken, no.

22       Q.   All right.  Now, a couple of other questions on

23   training.  You have given us all of the training that

24   you've done, and I trust that was all training through the

25   departments, et cetera?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)                                    83

1    A.  Yes.

2    Q.  Any outside training other than what the department

3    sent you through?

4    A.  No.

5    Q.  Any, like, that you may have paid personally to go

6    do?

7    A.  No.

8    Q.  All right.  And it -- did you ever return to a

9    college environment even as a part-time student?

10   A.  Yes.

11   Q.  What was that?

12   A.  To Iowa -- Iowa Western in Council Bluffs.  I get

13   Western Iowa Tech and Iowa Western mixed up since I did

14   both.

15   Q.  Yeah.

16   A.  And, so, yeah, Iowa Western.  I took online

17   classes.  I think I did a couple on-site classes over the

18   years.  I don't know how many credits, though.

19   Q.  And that's a junior college, too, isn't it?

20   A.  Yes.

21   Q.  Have you completed any degree program there?

22   A.  No.

23   Q.  Anywhere else?

24   A.  No.

25   Q.  Okay.  Now, going back to this day, you have -- on

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1  the morning of the 17th -- when you woke up on the morning

2  of the 17th, did you already know that on the day prior, on

3  the 16th, the warrant had been obtained?

4      A.  Yes.

5      Q.  How did you find out that the warrant had actually

6  been obtained?

7      A.  I would assume Detective Svajgl contacted me.  I

8  don't remember for sure, but I would assume.

9      Q.  And did you know that it was going to be executed

10 on the 17th?

11     A.  Yes.

12     Q.  And did you know that before you went to bed the

13 night before?

14     A.  Yes.

15     Q.  So you knew getting up the next day that I'm not

16 going to go to La Vista but I'm going to go and help on the

17 execution of this warrant?

18     A.  Yes.

19     Q.  And what was the plan in terms of -- did they say,

20 Just meet us out there at noon or 11:00, or did you have a

21 gathering?

22     A.  We have a gathering to do a briefing prior to.

23     Q.  And was that done at the Papillion Police

24 Department offices?

25     A.  Yes.

Iversen - Direct (Tjaden)

1    Q.   What time did that briefing begin?

2    A.   I don't know.  It was in the morning, but I don't

3  know exactly.

4    Q.   All right.  And then who attended the briefing, as

5  best you can recall?

6    A.   By name?

7    Q.   Preferably.

8    A.   Okay.

9    Q.   You were there.

10    A.   Yeah.

11    Q.   Detective Svajgl?

12    A.   Myself, Detective Svajgl.  Detective Duling, from

13  my agency, was assisting with the search warrant, the

14  service of the search warrant.

15    Q.   And what I want to do, if you don't mind, when you

16  name a name, I'm going to ask you some questions.

17    A.   Okay.

18    Q.   And if it's easier to just name the whole list

19  first, let me know what works best for you.

20    A.   You can stop me in the middle.

21    Q.   Okay.  Who is Detective Duling?

22    A.   Currently, he's a police officer with La Vista

23  Police Department.

24    Q.   Was he a La Vista officer at that time?

25    A.   He was a detective in the detective bureau in

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    La Vista at the time.

2        Q.   And he was asked to provide assistance as well?

3        A.   Yes.

4        Q.   You stated earlier your understanding of why you

5    were asked is because of your computer skills.

6        A.   Yes.

7        Q.   Why do you believe he was asked?

8        A.   For extra help.

9        Q.   Just a body?

10       A.   Yeah.  And he gets -- frequently for search

11   warrants -- he's on the SWAT team, so he frequently gets

12   asked to come help to make sure it's done safely.

13       Q.   Okay.

14       A.   I don't know if that's the case here, but that's

15   usually why he's there.

16       Q.   Other than Duling, who else?

17       A.   Specifically, I don't remember by name.

18       Q.   Okay.

19       A.   I mean, I know there was some command staff there,

20   but I don't remember by name.

21       Q.   Can you give me an idea of approximately how many

22   people were present at that briefing?

23       A.   I would say 10 to 15.

24       Q.   As a detective, you're not uniformed, are you?

25       A.   No.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                    87

1    Q.  Were there a mix of uniformed and nonuniformed or

2   all nonuniformed there?

3    A.  A mix.

4    Q.  And you said Duling often does SWAT stuff.

5    A.  Yeah.

6    Q.  Were you guys -- not you guys because you were in

7   plainclothes, but are we talking SWAT gear here?

8    A.  No.  You know, we wear -- I wear an external vest.

9   I mean, it depends on how much knowledge you have of law

10  enforcement.  Having watched "Cops," you know, it's not a

11  uniformed, you know, search warrant.  And, like, for

12  investigations, I wear an external vest that some might

13  say, you know, would look like a SWAT-type dress.

14   Q.  And that's done for your protection?

15   A.  Yeah.  And that's just a temporary vest that I wear

16  until I get into the house and start working.

17   Q.  And at this briefing, then --  I'm sorry if I

18  interrupted you.  Did you give me a ballpark number of

19  people present?

20   A.  Ten to 15.

21   Q.  And, then, when it's time to leave, do you all

22  leave together to go to the residence?

23   A.  Yes.

24   Q.  You don't drive together?  You don't take one of

25  those big, heavily armed recreational vehicles?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1      A.  No.  We --

2      Q.  All right.

3      A.  -- drive separately or two or three, you know,

4  officers per car.

5      Q.  Who did you drive with, if you can recall?

6      A.  I don't recall.

7      Q.  Who led the briefing meeting?

8      A.  I believe Detective Svajgl, because he's the case

9  officer.

10      Q.  You've referred to it as a case officer.  Is that

11  somebody who is in charge of the particular case and its

12  investigation?

13      A.  Yes.

14      Q.  And in this instance, you believed it was Detective

15  Svajgl?

16      A.  Yes.

17      Q.  So you -- what do you recall Detective Svajgl

18  telling you by way of the briefing on this?

19      A.  I don't remember specifically, but I can give you

20  kind of a general how these briefings typically go.

21  Usually we put up on a PowerPoint of some sort or pass out

22  a picture of the house, what it looks like, so we make sure

23  everybody goes to the right house, a picture of the people

24  who live there so we know who we're dealing with.  We'll

25  cover any dangers we need to be concerned about, if they

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)                                    89

1    have gun permits, do they -- you know, kind of what are we

2    walking into, for safety.

3        Q.  Do you remember any printed material provided to

4    you on this briefing?

5        A.  I don't remember specifically.  Usually that's the

6    case, but I don't remember.

7        Q.  Do you remember the discussion -- was there a

8    discussion of dangers in this particular instance?

9        A.  I don't recall.

10       Q.  Now, if I'm not mistaken, when you got there, there

11   was some things that caught your attention on site; is that

12   correct?  Were you involved in a reason that suggested

13   somebody call the bomb squad?

14       A.  I remember hearing that going on while I was doing

15   my thing, but I wasn't involved in that portion of it.

16       Q.  All right.  Do you know what they were talking

17   about?

18       A.  I heard they were talking about potential bomb-

19   making chemicals or there might be a concern of something

20   like that.

21       Q.  And that concern was alleviated shortly; is that

22   right?

23           MR. KUNHART:  Objection.  Foundation.

24       Q.  (By Mr. Tjaden)  Do you know?

25       A.  I don't know.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    Q.  Okay.  Did you see bomb squad people coming out?

2    A.  Yes.

3    Q.  Did you ever learn what the -- what happened --

4  what arose or didn't arise out of that concern?

5    A.  No.  Just through Mr. Nader's deposition, you know,

6  the other day.

7    Q.  Okay.  All right.  So you don't recall specifically

8  what printed material -- again, did you recall there being

9  a suggestion of any danger?

10   A.  No, I don't.

11   Q.  All right.  And you all leave.  Where do you -- do

12  you then all meet somewhere on the street in front of the

13  residence?

14   A.  Yeah.  Usually we'll all kind of drive together in

15  a caravan-type scenario, try and park out of view the best

16  we can so we're not alerting people we're coming, and then

17  walk up, you know, maybe a block or two from where we park.

18   Q.  Is that what you did in this instance?

19   A.  You know, I don't remember.  That's typically how

20  we would do it, but I don't remember for sure.

21   Q.  Do you all walk up together?

22   A.  Yes.

23   Q.  Do you all walk up to the front door together?

24   A.  Well, just stepping back, we usually -- there's a

25  group of people that are designated as the entry people, if

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1   you will, that are going to go through the house and make

2   sure the house is safe for the search people then to come

3   in.  So not every single person involved is involved in the

4   entry, but we would be in the area ready to go in once it's

5   secure.

6       Q.  Are the entry people, at least from what I see on

7   TV, usually uniformed officers?

8       A.  Uniform -- in this case, it was probably a mix.  I

9   don't remember for sure.

10      Q.  Were you on the entry team?

11      A.  I don't remember.

12      Q.  Do you recall if Detective Svajgl was on the entry

13  team?

14      A.  I don't remember.

15      Q.  Do you know who made the first contact with anybody

16  in the house?

17      A.  No, I don't remember.

18      Q.  You weren't the first person to enter the house?

19      A.  No, I don't believe so.

20      Q.  Were you the last, or do you know?

21      A.  I don't know.

22      Q.  All right.  And specifically, what was your

23  understanding -- when you're going there that day, what was

24  your understanding as to the role you were going to be

25  playing?

1    A.   Just to help identify the electronics and do a

2   preview of those electronics.

3    Q.   Where did you do the work that you were supposed to

4   be doing that day?

5    A.   The kitchen area.

6    Q.   And that's where you had found the Envy?

7    A.   Well, the Envy was on a table, I think, kind of --

8   probably designated as the kitchen area, but the

9   countertops is where I did the preview with the write

10  blocks.

11   Q.   So you go in.  Do you do any of the search for

12  items?

13   A.   No, no, I didn't in this case.

14   Q.   When you go in there to do your analysis or

15  preview, has somebody already brought you the Envy?  Are

16  you waiting for somebody to bring you the Envy or what?

17   A.   The Envy was sitting there running when we got

18  there.  It was turned on.

19   Q.   And it's a laptop?

20   A.   Yes.

21   Q.   And it was open?

22   A.   Yes.

23   Q.   That's a good thing; right?

24   A.   Yes.

25   Q.   Because if it's not open, what does that mean?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    A.  Well, we have -- we'll have to just seize it,

2    because we need a password to get into it usually.

3    Q.  All right.  And if you close it and should it have

4    any encryption material on it, then that triggers the

5    encryption software; right?

6    A.  Yes.

7    Q.  Is that correct?

8    A.  Yes, if you shut it down.

9    Q.  But if I'm not mistaken, this Envy had no

10   encryption software?

11   A.  Not that I recall seeing.

12   Q.  Okay.  So the Envy's there, and that's already out.

13   Then in the process of running the preview on that, do

14   other officers then keep bringing you hard drives and

15   things with -- that they're finding?

16   A.  Yes.

17   Q.  Was there any printed material taken out of their

18   home that day, to your knowledge?

19   A.  I don't know.

20   Q.  Okay.  Do you know if any printed child pornography

21   material was identified through this investigation?

22   A.  I don't know.

23   Q.  You don't have any reference to that in your

24   report?

25   A.  No.

Iversen - Direct (Tjaden)

1    Q.  And again, when you knew that you were going out

2  there to conduct this preview, that was what was told to

3  you as to what your job would be?

4    A.  Yes.

52  5    Q.  And then you believe that was by -- whoever was

6  leading the meeting told you that?

7    A.  Yes.

8    Q.  Okay.  All right.  You said the last time you ran

9  OS Triage.  When was the most recent time from today's date

53  10  that you ran the OS Triage program?

11    A.  On this case.

12    Q.  And this was the first time --

13    A.  Yes.

14    Q.  -- that you used it?

53  15    A.  Officially, yeah, on an investigation, yes.

16    Q.  So this was the only time in an official

17  investigation that you used the OS Triage program?

18    A.  Yes.

19    Q.  You had run it two or three times on a computer in

53  20  your office to see if you could make it work?

21    A.  Yes.

22    Q.  All right.  What was the last -- well, between

23  March 17th and today's date, for example, how many --

24  ballpark, how many search warrants have you assisted on?

54  25  And if it's greater than 25, just say that.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1      A.  I would say ten.

2      Q.  Okay.  And of those ten, did any of them involve

3  child crimes?

4      A.  Yes.

5      Q.  How many?

6      A.  Probably two or three.

7      Q.  And were they crimes against the child, like a

8  sexual assault?  Were they enticing or luring, or were they

9  possession of child pornography?

10     A.  Probably possession of child pornography.

11     Q.  You think all three of them were?

12     A.  I think so, yeah.

13     Q.  If those crimes that you were involved in -- and

14  this is since the 17th to today's date -- involved

15  investigation of child -- possession of child pornography

16  crimes, why would you not have used the triage on those?

17     A.  I didn't -- well, on those cases I didn't need to

18  use it.  So when it's my case, I'm the one that interviews

19  the suspected person.

20     Q.  And that's what Detective Svajgl did in this case?

21     A.  Yes.  So I would be the one doing the interview,

22  and so, therefore, preview, I just didn't see the need for

23  it, I guess, on these other ones.  I -- but, then, also

24  this triage program that I used, it took a long time to run

25  on Mr. Nader's Envy and it locked up at one point.  So --

Iversen - Direct (Tjaden)

1    and it was just sitting and didn't -- you know, wasn't --

2    you couldn't see -- it has, like, a status that shows you

3    it's actually running, and it locked up at one point.  So I

4    was kind of uncomfortable with that.  OS Triage does

5    webinars, so I wanted to attend a webinar to find out the

6    issue with Triage, and that's another factor in why I

7    didn't --

8         Q.  And when did you attend that?

9         A.  Well, I didn't have a need for it, but I would just

10   want to do this webinar to --

11        Q.  So you haven't done it yet?

12        A.  No.

13        Q.  So during the course of doing this triage, you

14   experienced a problem with it?

15        A.  Yes.

16        Q.  It did continue on, and ultimately you finished but

17   it took a long time?

18        A.  Yes.

19        Q.  And you don't want to use it again until you

20   determine what the problem was?

21        A.  Yes.

22        Q.  And you've not yet determined that?

23        A.  No.

24        Q.  Did that cause you concern that day that it was a

25   -- you know, that there was a problem with it?

1      A.   I don't know about concern.

2      Q.   Enough that you don't use it again?

3      A.   Yes.

4      Q.   Okay.  All right.  So these other three child --

5 possession of child pornography investigations you've been

6 involved in a search warrant on, were those all three your

7 cases?

8      A.   Yes.

9      Q.   So you would be doing the interviewing of the

10 suspect such as Detective Svajgl did on this case?

11      A.   Yes.

12      Q.   Were you present in the room when Detective Svajgl

13 was conducting the interview?

14      A.   No.

15      Q.   It's not an open concept?  See, I also watch a lot

16 of "House Hunters," too.

17      A.   Yeah.

18      Q.   It's not an open concept to where you're in the

19 kitchen on the counter and can see where the interview's

20 being conducted?

21      A.   No.

22      Q.   Okay.  What did you observe Detective Svajgl do?

23 Did you observe him do anything that day at the house?

24      A.   Just the interviewing, I believe.  That's all I --

25      Q.   Did you show him the Envy?

1    A.  I don't recall.  I don't know if I -- because it

2  was taking a long time, I recall -- I don't know if it was

3  him or somebody else coming and asking how's it going,

4  because it's kind of nice to know, when you're

5  interviewing, if anything's being found.

6    Q.  Okay.

7    A.  So I know I was contacted by somebody at one point,

8  and maybe two or three times, but I don't remember who.

9    Q.  All right.  Because this was taking a long time?

10   A.  Yes.

11   Q.  And was -- if I asked this question before, I

12  apologize.  All of the equipment that was found in the

13  house, was it all brought to your attention that day?

14   A.  I don't know if all of it was, but a great deal of,

15  you know, anything that would store data was brought to me.

16   Q.  And that which may not have been brought to you, do

17  you know if it was previewed by anybody else there?

18   A.  I don't -- no, it wouldn't have been, because I was

19  the only one doing previews.

20   Q.  Okay.  Detective Svajgl wasn't doing any previews?

21   A.  No, not to my knowledge.

22   Q.  When you were doing these two or three other

23  execution of search warrants, did you have somebody else --

24  since you're doing the -- since you're doing the

25  interviewing, did you have somebody else with your skill

1   set to do the previewing available there with you?

2       A.  No, I didn't.

3       Q.  All right.  And you say that was a situation in

4   which -- those were situations in which you didn't feel the

5   needs to use Triage.  Aside from the fact that you didn't

6   -- you weren't comfortable with the Triage program --

7       A.  Uh-huh.

8       Q.  -- because of how it performed on this day in

9   question --

10      A.  Yeah.

11      Q.  -- you didn't need the Triage?

12      A.  No.

13      Q.  Why?  What was different about these three than the

14  one on March 17th?

15      A.  I don't really know.  I don't know if I just didn't

16  have the -- the resources weren't available.  And in my

17  interview, I got everything I needed in my interview, so --

18      Q.  The resource was available.  You had Triage.

19      A.  Well --

20      Q.  You just didn't want to have to use it.

21      A.  I would have been the one to use it, which would

22  have taken me away from doing the interview, so I would

23  have had to have another person come in.  And I don't

24  recall if somebody just wasn't available.  I don't know

25  what the circumstances were, but we don't always do a

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    preview on every single child porn case.

2        Q.  And those three instances, you were doing the

3    interview, and I think you said that another reason why the

4    previews weren't necessary was because you got everything

5    you needed through the interview.

6        A.  Yeah.

7        Q.  Without names, what do you mean you got everything

8    you needed?

9        A.  A confession --

10       Q.  Okay.

11       A.  -- like a full confession.

12       Q.  And so is it safe to say that on those three

13   instances when you were there doing the investigation

14   serving the search warrant, you made an arrest?

15       A.  Yes.

16       Q.  And --

17       A.  I'm trying to think.  Yes, I think so, yeah.

18       Q.  Well, what -- to the best of your recollection --

19       A.  Well, I'm trying to think of the last --

20       Q.  Sure.

21       A.  -- the names on the last three.  I know the last

22   one I did, for sure there was an arrest on that one.

23       Q.  Okay.  What was that name?

24       A.  Gosh --

25       Q.  Well, strike that.  Was it working with -- was it a

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1  La Vista case?

2      A.  Yes.

3      Q.  All right.  So were those arrests based upon the

4  confessions?

5      A.  And the other -- yeah, and other evidence as well.

6      Q.  What other evidence?

7      A.  Well, the images.  So I -- the one I'm talking

8  about here where I told you I made the arrest is a cyber

9  tip, so along with the information from the cyber tip and

10  the person's admission to downloading the contraband.

11      Q.  Okay.  You had previously indicated that, right off

12  the top of your head, you can't recite the elements of the

13  crime of possession of child pornography --

14      A.  Yes.

15      Q.  -- is that accurate?

16      A.  Yes.

17      Q.  When you were doing these three warrants that you

18  talked about that are your case, what do you do so that you

19  understand what the elements are before those?  Do you

20  review it at that time?

21      A.  Yes.

22      Q.  Did you review the elements of the crime of

23  possession of child pornography before going to the Nader

24  home?

25      A.  No.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    Q.  Now, after you -- what was the sequence?  What did

2    you do first?  The Envy and then the Tableau through the

3    external hard drives?  Or did you do those first and then

4    the Envy?

5    A.  No.  I started the Envy -- almost immediately I

6    started --

7    Q.  And let it run?

8    A.  Yeah.

9    Q.  Because it wasn't working well?

10   A.  Yeah, 'cause it was taking a long time.

11   Q.  All right.

12   A.  So while I was waiting for that, I worked on the

13   other devices or --

14   Q.  In your report -- you did a report on this?

15   A.  Yes.

16   Q.  All right.  Let's talk about reporting.  In all of

17   the training that you've done, are you trained on reports?

18   A.  Yes.

19   Q.  What are you told about reports?

20   A.  Just to get all the pertinent information in the

21   report -- who, what, when, where.

22   Q.  Who, what, when, where?

23   A.  And how.

24   Q.  If an image is seen, you say what image is found?

25   A.  Yes.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    Q.  And this training, is it part of the academy

2    training or was it part of the ongoing training?  Is it

3    something every officer knows?

4    A.  It's something every officer knows.

5    Q.  And how important is accurate reporting?

6    A.  It's very important.

7    Q.  I've read through your report and I seem to

8    understand -- and if you don't remember this -- would you

9    like a copy of it?

10   A.  It's pretty short.  I think I can --

11   Q.  Well, I'll give you a copy.  Well, let's go ahead

12   and mark --  You have a couple of them; right?

13   A.  I've got -- yeah, I do have a couple.

14       MR. TJADEN:  Let's go ahead -- guys, do we have any

15   clue as to what exhibit we're on?

16       MR. KUNHART:  Hold on.  Looks like start on 24.

17       (Exhibit No. 24 marked.)

18   Q.  (By Mr. Tjaden)  All right.  I'll trade you, give

19   you what is now marked Exhibit 24.  Do you recognize that?

20   A.  Yes.

21   Q.  Is that a copy of both your report and supplemental

22   report?

23   A.  Yes.

24   Q.  And that details your investigation and statements

25   there beginning with 1100 hours.  Do you recall that?

1    A.   Yes.

2    Q.   All right.  So that's when the search began?

3    A.   Uh-huh.

4    Q.   So you would have been at the station for the

5  briefing prior to that and left and driven.  Do you know

6  how far -- well, you had to drive -- how long it took to

7  drive from the station where the briefing occurred to the

8  Nader residence?

9    A.   If I recall, it wasn't very far, maybe five

10  minutes.

11    Q.   Did you speak with Mr. Nader during that at all?

12    A.   I don't recall speaking to him.  If I did, it was

13  just in passing.  I seem to kind of recall them bringing

14  him maybe by the kitchen at some point, but I don't recall

15  if we talked at all.

16    Q.   And in that paragraph that begins with 1100 hours,

17  it talks about what you did, particularly on the Envy, and

18  it talks about your use of the OS Triage program.

19    A.   Yes.

20    Q.   Okay.  Doesn't say anything about the length of

21  time it took or any concerns that you had that it maybe

22  wasn't -- why it froze up?

23    A.   No.

24    Q.   And it doesn't talk anything about it was your

25  first use?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    A.  No.

2    Q.  It talks about running an analysis of the data on

3    the computer searching for keywords and programs often

4    used.  That's the keyword list that you think is already

5    preprogrammed in there?

6    A.  Yes.

7    Q.  Now, it does say here that while the program ran,

8    then you're conducting the other previews; is that --

9    A.  Yes, that's correct.

10    Q.  And that's the use of the Tableau?

11    A.  Yes.

12    Q.  Okay.  You've already testified that you did locate

13    a large amount of what appeared to be adult pornography.

14    A.  Yes.

15    Q.  All right.  There were a lot of folders and a lot

16    of subfolders; is that accurate?

17    A.  Yes.

18    Q.  All right.  So many, you couldn't have reviewed

19    them all?

20    A.  Yeah, that's correct.

21    Q.  I apologize, but again, as I understand, when

22    you're running the use of this, it goes from the external

23    hard drive you're looking at through the write block into

24    your computer?

25    A.  Yes.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1     Q.  What are you seeing on your screen when that is

2   doing that?

3     A.  Everything that you would normally see if you

4   plugged in a -- so if you plugged in a thumb drive to this

08 5   computer right now, the folders -- you could open up and

6   see if there were folders, if there were images.  You would

7   see it just the same way you would anything else.  It's

8   just that I can't alter any of the data on it.

9     Q.  But when you say you would see images or the

08 10   folders, you would see a folder with a name on it?

11     A.  Yes.

12     Q.  And is there an analysis tool that lets -- that

13   searches those for you looking for keywords there as well?

14     A.  No.

08 15     Q.  You have to individually look at all of these files

16   and the file names to see if there's anything that catches

17   your eye?

18     A.  Yes.

19     Q.  And that's what you're doing throughout this

08 20   process?

21     A.  Yes.

22     Q.  And if something catches your eye, it's going to be

23   a folder, and then you can go inside that folder?

24     A.  Yes.

08 25     Q.  Just like I could on my computer with a football

1    folder, open it up and then it will list things that are

2    inside of it; is that accurate?

3        A.  Yes.

4        Q.  And then I can click on one of those things to see

5    what that is, whether it's a paper or an image; correct?

6        A.  Yes.

7        Q.  And you'll know that by the ending on whatever is

8    identified up there?

9        A.  Yes.

10        Q.  .pdf, .img, or whatever --

11        A.  .com or -- yeah.

12        Q.  .doc?

13        A.  Yes.

14        Q.  All right.  Did you open anything while running

15    this Tableau program?

16        A.  Yes.

17        Q.  Images?

18        A.  Yes.

19        Q.  Specific images of pornography?

20        A.  Yes.

21        Q.  Why did you open any particular image in

22    pornography?

23        A.  Well, first I started -- when I started, I thought

24    I might be able to view all of it and see --

25        Q.  I understand why not.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    A.   Yeah.  And once I realized that I couldn't, then I

2    would open the folders and just browse the file names.  And

3    if I saw a file name that seemed -- you know, like I said,

4    if it had "young" or something --

5    Q.   "Barely legal"?

6    A.   -- "barely legal," something like that --

7    Q.   Which you agree is still legal?

8    A.   -- right -- I would open up and take a look.

9    Q.   How many pictures did you look at?

10   A.   I have no idea.  Probably a thousand at least.

11   Q.   Real quickly, just running through them?

12   A.   Yeah, yes.

13   Q.   And in looking at all of those photos, there was

14   nothing that you were able to identify as suspected child

15   pornography?

16   A.   No.

17   Q.   And, in fact, even looking at all the file names --

18   I note you don't -- it doesn't -- does it say in that

19   discussion about running that Tableau that you looked at

20   images?  It says you ran a quick scan of file names.

21   A.   Yeah.  The scan was just a visual scan of file

22   names.

23   Q.   You, with your eyes?

24   A.   Yeah, me with my eyes scanning the files.

25   Q.   But it doesn't say anything about looking at

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    images?

2        A.   No.

3        Q.   Okay.   The last sentence in that paragraph, The

4    file names, however, can be changed without altering the

5    actual content of the file, what does that mean?

6        A.   Well, if you go to a picture -- we talked about the

7    picture of you two.   If I had a picture of you on my

8    computer, I could right-click it, and where you go down and

9    it says rename, I could rename the file to -- and I could

10   put it as this image is child porn.   Well, then, I open it

11   and I see it's you, so I know it's not.   So it doesn't

12   alter the image, it just alters the name.

13       Q.   And is that also, kind of going back to our

14   discussion about changing the name, say, of a file on a

15   video from something like through a LimeWire that could pop

16   up on the computer as an Indiana Jones movie and then when

17   it's opened it's pornographic?

18       A.   Yes.

19       Q.   Okay.   So even if you get an innocuous name, it

20   doesn't tell you if it's pornographic or not?

21       A.   No.

22       Q.   And conversely, if you've got some wisecracker, you

23   could go the opposite direction, getting pornographic file

24   -- as your example was, this is child pornography, it

25   doesn't tell you that it's an illegal image?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    A.   No.  You'd have to look at the image to know.

2    Q.   All right.  And you'd never know unless you did

3    look at the image?

4    A.   Correct.

5    Q.   So why did you put that in there, in your report?

6    A.   What are you referring to?

7    Q.   The sentence, The files names, however, can be

8    changed without altering the actual content of the file,

9    A.   Well, just to be clear, even though I wasn't able

10   to view all of the images and the file names that I scanned

11   through, just because they didn't look like they could be

12   or were common terms in child pornography didn't mean they

13   were not child pornography.

14   Q.   And the same would be converse, if it did look like

15   child pornography by the name of the file, it doesn't

16   necessarily mean it is child pornography?

17   A.   Correct.

18   Q.   And that's why you open it and look?

19   A.   Yes.

20   Q.   And until you do that, you don't know that a crime

21   has been committed?

22   A.   Correct.

23   Q.   So, then, the next paragraph deals with the Triage

24   program.  And again -- back to that.  And you say in there

25   it identified 23 keyword hits and one hash value of

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1   interest.

2       A.  Yes.

3       Q.  All right.  You go on to say, However, upon running

4   a search for the hash value through a known database, the

5   hash value was not determined to be child pornography.

6       A.  Well, it didn't come up as -- so I have a program

7   that I have access to through Internet Crimes Against

8   Children Task Force.  I log on to that program and I run it

9   through known hash values that are loaded up to that -- to

10  that --

11      Q.  And it did not show up?

12      A.  It did not show up, no.

13      Q.  And when did you do that?

14      A.  I don't recall.

15      Q.  Was that done at the scene?

16      A.  No.  It would have been done at my office.

17      Q.  Okay.  But you -- from the scan done on the Triage,

18  it tells you that this -- this is just one of interest;

19  right?

20      A.  Well, it -- the scan shows that this is a child

21  pornography image, but the problem with that is that the

22  definition of child pornography is different state by state

23  depending on the statute, so --

24      Q.  But you didn't know if it was --

25      A.  So I don't know, until I see the image, what it is.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    So that's why I tried to run it through this database to

2    see if I could get a description of the image to know if it

3    met our definition of child pornography in Nebraska.

4        Q.  So when you get this hit of -- when Triage tells

5    you there's a hash value of interest, you have no way of

6    knowing it's pornographic or not?

7        A.  No.

8        Q.  Is that accurate?

9        A.  Not just by looking at the SHA value and Triage

10   saying that it's a hit for child pornography.  It doesn't

11   tell you.

12       Q.  All right.  You've got to do some more

13   investigation?

14       A.  Yes.

15       Q.  And the same with the 23 keyword hits, too?

16       A.  Yes.

17       Q.  Okay.  Subsequently, back at the shop later on, you

18   did -- you did run that through the known database and it

19   was determined to -- it was not determined to be child

20   pornographic?

21       A.  Not checking it with that database, no.

22       Q.  Okay.  There's other databases you could have

23   checked it with or whatever?

24       A.  Yeah, 'cause there's a -- I guess there's officers

25   that are -- or people that do computer forensics, that's

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    their main job for a living, they have a known database

2    that's current.  And so another thing that I did that I

3    didn't note in my report here is that it was my

4    understanding that Detective Dishaw, from Douglas County,

5    who works on the Cyber Crimes Task Force, was going to be

6    doing the examination.  So I contacted him and let him know

7    my findings as well.

8       Q.  Told him that the one of interest ended up not

9    being child pornography?

10      A.  Yes.

11      Q.  When you say in here that you ran it through a

12   database and it was determined not to be child pornography,

13   is that saying that that hash value was not child

14   pornography?

15      A.  No, not necessarily.

16      Q.  All right.  So -- and again, the same could be done

17   with the 23 keyword hits?

18      A.  Yes.

19      Q.  Just seeing a keyword hit does not tell you that

20   this is something that's pornographic?

21      A.  Yes.

22      Q.  You have to do something more --

23      A.  Yes.

24      Q.  -- to determine that; is that accurate?

25      A.  That is accurate.

1    Q.  Did you do anything more at the scene to determine

2    that any of those 23 hits were child pornography?

3    A.  No.

4    Q.  And you didn't do anything at the scene to

5    determine that hash value of interest was child

6    pornography?

7    A.  No.

8    Q.  And you knew at that time that the hash value of

9    interest popping up and the 23 keywords popping up does not

10   give you enough information to know a crime was committed,

11   is that accurate?

12   A.  Yes.

13   Q.  All right.  So when you run this OS Triage program,

14   you said that there's a -- it was your understanding this

15   program is a national program; is that correct?

16   A.  I don't know.

17   Q.  Well, you did the training on it out in Denver?

18   A.  Yes.

19   Q.  And, so, were there people from other states

20   besides Nebraska out there at the time?

21   A.  Yes.

22   Q.  How many states do you think were represented

23   there, ballpark?

24   A.  I don't recall.  Probably five or six.

25   Q.  All right.  And one of the problems that you

1  understood at this time was that triage may identify

2  something but that doesn't mean it meets your state's

3  requirements?

4      A.  That's correct.

5      Q.  You knew that at the time?

6      A.  Yes.

7      Q.  Okay.  You talked about -- you said SHA values.  Is

8  that hash values?

9      A.  Hash value, yes.

10     Q.  Okay.

11     A.  It's a secure hash algorithm.

12     Q.  All right.

13     A.  It's an acronym.

14     Q.  When you go on an assignment such as this with a

15  different agency, I've kind of addressed with you, I think,

16  the training they give you.  Do they talk to you about

17  their reporting requirements?

18     A.  No.

19     Q.  You just know it from experience?

20     A.  Yes.

21     Q.  And just do whatever you think is the right thing

22  to do?

23     A.  That's correct.

24     Q.  And you would agree with me that if you're

25  performing to the standards of your agency and the

1    standards are slightly different, I mean, should you

2    conform to the other agency or -- as long as yours aren't

3    illegal or wrong, is it okay for you to conform with yours?

4       A.  Yeah.

5           MS. JOHNSON:  Objection.  Form.

6           MR. KUNHART:  Objection.  Form and foundation.

7       Q.  (By Mr. Tjaden)  All right.  In your mind, I mean,

8    you're comfortable with conforming to your own standards --

9       A.  Yes.

10      Q.  -- of your agency?

11      A.  Yes.

12      Q.  All right.  The OS Triage, just briefly, it's my

13   understanding that it is able to detect whether or not USB

14   devices were connected to the machine; is that your

15   understanding?

16      A.  I don't recall.

17      Q.  All right.  I mean, if I asked you to give me a

18   list of things that OS Triage could do, could you write

19   that list out?

20      A.  Probably not a lot of them, other than searching

21   for the keywords and hash values.

22      Q.  It can detect encryption; do you understand that?

23      A.  Yes, I do recall that it can show programs that are

24   encryption programs.

25      Q.  And this report that you received, did you ever

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1   print out the report that triage generated on his screen?

2   Because it puts it into your flash drive; right?

3       A.  Yes.

4       Q.  Okay.  Did you ever print that out?

5       A.  No.

6       Q.  Do you still have it?

7       A.  Well, I believe I --

8           MR. KUNHART:  You should have it.

9       A.  Yeah.

10      Q.  (By Mr. Tjaden)  I don't know.  Individually on the

11  flash drive -- I didn't know that -- I didn't look at a

12  screenshot that showed the report.  All right.  Did you

13  review the report?

14      A.  Yes.

15      Q.  Did you review it for today?

16      A.  Yes.

17      Q.  All right.  And so I'm accurate that it doesn't

18  show any encryption; right?

19      A.  I don't recall.  It wasn't --

20      Q.  Okay.

21      A.  -- something I looked at.

22      Q.  And likewise, a list of things that it can't do, I

23  mean, obviously, it's not going to find something that's

24  not there?

25      A.  Yes.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    Q.  And it doesn't look for any deleted files, does it?

2    A.  No.

3    Q.  So any investigation that was done on March 17th at

4    the home of Paul Nader didn't show you anything about

5    deleted files; is that accurate?

6    A.  No.

7    Q.  Is that correct?

8    A.  That is correct, yes.

9    Q.  Okay.  Did you program the triage program or do

10   anything to conduct a customized search?

11   A.  No.

12   Q.  Were you told about the tip prior to going there?

13   A.  The cyber tip?

14   Q.  Yeah.

15   A.  All the details of it, I don't recall.

16   Q.  Yeah.

17   A.  I mean, I don't recall if it was.  I know it was a

18   cyber tip, but the details of it I don't know.

19   Q.  The cyber tip, if I'm correct, indicated that

20   Microsoft gave a tip that there was images up in the cloud.

21   A.  Yes.

22   Q.  Did you know what those images were?

23   A.  No.

24   Q.  Did you know what the hash values of those images

25   were?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    A.  No.

2    Q.  Did you know what you were looking for on this

3  computer other than just generally looking for child

4  pornography?

5    A.  Just generally looking for child pornography and

6  keywords.

7    Q.  You were looking -- you weren't told to look for

8  these six things -- or however number of items were on the

9  tip?

10    A.  No.

11    Q.  You weren't given the specific hashes to look for

12  those items?

13    A.  No.

14    Q.  Did you ever find those items that day?

15    A.  No.

16    Q.  But you did find a suspected one?

17    A.  Yes.

18    Q.  All right.  Okay.  And so you did not do a

19  customized search on this computer --

20    A.  No.

21    Q.  -- specifically looking for the items of the tip?

22    A.  No.

23    Q.  All right.  I asked you, between March 17th and

24  today's date, how many search warrants and specifically

25  child-related issues, and you said three.

1    A.  Yeah, I think, yeah.

2    Q.  Okay.  Prior to this, I imagine the number would be

3  much greater than the ten search warrants that you were on.

4    A.  Yes.

5    Q.  And I imagine the number of cases involving

6  child-related crimes would be much greater than the two or

7  three you mentioned.

8    A.  Yes.

9    Q.  And so let's limit it, then, to prior to

10  March 17th.  How many search warrants involving cases of

11  suspected possession of child pornography do you recall

12  being involved in?

13    A.  Just being involved in?

14    Q.  On the search warrant process.

15    A.  Okay.  Probably 15.

16    Q.  All right.  And of those 15, when you were involved

17  in the search warrant process, are all of those cases in

18  which you're the person doing the previewing?

19    A.  No.

20    Q.  All right.  Some of them were your own cases that

21  you were doing the interviews?

22    A.  Yes.

23    Q.  On those --  So let's break it down.  On the ones

24  that -- we're talking about a number of 15; right?

25  Ballpark number of 15?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    A.   Uh-huh.

2    Q.   How many of those do you think you would have been

3    the person doing the preview on?

4    A.   Probably three or four.

5    Q.   And the rest would have been when you were

6    interviewing or doing something else?

7    A.   Or somebody else was doing the --  Now, I was on

8    the cyber crimes task force and we served a lot of search

9    warrants for child pornography.  So in those, I would serve

10   in the capacity of a person helping to execute the search

11   warrant and secure the scene and then searching for

12   property while other people did --

13   Q.   Previews?

14   A.   -- previews.  So those are among the ones I'm

15   talking about that I was involved in, the 10 to 15.

16   Q.   So 10 to 15 is the big number?

17   A.   Yes.

18   Q.   And then within that 10 to 15 are three to four in

19   which you're doing the actual previewing?

20   A.   Yes.

21   Q.   And then there's a number, then, of the rest of

22   them, then, that you're doing the interviewing?

23   A.   Yes.

24   Q.   And then there's a number of them that are leftover

25   that you may just be assisting, since you're on the task

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1  force -- assisting in handling the securing of the premises

2  and bringing what you find in the table by the bed to the

3  guy running the previewing?

4       A.  Yes.

5       Q.  Okay.  When -- of those instances when you're not

6  doing the previewing, some of them may have involved

7  previewing.  Did they all involve previewing?

8       A.  Not -- not all of them.

9       Q.  Those that did involve previewing, who did the

10  previewing?

11      A.  Somebody from the task force, investigator from

12  the --

13      Q.  Who else from the task force was present at the

14  Nader home?

15      A.  I don't believe anybody else was.

16      Q.  Okay.  The preparation of your -- preparation of

17  your -- in preparation for the execution of this, I

18  understand you weren't given any data or information

19  regarding specifically looking for things from the tip;

20  right?

21      A.  Correct.

22      Q.  You weren't shown any images that you were looking

23  for either, were you?

24      A.  I don't recall.  I don't think so.

25      Q.  You understand what the dark web is; don't you?

1     A.  Not really, not enough to, I guess, discuss it

2  here.  I don't know.  I've heard of it.

3     Q.  You've heard of it?

4     A.  Yeah.

5     Q.  All right.  I think one of them used to be China

6  Road or something.  Silk Road.  China and Silk.  Have you

7  ever heard of Silk Road?

8     A.  No.

9     Q.  The -- search engines, you're familiar with search

10 engines, Google, Bing, those types of things; right?

11    A.  Yes.

12    Q.  Do they teach you about search engines and the use

13 of search engines in child pornography through the training

14 you've had?

15    A.  No, not specifically, no.

16    Q.  I mean, do you know if Google, for example, even

17 allows child pornography to be searched for or -- certainly

18 anybody can plug in any search they want, but whether -- do

19 they allow images like that on their system?

20    A.  No, I don't believe so.

21    Q.  You don't believe they do or you don't believe --

22    A.  I don't believe they do.

23    Q.  Okay.  So if an engine's going to -- if an image is

24 going to come up somewhere, it's going to have to come up

25 through something other than a Yahoo, Bing, or a Google

Iversen - Direct (Tjaden)

1   search; right?

2      A.   Yes.

3      Q.   Do you know -- if I am correct on this date of

4   March 17th, you couldn't see the search history?

5      A.   No.  That's correct.

6      Q.   My questions are bad.

7      A.   I'm sorry.

8      Q.   No, you're doing what you're supposed to.  You're

9   answering the questions.  It's my questions.  But that is

10   correct?

11      A.   So say that again just so --

12      Q.   You couldn't see the searches that were done?

13      A.   That's correct.

14      Q.   And you couldn't see what --  Strike that.

15           Could you see what search engines were even used?

16      A.   No.

17      Q.   So when you're looking at this, you don't have any

18   evidence of -- well, you don't have any evidence of Mr.

19   Nader's having gone to the dark web because you don't know

20   what the dark web is?

21      A.   Correct.

22      Q.   Okay.  And you don't have any evidence of Mr.

23   Nader's having gone to chat rooms involving pornography,

24   correct, on that day?

25      A.   Yes, correct.

Iversen - Direct (Tjaden)

1    Q.  And chat rooms are places where people go to talk

2    about child pornography; is that your understanding in your

3    training in cyber crimes and task force?

4    A.  Yes.

5    Q.  And there's no evidence on this computer that he

6    had gone to any of those?

7    A.  Not that I found that day, no.

8    Q.  Well, you're the only one looking that day.

9    A.  Yes.

10   Q.  And did you -- can you tell me, was there any

11   evidence or did you even look for any evidence of the

12   computer having been hacked at any point in the past?

13   A.  No.  I didn't even look.

14   Q.  Did you know if this computer had been hacked at

15   any point in time in the past?

16   A.  No.

17   Q.  And I think we've already established that there

18   was no evidence of any encryption software that you were

19   aware of on that date?

20   A.  That's correct.

21   Q.  What's the importance of encryption software in the

22   context of your investigation of cyber crimes?

23   A.  Well, if we don't seize a device properly and the

24   computer starts going -- starts encryping, then we could

25   lose, you know, potential evidence.

1    Q.  And encrypting means making it difficult, if not

2    impossible, to see what's on there?

3    A.  Yeah, usually needing a password or several

4    passwords in some cases.

5    Q.  All right.  Okay.  And I know that you didn't have

6    any evidence of encryption software on there at the day,

7    but subsequent analysis of the computer, the Envy, for

8    example, showed no encryption software on there; is that

9    your understanding?

10   A.  I don't know.

11   Q.  Okay.  In your training on cyber crimes, are you --

12   is it told to you that, you know, people involved in this

13   type of nefarious activity often have it encrypted?  I

14   mean, you're aware of it?

15   A.  Yes, I'm aware of it.  In my experience, I haven't

16   ran across it yet.

17   Q.  Okay.  And then I think also that there was no

18   evidence that you were able to uncover on March 17th,

19   during your analysis of the -- and preview of the computer

20   that there had been any trading or sharing of files; is

21   that accurate?

22   A.  Can you ask the question again?  Sorry.

23   Q.  Yeah.  As a result of the preview that you did and

24   the running of items on all of the electronics there that

25   were done on that day, there was no evidence of any trading

1    of files or sharing of files; is that accurate?

2        A.   That's correct.

3        Q.   Did you -- were you only able to run the Triage one

4    time, or did you run it a couple of times?

5        A.   Just the one time.

6        Q.   Before Triage, what did you do?  Before the program

7    of Triage, what did you do?  What did you use?

8        A.   Well, before Triage, you would have to shut the

9    computer down, take the hard drive out, and then you would

10   do a preview using Tableau write blocks accessing the hard

11   drive, but then you would need a program like EnCase or

12   FTK, you know, to run a scan of the hard drive, so --

13       Q.   So is Triage just something that was -- had come

14   out relatively recently prior to this date; right?

15       A.   Yes.

16       Q.   At least you had been trained on it relatively

17   recently?

18       A.   Yes.

19       Q.   And who decided to have you train on it?

20       A.   Nobody decided.  They -- I went to the Internet

21   Crimes Against Children training and it was a part of the

22   training.  It wasn't a specific class that they sent me to.

23   It was just a new tool that was available to Internet

24   investigators, and they put us through the training while I

25   was there that week.

Iversen - Direct (Tjaden)                    128

1     Q.  Other than maybe a brush-by conversation with Mr.

2   Nader at the scene, have you talked to him at any time

3   other than that?

4     A.  No.

5     Q.  Did you talk with any of the other people -- except

6   Detective Svajgl, did you talk with any of the other people

7   there at the scene other than maybe they'd bring you this

8   and say, Hey, I found this other piece of equipment?  I

9   mean, did you talk to them about your findings on the

10  computer, as best you can recall?

11    A.  No, I don't recall.

12    Q.  Do you know, how long did you spend at the house?

13    A.  I want to say several hours, but I'm not

14  100-percent sure.

15    Q.  When you left, was it a part of everybody leaving?

16    A.  I don't recall.

17    Q.  Did you see Mr. Nader leave?

18    A.  No, I don't believe so.

19    Q.  Were you -- did you leave before Mr. Nader was

20  removed from the premises?

21    A.  I think so.

22    Q.  When you left, did you take anything with you that

23  was being seized from the home?

24    A.  No.

25    Q.  Who was responsible for taking any seized items?

1    Do you know?

2        A.   Detective Svajgl.  And I -- you know, I believe

3    they had an evidence person there from their evidence lab,

4    if I remember correctly now.  And so that person probably

5    would have been the one in charge of logging it in.

6        Q.   Did you talk to Detective Svajgl about items he

7    should take?  You know, I mean, you obviously don't go

8    there with the idea that you're going to clean out the

9    entire house.  You take what you feel is important.  And so

10   do you give Officer -- or Detective Svajgl any suggestions

11   or advice that you ought to take the Envy, you ought to

12   take all these flash drives?

13       A.   I don't recall.

14       Q.   Okay.

15       A.   That's the whole purpose of the preview is to kind

16   of, like, triage what should be taken.

17       Q.   You want to know what to tell him to take?

18       A.   Yes.  But I don't recall having a discussion with

19   him.

20       Q.   But in this instance, the purpose of taking the

21   stuff would be to do a further analysis on it --

22       A.   Correct.

23       Q.   -- to determine whether or not any crime had been

24   committed?

25       A.   That's correct.

Iversen - Direct (Tjaden)

1      Q.  Because at that time you don't know that a crime

2  has been committed?

3      A.  I didn't, no.

4      Q.  Okay.  And again, you believe that you may have

5  left before Mr. Nader was taken into custody?

6      A.  I think so.

7      Q.  All right.  Do you know who made the arrest?

8      A.  I believe Detective Svajgl.

9      Q.  All right.  Did he discuss with you about making an

10  arrest?

11      A.  I don't recall.

12      Q.  Well, you were there to provide information

13  regarding the preview and what was on the computers.

14      A.  Yes.

15      Q.  So did you tell Detective Svajgl what you found?

16      A.  I probably did.  I don't remember specifically, you

17  know, face-to-face having that conversation.  I know that,

18  like -- I think I said before, people were coming and

19  checking in --

20      Q.  Okay.

21      A.  -- with me to see how it was coming, but I know

22  that, yeah, at some point I told him that my program

23  identified -- well, I don't know if I told him.  I told

24  somebody that my program had identified --

25      Q.  A possible?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    A.  -- a possible, yes.

2    Q.  Did you use the term "possible"?

3    A.  I don't recall what term I used.

4    Q.  Did you tell him what you've told me today, that

5    that's not evidence of a crime having been committed?

6        MR. KUNHART:  Objection.  Form.

7    Q.  (By Mr. Tjaden)  Go ahead.

8        MS. JOHNSON:  Objection.

9    Q.  (By Mr. Tjaden)  Go ahead.

10   A.  I don't recall exactly.

11   Q.  But that was your understanding at the time?

12   A.  Yes.

13   Q.  Did you, at any point in time, observe or hear

14   Detective Svajgl on the telephone?

15   A.  No, I didn't.

16   Q.  Do you know -- today, do you know if he made a

17   phone call to the Douglas County Attorney -- Douglas County

18   Attorney's Office?

19   A.  I know today because of --

20       MS. JOHNSON:  Objection.  How about Sarpy?

21   Q.  (By Mr. Tjaden)  I'm sorry.  How about Sarpy?  How

22   about Sarpy County?

23   A.  Yeah, I know today because of all of this going on,

24   but I didn't know at the time.

25   Q.  Do you know Jennifer Hessig?

Iversen - Direct (Tjaden)

1      A.   Yes.

2      Q.   Have you worked with Ms. Hessig?

3      A.   Yes.

4      Q.   On what types of cases have you worked with Miss

5  Hessig?

6      A.   I don't recall specifically, but I've handled a lot

7  of cases over the years --

8      Q.   Any child pornography -- possession of child

9  pornography cases?

10      A.   I don't recall if I've worked with her or not.

11      Q.   Did you have any conversations with Jennifer Hessig

12  about this case?

13      A.   No.

14      Q.   Is she still with the Sarpy County Attorney's

15  Office?

16      A.   I don't know what her status is.

17      Q.   Were you involved in the investigation of her

18  issues?

19      A.   No, I wasn't.

20      Q.   All right.  You don't recall discussing with

21  Detective Svajgl whether or not Mr. Nader should be placed

22  under arrest?

23      A.   No.

24      Q.   You don't recall what you told him about what you

25  found?

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1       A.  No.

2       Q.  Has Detective Svajgl ever told you anything about

3   that phone call with Jennifer Hessig, not that day but at

4   any point in time between now and back then?

5       A.  So not on that day or including that day?

6       Q.  Including that --

7       A.  Anything.

8       Q.  Not limited to just that day.  Has he ever

9   discussed the conversation he had with Jennifer Hessig with

10  you in any context whatsoever?

11      A.  Just that -- I believe he sought her advice on

12  whether or not to make an arrest.

13      Q.  Okay.  Did he tell you why he sought her advice on

14  whether or not to make an arrest?

15      A.  No.

16      Q.  When did you have this conversation with Detective

17  Svajgl?

18      A.  I don't recall.  We worked together quite a bit

19  on --

20      Q.  Did you discuss your deposition here today with

21  Detective Svajgl?

22      A.  No.

23      Q.  Did anybody ask your advice that day as to whether

24  or not you believed there was probable cause to make an

25  arrest?

1    A.   No.

2    Q.   And as I understand, you had no evidence of whether

3    or not this was knowingly downloaded; is that correct?

4    A.   That's correct.

5    Q.   This lawsuit, you filed an answer against the

6    allegation raised by the Naders; right?

7    A.   Yes.

8    Q.   There's been an answer filed on your behalf?

9    A.   Yes.

10   Q.   Now, I'm not interested, again, in discussions you

11   had with the attorney who filed that on your behalf.  I

12   assume that in order to get an answer you have to have some

13   discussion and you tell them what you know and then the

14   answer is made.  Did you draft the answer yourself, do you

15   know?

16   A.   I actually don't recall.

17   Q.   Okay.  I'd be surprised if you did, because I'm a

18   lawyer and I still have a hard time drafting a lot of

19   stuff.  Did you review the answer before it was filed?

20   A.   Yeah, I believe so.

21   Q.   Okay.  There's a couple of things I want to talk to

22   you about on your answer.  Your answer raises certain

23   affirmative defenses.  Do you know what an affirmative

24   defense is?

25   A.   No.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    Q.  All right.  One of the things that it says in here

2    is that the plaintiffs have failed to mitigate their

3    damages.  Do you know what that means?

4    A.  No.

5    Q.  It means they've failed to make their damages less

6    than what otherwise they may have incurred --

7    A.  Okay.

8    Q.  -- okay?  And again, I --  You know what?  I

9    understand that a lot of times things are drafted by the

10   attorneys.  You may even review it.  A lot of it's legal

11   stuff that maybe you don't fully understand.

12   A.  Uh-huh.

13   Q.  All right.  I get that.  But I'm interested in

14   knowing, if this matter goes forward and proceeds to trial

15   and the person raising the affirmative defense, in this

16   case you, in your case, has the obligation to come forward

17   with evidence and prove the affirmative defense.  You have

18   the burden of proof in an affirmative defense.  So I want

19   to know, just as we sit here today, since this is the only

20   time I'm going to get to depose you -- as we sit here

21   today, I want to know what evidence you believe you have

22   personally that shows that the Naders have failed to

23   mitigate their damages.  Do you have any?

24        MR. KUNHART:  Objection.  Form.  Foundation.

25        MS. JOHNSON:  Same objections.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    Q.   (By Mr. Tjaden)  Go ahead.

2    A.   I'm not sure I really understand what you're asking

3    me.

4    Q.   Well, did the Naders do anything to --  Well, I'll

5    strike that.

6         Okay.  You don't -- the problem we're having here

7    is you're not really fully aware of what failure to

8    mitigate damages means.

9    A.   That's correct.

10   Q.   Okay.  That's fine.  Do you know what the doctrine

11   of unavoidable consequences is?

12   A.   (Shakes head negatively.)

13        MR. TJADEN:  All right.  I think I'm just about

14   done here.  Why don't we take another break, take five

15   minutes, and then I may not have anything further; all

16   right?

17        THE WITNESS:  Okay.

18        (Recess taken.)

19   Q.   (By Mr. Tjaden)  Okay.  Again, just a few other

20   things that I want to get through with you real quick;

21   okay?

22   A.   Okay.

23   Q.   And some of this is going over what we've done.

24   Let's go back to the briefing you had before going out to

25   the house.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

Iversen - Direct (Tjaden)

1    A.  Okay.

2    Q.  Were you given any instruction on what you were to

3 do following your previewing of the equipment in terms of

4 communication of what you found to whoever was going to

5 make the decision to do an arrest?

6    A.  No.

7    Q.  All right.  So nobody told you, when you're done,

8 you have to come and tell us this stuff, this is what we

9 want to know or --

10    A.  No.

11    Q.  -- have you report to us?

12    A.  No.

13    Q.  Okay.  We've talked a little bit about hash values,

14 and I'm still a little concerned that we have been on the

15 same page.  I'm not sure; all right?

16    A.  Okay.

17    Q.  You've identified what you understand to be a hash

18 value, which is basically a fingerprint of a file or of an

19 image.

20    A.  Yes.

21    Q.  And you described it as a 32- or 64-alphanumeric

22 algorithm.

23    A.  Yes.

24    Q.  Okay.  How do you -- I mean, have you just gone

25 somewhere and it defines hash value as a 32- or 64-

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    alphanumeric algorithm, or do you know more about it than

2    that?

3        A.  That's about all I know about it.

4        Q.  All right.  Do you know what the difference is --

5    between a 32- or 64-alphanumeric number is?

6        A.  No.

7        Q.  Do you know why some may have 32 or some may have

8    64?

9        A.  No.

10       Q.  All right.  And we talked about two images -- and

11   it was probably a poor example -- of these two guys sitting

12   next to each other.  And I'm still not sure, because I've

13   seen references, in respect to hash values, of percentages.

14       A.  Uh-huh.

15       Q.  Is that your understanding that when comparing two,

16   there could be a percentage in the comparison?

17       A.  Yes, I know what you're talking about.  I know the

18   percentages but I don't know what --

19       Q.  Okay.  Are you aware of, in your department or

20   while working for different agencies such as Bellevue or

21   Papillion, when working on their cases -- do they give you

22   any information regarding what percentages should serve as

23   a threshold in determining whether or not a suspected image

24   is child pornography in need of further investigation?

25       A.  No, I've never heard of it put that way.

Iversen - Direct (Tjaden)

1    Q.  Okay.  Are there certain numbers you look for in

2    terms of hash values, percentages that you look for in

3    aiding your determination as to whether an image is

4    pornographic, child pornography?

5    A.  I'm not sure I understand where we're going.

6    Q.  Well, I'm not sure that either one of us -- I can

7    speak for myself, but I'm not sure that we really have a

8    grasp of what a hash value is.  That's my problem.

9    A.  Yeah.  And the only thing I know is what I've

10   stated, that it's a digital fingerprint to identify a file.

11   Q.  Okay.

12   A.  And it's supposed to be about as unique as a

13   fingerprint.  I'm not sure what the percentage is, but

14   there's -- you know, it's kind of similar to, like, a

15   percentage for DNA, you know, there's a 1-in-10-million

16   chance that somebody could have the same -- something along

17   those lines.

18   Q.  When you say percentage in the context of -- let's

19   use fingerprints, for example.

20   A.  Okay.

21   Q.  Every fingerprint is unique.

22   A.  Yes.

23   Q.  My fingerprint's going to have -- if my

24   fingerprint's on this chair and this table --

25   A.  Yes.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    Q.  -- in comparing those two fingerprints, they're

2    going to have 100-percent comparison --

3    A.  Yes.

4    Q.  -- is that right?

5    A.  Yes.

6    Q.  But if my fingerprint's on this chair and your

7    fingerprint's on this table, they may compare to one

8    another to some degree?

9    A.  Yes.

10    Q.  Because there are common characteristics across a

11    number of different fingerprints?

12    A.  Yes.

13    Q.  Swirls, et cetera?

14    A.  Yep.

15    Q.  So in comparing this fingerprint on the table to

16    this fingerprint on the chair, they may not be 100 percent

17    but they may be -- they would have a comparison value?

18    A.  Sure, yes.

19    Q.  All right.  One may be 10 percent similar to the

20    other one.

21    A.  Okay.  Yes.

22    Q.  If mine is the known -- if you know that the one on

23    the chair is my fingerprint --

24    A.  Uh-huh.

25    Q.  -- and you're trying to see if this one is my

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    fingerprint and you compare them together, mine is

2    100 percent -- that's the known --

3        A.   Uh-huh, correct.

4        Q.   -- and when you run them together, you're going to

5    get a percentage of how close the one on the table is to

6    mine on the chair; right?

7        A.   Okay.  Yes.

8        Q.   And that's going to be expressed in a percentage

9    point; is that your understanding?

10       A.   No, I'm not sure I'm comfortable in answering -- I

11   don't know.  I just don't know.

12       Q.   All right.  What about with respect to hash values?

13   Is it your understanding, with respect to hash values, if

14   you have a known hash value and you're trying to compare an

15   unknown hash value to it that you will get a percentage of

16   the unknown that compares to the known?

17            MR. KUNHART:  Objection.  Form.  Foundation.

18            MS. JOHNSON:  Same objection.

19       Q.   (By Mr. Tjaden)  Is that your understanding or not?

20       A.   No, I've never seen it that way ever.

21       Q.   Have you ever been trained in that?

22       A.   No.

23       Q.   The hash value that you received following the OS

24   Triage that day, did it present itself in terms of a

25   percentage?

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1     A.  No.

2     Q.  Okay.  So you wouldn't know -- in comparing the

3  hash value, the suspected hash value, that was indicated on

4  the Triage report, you wouldn't know if that was

5  100 percent of a known image or if it was 5 percent of a

6  known image; is that accurate?

7          MS. JOHNSON:  Objection.  Foundation.

8          MR. KUNHART:  Objection.  Form.  Foundation.

9     A.  Yeah, that's correct, yeah.

10     Q.  (By Mr. Tjaden)  Okay.  Do you know how they arrive

11  at -- when they talk about percentages, what they're

12  talking about?

13     A.  No.

14          MS. JOHNSON:  Objection.

15     Q.  (By Mr. Tjaden)  Go ahead.

16     A.  I've never heard it put like you're talking about

17  with a percentage.

18     Q.  Okay.

19     A.  The only way I've heard the hash values described

20  is -- and the fingerprint was probably a bad example --

21  more like DNA where, you know, one in a million will match,

22  or something along those lines.  I'm not sure what the

23  exact number is, but that's the only way I've heard of it

24  put in a percentage.

25     Q.  Does Triage give you that information?

1     A.  No.

2     Q.  It basically -- correct me if I'm wrong -- when

3  Triage tells you there is a suspected hash value there, it

4  tells you that it shares -- something's on that computer

5  that shares some characteristic with a known pornographic

6  image?

7     A.  That 32- or 64-digit number is the same as others

8  identified as child pornography.

9     Q.  In some way or another?

10        MR. KUNHART:  Objection.  Form.

11    Q.  (By Mr. Tjaden)  Or are you saying it's 100 percent

12  the same?

13    A.  I don't know.

14    Q.  And I'll accept that as -- I mean, that's fine.

15  You don't know?

16    A.  No.

17    Q.  And you didn't know on that day?

18    A.  No.

19    Q.  You've done work with other agencies besides

20  Papillion.  Have you done any work on suspected possession

21  of child pornography cases for Bellevue in their

22  investigations?

23    A.  Yes.

24    Q.  Have you done any since March 17th, 2015?

25    A.  No.

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

1    Q.  Do you know a gentleman by the name of Nathaniel

2    Wolfe?

3    A.  No.

4    Q.  Ever hear anything about him, know anything about

5    him?

6    A.  No, I don't think so.

7    Q.  All right.  Did your briefing -- you said it

8    included -- generally a briefing, and in this case there

9    would be no reason to suspect it was different -- included

10   topics such as dangers to be available -- or potential

11   dangers.

12   A.  Yes.

13   Q.  It gave you information about the home?

14   A.  Yes.

15   Q.  Did it give you information about people living in

16   the home?

17   A.  If I remember correctly, there was a discussion

18   about children being in the home, and I think that's why we

19   chose the time -- or why the time was chosen to do the

20   search warrant was to be sure kids weren't in the home at

21   the time.  I'm not 100-percent sure, though.

22   Q.  Okay.  Do you know why you thought they wouldn't be

23   in the home at 11 o'clock in the morning?  In other words,

24   did you know they were school-age children?

25   A.  Yes.

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

Iversen - Direct (Tjaden)

1    Q.  And did you know the occupant of the home that you

2    were targeting as a potential person involved in the

3    possession of child pornography was the owner of the home?

4    A.  Yes, I believe so.

5    Q.  All right.  And did you know -- you knew there was

6    children.  Did you know he was married?

7    A.  Yes.

8    Q.  Did you know his wife was in the Air Force?

9    A.  I don't recall if that was discussed or not.

10   Q.  Okay.  So you knew he owned property?

11   A.  Yes.

12   Q.  And you knew he had school-age children?

13   A.  Yes.

14   Q.  Do you talk about -- in the preparation of going in

15   and doing the work that you're going to be doing on the

16   execution of the warrant, do you talk about whether or not

17   the individual being targeted is a flight risk?

18   A.  Sometimes, yeah.

19   Q.  Did you in this instance?

20   A.  I don't recall.

21   Q.  And did you know -- you said you knew he was

22   married?

23   A.  Yes.

24   Q.  Did you know his wife lived there, too?

25   A.  I mean, I would -- I don't know.  I can't answer

**EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT**

1    that.

2        Q.   Okay.  Were you given any information as to who --

3    I mean, you knew the tip account was in the target, Paul

4    Nader's name?

5        A.   Uh-huh, yes.

6        Q.   Did you know whether anybody -- any other adult had

7    access to that -- those cloud accounts?

8        A.   No, I didn't know.

9        Q.   All right.  And you didn't know if anybody else,

10   even the minor children, had access to the web accounts?

11       A.   No, I didn't know.

12       Q.   All right.  I asked you about whether you were

13   given information as to what -- or any briefing as to what

14   information you should pass on to anybody.

15       A.   Yes.

16       Q.   Were you told in the briefing who you are reporting

17   to in this instance?

18       A.   No, I don't recall specifically.

19       Q.   Did you understand somebody that you were supposed

20   to be reporting to?

21       A.   Usually it would be the case officer.

22       Q.   In this case, Officer Svajgl?

23       A.   Yes.

24       Q.   Okay.  This is a stupid question, but it seems to

25   me any endeavor has to have somebody in charge and there

Iversen - Direct (Tjaden)

1    has to be a guy in charge and then people inferior and

2    people who report to him.

3        A.   Uh-huh.

4        Q.   Did you have anybody assisting you in the work you

5    were doing?

6        A.   No.

7        Q.   So nobody was reporting to you?

8        A.   No.

9        Q.   Correct?

10       A.   That is correct.

11       Q.   All right.  And you believe you were reporting to

12   -- if this was a normal case, it would be the case manager

13   or case --

14       A.   Case officer.

15       Q.   -- case officer, which would be Detective Svajgl?

16       A.   Yes.

17           MR. TJADEN:  All right.  I appreciate your time.

18   I'm done.  I'm sorry for any of the bad questions.  You did

19   a good job.

20           THE WITNESS:  That's fine.

21           MR. TJADEN:  She may have questions here.

22           THE WITNESS:  22 years.  I've gotten a lot of them.

23           MR. KUNHART:  Do you have just a couple?

24           MS. JOHNSON:  Just one.

25

EXHIBIT A TO ZACHARY LUTZ-PRIEFERT'S AFFIDAVIT

<u>CROSS-EXAMINATION</u>

1

BY MS. JOHNSON:

2

3      Q.  I'm Brandy Johnson.  I represent Sarpy County, as

4  well as its employees, L. Kenneth Polikov, who I believe is

5  the Lee Polikov --

6      A.  Yes.

7      Q.  -- in everyday life, and also Jennifer Hessig, now

8  known as Hessig, formerly known as Miralles.  Do you

9  understand that?

10      A.  Yes.

11      Q.  I just have one quick question for you.  I believe

12  Mr. Tjaden covered whether you had any direct contact at

13  the Nader residence when you were executing -- assisting in

14  executing the warrant on March 17th, 2015, whether you had

15  any direct contact with Jennifer Hessig.  I just wanted to

16  ask you, did you have any direct contact with the county

17  attorney, Lee Polikov?

18      A.  No.

19          MS. JOHNSON:  Thank you.  That's all I have.

20          MR. KUNHART:  Done?

21          MR. TJADEN:  You don't have any?

22          MR. KUNHART:  No.

23          MR. TJADEN:  Do you want to advise?

24          MR. KUNHART:  You have a right review your

25  deposition transcript.  You can't change your answers, but

1    you can change things such as typos and mistakes and stuff.

2    Or you can waive that right.

3              THE WITNESS:  Okay.  I can do that now?

4              MR. KUNHART:  You can waive it.

5              THE WITNESS:  That's fine.

6              (Deposition adjourned at 12:07 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              - C E R T I F I C A T E -

 2

 3          I, Pamela G. Weyant, a Shorthand Reporter in and for

 4     the State of Nebraska, do hereby certify that on the 8th day

 5     of September, 2017, at 13625 California Street, Omaha,

 6     Nebraska, was by me duly sworn to truthfully testify, and

 7     that the deposition by BEN IVERSEN as above set forth was

 8     taken by me by use of machine shorthand and thereafter

 9     reduced to typewriting, under my direction and supervision,

10     by use of computer-aided transcription.

11          That the within and foregoing deposition is a true

12     record of the testimony given by said witness and all

13     proceedings had on the taking of said deposition at the

14     above time and place, the reading and signing of the witness

15     to his deposition having been waived.

16          That any expressions in parentheses are

17     interpretations of the court reporter.

18          That I am not related to or employed by any of the

19     parties to this deposition, and, further, that I am not a

20     relative or employee of any attorney or counsel employed by

21     the parties hereto or financially interested in the action.

22          IN WITNESS WHEREOF, I affix my signature this 25th

23     day of September, 2017.

24
                                    _____
25                                  Pamela G. Weyant, RMR, CRR, Iowa CSR
```

**Incident LLP150318005282**

Incident Description

CAD Ref#: LLP150318005307          Reported: 3/18/2015 4:02:02 PM          Officer: IVERSEN , BEN

Start: 3/17/2015                          Dispatched: 3/18/2015 4:02:00 PM          Agency: LP

End: 3/18/2015 4:02:00 PM          Arrived: 3/18/2015 4:02:00 PM

Location: 7701 S 96TH ST LAVISTA NE 68128

Current   INACTIVE                                                        Date: 3/18/2015 4:02:00 PM
Disposition:

Exceptional   NOT APPLICABLE
Clearance:

Narratives

| Date | Author | Subject | Comment |
|------|--------|---------|---------|
| 3/17/2015 | IVERSEN, BEN | NARRATIVE | 3/17/15 at 1100 hours I Detective Iversen assisted Papillion Police Department with a search warrant. See supplemental report for details. |
| 3/31/2015 9:58:00 AM | IVERSEN, BEN | SUPPLEMENTAL REPORT-IVERSEN | |

IR #: 15-5282
Incident: Assist Other Agency
Reporting Officer: Detective Ben IVERSEN #15054
Typist: smc
Date Typed: 03/31/15 @ 0958 Hours

Report Type: 0 Arrest 0 DUI/DUS 0 Traffic 0 EPC 0 City Ordinance 0 Combined Crime & Arrest 0 Domestic Violence 0 Warrant Request 0 Investigative Follow-up 1 Other-Supplemental

INVOLVED PERSON(S)

Suspect(s): NADER, Wadith, S., W/M, DOB: 12/12/73, 5'10, 175 Lbs., Brown Hair, Brown Eyes, NE OLN: H12920538, 912 Hickory Hill Road, Papillion, NE 68046, Phone: 703-909-0551

SOURCE OF ACTIVITY

On 03/17/2015 at about 1000 hours I (Detective IVERSEN) assisted Detective SVAJGL with a search warrant involving child pornography.

INVESTIGATION /STATEMENTS

At 1100 hours I and Detectives of the Papillion Police Department served the search warrant at 912 Hickory Hill Road in Papillion. After securing the residence and the only person inside, I began looking for evidence. I immediately located a laptop computer on the kitchen table that was on. Utilizing a preview program identified as "osTriage", which is located on a dedicated flash drive. I inserted the flash drive into the computer and launched the "osTriage" program which runs an analysis of the data located on a computer searching for key words and programs often used in child pornography investigations. The laptop was identified as a Hewlett Packard Envy. While the program ran on the Hewlett Packard Envy I conducted a preview on numerous flash drives and external hard-drives located within the residence. I conducted the preview using Tableau Forensic USB Write Block, serial number 02084017 to complete the previews of the external media. During the preview I located a large amount of what appeared to be adult pornography. The pornography

EXHIBIT
24
9/8/17 PW

Exhibit A to Zachary Lutz-Priefert's Exhibit                    PAP 000001

3/23/2017                    Incident Detail [3/23/2017 9:21:38 AM (15013) ]

was in folders categorized in alphabetical order. Many of the folders had numerous sub-folders for each category. It would have been impossible to view each and every file however I conducted a quick scan of the file names in many of the folders and did not observe any known child pornography related file names. The file names however can be changed without altering the actual content of the file.

When the OS Triage Program completed its scan of the computer it identified 23 key word hits and one Hash Value of interest however upon running a search for the Hash Value through a known database the Hash Value was not determined to be child pornography.

After I completed the preview of the external media that I was able to preview I ended my assistance at the scene.

## Associated Offenses

| Code | Description | Attempted/Completed |
|------|-------------|---------------------|
| 999001 | ASSIST OTHER AGENCY | Completed |

## Associated Persons

| Name | Sex | Race | DOB | Involvement | Offense | Attempted/Completed | Disposition |
|------|-----|------|-----|-------------|---------|---------------------|-------------|
| NADER , WADITH S | M | W | 12/12/1973 | SUSPECT | 999001 ASSIST OTHER AGENCY | Completed | |

## Associated Businesses

| Name | Address | Involvement | Offense | Attempted/Completed |
|------|---------|-------------|---------|---------------------|
| CITIZENS OF LA VISTA | | VICTIM | 999001 ASSIST OTHER AGENCY | Completed |

## Associated Property

| SN/ OAN | Type | Make | Description | Current Status |
|---------|------|------|-------------|----------------|
| | RECORDINGS - AUDIO/VISUAL | | DVD-R CONTAINING OS TRIAGE REPORT | 3/18/2015 4:02:02 PM EVIDENCE |

## Associated Events

| Date | Association | Agency | Type | Ref# |
|------|-------------|--------|------|------|
| 12/3/2014 | INCIDENT TO INCIDENT | PP | Incident | LPP141223021009 |

Audit

Created:  8/27/2015 7:22:26 AM          User:  BURT               Agency:  LP

Exhibit A to Zachary Lutz-Priefert's Exhibit          PAP 000002

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WADITH STOCKINGER NADER and )
STACEY NICHOLE NADER, )
)                    Case No. 8:17-CV-00083
          Plaintiffs, )
)
  v. )
)
THE CITY OF PAPILLION; SARPY )     DEPOSITION OF:
COUNTY; BRYAN SVAJGL; BENJAMIN )   BRYAN SVAJGL
IVERSEN; SCOTT A. LYONS; )          TAKEN ON BEHALF
L. KENNETH POLIKOV; and )           OF PLAINTIFFS
JENNIFER MIRALLES, )
)
          Defendants. )
_____ )

DEPOSITION OF BRYAN SVAJGL, taken before

Jodi Hauschild, a Shorthand Reporter and General Notary

Public within and for the State of Nebraska, beginning at

the hour of 9:05 a.m., September 14, 2017, at 13625

California Street, Omaha, Nebraska, pursuant to the within

stipulations.

1

INDEX

CASE CAPTION ................................... Page 1
APPEARANCES .................................... Page 2
INDEX ......................................... Page 3
TESTIMONY ..................................... Page 4
REPORTER CERTIFICATE .......................... Page 160

TESTIMONY

DIRECT EXAMINATION
     BY MR. TJADEN ........................... Page 4
CROSS-EXAMINATION
     BY MR. VALENTINO ....................... Page 130
REDIRECT EXAMINATION
     BY MR. TJADEN .......................... Page 144
RECROSS-EXAMINATION
     BY MR. KUNHART ......................... Page 156
FURTHER REDIRECT EXAMINATION
     BY MR. TJADEN .......................... Page 157

EXHIBITS

NOS.   IDENTIFICATION                    INTRODUCED ON

25     Affidavit of Bryan Svajgl ................. Page 79

26     Incident Report .......................... Page 79

* * * * *

3

APPEARANCES:

FOR THE PLAINTIFFS:
Christopher J. Tjaden
Zachary Lutz-Priefert
Gross & Welch, PC, LLO
2120 South 72nd Street
Suite 1500
Omaha, Nebraska 68124
(402) 392-1500

FOR THE DEFENDANTS THE CITY OF PAPILLION, BRYAN SVAJGL,
BENJAMIN IVERSEN and SCOTT A. LYONS:
Ryan M. Kunhart
Dvorak Law Group, LLC
13625 California Street
Suite 110
Omaha, Nebraska 68154
(402) 934-4770

FOR THE DEFENDANTS SARPY COUNTY, L. KENNETH POLIKOV and
JENNIFER MIRALLES:
Vincent Valentino
Nebraska Telephone Building
130 South 13th Street
Suite 300
Lincoln, Nebraska 68508
(402) 742-9240

ALSO PRESENT:
Wadith Nader
Stacey Nader
Scott Lyons

2

MADAM COURT REPORTER:  Would you like to waive

the Rule 8 requirement?

          MR. TJADEN:  Yeah.

          MR. KUNHART:  Yes.

                    BRYAN SVAJGL,

          of lawful age, being first duly
          cautioned and solemnly sworn
          as hereinafter certified, was
          examined and testified as follows:

                DIRECT EXAMINATION

BY MR. TJADEN:

     Q.   Good morning, Detective.  To start with, can I

have you state your name and spell your last name into the

record?

     A.   It's Bryan, B-R-Y-A-N.  Last name is Svajgl,

S-V-A-J-G-L.

     Q.   J-G-L?

     A.   Uh-huh.

     Q.   I've been misspelling it throughout my notes.

What's your present address?

     A.   19808 Ash Street in Gretna.

     Q.   How long have you been there?

     A.   I think about two and a half years.

     Q.   You were present last week when we took the

deposition of Detective Iversen, correct?

4

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    A.   Yes.
2    Q.   And at that time, I asked Detective Iversen to
3  do me a few favors throughout his deposition.  I'll repeat
4  those and ask you to do the same.  Any question that calls
5  for a response of either a yes or a no, I'm going to ask
6  that you give such a response.  That's opposed to a shake
7  or nod of the head or some other utterance that's going to
8  be difficult to take down on the machine.
9    A.   Understood.
10   Q.   Secondly, if you are at all confused about my
11 question, either directly or through your attorney, Mr.
12 Kunhart, have me rephrase it.  If you don't do that, then
13 when we are preparing for trial and moving forward, I'm
14 going to assume that you understood the question as it was
15 asked and the answer you give will then stand against the
16 question as it was asked; okay?
17   A.   Okay.
18   Q.   Then finally, if you could afford me the
19 opportunity to finish my question before you start
20 answering, in return, I'm going to let you finish your
21 answer before I ask the next question.  That probably is
22 one of the most important rules.  It's going to prevent us
23 from speaking over one another, helping the court reporter
24 and also helping to ensure we get a nice clean record;
25 okay?

5

1    A.   Okay.
2    Q.   Can you tell me, what is your current
3  employment?
4    A.   Papillion Police Department with the city of
5  Papillion.
6    Q.   And how long have you been with them?
7    A.   11 and a half years.
8    Q.   What's your date of birth?
9    A.   3/8/77.
10   Q.   Are you married?
11   A.   Yes.
12   Q.   Any children?
13   A.   Yes.
14   Q.   How many?
15   A.   I have three children from a previous marriage,
16 and my wife has two children of her own.
17   Q.   So there is five?
18   A.   Yes.
19   Q.   And when you say two -- your wife has two
20 children of her own, would those be with you as well or
21 are they hers from a prior marriage?
22   A.   They're from a prior.
23   Q.   So not yours, mine, and ours, just a yours and
24 mine?
25   A.   Yes.

6

1    Q.   What are the ages on those kids, yours?
2    A.   My oldest is 19 and then I have twins that are
3  15.
4    Q.   And her children?
5    A.   Her oldest is 14 and then she has another one
6  that is 12.
7    Q.   Do you have custody of the twins?
8    A.   We have joint custody.
9    Q.   And so they spend a few days a week with you
10 then?
11   A.   Yes.
12   Q.   So a few days of the week you've got a full
13 household?
14   A.   Yes.
15   Q.   Is the 19-year-old away from home?
16   A.   Yes.
17   Q.   What does that person do?
18   A.   She is at college.
19   Q.   Whereabouts?
20   A.   Wayne State.
21   Q.   Wayne, Nebraska?
22   A.   Yes.
23   Q.   My brother-in-law used to be a star baseball
24 pitcher for them 45 years ago.
25        (Scott Lyons enters the room.)

7

1    Q.   (By Mr. Tjaden)  The position with -- that you
2  currently hold, we'll get into that in a little more
3  depth.  Why don't you tell me your educational background.
4  What is the highest level of formal education you've
5  completed?
6    A.   I received a bachelor's degree from college
7  of -- University of Nebraska at Omaha.
8    Q.   When was that?
9    A.   2002.
10   Q.   And what was the area of study?  What's the
11 degree in?
12   A.   Science of education with an art and coaching
13 endorsement.
14   Q.   Particular sport?
15   A.   Basketball.
16   Q.   Where did you grow up?
17   A.   In the Omaha and Bellevue area over by Gross
18 High School.
19   Q.   Is that where you went to high school?
20   A.   No.
21   Q.   Did you play basketball in high school and
22 that's why you wanted to coach?
23   A.   No.
24   Q.   You weren't the center, I know that.
25   A.   No, I was not.

8

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    Q.   If you graduated -- born in '77, I'm going to
2  guess you graduated from high school around '95?
3    A.   Yes.
4    Q.   Would that be the year you graduated?
5    A.   Yes.
6    Q.   And I'm going to guess the UNO degree was a
7  four-year degree?
8    A.   Yes.
9    Q.   Did you complete it in four years without
10 interruption?
11   A.   No.
12   Q.   Did you enter UNO that fall of '95 after your
13 graduation?
14   A.   I believe I did, and then I took a semester or a
15 year off to figure out what exactly I wanted to do.
16   Q.   Then you graduated in '02.  Let's talk about
17 your employment background post high school.  I'm not real
18 concerned about summer jobs if there were only summer jobs
19 unless they involved law enforcement.  You heard
20 Mr. Iversen say he kind of did a ride-along program.  Do
21 you recall that?
22   A.   Yeah.
23   Q.   Did you do a similar program at all while you
24 were in college?
25   A.   No.

9

1    Q.   So what was your employment history during
2  college, for example?  Anything other than summer jobs or
3  seasonal work?
4    A.   Fairly steady employment.
5    Q.   With?
6    A.   I believe I was at Toys "R" Us when I graduated
7  high school, and then shortly after, I went to Best Buy.
8    Q.   When you graduated from UNO and you had the
9  science of education -- So you graduated in 2002.  Do you
10 need to take any sort of state exams or anything to get
11 your teaching certificate?
12   A.   I don't recall.
13   Q.   Did you pursue a teaching certificate or
14 something beyond your bachelor's degree from UNO?
15   A.   I did obtain a teaching certificate, yes.
16   Q.   And you think that was because of your
17 education, or you don't recall if you took any
18 certification exams?
19   A.   I don't recall.
20   Q.   What did you first start doing employment-wise
21 after graduation from UNO?
22   A.   I was hired with Omaha Public Schools as an art
23 teacher at Pinewood Elementary.
24   Q.   Where is that?
25   A.   It is about 63rd and Sorensen.

10

1    Q.   You also had that -- what did you call it?
2    A.   Coaching endorsement.
3    Q.   You called it something else, I thought.  I have
4  art and coaching endorsement.  So did you coach at
5  Pinewood as well?
6    A.   No.
7    Q.   Did you coach anywhere within the OPS system?
8    A.   No.
9    Q.   You began working at --
10   A.   Actually, I take that back.  I did when I was
11 still in college.  Bellevue West, I assisted with them,
12 and also Creighton Prep, I assisted with them for a little
13 while.
14   Q.   Basketball?
15   A.   Uh-huh, yes.
16   Q.   Creighton Prep, my kids are all Westside, so we
17 don't like them.
18        MR. VALENTINO:  We don't like Westside either.
19   Q.   (By Mr. Tjaden)  So was Brother Wilmot their
20 basketball coach?
21   A.   He was.
22   Q.   Not while you were there?
23   A.   I think up until my freshman year.
24        MR. VALENTINO:  Off the record.
25        (Discussion off the record.)

11

1    Q.   (By Mr. Tjaden)  So you were at Pinewood
2  Elementary teaching art.  How long does that last?
3    A.   About four and a half years.
4    Q.   Without any interruption?
5    A.   Correct.
6    Q.   And that's a, I'll say, full-time job, but it's
7  nine months basically out of the year; is that right?
8    A.   Yes.
9    Q.   And I've got several family members in
10 education.  I like to tease them about that.  Did you do
11 anything during the off months?
12   A.   Yes.
13   Q.   What was that?  Don't tell me paint houses.
14   A.   I would assist with my dad's business.  I would
15 work with him.
16   Q.   What was that?
17   A.   It's been a while.  Midlands Communications.
18   Q.   And do they install cables material or what?
19   A.   They would install phone lines, cable lines,
20 audio systems for buildings, larger buildings and
21 schools.
22   Q.   Did you have any training that would allow you
23 to do that sort of work other than just working with your
24 father?
25   A.   It was more on-site training with him and the

12

DEPOSITION OF: Bryan Svajgl                                                    Pages 13-16

1  other employees.
2      Q.   I know UNO has a -- I think they've got a pretty
3  strong criminal justice department if I'm not mistaken.
4  When you were at UNO, did you take any classes in criminal
5  justice?
6      A.   No.
7      Q.   What caused you to leave Pinewood?
8      A.   Although I loved being with the kids and I liked
9  teaching, teaching does not pay the bills very well and
10 you spend -- although you say "nine months," teachers put
11 in a lot of time during that nine months that you really
12 don't get paid for.  So I knew that I liked teaching, but
13 it wasn't my forever career.  So I started doing research
14 to try to find out what I would like to do, what else.
15     Q.   And when you left Pinewood, did you have a
16 position lined up to go into?
17     A.   Yes.
18     Q.   And was that the Papillion Police Department
19 position?
20     A.   Yes.
21     Q.   So you are deciding to leave or thinking you
22 want to leave, so you do the research to determine what
23 you want to do next.  What was it about your research that
24 led you to go into law enforcement?
25     A.   I did a few ride-alongs, did other research

                                                              13

1  online.  I think law enforcement is something I probably
2  always wanted to do, just was unsure how it would work out
3  with kids, the wife, that schedule.  You have to work
4  nights usually.  But after going on the ride-alongs, I
5  knew that was what I wanted to do.
6      Q.   Now, you say "kids" and "the wife."  This was at
7  the time with your first marriage?
8      A.   Yes.
9      Q.   And you had all three kids by then?
10     A.   Yes.
11     Q.   What was your wife's first name -- your first
12 wife's name?
13     A.   Louanne.
14     Q.   And did that end in dissolution, divorce?
15     A.   Yes.
16     Q.   Sarpy or Douglas County divorce?
17     A.   It was Douglas County.
18     Q.   So when you make the decision that you want to
19 enter law enforcement, describe for me then the process
20 when you terminated with Pinewood.  I suspect you gave
21 them your notice that at the end of -- what year are we
22 talking about when you left?
23     A.   It would have been April 2006.
24     Q.   So when you -- you finished the spring school
25 term with them?

                                                              14

1      A.   There was still a month or two remaining in the
2  school year, I believe.
3      Q.   Why did you not finish the school term?
4      A.   I had an opportunity to go with the Papillion
5  Police Department.  They offered me a job.
6      Q.   There was an opening at the time?
7      A.   Yes.  So I had to take it.
8      Q.   When you took the job, what did you enter as?
9      A.   Road officer.
10     Q.   How did you learn about that job?  Just through
11 a posting on a job board somewhere?
12     A.   Online, research what testing for different
13 departments took place at the time.  Like Iversen said in
14 his interview, they were using MAPA, which was one test,
15 and then you could send the results to multiple
16 agencies.
17     Q.   What agencies did you apply to other than
18 Papillion?
19     A.   I applied with Council Bluffs, Papillion,
20 La Vista, Sarpy County, Bellevue, and I believe Douglas
21 County and Omaha.
22     Q.   And you took the MAPA test and had that
23 distributed to all of these agencies?
24     A.   Yes.
25     Q.   Were there openings in all of these agencies

                                                              15

1  that you were making application for or not?
2      A.   Yes, as far as I knew.  Omaha actually was a
3  separate test, but all the other ones were from MAPA.
4      Q.   What were the responses from these agencies that
5  you didn't go to work for?  Were you offered by any of
6  them?  I think Iversen said, if I'm not mistaken, that one
7  of them didn't have a position at the time when he was
8  applying.  So what were the responses from these various
9  agencies, if you recall?
10     A.   I did a couple interviews with Sarpy County.  I
11 did a couple of interviews with Bellevue and then did an
12 essay test.  I was not contacted after that.  With Council
13 Bluffs, I actually had just finished the chief's interview
14 when I got the call from Papillion, so I took my name out
15 of their running.  I was already all set up for a
16 chief's interview with Omaha Police when I took the spot
17 with Papillion and did the same with them, called and took
18 my name out of the running there.
19     Q.   The current chief in Papillion is sitting here
20 in the courtroom (sic); is that correct?
21     A.   Yes.
22          MR. TJADEN:  I'm sorry.  I've been educated on
23 the appropriate detective and et cetera.  What would be
24 the appropriate title for you, sir?
25          MR. LYONS:  Police chief.

                                                              16

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    Q.   (By Mr. Tjaden)  Chief Lyons, was he the chief
2  at the time you were first hired at Papillion?
3    A.   No.
4    Q.   Who was that?
5    A.   Chief Leonard Houloose.
6    Q.   And you had a chief's interview.  What does the
7  chief interview involve?
8    A.   It's the chief, one or two other staff members
9  from the department, and they ask you questions about your
10 interest in law enforcement.
11   Q.   They ask you about your education?
12   A.   Yes.
13   Q.   And at that point, you hadn't had any education,
14 any training other than a ride-along in law enforcement;
15 is that accurate?
16   A.   Correct.
17   Q.   So then when you're hired, what's the process
18 then to obtain the training?
19   A.   Well, within two weeks of starting, I went to
20 the academy in Grand Island, the Nebraska Law Enforcement
21 Training Center.
22   Q.   Is that where Papillion sent you?
23   A.   Yes.
24   Q.   And what was the program there?
25   A.   It was new officer training program.

17

1    Q.   What does that involve?  Classwork, field
2  work?
3    A.   Both, classroom, field work.  It was, I want to
4  say, three and a half months at the time.
5    Q.   Is that three and a half months where you are in
6  Grand Island on a campus doing the training?
7    A.   Yes.
8    Q.   And so you're not an active police officer with
9  the City of Papillion during that three and a half months
10 training; is that accurate?
11   A.   That's true.
12   Q.   And so on this training, what specifically can
13 you tell me, the classwork, is it broken down into topics
14 and each topic is addressed for a certain number of days
15 or weeks?
16   A.   Yes.
17   Q.   Give me an example.  What are the topics that
18 they have classes on?
19   A.   We would have sessions of defensive tactics.
20 That, you would do on and kind of throughout.  We did
21 have classroom stuff on death investigations, legal
22 matters, law.
23   Q.   Accident invest- -- motor vehicle accident?
24   A.   Accident investigation, EVOC training, firearms
25 training.

18

1    Q.   The legal matters, law as you've described them,
2  what did that involve?  Is that where we're talking about
3  training on searches, seizures, executions of warrants, et
4  cetera?
5    A.   Yes.
6    Q.   How long was that class?
7    A.   I don't recall exactly.
8    Q.   Were you given written materials from that
9  class?
10   A.   Yes.
11   Q.   Did you retain those written materials?
12   A.   I may still have them.  I don't know for sure.
13   Q.   And they were provided to you from the
14 academy?
15   A.   Yes.
16   Q.   Do you recall, were those -- the instructors who
17 ran the legal matters instruction, were they officers or
18 were they attorneys, judges?  Who were they?
19   A.   I believe he was an attorney.
20   Q.   Do you have any idea who that was?
21   A.   I don't remember the first name.  I believe the
22 last name was Stolz.
23        MR. VALENTINO:  It would be David Stolz,
24 S-T-O-L-Z.
25   Q.   (By Mr. Tjaden)  If you can recall, did the

19

1  instruction in the legal matters deal with the execution
2  of warrants?
3    A.   I believe it was touched upon.
4    Q.   How about the application for the warrant
5  process?
6    A.   I don't recall if that was reviewed.
7    Q.   If I'm not mistaken, in this particular case --
8  and we'll get to it a little bit more in depth -- you made
9  the application for the search warrant, correct?
10   A.   Yes.
11   Q.   And that probably wasn't the first one you
12 did?
13   A.   No.
14   Q.   How did you learn how to complete a search
15 warrant application?
16   A.   I did attend a training put on by Omaha -- or
17 maybe former Omaha narcotics investigators about writing
18 search warrants.
19   Q.   Was that done while you were a Papillion police
20 officer?
21   A.   Yes.
22   Q.   That's not part of this academy training?
23   A.   No.
24   Q.   Were there any instructions given during the
25 academy on the -- You've talked about instruction on

20

Exhibit B to Zachary Lutz-Priefert's Affidavit

DEPOSITION OF: Bryan Svajgl                                                    Pages 21-24

1  investigation of motor vehicle accidents, deaths, et
2  cetera.  Any instruction given on the investigation of a
3  crime such as the possession of child pornography?
4      A.  I don't recall.  It doesn't mean it wasn't
5  there, but I don't remember it off the top of my head.
6      Q.  So after you complete the academy training, you
7  get a certificate?
8      A.  Yes.
9      Q.  And then you return to the Papillion area and
10  begin being an officer?
11      A.  You have to go through field training as well.
12      Q.  Is that when you are riding with another officer
13  from Papillion?
14      A.  Yes.
15      Q.  How long does that last?
16      A.  It's another three and a half months.
17      Q.  And then what?  You get your own patrol car?
18      A.  Once you graduate from that, yes.
19      Q.  How long did you remain a road officer?
20      A.  Until January of 2014.
21      Q.  During the time you were a road officer, you had
22  the opportunity to participate in the execution of search
23  warrants?
24      A.  Yes.
25      Q.  Can you give me a ballpark figure on how many?

21

1  If you can't, just say in excess of 50, in excess of 25.
2      A.  I would say it was probably ballpark between
3  five and ten.
4      Q.  Between five and ten execution of warrants?
5      A.  That I assisted with.
6      Q.  As a road officer?
7      A.  Yes.
8      Q.  When did you first go on active -- I'll call it
9  active duty?  When did you graduate from that training and
10  become a road officer actually working?
11      A.  From the FTO program?
12      Q.  From the what program?
13      A.  Field training program, is that what you're
14  asking?
15      Q.  Yeah.
16      A.  I believe it was in November.
17      Q.  Of what year?
18      A.  2006, somewhere around there.
19      Q.  So in November of 2006 when you are actually out
20  on patrol now until January of 2014 when you were no
21  longer a road officer, during that roughly eight-year
22  period, you did maybe five to ten executions of search
23  warrants?
24      A.  Yes.
25      Q.  So less than one a year?

22

1      A.  Yes.
2      Q.  Of those that you participated in during that
3  period of time, did any of those involve crimes such as --
4  well, the crime of possession of child pornography, any of
5  those five to ten?
6      A.  Not that I recall.
7      Q.  Can you tell me what your role was as best you
8  recall in those executions of search warrants?
9      A.  On a couple of them, I was just a perimeter
10  officer during the initial contact of the search warrant.
11  On a couple, I was part of the initial contact and part of
12  the search.
13      Q.  You have a requirement for continuing education
14  on an annual basis?
15      A.  Yes.
16      Q.  What is that requirement?
17      A.  I believe it's 20 hours.
18      Q.  Are they 20 hours -- are those defined for you
19  in terms of what area they must be in, or do you just get
20  to choose and accumulate 20 hours of the topics of your
21  choice?
22      A.  I do not believe it has to be in a specific
23  area.
24      Q.  Have you had any continuing education training
25  in the area of investigation of crimes involving child

23

1  pornography?
2      A.  Yes.
3      Q.  Tell me about those continuing educational
4  courses.
5      A.  I've been to a couple of Speaking of Children
6  conferences in which they had break-out sessions that
7  talked about online crime investigations.
8      Q.  A couple of what?
9      A.  Online crime investigation.
10      Q.  You called them a couple of what sessions?
11      A.  Speaking with Children (sic) conferences.
12      Q.  Speaking with Children?
13      A.  Yes.
14      Q.  And those were seminars?
15      A.  Yes.
16      Q.  And what were the break-out sessions again?
17      A.  They had some child crimes, child abuse, and
18  also Internet -- like, Internet tools for criminal
19  investigators.
20      Q.  Internet tools?
21      A.  Yes.
22      Q.  So this is a class that is talking about the
23  tools that you could use to investigate these online
24  crimes?
25      A.  Yes.

24

Exhibit B to Zachary Lutz-Priefert's Affidavit

DEPOSITION OF: Bryan Svajgl                                        Pages 25-28

1    Q.   When was that and where was that taught at?
2    A.   I believe that would have been in March of
3  2014.
4    Q.   And do you recall where that was taught at?
5    A.   They hold that at the Embassy in La Vista.
6    Q.   Who puts it on?
7    A.   It's in collaboration with Project Harmony.
8    Q.   So it's a local program?
9    A.   Yes.
10   Q.   And is that one of those classes that you would
11 receive continuing education credits for?
12   A.   I believe so.
13   Q.   And how was it that you decided to attend that
14 particular one since you get to choose what topics you
15 want?
16   A.   It was something that I thought was relevant
17 to -- that we hadn't done a lot of was investigating
18 online and computer crimes.
19   Q.   Detective Iversen discussed, I believe, being
20 part of a task force for child crimes.  Are you on that
21 task force?
22   A.   No.
23   Q.   Do you know how one gets to be on that task
24 force?
25   A.   Vaguely, as Detective Stigge with our department
                                                            25

1    A.   Yes.
2    Q.   And do you recall how many others you've done
3  since March of 2014?
4    A.   I don't recall how many, no.
5    Q.   What's the most recent one that you recall?
6    A.   I did another criminal -- Internet tools for
7  criminal investigators class, which kind of ran the whole
8  gamut of router interrogation, phone -- searching phones,
9  searching houses, search warrants.  It included kind of a
10 whole conglomerate of it all.
11   Q.   When did you do that one?
12   A.   That one was --  I don't know the exact dates.
13 It was a couple months ago.
14   Q.   Just recently?
15   A.   Yes.
16   Q.   And how is it you came to attend that class?
17 Was it referred -- were you referred there, or was that
18 again one of these choices of yours?
19   A.   It was a choice.
20   Q.   So just a couple of months ago, you did one.
21 Between March of 2014 and the one you did most recently,
22 any other Internet crime seminars or child crime
23 investigation seminars?
24   A.   Yes.  I've done a couple of webinars about child
25 crimes and child pornography and the evidence collection
                                                            27

1  has joined that task force.  Basically, our department
2  requested if there was a spot that he could join, and he
3  had to work with the supervisors there to get clearance
4  and training with them.
5    Q.   So you're not on the task force.  Have you ever
6  sought to be on the task force?
7    A.   No.
8    Q.   Have you ever undergone the training that you
9  just mentioned somebody would need to undergo to be on the
10 task force?
11   A.   No.
12   Q.   You're talking about the -- we have talked about
13 the March 2014 seminar as one of the seminars that you
14 recall attending that gave training on investigation of
15 child crimes.  Was that the first one you did?
16   A.   I don't recall.  I believe so.
17   Q.   And which -- are there other classes or seminars
18 or training opportunities on the investigation of child
19 crimes?
20   A.   I don't recall which exact ones, but I have been
21 to others since then.
22   Q.   You've done others since March 2014?
23   A.   Yes.
24   Q.   So you believe that most likely in March was the
25 first one?
                                                            26

1  from that.
2    Q.   A couple.  Two?
3    A.   Yeah.
4    Q.   And when were those?
5    A.   Probably in 2015.
6    Q.   Both of them?
7    A.   I believe so.
8    Q.   The most recent one you took, who put that on
9  and where was it given?
10   A.   That was PATC, and I don't recall the
11 instructor's name.
12   Q.   Was it here in Omaha?
13   A.   It was in Lincoln.
14   Q.   And the webinars on the collection of evidence
15 and investigation of child crimes, that included computer
16 aspects as well?
17   A.   Yes.
18   Q.   You say those were in 2015?
19   A.   Yes.
20   Q.   Winter, spring, summer, fall?
21   A.   Probably during the summer.
22   Q.   Would both of those have been after March 17th,
23 the date of the arrest of Mr. Nader?
24   A.   Yes.
25   Q.   So prior to Mr. Nader's arrest, the only
                                                            28

Exhibit B to Zachary Lutz-Priefert's Affidavit

1  training you had with respect to the investigation of
2  child crimes would have been that March 2014 seminar with
3  a couple of break-out sessions at the Embassy in La
4  Vista?
5      A.  There was also -- I attended the one in 2015,
6  which was early March as well.
7      Q.  The same Embassy one?
8      A.  Same conference.  They hold it annually.
9      Q.  That was going to be my next question.  The
10  PATC, I'm not sure if that would be an annual one?
11     A.  No.
12     Q.  But the local sponsored one at the Embassy,
13  that's an annual one?
14     A.  Yes.
15     Q.  And you did attend that in March of 2015?
16     A.  Yes.
17     Q.  Do they give you a certificate of completion of
18  that?
19     A.  For some of the classes, I know they do, yes.
20     Q.  I mean, if you're trying to get in for CE
21  classes, you would think --
22     A.  Most of the classes do, yes.
23     Q.  And in that March 2015 seminar, it sounds
24  like -- well, that's a seminar that's related -- is still
25  called Speaking with Children?
                                                            29

1      A.  Yes.
2      Q.  What was the agenda for that meeting in the
3  March of 2015 time frame?
4      A.  It was similar-type break-out sessions, child
5  crimes, child abuse, legal stuff pertaining to those type
6  of crimes.  I don't recall which break-outs I went to.
7      Q.  Do they discuss with you the elements of various
8  crimes?
9      A.  In some of those, yes.
10     Q.  Well, do you recall having discussion -- not
11  specifically knowing what break-out sessions, but do you
12  recall being instructed or given the elements of a crime
13  of possession of child pornography in the March of 2015
14  seminar?
15     A.  I don't recall.
16     Q.  Now, you mentioned that you did a number of
17  different -- participated in search warrants.  I asked you
18  what your role was prior to becoming -- prior to a change
19  in January of 2014?
20     A.  Uh-huh, yes.
21     Q.  Were you ever the lead officer on the execution
22  of those warrants?
23     A.  No.
24     Q.  So since January of 2014 to today's date to
25  start with, give me a ballpark on how many warrants you've
                                                            30

1  been involved on with respect to the execution of the
2  search warrants.
3      A.  I'm not sure that I'm understanding the
4  question.
5      Q.  Well, let's try this:  In January of 2014, you
6  were no longer a road officer.  What was your title then
7  at the time?
8      A.  Detective.
9      Q.  And did you apply for that promotion?
10     A.  Yes.
11     Q.  What did you have to do in terms of any
12  additional training or classwork or testing to get the
13  promotion?
14     A.  I attended some criminal investigation training,
15  child abuse crimes against children, child death
16  investigations, homicide investigation, background
17  investigations.  Those are to name a few.  I don't recall
18  what other ones.
19     Q.  Well, you mentioned some training involving
20  child crimes.  Do they specifically go into the crime of
21  possession of child pornography?
22     A.  Which one are you talking about?
23     Q.  You said you identified training that was
24  necessary to become a detective, and I thought you had
25  indicated that that involved -- some of those involved
                                                            31

1  training or some of the -- involved children.  I'm sorry.
2      A.  It was after I was selected I went to some of
3  those trainings.
4      Q.  Are we talking again about the Embassy?
5      A.  No.
6      Q.  So the training you went to after you were
7  selected as the detective, to the extent they involved an
8  investigation of possession of child pornography crimes,
9  tell me about those trainings, because you haven't listed
10  them earlier.  I know that we have the Embassy and then we
11  don't have anything until after.
12     A.  I don't recall any specific ones with child porn
13  investigations.
14     Q.  Prior to March 17th, do you recall anybody
15  explaining to you what the elements of the crime of
16  possession of child pornography is?
17     A.  I don't recall.
18     Q.  When did Chief Lyons become chief?
19     A.  I believe in 2015.
20     Q.  What time frame?  Was he the chief on
21  March 17th, 2015?
22     A.  Yes.
23     Q.  And was he in the department at the time he
24  became chief or did he come from outside?
25     A.  He came from outside.
                                                            32

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Page 33**

Q.   Do you know where he came from?

A.   Kansas.

Q.   When he first became chief, did he interview each of his detectives?  Do you know, did he interview you after he got the job?

A.   I believe we did meet.

Q.   What do you recall about that meeting?  Did he inquire as to what you did for the department?

A.   Yes.

Q.   Did he inquire as to your training?

A.   No, I don't believe so.

Q.   So once you became a detective, up until and including the execution of the search warrant on the Naders' property on March 17th, how many searches were you involved in as a detective?  So it's basically about a year's time frame, maybe a couple of months longer.

A.   One or two.

Q.   And did either of those one or two involve an investigation in a case with respect to a possession of child pornography?

A.   No.

Q.   Were you the -- I'll call it the lead investigator on those one or two that you participated in?

A.   No.

**Page 34**

Q.   What role did you play in those one or two?

A.   I would have been assisting with probably entering and then searching.

Q.   So correct me if I'm wrong, but based upon what you've told me, the March 17th execution of the warrant on the Nader property was the first such execution involving a crime dealing with possession of child pornography in your career?

A.   Yes.

Q.   And you don't recall having received any training with respect to the elements of that crime at any point prior to the execution of that warrant; is that accurate?

MR. KUNHART:  Objection.  Foundation.

Can you reask the question, please?

Q.   (By Mr. Tjaden)  Well, I believe I have asked or at least tried to ask you what -- on what instruction you were given with respect to specifically the elements of the crime of possession of child pornography prior to March 17th, 2015, the execution of the warrant on the Nader home.  And you haven't identified any specific recollection of any training on the elements of that crime of possession of child pornography.

So my question, I believe, was, this was your first such execution of a warrant involving possession of

**Page 35**

child pornography and at that time of the execution of the first warrant for investigating the crime of possession of child pornography, you hadn't received any training as to the elements of that specific crime; is that accurate?

MR. KUNHART:  Objection.  Foundation.

Q.   (By Mr. Tjaden)  You know what you've been trained on, right?

A.   For the most part.  It's been a long time.  I probably have had some training on the statute and its elements.

Q.   And had you had that training, where do you recall that would have been done?

A.   More than likely at the academy.

Q.   Back in --

A.   Grand Island.

Q.   We're talking back in what year?

A.   2006.

Q.   Nothing in between as best you can recall?

A.   Not that I can recall.

Q.   The search of the Nader home on March 17th, 2015, you understood you were investigating a possible crime of possession of child pornography?

A.   Yes.

Q.   Was that your case?

A.   Yes.

**Page 36**

Q.   How do you get assigned to a case, and specifically, how did you get assigned to this case?

A.   My sergeant assigned it to me.

Q.   Was it -- who is your sergeant?

A.   Sergeant Jeff Payton.

Q.   How long had he been your sergeant before this assignment?

A.   Since I joined investigations.

Q.   So he was with you the whole time?

A.   Yes.

Q.   Do you know, would you discuss with him your training in various areas of law enforcement?

A.   He should be aware of that.

Q.   Okay.  He had been your sergeant the whole time you were a detective there?

A.   Yes.

Q.   And was he a sergeant the whole time you were a road officer?

A.   He was a sergeant with the department, yes.

Q.   Not necessarily overseeing you?

A.   Correct.

Q.   But while you're a detective, he is your sergeant?

A.   Yes.

Q.   The investigation of the Nader suspected crime,

1 we know it was the first such investigation you had
2 involving possession of child pornography, right?
3     A.  No.
4     Q.  I thought -- Is it the first one you were the
5 lead on?  Because I asked you that not too long ago, and I
6 think you said it was the first one.  You had one or two
7 in which you were involved in the search warrant
8 process -- one or two cases in which you were involved as
9 a detective prior to this date?
10     A.  Uh-huh.
11     Q.  And neither of those involved possession of
12 child pornography?
13     A.  Correct.
14     Q.  Have you been involved in the investigation of
15 child pornography cases, other than in the role of
16 executing a search warrant?
17     A.  Yes.
18     Q.  How many?
19     A.  One.
20     Q.  And when was that?
21     A.  I believe it was December of 2014.
22     Q.  What was your role in that investigation?
23     A.  It was assigned to me.
24     Q.  The case itself?
25     A.  Yes.

37

1     Q.  But -- and that was a suspected possession of
2 child pornography case?
3     A.  Yes.
4     Q.  And so you -- had you not gotten to the point
5 where you were going to execute a search warrant?  That
6 was in December of 2014.  By March of 2015, had you not
7 gotten to the point on that other case that you're the
8 lead on to request or execute a warrant?
9     A.  That case was closed before then.
10     Q.  And tell me about that case.  What happened?
11 How did it get closed?
12     A.  That case was actually requested that I follow
13 up with by the Attorney Jennifer Miralles.  I had a sexual
14 assault of a child investigation in which a stepfather
15 allegedly assaulted his stepdaughter, and throughout the
16 court time through the case, there was some --
17     Q.  I'm sorry.  Throughout the what?
18     A.  Throughout the court -- I don't know what you
19 want to call it.
20     Q.  The court?
21     A.  When it was in court, she had received
22 information that there was possibly a picture of the
23 victim nude that either the stepdad or stepmom -- or the
24 actual mom had or had given to the defense attorney.  So I
25 was asked to investigate that.

38

1     Q.  So that started as a different type of a crime
2 against the child?
3     A.  Correct.
4          MR. KUNHART:  Objection.  Form.
5     Q.  (By Mr. Tjaden)  Well, when you first learned of
6 that or were first assisting on that, it didn't involve
7 possession of child pornography.  It was a sexual assault
8 case?
9     A.  Yes.
10     Q.  Were you the lead officer in the investigation
11 of the sexual assault case?
12     A.  Yes.
13     Q.  And then at some point in time, an aspect arose
14 within that case that possibly involved the possession of
15 pornography?
16     A.  Yes.
17     Q.  Is that accurate?
18     A.  Yes.
19     Q.  How was that resolved?  The defendant had been
20 involved in a court procedure dealing with the sexual
21 assault for some time; is that accurate?
22     A.  Yes.
23     Q.  And so how did the case end up getting
24 resolved?
25     A.  The case was unfounded.

39

1     Q.  I don't know what that means.
2     A.  That means I did not have evidence to say that
3 the allegation was true.
4     Q.  You did not have evidence to say what allegation
5 was true, the sexual assault or the possession of child
6 pornography?
7     A.  The possession of child pornography.
8     Q.  You were working with Ms. Miralles on this
9 particular case?
10     A.  Yes.
11     Q.  And what was it that your investigation involved
12 to determine whether there was evidence of possession of
13 child pornography?  There was a tip from the mother of the
14 victim, you believe; is that correct?
15     A.  I don't recall if that's who it came from.  I
16 believe she had the photo at one point was the information
17 I received and then provided either a log-in or some way
18 that -- to give it to the defense attorney.  So I
19 interviewed the attorneys that were involved.
20     Q.  You interviewed the defense attorneys?
21     A.  Yes.
22     Q.  Did you -- You say that she gave them a log-in.
23 Was this a log-in to a computer that the defendant had
24 that the picture may have been on?
25     A.  It was Facebook Messenger, I believe.

40

DEPOSITION OF: Bryan Svajgl                                         Pages 41-44

```
 1    Q.  Did you look on his computer?
 2    A.  No.
 3    Q.  What did you do to determine there was no
 4  evidence?
 5    A.  I interviewed both of them and the mom, and it
 6  did not appear that the photo had been given to them.
 7    Q.  This was his attorney that you're talking to?
 8    A.  Yes.
 9    Q.  And you asked them, did he have this photo, and
10  they said no?
11    A.  Yes.
12    Q.  Then you asked the mom, did she give him a
13  photo?
14    A.  It was a little more in depth than that, but
15  yes.
16    Q.  And did she say no?
17    A.  I don't recall what she said.
18    Q.  But you didn't look on any computers?
19    A.  No.
20    Q.  Did you arrest him --  I would assume that
21  that's a separate charge than what he was already
22  facing?
23    A.  The child pornography?
24    Q.  Yes.  Possession of child pornography is a
25  separate charge than his sexual assault charge he was
                                                        41
```

```
 1  facing.  Is that your understanding?
 2    A.  It wasn't the defendant that was being
 3  accused.
 4    Q.  Okay.  It was somebody else?
 5    A.  It was the law firm.
 6    Q.  It was what?
 7    A.  It was the law firm that the attorneys were
 8  being accused of having the image.
 9    Q.  Now I'm confused here.  This investigation came
10  up as a result of this -- it came up in the context of
11  this sexual assault court procedure?
12    A.  Correct.
13    Q.  All right.  But the people you were
14  investigating and potentially considering bringing charges
15  against were the lawyers defending this guy?
16    A.  Yes.
17    Q.  And you didn't arrest them?
18    A.  No.
19    Q.  And you didn't arrest them because they told you
20  they didn't have the picture?
21    A.  Yes.  I had no evidence of the picture.
22    Q.  Did you execute a warrant on their -- seek or
23  make application for a warrant on their equipment?
24    A.  No.
25    Q.  Who told you to go after these guys?
                                                        42
```

```
 1  Ms. Miralles?
 2    A.  She was the one that requested I look into it,
 3  yes.
 4    Q.  And so I understand clearly again, they were the
 5  attorneys for the defendant -- they were representing and
 6  defending the gentleman that Ms. Miralles was
 7  prosecuting?
 8    A.  Yes.
 9    Q.  You had mentioned that Jeff Payton was your
10  sergeant?
11    A.  Yes.
12    Q.  You made a comment that he should be aware of
13  the training you had.  I had also asked you earlier about
14  the conversations you've had with -- just when Chief Lyons
15  came over.  Did you talk with Chief Lyons in terms of
16  setting forth for him what your training had been in
17  criminal investigations?
18    A.  Not that I recall.
19    Q.  Do you believe he likewise should know what your
20  training is as the chief?
21    A.  That's not for me to answer.
22    Q.  I know he's sitting in this room and you
23  mentioned Sergeant Payton should know.  Shouldn't the
24  chief know?
25    A.  That's kind of a hypothetical question I can't
                                                        43
```

```
 1  answer.
 2    Q.  You can't answer that one?
 3    A.  No.
 4    Q.  So Sergeant Payton assigns you to this case?
 5    A.  Yes.
 6    Q.  What does he tell you about it?  What do you
 7  first learn about this case?
 8    A.  I was informed that a CyberTip had been received
 9  from Microsoft to NCMEC that two images were uploaded to
10  the SkyDrive that were suspected child pornography.
11    Q.  You're being told this from -- suspected child
12  pornography -- and you're being told this from Sergeant
13  Payton?
14    A.  Yes.
15    Q.  What's NCMEC?
16    A.  National Center for Missing and Exploiting
17  Children.
18    Q.  Were you aware of that prior to receiving this
19  assignment?
20    A.  I believe I heard of them before, yes.
21    Q.  Having heard of them is one thing.  Had you
22  worked on any matters involving NCMEC or their tips before
23  this?
24    A.  No.
25    Q.  So he tells you this, and then was this going to
                                                        44
```

Exhibit B to Zachary Lutz-Priefert's Affidavit

1 be a team effort? Did you have to select officers that
2 you wanted to assist you in this investigation?
3    A.   No.
4    Q.   So you don't get it from Sergeant Payton and
5 then form a team of your own to do the investigation?
6    A.   No.
7    Q.   When it comes time to the execution of a
8 warrant -- a search warrant in this case, more than just
9 yourself goes out and does that?
10    A.   Yes.
11    Q.   Do you select the team of individuals that are
12 going to be assisting you on the execution of the search
13 warrant?
14    A.   Yes.
15    Q.   And in this particular case, I think we have
16 yourself as the primary reporting officer?
17    A.   Yes.
18    Q.   You have a Brandon Stigge as an assisting
19 officer?
20    A.   Yes.
21    Q.   What did -- Is that a Detective Stigge?
22    A.   Yes.
23    Q.   What was his involvement with respect to the
24 search? Did he go to the house with you that day?
25    A.   Yes.
                                                          45

1    Q.   What was he doing?
2    A.   He assisted with searching for the electronic
3 devices.
4    Q.   When you say he assisted in "searching for the
5 electronic devices," are you talking about he's going from
6 room to room looking for these items?
7    A.   Yes.
8    Q.   Do you know, did he do any forensic analysis on
9 the items?
10    A.   Not that I know of.
11    Q.   Well, you're selecting this team and you're
12 going to be telling each of these individuals what it is
13 that they're going to be doing. Did you have somebody in
14 mind that you were going to rely upon to do the forensic
15 analysis?
16    A.   Yes.
17    Q.   Who was that?
18    A.   On-site preview was Ben Iversen.
19    Q.   Was he the only one who was conducting on-site
20 previews?
21    A.   Yes.
22    Q.   What about Preston Maas? Are these all
23 detectives?
24    A.   Those three are.
25    Q.   What did Detective Maas do?
                                                          46

1    A.   Detective Maas also assisted with searching.
2    Q.   So these are guys going through the drawers,
3 looking in the cabinets, all of that stuff?
4    A.   Yes.
5    Q.   How about Dooling?
6    A.   Dooling was also there to assist with the
7 search.
8    Q.   Goley?
9    A.   Goley, I believe, assisted with the actual
10 entering.
11    Q.   Kustka?
12    A.   He assisted with the entry and then assisted
13 with maintaining perimeter throughout.
14    Q.   And Higgins?
15    A.   Higgins assisted with the entry and, I believe,
16 also the perimeter.
17    Q.   So the only one who was given the responsibility
18 of on-site preview was Detective Iversen?
19    A.   Yes.
20    Q.   Did you do any on-site previewing?
21    A.   No.
22    Q.   When you meet with this group, I'm going to
23 assume -- And I know you were there last week and I got
24 to say I did it again last night. I watched several
25 episodes of COPS. But that doesn't really show a meeting
                                                          47

1 where they're talking about executing a warrant
2 necessarily. I mean, it does in some instances, but back
3 in the day of Hill Street Blues, they always met before
4 they went out to do something like this.
5        You had a meeting on the day of March 17th prior
6 to the actual execution of the warrant?
7    A.   Yes.
8    Q.   Where was that meeting?
9    A.   At the Papillion Police Department.
10    Q.   And did all of these officers attend that
11 meeting and detectives?
12    A.   Yes.
13    Q.   Anybody else?
14    A.   Todd Dudas, the evidence clerk, may have been
15 there.
16    Q.   How about Sergeant Payton?
17    A.   I don't recall if he was there.
18    Q.   Chief Lyons?
19    A.   I don't recall if he was there.
20    Q.   So typically -- Detective Iversen talked about
21 that meeting -- in general terms, he would talk about the
22 location of where you're going, the layout of the house,
23 et cetera, potential dangers, right?
24    A.   Yes.
25    Q.   Is that what happened in this particular
                                                          48

1  instance?
2      A.   Yes.
3      Q.   Did you tell them what you were going to be
4  looking for?
5      A.   Yes.
6      Q.   What did you tell them in connection with what
7  they were going to be looking for?
8      A.   That we were looking for computer electronic
9  devices that could store digital media, possibly child
10 porn images or videos.
11     Q.   So most of these guys that were there were being
12 told, We're looking for any device that could be used to
13 house or store this material?
14     A.   Yes.
15     Q.   So you're basically saying to them, Go look
16 through everything in the house and if you find a flash
17 drive, a computer, a cell phone, anything, gather it up?
18     A.   Yes.
19     Q.   And bring it to Iversen?
20     A.   No, to the evidence tech, Todd Dudas.
21     Q.   So he is there on-site?
22     A.   Yes.
23     Q.   So everything comes to him?
24     A.   Yes.
25     Q.   That was the plan that day?
                                                            49

1      A.   Yes.
2      Q.   All right.  So then what would he do with it?
3      A.   He would log it in unless we found an item such
4  as a computer that we could preview.
5      Q.   Did you find any of those?
6      A.   Yes.
7      Q.   Was that the ENVY that Detective Iversen talked
8  about?
9      A.   Yes.
10     Q.   He ran that preview?
11     A.   Yes.
12     Q.   Do you know --  He mentioned some equipment.
13 The OS Triage, are you familiar with that?
14     A.   I don't know the specifics of it, no.
15     Q.   Well, other than the fact that it showed up on
16 this report, had you ever heard of OS Triage before this
17 date?
18     A.   Just in brief conversations with him before the
19 execution of the search warrant.
20     Q.   On that date during the meeting or even prior?
21     A.   It would have been prior to that.
22     Q.   When did you first visit with Detective Iversen
23 about his helping you on this case?
24     A.   I don't recall the exact date.
25     Q.   Do you recall when you first met Detective
                                                            50

1  Iversen, period, in life?
2      A.   No.  I don't recall that either.
3      Q.   Had you ever worked on other cases with
4  Detective Iversen prior to this Nader case?
5      A.   Yes, I believe so.
6      Q.   How many cases?
7      A.   My guess would be a couple.
8      Q.   And did those cases -- were you the lead on
9  those or assisting?
10     A.   I would have been assisting.
11     Q.   Did they involve cyber crimes not limited to
12 child pornography but any sort of a cyber crime?
13     A.   We did have one that I was assisting on.  He was
14 investigating.  I don't recall if it was before or after
15 the search warrant.  It had to do with the Papillion
16 purge, which was basically boyfriends were posting to a
17 web page photos of their girlfriends that had sent them
18 photos and so he was investigating that.
19     Q.   Were these illegal photos or just unauthorized
20 photos?
21     A.   I believe they were a mix of both.
22     Q.   During your previous times that you worked with
23 Detective Iversen, you think at some point the
24 conversation mentioned OS Triage?
25     A.   I believe we discussed it briefly, yeah.
                                                            51

1      Q.   Were you aware that this was the first time in
2  actual police work Detective Iversen was using OS
3  Triage?
4      A.   I don't believe so.
5      Q.   You don't believe --
6      A.   I don't believe I was aware of that.
7      Q.   Have you ever used any equipment or software or
8  programs to run analysis on computers?
9      A.   No.
10     Q.   You've not had any training in that at all?
11     A.   No.
12     Q.   And then there was another piece of equipment I
13 think he called a Tableau.  Did you see him have that out
14 there on the site?
15     A.   No.
16     Q.   That's something that you get these flash drives
17 with and can hook it through and look at it on a different
18 screen or do analysis of that.  Is that your recollection
19 from his testimony?
20     A.   Yeah.  I seem to recall him talking about
21 that.
22     Q.   Any training on the use of that piece of
23 equipment?
24     A.   No.
25     Q.   Anything similar?
                                                            52

1     A.  No.
2     Q.  Again, there is just no training on any
3  equipment that would aid in the forensic analysis of
4  computers; is that accurate?
5     A.  No.  I have none.
6     Q.  Okay.  How did you choose the officers that you
7  were going to have come with you to do this execution of
8  the search warrant?
9     A.  Detective Stigge had successfully served one or
10 two similar search warrants and investigations.  Iversen
11 was the -- at the time working with the child exploitation
12 task force in some degree, and so from our policy, it says
13 to work with either La Vista, Douglas County, or NSP.  So
14 we worked closely with La Vista.  They were the optimal
15 choice being that Iversen worked with the task force.
16    Q.  Stigge, did he have experience in the use of
17 that forensic equipment?
18    A.  Not to my knowledge.
19    Q.  So you needed a computer guy?
20    A.  Yes.
21    Q.  And the computer guy you chose was Iversen?
22    A.  Yes.
23    Q.  You had worked with Iversen before.  When you --
24 you're not sure if you worked with him on a cyber crime
25 before or after this -- is that accurate -- before or
                                                        53

1  after March 17th?
2     A.  I don't know the exact date.
3     Q.  When you worked with him and when you asked him
4  to assist you on this particular situation, did you
5  inquire as to his training?
6     A.  I asked if he was able to do on-site previews.
7  He told me he was.
8     Q.  That's as far as it went, Are you able to do
9  on-site previews?
10    A.  No.
11    Q.  Did it go further than that?
12    A.  Not that I know of.
13    Q.  So that was the extent of your inquiry into his
14 ability to assist you, you just asked him if he was okay
15 to do on-site previews?
16    A.  Yes.
17    Q.  And did that -- what was your intent when you
18 were asking that?  Did he know how to run the equipment or
19 did he know what he was looking for?  What was your
20 intent?
21    A.  Yes, if he was able to run the equipment and had
22 been trained on it.
23    Q.  How to plug it in and run it?
24    A.  Yeah.
25    Q.  Because nobody else there that day had that
                                                        54

1  knowledge as far as you understand?
2     A.  Not to my knowledge.
3     Q.  Papillion has certain policies with respect to
4  how their officers are supposed to perform in situations
5  like this, correct?
6     A.  I don't know that I understand your question.
7     Q.  Well, you know -- do they -- does Papillion
8  instruct you on, say, warrantless arrests?
9     A.  Yes.
10    Q.  And what was the instruction you recall having
11 received from Papillion regarding warrantless arrests?
12    A.  We do have a policy.
13    Q.  What is that policy to your knowledge?
14    A.  Arrest and citation in lieu of arrest.
15    Q.  With respect to the arrest, not the citation in
16 lieu of arrest, the arrest, that's taking physical custody
17 and removing, correct?
18    A.  Yes.
19    Q.  That's what happened here?
20    A.  Yes.
21    Q.  With respect to that procedure in a warrantless
22 situation, what's the policy as you understand it from
23 Papillion?
24    A.  You have to have probable cause and you have to
25 complete an affidavit of probable cause when the arrest is
                                                        55

1  made.
2     Q.  And the probable cause has to be that a crime
3  has been committed?
4        MR. KUNHART:  Objection.  Form and foundation.
5     Q.  (By Mr. Tjaden)  Is that your understanding?
6  You say "probable cause."  What do you mean by "probable
7  cause"?
8     A.  Yes, that a crime has been committed and that
9  the person you're taking into custody was likely the
10 person who committed that crime.
11    Q.  And so you need to know the elements of the
12 crime that you're talking about, right?
13    A.  Correct.
14    Q.  And as far as the elements of possession of
15 child pornography, you may have received some description
16 of those back in 2006 at the academy, but you hadn't
17 received anything up until the execution of this warrant,
18 correct?
19    A.  Are you talking about training or me actually
20 educating myself?
21    Q.  I'm talking about training.  That was your
22 earlier testimony, that you had the 2006 training but
23 nothing up until this date?
24    A.  Not that I recall.
25    Q.  Now you've raised the issue of you with respect
                                                        56

1  to your personal education.  What are you doing by way of
2  personal education on these matters?
3      A.  Anytime we're assigned an investigation, one of
4  the things we will do or I will do is review the state
5  statute.
6      Q.  So you reviewed the state statute on possession
7  of child pornography when you are given this assignment?
8      A.  Yes.
9      Q.  You recall having done that, going to --  Where
10 do you get it?
11     A.  You can get it from the statute book, the
12 Nebraska statute book, or you can go to any state statutes
13 website and you can pull it up on there.
14     Q.  Is that what you did?
15     A.  I don't recall which I did in this instance.
16     Q.  What do you recall the elements of the crime
17 being as you're going out to the home to execute the
18 search warrant?
19     A.  Intentionally or knowingly possessing -- I don't
20 remember the exact wording -- basically, that has a child
21 as one of its perpetrators or actor.
22     Q.  You're the guy who is going to make the decision
23 whether or not to place Mr. Nader or whomever under arrest
24 in this case, right?
25     A.  Yes.
                                                        57

1      Q.  And you do that review of the statutes anytime
2  you get an assignment?
3      A.  Usually, yes.
4      Q.  This was the first assignment involving
5  possession of child pornography?
6      A.  No.
7      Q.  As the lead?  I thought we've already
8  established that.
9      A.  Remember, I said there was the one in
10 December.
11     Q.  Well, okay.  So in December, did you check the
12 statutes for that one?
13     A.  Yes, I would have.
14     Q.  Did you talk with Ms. Miralles and did she give
15 you any instruction at that time as to what the elements
16 are and what you should be looking for in terms of
17 evidence of each element?
18     A.  I don't recall talking to her.
19     Q.  In this instance when you consult the statute,
20 do you consult them in terms of what is needed to prove a
21 specific element of the crime?
22     A.  I don't know that I'm following you.
23     Q.  Well, you say you were looking at the statute in
24 the day --  When was it -- when you just get the
25 assignment?
                                                        58

1      A.  Usually, it's towards the first couple of days
2  when I get the assignment, yes.
3      Q.  When did you get this assignment?
4      A.  Which one are we talking about?
5      Q.  We're talking about the one with Mr. Nader's
6  residence.
7      A.  I believe that was on December 22nd.
8      Q.  And so when do you recall having consulted the
9  statutes?
10     A.  I don't recall the exact date.
11     Q.  Well, was it before the end of the year?
12     A.  I don't recall.
13     Q.  When you consulted the statutes, you were
14 reading what is required, what the elements are; is that
15 accurate?
16     A.  Yes.
17     Q.  Do you read or consult anything that tells you
18 what evidence is needed to establish any of those
19 elements, and if so, where do you get that information?
20 Because it's usually not in the statutes.
21     A.  I don't recall reading that in the statute.
22     Q.  Did you go anywhere else to read it?  You're
23 telling me you look at the statutes.  So other than
24 looking at the statutes and reading the description of the
25 crime, do you do any other research to determine the
                                                        59

1  elements or what evidence is necessary to be able to
2  establish an individual element?
3      A.  Yes.
4      Q.  And what is that?
5      A.  I discussed it with Detective Stigge who had
6  been through that, who had done a couple of those
7  investigations and also been to some training on such
8  investigations.
9      Q.  When did you discuss this with Stigge?
10     A.  When I was assigned the report.
11     Q.  When you did what?
12     A.  When I was assigned the report.
13     Q.  Back in December of '14?
14     A.  Yes.
15     Q.  And what did you ask him?
16     A.  I don't remember the specific questions.
17     Q.  Generally?
18     A.  Just asked him kind of the general steps in
19 order on how we need to approach this type of
20 investigation.
21     Q.  And did you talk about eventually you will
22 probably seek a search warrant?
23     A.  Yes.
24     Q.  And did you talk to him about what evidence you
25 would look for in order to establish any of the elements
                                                        60

Exhibit B to Zachary Lutz-Priefert's Affidavit

1 of this crime?
2    A.  Yes.
3    Q.  What did he tell you with respect to what
4 evidence you should look for to establish any elements of
5 this crime?
6    A.  Obviously, the images themselves or videos
7 themselves.
8    Q.  During the search, you're looking to see, first
9 of all, if you could find any images or videos?
10   A.  Correct.
11   Q.  If I'm not mistaken, in this case, none of that
12 was found; is that accurate?
13       MR. KUNHART:  Objection.  Form and foundation.
14   A.  I had that before the actual search warrant.
15   Q.  (By Mr. Tjaden)  I'm talking about in this
16 search.  Is it accurate that none of that was found as a
17 result of this search on March 17th?
18       MR. KUNHART:  Objection.  Form.
19   A.  Am I supposed to answer?
20   Q.  (By Mr. Tjaden)  Yes.
21   A.  Iversen informed me during the search warrant
22 that he had a hit on a possible -- one possible.
23   Q.  All right.  And we'll get into that more in
24 depth, but as far as -- And I think Detective Iversen
25 said that that was a hit on a hash value.  Is that your
61

1 recollection?
2    A.  Yes.
3    Q.  He didn't look at any images according to his
4 testimony.  Is that your recollection?
5    A.  Yes.
6    Q.  So as far as on March 17th at the home of Paul
7 Nader, there were no images identified; is that
8 accurate?
9        MR. KUNHART:  Objection.  Form and foundation.
10   A.  I had already seen the images and identified
11 them prior to the search warrant.
12   Q.  (By Mr. Tjaden)  Again, my question isn't
13 concerning that.  My question is, on March 17th, at the
14 home of the Naders, there were no images found; is that
15 accurate?
16       MR. KUNHART:  Objection.  Form and foundation.
17   A.  Not at the home, no.
18   Q.  (By Mr. Tjaden)  There were no images at the
19 home?
20   A.  No.
21   Q.  We're getting double negatives here, and it's my
22 fault, not yours.  Just to be very clear, am I correct in
23 understanding that at the home on March 17th, there were
24 no images found?
25       MR. KUNHART:  Objection.  Form and foundation.
62

1        MR. VALENTINO:  I'll object to that, also.
2    Q.  (By Mr. Tjaden)  Am I correct in that?
3        MR. KUNHART:  Objection.  Form and foundation.
4    A.  No.
5    Q.  (By Mr. Tjaden)  What am I wrong on?  I tried to
6 make it easy to avoid the double negative.  If you're
7 saying I'm not correct that there were no images found,
8 then tell me how I'm wrong.
9    A.  Well, you still have to do the forensic
10 processing of the computers, so no images were found on
11 the scene, no.
12   Q.  That's what I'm talking about.  That's my
13 question.  So no images are found on the scene?
14   A.  No.
15   Q.  And the only indication of any potential child
16 pornography on the scene on that day was Detective Iversen
17 saying, We've got a hit on a possible hash value of -- a
18 potential hash value of a possible child pornography?
19       MR. KUNHART:  Objection.  Form.
20   Q.  (By Mr. Tjaden)  Is that correct?
21   A.  Yes.
22   Q.  And you yourself, we know, didn't do any of the
23 forensic analysis.  You didn't open any photos, open any
24 files.  You didn't do any of that, right?
25   A.  On scene, no.
63

1    Q.  Now, you keep talking about on scene versus
2 something else.  Was there more stuff done later?
3    A.  Well, the computers were forensically analyzed
4 later.
5    Q.  Much later, right?
6    A.  Yes.
7    Q.  And there was an analysis done within the next
8 12 hours or 24 hours, no longer than that, by Detective
9 Iversen on that suspected possible child pornography hash
10 value, right?
11   A.  Yes.
12   Q.  And what did he tell you about that?
13   A.  He told me that that did not come back to an
14 image that he could prove was child porn.
15   Q.  So that one ended up being nothing?
16   A.  Apparently, yes.
17   Q.  And then there was also an investigation -- you
18 talked about this other piece of equipment that looked at
19 all the flash drives and external hard drives, right?
20   A.  I'm sorry?
21   Q.  That was done on site, the use of this Tableau
22 to hook up those flash drives?
23   A.  I was not a part of that.
24   Q.  No.  That was done by Detective Iversen?
25   A.  Yes.
64

1    Q.   Did he tell you before Mr. Nader was placed
2  under arrest that the results of his having run that
3  analysis through those hard drives was that he did not
4  observe any child pornography-related file names?
5    A.   I don't recall what he told me about that.
6    Q.   All right.  And then you do recall him talking
7  about the OS Triage program that was run on the ENVY, and
8  that was where there was a -- I want to get the words
9  right -- he identified one hash value of interest,
10 right?
11   A.   Yes.
12   Q.   And then he also said he identified 23 keyword
13 hits.  Do you know what a keyword hit is?
14   A.   I do not.
15   Q.   So whatever Detective Iversen testified, you
16 defer to his description or defining those?
17   A.   Yes.
18   Q.   Did you inquire of him what the hash value of
19 interest was?
20   A.   Can you explain the question?
21   Q.   You're telling us that he told you that he had
22 one hit on the ENVY of a hash value of interest?
23   A.   Yes.
24   Q.   Do you know what a hash value is?
25   A.   I was informed it was, as Iversen explained it

65

1  the other day, like a digital fingerprint of an item that
2  were already precategorized as possible child porn.
3    Q.   When were you given that description or
4  definition?
5    A.   I don't remember if it was before the search
6  warrant or at the search warrant.
7    Q.   Have you ever done any work with hash values
8  yourself?
9    A.   No.
10   Q.   Do you have any idea what they mean in terms of
11 comparison of one photo to another?
12   A.   The only thing I know is that each item has its
13 own hash value like a fingerprint and although the file
14 name can be changed, the hash value will stay the same.
15   Q.   As long as the photo is the same, or do you know
16 that?
17   A.   I don't know that.
18   Q.   I mean, you can crop photos, you can change
19 them, you can take two very similar photos, but when you
20 compare them, they're going to be -- Well, do you know
21 how they compare them?
22   A.   No.
23        MR. KUNHART:  You want to take a break?
24        MR. TJADEN:  Sure.
25        (Brief recess.)

66

1    Q.   (By Mr. Tjaden)  A couple of items came to my
2  attention that I want to just go clear up.  I've been
3  asking in terms of the number of search warrants that you
4  were involved in and we've established that since you
5  become a detective as to one or two search warrants, none
6  of which -- again, this is prior to March 17th -- none of
7  which were related to child pornography.  But I also want
8  to ask --  And you mentioned the one child pornography
9  case prior to this one, which was the investigating
10 attorneys, right?
11   A.   Right.
12   Q.   And were you the lead investigator on that
13 one?
14   A.   Yes.
15   Q.   How many cases were you the lead investigator on
16 prior to March 17th once you became a detective, so in
17 that year or so, how many cases do you recall being the
18 lead investigator on?
19   A.   I don't know for sure.  I probably do an average
20 between 30 and 50 cases a year would be my guess.
21   Q.   That's as the lead investigator?
22   A.   Yeah.
23   Q.   And those are going to encompass all crimes?
24   A.   Yes.
25   Q.   Now, you talked about this one that you were, I

67

1  guess, directed by Ms. Miralles to investigate the lawyers
2  or asked by her to investigate the lawyers?
3    A.   Yes.
4    Q.   Did that involve a gentleman from Offutt Air
5  Force Base?  Was he the defendant in that underlying
6  case?
7    A.   No.
8    Q.   Who was the --  Not a name.  Give me a bit of
9  background information on who the defendant was in that
10 case that the lawyers were representing.  Do you have any
11 idea?  I mean, you were working on it.
12   A.   Yeah.  You want the name?
13   Q.   I don't want the name.  Just tell me, was he
14 a --
15        MR. VALENTINO:  It's probably public record.
16 Just ask him the name.  State vs. Who?
17   A.   It's David Eblin.
18   Q.   (By Mr. Tjaden)  You don't recall whether he was
19 or you know he was not in the Air Force?
20   A.   No.  He worked for TSA.
21   Q.   Were you familiar with a situation at Offutt in
22 the months prior to this in which there had been an
23 investigation of a child pornography ring?
24   A.   No.
25   Q.   You didn't have any role in that investigation

68

1 at all?

2    A.    No.

3    Q.    You were not familiar with that investigation?

4    A.    No.

5    Q.    Had you discussed that -- in any of your

6 discussions with any of the other officers or detectives

7 or Ms. Miralles, that topic of a prior child pornographic

8 ring centered around Offutt didn't take place?

9    A.    Not that I recall.

10    Q.    You had information going into this search as

11 background on both Mr. and Mrs. Nader?

12    A.    Yes.

13    Q.    Did you know that he was a former Air Force

14 member?

15    A.    Yes.

16    Q.    Did you know she was a current Air Force

17 member?

18    A.    Yes.

19    Q.    So you knew there was an affiliation with Offutt

20 for both of them?

21    A.    Yes.

22    Q.    Now, we had been talking about these hash

23 values, and it's my understanding, you're just not that

24 familiar with the hash value?

25        MR. KUNHART:  Objection.  Form.

69

1    Q.    (By Mr. Tjaden)  Is that correct, other than to

2 know that -- to believe it's a digital fingerprint of an

3 image?

4    A.    Other than that basic definition, no.

5    Q.    And the hash value itself doesn't tell you if

6 it's an image of child pornography?

7    A.    It can.

8    Q.    How?

9    A.    From my understanding is -- like I said, it's a

10 digital fingerprint of that image.  Some of those images

11 have already been flagged as child pornography.  So a hash

12 value could then identify one that's potentially child

13 porn.

14    Q.    In order to be child porn, you have a known hash

15 value, right?

16    A.    Yes.

17    Q.    And then there is a hash value on an item that

18 might be on a piece of equipment, right?

19        MR. KUNHART:  Objection.  Form.

20    Q.    (By Mr. Tjaden)  Do they carry the same

21 identical hash values, or do you know?

22    A.    I don't know that I understand.

23    Q.    Detective Iversen said you can't really tell --

24 regardless of the hash value, you can't really tell that

25 an image -- or a hit of a hash value on the computer is

70

1 actually child pornography until you look at that image

2 with that hash value as found on the equipment.  Do you

3 recall his testimony to that effect?

4    A.    Yes.

5    Q.    Would you agree with that, disagree, or don't

6 have the knowledge and have to defer to what he said?

7    A.    I would not have the knowledge and probably

8 defer.

9    Q.    Did anybody discuss that with you?  Was there

10 any training from the City of Papillion or in any of your

11 training that would allow you to answer that question

12 other than, I would have to defer to Detective Iversen?

13    A.    No.

14    Q.    Did Detective Iversen tell you that day -- I

15 understand he told you he had a suspected hash value?

16    A.    Yes.

17    Q.    Did he tell you that in order to be sure whether

18 or not this is child pornography, we have to actually look

19 at the image?

20    A.    He told me he was trying to observe the image

21 and was having difficulty for some reason with the program

22 moving slow, as he said in his testimony -- deposition.

23 That's what I was informed.

24    Q.    Did you know -- He's telling you he's trying to

25 observe it.  Did he tell you why he was trying to observe

71

1 it?

2    A.    To confirm it.

3    Q.    So prior to that, he hadn't -- it was your

4 understanding he hadn't confirmed that it was an illegal

5 image?

6    A.    Correct.

7    Q.    And couldn't confirm it until he actually saw

8 it?

9    A.    Yes.

10    Q.    Did he ever come back to you before he left the

11 residence that day and say, I was able to look at it and I

12 did confirm it?

13    A.    No.

14    Q.    So when he leaves, there is still no

15 confirmation that there is an illegal image on that

16 computer; is that correct?

17    A.    No.

18        MR. KUNHART:  Objection.  Form and foundation.

19    Q.    (By Mr. Tjaden)  That's wrong?

20    A.    Huh?

21    Q.    That's wrong, or are we in our double

22 negatives?

23    A.    You're confusing me again.

24    Q.    At the time that Detective Iversen leaves, there

25 was still no confirmation that there was an illegal image

72

1  on that ENVY computer, right?
2         MR. KUNHART:  Objection.  Form.
3     A.  Not from the preview.
4     Q.  (By Mr. Tjaden)  From anywhere else?
5     A.  The CyberTips that I had received prior to that,
6  yes.
7     Q.  So all you really have is the CyberTip.  You
8  don't have anything else.  The search didn't reveal
9  anything else?
10    A.  No.
11    Q.  It did not reveal?
12        MR. KUNHART:  The search at the home?
13        MR. TJADEN:  The search at the home.
14    A.  We did not get an image verification at the
15 home.
16    Q.  (By Mr. Tjaden)  What you got was Detective
17 Iversen telling you there was a certain hash value of
18 interest to him, right?
19    A.  Yes.
20    Q.  And he told you that he was having a hard time
21 opening it to confirm what it was?
22    A.  Yes.
23    Q.  And when he left, he hadn't confirmed it yet?
24    A.  Correct.
25    Q.  So when he leaves, to the best of your
                                                    73

1  knowledge, based upon what Iversen told you, there was no
2  confirmation of an illegal image on that computer?
3         MR. VALENTINO:  Asked and answered.
4         MR. KUNHART:  Objection to form.
5     Q.  (By Mr. Tjaden)  Go ahead.
6     A.  Ask the question again.  I was distracted.
7         MR. TJADEN:  We'll accept your objections on the
8  re-reading.  You don't need to make them again.
9         I understand how that takes your attention away.
10        Could you re-read that for us?
11        (Record read as requested.)
12    A.  There was no confirmation, no.
13    Q.  (By Mr. Tjaden)  Do you know what the Tanner
14 methodology is?
15    A.  No.
16    Q.  What was the purpose of removing all of that
17 equipment and taking it back to, say, the police
18 department?
19    A.  So that we could have a computer forensic expert
20 examine everything thoroughly.
21    Q.  And perhaps identify and confirm that there were
22 illegal images on the computer?
23    A.  Yes.
24    Q.  Now, you did an incident report on this?
25    A.  Yes.
                                                    74

1     Q.  As the lead investigator, that's your primary
2  responsibility in terms of -- you are the person primarily
3  responsible in terms of the reporting?
4     A.  Yes.
5     Q.  Others do incident reports related to what they
6  did on the job?
7     A.  In this case?
8     Q.  Iversen, for example, he did his own report?
9     A.  A supplemental report, yes.
10    Q.  Any other officers do supplemental reports on
11 this matter, or detectives?
12    A.  Just the forensic experts, Deshaw and Shelby
13 Mertins.
14    Q.  Their work was done significantly after
15 March 17th?
16    A.  Yes.
17    Q.  When you -- you had to fill out reports probably
18 from the very first day you began as an officer with the
19 police department?
20    A.  Yes.
21    Q.  Traffic reports, accident reports, et cetera?
22    A.  Yes.
23    Q.  What training did you receive and from whom with
24 respect to how do you do a report?
25    A.  There was some training I received at the
                                                    75

1  academy, and then there was also more training when you're
2  going through field training program.
3     Q.  How about when you became a detective, did Chief
4  Lyons give you any instruction?
5     A.  No.
6     Q.  Sergeant Payton give you any instruction?
7     A.  I don't recall if he did.
8     Q.  Anything you recall from reviewing the policies
9  or procedures of Papillion Police Department instructing
10 you on reporting?
11    A.  I've referred to the policies referencing
12 reporting, yes.
13    Q.  We have the policies, but what do you recall the
14 direction given under the policies for reporting
15 purposes?
16    A.  I don't know that I understand the question.
17    Q.  Well, what do the policies of the Papillion
18 Police Department require when preparing your reports?
19    A.  That you state the facts to the complete
20 investigation, make sure you include the elements of the
21 crime and whether or not they're met.
22    Q.  Now, your role in this execution of the search
23 warrant was to secure Mr. Nader.  You got him off for an
24 interview, right?
25    A.  Yes.
                                                    76

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    Q.   And did you do anything else?  Did you look for
2    items?
3    A.   Briefly.
4    Q.   Where did you look?  What was that part of the
5    search for you?
6    A.   When I met with the other officers that were
7    searching, I did do a little bit of searching upstairs.  I
8    had found some items under the bed, I believe some hard
9    drives.  So I briefly assisted in searching the rest of
10   the bedroom.
11   Q.   These are just locating hard drives, and you're
12   not previewing them?
13   A.   No.
14   Q.   Did you locate any CDs or DVDs?
15   A.   I don't recall.
16   Q.   One of the reasons I'm asking is that I've
17   looked at your incident report, and it gives an inventory
18   of matters taken from the home.
19   A.   Yes.
20   Q.   It refers to an evidence recording audio visual,
21   and then the description is, DVD CyberTip from ICAC?
22   A.   ICAC.
23   Q.   What is ICAC?
24   A.   Internet Crimes Against Children.  It's the unit
25   in Nebraska State Patrol that investigates cyber crimes.

                                                            77

1    Q.   So when your description says, DVD CyberTip from
2    ICAC --
3    A.   Yes.
4    Q.   -- is that a DVD that was found at the property
5    or is that a DVD that you had prior to this?
6    A.   No.  I had that prior.
7    Q.   And so these first two items that are listed are
8    both DVDs.  So the two DVDs are not items that were
9    obtained as a result of the search; is that accurate?
10   A.   Yes.
11   Q.   I suspect the policies of Papillion want you to
12   be accurate in your reporting?
13   A.   Yes.
14   Q.   They want you to review it for errors?
15   A.   Yes.
16   Q.   I think we had a couple of errors in this one,
17   didn't we?
18   A.   Yes.
19   Q.   Did you review it before signing off on it?
20   A.   Yes.
21   Q.   Just missed the errors?
22   A.   Yes.
23   Q.   One of them that we're talking about is the
24   date.  You had a date on here about something occurring on
25   March 31st.  I'm looking at your affidavit.  We'll get

                                                            78

1    into this a little more, but I just want to talk about the
2    errors.  There was one on --
3    MR. VALENTINO:  Is that an exhibit, by the way,
4    Counsel?
5    MR. TJADEN:  Not yet.
6    MR. VALENTINO:  Why don't you mark it.
7    MR. TJADEN:  Because mine is all marked up.
8    Why don't we go ahead and mark both the
9    affidavit and the incident report.
10   (Exhibit Nos. 25 and 26 marked.)
11   Q.   (By Mr. Tjaden)  Again, we'll get into the
12   affidavit more thoroughly later, but one of the problems
13   you find with your affidavit is the paragraph 13.  Your
14   search warrant application incorrectly identified the date
15   you received responsive records from CenturyLink as
16   March 31st as opposed to March 3rd, so that was most
17   likely a typo or something, right?
18   A.   Yes.
19   Q.   And then I think there is another correction
20   made with respect to the conversation you may have had
21   with Ms. Miralles, right?
22   A.   Yes.
23   Q.   You hadn't reviewed or at least hadn't detected
24   those two problems with your application for the search
25   warrant or your incident report prior to signing it and

                                                            79

1    making it part of the file?
2    A.   No.
3    Q.   When did you first realize those two mistakes?
4    A.   I didn't realize that until this process had
5    started.
6    Q.   And "this process," you don't mean filing of
7    this lawsuit, right?  Or do you mean just the preparation
8    for the deposition or the discussion with somebody with
9    respect to your affidavit?
10   A.   With discussion to the affidavit and my report,
11   yeah.
12   Q.   Who prepared this affidavit for you?
13   A.   I was assisted by Ryan Kunhart in preparing
14   this.
15   Q.   Do you know why you were asked to prepare an
16   affidavit like this?
17   A.   I believe it was for a qualified immunity.
18   Q.   For whom?
19   A.   For summary judgment for all of us.
20   Q.   For all of you?
21   A.   Yes.
22   Q.   Did you have any discussions with Ms. Miralles,
23   now Ms. Hessig, in the preparation of this affidavit?
24   A.   No.
25   Q.   How about with her attorney, Mr. Valentino?

                                                            80

1    A.    No.
2    Q.    One thing I didn't ask you in the beginning,
3  what did you review in preparation for this deposition?
4    A.    I reviewed this affidavit.  I reviewed my
5  reports.
6    Q.    The application for the warrant?
7    A.    Yes, I believe so.
8    Q.    Did you review the report of Detective
9  Iversen?
10   A.    Briefly, as well as the reports from Deshaw and
11 Shelby Mertins.
12   Q.    And again, those are reports that were generated
13 as a result of work done by those two individuals in the
14 weeks following March 17th?
15   A.    Yes.
16   Q.    Weeks or months?
17   A.    Yes.
18   Q.    Who pointed out the errors that you had made
19 that you reference in your affidavit?
20   A.    Mr. Kunhart.
21   Q.    As to both the March 31st potential typo and the
22 references to Ms. Miralles?
23   A.    Yes.
24   Q.    You hadn't noticed those on your own review?
25   A.    No.
                                                    81

1    Q.    Did you review the affidavit before signing
2  it?
3    A.    Yes.
4    Q.    Does it contain any errors?
5    A.    Not that I observed.
6    Q.    Did you talk to Detective Iversen about the
7  preparation of that affidavit?
8    A.    No.
9    Q.    With respect to the reporting that was done and
10 particularly Detective Iversen's reporting, did you talk
11 to him about how he should prepare his report -- his
12 incident report?
13   A.    No.  I just requested his supplemental report.
14   Q.    You didn't tell him what it is you would like to
15 see in the reports or what you feel should be in those
16 reports?
17   A.    No.
18   Q.    When did you find out that that hash value of
19 interest was nothing?
20   A.    I don't recall.
21   Q.    Do you read his reports when he gives them to
22 you?
23   A.    Yes.
24   Q.    So his report is dated the 18th, I believe, the
25 day after this search warrant.  Was that when you would
                                                    82

1  have known that the hash value of interest was nothing,
2  was not child pornography?
3    A.    I don't recall.
4    Q.    The information was available to you on that
5  date?
6    A.    I don't know that it was because he may have
7  turned it into his department, but I may not have received
8  it for a couple of days after.  I don't recall.
9    Q.    You don't know if -- you didn't have a
10 requirement of anybody working with you on that and
11 charged with doing a supplemental report that they would
12 turn that into you, the lead officer, that could turn it
13 into somebody else?
14   A.    I don't know how I got it.  I don't recall.
15   Q.    Did you give Detective Iversen the hash values
16 from the tip prior to his doing a preview on-site?  Did
17 you share that information with him?
18   A.    Not that I recall.
19   Q.    How about a description of the images?
20   A.    Not that I recall.
21   Q.    That wouldn't have mattered because he didn't
22 see any images, right?
23        MR. KUNHART:  Objection.  Form.
24        MR. VALENTINO:  Asked and answered.
25   Q.    (By Mr. Tjaden)  He didn't see anything,
                                                    83

1  right?
2    A.    Can you rephrase the question?
3    Q.    It wouldn't have mattered if you described the
4  images for him because it's your understanding Detective
5  Iversen didn't look at any pictures, see any images
6  on-site?
7    A.    I don't know if he did.
8        MR. KUNHART:  Objection.  Form.
9    Q.    (By Mr. Tjaden)  How about file names -- did you
10 give him any file names before the search?
11   A.    No.
12   Q.    Did Detective Iversen explain to you or give you
13 any information about any concerns he was having during
14 the running of the OS Triage on the ENVY?
15   A.    I believe he told me it was running slow.
16   Q.    Okay.  Was there anything about Mr. Nader that
17 caused you concern as to his being a potential flight
18 risk?
19   A.    Yes.
20   Q.    And what was that?
21   A.    He stated he was a Colombian refugee, so he has
22 ties elsewhere.
23   Q.    Okay.  Let's talk about that.  He stated he was
24 a Colombian refugee?
25   A.    He stated that's how he came over here.
                                                    84

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    Q.  And I do note you missed a mistake in your
2  report.  Colombia is C-O-L-O-M-B-I-A.  This isn't the
3  University or Kansas or Missouri or whatever.
4         MR. KUNHART:  And Iversen works for La Vista,
5  not Papillion.
6         MR. TJADEN:  Well, he was on loan to Papillion
7  on this date.
8         MR. KUNHART:  And he testified he worked for La
9  Vista.  You had it as Papillion right off the bat, and I
10  told you that, too.
11         MR. TJADEN:  On this date, he worked for
12  Papillion.
13    Q.  (By Mr. Tjaden)  Is it your understanding he was
14  working with you in assisting you in a matter that the
15  Papillion police were investigating?
16    A.  He was assisting us, yes.
17    Q.  Working for you on a matter the Papillion police
18  were investigating?
19    A.  He doesn't work for Papillion.
20    Q.  He was working on a matter you were
21  investigating?
22    A.  Yes.
23    Q.  I understand he's not an employee of Papillion;
24  is that right?
25    A.  Correct.

                                                          85

1    Q.  But when you enlist the help of people from
2  other agencies, do you pay them for that?
3         MR. KUNHART:  Objection.  Foundation.
4    A.  No.
5    Q.  (By Mr. Tjaden)  When you send your officers to
6  other agencies, do the other agencies pay them or do
7  you?
8         MR. VALENTINO:  Objection to form and
9  foundation.
10    A.  That's not my department.  That's not what I
11  deal with.
12    Q.  (By Mr. Tjaden)  So tell me more about this
13  Colombian refugee status.  He told you that during his --
14  the interview you had with him; is that right?
15    A.  Yes.
16    Q.  Did you determine that from anything you had
17  done leading up to the execution of the warrant?
18    A.  No.
19    Q.  You had a lot of information on him, right?
20    A.  Yes.
21    Q.  You knew he was a homeowner, owned property?
22    A.  Yes.
23    Q.  You knew he was formerly in the Air Force?
24    A.  Yes.
25    Q.  You knew he was married?

                                                          86

1    A.  Yes.
2    Q.  You knew his wife was currently in the Air
3  Force?
4    A.  Yes.
5    Q.  You knew they had minor children?
6    A.  Yes.
7    Q.  You knew the minor children were enrolled in
8  school?
9    A.  Yes.
10    Q.  So other than what you believe you were told by
11  Mr. Nader that he was a Colombian refugee, was there
12  anything else that concerned you as his being a flight
13  risk?
14    A.  No.
15    Q.  And he didn't tell you he was a Colombian
16  refugee.  You knew he was a U.S. citizen, right?
17    A.  I did not know that.
18    Q.  His family and relatives are in Colombia?
19    A.  Yes.
20    Q.  Have you ever assisted the Bellevue Police
21  Department agency on matters that they were
22  investigating?
23    A.  Yes.
24    Q.  In other words, they have a lead officer and
25  you're doing something to assist them?

                                                          87

1    A.  Are you talking about an investigation or on the
2  road?
3    Q.  How about an execution of -- Well, no, scratch
4  that.
5         Let's talk about the arrest.  Now, whose
6  decision was it to arrest Paul Nader?
7    A.  It was mine.
8    Q.  Looking back at your report, we have --  Scratch
9  that.
10         First of all, you said an incident report was
11  prepared by Dudas?
12    A.  No.
13    Q.  By who else?  You said somebody else did an
14  incident report besides Iversen?
15    A.  Supplemental reports were done by Deputy Deshaw,
16  the Cyber Crimes Task Force, and Shelby Mertins.
17    Q.  Just those two?
18    A.  Yes.
19    Q.  Who was Dudas?
20    A.  He was the evidence technician.
21    Q.  And he was on-site?
22    A.  Yes.
23    Q.  I didn't check.  Is he listed here?  He's not
24  listed on your list of people there (indicating).  Why is
25  that?

                                                          88

DEPOSITION OF: Bryan Svajgl                                                    Pages 89-92

1    A.   He's not an officer, so I --
2    Q.   What is he?
3    A.   He's our evidence technician.
4    Q.   It sounds like a pretty important guy if you're
5  giving everything to him to log in.  Do you typically
6  leave him off of the incident reports?
7    A.   I suppose.  I don't know that I've put him on
8  there before or not.
9    Q.   Can I see Exhibit 26 for a second?
10   A.   (Witness tenders document to counsel.)
11   Q.   On that exhibit, there is a listing again of the
12 property that was taken subject to the search, right?  I
13 think it's on page 2 of 16 actually.
14   A.   This one (indicating)?
15   Q.   No, page 2 of 16.  Go back to the beginning.
16      MR. KUNHART:   This says 19.
17      MR. TJADEN:   Why do you have three extra pages?
18 I'll direct you.
19   Q.   (By Mr. Tjaden)  So you're on page 14 then.
20 That's the list of all items taken.  That says, Search of
21 the residence produced the following items which were
22 collected as evidence, right?
23   A.   Yes.
24   Q.   And that list then is intended to be a list of
25 things that were actually found and gathered from a search
                                                           89

1  of the residence?
2    A.   That's what I intended.
3    Q.   And you say that's what you intended, but that's
4  not how it turned out?
5    A.   Obviously, I see the DVDs of the CyberTips on
6  here, which were not taken from the residence.
7    Q.   Other than the DVDs that are referenced there,
8  is it your testimony everything else was actually stuff
9  confiscated during the search of the residence?  Take a
10 moment to look through everything.
11   A.   Yes.
12   Q.   Now, the decision to make the arrest was your
13 decision?
14   A.   Yes.
15   Q.   And you had a tip from NCMEC, right?
16   A.   Yes.
17   Q.   And you had reviewed those images and actually
18 seen the pictures themselves prior to executing the search
19 warrant?
20   A.   Yes.
21   Q.   But you never identified those as being at the
22 property on March 17th?
23   A.   Can you rephrase the question?
24   Q.   On March 17th, you hadn't identified that any
25 images from the tip were at the residence.
                                                           90

1    A.   I don't know that I'm following you.
2    Q.   On March 17th, when you're doing the search --
3    A.   Correct.
4    Q.   And you have done the search and you have all of
5  these items that are on the incident report with the
6  exception of the first two because you had those before?
7    A.   Right.
8    Q.   Those two are the tip, right?
9    A.   Right.
10   Q.   So you weren't able during the search to locate
11 those images at the property?
12      MR. KUNHART:   Objection.  Form.
13   A.   No.
14   Q.   (By Mr. Tjaden)  No, I was not able to locate
15 them?
16   A.   No.
17   Q.   Please finish your sentence.
18   A.   No.  We did not locate those images.
19   Q.   Okay.  So at the time of the decision to make
20 the arrest, you had the tip.  What else did you get as a
21 result of the search that led to you making the arrest?
22   A.   I already had probable cause to make the arrest.
23 I just needed to confirm some things.
24   Q.   So you already had probable cause, and you
25 believe what you already had that gave you probable cause
                                                           91

1  were the tips?
2    A.   The images from the tips, yes.
3    Q.   And did you talk with anybody prior to going to
4  execute the search and inquire as to whether those images
5  that you had received on the tip gave you probable
6  cause?
7    A.   I may have discussed it with Detective Stigge.
8    Q.   Do you recall specifically?
9    A.   No.
10   Q.   You made a phone conversation at some point to
11 County Attorney Miralles?
12   A.   Yes.
13   Q.   Did you discuss with her that the only thing you
14 have were the confirmed -- I'm sorry -- were the images
15 from the tip?
16   A.   That's not the only thing we had.
17   Q.   I'm asking you, what else did you have?
18   A.   We also -- so it all -- the pieces come
19 together, and that's what I explained to her.  So we had
20 the images.  We knew that the images were loaded up to the
21 SkyDrive by Microsoft.
22   Q.   That's the tip?
23   A.   Yes.  The SkyDrive account came back to Wadith
24 Nader or the e-mail wadith@- -- is it okay if I refer to
25 the report to find it?
                                                           92

WEYANT REPORTING   (402) 345-5202

Exhibit B to Zachary Lutz-Priefert's Affidavit

1  Q.  Sure.
2  A.  Wadith@hotmail.com.  So we had that information.
3  We also had an IP address which we verified through
4  CenturyLink as coming back to Wadith Nader and that
5  address.  And speaking with Mr. Nader, he confirmed that
6  was his e-mail address.  He also confirmed that he had
7  moved some images over that possibly were uploaded to the
8  SkyDrive and was aware that's probably how his e-mail
9  account got locked up from Microsoft.
10  Q.  No discussion as to those being child
11  pornography?
12  A.  I did have discussion with the gal who -- or the
13  Ms. Browder from ICAC who sent the images.
14  Q.  I'm talking about discussions with Mr. Nader
15  himself.
16  A.  Yes.
17  Q.  That he believed those that had been transferred
18  over were child pornography?
19  A.  No, he did not.
20  Q.  If you believed you had probable cause before
21  going to the residence, why did you not get an arrest
22  warrant for him?
23  A.  Because as I explained, we needed to verify,
24  confirm a couple of things:  The computer that was used,
25  the e-mail address that was used, the person and the

93

1  method of how they were uploaded.
2  Q.  With respect to verifying and confirming certain
3  items, you say computer used.  What did you do -- what was
4  discovered to confirm the computer used?
5  A.  I asked Mr. Nader which computer was used and he
6  explained the HP ENVY.
7  Q.  Computer used for whenever he's on the system?
8  A.  His main computer, yes.
9  Q.  Then you did a preview of that?
10  A.  Yes.
11  Q.  And again, that preview didn't show you
12  anything?
13  MR. KUNHART:  Objection.  Form and foundation.
14  A.  No.
15  Q.  (By Mr. Tjaden)  Person -- what did you do to
16  confirm or verify a person?
17  A.  I spoke with Mr. Nader.
18  Q.  And what did he say that gave you confirmation
19  or verification?
20  A.  He identified himself, his e-mail address, the
21  issue with his account being locked down, and that he
22  possibly had moved some images up to the SkyDrive.
23  Q.  Anything about other people having access to
24  that computer or using that computer?
25  A.  He said he's the one that uses that computer.

94

1  Q.  Did he say nobody else is allowed to use the
2  computer, nobody else has his passwords?
3  A.  I don't recall.  I'd have to review my report.
4  Q.  Detective Iversen mentioned some things that are
5  normally looked at to determine if somebody is involved in
6  this type of activity.  I think he referenced that you
7  look for encryption programs or encryption software.  Are
8  you aware of that or familiar with that?
9  A.  I'm not familiar with it, no.
10  Q.  Did Detective Iversen tell you there was no
11  encryption software on this particular computer?
12  A.  Not that I recall.
13  Q.  Evidence of trading or sharing files, did he
14  tell you there was no evidence of trading or sharing files
15  on this computer?
16  A.  Not that I recall.
17  Q.  Evidence of going to chat rooms, did he tell you
18  there was no evidence of going to chat rooms following his
19  preview of this computer?
20  A.  Not that I recall.
21  Q.  And any evidence of going to the dark web or
22  going to Tor?  You know what Tor is?
23  A.  No.
24  Q.  Did he give you any indication as to whether
25  there was any evidence of going to the dark web?

95

1  A.  No.
2  Q.  Mr. Nader made no admissions that he had
3  downloaded any child porn, did he?
4  A.  No.
5  Q.  He had indicated to you that he believes his
6  computer had been hacked prior to this, did he not?
7  A.  He did say it was hacked, I believe, in 2012.
8  Q.  So did you do anything to confirm, verify, or
9  check yourself whether there had been any evidence of
10  trading, encryption, chat room visits, or dark web visits
11  on the day of the arrest?
12  A.  No.
13  Q.  So I understand then, you had the tip, and in
14  addition to the tip, you're saying what you got out of a
15  result of this search was confirmation that the IP address
16  was his.  He owned the ENVY.  Is that it?
17  A.  And the e-mail address was his.
18  Q.  And the e-mail address was his.  Okay.  Why did
19  you call the county attorney's office?
20  A.  To confer with her or the on-call attorney.
21  Q.  Tell me a little bit about you say she's the
22  on-call attorney.  I know you had worked with her before
23  when she, I guess, was involved in that other case?
24  A.  Yes.
25  Q.  Did you reach out to her or did she reach out to

96

1  you in that December case?
2      A.  She reached out to me.
3      Q.  In this particular instance, did you have any
4  involvement or discussion with County Attorney Miralles or
5  anybody in the county attorney's office on the Nader case
6  before that phone call?
7      A.  Other than their assistance in having a judge
8  sign the search warrant, no.
9      Q.  Who assisted you in that?
10     A.  I don't recall.
11     Q.  Was it Ms. Miralles?
12     A.  I do not recall.
13     Q.  So again, I'm kind of wondering if you believed
14  before you went out there that you already had probable
15  cause but you wanted to confirm some things and you go out
16  there and you told me what it is that you believe you
17  obtained to confirm.  Why did you call the county
18  attorney?  Were you asking them to advise you on what you
19  should do next?
20     A.  No.  I was asking them what their thought was on
21  the situation, if they agreed there was probable cause or
22  had some ideas of something else we may need to look at.
23     Q.  You had looked at everything that you felt
24  necessary to look at?
25     A.  Yes.

97

1      Q.  What exactly did you tell Ms. Miralles?  Because
2  that's where we get a little bit of difference from your
3  report and your affidavit.  As we sit here today, what do
4  you recall telling Ms. Miralles?
5      A.  I remember telling her the basic details of the
6  case, that we had received CyberTips of initially two
7  images and then an additional five and that three of those
8  images that had been uploaded to Microsoft SkyDrive by
9  e-mail wadith@hotmail.com.
10     Q.  It sounds like for that part you told her all
11  about the tip.
12     A.  You stopped me.  I wasn't finished.
13     Q.  I'm going to try to fast-forward.  You told her
14  about the tip?
15     A.  Yes.
16     Q.  What did you tell her about what you found
17  on-site during your execution of the search warrant?
18     A.  I informed her that we found some computer
19  equipment, several hard drives, and that during the
20  preview, we had a hit of one possible hash value but that
21  there was also -- I had been informed there was lots of --
22  a large quantity of pornography categorized on the
23  computer.
24     Q.  And there's certainly nothing illegal of having
25  a large portion of pornography on one's computer, right?

98

1  You would agree with that?
2          MR. VALENTINO:  Objection.  Form and
3  foundation.
4          MR. KUNHART:  Same objections.
5      Q.  (By Mr. Tjaden)  Adult pornography?
6      A.  No.
7      Q.  There was nothing in the preview that suggested
8  this was child pornography?
9      A.  No.
10     Q.  So you tell her that there is a possible hash
11  value and lots of porn?
12     A.  Yes.
13     Q.  What else did you tell her you were able to find
14  or locate that day?
15     A.  I informed her I was able to confirm his e-mail
16  address, we confirmed the IP address prior to going, and
17  that in discussion with Mr. Nader, he did say that he
18  possibly uploaded several hundred images to the
19  SkyDrive.
20     Q.  And again, he didn't describe what images or
21  didn't describe any as possible child pornography?
22     A.  He said he did not recall the images.
23     Q.  He also said he does not and never had searched
24  for child pornography?
25     A.  That's what he said.

99

1      Q.  Anything else you told Ms. Miralles?
2      A.  I informed her that there was other concerns.
3  He was home alone with his two children.
4      Q.  Weren't they in school?
5      A.  Well, his wife was out of town.
6      Q.  Why was that a concern?
7      A.  I was investigating someone for suspected
8  possession of child porn and to leave him alone with two
9  children, we had -- I wanted to -- I kind of questioned
10  doing that, the safety of the children.
11     Q.  What about somebody who might be in possession
12  of child pornography tells you that there is a threat to
13  children in the home with that person?
14     A.  I'm sorry?  I didn't catch all of that.
15     Q.  You were there investigating an issue involving
16  possession of child pornography?
17     A.  Yes.
18     Q.  But then you're concerned when you know his wife
19  is out of town of leaving the minor children there?
20     A.  Yes.
21     Q.  And it seems like we're making a jump to a
22  different crime here.
23     A.  Until we know that those children are safe,
24  we're not making a jump.  That's part of our job to
25  protect them.

100

1    Q.   I think in the application, there was reference
2  to what you were looking at is -- I'm seeing if this was
3  in the report.  When you submitted your search warrant
4  application to Judge Hutton, your affidavit says you had
5  the belief and probable cause to believe that the premises
6  of Mr. Nader were being used for the purpose of concealing
7  or keeping evidence related to the possession and
8  distribution of child pornography.  That's what you put in
9  your search warrant, right?
10   A.   Yes.
11   Q.   Concealing or keeping evidence related to the
12 possession of child pornography.  Now, once again, you
13 didn't find anything that would have supported concealing
14 or keeping evidence related to the possession and
15 distribution of child pornography as a result of that
16 search, did you?
17   A.   Not on scene.
18   Q.   Not on scene.  Okay.  You also say, And
19 attempted sexual assault of a child?
20   A.   Yes.
21   Q.   What is that about?
22   A.   Well, that is that those images we saw were
23 images of children and so our concern is are children
24 being assaulted as well or being forced to pose for these
25 images.

101

1    Q.   Specifically, the Nader children?
2    A.   That's something when we investigate child porn
3  in which kids are in the home or the person has access to
4  the children we have to investigate.
5    Q.   What would a person be called who perpetrates a
6  sexual assault of a child be?  What do you call those
7  people?
8    A.   Pedophile.
9         MR. KUNHART:  Objection.  Form and foundation.
10   Q.   (By Mr. Tjaden)  "Pedophile," is that what you
11 call it?
12   A.   I suppose.
13   Q.   So what you're telling us here is that basically
14 when you're talking about somebody who is suspected of
15 possession of child pornography, you're basically also
16 suspecting them of being a pedophile?
17        MR. KUNHART:  Objection.  Form and foundation.
18   A.   That's kind of a hypothetical.
19   Q.   (By Mr. Tjaden)  Well, then answer it
20 hypothetically.
21   A.   Until we've ruled out that option, yes.  That's
22 part of our duty for those kids.
23   Q.   So when someone -- you would -- you personally
24 then -- when you see something referencing possession of
25 child pornography, you also are thinking pedophile?

102

1         MR. KUNHART:  Objection.  Form and foundation.
2    Q.   (By Mr. Tjaden)  This is you, so you should have
3  the foundation to answer.
4    A.   So hypothetical again, not necessarily, but I
5  still have a duty if they have access to children.
6    Q.   If they have access to children?
7    A.   I need to make sure that those children are safe
8  and haven't been assaulted or photographed, whatever.
9    Q.   So then you talked to Ms. Miralles and confirmed
10 the e-mail, confirmed the IP address, confirmed that there
11 had been images -- unknown images uploaded.  Did you tell
12 Ms. Miralles that Iversen had been unable to confirm the
13 hash value of interest at that time of being child
14 pornography?
15   A.   I believe so.
16   Q.   What did she respond to you when you told her
17 that the hash value of interest had not been confirmed to
18 be child pornography?
19        MR. VALENTINO:  Object to the form of that
20 question.  Calls for speculation and conjecture.
21        MR. KUNHART:  I'll join.
22   A.   I don't recall.
23   Q.   (By Mr. Tjaden)  You don't recall her
24 response?
25   A.   No.

103

1    Q.   But you believe you told her that?
2    A.   I believe so.
3    Q.   What evidence do you believe you were able to
4  secure at the site that supported -- that was evidence of
5  Mr. Nader's having knowingly possessed child
6  pornography?
7    A.   The fact that we had the images that were
8  uploaded to the cloud and he corroborated that he possibly
9  uploaded several hundred images to the cloud.
10   Q.   Tell me about when you say he corroborated that
11 he possibly uploaded several hundred images -- or several
12 images.  Did he give you a number?  A lot, right?
13   A.   I have to refer to my report.
14   Q.   The fact that he told you that, Yeah, I may have
15 had images uploaded, did you inquire how that may have
16 happened?
17   A.   Yes.
18   Q.   What did he tell you?
19   A.   He said that he was dragging a bunch over to put
20 in another folder and possibly clicked on the wrong
21 folder.
22   Q.   And what does that -- where is the evidence in
23 that statement that he knowingly had child pornography?
24        MR. KUNHART:  Objection.  Form.
25   A.   Just because he's not telling me he knows

104

Exhibit B to Zachary Lutz-Priefert's Affidavit

1  doesn't mean that's true.
2      Q.   (By Mr. Tjaden)  I know.  I'm not asking you
3  that.  My guess is --  And again, I watch enough episodes
4  of COPS.  They're not always going to -- they'll say, I
5  don't have anything in my pocket, and then they'll find a
6  crack pipe in their pocket.
7      A.   Exactly.
8      Q.   But what I'm asking is, what about that
9  statement was evidence of him knowingly doing that?
10     A.   Because it corroborated the fact that child porn
11  was uploaded to his SkyDrive and that he possibly did
12  it.
13     Q.   "Possibly did it"?
14     A.   As he put it.
15     Q.   Well, he didn't say he possibly did child
16  pornography; he said he possibly uploaded images,
17  correct?
18     A.   Yes.
19     Q.   In your application for the search warrant, one
20  of the things you set forth is that --  Well, first of
21  all, who helped you draft this application?
22     A.   Myself and Detective Stigge.
23     Q.   And if you want to look at -- I think that's
24  Exhibit 25, which is -- the application is attached to
25  that.
                                                        105

1      A.   Which application are we talking about?
2      Q.   Application for search warrant.  It's an exhibit
3  in that.  At page 5 of the application, Exhibit A to
4  Affidavit of B. Svajgl, paragraph 14:  Your Affiant knows
5  from training and experience that searches and seizures of
6  the computer-related evidence may require the seizure of
7  most or all computer-related items.
8          What training and experience do you recall
9  receiving that lets you put that into your affidavit?
10     A.   Training I had with Speaking with Children, the
11  computer Internet stuff there.
12     Q.   And that sentence goes on to say, To be
13  processed later by a qualified person in a laboratory or
14  other controlled environment.  What's the purpose of
15  that?
16     A.   Where is that at?
17     Q.   That's continuing the first sentence in
18  paragraph 14.
19     A.   In a controlled environment, is that what you're
20  asking?
21     Q.   Well, processed later by a qualified person?
22     A.   Yes.
23     Q.   So that's the idea.  You go out and get the
24  stuff, take it, and have it analyzed?
25     A.   Yes.
                                                        106

1      Q.   It says, continuing on to the next page, Due to
2  time constraints -- again in that top line beginning of
3  the first full sentence -- this sorting process renders it
4  impractical to attempt this kind of data analysis on-site.
5  What does that mean?
6      A.   Due to the lengthy time it takes to do forensics
7  on a computer, as I understand it, to actually try to do
8  that on -- I mean, it takes hours, sometimes weeks to
9  process one device.  So there is not that time to do that
10  on-site while you're serving a search warrant.
11     Q.   Then further down in that paragraph, it says,
12  Since computer-related evidence is extremely vulnerable to
13  tampering or destruction (either from external sources or
14  from destructive code imbedded in the system as a "booby
15  trap"), the controlled environment of a laboratory may be
16  required for its complete and accurate analysis.
17          Do you see that?
18     A.   Yeah.
19     Q.   What do you mean by "vulnerable to tampering"
20  such as destructive codes and booby traps?
21     A.   Kind of the encryption that you mentioned
22  earlier.  Somebody could have it encrypted.  Somebody
23  could have a device somewhere else that they could then
24  shut down or wipe their computer.
25     Q.   And that's the purpose for taking it all with
                                                        107

1  you?
2      A.   Yes.
3      Q.   And taking it into a controlled environment?
4      A.   Yes.
5      Q.   And then what you're looking for is to make sure
6  what you've gotten is complete and accurately analyzed?
7      A.   Yes.
8      Q.   Assisting investigators may conduct an
9  investigation of the computer hardware on-site using
10  hardware and software that will not alter or change any
11  potential evidence located on the computer hardware.
12  That's the last part of that top paragraph.
13     A.   Okay.
14     Q.   And that was done in this case?
15     A.   Yes.
16     Q.   By Detective Iversen?
17     A.   Yes.
18     Q.   Can you conduct a warrantless arrest on a tip
19  alone?
20     A.   No.  Well, I guess that's kind of a hypothetical
21  question.  More than likely, it depends on the situation
22  and you need to gather certain evidence or more evidence,
23  but that's a hypothetical question.
24     Q.   Is that something that the City of Papillion
25  would have told you, You need more evidence, you can't
                                                        108

Exhibit B to Zachary Lutz-Priefert's Affidavit

1 just go on the tip alone?  Or did you learn that somewhere
2 else?
3     A.   That would probably be from just my overall
4 training and experience.  You have to look at every
5 avenue.
6     Q.   Well, do you recall there being any policy on
7 that from the City of Papillion?
8         MR. KUNHART:  On what?
9         MR. TJADEN:  On you can't arrest on a tip alone,
10 you need to do other verifying and confirming -- find
11 other verifying and confirming evidence.
12    A.   I don't recall.
13    Q.   (By Mr. Tjaden)  So you're on the phone with
14 Ms. Miralles.  You tell her about the tip.  You tell her
15 about the confirmation of the e-mail address, the IP
16 address, the fact that there is an ENVY computer in there
17 that Mr. Nader has used.  You tell her that he said, Yeah,
18 I mean, I may have transferred some images over.  Did you
19 specifically tell her that he denied having possessed any
20 child pornography?
21    A.   Yes.
22    Q.   And you also believe, if I'm not mistaken, that
23 you told her that the hash value of interest had not been
24 confirmed to be child pornography?
25    A.   Yes.
                                                         109

1     Q.   Do you recall telling her anything else?  I
2 think you said that you told her he was alone with the
3 kids.
4     A.   I think we discussed that and probably also the
5 firearms in the residence and the chemicals in the garage
6 which had been -- which were -- I don't know if they had
7 been checked at that time or not.
8     Q.   That was my next question.  You found firearms.
9 When you were at the scene, do you do any sort of checking
10 or verifying whether the firearms are illegally
11 possessed?
12    A.   I did not.  I believe the search team did some
13 of that.
14    Q.   You mentioned chemicals in the garage.  Can you
15 recall calling the bomb squad out to look at that?
16    A.   I don't believe I did.
17    Q.   Do you recall them coming out to look at it?
18    A.   Yes.
19    Q.   You know how long it took after you first got
20 onto the premises that the bomb squad arrived?
21    A.   I don't recall how long.
22    Q.   How long were you on the premises in total?
23    A.   I don't recall an exact time.  It was a few
24 hours.
25    Q.   When the bomb squad left, had you been assured
                                                         110

1 that there was no issue related to those chemicals?
2     A.   That's what we were informed, yes.
3     Q.   Had you placed Mr. Nader under arrest prior to
4 the bomb squad leaving?
5     A.   I don't recall.  I'd have to refer to my report
6 if it's in there.
7     Q.   Is it in your report?  Why don't you take a
8 look.
9     A.   I don't know if it is or not.  I don't recall.
10    Q.   You don't recall if the bomb squad had come and
11 gone prior to your conversation with Ms. Miralles?
12    A.   I don't recall.
13    Q.   Did you already place Mr. Nader under arrest
14 before calling Ms. Miralles?
15    A.   No.
16    Q.   In any event, when the bomb squad left, there
17 was no reason to be concerned of the chemicals?
18        MR. KUNHART:  Objection.  Foundation.
19    A.   That's what we were informed.
20    Q.   (By Mr. Tjaden)  Did you have any reason --
21 other than having been informed, Don't worry about it, did
22 you have any reason to continue to worry about it?
23    A.   No.
24    Q.   One of the changes that appear between your
25 affidavit, which is on file or to be filed in the lawsuit,
                                                         111

1 and your incident report concerns Ms. Miralles.  In
2 paragraph 38 on page 11 of your affidavit, you say you
3 explained the evidence discussed above that I had gathered
4 during my investigation.  Are we talking -- again, with
5 respect to evidence that had been gathered, you're
6 referring only to those items that were taken at the house
7 and confirmation of the IP address, et cetera?
8     A.   And the images that were uploaded to the
9 SkyDrive.
10    Q.   But you didn't gather those --  That's just
11 gathered during your investigation, not at the house,
12 right?
13    A.   Which paragraph are we looking at?
14    Q.   38.  Those are just gathered during the
15 investigation, not gathered at the house, right?
16    A.   Yeah.  That's during the investigation.
17    Q.   You say then that you stated to Ms. Miralles,
18 paragraph 39, that you believed you had probable cause to
19 believe a crime had been committed based on the evidence
20 gathered in your investigation and the execution of the
21 search warrant, and she agreed?
22    A.   Yes.
23    Q.   And so I want to distinguish the two things you
24 have on either side of that word "and."  You have evidence
25 gathered in your investigation and the execution of the
                                                         112

1  search warrant.  The evidence gathered during your
2  investigation was the tip; is that accurate?
3      A.   There was more than that.
4      Q.   What was there that was more than that?
5      A.   The evidence gathered during the investigation
6  we've discussed.
7      Q.   Well, it seems to me that you had some evidence
8  that was before the execution of the warrant and some
9  evidence after the execution of the warrant.
10     A.   Yes.
11     Q.   And so the evidence gathered in your
12 investigation in that sentence, does that refer to all of
13 it before and after?
14     A.   Yeah.
15     Q.   And then there is the word "and" the execution
16 of the search warrant.
17     A.   Okay.
18     Q.   So what are we specifically talking about with
19 respect to the execution of the search warrant?  Again,
20 the confirmation of the IP --
21     A.   The corroboration with him and then the
22 electronic devices we gathered from the home.
23     Q.   What did those gathering of the electronic
24 devices from the home -- what about that led you to
25 believe a crime had been committed?

113

1      A.   Because we had a possible hit that I was
2  informed of.
3      Q.   But also informed of no confirmation of it?
4      A.   At the time, yeah.
5      Q.   It subsequently was confirmed not to be?
6      A.   Yes.
7      Q.   And then on the next page, page 12 on paragraph
8  40, I reviewed my incident report previously filed and it
9  incorrectly states that during my conversation with
10 Ms. Miralles that she agreed to take custody of Mr. Nader.
11 That's what your incident report says, right?
12     A.   Yes.
13     Q.   Your incident report says, She, Ms. Miralles,
14 agreed to take custody of Wadith Nader based on the
15 previous confirmed photographs that were reported to be
16 uploaded to the Microsoft drive.  That's what you stated
17 there in the incident report?
18     A.   Which page is that on?
19     Q.   15, I believe.
20     A.   Okay.
21     Q.   So when you did this report -- which you did
22 within the day or the same day of that telephone
23 conversation?
24     A.   Same day, yeah.
25     Q.   So on the same day you had the telephone

114

1  conversation, you write in your report the one that you're
2  to be accurate on and to put all the facts on that
3  Ms. Miralles agreed to take custody of Mr. Nader based on
4  the previous confirmed photographs, right?
5      A.   Yes.
6      Q.   But now, two years later, you don't recall it
7  that way?
8      A.   I misworded it in the report.
9      Q.   What is it that it was misworded?  That she
10 agreed to take custody?
11     A.   Yes.
12     Q.   Is the rest of it still accurate?
13     A.   Yes.
14     Q.   What did she do?  Instead of agreeing to take
15 custody, what is it that she did?
16     A.   She agreed with me that there was probable
17 cause.
18     Q.   Now, is the part here about -- that you state in
19 your incident report, Based on the previous confirmed
20 photographs, accurate?
21     A.   Yes.
22     Q.   That doesn't say anything about what you found
23 at the site?
24     A.   That was already in the report.
25     Q.   You don't make a change in your affidavit

115

1  related to the last sentence of your incident report that
2  says, Miralles advised that the county attorney's office
3  would amend additional counts after the analysis of
4  digital evidence was complete, if needed.  What does that
5  mean?
6      A.   I believe originally -- I don't remember how
7  many counts were charged originally, but after the
8  forensics were done with the computers, they could add
9  additional if they found more child porn.
10     Q.   You had seven images when you went to the house
11 on your mind that day, right?
12     A.   Yes.
13     Q.   You charged him on three?
14     A.   Yes.
15     Q.   And then why did you charge only on three?
16     MR. VALENTINO:  Object to the form of the
17 question.  He can't charge anybody.  It's the county
18 attorney's office that does that.
19     MR. TJADEN:  All right.
20     Q.   (By Mr. Tjaden)  Explain to me then --  How many
21 charges did you arrest him on?
22     A.   The three counts.
23     Q.   Why three instead of seven?
24     A.   Three because we had three confirmed known
25 victims of child porn that were confirmed by CVIP.  So I

116

DEPOSITION OF: Bryan Svajgl                                              Pages 117-120

1  initially charged with the three as I discussed with -- or
2  I believe I discussed with Ms. Miralles.
3       Q.  That raises the question you say you discussed
4  something about three.  That's not in either the affidavit
5  nor the incident report.  So what do you recall discussing
6  with Ms. Miralles?
7       A.  This far out, I don't know.  I don't recall.
8       Q.  That's part of the problem with being this far
9  out.  You don't recall.  You would agree that what you can
10 look at to give you the best recollection is what you
11 wrote on the same day?
12          MR. VALENTINO:  I'll object to the form of that
13 question.  Move to strike the question as being
14 argumentative.
15          MR. KUNHART:  Also, object on form.
16      Q.  (By Mr. Tjaden)  Go ahead and answer.
17      A.  What's the question again?
18      Q.  Well, would you believe or agree that what you
19 write on the same day is more accurate than what you
20 remember two years later?
21          MR. KUNHART:  Objection.  Form.
22          MR. VALENTINO:  Argumentative.
23      A.  Do you want me to give you a full explanation?
24      Q.  (By Mr. Tjaden)  Yeah.  Give me a full
25 explanation.
                                                            117

1       A.  Okay.  When I wrote this report, I -- typically
2  when I write an affidavit after I make an arrest, I will
3  write it as the report and then submit it as the affidavit
4  for arrest as well because I try to be very thorough with
5  what I do, as much as I can.  However, after you've worked
6  a full shift all day, you're going to make some mistakes.
7  Usually, I will re-read and try to correct those mistakes.
8  Sometimes you miss them.
9       Q.  In this case, did you miss it or did you not
10 re-read it or what?
11      A.  What are we talking about?
12      Q.  Well, the mistakes.
13      A.  Not every detail gets put in a report.
14      Q.  Well, these are some -- these aren't "every"
15 details.  These are some details that are very specific,
16 that you were advised by Ms. Miralles they would take
17 custody.  So what is it that --
18      A.  She agreed we had probable cause.
19      Q.  But what is it that triggered your recollection
20 two years later that that was a mistake that you put in
21 your report?
22      A.  Reviewing it and reading it.
23      Q.  Reviewing what?
24      A.  Reviewing the report.
25      Q.  Could you look at your incident report -- the
                                                            118

1  incident report?  If you go to page 3 of 19, it says,
2  Property Involved.  We've established that those first two
3  items listed under, Property Involved, the DVDs, were not
4  something that you found at the property, right?
5       A.  On the scene.
6       Q.  Well, at the property.  You didn't find them at
7  the property?
8       A.  You mean "property" meaning house?
9       Q.  Yeah.
10      A.  No.
11      Q.  You didn't find them on any of the computers at
12 any time later, right?
13      A.  Hold on.  Rephrase that.
14      Q.  Iversen didn't find them at any time later,
15 right?
16      A.  During his preview, no.
17      Q.  Or during his subsequent running of any further
18 analysis?
19      A.  Iversen did not.
20      Q.  Now, the next page, page 4, it says, Property
21 item, and it's No. 0003.  Do you see that?
22      A.  Yes.
23      Q.  That's a white data traveler?
24      A.  Yes.
25      Q.  If you look over there, it says, Evidence:  Yes.
                                                            119

1  Do you see that?
2       A.  Yes.
3       Q.  What does that mean?
4       A.  I would assume it means evidence, but I don't
5  know.
6       Q.  Original Status Date, what does that mean?
7       A.  I don't know.
8       Q.  Current Status Date, what does that mean?
9       A.  I don't know.
10      Q.  Is this report something that's
11 computer-generated or do you have to type in these --
12 like, how did the word -- the description "FB MAAS 457,"
13 how did that get put onto this "Property Involved"
14 section?
15      A.  I don't know.  I did not do this.
16      Q.  Who did this?
17      A.  I don't know.
18      Q.  Well, this is your case.  This is an incident
19 report you signed.  You don't know how this got into the
20 system?
21      A.  This is not part of my incident report or it
22 prints out different after clerical enters it.  I don't
23 know.
24      Q.  So you think this is something clerical
25 entered?
                                                            120

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    A.  Possibly.
2    Q.  Where would they have gotten the information to
3  fill in that line on description, "FB MASS 457: GRAY HP
4  LAPTOP"?
5    A.  Property sheets.
6    Q.  And who does the property sheets?
7    A.  In this case, Todd Dudas.
8    Q.  He's the guy who is logging stuff in?
9    A.  The evidence tech, yeah.
10    Q.  But you don't know what "Original Status" and
11  "Current Status Date" mean?
12    A.  No.
13    Q.  Can you tell me who does know what that means?
14    A.  No.
15        MR. KUNHART:  How much more do you have, Chris?
16        MR. TJADEN:  How much are you going to have?
17        MR. VALENTINO:  How about we take a break?  It's
18  been an hour and a half.
19        (Brief recess.)
20    Q.  (By Mr. Tjaden)  Detective Svajgl, while you
21  were at the house conducting the search up until any point
22  you left, did you see any members of the media out
23  there?
24    A.  I believe I was told media had arrived.
25    Q.  Had you seen any trucks or anything?
                                                              121

1    A.  I don't recall.
2    Q.  Have you been on searches when the media arrives
3  before?
4    A.  I don't recall.
5    Q.  Do you know how the media would have become
6  aware of what was going on?
7    A.  No.
8    Q.  Did you speak with anybody involved with the
9  media while you were at the residence?
10    A.  No.
11    Q.  At any point in time, did you ever speak with
12  anybody involved with the media on this case?
13    A.  No.
14    Q.  Do you know, did the police department issue a
15  statement about this case to the media?
16    A.  I don't recall.
17    Q.  If they did, do you know who would have made
18  that statement?
19    A.  Usually, our lieutenants are the only ones
20  authorized to speak with the media.
21    Q.  There was a -- an article that appeared on the
22  KETV NewsWatch 7 website, and it refers to this incident.
23  If somebody at the scene was the person talking to the
24  media, would that be noted in your incident report?
25    A.  No.
                                                              122

1    Q.  Who is Lieutenant Orin Orchard?
2    A.  He is our -- he's one of our lieutenants at the
3  PD.  I don't know what division he's over.  He's over the
4  investigation division, but I don't know what his proper
5  title was at the time.
6    Q.  Is that your division?
7    A.  Yes.
8    Q.  Did you report to him on this matter?
9    A.  Possibly.  I don't recall.
10    Q.  Do you have any knowledge or information as to
11  where Lieutenant Orchard would have gotten his information
12  to give a statement to the media on?
13    A.  More than likely, they got some of the
14  information from me, but I don't recall.
15    Q.  Did you speak with any of the neighbors of the
16  Naders?
17    A.  I don't recall.
18    Q.  Either on that day or at any time after, you
19  don't recall?
20    A.  Okay.
21    Q.  Okay.  Now, you did talk with -- in part of the
22  investigation, you had indicated that one of your concerns
23  at least on the day of the arrest was to get him away from
24  the children because his wife was out of town, right?
25    A.  To keep the children safe, yes.
                                                              123

1    Q.  And when you removed him, what happened to the
2  children with his wife being out of town?
3    A.  I spoke with him.  He informed me his
4  mother-in-law, I believe, lived in town.  So with his
5  assistance, we made arrangements for her to get the
6  kids.
7    Q.  And then eventually, was this matter to your
8  knowledge turned over to Project Harmony or Child
9  Protective Services?
10    A.  I did work with Ms. Nader later to schedule
11  Project Harmony interviews for both of the kids.
12    Q.  Now, at some point within relatively a short
13  time after the execution of the search warrant, you became
14  aware that Detective Iversen had determined the one
15  suspected hash value was not child pornography?
16    A.  Yes.  I don't recall when.
17    Q.  And you knew that with that not having been
18  suspected of child pornography, on the physical equipment,
19  that those 23 keywords didn't tell you anything, right?
20        MR. VALENTINO:  Object on the form.
21    A.  I don't know what the keywords are.
22    Q.  (By Mr. Tjaden)  You knew that on the flash
23  drives and everything, the preliminary preview done by
24  Iversen didn't show any known child pornography?
25        MR. VALENTINO:  Asked and answered.
                                                              124

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Page 125**

```
 1    Q.  (By Mr. Tjaden)  You knew all of that.  So my
 2  question is, having known now that the suspected hash
 3  value was not child pornography, you continued to work
 4  with Project Harmony and keep the children away from
 5  Mr. Nader?
 6    A.  Yes.
 7    Q.  And at some point in time, you learned from
 8  Project Harmony Mr. Nader had undergone a psychological
 9  evaluation?
10    A.  I don't recall that.
11    Q.  Did you at any point in time learn that the
12  psychologist determined that they had 100 percent no
13  concerns in their examination of the children, that
14  something inappropriate had taken place?
15    A.  You're saying the children, not Mr. --  You're
16  confusing me on what you're asking.
17    Q.  Let's start with the children.  You're working
18  with Project Harmony?
19    A.  Correct.
20    Q.  At some point in time, did you learn that the
21  investigators or the psychologists at Project Harmony had
22  no concern whatsoever about the children being with their
23  father?
24    A.  What it is is we do forensic interviews with the
25  kids that are led by a child advocate interviewer who
```

**Page 126**

```
 1  that's what they do is forensic interviews with kids.  I
 2  was present for those interviews and met with Ms. Nader
 3  before and after, I believe, along with Mr. Nader's
 4  attorney, who was also present.  Those interviews did not
 5  reveal a concern.
 6    Q.  Do you recall when that was done?
 7    A.  I'd have to look at my report to get the exact
 8  date.
 9    Q.  What was the last work you did on this case?
10    A.  I don't recall.
11    Q.  Now, you've seen -- I assume you've seen the
12  complaint that was filed against you?
13    A.  Yes.
14    Q.  And you know there was an answer filed on your
15  behalf?
16    A.  Yes.
17    Q.  Did you review that answer?
18    A.  I believe so.
19    Q.  The answer raises as affirmative defenses that
20  the plaintiffs in this case, Mr. and Mrs. Nader, have
21  failed to mitigate their damages.  Do you know what that
22  means?
23    A.  Not exactly.
24    Q.  Did you -- when you read it and -- Did you give
25  the okay to file this, or do you know?
```

**Page 127**

```
 1    A.  Yeah.
 2    Q.  Okay.  And so that's an affirmative defense, and
 3  it's something that as an affirmative defense you have to
 4  prove at trial.  So I'm wondering, what evidence do you
 5  have that would prove the plaintiffs had failed to
 6  mitigate their damages?
 7        MR. KUNHART:  I'll object.  Form and
 8  foundation.
 9    A.  I don't know.
10    Q.  (By Mr. Tjaden)  You also state that their
11  claims are subject to --  I'm going to tell you I do a lot
12  of defense work.  I know lawyers prepare this, and so the
13  individual client may not often know exactly what the
14  terms mean.  But you allege in your answer that
15  Plaintiffs' claims are subject to the Doctrine of
16  Avoidable Consequences.  Do you know what that means?
17    A.  No.
18        MR. TJADEN:  Ryan, do you have the copy of your
19  report, that initial report we did?
20        MR. KUNHART:  The Rule 26 report?
21        MR. TJADEN:  Yeah, that sets forth the elements.
22  On that one, you go into a bit more specificity.
23        MR. VALENTINO:  I think both of us did.
24        MR. TJADEN:  On the affirmative defenses.
25        MR. VALENTINO:  They are what they are.
```

**Page 128**

```
 1        MR. TJADEN:  Wait a minute.  We have it.  Never
 2  mind.
 3        MR. VALENTINO:  I think that was with respect to
 4  the negligence claims.
 5    Q.  (By Mr. Tjaden)  Defense 5 was failure to
 6  mitigate, Doctrine of Avoidable Consequences.  It talks
 7  about in here, Detective, that Plaintiff Wadith Nader, by
 8  the manner in which he voluntarily engaged in Internet
 9  activity, placed himself in a position to be subject to a
10  reasonable warrant for arrest and incarceration.  Then it
11  says, He had prearrest opportunities through his Internet
12  conduct to avoid the results but not avail himself of
13  those.
14        Do you have any evidence as to what the
15  prearrest opportunities would be?  Are you basically
16  saying he just shouldn't have downloaded any porn?
17    A.  Yes.
18    Q.  Even though downloading porn is not illegal?
19    A.  Well, hold on.  Child porn is illegal.
20    Q.  You say, Plaintiff Stacey Nader had an
21  opportunity to intervene to prevent her husband's
22  affirmation conduct but did not intervene.  Do you have
23  evidence that goes to what the opportunities to intervene
24  were and how she did not intervene?
25        MR. KUNHART:  Object on foundation.
```

1    Q.   (By Mr. Tjaden)  Again, I just want to know what
2  you're going to be testifying to.  There may be other
3  areas in which evidence may be developed, but I just want
4  to know what you as the current deponent has to offer in
5  that regard.
6    A.   Is that a question?
7    Q.   Yeah.
8    A.   No.  I don't have any.
9    Q.   It is then stated that Plaintiff Stacey Nader
10 had alternative choices available to her that would have
11 avoided her alleged lost job opportunity.  What evidence
12 do you have in that -- are you personally aware of in
13 regards to that statement?
14   A.   I don't know.
15   Q.   It says, She deliberately chose to incur this
16 purported loss for personal reasons unrelated to any
17 alleged wrongful conduct of the defendants.  What evidence
18 do you have with respect to that statement?
19   A.   Which statement?
20   Q.   That she deliberately chose to incur this
21 purported loss for personal reasons unrelated to any
22 alleged wrongful conduct of the defendants.  You were
23 present at her deposition.  Was there anything she said in
24 her deposition that you think supports a deliberate choice
25 to incur the loss?
                                                        129

1        MR. VALENTINO:  Objection.  Form and
2  foundation.
3        MR. KUNHART:  Same objections.
4    Q.   (By Mr. Tjaden)  Go ahead.
5    A.   No.  I don't know other than she's still married
6  to him.  She's still with him.
7    Q.   She's still what?
8    A.   She's still with him.
9    Q.   What's that got to do with --
10   A.   Reading that, that's what I would get.
11   Q.   What's that got to do with choosing to incur the
12 loss, which was the job loss that is being referred to,
13 for personal reasons?
14   A.   Oh, I don't know.
15       MR. TJADEN:  Detective, I believe that's all we
16 have.  Thank you.
17              CROSS-EXAMINATION
18 BY MR. VALENTINO:
19   Q.   Detective Svajgl, I just have a couple of
20 follow-ups for you on behalf of my clients.  You were
21 asked about a prior case that you were involved in with
22 Ms. Miralles on a child sexual assault.  Did you -- you
23 were the primary investigator on that child sexual
24 assault?
25   A.   Yes.
                                                        130

1    Q.   And that involved a case called State vs.
2  Eblin?
3    A.   Yes.
4    Q.   How old was the victim in that case?
5    A.   I believe 12.
6    Q.   Now, apparently, during the course of that case,
7  I'm gathering that there was a forensic interview done of
8  the victim?
9    A.   Yes.
10   Q.   And there was a report made to school
11 authorities at some point?
12   A.   I believe the school was aware.
13   Q.   Okay.  Now, at some point in time, there
14 surfaced an allegation that there were a photograph or
15 photographs of this victim; is that true?
16   A.   Yes.
17   Q.   And I'm gathering during the course of the
18 proceedings, there was discovery done between the parties.
19 In other words, the defense asked for certain items, the
20 prosecution asked for certain items back.  Were you part
21 of that process at all?
22   A.   Not that I recall.
23   Q.   Okay.  Who surfaced the report that there was
24 likely a photograph of this young girl?
25   A.   I was informed by Jennifer Miralles.
                                                        131

1    Q.   That?
2    A.   I think -- I can't recall without referring to
3  my report exactly, but I believe she said it came from the
4  mother.
5    Q.   And the mother -- do you know whether or not she
6  was supportive of her daughter or was she defending her
7  husband?
8    A.   She was more defending her husband.
9    Q.   But somewhere along the line, this photograph
10 allegation surfaced; is that true?
11   A.   Yeah.
12   Q.   Do you recall if the girl had indicated -- the
13 victim had indicated that her father had photographed her
14 possibly?
15   A.   No.
16   Q.   So given that there may be a photograph out
17 there, was there also an allegation that had been sent to
18 the defense lawyers in that case?
19   A.   That was the allegation, that they possibly had
20 the hard copy is what I understood.
21   Q.   In other words, that would be evidence
22 supporting the prosecution of this case, would it not, if
23 it existed?
24       MR. TJADEN:  Objection.  Form and foundation.
25   Q.   (By Mr. Valentino)  What I'm asking you is, in
                                                        132

1 the prosecution for a child assault, a naked photograph of
2 the victim taken by the perpetrator would be or could be
3 used as evidence in the case, could it not?
4     A.   It could.
5          MR. TJADEN:  Form and foundation.
6     Q.   (By Mr. Valentino)  You've been involved in that
7 prosecution, were you not?
8     A.   Yes.
9     Q.   Was the individual convicted?
10    A.   He was convicted.  I don't remember what the
11 final charges were.
12    Q.   Now, you were tasked with finding out whether or
13 not this photograph actually existed; is that true?
14    A.   Correct.
15    Q.   And you interviewed the defense lawyers?
16    A.   Yes.
17    Q.   Do you remember who the defense lawyer or
18 lawyers were?
19    A.   No.
20    Q.   In any event, the interviews that you had with
21 them were basically, We don't have that, true?
22    A.   Yes.
23    Q.   You wouldn't have expected them to give you
24 evidence against their client, would you?
25    A.   No.

                                                              133

1     Q.   So it didn't surprise you that they said, No,
2 did it?
3     A.   No.
4     Q.   But there was no further follow-up regarding
5 that, was there?
6     A.   No.  I didn't have enough evidence that the
7 photo existed or what it was.
8     Q.   So I mean, the mother wasn't going to tell you
9 that it existed, did she, or did the mother tell you it
10 existed?
11    A.   No.  I don't recall.
12    Q.   But in any event, you didn't have the personal
13 knowledge to go and try to get a search warrant for the
14 computers of the defense lawyers to find out if that
15 existed on their computers?
16    A.   No.
17    Q.   Do you know if the Defendant Eblin was convicted
18 of a felony?
19    A.   I don't recall.
20    Q.   But in any event, he was convicted?
21    A.   Yes.  I know he was convicted of something.
22    Q.   Was he sentenced to the penal institution?
23    A.   I don't recall.
24    Q.   Now, with respect to your --  There was a
25 question from Mr. Tjaden that you needed a computer guy

                                                              134

1 for the search and believed Iversen could do this.  The
2 only reason you needed a computer guy was why?
3     A.   To do an on-site preview.
4     Q.   But without the on-site preview, would you have
5 just taken the items that the judge had authorized you to
6 take and brought them back for forensic authorization?
7     A.   Yes.
8     Q.   So the computer guy, although he would be
9 somebody that you might be able to utilize, wasn't
10 essential to the seizure of the items that the judge told
11 you he could seize, was he?
12    A.   No.
13    Q.   And in terms of who had custody of Mr. Nader,
14 you actually had him cuffed when you entered that house,
15 didn't you?  Wasn't he already restrained?
16    A.   I believe so.
17    Q.   So you actually already had custody of Mr. Nader
18 albeit in his home, correct?
19    A.   Yes.
20    Q.   And that was true during the entire process of
21 him being interviewed?
22    A.   The cuffs were not on when he was interviewed.
23    Q.   When did those go on?
24    A.   I don't recall for sure, but typically, the
25 person is detained in handcuffs when we make the initial

                                                              135

1 entry for our safety while they're searched and the area
2 is checked.  I don't recall, but he was likely handcuffed.
3 And then once everything was safe and the room was safe,
4 we would have taken them off for the interview.
5     Q.   How long did that interview last
6 approximately?
7     A.   Approximately 105 minutes.
8     Q.   And was he seated somewhere in the house during
9 this interview?
10    A.   Yes.
11    Q.   Was he uncuffed during that interview?
12    A.   Yes.
13    Q.   What point in time do the cuffs come on again?
14    A.   When I informed him he was going to be placed
15 under arrest for the child porn.
16    Q.   And then you had custody of him at that point,
17 correct?
18    A.   Yes.
19    Q.   And then he was taken to the Sarpy County
20 Jail?
21    A.   Yes.
22    Q.   So the statement that was in your report that
23 Mr. Tjaden made reference to that the county attorney said
24 she would take custody of him was really kind of
25 nonsensical, was it not?

                                                              136

MR. TJADEN:  Objection.  Form and foundation.

Q.  (By Mr. Valentino)  It's inaccurate?

A.  Yes.

Q.  County attorneys can't take custody of anybody, can they?

A.  No.

Q.  They don't have power of arrest, do they?

A.  No.

Q.  But you do?

A.  Yes.

Q.  You've got the badge, you've got the gun, and you've got the certificate for law enforcement that allows you to do that, correct?

A.  Yes.

Q.  Especially if you have probable or reasonable cause?

A.  Yes.

Q.  And you believed you had that?

A.  Yes.

Q.  Now, let's say for the sake of argument that you had decided to take all the items out of the house that were listed on the search warrant, anything that could be Internet downloaded to, whether it's hard drives, phones, or any other electronic device that could hold data that could be downloaded or uploaded, whichever the Microsoft

137

tip said had occurred, those items could have simply been taken by you and Mr. Nader left at home, true?

A.  Yes.

Q.  But you could have gone back to the Court, used the same format that you had on your computer to swear out an arrest warrant, correct?

A.  Yes.

Q.  And the judge would have given that consideration and then either issued it or not?

MR. TJADEN:  Objection.  Form and foundation.

A.  Yes.

Q.  (By Mr. Valentino)  Now, when you went to Judge Hutton on the initial application for the search warrant, did you go by yourself?

A.  I don't recall.

Q.  Do you know how it was that you made the appointment to get into his chambers?

A.  I would have gone to the county attorney's office, met with one of the county attorneys, explained to them I needed a search warrant signed by a judge.  They usually escort us back to the judge's chamber, meet with the judge, and they'll read it and sign it or not sign it.

Q.  So Judge Hutton would have read your affidavit that you prepared and application in your presence?

138

A.  Yes.

Q.  And then he would have signed it in your presence?

A.  Yes.

Q.  And then would you have taken that and left?

A.  Yes.

Q.  Was anybody else in the room besides you and Judge Hutton that you recall?

A.  There would have been.  I don't recall who it was.  Usually, it's a county attorney.

Q.  Somebody from that office?

A.  Yes.

Q.  Is the same true on the warrantless affidavit that you prepared?  Would you have gone to a county judge by yourself, or would somebody else have accompanied you in?

A.  It depends on --  There is multiple different ways that you can have a warrantless arrest walked through.  We can either leave with the county attorney and they will do it and we can come back or the same process.

Q.  But you have to complete the affidavit?

A.  Yes.

Q.  And whatever the application is for the detention to be administered by a judge?

139

A.  Yes.

Q.  And in this particular case, since you chose to remove Mr. Nader from the home into your custody, you would have taken them directly to the jail and then completed the affidavit for warrantless arrest and detention?

A.  Yes.

Q.  And then if that -- when that was approved by the judge, then that would have been the extent of your involvement with Mr. Nader?

A.  Yes.

Q.  Now, you are aware that there are forensic labs that can look at these devices in depth, run all the scans that they have to in order to find the images.  Did it first go to Douglas County, their crime lab?

A.  No.  It went to a Cyber Crimes Task Force, which Deputy Deshaw, who is a Douglas County sheriff, works for.

Q.  Now, apparently there was a partial exam done by the Douglas County Crime Lab; is that true?

A.  That was Deputy Deshaw.  He works for the Cyber Task Force at the FBI Cyber Task Force Lab.

Q.  There was a partial forensics lab exam completed; is that true?

A.  Yes.

140

Exhibit B to Zachary Lutz-Priefert's Affidavit

DEPOSITION OF: Bryan Svajgl                                      Pages 141-144

```
 1    Q.  There was a report on that that we saw?
 2    A.  Yes.
 3    Q.  Then apparently, they didn't either have the
 4 time to complete it or said, We just as soon have the
 5 state patrol do this; is that true?
 6        MR. TJADEN:  Object to form and foundation.
 7    A.  Yes.
 8    Q.  (By Mr. Valentino)  And then who took the drives
 9 down to this Nebraska State Patrol forensics lab?
10    A.  I believe I did.
11    Q.  And you would have met with one of their
12 forensic examiners there?
13    A.  Yes.
14    Q.  Would that have been Shelby Mertins?
15    A.  I met her, yes.
16    Q.  And then did she perform an analysis of the
17 computer drives?
18    A.  Yes.
19    Q.  And to your knowledge, as we sit here today, is
20 there a mirror image of that down at that lab?
21    A.  I don't know.
22    Q.  In any event, she completed the forensics exam
23 and then would have provided a copy to you and to the
24 county attorney, or do you know?
25    A.  Yes.
                                                        141
```

```
 1    Q.  Both?
 2    A.  Yes.
 3    Q.  And then they would have completed whatever
 4 their process was with respect to either amending the
 5 charges or otherwise concluding that they either had what
 6 they needed for the prosecution or not, true?
 7    A.  Yes.
 8    Q.  They didn't ask you to do any follow-up
 9 investigation after Mertins' report, did they?
10    A.  No.
11    Q.  Now, the other thing you got from the county
12 attorney's office was what is called a county attorney
13 subpoena; is that true?
14    A.  Yes.
15    Q.  And can you tell us essentially what that
16 involves?
17    A.  That involves an affidavit -- similar you would
18 do for a search warrant -- affidavit for subpoena and then
19 you meet with the county attorney.  They read it, review
20 it, and sign it.
21    Q.  What kind of records can be sought under a
22 county attorney subpoena, which is a statutory creature?
23    A.  I don't know.
24    Q.  Is it limited to telecommunications?
25        MR. TJADEN:  Objection.  Foundation.
                                                        142
```

```
 1    Q.  (By Mr. Valentino)  Or do you know?
 2    A.  I don't believe so, no.
 3    Q.  It could be bank records?
 4    A.  Yes.
 5    Q.  It can be any records held by some custodian?
 6    A.  Yes.
 7    Q.  That's a third party?
 8    A.  Yes.
 9    Q.  And you applied for one to do what with
10 Mr. Nader?
11    A.  I applied for one for CenturyLink to confirm the
12 IP address.
13    Q.  And so when you had the Microsoft tips, you had
14 the county attorney subpoena to confirm the IP address.
15 You also went to the county assessor and got a picture of
16 the address of the house?
17    A.  Through the website.
18    Q.  Then you put together your affidavit that went
19 to Judge Hutton; is that true?
20    A.  Yes.
21        MR. VALENTINO:  I don't have anything further.
22        MR. TJADEN:  Do you have any?
23        MR. KUNHART:  Go ahead.
24
25 //
                                                        143
```

```
 1                REDIRECT EXAMINATION
 2 BY MR. TJADEN:
 3    Q.  I have a couple of items following
 4 Mr. Valentino's questioning.  You talked about custody.
 5 You go in and you place the cuffs on Mr. Nader when you go
 6 in there the first time, right?
 7    A.  I don't recall, but that's normally how it
 8 works, yes.
 9    Q.  Are you taking custody of him at that time?
10    A.  It's more of a detention while you --
11    Q.  Were you placing him under arrest at that
12 time?
13    A.  No.
14    Q.  Is he free to leave at that time?
15    A.  One could argue that.
16    Q.  What's your argument?
17    A.  No.
18    Q.  Your belief is that once you place those cuffs
19 on him going in there, he's not free to leave?
20    A.  Yeah.
21    Q.  And you've secured him?
22    A.  Yes.
23    Q.  But you haven't placed him under formal
24 arrest?
25    A.  No.
                                                        144
```

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    Q.   That happens later?
2    A.   Yes.
3    Q.   That happens after you talk with Miralles?
4    A.   Yes.
5    Q.   And Mr. Valentino indicated that Ms. Miralles
6    doesn't have the authority to arrest somebody.  Is that
7    your understanding?
8    A.   Yes.
9    Q.   Then why do you call her?
10   A.   To get someone else's opinion as I explained
11   earlier.
12   Q.   Do you get advice from her?
13   A.   Yeah.
14   Q.   Did she advise you to place him under arrest?
15   A.   No.  She agreed that she believed there was
16   probable cause.
17   Q.   So her advice to you was that you had sufficient
18   probable cause to place him under arrest?
19   A.   She agreed with me that I did, yes.
20   Q.   And that was based upon what we've already gone
21   over as to what you've told her?
22   A.   Yes.
23   Q.   Including the fact that there had been no
24   confirmed child pornography found during the search?
25   A.   We already had that.  We already had the
                                                    145

1    images.
2    Q.   Found during the search?
3    A.   Not from the search.
4    Q.   Found on the site at the residence?
5    A.   Not from the search, no.
6    Q.   And she knew that at the time?
7    A.   I informed her of such.
8    Q.   You took -- did you take Mr. Nader to the
9    jail?
10   A.   No.
11   Q.   Who did?
12   A.   I believe it was Officer Kustka.
13   Q.   Do you know where he was booked at the jail --
14   where he was held while at the jail?
15   A.   No.
16   Q.   Are you familiar with where people are generally
17   held at the jail?
18   A.   Yes.
19   Q.   How are they segregated?  By dangerousness of
20   crime?
21   A.   I don't know that.
22   Q.   Obviously, gender.  They're segregated by
23   gender?
24   A.   I don't know that.
25   Q.   You removed all the equipment.  You've described
                                                    146

1    subsequently who looked at it, the various agencies that
2    looked at it.  Were you ever called upon to offer any
3    testimony in a court on this case?
4    A.   Not that I recall.
5    Q.   Do you know what happened to this case?
6    A.   It was dismissed.
7    Q.   Do you know why?  I imagine there is some
8    follow-up when a case you're working on and have been
9    assigned to investigate and working with the county
10   attorney that you generally retain an interest in what
11   happens with that case.
12   A.   Yes.
13   Q.   And did you do that in this instance?
14   A.   Yes.
15   Q.   And do you know why this case was dropped?
16   MR. VALENTINO:  Objection.  Form and foundation
17   as to who he talked to.
18   MR. KUNHART:  Same objections.
19   Q.   (By Mr. Tjaden)  Who did you talk to to learn
20   this information?  Was it the county attorney's office?
21   A.   County Attorney Ben Perlman.
22   Q.   So it wasn't Ms. Miralles?
23   A.   No.
24   Q.   Was she still working on this case at the time?
25   Do you know?
                                                    147

1    A.   No.
2    Q.   Your involvement with her wasn't as the county
3    attorney prosecuting this case but as, I believe you've
4    indicated, the county attorney on call?
5    A.   Correct.
6    Q.   And you had situations where you've had to call
7    into the county attorney and talk to the county attorney
8    on call prior to this?
9    A.   Yeah.
10   Q.   Have you ever caught Ms. Miralles on that
11   rotation before this instance?  I know you've worked with
12   her, but have you ever caught her on the attorney on
13   call?
14   A.   I don't recall.
15   Q.   So what do you recall Attorney Perlman telling
16   you as to why this case was dismissed?
17   MR. VALENTINO:  Objection.  Form and foundation.
18   Hearsay.
19   Q.   (By Mr. Tjaden)  Go ahead.
20   A.   We discussed briefly what Shelby Mertins had
21   informed us, that she found the images on the computer but
22   she was not confident stating that he intended to have the
23   images because of the amount of porn that was on the
24   computer.
25   Q.   That's an element of the crime, intent,
                                                    148

1 correct?

2    A.  Yes.

3    Q.  Did she talk to you about what the evidence of

4 intent was that she didn't find or was hoping to find?

5    A.  She couldn't confirm or -- she couldn't confirm

6 where the images came from is how I understood it.

7    Q.  Did you have any information confirming where

8 the images came from when you made the arrest?

9    A.  From Mr. Nader's computer that were uploaded to

10 SkyDrive.

11    Q.  So if you had that information, what was it

12 about the case following her -- as you understand,

13 following her completion of her assignment that called

14 into question evidence of the ability to confirm where the

15 images came from?

16         MR. KUNHART:  Objection.  Form and foundation.

17    A.  I don't know.

18    Q.  (By Mr. Tjaden)  And at the time that you made

19 the arrest, your confirmation was limited to that it was

20 his e-mail address, his IP address, and a computer he

21 used, correct?

22    A.  We already stated that.

23    Q.  That's correct, right?

24    A.  I don't know that many.  It's in my report, and

25 I've already stated it.

                                                        149

1    Q.  Okay.  Of course, you knew what the IP address

2 was from the county attorney subpoena before going out to

3 the house?

4    A.  Yes.

5    Q.  And you knew that was his residence?

6    A.  Yes.

7    Q.  And you even knew his e-mail address before

8 then, didn't you?

9    A.  Yes.

10    Q.  So again, nothing really new was obtained on

11 March 17th, 2015?

12    A.  Confirmation and corroboration.

13    Q.  Him telling you that himself?

14    A.  Yes.

15    Q.  And then finally, Mr. Valentino talked to you a

16 little bit about your previous work with Ms. Miralles on

17 that case.  Now those questions created some more

18 confusion for me.  You were involved with Ms. Miralles and

19 did the investigation on a gentleman.  His name is

20 Eblin?

21    A.  David Eblin.

22    Q.  And you were investigating him and he was

23 subsequently charged with sexual assault of a child?

24    A.  Yes.

25    Q.  And during that investigation, a question arose

                                                        150

1 as to a photograph that Mr. -- that somebody had regarding

2 the victim in that case?

3    A.  Yes.

4    Q.  And Ms. Miralles brought that issue to your

5 attention?

6    A.  Yes.

7    Q.  Did she tell you where she got that

8 information?

9    A.  Like I told Vince, I don't recall fully.  I

10 believe it was from the mom.

11    Q.  The mom who would also be the spouse of the

12 defendant on trial?

13    A.  Yes.

14    Q.  And the mother of the victim?

15    A.  Yes.

16    Q.  But the victim was not the daughter of the

17 defendant.  Is that your understanding?

18    A.  No, not biological.

19    Q.  It was a stepdaughter?

20    A.  Yes.

21    Q.  So this is a tip that Ms. Miralles gets from the

22 mom that there is a photo?

23    A.  Yes.

24    Q.  Was it your understanding that this mom had

25 actually seen the photo with her own eyes?

                                                        151

1    A.  I don't recall the details of that.  I was

2 informed it was possibly a photo the daughter took of

3 herself over Facebook to attempt to send to somebody.

4    Q.  This is something new here.  You're saying now

5 it's a photo that perhaps the daughter took?

6    A.  Yes.

7    Q.  Sexting?

8    A.  Yes.

9    Q.  Intended --  Again, just to your knowledge and

10 what you understood or were told or believed at the time,

11 this photo that may have been taken by the daughter, was

12 it to be sent to the stepfather or somebody else?

13    A.  Somebody else.

14    Q.  Were you told anything regarding whether it had

15 been sent?

16    A.  I did not -- I don't recall if I found out if it

17 had been sent.

18    Q.  How did you come to believe that the stepfather

19 and husband's attorneys had the photograph?

20    A.  It was the attorneys -- I was informed that Mom

21 had intercepted the photo and possibly given it to the

22 defense attorneys.

23    Q.  You were informed of that from Ms. Miralles?

24    A.  Or given them access, yeah.

25    Q.  Or given the attorneys access?

                                                        152

1    A.   Yes.
2    Q.   But as I understand, you weren't going out there
3 to determine the existence of this photograph in
4 connection with the prosecution of the defendant; is that
5 accurate?
6    A.   Correct.
7    Q.   You were sent out there to investigate the
8 existence of this photograph concerning potential charges
9 against the attorneys?
10   A.   Yes.
11   Q.   What were those charges that you believed were
12 being considered?
13   A.   Possible possession of child porn.
14   Q.   Same charge we have in this case?
15   A.   Yes.
16   Q.   So we have a tip from Mom about the existence of
17 this photo, right?
18   A.   I was given the information from Jennifer
19 Miralles.
20   Q.   To your knowledge, Ms. Miralles has a tip from
21 Mom about the existence of this photo?
22   A.   Yes.
23   Q.   That tip is passed along to you, right?
24   A.   Yes.
25   Q.   In the Nader case, we have a tip from NCMEC

153

1 about the possibility of an upload?
2    A.   Yes.
3    Q.   And that tip is communicated to you, and you're
4 shown the photos and review them with Detective Stigge?
5    A.   Yes.
6    Q.   You went out there to confirm that this
7 computer, IP address, e-mail address belonged to
8 Mr. Nader, and to make that confirmation, you had a
9 discussion with him and you had a search warrant, right?
10   A.   Yes.
11   Q.   In the case involving the attorneys for
12 Mr. Eblin, you go out there and ask them, Do you have this
13 photo; is that right?
14   A.   I asked them if they had the photo.
15   Q.   And they said, No?
16   A.   Correct.
17   Q.   And that ended it?
18   A.   I did other investigation with it.  I don't
19 recall what all that was.  I did not have enough evidence
20 to say that they had possessed it.
21   Q.   Well, you were told that they were given the
22 photo, right?
23        MR. VALENTINO:  That's misquoting the witness.
24 I object on form.
25   Q.   (By Mr. Tjaden)  Were you told they were given

154

1 the photo?
2    A.   I was told they were possibly given the photo.
3    Q.   And you were in their offices?
4    A.   No.
5    Q.   Where did you ask them?
6    A.   I asked them over the phone.  I tried to make an
7 appointment but had to do it over the phone.
8    Q.   Why didn't you get a search warrant?
9    A.   Because I didn't have enough evidence to say
10 that there was a photo.
11   Q.   You didn't have enough evidence to even say
12 there was a photo?
13   A.   No.
14   Q.   Again, was that an unusual request to go out and
15 investigate a charge against the lawyer defending that
16 defendant?
17        MR. KUNHART:  Objection.  Form.
18   A.   Yes.
19   Q.   (By Mr. Tjaden)  Had you ever had that done
20 before?
21   A.   No.
22   Q.   What did you think about that?
23   A.   It was very odd.
24   Q.   Did you consider it to be an effort to pressure
25 the lawyers to deal with their client differently?

155

1        MR. KUNHART:  Objection.  Form and foundation.
2        MR. VALENTINO:  Form and foundation.
3    Q.   (By Mr. Tjaden)  This is how you considered it.
4 Did you consider it an effort to pressure the lawyers to
5 pressure the client?
6    A.   No.
7    Q.   Then what did you find odd about it?
8    A.   Well, being advocates of the court, that a
9 lawyer would even take possession of something like that.
10 My thought is an attorney would be much smarter than
11 that.
12   Q.   So your thinking of the oddness was more
13 directed towards the attorneys' conduct and not the
14 request itself?
15   A.   Yes.
16        MR. TJADEN:  I don't have anything further.
17        MR. VALENTINO:  I don't have anything further
18 either.
19        MR. KUNHART:  I have a couple of questions.
20              RECROSS-EXAMINATION
21 BY MR. KUNHART:
22   Q.   Earlier, you testified that Shelby Mertins said
23 that she had found the images that were on Mr. Nader's
24 computer, correct?
25   A.   Yes.

156

Exhibit B to Zachary Lutz-Priefert's Affidavit

1    Q.  The images -- she's talking about the images
2  from the CyberTip that was generated prior to Mr. Nader's
3  arrest, correct?
4    A.  Yes.
5        MR. KUNHART:  I don't have any questions.
6              FURTHER REDIRECT EXAMINATION
7  BY MR. TJADEN:
8    Q.  All of them?  Some of them?  Portions of them?
9  What do you recall?
10   A.  I believe it was all of them.
11   Q.  All of them in full 100-percent hash value
12 form?
13   A.  I would have to check her report.  It's in her
14 report.
15   Q.  So you'll defer to her report in that regard?
16   A.  Yes.
17   Q.  And yet the charges were dropped because of this
18 concern that we didn't have enough evidence to prove one
19 of the main elements, that being knowingly?
20       MR. KUNHART:  Objection to form and
21 foundation.
22   Q.  (By Mr. Tjaden)  Is that what you were told from
23 the county attorney?
24       MR. VALENTINO:  I'll object to that.  Form and
25 foundation.

157

1    A.  What's the question?
2    Q.  (By Mr. Tjaden)  What were you told?  You were
3  told because he couldn't prove knowingly?
4    A.  That was the basis of it from my
5  understanding.
6    Q.  That's an easy yes.  Thank you.
7        MR. KUNHART:  You have the right to review your
8  deposition.  You can't change your answers, but you can
9  look for typos, misspellings, those issues.  Or you can
10 waive that right.  You can waive it unless you want to
11 read it.
12       THE WITNESS:  I'm fine.
13       (Deposition adjourned at 1:07 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

159

1        MR. KUNHART:  Same objections.
2    Q.  (By Mr. Tjaden)  You want to re-read the
3  question without the objections?
4    A.  Sure.
5        MR. TJADEN:  They'll go ahead and stand on
6  there.
7        MR. VALENTINO:  We've already asked it before.
8        (Record read as requested.)
9    A.  I didn't have a final conversation when he
10 dismissed it.  That was his choice.
11   Q.  (By Mr. Tjaden)  I understand it was his choice.
12 I just wanted to know what he told you.
13       MR. VALENTINO:  It was his discussion.
14   Q.  (By Mr. Tjaden)  As I understand it and as you
15 understood it, it was because they couldn't prove
16 knowingly?
17       MR. KUNHART:  Objection.  Form and foundation.
18   A.  That was his choice.
19   Q.  (By Mr. Tjaden)  I understand it was his choice.
20 I'm just asking what your understanding as to why it was
21 dismissed was, what you were told.
22       MR. KUNHART:  Objection.  Form and foundation.
23 Asked and answered.
24       THE WITNESS:  Am I supposed to answer that?
25       MR. KUNHART:  Yes.

158

                    -CERTIFICATE-
1    I, Jodi Hauschild, a Shorthand Reporter and General
2  Notary Public in and for the State of Nebraska, do hereby
3  certify that BRYAN SVAJGL was by me duly sworn to
4  truthfully testify, and that the deposition by him as
5  above set forth was taken by me by use of machine
6  shorthand and thereafter reduced to typewriting by use of
7  computer-aided transcription.
8    That the expressions in parentheses are
9  interpretations of the court reporter.
10   That the within and foregoing deposition was taken by
11 me at the time and place herein specified and in
12 accordance with the within stipulations, the reading and
13 signing of the witness to his deposition having been
14 waived.
15   That I am not counsel, attorney, or relative of
16 either party or otherwise interested in the event of the
17 suit.
18   IN WITNESS WHEREOF, I hereunto affix my signature and
19 seal this 25th day of September, 2017.
20
21
22
23        _____
         Jodi Hauschild, RPR, CRR
         General Notary Public
24
25

160

DEPOSITION OF:  Bryan Svajgl                                    Keyword Index

< Dates >
., September 14, 2017 1:30
3/8/77 6:9
April 2006 14:23
December 22nd 59:7
March 17th 28:22, 32:14, 33:14, 34:5, 48:5, 54:1, 61:17, 62:6, 62:13, 62:23, 67:6, 67:16, 75:15, 81:14, 90:22, 90:24, 91:2
March 17th, 2015 32:21, 34:20, 35:20, 150:11
March 2014 26:13, 26:22, 29:2
March 2015 29:23
March 31st 78:25, 79:16, 81:21
March 3rd 79:16
September, 2017. 160:20
"nine 13:10
'02. 9:16
'14 60:13
'77 9:1
'95 9:2, 9:12
-CERTIFICATE- 160:1

< 0 >
0003. 119:21

< 1 >
1 3:3
100 125:12
100-percent 157:11
105 136:7
11 6:7, 112:2
110 2:17
12 7:6, 64:8, 114:7, 131:5
13. 79:13
130 2:25, 3:15
13625 1:30, 2:16

13th 2:25
14 7:5, 89:19
14. 106:18
144 3:17
14: 106:4
15 7:3, 114:19
1500 2:8
156 3:19
157 3:21
16 89:13
16. 89:15
160 3:7
17-CV-00083 1:6
18th 82:24
19 7:2, 119:1
19-year-old 7:15
19. 89:16
19808 4:26
1:07 159:13

< 2 >
2 3:4, 89:13, 89:15
20 23:17, 23:18, 23:20
2002 8:9
2002. 10:9
2006 22:18, 22:19, 35:17, 56:16, 56:22
2012 96:7
2014 21:20, 22:20, 25:3, 27:3, 27:21, 30:19, 30:24, 31:5, 37:21
2014. 38:6
2015 28:5, 28:18, 29:5, 29:15, 30:3, 30:13, 32:19, 38:6
2120 2:7
23 65:12, 124:19
24 64:8
25 3:32, 79:10, 105:24
25. 22:1
25th 160:20
26 3:34, 79:10, 89:9, 127:20

< 3 >
3 3:5, 119:1
30 67:20
300 2:26
38 112:2
38. 112:14
39 112:18
392-1500 2:10

< 4 >
4 3:6, 3:13, 119:20
40 114:8
402 2:10, 2:19, 2:28
45 7:24
457 120:12
457: 121:3

< 5 >
5 106:3, 128:5
50 22:1, 67:20

< 6 >
63rd 10:25
68124 2:9
68154 2:18
68508 2:27

< 7 >
7 122:22
72nd 2:7
742-9240 2:28
79 3:32, 3:34

< 8 >
8 4:2
8: 1:6

< 9 >
934-4770 2:19
9:05 1:30

< A >
A. 1:13, 2:13

a.m. 1:30
ability 54:14, 149:14
able 54:6, 54:8, 54:21, 60:1, 72:11, 91:10, 91:14, 99:13, 99:15, 104:3, 135:9
above 112:3, 160:6
abuse 24:17, 30:5, 31:15
academy 17:20, 19:14, 20:22, 20:25, 21:6, 35:13, 56:16, 76:1
accept 74:7
access 94:23, 102:3, 103:5, 103:6, 152:24, 152:25
Accident 18:23, 18:24, 75:21
accidents 21:1
accompanied 139:15
accordance 160:13
according 62:3
account 92:23, 93:9, 94:21
accumulate 23:20
accurate 17:15, 18:10, 34:13, 35:4, 39:17, 39:21, 53:4, 53:25, 59:15, 61:12, 61:16, 62:8, 62:15, 78:9, 78:12, 107:16, 113:2, 115:2, 115:12, 115:20, 117:19, 153:5
accurately 108:6
accused 42:3, 42:8
active 18:8, 22:8, 22:9
activity 95:6, 128:9
actor 57:21
actual 38:24, 47:9, 48:6, 52:2, 61:14
Actually 11:10, 16:2, 16:13, 16:15, 22:10, 22:19, 38:12, 56:19, 71:1,

Exhibit B to Zachary Lutz-Priefert's Affidavit

DEPOSITION OF:  Bryan Svajgl                                    Keyword Index

71:18, 72:7, 89:13,
89:25, 90:8, 90:17,
107:7, 133:13,
135:14, 135:17,
151:25
**add** 116:8
**addition** 96:14
**additional** 31:12,
98:7, 116:3, 116:9
**address** 4:25, 93:3,
93:5, 93:6, 93:25,
94:20, 96:15,
96:17, 96:18,
99:16, 103:10,
109:15, 109:16,
112:7, 143:12,
143:14, 143:16,
149:20, 150:1,
150:7, 154:7
**addressed** 18:14
**adjourned** 159:13
**administered** 139:25
**admissions** 96:2
**Adult** 99:5
**advice** 145:12,
145:17
**advise** 97:18, 145:14
**advised** 116:2,
118:16
**advocate** 125:25
**advocates** 156:8
**Affiant** 106:4
**Affidavit** 3:32, 55:25,
78:25, 79:9, 79:12,
79:13, 80:9, 80:10,
80:12, 80:16,
80:23, 81:4, 81:19,
82:1, 82:7, 98:3,
101:4, 106:4,
106:9, 111:25,
112:2, 115:25,
117:4, 118:2,
118:3, 138:24,
139:13, 139:22,
140:5, 142:17,
142:18, 143:18
**affiliation** 69:19
**affirmation** 128:22
**affirmative** 126:19,
127:2, 127:3,

127:24
**affix** 160:19
**afford** 5:18
**age** 4:8
**agencies** 15:16,
15:17, 15:23,
15:25, 16:4, 16:9,
86:2, 86:6, 147:1
**agency** 87:21
**agenda** 30:2
**ages** 7:1
**ago** 7:24, 27:13,
27:20, 37:5
**agree** 71:5, 99:1,
117:9, 117:18
**agreed** 97:21,
112:21, 114:10,
114:14, 115:3,
115:10, 115:16,
118:18, 145:15,
145:19
**agreeing** 115:14
**ahead** 74:5, 79:8,
117:16, 130:4,
143:23, 148:19,
158:5
**aid** 53:3
**Air** 68:4, 68:19,
69:13, 69:16,
86:23, 87:2
**albeit** 135:18
**allegation** 40:3,
40:4, 131:14,
132:10, 132:17,
132:19
**allege** 127:14
**alleged** 129:11,
129:17, 129:22
**allegedly** 38:15
**allow** 12:22, 71:11
**allowed** 95:1
**allows** 137:12
**alone** 100:3, 100:8,
108:19, 109:1,
109:9, 110:2
**already** 16:15,
41:21, 58:7, 62:10,
66:2, 70:11, 91:22,
91:24, 91:25,
97:14, 111:13,

115:24, 135:15,
135:17, 145:20,
145:25, 149:22,
149:25, 158:7
**alter** 108:10
**alternative** 129:10
**Although** 13:8,
13:10, 66:13,
135:8
**amend** 116:3
**amending** 142:4
**amount** 148:23
**analysis** 46:8, 46:15,
52:8, 52:18, 53:3,
63:23, 64:7, 65:3,
107:4, 107:16,
116:3, 119:18,
141:16
**analyzed** 64:3,
106:24, 108:6
**and.** 112:24
**annual** 23:14, 29:10,
29:13
**annually** 29:8
**answer** 5:15, 5:21,
43:21, 44:1, 44:2,
61:19, 71:11,
102:19, 103:3,
117:16, 126:14,
126:17, 126:19,
127:14, 158:24
**answered** 74:3,
83:24, 124:25,
158:23
**answering** 5:20
**answers** 159:8
**Anybody** 32:14,
48:13, 71:9, 83:10,
92:3, 97:5, 116:17,
122:8, 122:12,
137:4, 139:7
**Anytime** 57:3, 58:1
**Apparently** 64:16,
131:6, 140:19,
141:3
**appear** 41:6, 111:24
**APPEARANCES** 2:1,
3:4
**appeared** 122:21
**Application** 16:1,

20:4, 20:9, 20:15,
42:23, 79:14,
79:24, 81:6, 101:1,
101:4, 105:19,
105:21, 105:24,
106:1, 106:2,
106:3, 138:13,
138:25, 139:24
**applied** 15:19,
143:9, 143:11
**apply** 15:17, 31:9
**applying** 16:8
**appointment**
138:17, 155:7
**approach** 60:19
**appropriate** 16:23,
16:24
**approved** 140:8
**Approximately**
136:6, 136:7
**area** 8:10, 8:17, 21:9,
23:19, 23:23,
23:25, 136:1
**areas** 36:12, 129:3
**argue** 144:15
**argument** 137:20,
144:16
**Argumentative**
117:14, 117:22
**arose** 39:13, 150:25
**around** 9:2, 22:18,
69:8
**arrangements** 124:5
**arrests** 55:8, 55:11
**arrived** 110:20,
121:24
**arrives** 122:2
**art** 8:12, 10:22, 11:4,
12:2
**article** 122:21
**Ash** 4:26
**aspect** 39:13
**aspects** 28:16
**assault** 38:14, 39:7,
39:11, 39:21, 40:5,
41:25, 42:11,
101:19, 102:6,
130:22, 130:24,
133:1, 150:23
**assaulted** 38:15,

DEPOSITION OF:  Bryan Svajgl                              Keyword Index

101:24, 103:8
**assessor** 143:15
**assigned** 36:1, 36:2,
   36:3, 37:23, 57:3,
   60:10, 60:12,
   147:9
**assignment** 36:7,
   44:19, 57:7, 58:2,
   58:4, 58:25, 59:2,
   59:3, 149:13
**assigns** 44:4
**assist** 12:14, 45:2,
   47:6, 54:4, 54:14,
   87:25
**assistance** 97:7,
   124:5
**assisted** 11:11,
   11:12, 22:5, 46:2,
   46:4, 47:1, 47:9,
   47:12, 47:15, 77:9,
   80:13, 87:20, 97:9
**Assisting** 34:2, 39:6,
   45:12, 45:18, 51:9,
   51:10, 51:13,
   85:14, 85:16,
   108:8
**assume** 5:14, 41:20,
   47:23, 120:4,
   126:11
**assured** 110:25
**attached** 105:24
**attempt** 107:4, 152:3
**attempted** 101:19
**attend** 20:16, 25:13,
   27:16, 29:15,
   48:10
**attended** 29:5, 31:14
**attending** 26:14
**attention** 67:2, 74:9,
   151:5
**Attorney** 5:11, 19:19,
   38:13, 38:24,
   40:18, 41:7, 80:25,
   92:11, 96:19,
   96:20, 96:22, 97:4,
   97:5, 97:18, 116:2,
   116:18, 126:4,
   136:23, 138:18,
   139:10, 139:19,
   141:24, 142:12,

142:19, 142:22,
   143:14, 147:10,
   147:20, 147:21,
   148:3, 148:4,
   148:7, 148:12,
   148:15, 150:2,
   156:10, 157:23,
   160:16
**attorneys** 19:18,
   40:19, 40:20, 42:7,
   43:5, 67:10, 137:4,
   138:19, 152:19,
   152:20, 152:22,
   152:25, 153:9,
   154:11, 156:13
**audio** 12:20, 77:20
**authorities** 131:11
**authority** 145:6
**authorization** 135:6
**authorized** 122:20,
   135:5
**avail** 128:12
**available** 83:4,
   129:10
**avenue** 109:5
**average** 67:19
**avoid** 63:6, 128:12
**Avoidable** 127:16,
   128:6
**avoided** 129:11
**aware** 36:13, 43:12,
   44:18, 52:1, 52:6,
   93:8, 95:8, 122:6,
   124:14, 129:12,
   131:12, 140:12
**away** 7:15, 74:9,
   123:23, 125:4


< B >
**B-R-Y-A-N** 4:20
**B.** 106:4
**bachelor** 8:6, 10:14
**Back** 11:10, 35:14,
   35:16, 48:2, 56:16,
   60:13, 64:13,
   72:10, 74:17, 88:8,
   89:15, 92:23, 93:4,
   131:20, 135:6,
   138:4, 138:21,

139:20
**background** 8:3,
   9:17, 31:16, 68:9,
   69:11
**badge** 137:11
**ballpark** 21:25, 22:2,
   30:25
**bank** 143:3
**Base** 68:5
**baseball** 7:23
**Based** 34:4, 74:1,
   112:19, 114:14,
   115:3, 115:19,
   145:20
**basic** 70:4, 98:5
**Basically** 12:7, 26:1,
   33:15, 49:15,
   51:16, 57:20,
   102:13, 102:15,
   128:15, 133:21
**basis** 23:14, 159:4
**Basketball** 8:15,
   8:21, 11:14, 11:20
**bat** 85:9
**became** 32:24, 33:3,
   33:12, 67:16, 76:3,
   124:13
**become** 22:10,
   31:24, 32:18, 67:5,
   122:5
**becoming** 30:18
**bed** 77:8
**bedroom** 77:10
**began** 11:9, 75:18
**begin** 21:10
**beginning** 1:29,
   81:2, 89:15, 107:2
**BEHALF** 1:13,
   126:15, 130:20
**belief** 101:5, 144:18
**believed** 93:17,
   93:20, 97:13,
   112:18, 135:1,
   137:18, 145:15,
   152:10, 153:11
**believes** 96:5
**Bellevue** 8:17, 11:11,
   15:20, 16:11,
   87:20
**belonged** 154:7

**Ben** 46:18, 147:21
**BENJAMIN** 1:12,
   2:13
**besides** 88:14,
   139:7
**Best** 10:7, 23:7,
   35:18, 73:25,
   117:10
**beyond** 10:14
**bills** 13:9
**biological** 151:18
**birth** 6:8
**bit** 20:8, 68:8, 77:7,
   96:21, 98:2,
   127:22, 150:16
**Blues** 48:3
**Bluffs** 15:19, 16:13
**board** 15:11
**bomb** 110:15,
   110:20, 110:25,
   111:4, 111:10,
   111:16
**booby** 107:14,
   107:20
**book** 57:11, 57:12
**booked** 146:13
**born** 9:1
**boyfriends** 51:16
**Brandon** 45:18
**break** 66:23, 121:17
**break-out** 24:6,
   24:16, 29:3, 30:4,
   30:11
**break-outs** 30:6
**Brief** 50:18, 66:25,
   121:19
**Briefly** 51:25, 77:3,
   77:9, 81:10,
   148:20
**bring** 49:19
**bringing** 42:14
**broken** 18:13
**Brother** 11:19
**brother-in-law** 7:23
**brought** 135:6,
   151:4
**Browder** 93:13
**BRYAN** 1:12, 1:27,
   2:12, 3:32, 4:6,
   4:20, 160:4

DEPOSITION OF:  Bryan Svajgl                    Keyword Index

**Building** 2:24
**buildings** 12:20
**bunch** 104:19
**business** 12:14
**Buy** 10:7

**< C >**
**C-O-L-O-M-B-I-A**
    85:2
**cabinets** 47:3
**cable** 12:19
**cables** 12:18
**California** 1:31, 2:16
**call** 11:1, 16:14,
    22:8, 33:22, 38:19,
    96:19, 97:6, 97:17,
    102:6, 102:11,
    145:9, 148:4,
    148:6, 148:8,
    148:13
**called** 11:3, 16:17,
    24:10, 29:25,
    52:13, 102:5,
    131:1, 142:12,
    147:2, 149:13
**calling** 110:15,
    111:14
**Calls** 5:4, 103:20
**campus** 18:6
**CAPTION** 3:3
**car** 21:17
**career** 13:13, 34:8
**carry** 70:20
**cases** 37:8, 37:15,
    51:3, 51:6, 51:8,
    67:15, 67:17,
    67:20
**catch** 100:14
**categorized** 98:22
**caught** 148:10,
    148:12
**cause** 55:24, 55:25,
    56:2, 56:7, 91:22,
    91:24, 91:25, 92:6,
    93:20, 97:15,
    97:21, 101:5,
    112:18, 115:17,
    118:18, 137:16,
    145:16, 145:18

**cause.** 56:6
**caused** 13:7, 84:17
**cautioned** 4:9
**Cds** 77:14
**CE** 29:20
**cell** 49:17
**Center** 8:24, 17:21,
    44:16
**centered** 69:8
**Centurylink** 79:15,
    93:4, 143:11
**certain** 18:14, 55:3,
    73:17, 94:2,
    108:22, 131:19,
    131:20
**certainly** 98:24
**CERTIFICATE** 3:7,
    10:11, 10:13,
    10:15, 21:7, 29:17,
    137:12
**certification** 10:18
**certified** 4:10
**certify** 160:4
**cetera** 16:23, 19:4,
    21:2, 48:23, 75:21,
    112:7
**chamber** 138:21
**chambers** 138:17
**change** 30:18,
    66:18, 108:10,
    115:25, 159:8
**changed** 66:14
**changes** 111:24
**charge** 41:21, 41:25,
    116:15, 116:17,
    153:14, 155:15
**charged** 83:11,
    116:7, 116:13,
    117:1, 150:23
**charges** 42:14,
    116:21, 133:11,
    142:5, 153:8,
    153:11, 157:17
**chat** 95:17, 95:18,
    96:10
**check** 58:11, 88:23,
    96:9, 157:13
**checked** 110:7,
    136:2
**checking** 110:9

**chemicals** 110:5,
    110:14, 111:1,
    111:17
**Chief** 16:13, 16:16,
    16:19, 16:25, 17:1,
    17:5, 17:6, 17:7,
    17:8, 32:18, 32:20,
    32:24, 33:3, 43:14,
    43:15, 43:20,
    43:24, 48:18, 76:3
**Children** 6:12, 6:15,
    6:16, 6:20, 7:4,
    24:5, 24:11, 24:12,
    29:25, 31:15, 32:1,
    44:17, 77:24, 87:5,
    87:7, 100:3, 100:9,
    100:10, 100:13,
    100:19, 100:23,
    101:23, 102:1,
    102:4, 103:5,
    103:6, 103:7,
    106:10, 123:24,
    123:25, 124:2,
    125:4, 125:13,
    125:15, 125:17,
    125:22
**choice** 23:21, 27:19,
    53:15, 129:24,
    158:10, 158:11,
    158:18, 158:19
**choices** 27:18,
    129:10
**choose** 23:20,
    25:14, 53:6
**choosing** 130:11
**chose** 53:21, 129:15,
    129:20, 140:2
**Chris** 121:15
**Christopher** 2:4
**citation** 55:14, 55:15
**citizen** 87:16
**City** 1:11, 2:12, 6:4,
    18:9, 71:10,
    108:24, 109:7
**claims** 127:11,
    127:15, 128:4
**class** 19:6, 19:9,
    24:22, 27:7, 27:16
**classes** 13:4, 18:18,
    25:10, 26:17,

    29:19, 29:21,
    29:22
**classroom** 18:3,
    18:21
**Classwork** 18:1,
    18:13, 31:12
**clean** 5:24
**clear** 62:22, 67:2
**clearance** 26:3
**clearly** 43:4
**clerical** 120:22,
    120:24
**clerk** 48:14
**clicked** 104:20
**client** 127:13,
    133:24, 155:25,
    156:5
**clients** 130:20
**closed** 38:9, 38:11
**closely** 53:14
**cloud** 104:8, 104:9
**coach** 8:22, 11:4,
    11:7, 11:20
**Coaching** 8:12, 11:2,
    11:4
**code** 107:14
**codes** 107:20
**collaboration** 25:7
**collected** 89:22
**collection** 27:25,
    28:14
**college** 7:18, 8:6,
    9:24, 10:2, 11:11
**Colombia** 85:2,
    87:18
**Colombian** 84:21,
    84:24, 86:13,
    87:11, 87:15
**com** 93:2
**comes** 45:7, 49:23
**coming** 93:4, 110:17
**comment** 43:12
**committed** 56:3,
    56:8, 56:10,
    112:19, 113:25
**communicated**
    154:3
**Communications**
    12:17
**compare** 66:20,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

66:21
**comparison** 66:11
**complaint** 126:12
**complete** 9:9, 20:14, 21:6, 55:25, 76:19, 107:16, 108:6, 116:4, 139:22, 141:4
**completed** 8:5, 140:5, 140:24, 141:22, 142:3
**completion** 29:17, 149:13
**computer-aided** 160:8
**computer-generate d** 120:11
**computer-related** 106:6, 106:7, 107:12
**computers** 41:18, 52:8, 53:4, 63:10, 64:3, 116:8, 119:11, 134:14, 134:15
**Concealing** 101:6, 101:11, 101:13
**concern** 84:17, 100:6, 101:23, 125:22, 126:5, 157:18
**concerned** 9:18, 87:12, 100:18, 111:17
**concerning** 62:13, 153:8
**concerns** 84:13, 100:2, 112:1, 123:22, 125:13
**concluding** 142:5
**conduct** 108:8, 108:18, 128:12, 128:22, 129:17, 129:22, 156:13
**conducting** 46:19, 121:21
**confer** 96:20
**conference** 29:8
**conferences** 24:6, 24:11

**confident** 148:22
**confirm** 72:2, 72:7, 72:12, 73:21, 74:21, 91:23, 93:24, 94:4, 94:16, 96:8, 97:15, 97:17, 99:15, 103:12, 143:11, 143:14, 149:5, 149:14, 154:6
**Confirmation** 72:15, 72:25, 74:2, 74:12, 94:18, 96:15, 109:15, 112:7, 113:20, 114:3, 149:19, 150:12, 154:8
**confirmed** 72:4, 73:23, 92:14, 93:5, 93:6, 99:16, 103:9, 103:10, 103:17, 109:24, 114:5, 114:15, 115:4, 115:19, 116:24, 116:25, 145:24
**confirming** 94:2, 109:10, 109:11, 149:7
**confiscated** 90:9
**confused** 5:10, 42:9
**confusing** 72:23, 125:16
**confusion** 150:18
**conglomerate** 27:10
**conjecture** 103:20
**connection** 49:6, 153:4
**Consequences** 127:16, 128:6
**consider** 155:24, 156:4
**consideration** 138:9
**considered** 153:12, 156:3
**considering** 42:14
**constraints** 107:2
**consult** 58:19, 58:20, 59:17
**consulted** 59:8, 59:13

**contact** 23:10, 23:11
**contacted** 16:12
**contain** 82:4
**context** 42:10
**continue** 111:22
**continued** 125:3
**continuing** 23:13, 23:24, 24:3, 25:11, 106:17, 107:1
**controlled** 106:14, 106:19, 107:15, 108:3
**conversation** 51:24, 79:20, 92:10, 111:11, 114:9, 114:23, 115:1, 158:9
**conversations** 43:14, 50:18
**convicted** 133:9, 133:10, 134:17, 134:20, 134:21
**COPS** 47:25, 105:4
**copy** 127:18, 132:20, 141:23
**correction** 79:19
**corroborated** 104:8, 104:10, 105:10
**corroboration** 113:21, 150:12
**Council** 15:19, 16:12
**Counsel** 79:4, 160:16
**counsel.** 89:10
**counts** 116:3, 116:7, 116:22
**couple** 16:10, 16:11, 23:9, 23:11, 24:5, 24:8, 24:10, 27:13, 27:20, 27:24, 28:2, 29:3, 33:16, 51:7, 59:1, 60:6, 67:1, 78:16, 83:8, 93:24, 130:19, 144:3, 156:19
**course** 131:6, 131:17, 150:1
**courses** 24:4
**Court** 1:1, 4:1, 5:23, 38:16, 38:18,

38:20, 38:21, 39:20, 42:11, 138:4, 147:3, 156:8, 160:10
**courtroom** 16:20
**crack** 105:6
**created** 150:17
**creature** 142:22
**credits** 25:11
**Creighton** 11:12, 11:16
**Crime** 21:3, 23:4, 24:7, 24:9, 27:22, 30:12, 31:20, 32:15, 34:7, 34:11, 34:19, 34:22, 35:2, 35:4, 35:22, 36:25, 39:1, 51:12, 53:24, 56:2, 56:8, 56:10, 56:12, 57:16, 58:21, 59:25, 61:1, 61:5, 76:21, 100:22, 112:19, 113:25, 140:15, 140:20, 146:20, 148:25
**Crimes** 23:3, 23:25, 24:17, 24:24, 25:18, 25:20, 26:15, 26:19, 27:25, 28:15, 29:2, 30:5, 30:6, 30:8, 31:15, 31:20, 32:8, 51:11, 67:23, 77:24, 77:25, 88:16, 140:16
**criminal** 13:3, 13:4, 24:18, 27:6, 27:7, 31:14, 43:17
**crop** 66:18
**CROSS-EXAMINATI ON** 3:14, 130:17
**CRR** 160:25
**cuffed** 135:14
**cuffs** 135:22, 136:13, 144:5, 144:18
**Current** 6:2, 16:19, 69:16, 120:8, 121:11, 129:4

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl
Keyword Index

**currently** 8:2, 87:2
**custodian** 143:5
**custody** 7:7, 7:8, 55:16, 56:9, 114:10, 114:14, 115:3, 115:10, 115:15, 118:17, 135:13, 135:17, 136:16, 136:24, 137:4, 140:3, 144:4, 144:9
**CVIP** 116:25
**Cyber** 51:11, 51:12, 53:24, 77:25, 88:16, 140:16, 140:21, 140:22
**Cybertip** 44:8, 73:7, 77:21, 78:1, 157:2
**Cybertips** 73:5, 90:5, 98:6

**< D >**
**dad** 12:14
**damages** 126:21, 127:6
**dangerousness** 146:19
**dangers** 48:23
**dark** 95:21, 95:25, 96:10
**data** 107:4, 119:23, 137:24
**Date** 6:8, 28:23, 30:24, 37:9, 50:17, 50:20, 50:24, 54:2, 56:23, 59:10, 78:24, 79:14, 83:5, 85:7, 85:11, 120:6, 120:8, 121:11, 126:8
**dated** 82:24
**dates** 27:12
**daughter** 132:6, 151:16, 152:2, 152:5, 152:11
**David** 19:23, 68:17, 150:21
**day** 45:24, 48:3, 48:5, 49:25, 54:25,

58:24, 63:16, 66:1, 71:14, 72:11, 75:18, 82:25, 96:11, 99:14, 114:22, 114:24, 114:25, 116:11, 117:11, 117:19, 118:6, 123:18, 123:23, 160:20
**days** 7:9, 7:12, 18:14, 59:1, 83:8
**deal** 20:1, 86:11, 155:25
**dealing** 34:7, 39:20
**death** 18:21, 31:15
**deaths** 21:1
**December** 37:21, 38:6, 58:10, 58:11, 60:13, 97:1
**decided** 25:13, 137:21
**deciding** 13:21
**decision** 14:18, 57:22, 88:6, 90:12, 90:13, 91:19
**Defendant** 39:19, 40:23, 42:2, 43:5, 68:5, 68:9, 134:17, 151:12, 151:17, 153:4, 155:16
**DEFENDANTS** 1:17, 2:12, 2:21, 129:17, 129:22
**defending** 42:15, 43:6, 132:6, 132:8, 155:15
**Defense** 38:24, 40:18, 40:20, 127:2, 127:3, 127:12, 128:5, 131:19, 132:18, 133:15, 133:17, 134:14, 152:22
**defenses** 126:19, 127:24
**defensive** 18:19
**defer** 65:16, 71:6, 71:8, 71:12, 157:15
**defined** 23:18

**defining** 65:16
**definition** 66:4, 70:4
**degree** 8:6, 8:11, 9:6, 9:7, 10:14, 53:12
**deliberate** 129:24
**deliberately** 129:15, 129:20
**denied** 109:19
**Department** 6:4, 13:3, 13:18, 15:5, 17:9, 25:25, 26:1, 32:23, 33:8, 36:19, 48:9, 74:18, 75:19, 76:9, 76:18, 83:7, 86:10, 87:21, 122:14
**departments** 15:13
**depends** 108:21, 139:17
**deponent** 129:4
**Deposition** 1:11, 1:27, 4:30, 5:3, 71:22, 80:8, 81:3, 129:23, 129:24, 159:8, 159:13, 160:5, 160:11, 160:14
**depth** 8:3, 20:8, 41:14, 61:24, 140:13
**Deputy** 88:15, 140:17, 140:21
**describe** 14:19, 99:20, 99:21
**described** 19:1, 84:3, 146:25
**description** 56:15, 59:24, 65:16, 66:3, 77:21, 78:1, 83:19, 120:12, 121:3
**Deshaw** 75:12, 81:10, 88:15, 140:17, 140:21
**destruction** 107:13
**destructive** 107:14, 107:20
**detail** 118:13
**details** 98:5, 118:15, 152:1

**detained** 135:25
**detected** 79:23
**detectives** 33:4, 46:23, 48:11, 69:6, 75:11
**detention** 139:25, 140:6, 144:10
**determine** 13:22, 40:12, 41:3, 59:25, 86:16, 95:5, 153:3
**determined** 124:14, 125:12
**developed** 129:3
**device** 49:12, 107:9, 107:23, 137:24
**devices** 46:3, 46:5, 49:9, 113:22, 113:24, 140:13
**difference** 98:2
**different** 15:12, 30:17, 39:1, 52:17, 100:22, 120:22, 139:17
**differently** 155:25
**difficult** 5:8
**difficulty** 71:21
**digital** 49:9, 66:1, 70:2, 70:10, 116:4
**DIRECT** 3:12, 4:15, 89:18
**directed** 68:1, 156:13
**direction** 76:14
**directly** 5:11, 140:4
**disagree** 71:5
**discovered** 94:4
**discovery** 131:18
**discuss** 30:7, 36:11, 60:9, 71:9, 92:13
**discussed** 25:19, 51:25, 60:5, 69:5, 92:7, 110:4, 112:3, 113:6, 117:1, 117:2, 117:3, 148:20
**discussing** 117:5
**Discussion** 11:25, 30:10, 80:8, 80:10, 93:10, 93:12, 97:4, 99:17, 154:9,

158:13
**discussions** 69:6,
  80:22, 93:14
**dismissed** 147:6,
  148:16, 158:10,
  158:21
**dissolution** 14:14
**distinguish** 112:23
**distracted** 74:6
**distributed** 15:23
**distribution** 101:8,
  101:15
**DISTRICT** 1:1, 1:2
**division** 123:3,
  123:4, 123:6
**divorce** 14:14, 14:16
**Doctrine** 127:15,
  128:6
**document** 89:10
**doing** 10:20, 13:13,
  18:6, 46:1, 46:13,
  57:1, 83:11, 83:16,
  87:25, 91:2,
  100:10, 105:9
**done** 20:19, 25:17,
  26:22, 27:2, 27:24,
  35:12, 57:9, 60:6,
  64:2, 64:7, 64:21,
  64:24, 66:7, 75:14,
  81:13, 82:9, 86:17,
  88:15, 91:4,
  108:14, 116:8,
  124:23, 126:6,
  131:7, 131:18,
  140:19, 155:19
**Dooling** 47:5, 47:6
**double** 62:21, 63:6,
  72:21
**Douglas** 14:16,
  14:17, 15:20,
  53:13, 140:15,
  140:17, 140:20
**down** 5:8, 18:13,
  94:21, 107:11,
  107:24, 141:9,
  141:20
**downloaded** 96:3,
  128:16, 137:23,
  137:25
**downloading** 128:18

**draft** 105:21
**dragging** 104:19
**drawers** 47:2
**drive** 49:17, 114:16
**drives** 52:16, 64:19,
  64:22, 65:3, 77:9,
  77:11, 98:19,
  124:23, 137:23,
  141:8, 141:17
**dropped** 147:15,
  157:17
**Dudas** 48:14, 49:20,
  88:11, 88:19,
  121:7
**Due** 107:1, 107:6
**duly** 4:8, 160:4
**During** 10:1, 12:11,
  13:11, 18:9, 20:24,
  21:21, 22:21, 23:2,
  23:10, 28:21,
  50:20, 51:22, 61:8,
  61:21, 84:13,
  86:13, 90:9, 91:10,
  98:17, 98:19,
  112:4, 112:11,
  112:14, 112:16,
  113:1, 113:5,
  114:9, 119:16,
  119:17, 131:6,
  131:17, 135:20,
  136:8, 136:11,
  145:24, 146:2,
  150:25
**duty** 22:9, 102:22,
  103:5
**DVD** 77:21, 78:1,
  78:4, 78:5
**Dvds** 77:14, 78:8,
  90:5, 90:7, 119:3
**Dvorak** 2:15


**< E >**
**e-mail** 92:24, 93:6,
  93:8, 93:25, 94:20,
  96:17, 96:18, 98:9,
  99:15, 103:10,
  109:15, 149:20,
  150:7, 154:7
**Earlier** 32:10, 43:13,

56:22, 107:22,
  145:11, 156:22
**early** 29:6
**easy** 63:6, 159:6
**Eblin** 68:17, 131:2,
  134:17, 150:20,
  150:21, 154:12
**educated** 16:22
**educating** 56:20
**education** 8:4, 8:12,
  10:9, 10:17, 12:10,
  17:11, 17:13,
  23:13, 23:24,
  25:11, 57:1, 57:2
**educational** 8:3,
  24:3
**effect** 71:3
**effort** 45:1, 155:24,
  156:4
**eight-year** 22:21
**Either** 5:5, 5:11,
  11:18, 33:18,
  38:23, 40:17, 51:2,
  53:13, 107:13,
  112:24, 117:4,
  123:18, 138:9,
  139:19, 141:3,
  142:4, 142:5,
  156:18, 160:17
**electronic** 46:2,
  46:5, 49:8, 113:22,
  113:23, 137:24
**element** 58:17,
  58:21, 60:2,
  148:25
**Elementary** 10:23,
  12:2
**elements** 30:7,
  30:12, 32:15,
  34:11, 34:18,
  34:22, 35:4, 35:10,
  56:11, 56:14,
  57:16, 58:15,
  59:14, 59:19, 60:1,
  60:25, 61:4, 76:20,
  127:21, 157:19
**elsewhere** 84:22
**Embassy** 25:5, 29:3,
  29:7, 29:12, 32:4,
  32:10

**employee** 85:23
**employees** 13:1
**employment** 6:3,
  9:17, 10:1, 10:4
**employment-wise**
  10:20
**encompass** 67:23
**encrypted** 107:22
**encryption** 95:7,
  95:11, 96:10,
  107:21
**end** 14:14, 14:21,
  39:23, 59:11
**ended** 64:15, 154:17
**endorsement** 8:13,
  11:2, 11:4
**Enforcement** 9:19,
  13:24, 14:1, 14:19,
  17:10, 17:14,
  17:20, 36:12,
  137:12
**engaged** 128:8
**enlist** 86:1
**enough** 105:3,
  134:6, 154:19,
  155:9, 155:11,
  157:18
**enrolled** 87:7
**ensure** 5:24
**enter** 9:12, 14:19,
  15:8
**entered** 120:25,
  135:14
**entering** 34:3, 47:10
**enters** 7:25, 120:22
**entire** 135:20
**entry** 47:12, 47:15,
  136:1
**environment** 106:14,
  106:19, 107:15,
  108:3
**ENVY** 50:7, 65:7,
  65:22, 73:1, 84:14,
  94:6, 96:16,
  109:16
**episodes** 47:25,
  105:3
**equipment** 42:23,
  50:12, 52:7, 52:12,
  52:23, 53:3, 53:17,

Exhibit B to Zachary Lutz-Priefert's Affidavit

DEPOSITION OF:  Bryan Svajgl                                    Keyword Index

54:18, 54:21,
64:18, 70:18, 71:2,
74:17, 98:19,
124:18, 146:25
**errors** 78:14, 78:16,
78:21, 79:2, 81:18,
82:4
**escort** 138:21
**Especially** 137:15
**essay** 16:12
**essential** 135:10
**essentially** 142:15
**establish** 59:18,
60:2, 60:25, 61:4
**established** 58:8,
67:4, 119:2
**et** 16:23, 19:3, 21:1,
48:23, 75:21,
112:7
**evaluation** 125:9
**event** 111:16,
133:20, 134:12,
134:20, 141:22,
160:17
**eventually** 60:21,
124:7
**everything** 49:16,
49:23, 74:20, 89:5,
90:8, 90:10, 97:23,
124:23, 136:3
**EVOC** 18:24
**exact** 26:20, 27:12,
50:24, 54:2, 57:20,
59:10, 110:23,
126:7
**Exactly** 9:15, 19:7,
98:1, 105:7,
126:23, 127:13,
132:3
**exam** 140:19,
140:23, 141:22
**EXAMINATION** 3:12,
3:16, 3:20, 4:15,
125:13, 144:1,
157:6
**examine** 74:20
**examined** 4:11
**examiners** 141:12
**example** 10:2, 18:17,
75:8

**exams** 10:10, 10:18
**exception** 91:6
**excess** 22:1
**execute** 38:5, 38:8,
42:22, 57:17, 92:4
**executing** 37:16,
48:1, 90:18
**execution** 20:1,
21:22, 22:4, 30:21,
31:1, 33:13, 34:5,
34:6, 34:12, 34:20,
34:25, 35:1, 45:7,
45:12, 48:6, 50:19,
53:7, 56:17, 76:22,
86:17, 88:3, 98:17,
112:20, 112:25,
113:8, 113:9,
113:15, 113:19,
124:13
**executions** 19:3,
22:22, 23:8
**Exhibit** 79:3, 79:10,
89:9, 89:11,
105:24, 106:2,
106:3
**EXHIBITS** 3:28
**existed** 132:23,
133:13, 134:7,
134:9, 134:10,
134:15
**existence** 153:3,
153:8, 153:16,
153:21
**expected** 133:23
**experience** 53:16,
106:5, 106:8,
109:4
**expert** 74:19
**experts** 75:12
**Explain** 65:20,
84:12, 116:20
**explained** 65:25,
92:19, 93:23, 94:6,
112:3, 138:19,
145:10
**explaining** 32:15
**explanation** 117:23,
117:25
**exploitation** 53:11
**Exploiting** 44:16

**expressions** 160:9
**extent** 32:7, 54:13,
140:9
**external** 64:19,
107:13
**extra** 89:17
**extremely** 107:12
**eyes** 151:25


**< F >**
**Facebook** 40:25,
152:3
**facing** 41:22, 42:1
**fact** 50:15, 104:7,
104:14, 105:10,
109:16, 145:23
**facts** 76:19, 115:2
**failed** 126:21, 127:5
**failure** 128:5
**Fairly** 10:4
**fall** 9:12, 28:20
**familiar** 50:13,
68:21, 69:3, 69:24,
95:8, 95:9, 146:16
**family** 12:9, 87:18
**far** 16:2, 54:8, 55:1,
56:14, 61:24, 62:6,
117:7, 117:8
**fast-forward** 98:13
**father** 12:24, 125:23,
132:13
**fault** 62:22
**favors** 5:3
**FB** 120:12, 121:3
**FBI** 140:22
**feel** 82:15
**felony** 134:18
**felt** 97:23
**few** 5:3, 7:9, 7:12,
13:25, 31:17,
110:23
**Field** 18:1, 18:3,
21:11, 22:13, 76:2
**figure** 9:15, 21:25
**file** 65:4, 66:13, 80:1,
84:9, 84:10,
111:25, 126:25
**filed** 111:25, 114:8,
126:12, 126:14

**files** 63:24, 95:13,
95:14
**filing** 80:6
**fill** 75:17, 121:3
**final** 133:11, 158:9
**finally** 5:18, 150:15
**find** 13:14, 49:16,
50:5, 61:9, 79:13,
82:18, 92:25,
99:13, 101:13,
105:5, 109:10,
119:6, 119:11,
119:14, 134:14,
140:14, 149:4,
156:7
**finding** 133:12
**fine** 159:12
**fingerprint** 66:1,
66:13, 70:2, 70:10
**finish** 5:19, 5:20,
15:3, 91:17
**finished** 14:24,
16:13, 98:12
**firearms** 18:24,
110:5, 110:8,
110:10
**firm** 42:5, 42:7
**First** 4:8, 10:20,
14:7, 14:11, 17:2,
19:21, 20:11, 22:8,
26:15, 26:25, 33:3,
34:6, 34:25, 35:2,
37:1, 37:4, 37:6,
39:5, 39:6, 44:7,
50:22, 50:25, 52:1,
58:4, 59:1, 61:8,
75:18, 78:7, 80:3,
88:10, 91:6,
105:20, 106:17,
107:3, 110:19,
119:2, 140:15,
144:6
**five** 6:17, 22:3, 22:4,
22:22, 23:5, 98:7
**flagged** 70:11
**flash** 49:16, 52:16,
64:19, 64:22,
124:22
**flight** 84:17, 87:12
**folder** 104:20,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                          Keyword Index

104:21
**follow** 38:12
**follow-up** 134:4,
    142:8, 147:8
**follow-ups** 130:20
**following** 58:22,
    81:14, 89:21, 91:1,
    95:18, 144:3,
    149:12, 149:13
**follows** 4:11
**Force** 25:20, 25:21,
    25:24, 26:1, 26:5,
    26:6, 26:10, 53:12,
    53:15, 68:5, 68:19,
    69:13, 69:16,
    86:23, 87:3, 88:16,
    140:16, 140:22
**forced** 101:24
**foregoing** 160:11
**forensic** 46:8, 46:14,
    53:3, 53:17, 63:9,
    63:23, 74:19,
    75:12, 125:24,
    126:1, 131:7,
    135:6, 140:12,
    141:12
**forensically** 64:3
**forensics** 107:6,
    116:8, 140:23,
    141:9, 141:22
**forever** 13:13
**formal** 8:4, 144:23
**format** 138:5
**former** 20:17, 69:13
**formerly** 86:23
**forth** 43:16, 105:20,
    127:21, 160:6
**forward** 5:13
**Found** 50:3, 61:12,
    61:16, 62:14,
    62:24, 63:7, 63:10,
    63:13, 71:2, 77:8,
    78:4, 89:25, 98:16,
    98:18, 110:8,
    115:22, 116:9,
    119:4, 145:24,
    146:2, 146:4,
    148:21, 152:16,
    156:23
**Foundation** 34:14,

35:5, 56:4, 61:13,
    62:9, 62:16, 62:25,
    63:3, 72:18, 86:3,
    86:9, 94:13, 99:3,
    102:9, 102:17,
    103:1, 103:3,
    111:18, 127:8,
    128:25, 130:2,
    132:24, 133:5,
    137:1, 138:10,
    141:6, 142:25,
    147:16, 148:17,
    149:16, 156:1,
    156:2, 157:21,
    157:25, 158:17,
    158:22
**four** 9:9, 12:3
**four-year** 9:7
**frame** 30:3, 32:20,
    33:16
**free** 144:14, 144:19
**freshman** 11:23
**FTO** 22:11
**full** 7:12, 107:3,
    117:23, 117:24,
    118:6, 157:11
**full-time** 12:6
**fully** 151:9


**< G >**
**gal** 93:12
**gamut** 27:8
**garage** 110:5, 110:14
**gather** 49:17,
    108:22, 112:10
**gathered** 89:25,
    112:3, 112:5,
    112:11, 112:14,
    112:15, 112:20,
    112:25, 113:1,
    113:5, 113:11,
    113:22
**gathering** 113:23,
    131:7, 131:17
**gave** 14:20, 26:14,
    40:22, 91:25, 92:5,
    94:18
**gender** 146:22,
    146:23

**General** 1:28, 48:21,
    60:18, 160:2,
    160:26
**Generally** 60:17,
    146:16, 147:10
**generated** 81:12,
    157:2
**gentleman** 43:6,
    68:4, 150:19
**gets** 25:23, 118:13,
    151:21
**getting** 39:23, 62:21
**girl** 131:24, 132:12
**girlfriends** 51:17
**Give** 5:6, 5:15,
    18:17, 21:25,
    29:17, 30:25,
    40:18, 41:12,
    58:14, 68:8, 76:4,
    76:6, 83:15, 84:10,
    84:12, 95:24,
    104:12, 117:10,
    117:23, 117:24,
    123:12, 126:24,
    133:23
**given** 19:8, 20:24,
    21:2, 28:9, 30:12,
    34:18, 38:24, 41:6,
    47:17, 57:7, 66:3,
    76:14, 132:16,
    138:8, 152:21,
    152:24, 152:25,
    153:18, 154:21,
    154:25, 155:2
**gives** 77:17, 82:21
**giving** 89:5
**Goley** 47:8, 47:9
**gotten** 38:4, 38:7,
    108:6, 121:2,
    123:11
**graduate** 21:18, 22:9
**graduated** 9:1, 9:2,
    9:4, 9:16, 10:6,
    10:8, 10:9
**graduation** 9:13,
    10:21
**Grand** 17:20, 18:6,
    35:15
**GRAY** 121:3
**Gretna** 4:26

**Gross** 2:6, 8:17
**Group** 2:15, 47:22
**grow** 8:16
**guess** 9:2, 9:6, 51:7,
    67:20, 68:1, 96:23,
    105:3, 108:20
**gun** 137:11
**guy** 42:15, 53:19,
    53:21, 57:22, 89:4,
    121:8, 134:25,
    135:2, 135:8
**guys** 42:25, 47:2,
    49:11


**< H >**
**hacked** 96:6, 96:7
**half** 4:28, 6:7, 12:3,
    18:4, 18:5, 18:9,
    21:16, 121:18
**handcuffed** 136:2
**handcuffs** 135:25
**happened** 38:10,
    48:25, 55:19,
    104:16, 124:1,
    147:5
**happens** 145:1,
    145:3, 147:11
**hard** 64:19, 65:3,
    73:20, 77:8, 77:11,
    98:19, 132:20,
    137:23
**hardware** 108:9,
    108:10, 108:11
**Harmony** 25:7,
    124:8, 124:11,
    125:4, 125:8,
    125:18, 125:21
**hash** 61:25, 63:17,
    63:18, 64:9, 65:9,
    65:18, 65:22,
    65:24, 66:7, 66:13,
    66:14, 69:22,
    69:24, 70:5, 70:11,
    70:14, 70:17,
    70:21, 70:24,
    70:25, 71:2, 71:15,
    73:17, 82:18, 83:1,
    83:15, 98:20,
    99:10, 103:13,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

103:17, 109:23,
124:15, 125:2,
157:11
**Hauschild** 1:28,
160:2, 160:25
**head** 5:7, 21:5
**heard** 9:19, 44:20,
44:21, 50:16
**Hearsay** 148:18
**held** 143:5, 146:14,
146:17
**help** 86:1
**helped** 105:21
**helping** 5:23, 5:24,
50:23
**hereby** 160:3
**herein** 160:12
**hereinafter** 4:10
**hereunto** 160:19
**herself** 152:3
**Hessig** 80:23
**Higgins** 47:14, 47:15
**High** 8:18, 8:19,
8:21, 9:2, 9:17,
10:7
**highest** 8:4
**Hill** 48:3
**hired** 10:22, 17:2,
17:17
**history** 10:1
**hit** 61:22, 61:25,
63:17, 65:13,
65:22, 70:25,
98:20, 114:1
**hits** 65:13
**Hold** 8:2, 25:5, 29:8,
119:13, 128:19,
137:24
**home** 7:15, 34:21,
35:20, 57:17, 62:6,
62:14, 62:17,
62:19, 62:23,
73:12, 73:13,
73:15, 77:18,
100:3, 100:13,
102:3, 113:22,
113:24, 135:18,
138:2, 140:3
**homeowner** 86:21
**homicide** 31:16

**hook** 52:17, 64:22
**hoping** 149:4
**Houloose** 17:5
**hour** 1:30, 121:18
**hours** 23:17, 23:18,
23:20, 64:8, 107:8,
110:24
**house** 45:24, 48:22,
49:13, 49:16,
112:6, 112:11,
112:15, 116:10,
119:8, 121:21,
135:14, 136:8,
137:21, 143:16,
150:3
**household** 7:13
**houses** 12:13, 27:9
**HP** 94:6, 121:3
**hundred** 99:18,
104:9, 104:11
**husband** 128:21,
132:7, 132:8,
152:19
**Hutton** 101:4,
138:13, 138:24,
139:8, 143:19
**hypothetical** 43:25,
102:18, 103:4,
108:20, 108:23
**hypothetically**
102:20


**< I >**
**ICAC** 77:21, 77:22,
77:23, 78:2, 93:13
**idea** 19:20, 66:10,
68:11, 106:23
**ideas** 97:22
**identical** 70:21
**IDENTIFICATION**
3:30
**identified** 31:23,
34:21, 62:7, 62:10,
65:9, 65:12, 79:14,
90:21, 90:24,
94:20
**identify** 70:12, 74:21
**illegal** 51:19, 72:4,
72:15, 72:25, 74:2,

74:22, 98:24,
128:18, 128:19
**illegally** 110:10
**image** 42:8, 64:14,
70:3, 70:6, 70:10,
70:25, 71:1, 71:19,
71:20, 72:5, 72:15,
72:25, 73:14, 74:2,
141:20
**imagine** 147:7
**imbedded** 107:14
**immunity** 80:17
**important** 5:22, 89:4
**impractical** 107:4
**in.** 89:5
**inaccurate** 137:2
**inappropriate**
125:14
**incarceration**
128:10
**Incident** 3:34, 74:24,
75:5, 77:17, 79:9,
79:25, 82:12,
88:10, 88:14, 89:6,
91:5, 112:1, 114:8,
114:11, 114:13,
114:17, 115:19,
116:1, 117:5,
118:25, 119:1,
120:18, 120:21,
122:22, 122:24
**include** 76:20
**included** 27:9, 28:15
**Including** 33:13,
145:23
**incorrectly** 79:14,
114:9
**incur** 129:15,
129:20, 129:25,
130:11
**INDEX** 3:1, 3:5
**indicated** 31:25,
96:5, 123:22,
132:12, 132:13,
145:5, 148:4
**indicating** 88:24,
89:14
**indication** 63:15,
95:24
**individual** 60:2,

127:13, 133:9
**individuals** 45:11,
46:12, 81:13
**information** 38:22,
40:16, 59:19, 68:9,
69:10, 83:4, 83:17,
84:13, 86:19, 93:2,
121:2, 123:10,
123:11, 123:14,
147:20, 149:7,
149:11, 151:8,
153:18
**informed** 44:8,
61:21, 65:25,
71:23, 98:18,
98:21, 99:15,
100:2, 111:2,
111:19, 111:21,
114:2, 114:3,
124:3, 131:25,
136:14, 146:7,
148:21, 152:2,
152:20, 152:23
**initial** 23:10, 23:11,
127:19, 135:25,
138:13
**initially** 98:6, 117:1
**inquire** 33:8, 33:10,
54:5, 65:18, 92:4,
104:15
**inquiry** 54:13
**install** 12:18, 12:19
**instance** 49:1,
57:15, 58:19, 97:3,
147:13, 148:11
**instances** 48:2
**Instead** 115:14,
116:23
**institution** 134:22
**instruct** 55:8
**instructed** 30:12
**instructing** 76:9
**instruction** 19:17,
20:1, 20:25, 21:2,
34:17, 55:10,
58:15, 76:4, 76:6
**instructions** 20:24
**instructor** 28:11
**instructors** 19:16
**Intended** 89:24,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                                    Keyword Index

90:2, 90:3, 148:22,
152:9
**intent** 54:17, 54:20,
148:25, 149:4
**Intentionally** 57:19
**intercepted** 152:21
**interest** 17:10, 65:9,
65:19, 65:22,
73:18, 82:19, 83:1,
103:13, 103:17,
109:23, 147:10
**interested** 160:17
**Internet** 24:18,
24:20, 27:6, 27:22,
77:24, 106:11,
128:8, 128:11,
137:23
**interpretations**
160:10
**interrogation** 27:8
**interruption** 9:10,
12:4
**intervene** 128:21,
128:22, 128:23,
128:24
**interview** 15:14,
16:13, 16:16, 17:6,
17:7, 33:3, 33:4,
76:24, 86:14,
131:7, 136:4,
136:5, 136:9,
136:11
**interviewed** 40:19,
40:20, 41:5,
133:15, 135:21,
135:22
**interviewer** 125:25
**interviews** 16:10,
16:11, 124:11,
125:24, 126:1,
126:2, 126:4,
133:20
**INTRODUCED** 3:30
**inventory** 77:17
**invest-** 18:23
**investigate** 24:23,
38:25, 68:1, 68:2,
102:2, 102:4,
147:9, 153:7,
155:15

**investigates** 77:25
**investigating** 25:17,
35:2, 35:21, 42:14,
51:14, 51:18, 67:9,
85:15, 85:18,
85:21, 87:22,
100:7, 100:15,
150:22
**investigations**
18:21, 24:7, 31:16,
31:17, 32:13, 36:8,
43:17, 53:10, 60:7,
60:8
**investigator** 33:23,
67:12, 67:15,
67:18, 67:21, 75:1,
130:23
**investigators** 20:17,
24:19, 27:7, 108:8,
125:21
**involve** 17:7, 18:1,
19:2, 23:3, 33:18,
39:6, 51:11, 68:4
**Involved** 9:19, 31:1,
31:25, 32:1, 32:7,
33:15, 37:7, 37:8,
37:11, 37:14,
39:14, 39:20,
40:11, 40:19, 67:4,
95:5, 96:23, 119:2,
119:3, 120:13,
122:8, 122:12,
130:21, 131:1,
133:6, 150:18
**involvement** 45:23,
97:4, 140:10,
148:2
**involves** 142:16,
142:17
**involving** 23:25,
31:19, 34:6, 34:25,
37:2, 44:22, 58:4,
100:15, 154:11
**IP** 93:3, 96:15, 99:16,
103:10, 109:15,
112:7, 113:20,
143:12, 143:14,
149:20, 150:1,
154:7
**Island** 17:20, 18:6,

35:15
**issue** 56:25, 94:21,
100:15, 111:1,
122:14, 151:4
**issued** 138:9
**issues** 159:9
**item** 50:3, 66:1,
66:12, 70:17,
119:21
**items** 46:6, 46:9,
67:1, 77:2, 77:8,
78:7, 78:8, 89:20,
89:21, 91:5, 94:3,
106:7, 112:6,
119:3, 131:19,
131:20, 135:5,
135:10, 137:21,
138:1, 144:3
**itself** 37:24, 70:5,
156:14

**< J >**
**J-G-L** 4:22
**J.** 2:4
**Jail** 136:20, 140:4,
146:9, 146:13,
146:14, 146:17
**January** 21:20,
22:20, 30:19,
30:24, 31:5
**Jeff** 36:5, 43:9
**Jennifer** 1:15, 2:22,
38:13, 131:25,
153:18
**job** 12:6, 15:5, 15:8,
15:10, 15:11, 33:5,
75:6, 100:24,
129:11, 130:12
**jobs** 9:18, 10:2
**Jodi** 1:28, 160:2,
160:25
**join** 26:2, 103:21
**joined** 26:1, 36:8
**joint** 7:8
**Judge** 97:7, 101:4,
135:5, 135:10,
138:8, 138:12,
138:20, 138:21,
138:22, 138:24,

139:8, 139:14,
139:25, 140:9,
143:19
**judges** 19:18
**judgment** 80:19
**jump** 100:21, 100:24
**justice** 13:3, 13:5

**< K >**
**Kansas** 33:2, 85:3
**keep** 64:1, 123:25,
125:4
**keeping** 101:7,
101:11, 101:14
**KENNETH** 1:14, 2:21
**KETV** 122:22
**keyword** 65:12,
65:13
**keywords** 124:19,
124:21
**kids** 7:1, 11:16, 13:8,
14:3, 14:6, 14:9,
102:3, 102:22,
110:3, 124:6,
124:11, 125:25,
126:1
**Kind** 9:20, 18:20,
27:7, 27:9, 43:25,
60:18, 97:13,
100:9, 102:18,
107:4, 107:21,
108:20, 136:24,
142:21
**knowing** 30:11
**knowingly** 57:19,
104:5, 104:23,
105:9, 157:19,
158:16, 159:3
**knowledge** 53:18,
55:1, 55:2, 55:13,
71:6, 71:7, 74:1,
123:10, 124:8,
134:13, 141:19,
152:9, 153:20
**known** 70:14, 83:1,
116:24, 124:24,
125:2
**knows** 104:25, 106:4
**Kustka** 47:11,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                              Keyword Index

146:12

< L >
L. 1:14, 2:21
La 15:20, 25:5, 29:3, 53:13, 53:14, 85:4, 85:8
Lab 140:15, 140:20, 140:22, 140:23, 141:9, 141:20
laboratory 106:13, 107:15
labs 140:12
LAPTOP 121:4
large 98:22, 98:25
larger 12:20
Last 4:18, 4:20, 4:29, 12:2, 19:22, 21:15, 47:23, 47:24, 108:12, 116:1, 126:9, 136:5
later 64:2, 64:4, 64:5, 79:12, 106:13, 106:21, 115:6, 117:20, 118:20, 119:12, 119:14, 124:10, 145:1
Law 2:15, 9:19, 13:24, 14:1, 14:19, 17:10, 17:14, 17:20, 18:22, 19:1, 36:12, 42:5, 42:7, 137:12
lawful 4:8
lawsuit 80:7, 111:25
lawyer 133:17, 155:15, 156:9
lawyers 42:15, 68:1, 68:2, 68:10, 127:12, 132:18, 133:15, 133:18, 134:14, 155:25, 156:4
layout 48:22
lead 30:21, 33:22, 37:5, 38:8, 39:10, 51:8, 58:7, 67:12,

67:15, 67:18, 67:21, 75:1, 83:12, 87:24
leading 86:17
learn 15:10, 20:14, 44:7, 109:1, 125:11, 125:20, 147:19
learned 39:5, 125:7
least 34:17, 79:23, 123:23
leave 13:7, 13:21, 13:22, 89:6, 100:8, 139:19, 144:14, 144:19
leaves 72:14, 72:24, 73:25
leaving 100:19, 111:4
led 13:24, 91:21, 113:24, 125:25
left 13:15, 14:22, 72:10, 73:23, 110:25, 111:16, 121:22, 138:2, 139:5
legal 18:21, 19:1, 19:17, 20:1, 30:5
lengthy 107:6
Leonard 17:5
less 22:25
level 8:4
lieu 55:14, 55:16
Lieutenant 123:1, 123:11
lieutenants 122:19, 123:2
life 51:1
likely 26:24, 35:13, 56:9, 79:17, 108:21, 123:13, 131:24, 136:2
likewise 43:19
limited 51:11, 142:24, 149:19
Lincoln 2:27, 28:13
line 107:2, 121:3, 132:9
lined 13:16
lines 12:19

list 88:24, 89:20, 89:24
listed 32:9, 78:7, 88:23, 88:24, 119:3, 137:22
listing 89:11
little 8:2, 11:12, 20:8, 41:14, 77:7, 79:1, 96:21, 98:2, 150:16
lived 124:4
LLC 2:15
LLO 2:6
loaded 92:20
loan 85:6
local 25:8, 29:12
locate 77:14, 91:10, 91:14, 91:18, 99:14
located 108:11
locating 77:11
location 48:22
locked 93:9, 94:21
log 50:3, 89:5
log-in 40:17, 40:22, 40:23
logging 121:8
long 4:27, 6:6, 12:2, 19:6, 21:15, 21:19, 35:8, 36:6, 37:5, 66:15, 110:19, 110:21, 110:22, 136:5
longer 22:21, 31:6, 33:16, 64:8
look 41:1, 41:18, 43:2, 49:15, 52:17, 59:23, 60:25, 61:4, 62:3, 71:1, 71:18, 72:11, 77:1, 77:4, 84:5, 90:10, 95:7, 97:22, 97:24, 105:23, 109:4, 110:15, 110:17, 111:8, 117:10, 118:25, 119:25, 126:7, 140:13, 159:9
looked 64:18, 77:17, 95:5, 97:23, 147:1,

147:2
Looking 46:6, 47:3, 49:4, 49:7, 49:8, 49:12, 54:19, 58:16, 58:23, 59:24, 61:8, 78:25, 88:8, 101:2, 108:5, 112:13
loss 129:16, 129:21, 129:25, 130:12
lost 129:11
lot 13:11, 25:17, 86:19, 104:12, 127:11
lots 98:21, 99:11
Louanne 14:13
loved 13:8
Lutz-priefert 2:5
Lyons 1:13, 2:13, 2:33, 7:25, 16:25, 17:1, 32:18, 43:14, 43:15, 48:18, 76:4

< M >
M. 2:14
MAAS 46:22, 46:25, 47:1, 120:12
machine 5:8, 160:6
MADAM 4:1
main 94:8, 157:19
maintaining 47:13
manner 128:8
MAPA 15:14, 15:22, 16:3
March 25:2, 26:24, 27:3, 27:21, 29:6, 29:15, 30:3, 30:13, 38:6
mark 79:6, 79:8
marked 79:7
marked. 79:10
marriage 6:15, 6:21, 14:7
married 6:10, 86:25, 130:5
MASS 121:3
material 12:18, 49:13
materials 19:8,

DEPOSITION OF:  Bryan Svajgl                          Keyword Index

19:11

**matter** 75:11, 85:14, 85:17, 85:20, 123:8, 124:7

**mattered** 83:21, 84:3

**matters** 18:22, 19:1, 19:17, 20:1, 44:22, 57:2, 77:18, 87:21

**mean** 21:4, 29:20, 48:2, 56:6, 66:10, 66:18, 68:11, 80:6, 80:7, 105:1, 107:5, 107:8, 107:19, 109:18, 116:5, 119:8, 120:3, 120:6, 120:8, 121:11, 127:14, 134:8

**meaning** 119:8

**means** 40:1, 40:2, 120:4, 121:13, 126:22, 127:16

**media** 49:9, 121:22, 121:24, 122:2, 122:5, 122:9, 122:12, 122:15, 122:20, 122:24, 123:12

**meet** 33:6, 47:22, 138:21, 142:19

**meeting** 30:2, 33:7, 47:25, 48:5, 48:8, 48:11, 48:21, 50:20

**member** 69:14, 69:17

**members** 12:9, 17:8, 121:22

**mentioned** 26:9, 30:16, 31:19, 43:9, 43:23, 50:12, 51:24, 67:8, 95:4, 107:21, 110:14

**Mertins** 75:13, 81:11, 88:16, 141:14, 142:9, 148:20, 156:22

**Messenger** 40:25

**met** 48:3, 50:25, 76:21, 77:6, 126:2,

138:19, 141:11, 141:15

**method** 94:1

**methodology** 74:14

**Microsoft** 44:9, 92:21, 93:9, 98:8, 114:16, 137:25, 143:13

**Midlands** 12:17

**mind** 46:14, 116:11, 128:2

**mine** 6:23, 6:24, 79:7, 88:7

**minor** 87:5, 87:7, 100:19

**minute** 128:1

**minutes** 136:7

**mirror** 141:20

**misquoting** 154:23

**missed** 78:21, 85:1

**Missing** 44:16

**Missouri** 85:3

**misspelling** 4:24

**misspellings** 159:9

**mistake** 85:1, 118:20

**mistaken** 13:3, 16:6, 20:7, 61:11, 109:22

**mistakes** 80:3, 118:6, 118:7, 118:12

**misworded** 115:8, 115:9

**mitigate** 126:21, 127:6, 128:6

**mix** 51:21

**Mom** 38:24, 41:5, 41:12, 151:10, 151:11, 151:22, 151:24, 152:20, 153:16, 153:21

**moment** 90:10

**month** 15:1

**months** 12:7, 12:11, 13:10, 13:11, 18:4, 18:5, 18:9, 21:16, 27:13, 27:20, 33:16, 68:22, 81:16

**morning** 4:17

**mother** 40:13, 132:4, 132:5, 134:8, 134:9, 151:14

**mother-in-law** 124:4

**motor** 18:23, 21:1

**Move** 117:13

**moved** 93:7, 94:22

**moving** 5:13, 71:22

**Ms** 40:8, 43:1, 43:6, 58:14, 68:1, 69:7, 79:21, 80:22, 80:23, 81:22, 93:13, 97:11, 98:1, 98:4, 100:1, 103:9, 103:12, 109:14, 111:11, 111:14, 112:1, 112:17, 114:10, 114:13, 115:3, 117:2, 117:6, 118:16, 124:10, 126:2, 130:22, 145:5, 147:22, 148:10, 150:16, 150:18, 151:4, 151:21, 152:23, 153:20

**multiple** 15:15, 139:17

**Myself** 56:20, 105:22

**< N >**

**Naders** 33:14, 62:14, 123:16

**naked** 133:1

**name** 4:18, 4:20, 14:11, 14:12, 16:14, 16:18, 19:21, 19:22, 28:11, 31:17, 66:14, 68:8, 68:12, 68:13, 68:16, 150:19

**names** 65:4, 84:9, 84:10

**narcotics** 20:17

**National** 44:16

**NCMEC** 44:9, 44:15, 44:22, 90:15, 153:25

**Nebraska** 1:2, 1:29, 1:31, 2:9, 2:18, 2:24, 2:27, 7:21, 8:7, 17:20, 57:12, 77:25, 141:9, 160:3

**necessarily** 36:20, 48:2, 103:4

**necessary** 31:24, 60:1, 97:24

**need** 10:10, 26:9, 56:11, 60:19, 74:8, 97:22, 103:7, 108:22, 108:25, 109:10

**needed** 53:19, 58:20, 59:18, 91:23, 93:23, 116:4, 134:25, 135:2, 138:20, 142:6

**negative** 63:6

**negatives** 62:21, 72:22

**negligence** 128:4

**neighbors** 123:15

**neither** 37:11

**new** 17:25, 150:10, 152:4

**Newswatch** 122:22

**next** 5:21, 13:23, 29:9, 64:7, 97:19, 107:1, 110:8, 114:7, 119:20

**nice** 5:24

**NICHOLE** 1:5

**night** 47:24

**nights** 14:4

**nine** 12:7, 13:11

**No.** 1:6, 51:2, 53:5, 64:24, 68:20, 78:6, 82:13, 91:18, 97:20, 108:20, 119:21, 129:8, 130:5, 134:6, 134:11, 140:16, 145:15

**nobody** 54:25, 95:1, 95:2

**nod** 5:7

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                          Keyword Index

**none** 53:5, 61:11, 61:16, 67:5, 67:6
**nonsensical** 136:25
**nor** 117:5
**normally** 95:5, 144:7
**Nos.** 3:30, 79:10
**Notary** 1:28, 160:3, 160:26
**note** 85:1
**noted** 122:24
**notes** 4:24
**Nothing** 35:18, 56:23, 64:15, 82:19, 83:1, 98:24, 99:7, 150:10
**notice** 14:21
**noticed** 81:24
**November** 22:16, 22:19
**NSP** 53:13
**nude** 38:23
**number** 18:14, 30:16, 67:3, 104:12

**< O >**
**Object** 63:1, 103:19, 116:16, 117:12, 117:15, 124:20, 127:7, 128:25, 141:6, 154:24, 157:24
**objections** 74:7, 99:4, 130:3, 147:18, 158:1, 158:3
**observe** 65:4, 71:20, 71:25
**observed** 82:5
**obtain** 10:15, 17:18
**obtained** 78:9, 97:17, 150:10
**Obviously** 61:6, 90:5, 146:22
**occurred** 138:1
**occurring** 78:24
**odd** 155:23, 156:7
**oddness** 156:12
**offer** 129:4, 147:2

**offered** 15:5, 16:5
**office** 96:19, 97:5, 116:2, 116:18, 138:19, 139:11, 142:12, 147:20
**Officer** 15:9, 17:25, 18:8, 20:20, 21:10, 21:12, 21:19, 21:21, 22:6, 22:10, 22:21, 23:10, 30:21, 31:6, 36:18, 39:10, 45:16, 45:19, 75:18, 83:12, 87:24, 89:1, 146:12
**officers** 19:17, 45:1, 48:10, 53:6, 55:4, 69:6, 75:10, 77:6, 86:5
**offices** 155:3
**Offutt** 68:4, 68:21, 69:8, 69:19
**often** 127:13
**Okay** 5:16, 5:17, 5:25, 6:1, 36:14, 42:4, 53:6, 54:14, 58:11, 84:16, 84:23, 91:19, 92:24, 96:18, 101:18, 108:13, 113:17, 114:20, 118:1, 123:21, 126:25, 127:2, 131:13, 131:23, 150:1
**old** 131:4
**oldest** 7:2, 7:5
**Omaha** 1:31, 2:9, 2:18, 8:7, 8:17, 10:22, 15:21, 16:2, 16:16, 20:16, 20:17, 28:12
**on-call** 96:20, 96:22
**On-site** 12:25, 46:18, 46:19, 47:18, 47:20, 49:21, 54:6, 54:9, 54:15, 83:16, 84:6, 88:21, 98:17, 107:4, 107:10, 108:9, 135:3,

135:4
**Once** 21:18, 33:12, 67:16, 101:12, 136:3, 144:18
**one.** 27:20
**ones** 16:3, 26:20, 31:18, 32:12, 122:19
**Online** 14:1, 15:12, 24:7, 24:9, 24:23, 25:18
**open** 63:23
**opening** 15:6, 73:21
**openings** 15:25
**opinion** 145:10
**opportunities** 26:18, 128:11, 128:15, 128:23
**opportunity** 5:19, 15:4, 21:22, 128:21, 129:11
**opposed** 5:6, 79:16
**OPS** 11:7
**optimal** 53:14
**option** 102:21
**Orchard** 123:1, 123:11
**order** 60:19, 60:25, 70:14, 71:17, 140:14
**Original** 120:6, 121:10
**originally** 116:6, 116:7
**Orin** 123:1
**OS** 50:13, 50:16, 51:24, 52:2, 65:7, 84:14
**Others** 26:21, 26:22, 27:2, 75:5
**otherwise** 142:5, 160:17
**outside** 32:24, 32:25
**overall** 109:3
**overseeing** 36:20
**own** 6:16, 6:20, 21:17, 45:5, 66:13, 75:8, 81:24, 151:25
**owned** 86:21, 96:16

**< P >**
**p.m.** 159:13
**Page** 3:3, 3:4, 3:5, 3:6, 3:7, 3:13, 3:15, 3:17, 3:19, 3:21, 3:32, 3:34, 51:17, 89:13, 89:15, 89:19, 106:3, 107:1, 112:2, 114:7, 114:18, 119:1, 119:20
**pages** 89:17
**paid** 13:12
**paint** 12:13
**Papillion** 1:11, 2:12, 6:4, 6:5, 13:18, 15:4, 15:18, 15:19, 16:14, 16:17, 16:19, 17:2, 17:22, 18:9, 20:19, 21:9, 21:13, 48:9, 51:15, 55:3, 55:7, 55:11, 55:23, 71:10, 76:9, 76:17, 78:11, 85:5, 85:6, 85:9, 85:12, 85:15, 85:17, 85:19, 85:23, 108:24, 109:7
**paragraph** 79:13, 106:4, 106:18, 107:11, 108:12, 112:2, 112:13, 112:18, 114:7
**parentheses** 160:9
**part** 20:22, 23:11, 25:20, 35:8, 64:23, 77:4, 80:1, 98:10, 100:24, 102:22, 108:12, 115:18, 117:8, 120:21, 123:21, 131:20
**partial** 140:19, 140:23
**participate** 21:22
**participated** 23:2, 30:17, 33:23
**Particular** 8:14,

WEYANT REPORTING - (402) 345-5202

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF: Bryan Svajgl                    Keyword Index

20:7, 25:14, 40:9,
45:15, 48:25, 54:4,
95:11, 97:3, 140:2
**particularly** 82:10
**parties** 131:18
**party** 143:7, 160:17
**passed** 153:23
**passwords** 95:2
**PATC** 28:10, 29:10
**Patrol** 21:17, 22:20,
77:25, 141:5,
141:9
**Paul** 62:6, 88:6
**pay** 13:9, 86:2, 86:6
**Payton** 36:5, 43:9,
43:23, 44:4, 44:13,
45:4, 48:16, 76:6
**PC** 2:6
**PD** 123:3
**Pedophile** 102:8,
102:10, 102:16,
102:25
**penal** 134:22
**people** 42:13, 86:1,
88:24, 94:23,
102:7, 146:16
**percent** 125:12
**perform** 55:4,
141:16
**perhaps** 74:21,
152:5
**perimeter** 23:9,
47:13, 47:16
**period** 22:22, 23:3,
51:1
**Perlman** 147:21,
148:15
**perpetrates** 102:5
**perpetrator** 133:2
**perpetrators** 57:21
**Person** 7:17, 56:9,
56:10, 75:2, 93:25,
94:15, 94:16,
100:13, 102:3,
102:5, 106:13,
106:21, 122:23,
135:25
**personal** 57:1, 57:2,
129:16, 129:21,
130:13, 134:12

**personally** 102:23,
129:12
**pertaining** 30:5
**phone** 12:19, 27:8,
49:17, 92:10, 97:6,
109:13, 155:6,
155:7
**phones** 27:8, 137:23
**photo** 40:16, 41:6,
41:9, 41:13, 66:11,
66:15, 134:7,
151:22, 151:25,
152:2, 152:5,
152:11, 152:21,
153:17, 153:21,
154:13, 154:14,
154:22, 155:1,
155:2, 155:10,
155:12
**photograph** 131:14,
131:24, 132:9,
132:16, 133:1,
133:13, 151:1,
152:19, 153:3,
153:8
**photographed**
103:8, 132:13
**photographs**
114:15, 115:4,
115:20, 131:15
**photos** 51:17, 51:18,
51:19, 51:20,
63:23, 66:18,
66:19, 154:4
**physical** 55:16,
124:18
**picture** 38:22, 40:24,
42:20, 42:21,
143:15
**pictures** 84:5, 90:18
**piece** 52:12, 52:22,
64:18, 70:18
**pieces** 92:18
**Pinewood** 10:23,
11:5, 12:1, 13:7,
13:15, 14:20
**pipe** 105:6
**pitcher** 7:24
**place** 15:13, 57:23,
69:8, 111:13,

125:14, 144:5,
144:18, 145:14,
145:18, 160:12
**placed** 65:1, 111:3,
128:9, 136:14,
144:23
**placing** 144:11
**Plaintiff** 128:7,
128:20, 129:9
**Plaintiffs** 1:7, 1:14,
2:3, 126:20, 127:5,
127:15
**plan** 49:25
**play** 8:21, 34:1
**Please** 34:15, 91:17
**plug** 54:23
**pocket** 105:5, 105:6
**point** 17:13, 34:12,
38:4, 38:7, 39:13,
40:16, 51:23,
92:10, 121:21,
122:11, 124:12,
125:7, 125:11,
125:20, 131:11,
131:13, 136:13,
136:16
**pointed** 81:18
**Police** 6:4, 13:18,
15:5, 16:16, 16:25,
18:8, 20:19, 48:9,
52:2, 74:17, 75:19,
76:9, 76:18, 85:15,
85:17, 87:20,
122:14
**policies** 55:3, 76:8,
76:11, 76:13,
76:14, 76:17,
78:11
**policy** 53:12, 55:12,
55:13, 55:22,
109:6
**POLIKOV** 1:14, 2:21
**porn** 32:12, 49:10,
64:14, 66:2, 70:13,
70:14, 96:3, 99:11,
100:8, 102:2,
105:10, 116:9,
116:25, 128:16,
128:18, 128:19,
136:15, 148:23,

153:13
**pornographic** 69:7
**pornography-relate
d** 65:4
**portion** 98:25
**Portions** 157:8
**pose** 101:24
**position** 8:1, 13:16,
13:19, 16:7, 128:9
**possessed** 104:5,
109:19, 110:11,
154:20
**possessing** 57:19
**Possession** 21:3,
23:4, 30:13, 31:21,
32:8, 32:16, 33:19,
34:7, 34:19, 34:23,
34:25, 35:2, 35:22,
37:2, 37:11, 38:1,
39:7, 39:14, 40:5,
40:7, 40:12, 41:24,
56:14, 57:6, 58:5,
100:8, 100:11,
100:16, 101:7,
101:12, 101:14,
102:15, 102:24,
153:13, 156:9
**possibility** 154:1
**Possible** 35:21,
61:22, 63:17,
63:18, 64:9, 66:2,
98:20, 99:10,
99:21, 114:1,
153:13
**Possibly** 38:22,
39:14, 49:9, 93:7,
94:22, 99:18,
104:8, 104:11,
104:20, 105:11,
105:13, 105:15,
105:16, 121:1,
123:9, 132:14,
132:19, 152:2,
152:21, 155:2
**post** 9:17
**posting** 15:11, 51:16
**potential** 48:23,
63:15, 63:18,
81:21, 84:17,
108:11, 153:8

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                                    Keyword Index

**potentially** 42:14, 70:12
**power** 137:7
**prearrest** 128:11, 128:15
**precategorized** 66:2
**preliminary** 124:23
**premises** 101:5, 110:20, 110:22
**Prep** 11:12, 11:16
**preparation** 80:7, 80:23, 81:3, 82:7
**prepare** 80:15, 82:11, 127:12
**prepared** 80:12, 88:11, 138:25, 139:14
**preparing** 5:13, 76:18, 80:13
**presence** 138:25, 139:3
**PRESENT** 2:30, 4:25, 4:29, 126:2, 126:4, 129:23
**pressure** 155:24, 156:4, 156:5
**Preston** 46:22
**pretty** 13:2, 89:4
**prevent** 5:22, 128:21
**preview** 46:18, 47:18, 50:4, 50:10, 73:3, 83:16, 94:9, 94:11, 95:19, 98:20, 99:7, 119:16, 124:23, 135:3, 135:4
**previewing** 47:20, 77:12
**previews** 46:20, 54:6, 54:9, 54:15
**previous** 6:15, 51:22, 114:15, 115:4, 115:19, 150:16
**previously** 114:8
**primarily** 75:2
**primary** 45:16, 75:1, 130:23
**prints** 120:22
**Prior** 6:21, 6:22,

28:25, 30:18, 32:14, 34:12, 34:19, 37:9, 44:18, 48:5, 50:20, 50:21, 51:4, 62:11, 67:6, 67:9, 67:16, 68:22, 69:7, 72:3, 73:5, 78:5, 78:6, 79:25, 83:16, 90:18, 92:3, 96:6, 99:16, 111:3, 111:11, 130:21, 148:8, 157:2
**probable** 55:24, 55:25, 56:2, 56:6, 91:22, 91:24, 91:25, 92:5, 93:20, 97:14, 97:21, 101:5, 112:18, 115:16, 118:18, 137:15, 145:16, 145:18
**Probably** 5:21, 14:1, 20:11, 22:2, 28:5, 28:21, 34:2, 35:9, 60:22, 67:19, 68:15, 71:7, 75:17, 93:8, 109:3, 110:4
**problem** 117:8
**problems** 79:12, 79:24
**procedure** 39:20, 42:11, 55:21
**procedures** 76:9
**proceedings** 131:18
**process** 14:19, 17:17, 20:5, 37:8, 80:4, 80:6, 107:3, 107:9, 131:21, 135:20, 139:21, 142:4
**processed** 106:13, 106:21
**processing** 63:10
**produced** 89:21
**program** 9:20, 9:23, 17:24, 17:25, 22:11, 22:12, 22:13, 25:8, 65:7, 71:21, 76:2
**programs** 52:8, 95:7

**Project** 25:7, 124:8, 124:11, 125:4, 125:8, 125:18, 125:21
**promotion** 31:9, 31:13
**proper** 123:4
**Property** 33:14, 34:6, 78:4, 86:21, 89:12, 90:22, 91:11, 119:2, 119:3, 119:4, 119:6, 119:7, 119:8, 119:20, 120:13, 121:5, 121:6
**prosecuting** 43:7, 148:3
**prosecution** 131:20, 132:22, 133:1, 133:7, 142:6, 153:4
**protect** 100:25
**Protective** 124:9
**prove** 58:20, 64:14, 127:4, 127:5, 157:18, 158:15, 159:3
**provided** 19:13, 40:17, 141:23
**psychological** 125:8
**psychologist** 125:12
**psychologists** 125:21
**Public** 1:29, 10:22, 68:15, 160:3, 160:26
**pull** 57:13
**purge** 51:16
**purported** 129:16, 129:21
**purpose** 74:16, 101:6, 106:14, 107:25
**purposes** 76:15
**pursuant** 1:31
**pursue** 10:13
**put** 13:10, 20:16, 28:8, 89:7, 101:8, 104:19, 105:14,

106:9, 115:2, 118:13, 118:20, 120:13, 143:18
**puts** 25:6

**< Q >**
**qualified** 80:17, 106:13, 106:21
**quantity** 98:22
**question** 5:4, 5:11, 5:14, 5:16, 5:19, 5:21, 29:9, 31:4, 34:15, 34:24, 43:25, 55:6, 62:12, 62:13, 63:13, 65:20, 71:11, 74:6, 76:16, 84:2, 90:23, 103:20, 108:21, 108:23, 110:8, 116:17, 117:3, 117:13, 117:17, 125:2, 129:6, 134:25, 149:14, 150:25, 158:3, 159:1
**questioned** 100:9
**questioning** 144:4
**questions** 17:9, 60:16, 150:17, 156:19, 157:5

**< R >**
**raised** 56:25
**raises** 117:3, 126:19
**ran** 19:17, 27:7, 50:10
**re-read** 74:10, 118:7, 118:10, 158:2
**re-reading** 74:8
**reach** 96:25
**reached** 97:2
**read** 59:17, 59:22, 74:11, 82:21, 126:24, 138:22, 138:24, 142:19, 158:8, 159:11
**Reading** 59:14, 59:21, 59:24,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF: Bryan Svajgl                          Keyword Index

118:22, 130:10, 160:13

**real** 9:17

**realize** 80:3, 80:4

**really** 13:11, 47:25, 70:23, 70:24, 73:7, 136:24, 150:10

**reask** 34:15

**reason** 71:21, 111:17, 111:20, 111:22, 135:2

**reasonable** 128:10, 137:15

**reasons** 77:16, 129:16, 129:21, 130:13

**receive** 25:11, 75:23

**received** 8:6, 34:10, 35:3, 38:21, 40:17, 44:8, 55:11, 56:15, 56:17, 73:5, 75:25, 79:15, 83:7, 92:5, 98:6

**receiving** 44:18, 106:9

**recent** 27:5, 28:8

**recently** 27:14, 27:21

**recess.** 66:25, 121:19

**recollection** 34:22, 52:18, 62:1, 62:4, 117:10, 118:19

**Record** 4:19, 5:24, 11:24, 68:15, 74:11, 158:8

**record.** 11:25

**recording** 77:20

**records** 79:15, 142:21, 143:3, 143:5

**RECROSS-EXAMIN ATION** 3:18, 156:20

**REDIRECT** 3:16, 3:20, 144:1, 157:6

**reduced** 160:7

**refer** 92:24, 104:13, 111:5, 113:12

**reference** 81:19,

**referenced** 90:7, 95:6

**references** 81:22

**referencing** 76:11, 102:24

**referred** 27:17, 76:11, 130:12

**referring** 112:6, 132:2

**refers** 77:20, 122:22

**refugee** 84:21, 84:24, 86:13, 87:11, 87:16

**regard** 129:5, 157:15

**regarding** 55:11, 134:4, 151:1, 152:14

**regardless** 70:24

**regards** 129:13

**related** 29:24, 67:7, 75:5, 101:7, 101:11, 101:14, 111:1, 116:1

**relative** 160:16

**relatively** 124:12

**relatives** 87:18

**relevant** 25:16

**rely** 46:14

**remain** 21:19

**remaining** 15:1

**Remember** 19:21, 21:5, 57:20, 58:9, 60:16, 66:5, 98:5, 116:6, 117:20, 133:10, 133:17

**remove** 140:3

**removed** 124:1, 146:25

**removing** 55:17, 74:16

**renders** 107:3

**repeat** 5:3

**Rephrase** 5:12, 84:2, 90:23, 119:13

**reported** 114:15

**Reporter** 1:28, 3:7, 4:1, 5:23, 160:2, 160:10

**reporting** 45:16,

75:3, 76:10, 76:12, 76:14, 78:12, 82:9, 82:10

**reports** 75:5, 75:10, 75:17, 75:21, 76:18, 81:5, 81:10, 81:12, 82:15, 82:16, 82:21, 88:15, 89:6

**representing** 43:5, 68:10

**request** 38:8, 155:14, 156:14

**requested** 26:2, 38:12, 43:2, 82:13

**requested.** 74:11, 158:8

**require** 76:18, 106:6

**required** 59:14, 107:16

**requirement** 4:2, 23:13, 23:16, 83:10

**research** 13:13, 13:22, 13:23, 13:25, 15:12, 59:25

**residence** 59:6, 72:11, 89:21, 90:1, 90:6, 90:9, 90:25, 93:21, 110:5, 122:9, 146:4, 150:5

**resolved** 39:19, 39:24

**respect** 29:1, 31:1, 33:19, 34:11, 34:18, 45:23, 55:3, 55:15, 55:21, 56:25, 61:3, 75:24, 79:20, 80:9, 82:9, 94:2, 112:5, 113:19, 128:3, 129:18, 134:24, 142:4

**respond** 103:16

**response** 5:5, 5:6, 103:24

**responses** 16:4, 16:8

**responsibility** 47:17, 75:2

**responsible** 75:3

**responsive** 79:15

**rest** 77:9, 115:12

**restrained** 135:15

**result** 42:10, 61:17, 78:9, 81:13, 91:21, 96:15, 101:15

**results** 15:15, 65:2, 128:12

**retain** 19:11, 147:10

**return** 5:20, 21:9

**reveal** 73:8, 73:11, 126:5

**review** 57:4, 58:1, 78:14, 78:19, 81:3, 81:8, 81:24, 82:1, 95:3, 126:17, 142:19, 154:4, 159:7

**reviewed** 20:6, 57:6, 79:23, 81:4, 90:17, 114:8

**Reviewing** 76:8, 118:22, 118:23, 118:24

**ride-along** 9:20, 17:14

**ride-alongs** 13:25, 14:4

**riding** 21:12

**ring** 68:23, 69:8

**risk** 84:18, 87:13

**Road** 15:9, 21:19, 21:21, 22:6, 22:10, 22:21, 31:6, 36:18, 88:2

**role** 23:7, 30:18, 34:1, 37:15, 37:22, 68:25, 76:22

**room** 43:22, 46:6, 96:10, 136:3, 139:7

**room.** 7:25

**rooms** 95:17, 95:18

**rotation** 148:11

**roughly** 22:21

**router** 27:8

**RPR** 160:25

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Rule** 4:2, 127:20
**ruled** 102:21
**rules** 5:22
**run** 52:8, 54:18,
  54:21, 54:23, 65:2,
  65:7, 140:13
**running** 16:15,
  16:18, 84:14,
  84:15, 119:17
**Ryan** 2:14, 80:13,
  127:18

**< S >**
**S-T-O-L-Z** 19:24
**S-V-A-J-G-L** 4:21
**safe** 100:23, 103:7,
  123:25, 136:3
**safety** 100:10, 136:1
**sake** 137:20
**Sarpy** 1:11, 2:21,
  14:16, 15:20,
  16:10, 136:19
**saw** 72:7, 101:22,
  141:1
**saying** 49:15, 63:7,
  63:17, 96:14,
  125:15, 128:16,
  152:4
**says** 53:12, 78:1,
  89:16, 89:20,
  101:4, 107:1,
  107:11, 114:11,
  114:13, 116:2,
  119:1, 119:20,
  119:25, 128:11,
  129:15
**scans** 140:13
**scene** 63:11, 63:13,
  63:16, 63:25, 64:1,
  101:17, 101:18,
  110:9, 119:5,
  122:23
**schedule** 14:3,
  124:10
**School** 8:18, 8:19,
  8:21, 9:2, 9:17,
  10:7, 14:24, 15:2,
  15:3, 87:8, 100:4,
  131:10, 131:12

**Schools** 10:22,
  12:21
**Science** 8:12, 10:9
**Scott** 1:13, 2:13,
  2:33, 7:25
**Scratch** 88:3, 88:8
**screen** 52:18
**seal** 160:20
**searched** 99:23,
  136:1
**searches** 19:3,
  33:14, 106:5,
  122:2
**searching** 27:8,
  27:9, 34:3, 46:2,
  46:4, 47:1, 77:7,
  77:9
**seasonal** 10:3
**seated** 136:8
**second** 89:9
**Secondly** 5:10
**section** 120:14
**secure** 76:23, 104:4
**secured** 144:21
**seeing** 101:2
**seek** 42:22, 60:22
**seem** 52:20
**seems** 100:21, 113:7
**seen** 62:10, 90:18,
  121:25, 126:11,
  151:25
**segregated** 146:19,
  146:22
**seize** 135:11
**seizure** 106:6,
  135:10
**seizures** 19:3, 106:5
**select** 45:1, 45:11
**selected** 32:2, 32:7
**selecting** 46:11
**semester** 9:14
**seminar** 26:13, 29:2,
  29:23, 29:24,
  30:14
**seminars** 24:14,
  26:13, 26:17,
  27:22, 27:23
**send** 15:15, 86:5,
  152:3
**sent** 17:22, 51:17,

93:13, 132:17,
  152:12, 152:15,
  152:17, 153:7
**sentence** 91:17,
  106:12, 106:17,
  107:3, 113:12,
  116:1
**sentenced** 134:22
**separate** 16:3,
  41:21, 41:25
**Sergeant** 36:3, 36:4,
  36:5, 36:6, 36:14,
  36:17, 36:19,
  36:23, 43:10,
  43:23, 44:4, 44:12,
  45:4, 48:16, 76:6
**served** 53:9
**Services** 124:9
**serving** 107:10
**session** 30:11
**sessions** 18:19,
  24:6, 24:10, 24:16,
  29:3, 30:4
**set** 16:15, 105:20,
  160:6
**sets** 127:21
**setting** 43:16
**seven** 116:10,
  116:23
**several** 12:9, 47:24,
  98:19, 99:18,
  104:9, 104:11
**Sexting** 152:7
**sexual** 38:13, 39:7,
  39:11, 39:20, 40:5,
  41:25, 42:11,
  101:19, 102:6,
  130:22, 130:23,
  150:23
**shake** 5:6
**share** 83:17
**sharing** 95:13, 95:14
**sheets** 121:5, 121:6
**Shelby** 75:12, 81:11,
  88:16, 141:14,
  148:20, 156:22
**sheriff** 140:17
**shift** 118:6
**short** 124:12
**Shorthand** 1:28,

160:2, 160:7
**shortly** 10:7
**Shouldn't** 43:23,
  128:16
**show** 47:25, 94:11,
  124:24
**showed** 50:15
**shown** 154:4
**shut** 107:24
**sic** 16:20, 24:11
**side** 112:24
**sign** 97:8, 138:22,
  142:20
**signature** 160:19
**signed** 120:19,
  138:20, 139:2
**significantly** 75:14
**signing** 78:19,
  79:25, 82:1,
  160:14
**similar** 9:23, 52:25,
  53:10, 66:19,
  142:17
**similar-type** 30:4
**simply** 138:1
**sir** 16:24
**sit** 98:3, 141:19
**site** 52:14, 64:21,
  104:4, 115:23,
  146:4
**sitting** 16:19, 43:22
**situation** 54:4,
  55:22, 68:21,
  97:21, 108:21
**situations** 55:4,
  148:6
**Skydrive** 44:10,
  92:21, 92:23, 93:8,
  94:22, 98:8, 99:19,
  105:11, 112:9,
  149:10
**slow** 71:22, 84:15
**smarter** 156:10
**software** 52:7, 95:7,
  95:11, 108:10
**solemnly** 4:9
**Somebody** 26:9,
  42:4, 46:13, 80:8,
  83:13, 88:13, 95:5,
  100:11, 102:14,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

107:22, 122:23, 135:9, 139:11, 139:15, 145:6, 151:1, 152:3, 152:12, 152:13
**someone** 100:7, 102:23, 145:10
**Sometimes** 107:8, 118:8
**somewhere** 15:11, 22:18, 107:23, 109:1, 132:9, 136:8
**soon** 141:4
**Sorensen** 10:25
**sorry** 16:22, 32:1, 38:17, 64:20, 92:14, 100:14
**sort** 10:10, 12:23, 51:12, 110:9
**sorting** 107:3
**sought** 26:6, 142:21
**sounds** 29:23, 89:4, 98:10
**sources** 107:13
**South** 2:7, 2:25
**Speaking** 5:23, 24:5, 24:11, 24:12, 29:25, 93:5, 106:10
**specific** 23:22, 32:12, 34:21, 35:4, 58:21, 60:16, 118:15
**Specifically** 18:12, 30:11, 31:20, 34:18, 36:2, 92:8, 102:1, 109:19, 113:18
**specificity** 127:22
**specifics** 50:14
**specified** 160:12
**speculation** 103:20
**spell** 4:18
**spend** 7:9, 13:10
**spoke** 94:17, 124:3
**sponsored** 29:12
**sport** 8:14
**spot** 16:16, 26:2
**spouse** 151:11

**spring** 14:24, 28:20
**squad** 110:15, 110:20, 110:25, 111:4, 111:10, 111:16
**Stacey** 1:5, 2:32, 128:20, 129:9
**staff** 17:8
**stand** 5:15, 158:5
**star** 7:23
**start** 4:17, 5:19, 10:20, 30:25, 125:17
**started** 13:13, 39:1, 80:5
**starting** 17:19
**State** 1:29, 4:18, 7:20, 10:10, 57:4, 57:6, 57:12, 68:16, 76:19, 77:25, 115:18, 127:10, 131:1, 141:5, 141:9, 160:3
**stated** 84:21, 84:23, 84:25, 112:17, 114:16, 129:9, 149:22, 149:25
**statement** 104:23, 105:9, 122:15, 122:18, 123:12, 129:13, 129:18, 129:19, 136:22
**STATES** 1:1, 114:9
**stating** 148:22
**Status** 86:13, 120:6, 120:8, 121:10, 121:11
**statute** 35:9, 57:5, 57:6, 57:11, 57:12, 58:19, 58:23, 59:21
**statutes** 57:12, 58:1, 58:12, 59:9, 59:13, 59:20, 59:23, 59:24
**statutory** 142:22
**stay** 66:14
**steady** 10:4
**stepdad** 38:23
**stepdaughter** 38:15,

151:19
**stepfather** 38:14, 152:12, 152:18
**stepmom** 38:23
**steps** 60:18
**Stigge** 25:25, 45:18, 45:21, 53:9, 53:16, 60:5, 60:9, 92:7, 105:22, 154:4
**stipulations** 1:32, 160:13
**STOCKINGER** 1:4
**Stolz** 19:22, 19:23
**stopped** 98:12
**store** 49:9, 49:13
**Street** 1:31, 2:7, 2:16, 2:25, 4:26, 48:3
**strike** 117:13
**strong** 13:3
**study** 8:10
**stuff** 18:21, 30:5, 47:3, 64:2, 90:8, 106:11, 106:24, 121:8
**subject** 89:12, 127:11, 127:15, 128:9
**submit** 118:3
**submitted** 101:3
**subpoena** 142:13, 142:18, 142:22, 143:14, 150:2
**subsequent** 119:17
**subsequently** 114:5, 147:1, 150:23
**successfully** 53:9
**sufficient** 145:17
**suggested** 99:7
**suit** 160:18
**Suite** 2:8, 2:17, 2:26
**summary** 80:19
**summer** 9:18, 10:2, 28:20, 28:21
**supervisors** 26:3
**Supplemental** 75:9, 75:10, 82:13, 83:11, 88:15
**supported** 101:13, 104:4

**supporting** 132:22
**supportive** 132:6
**supports** 129:24
**suppose** 89:7, 102:12
**supposed** 55:4, 61:19, 158:24
**surfaced** 131:14, 131:23, 132:10
**surprise** 134:1
**suspect** 14:20, 78:11
**suspected** 36:25, 38:1, 40:10, 44:11, 64:9, 71:15, 100:7, 102:14, 124:15, 124:18, 125:2
**suspecting** 102:16
**SVAJGL** 1:12, 1:27, 2:12, 3:32, 4:6, 4:20, 106:4, 121:20, 130:19, 160:4
**swear** 138:5
**sworn** 4:9, 160:4
**system** 11:7, 94:7, 107:14, 120:20
**systems** 12:20

**< T >**
**Tableau** 52:13, 64:21
**tactics** 18:19
**talked** 20:25, 24:7, 26:12, 48:20, 50:7, 64:18, 67:25, 103:9, 144:4, 147:17, 150:15
**talks** 128:6
**tampering** 107:13, 107:19
**Tanner** 74:13
**Task** 25:20, 25:21, 25:23, 26:1, 26:5, 26:6, 26:10, 53:12, 53:15, 88:16, 140:16, 140:22
**tasked** 133:12
**taught** 25:1, 25:4
**teacher** 10:23
**teachers** 13:10

Exhibit B to Zachary Lutz-Priefert's Affidavit

DEPOSITION OF: Bryan Svajgl                                    Keyword Index

**teaching** 10:11,
  10:13, 10:15, 12:2,
  13:9, 13:12
**team** 45:1, 45:5,
  45:11, 46:11,
  110:12
**tease** 12:10
**tech** 49:20, 121:9
**technician** 88:20,
  89:3
**telecommunication
  s** 142:24
**Telephone** 2:24,
  114:22, 114:25
**tells** 44:25, 59:17,
  100:12
**ten** 22:3, 22:4, 22:22,
  23:5
**tenders** 89:10
**term** 14:25, 15:3
**terminated** 14:20
**terms** 23:19, 31:11,
  43:15, 48:21,
  58:16, 58:20,
  66:10, 67:3, 75:2,
  75:3, 127:14,
  135:13
**test** 15:14, 15:22,
  16:3, 16:12
**testified** 4:11, 65:15,
  85:8, 156:22
**testify** 160:5
**testifying** 129:2
**TESTIMONY** 3:6,
  3:11, 52:19, 56:22,
  62:4, 71:3, 71:22,
  90:8, 147:3
**testing** 15:12, 31:12
**themselves** 61:6,
  61:7, 90:18
**thereafter** 160:7
**They'll** 105:4, 105:5,
  138:22, 158:5
**they've** 13:2
**thinking** 13:21,
  102:25, 156:12
**third** 143:7
**thorough** 118:4
**thoroughly** 74:20,
  79:12

**though** 128:18
**threat** 100:12
**Three** 6:15, 14:9,
  18:4, 18:5, 18:9,
  21:16, 46:24,
  89:17, 98:7,
  116:13, 116:15,
  116:22, 116:23,
  116:24, 117:1
**three.** 117:4
**Throughout** 4:24,
  5:3, 18:20, 38:15,
  38:17, 38:18,
  47:13
**ties** 84:22
**tip** 40:13, 83:16,
  90:15, 90:25, 91:8,
  91:20, 92:5, 92:15,
  92:22, 96:13,
  96:14, 98:11,
  98:14, 108:18,
  109:1, 109:9,
  109:14, 113:2,
  138:1, 151:21,
  153:16, 153:20,
  153:23, 153:25,
  154:3
**tips** 44:22, 92:1,
  92:2, 143:13
**title** 16:24, 31:6,
  123:5
**today** 30:24, 98:3,
  141:19
**Todd** 48:14, 49:20,
  121:7
**together** 92:19,
  143:18
**took** 4:29, 9:14,
  10:17, 15:8, 15:13,
  15:22, 16:14,
  16:16, 16:17, 28:8,
  110:19, 141:8,
  146:8, 152:2,
  152:5
**tools** 24:18, 24:20,
  24:23, 27:6
**top** 21:5, 107:2,
  108:12
**topic** 18:14, 69:7
**topics** 18:13, 18:17,

23:20, 25:14
**Tor** 95:22
**total** 110:22
**touched** 20:3
**towards** 59:1,
  156:13
**town** 100:5, 100:19,
  123:24, 124:2,
  124:4
**Toys** 10:6
**trading** 95:13, 95:14,
  96:10
**Traffic** 75:21
**trained** 35:7, 54:22
**trainings** 32:3, 32:9
**transcription** 160:8
**transferred** 93:17,
  109:18
**trap"** 107:15
**traps** 107:20
**traveler** 119:23
**Triage** 50:13, 50:16,
  51:24, 52:3, 65:7,
  84:14
**trial** 5:13, 127:4,
  151:12
**tried** 34:17, 63:5,
  155:6
**triggered** 118:19
**trucks** 121:25
**true** 18:11, 40:3,
  40:5, 105:1,
  131:15, 132:10,
  133:13, 133:21,
  135:20, 138:2,
  139:13, 140:20,
  140:24, 141:5,
  142:6, 142:13,
  143:19
**truthfully** 160:5
**try** 13:14, 31:5,
  98:13, 107:7,
  118:4, 118:7,
  134:13
**trying** 29:20, 71:20,
  71:24, 71:25
**TSA** 68:20
**turn** 83:12
**turned** 83:7, 90:4,
  124:8

**twins** 7:2, 7:7
**Two** 4:28, 6:16, 6:19,
  15:1, 17:8, 17:19,
  28:2, 33:17, 33:18,
  33:23, 34:1, 37:6,
  37:8, 44:9, 53:10,
  66:19, 67:5, 78:7,
  78:8, 79:24, 80:3,
  81:13, 88:17, 91:6,
  91:8, 98:6, 100:3,
  100:8, 112:23,
  115:6, 117:20,
  118:20, 119:2
**type** 30:5, 39:1,
  60:19, 95:6,
  120:11
**typewriting** 160:7
**typically** 48:20, 89:5,
  118:1, 135:24
**typo** 79:17, 81:21
**typos** 159:9


**< U >**
**unable** 103:12
**unauthorized** 51:19
**uncuffed** 136:11
**undergo** 26:9
**undergone** 26:8,
  125:8
**underlying** 68:5
**understand** 43:4,
  55:1, 55:6, 55:22,
  70:22, 71:15, 74:9,
  76:16, 85:23,
  96:13, 107:7,
  149:12, 153:2,
  158:11, 158:14,
  158:19
**understanding** 31:3,
  42:1, 56:5, 62:23,
  69:23, 70:9, 72:4,
  84:4, 85:13, 145:7,
  151:17, 151:24,
  158:20, 159:5
**Understood** 5:9,
  5:14, 35:21,
  132:20, 149:6,
  152:10, 158:15
**unfounded** 39:25

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                                      Keyword Index

**unit** 77:24
**UNITED** 1:1
**University** 8:7, 85:3
**unknown** 103:11
**unless** 9:19, 50:3,
    159:10
**UNO** 9:6, 9:12, 10:8,
    10:14, 10:21, 13:2,
    13:4
**unrelated** 129:16,
    129:21
**unsure** 14:2
**Until** 11:23, 21:20,
    22:20, 32:11,
    33:12, 56:17,
    56:23, 71:1, 72:7,
    80:4, 100:23,
    102:21, 121:21
**unusual** 155:14
**upload** 154:1
**uploaded** 44:9, 93:7,
    94:1, 98:8, 99:18,
    103:11, 104:8,
    104:9, 104:11,
    104:15, 105:11,
    105:16, 112:8,
    114:16, 137:25,
    149:9
**upstairs** 77:7
**uses** 94:25
**using** 15:14, 52:2,
    94:24, 108:9
**utilize** 135:9
**utterance** 5:7


**< V >**
**v.** 1:9
**Vaguely** 25:25
**value** 61:25, 63:17,
    63:18, 64:10, 65:9,
    65:18, 65:22,
    65:24, 66:13,
    66:14, 69:24, 70:5,
    70:12, 70:15,
    70:17, 70:24,
    70:25, 71:2, 71:15,
    73:17, 82:18, 83:1,
    98:20, 99:11,
    103:13, 103:17,

109:23, 124:15,
    125:3, 157:11
**values** 66:7, 69:23,
    70:21, 83:15
**various** 16:8, 30:7,
    36:12, 147:1
**vehicle** 18:23, 21:1
**verification** 73:14,
    94:19
**verified** 93:3
**verify** 93:23, 94:16,
    96:8
**verifying** 94:2,
    109:10, 109:11,
    110:10
**versus** 64:1
**victim** 38:23, 40:14,
    131:4, 131:8,
    131:15, 132:13,
    133:2, 151:2,
    151:14, 151:16
**victims** 116:25
**videos** 49:10, 61:6,
    61:9
**Vince** 151:9
**Vincent** 2:23
**visit** 50:22
**visits** 96:10
**Vista** 15:20, 25:5,
    29:4, 53:13, 53:14,
    85:4, 85:9
**visual** 77:20
**voluntarily** 128:8
**vs** 68:16, 131:1
**vulnerable** 107:12,
    107:19


**< W >**
**Wadith** 1:4, 2:31,
    92:23, 93:4,
    114:14, 128:7
**wadith@-** 92:24
**Wadith@hotmail**
    93:2
**wadith@hotmail.co
    m** 98:9
**Wait** 128:1
**waive** 4:1, 159:10
**waived** 160:15

**walked** 139:18
**wanted** 8:22, 9:15,
    14:2, 14:5, 45:2,
    97:15, 100:9,
    158:12
**warrantless** 55:8,
    55:11, 55:21,
    108:18, 139:13,
    139:18, 140:5
**warrants** 19:3, 20:2,
    20:18, 21:23, 22:4,
    22:23, 23:8, 27:9,
    30:17, 30:22,
    30:25, 31:2, 53:10,
    67:3, 67:5
**watch** 105:3
**watched** 47:24
**Wayne** 7:20, 7:21
**ways** 139:18
**web** 51:17, 95:21,
    95:25, 96:10
**webinars** 27:24,
    28:14
**website** 57:13,
    122:22, 143:17
**week** 4:29, 7:9, 7:12,
    47:23
**Weeks** 17:19, 18:15,
    81:14, 81:16,
    107:8
**Welch** 2:6
**West** 11:11
**Westside** 11:16,
    11:18
**whatever** 65:15,
    85:3, 103:8,
    139:24, 142:3
**whatsoever** 125:22
**whenever** 94:7
**Whereabouts** 7:19
**WHEREOF** 160:19
**whether** 40:12,
    57:23, 68:18,
    71:17, 76:21, 92:4,
    95:24, 96:9,
    110:10, 132:5,
    133:12, 137:23,
    152:14
**whichever** 137:25
**white** 119:23

**whole** 27:7, 27:10,
    36:9, 36:14, 36:17
**whom** 75:23, 80:18
**whomever** 57:23
**wife** 6:16, 6:19, 14:3,
    14:11, 14:12, 87:2,
    100:5, 100:18,
    123:24, 124:2
**wife.** 14:6
**will** 5:15, 57:4,
    60:21, 66:14,
    108:10, 118:2,
    118:7, 139:20
**Wilmot** 11:19
**Winter** 28:20
**wipe** 107:24
**within** 1:29, 1:31,
    11:7, 17:19, 39:14,
    64:7, 114:22,
    124:12, 160:11,
    160:13
**Without** 9:9, 12:4,
    132:2, 135:4,
    158:3
**WITNESS** 89:10,
    154:23, 158:24,
    159:12, 160:14,
    160:19
**wondering** 97:13,
    127:4
**word** 112:24, 113:15,
    120:12
**wording** 57:20
**words** 65:8, 87:24,
    131:19, 132:21
**work** 10:3, 12:15,
    12:23, 14:2, 14:3,
    16:5, 18:2, 18:3,
    26:3, 52:2, 53:13,
    66:7, 75:14, 81:13,
    85:19, 124:10,
    125:3, 126:9,
    127:12, 150:16
**worked** 44:22, 51:3,
    51:22, 53:14,
    53:15, 53:23,
    53:24, 54:3, 68:20,
    85:8, 85:11, 96:22,
    118:5, 148:11
**Working** 11:9, 12:23,

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

DEPOSITION OF:  Bryan Svajgl                          Keyword Index

22:10, 40:8, 53:11,
68:11, 83:10,
85:14, 85:17,
85:20, 125:17,
147:8, 147:9,
147:24
**works** 85:4, 140:17,
140:21, 144:8
**worry** 111:21, 111:22
**write** 115:1, 117:19,
118:2, 118:3
**writing** 20:17
**written** 19:8, 19:11
**wrongful** 129:17,
129:22
**wrote** 117:11, 118:1


**< Y >**
**year** 9:4, 9:15, 11:23,
12:7, 14:21, 15:2,
22:17, 22:25,
33:16, 35:16,
59:11, 67:17,
67:20
**years** 4:28, 6:7, 7:24,
9:9, 12:3, 115:6,
117:20, 118:20
**young** 131:24
**yourself** 45:9, 45:16,
63:22, 66:8, 96:9,
138:14, 139:15


**< Z >**
**Zachary** 2:5

Exhibit B to Zachary Lutz-Priefert's Affidavit

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WADITH STOCKINGER NADER and STACEY NICHOLE NADER, ) ) | Case No. 8:17-cv-00083 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | AFFIDAVIT OF BRYAN SVAJGL |
| THE CITY OF PAPILLION; SARPY ) COUNTY; BRYAN SVAJGL; BENJAMIN ) IVERSEN; SCOTT A. LYONS; L. ) KENNETH POLIKOV; and JENNIFER ) MIRALLES, ) | |
| ) | |
| Defendants. ) | |

STATE OF NEBRASKA    )
                     ) SS.
COUNTY OF SARPY      )

I, Bryan Svajgl, being first duly sworn, depose and state as follows:

1. I am a resident of Gretna, Nebraska and am more than 21 years of age. The facts stated herein are based upon my own personal knowledge and the reports I prepared in the regular course of my duties as a Detective for the Papillion Police Department. I am supplying this Affidavit in support of Defendants Sarpy County, Kenneth Polikov, and Jennifer Miralles' Motion for Summary Judgment.

2. I am a certified law enforcement officer and a Detective with over 11 years of experience in law enforcement with the Papillion Police Department. Currently I am assigned to the Investigative Services Division of the Papillion Police Department. My duties as a Detective include investigating crimes involving manufacturing, distributing, and possessing visual depictions of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, hereinafter generally referred to as child pornography, in violation of the laws of the State of Nebraska.

3. On December 12, 2014, the Nebraska State Patrol received a CyberTip (3184694) from the National Center for Missing and Exploited Children (NCMEC). The CyberTip was generated by Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014 their

451454 1

1



EXHIBIT
25

Exhibit B to Zachary Lutz-Priefert's Affidavit

customer with the email address wadith@hotmail.com uploaded two images to Microsoft Skydrive, which Microsoft reported as child pornography. The reported images were included within the CyberTip.

4.    On December 20, 2014 the Nebraska State Patrol received an additional CyberTip (3320099) from the National Center for Missing and Exploited Children (NCMEC). The tip was deemed by NCMEC to be related to the previous tip (3184694). Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with the email address wadith@hotmail.com uploaded five images to Microsoft Skydrive, which Microsoft suspected was child pornography. The reported images were included within the CyberTip.

5.    On December 22, 2014, I was assigned to conduct follow-up on a possible possession of child pornography report stemming from the two CyberTips generated by Microsoft. With the assistance of Papillion Police Department Detective Brandon Stigge #469, I examined the image files uploaded on December 3, 2014 to Microsoft Skydrive from the email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3184694. Following is a description of the image files:

a.    Image file named "1773334201.jpg" depicts an apparent juvenile female (presumably between the ages of 12 and 14). The female depicted is sleeping with her vagina exposed. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

b.    Image file named "1850260232.jpg" depicts the same apparent juvenile female with her vagina and anus exposed. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

6.    On January 20, 2015, with the assistance of Detective Stigge, I examined the additional image files uploaded on December 3, 2014 to Microsoft Skydrive from the email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3320099. Following is a description of the image files:

a.    Image file named "1600471024.jpg" depicts a prepubescent white female wearing no pants or underwear. She is laying on the bed with her legs tied together and her vagina exposed. The female appears to be sleeping or unconscious. The female appears to be

451454 1                                                          2

approximately 8 to 10 years of age. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Colorful Bedroom" Series (CVIP report #84653).

      b.     Image filed named "409277812.jpg" depicts a fully nude white female approximately 12-14 years of age. She is sitting down with her legs off to her side and a portrait backdrop behind her.

      c.     Image file named "829555945.jpg" depicts a fully nude white female approximately 13-15 years of age. She is sitting on a rock by a body of water with her vagina exposed.

      d.     Image file named "1766201396.jpg" depicts a fully nude white female approximately 15-17 years of age. She is wearing no pants or underwear with her vagina exposed.

      e. Image file named "864858517.jpg" depicts a fully nude white female approximately 14-16 years of age. She is wearing no pants or underwear with her vagina exposed.

      7.     Based on my training and experience, I determined that the seven images indicated as being uploaded from the email address wadith@hotmail.com by Microsoft CyberTips 3184694 and 3320099 likely constituted the visual depiction of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, the possession of which is in violation of the laws of the State of Nebraska.

      8.     Microsoft provided an Internet Protocol (IP) address of 75.163.85.5 which was verified as belonging to CenturyLink. Microsoft reported the email wadith@hotmail.com uploaded the photographs. Nebraska State Patrol verified the email address belonged to Wadith S. Nader (sometimes referred to as "Mr. Nader") of 912 Hickory Hill Road.

      9.     On February 10, 2015, I served CenturyLink with a Sarpy County Attorney subpoena requesting records and information relating to the identification of their subscriber using the IP address 75.163.85.5 on December 3, 2014, at 1822 and 1830 hours UTC. This is the specific date and times when Microsoft reported the apparent child pornography had been uploaded from said IP address using the wadith@hotmail.com email address according to CyberTips 3184694 and 3320099.

      10.     On February 21, 2015, I queried the Nebraska Department of Motor Vehicles database for the name Wadith Nader, and located a person named Wadith S. Nader, DOB

The address 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska was listed for Wadith S. Nader with the Nebraska Department of Motor Vehicles. With further research, I observed the email wadith@hotmail.com was linked with the Facebook profile of Paul Nader. I compared the photograph on the Facebook profile of Paul Nader to the photo on file with the Nebraska Department of Motor Vehicles, and determined the profile picture for Paul Nader depicts Wadith S. Nader, DOB                .

11.    On February 24, 2015 I made email contact with Air Force OSI agent Peter Vandamme. He confirmed Mr. Nader was formerly with the Air Force but no longer was with the department. They had since lost contact with him. Mr. Nader's spouse, Stacey Nader (w/f DOB             ), was still active with the Air Force as a Lieutenant Colonel. I briefed Agent Vandamme on the facts of the case.

12.    On March 3, 2015, I reviewed a responsive records form that CenturyLink provided. The requested records, which show that Internet Protocol (IP) address 75.163.85.5 was issued to subscriber Wadith Nader at 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, with the username "naderwadith" and telephone number (402) 505-3684. Additionally, CenturyLink provided Internet Protocol (IP) address dates for their customer Wadith Nader, 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska. Based on several dates of surveillance of 912 Hickory Hill Road, I had also witnessed Mr. Nader leave said residence. Mr. Nader had also declared his residence as 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska with the Nebraska Department of Motor Vehicles.

13.    My Search Warrant Application, as defined below, incorrectly identifies the date when I received responsive records from CenturyLink, as being March 31, 2014.  The correct date is March 3, 2015.

14.    In addition to its responsive records, CenturyLink provided Internet Protocol (IP) address logs for their customer Wadith Nader of 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, which showed Mr. Nader was issued the IP address 75.163.85.5 on November 10, 2014 and continued to hold the IP address throughout the duration of my investigation. This showed Mr. Nader was the CenturyLink customer on the specific dates and times aforementioned—when Microsoft SkyDrive was accessed and the seven photographs were uploaded as reported by Microsoft in CyberTips 3184694 and 3320099.

Exhibit B to Zachary Lutz-Priefert's Affidavit

15.     On March 13, 2015, a preservation letter was drafted and faxed to Microsoft Corporation's Online Custodian of Records. Microsoft confirmed the preservation request on March 17, 2015.

16.     On March 16, 2015, I completed an affidavit and application for issuance of a search warrant for 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska (the "Search Warrant Application"). A copy of the Search Warrant Application is attached hereto as Exhibit "A" and incorporated herein by this reference.

17.     Based on the above information stemming from my knowledge, training, and experience, I submitted the Search Warrant Application to the Honorable Judge Hutton of the Sarpy County Court with the belief, and probable cause to believe, that the premises of Mr. Nader were being used for the purpose of concealing or keeping evidence related to the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child, in violation of the laws of the State of Nebraska.

18.     In response to the just and reasonable grounds for my belief that there was material related to such violations of the laws of Nebraska concealed and kept at the premises at 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, the Search Warrant Application requested the search warrant to cover the following:

a.     Computer hardware to include (but not limited to) any and all computer equipment and/or electronic devices used to collect, analyze, create, display, convert, store, conceal, or transmit, any magnetic, optical, electronic, or similar computer impulses, files, data, and binary data; and any and all data storage devices such as fixed disks, internal and external hard disks, floppy disk drives and diskettes, tape drives and tapes, DVDs, CDs, flash drives, thumb drives, memory cards, digital cameras, mobile devices, Personal Data Assistants (PDAs), cellular phones, digital music players, and gaming consoles, or other magnetic, optical, and electronic data storage devices; and any and all data-processing devices such as central processing units, and personal computers to include "laptop" or "notebook" or "pocket" computers; and any and all input and output devices to include keyboards, printers, network communication devices, modems and external or connected devices used for accessing computer data; and any and all connecting hardware such as power cords, cables, and adapters needed for the operation of the described computer hardware.

Exhibit B to Zachary Lutz-Priefert's Affidavit

b.      Data files to include (but not limited to) files bearing graphic interchange format extensions, .jpg, .gif, .tif, .avi, and .mpg, in the form of images and/or videos, which depict children in a sexually explicit manner, which would include visual representation of a person, or portion of the nude human body, or child erotica, and any accompanying text associated with those graphic files, and/or log files recording the transmission or storage of those graphic files, as they relate to violations of the laws of the State of Nebraska cited herein as related to the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

c.      Data files depicting sexual conduct, whether between adults or between adults and children.

d.      Correspondence, data files, documents, or records (whether digital or written) pertaining to the possession, receipt, origin, or distribution of images involving the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

e.      Correspondence, data files, documents, or records (whether digital or written) exhibiting an interest or the intent to sexually exploit children, or to identify a particular user of the materials, or contraband, and any data or text, which tends to prove the identity of the computer user at a time that may be relevant to prove the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

f.      Computer software and application software, and the associated installation and operation media.

g.      Manuals and other documents (whether digital or written), which describe the operation of computer hardware, software, or property seized.

h.      Items that would tend to establish ownership or use of computers, and ownership or use of any Internet service accounts accessed to facilitate the sexual exploitation of children, to include credit card bills, telephone bills, correspondence, and other identification documents.

i.      Computer hardware, software, and data, related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same Internet Protocol address.

j.      Items containing or displaying passwords, access codes, usernames, or other identifiers necessary to examine or operate computer hardware, software, or data seized.

Exhibit B to Zachary Lutz-Priefert's Affidavit

  k.  Items that would tend to show dominion and control of the property or premises searched, to include utility bills, telephone bills, correspondence, rental agreements, and other identification documents.

  l.  Digital cameras, film cameras, video cameras, associated data storage devices and media, and all connecting hardware such as power cords, cables, and adapters needed for the operation of the described items. Data storage devices and media shall include (but not limited to) DVDs, CDs, memory cards and other solid-state media, tapes, and film.

  19.  Based on my investigation, I believed that the above-stated property was being concealed, kept, or used in violation of the laws of the State of Nebraska, or was being concealed or kept at the premises and constituted evidence of, or evidence relevant to proving a violation of the laws of the State of Nebraska, to wit: Possession of Child Pornography, § 28-813.01; Distribution of Child Pornography, § 28-1463.03.

  20.  Within the Search Warrant Application, I advised the court that the examination of a computer system is a lengthy process requiring special steps to ensure the integrity of the electronic evidence, and therefore, it may not have been possible to complete a return to the Court within the ten days normally required by the Court.

  21.  Based on the aforementioned information acquired through my knowledge, training, and experience, I requested the Sarpy County Court issue a search warrant for the premises of Mr. Nader, located at 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska.

  22.  I further requested that the affidavit, search warrant, and subsequent return be sealed until further order of the Court for the reason that the investigation was ongoing and the knowledge of its existence and the information received could jeopardize the investigation.

  23.  On March 16, 2015, I presented the Search Warrant Application to the Honorable Judge Hutton of the Sarpy County Court, and Judge Hutton subsequently issued a search warrant (the "Search Warrant"). A copy of the Search Warrant is attached hereto as Exhibit "B" an incorporated herein by this reference.

  24.  On March 17, 2015, at 1105 hours, I, along with Detective Ben Iversen of the LaVista Police Department, Detective Shawn Dooling of the LaVista Police Department, Detective Brandon Stigge #469, Detective Preston Maas #457, Officer Goley #446, Officer Kustka #414, and Officer Higgins #405, conducted a search at 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska by way of the Search Warrant. Mr. Nader answered the door after initial

announcement. I advised him of the nature of my visit and provided him a copy of the search warrant. He confirmed he was the sole occupant of the residence at the time of our arrival.

25.     Mr. Nader was searched for weapons by Officer Goley. Officer Goley then completed a cursory search of the front living room observing no weapons. Mr. Nader informed us there were several handguns in the closet by the front door. He also advised there were more firearms upstairs in the master bedroom and downstairs in a closet.

26.     I then requested Mr. Nader have a seat on the couch in the front living room. He provided me permission to use the desk chair near the couch. Mr. Nader informed me that his two children              age 8, and              age 5, were at school and that his wife was out of town in Georgia. He explained he worked for the military doing counterterrorist work until he was discharged four years ago. Since that time, he has not worked. He instead completed a doctorate program through Putnam University in California. Wadith explained that he was just speaking to his attorney as he is trying to complete documentation to get his job back. He advised that he is from Columbia and Orthodox. He said he is married to Stacey (Nikki) Nader and that they met in the Air Force years ago.

27.     I then explained that our Search Warrant was for electronic devices that may contain data relating to the possession, distribution, or dissemination of child pornography. Mr. Nader was then advised of his Miranda Rights which he stated he understood. I then removed my tactical vest so I could interview Mr. Nader while the other Officers completed the search. The interview lasted for approximately 105 minutes, and was recorded and entered as evidence.

28.     Initially I asked Mr. Nader in an effort to speed our search up, where we should be looking. He advised the computer in the kitchen. I asked him where the items were stored. He then asked what items. I specifically said the child pornography. Mr. Nader stated there was none that he was aware of. He followed it up by saying there is a lot of pornography, but he is not interested in children. He said, "Children are dirty, I don't find that sexy." I then asked Mr. Nader what he does when he looks at pornography. He stated that he masturbates. I asked Mr. Nader what types of pornography he likes. He informed me he likes viewing thin and fit females, older women, women with hair, threesomes, and dirty underwear. Mr. Nader elaborated that he does not like females with no hair, he likes women more his age. I asked where he got his pornography from. He said he downloads it from websites, and that he does not go to specific forums or search for children.

Exhibit B to Zachary Lutz-Priefert's Affidavit

29.    Mr. Nader explained that about three months prior he was locked out of his Microsoft Hotmail account wadith@hotmail.com. He stated he was unsure why he was locked out and was concerned because his email had been hacked before, causing spam to be sent to his friends from his email. He attempted to contact Microsoft to find out why he was locked out. Microsoft told him it was something to do with something called Skydrive. Mr. Nader then explained that when he tried to take a picture and slide it over, it went into Skydrive which tipped Microsoft. He thought Microsoft then probably called the police. I asked if he knew what picture it was. He said he had no idea. He explained that Microsoft would not tell him anything. He again stated that he had no idea what picture it was. I informed him it was several pictures. He then asked, "So, you know this?" He remarked it was SkyDrive. He again stated he did not know what pictures it would be.

30. Mr. Nader said he does not search for child pornography on the Internet. He said he does not trade with others or chat with people on the Internet, adding that chatting might lead to other things that he is not interested in doing because he is married. He continued to explain that he does not email anyone about trading and requested we check his emails. He said he does not talk to people online. I asked if he used torrent to download the images from other users and he said, "No." He again said he likes women of age and that he will usually view pornography during the day for a couple of hours at a time. Mr. Nader stated that he looks at pornography on the main computer which was located in the kitchen. He had a couple external hard drives which he also stored downloaded pornography including videos and photos.

31.    Mr. Nader explained that he views and downloads pornography from imgfap.com which is an electronic bulletin board website where users can post photos. He explained that he learned of the website after viewing pictures on picturehunter.com that came from imgfap.com. Mr. Nader explained he has downloaded thousands of pornographic photos from the website believing all images and videos were of legal-aged females. He stated it was possible some were not of legal age but that he was unaware of it.

32.    At one point I told Mr. Nader I did not believe him and that I did not believe he pulled the images from imgfap.com but got them from somewhere else. He again denied having traded child pornography and stated he never intended to download child pornographic photos. Mr. Nader again stated that he did not know which images were uploaded to Microsoft SkyDrive. He said he may have been attempting to move some 700 downloaded pornographic

Exhibit B to Zachary Lutz-Priefert's Affidavit

files with unknown child pornography which he inadvertently uploaded some to Microsoft SkyDrive.

33.       I asked Mr. Nader if he views the photos on his phone, tablets or anything else. He replied that he does not view pornography on his phone or any tablets. He did advise that he stores it on an external hard drive which was either in the basement or his bedroom.

34.       Search of the residence produced the following items which were collected as evidence:

   a.      1-DVD of images from CyberTip #3184694
   b.      1-DVD of images from CyberTip #3320099
   c.      1-White Travelor 1GB thumb drive
   d.      1-Matsunichi HD (Hard Drive) Model #DM256
   e.      1-Black Western Digital HD S/n #WXNX088D811
   f.      1-Silver HDD external hard drive Model # WLX-393UB
   g.      1-Black Kyocera cellphone
   h.      1-Gray HP laptop serial # SCH135135M
   i.      1-Samsung Galaxy 4.0 cellphone
   j.      1-Black external hard drive 3TB S/n #E3JAJJHA300258
   k.      1-Purple 32 GB thumb drive DT10162
   l.      1-Western Digital external hard drive S/n #WX21E42APP51
   m.      31-Box containing 31 internal hard drives
   n.      1-Black HP Pavillion S/n #CNF64319QL
   o.      1-Samsung Galaxy 4 in white case
   p.      1-Micro SD Card 1 GB
   q.      1-HP Envy laptop
   r.      1-Asus tablet with case

35.       During the search, I was assisted by Detective Ben Iversen of the LaVista Police Department in order to conduct preliminary scans of the hardware, computer software, and hard drives, etc. as detailed in the search warrant. Detective Iversen began his examination at or around 1130 hours using a forensic examination device. Detective Iversen examined the HP Envy laptop found in the kitchen. He located several large files of pornography downloaded on the computer hard drive. The files were all categorized by style of pornography. Scanning the HP

Exhibit B to Zachary Lutz-Priefert's Affidavit

Envy laptop, Detective Iversen discovered one image was flagged as possible known child pornography. The HP Envy laptop computer and hard drive was retained for further examination in a safe forensic environment.

36.     While searching the residence, we also observed that there were several watches disassembled throughout the home, including watch parts and tools. Firearms were also located throughout the residence in almost every room. Some were loaded and others were not. In the master bedroom, basement, and garage there was a significant amount of alcohol both empty and full or partially full. There was also several computer boards, old cell phones, cameras, old video games, and hard drive disks. In the garage, we located nitric and sulfuric acid. Near the chemicals was a large trashcan with a PVC pipe coming out of the top and leading to several other buckets and tubes. Unsure what the items were, we contacted FBI Bomb Tech John Hallock and Omaha Police Department Bomb Tech Matt Manhart.

37.     I then spoke to Mr. Nader about the other items we observed in the house. He explained that since he lost his job he had been depressed and does drink alcohol. He explained that he also fixes watches and tinkers with them, and then sells them on Etsy, an online store. He also occasionally will sell jewelry on the website. He continued to explain the chemicals and set up in the garage are for breaking down items such as computer boards to extract the gold, which he will then sell. He advised the process is called "aqua regia". He then explained that he learned how to do the process from the Internet. He also purchased the chemicals over the Internet. The FBI and Omaha Police Bomb Techs responded to confirm the chemicals were safe in their current state and it did not appear he was attempting to make explosives.

38.     I made contact with the Sarpy County Attorney's Office and briefed the on-call Deputy Sarpy County Attorney, Jennifer Miralles, on the circumstances revolving around the case. While I cannot exactly recall my conversation with Ms. Miralles, to the best of my recollection I generally explained to Ms. Miralles that I was executing the Search Warrant, where I was in the process of my investigation of Wadith Nader, and I explained the evidence discussed above that I had gathered during my investigation.

39.     After explaining all of this information to Ms. Miralles, to the best of my recollection, I stated that I believed that I had probable cause to believe a crime had been committed by Mr. Nader based on the evidence gathered in my investigation and the execution of the Search Warrant, and Ms. Miralles agreed.

40.    I have reviewed my incident report previously filed with the Papillion Police Department and it incorrectly states that during my conversation with Ms. Miralles that she agreed to take custody of Mr. Nader. I made the decision to take custody of Mr. Nader based on my belief that I had probable cause to believe a crime had been committed by Mr. Nader.

41.    On March 17, 2015, at approximately 1105 hours in Sarpy County, I arrested Mr. Nader based on the three child pornography images previously confirmed by CVIP and he was handcuffed and transported to the Sarpy County Jail by Officer Kustka.

42.    I was able to contact Mr. Nader's mother in-law Judy Sweigard, who agreed to pick up the kids from school and care for them until Stacey Nader's return.

43.    Mr. Nader was issued State of Nebraska Uniform Citation and Complaint #A2348812 for possession of child pornography, in violation of Neb. Rev. Stat. § 28-813.01, for "knowingly possess[ing] any visual depiction of sexually explicit conduct...which has a child...as one of its participants or portrayed observers." Wadith's court date was set for April 29, 2015.

44.    The computers, hard drive devices, and other electronic devices seized at Mr. Nader's residence were logged into evidence. All evidence was seized by Officers of the Papillion Police Department and LaVista Police Department. Copy of the search warrant and property forms of items collected were left on the kitchen table at the residence.

45.    Upon returning to the Papillion Police Department, with the assistance of Detective Stigge, I viewed the images from the CyberTips 3184694 and 3320099 again for reporting purposes. After reviewing the images an additional time, I was able to determine with a high level of confidence that all reported images, except image "1766201396" (which is age difficult), are clearly depicting juvenile females under the age of 18 years old.

46.    Based on my review, and high level of confidence such images depicted juvenile females, I requested the charges against Mr. Nader to be amended to reflect 6 counts of possession of child pornography in violation of Neb. Rev. Stat. § 28-813.01.

47.    Later that day of March 17, 2015 I submitted an Affidavit of Probable Cause for Warrantless Arrest ("Warrantless Arrest Affidavit"), containing the same aforementioned belief and information leading to my professional belief, based on my knowledge, training, and experience, that there was sufficient probable cause to make an arrest of Wadith Nader. A copy

Exhibit B to Zachary Lutz-Priefert's Affidavit

of the Warrantless Arrest Affidavit is attached hereto as Exhibit "C" and incorporated herein by this reference.

FURTHER AFFIANT SAYETH NOT.

_____
Bryan S. Svajgl

Subscribed and sworn to before me this 15th day of August, 2017.



_____
Notary Public

My Commission Expires:

April 26, 2020

Exhibit B to Zachary Lutz-Priefert's Affidavit

FILED
SARPY COUNTY
DISTRICT

IN THE COUNTY COURT OF SARPY COUNTY, NEBRASKA

2015 MAR 24  PH 3: 07

CR 15 - 175

STATE OF NEBRASKA  )
         ) SS.
COUNTY OF SARPY   )

CLERK DISTRICT COURT

**AFFIDAVIT AND APPLICATION
FOR ISSUANCE OF A
SEARCH WARRANT**

1. COMES NOW, Detective Bryan Svajgl, of the Papillion Police Department, on this 16th day of March 2015, who being first duly sworn, upon oath says:

2. Your Affiant is a certified law enforcement officer and a Detective with over 8 years of experience in law enforcement with the Papillion Police.  He is currently assigned to the Investigative Services Division of the Papillion Police Department, where said Affiant conducts investigations of criminal matters, including felony and misdemeanor violations of law.  Affiant further states that he is currently investigating the crimes of the manufacture, distribution, and possession of the visual depiction of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, hereinafter generally referred to as child pornography, in violation of the laws of the State of Nebraska, in Sarpy County, Nebraska.

3. I make this affidavit in support of an application for a warrant to search the residence located at 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska which is more fully described in **Attachment A** of this affidavit.

4. That said property is under the control or custody of Wadith S. NADER (dob  ), and Stacey N. NADER (dob  ) according to the Sarpy County Assessor's website.

5. The statements contained in this affidavit are based upon my investigation, information provided by other law enforcement officers, other personnel specially trained in the seizure and analysis of computers and electronic media, and on my experience and training as a Police Officer in the Papillion Police Department.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.



Exhibit A to Affd. of B. Svajgl
Exhibit B to Zachary Lutz-Priefert's Affidavit

001

6.    The following facts support your Affiant's probable cause for issuance of a search warrant, pursuant to Neb.Rev.Stat. § 86-2,106, and other applicable sections of Nebraska law, to-wit:

FACTS

7.    On December 12, 2014, the Nebraska State Patrol received a CyberTip (3184694) from the National Center for Missing and Exploited Children (NCMEC). The CyberTip was generated by Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with email address wadith@hotmail.com uploaded two images to Microsoft Skydrive, which Microsoft reported as child pornography. The reported images were included within the CyberTip.

On December 20, 2014, the Nebraska State Patrol received addition CyberTip (3320099) from the National Center for Missing and Exploited Children (NCMEC). This tip was deemed by NCMEC to be related to previous tip (3184694). CyberTip (3320099) was generated by information from Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with email address wadith@hotmail.com uploaded five images to Microsoft Skydrive, which Microsoft suspected was child pornography. The reported images were included with the CyberTip.

On December 22nd, 2014, I, Det. Svajgl examined the image file uploaded on December 3rd, 2014 to the Microsoft Skydrive with email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3184694. Following is a description of the image files:

a.    Image file named "1773334201.jpg," which depicts an apparent juvenile female (presumably between the ages of 12 and 14). That female depicted is sleeping with her vagina exposed. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

Exhibit A to Affd. of B. Svajgl
Exhibit B to Zachary Lutz-Priefert's Affidavit

002

b.      Image file named "1850260232.jpg" which depicts the same apparent juvenile female with her vagina and anus exposed. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

On January 20, 2015, I, Det. Svajgl examined the additional image files uploaded on December 3rd, 2014 to the Microsoft Skydrive with email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3320099.  Following is a description of the image files:

a.      Image file named "1600471024.jpg," which depicts a prepubescent white female wearing no pants or underwear on.  She is laying on the bed with her legs tied together and her vagina exposed.  The female appears to be sleeping or unconscious.  The female appears to be approximately 8 to 10 years of age.  Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Colourful Bedroom" Series. (CVIP report #84653)

b.      Image file named "409277812.jpg" which depicts a fully nude white female approximately 12-14 years of age.  She is sitting down with her legs off to her side and a portrait backdrop behind her.

c.      Image file named "829555945.jpg" which depicts a fully nude white female approximately 13-15 years of age.  She is sitting on a rock by a body of water with her vagina exposed.

d.      file named "1766201396.jpg" which depicts a fully nude white female approximately 15-17 years of age.  She is wearing no pants or underwear with her vagina exposed.

f.      file named "864858517.jpg" which depicts a fully nude white female approximately 14-16 years of age.  She is wearing no pants or underwear with her vagina exposed.

Exhibit A to Affd. of B. Svajgl
Exhibit B to Zachary Lutz-Priefert's Affidavit

003

Based on my training and experience, I believe that the images described above are visual depiction of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, the possession of which is in violation of the Laws of the State of Nebraska.

Microsoft provided an IP address of 75.163.85.5 which was verified as belonging to CenturyLink.  Microsoft reported the email wadith@hotmail.com uploaded the photograph. Nebraska State Patrol verified the email address belongs to Wadith S. Nader of 912 Hickory Hill Road.

8.      On February 21, 2015, Detective Svajgl queried Nebraska Department of Motor Vehicles database for the name Wadith NADER, and located a person named Wadith S. NADER, DOB                      The address 912 Hickory Hill Road, Papillion, NE, Sarpy, Nebraska, is listed for Wadith S. NADER with the Nebraska Department of Motor Vehicles.  Additionally, Detective Svajgl observed the email wadith@hotmail.com linked with the Facebook profile of Paul NADER.  Det. Svajgl compared the photograph on the Facebook profile of Paul NADER to the photo on file with the Nebraska Department of Motor Vehicles. Det. Svajgl determined the profile picture for Paul NADER depicts Wadith S. NADER, DOB

9.      On February 10, 2015, Det. Bryan Svajgl served Century Link with a Sarpy County Attorney subpoena requesting records and information relating to the identification of their subscriber using Internet Protocol (IP) address 75.163.85.5 on December 3, 2014, at 1822 and 1830 hours UTC. This specific date and times are when Microsoft reported the apparent child pornography had been uploaded from said IP address using wadith@hotmail.com email address in CyberTips 3184694 and 3320099.

10.     On March 31, 2014, I reviewed a responsive records form that Century Link provided. The requested records, which show that Internet Protocol (IP) address 75.163.85.5 was issued to subscriber Wadith NADER 912 Hickory Hill Road, Papillion, Sarpy County Nebraska, with the user name naderwadith and telephone numbers (402) 505-3684. Based on several dates of

Exhibit A to Affd. of B. Svajgl

Exhibit B to Zachary Lutz-Priefert's Affidavit

004

surveillance of 912 Hickory Hill Road, Your Affiant has witnessed Wadith NADER leave said residence. Wadith NADER also declared his residence as 912 Hickory Hill Road, Papillion, NE Sarpy County, NE with the Nebraska Department of Motor Vehicles.

11.    Additionally, Century Link provided Internet Protocol (IP) address logs for their customer Wadith NADER, 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, which showed that Wadith NADER was issued Internet Protocol (IP) address 75.163.85.5 on November 10, 2014, to the current date. For the specific dates and times aforementioned Microsoft was accessed and a photograph had been uploaded as reported by Microsoft in CyberTips 3184694 and 3320099.

12.    Your Affiant knows from training and experience that persons trading in, receiving, distributing, or possessing images involving the sexual exploitation of children or those interested in the actual sexual exploitation of children, such as in this case, often communicate with others through correspondence or other documents (whether digital or written), which could tend to identify the origin of the images as well as provide evidence of a person's intent and interest in child pornography or child exploitation.

13.    Your Affiant knows from training and experience that sometimes a person will keep data storage devices on their person. Many of these data storage devices are small enough to conceal easily in clothing, and can store hundreds or even thousands of files. Additionally, your Affiant knows from training and experience that oftentimes a person will transport computers and data storage devices in their vehicle.

14.    Your Affiant knows from training and experience that searches and seizures of computer related evidence may require the seizure of most or all computer related items (computer hardware, software, passwords and instructions) to be processed later by a qualified person in a laboratory, or other controlled environment. Computer hardware, which can be accessed by computers to store or retrieve data or images of child pornography, can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires analyzing authorities to examine all the stored data to

determine whether it is included in the warrant. Due to time constraints, this sorting process renders it impractical to attempt this kind of data analysis on site. Analyzing computers for criminal evidence requires experience in the computer field and a properly controlled environment in order to protect the integrity of the evidence, and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer related evidence is extremely vulnerable to tampering or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory may be required for its complete and accurate analysis. Affiant or other assisting Investigators may however conduct an examination of the computer hardware on-site using hardware and software that will not alter or change any potential evidence located on the computer hardware.

15.     Your Affiant knows from training and experience that in order to fully retrieve files and data from computer hardware or a data storage device, the analyst may need the computer hardware as well as the data storage device. In cases like this one where the evidence consists partly of graphics files, input and output devices used for accessing computer data, and the associated computer data, may be required by an analyst to show the nature and quality of the graphic images, which the computer could produce. In addition, the analyst may need all the system software (operating systems or interfaces, and hardware drivers), and any application software, which may have been used to create the data (whether stored on internal or peripheral data storage devices), as well as documentation of the data, items containing or displaying passwords, access codes, usernames, or other identifiers necessary to examine or operate computer hardware, software, or files and data seized, or to activate specific computer hardware or software.

16.     Your Affiant knows from training and experience that persons trading in, receiving, distributing, or possessing images involving the sexual exploitation of children or those interested in the sexual exploitation of children may communicate with others through correspondence or other documents (whether digital or written), which could tend to identify the origin of the images as well as provide evidence of a persons intent and interest in child

Exhibit A to Affd. of B. Svajgl

006

pornography or child exploitation. Additionally, files related to the exploitation of children found on computer hardware are usually obtained from the Internet using application software, which often leaves files, logs, or file remnants, which would tend to show the exchange, transfer, distribution, possession, or origin of the files. Your Affiant is also aware from training and experience that computer hardware and software exists that allows persons to share Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same Internet Protocol address, and allowing mobility and concealment of the computer used to access the Internet. Examination of these items can reveal information about the authorized or unauthorized use of Internet connections.

17.    Based upon your Affiant's knowledge, training, and experience investigating cases involving child exploitation and child pornography, your Affiant has learned and believes that contraband related to child exploitation and child pornography is typically collected, stored, and distributed by individuals with a sexual attraction to children that trade in this type of illegal activity. This type of contraband is not "used up" as other types of contraband can be such as alcohol or drugs. This type of contraband is usually stored in a manner that is secure but easily accessible to the persons collecting the contraband that is within their immediate control, to enable the collector to view their collection, which to them is highly valued, such as on computer hardware and data storage devices. For these reasons, contraband of this type can and is usually stored for an indefinite amount of time by the possessor, and may be found at the premises even though significant amount of time may have passed. In the experience and training of the Affiant, contraband stored in this manner has been found that was stored for years and transferred from and between computer hardware and data storage devices and from computer to computer where new computers are obtained by those who collect and trade in child pornography.

18.    Collections can include books, magazines, diaries, letters, photographs, articles, newspapers, slides, movies, films, albums, digital images, drawings, audio tapes, video tapes, negatives, correspondence, mailing lists, child erotica, etc., and the equipment utilized to view or read any of these items.

Exhibit A to Affd. of B. Svajgl
Exhibit B to Zachary Lutz-Priefert's Affidavit

007

19.     Collections vary in size and in the items based on many factors.  Factors, which can determine the size and extent of a collection, include living arrangements, economic status, and age.

20.     The use of the computer has changed the collection of child exploitation material and individual behavior.  Computers allow an individual to collect items and more easily hide their collection from others.  The computer has in essence, allowed the individual who views or collects child pornography to maintain a certain anonymity via the Internet through the use of aliases known as "screen names" or "user names," as well as allowing for the storage of the collection and easy retrieval for viewing.  The computer has also made it easy for individuals with similar behaviors to contact, exchange information and validate their behavior amongst each other.  Computer hardware, software, and related documentation are integral tools of this type of criminal activity and constitute the means of committing it.  Given the information provided, individuals have the ability to view and store these types of items in their residence or a secure and easily accessible place, especially using computer hardware and or data storage devices.

21.     The above information leads your Affiant to believe, and to have probable cause to believe that the premises are being used for the purpose of concealing or keeping evidence related to Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child, in violation of the laws of the State of Nebraska.

22.     Affiant has just and reasonable grounds to believe, and does believe that there is concealed or kept at the aforementioned premises at LOT 62 HICKORY HILL II, commonly known as 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, including the dwelling, outbuildings, and any persons or vehicles on the premises, the following property, to-wit:

a.     Computer hardware to include (but not limited to) any and all computer equipment and/or electronic device used to collect, analyze, create, display, convert, store, conceal, or transmit, any magnetic, optical, electronic, or similar computer impulses, files, data, and binary data; and any and all data storage devices such as fixed disks, internal and external hard disks, floppy disk

**Exhibit A to Affd. of B. Svajgl**
Exhibit B to Zachary Lutz-Priefert's Affidavit                              **008**

drives and diskettes, tape drives and tapes, DVDs, CDs, flash drives, thumb drives, memory cards, digital cameras, mobile devices, Personal Data Assistants (PDAs), cellular phones, digital music players, and gaming consoles, or other magnetic, optical, and electronic data storage devices; and any and all data-processing devices such as central processing units, and personal computers to include "laptop" or "notebook" or "pocket" computers; and any and all input and output devices to include keyboards, printers, , network communication devices, modems and external or connected devices used for accessing computer data; and any and all connecting hardware such as power cords, cables, and adapters needed for the operation of the described computer hardware.

b.      Data files to include (but not limited to) files bearing graphic interchange format extensions, .jpg, .gif, .tif, .avi, and .mpg, in the form of images and/or videos, which depict children in a sexually explicit manner, which would include visual representation of a person, or portion of the nude human body, or child erotica, and any accompanying text associated with those graphic files, and/or log files recording the transmission or storage of those graphic files, as they relate to violations of the laws of the State of Nebraska cited herein as related to the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

c.      Data files depicting sexual conduct, whether between adults or between adults and children.

d.      Correspondence, data files, documents, or records (whether digital or written) pertaining to the possession, receipt, origin, or distribution of images involving the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

e.      Correspondence, data files, documents, or records (whether digital or written) exhibiting an interest or the intent to sexually exploit children, or to identify a particular user of the materials, or contraband, and any data or text, which tends to prove the identity of the computer user at a time that may be relevant to prove the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

Page 9 of 12
Exhibit A to Affd. of R. Svajgl
Exhibit D to Zachary Lutz-Priefert's Affidavit

009

f.      Computer software and application software, and the associated installation and operation media.

g.      Manuals and other documents (whether digital or written), which describe the operation of computer hardware, software, or property seized.

h.      Items that would tend to establish ownership or use of computers, and ownership or use of any Internet service accounts accessed to facilitate the sexual exploitation of children, to include credit card bills, telephone bills, correspondence, and other identification documents.

i.      Computer hardware, software, and data, related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same Internet Protocol address.

j.      Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate computer hardware, software, or data seized.

k.      Items that would tend to show dominion and control of the property or premises searched, to include utility bills, telephone bills, correspondence, rental agreements, and other identification documents.

l.      Digital cameras, film cameras, video cameras, associated data storage devices and media, and all connecting hardware such as power cords, cables, and adapters needed for the operation of the described items. Data storage devices and media shall include (but not limited to) DVDs, CDs, memory cards and other solid-state media, tapes, and film.

23.      Your Affiant believes that the above property is being concealed, kept, or used in violation of the laws of the State of Nebraska, or is being concealed or kept at the premises and constitutes evidence of, or evidence relevant to proving a violation of the laws of the State of

Exhibit A to Affd. of B. Svaigl
Exhibit B to Zachary Lutz-Priefert's Affidavit

Nebraska, to wit: Possession of Child Pornography, §28-813.01; Distribution of Child Pornography, §28-1463.03.

24.     Furthermore, your Affiant advises that the examination of a computer system is a lengthy process requiring special steps to ensure the integrity of the electronic evidence. Therefore, your Affiant would like to advise the Court that it might not be possible to complete a return to the Court within the ten days normally required by the Court.

25.     Based on the information set forth herein your Affiant requests that a search warrant be issued.

26.     Affiant further requests that this Affidavit, Search Warrant, and subsequent Return be sealed until further order of this Court for the reason that this is pursuant to an ongoing investigation, and that knowledge of its existence and the information received could jeopardize the investigation.

27.     Your Affiant further states that this search warrant should be served during daylight hours.

28.     WHEREFORE, your Affiant prays that a search warrant may be issued according to law.

_Det. Bryan Svajgl_

Bryan S. Svajgl, Detective
Papillion Police Department

SUBSCRIBED AND SWORN TO before me this _16_ day of _MAR._, 2015.

SARPY COUNTY COURT JUDGE

**Exhibit A to Affd. of B. Svajgl**
Exhibit B to Zachary Lutz-Priefert's Affidavit

## ATTACHMENT A
### DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 912 Hickory Hill Road, Papillion, Nebraska Sarpy County is identified as follows:

912 Hickory Hill Road, Papillion, Sarpy County NE, is described as a two-story single-family residence with an attached two-car garage. The exterior has light crème colored siding and light gray dark trim. The numbers "912" are displayed above the garage door. The legal description of the residence as reported by the Sarpy County Assessors Website is LOT 62 HICKORY HILL II.



FILED
SARPY COUNTY
DISTRICT COURT

2015 MAR 24  PM 3: 07

IN THE COUNTY COURT OF SARPY COUNTY, NEBRASKA

CLERK DISTRICT COURT    CR15- 175

STATE OF NEBRASKA          )
                          ) SS.          **SEARCH WARRANT**
COUNTY OF SARPY            )

TO:    Detective Bryan Svajgl, a law enforcement officer of the Papillion Police Department, and to all other law enforcement officers:

1.      This matter came on for consideration on the 16th day of March, 2015, upon the sworn affidavit and application for issuance of a search warrant of Detective Bryan Svajgl, of the Papillion Police Department, and the Court, being fully advised in the premises finds as follows:

2.      That the Court has jurisdiction of this matter pursuant to Neb.Rev.Stat. §29-812 through Neb.Rev.Stat. §29-829.

3.      That the subject of the request for issuance of a search warrant is an investigation, which includes possession and distribution of the visual depiction of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, in violation of Neb.Rev.Stat. §28-813.01, hereinafter generally referred to as child pornography which is in violation of the laws of the State of Nebraska, in Sarpy County.

4.      That based upon the sworn affidavit and application for issuance of a search warrant of Detective Bryan Svajgl, of the Papillion Police Department dated the 16th day of March, 2015; there is probable cause to believe that kept or concealed at or within the following described place, or person, to-wit: 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, including the dwelling, outbuildings, and any persons or vehicles on the premises, the following property, to-wit:



000438604D59

a.      Computer hardware to include (but not limited to) any and all computer equipment and/or electronic device used to collect, analyze, create, display, convert, store, conceal, or transmit, any magnetic, optical, electronic, or similar computer impulses, files, data, and binary data; and any and all data storage devices such as fixed disks, internal and external hard disks, floppy disk drives and diskettes, tape drives and tapes, DVDs, CDs, flash drives, thumb drives, memory cards, digital cameras, mobile devices, Personal Data Assistants (PDAs), digital music players, and gaming consoles, or other magnetic, optical, and electronic data storage devices; and any and all data-processing devices such as central processing units, and personal computers to include "laptop" or "notebook" or "pocket" computers; and any and all input and output devices to include keyboards, printers, , network communication devices, modems and external or connected devices used for accessing computer data; and any and all connecting hardware such as power cords, cables, and adapters needed for the operation of the described computer hardware.

b.      Data files to include (but not limited to) files bearing graphic interchange format extensions, .jpg, .gif, .tif, .avi, and .mpg, in the form of images and/or videos, which depict children in a sexually explicit manner, which would include visual representation of a person, or portion of the nude human body, or child erotica, and any accompanying text associated with those graphic files, and/or log files recording the transmission or storage of those graphic files, as they relate to violations of the laws of the State of Nebraska cited herein as related to the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

c.      Data files depicting sexual conduct, whether between adults or between adults and children.

d.      Correspondence, data files, documents, or records (whether digital or written) pertaining to the possession, receipt, origin, or distribution of images involving the Possession and

Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

e.      Correspondence, data files, documents, or records (whether digital or written) exhibiting an interest or the intent to sexually exploit children, or to identify a particular user of the materials, or contraband, and any data or text, which tends to prove the identity of the computer user at a time that may be relevant to prove the Possession and Distribution of Child Pornography, and Attempted Sexual Assault of a Child.

f.      Computer software and application software, and the associated installation and operation media.

g.      Manuals and other documents (whether digital or written), which describe the operation of computer hardware, software, or property seized.

h.      Items that would tend to establish ownership or use of computers, and ownership or use of any Internet service accounts accessed to facilitate the sexual exploitation of children, to include credit card bills, telephone bills, correspondence, and other identification documents.

i.      Computer hardware, software, and data, related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same Internet Protocol address.

j.      Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate computer hardware, software, or data seized.

k.      Items that would tend to show dominion and control of the property or premises searched, to include utility bills, telephone bills, correspondence, rental agreements, and other identification documents.

Page 3 of 4
Exhibit B to Zachary Buts-Deifert's Affidavit
Exhibit B to B. Svajgl Aff.

003

1.      Digital cameras, film cameras, video cameras, associated data storage devices and media, and all connecting hardware such as power cords, cables, and adapters needed for the operation of the described items.  Data storage devices and media shall include (but not limited to) DVDs, CDs, memory cards and other solid-state media, tapes, and film.

5.      YOU ARE THEREFORE ORDERED, with the necessary and proper assistance, to search the above described premises for the purpose of seizing the before described property, and if found, to seize and deal with the same as provided by law.

6.      IT IS FURTHER ORDERED, that execution of the search warrant be forthwith during daylight hours.

7.      IT IS FURTHER ORDERED, that this Search Warrant, the Affidavit, and Subsequent Return be sealed by the Court until further order of this Court.

8.      IT IS FURTHER ORDERED, that Detective Bryan Svajgl, of the Papillion Police Department, or his designee, make return of this search warrant to me within ten days after the date hereof.  An amended return may be filed after ten days, if seized and inventoried evidence pursuant to this warrant is further analyzed as authorized herein.

GIVEN under my hand this _16_ day of _MARCH_, 2015.

SARPY COUNTY COURT JUDGE

## AFFIDAVIT OF PROBABLE CAUSE FOR WARRANTLESS ARREST

Your Affiant Detective Bryan Svajgl #468 is now, and at all times herein mentioned was, a law enforcement officer employed by Papillion Police Department.

Your Affiant did participate in the arrest of Wadith S. Nader D.O.B.:          on the 17th day of March, 2015, at 1105 A.M. in Sarpy County.

Affiant is informed and believes, and on such information and belief, and in good faith, states that probable cause exists for the arrest and continued detention of said arrestee, based upon the following:

On December 12, 2014, the Nebraska State Patrol received a CyberTip (3184694) from the National Center for Missing and Exploited Children (NCMEC). The CyberTip was generated by Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with email address wadith@hotmail.com uploaded two images to Microsoft Skydrive, which Microsoft reported as child pornography. The reported images were included within the CyberTip.

On December 20, 2014, the Nebraska State Patrol received addition CyberTip (3320099) from the National Center for Missing and Exploited Children (NCMEC). This tip was deemed by NCMEC to be related to previous tip (3184694). CyberTip (3320099) was generated by information from Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with email address wadith@hotmail.com uploaded five images to Microsoft Skydrive, which Microsoft suspected was child pornography. The reported images were included with the CyberTip.

On December 22nd, 2014, I, Det. Svajgl examined the image file uploaded on December 3rd, 2014 to the Microsoft Skydrive with email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3184694. Following is a description of the image files:

a. The Image file named "1850260232.jpg," which depicts an apparent white juvenile female (presumably between the ages of 12 and 14). That female depicted is sleeping on her stomach while wearing a green shirt which is pulled up exposing a white bra. She is also wearing white shorts but her vagina is exposed. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

b. Image file named "1773334201.jpg" which depicts the same apparent juvenile female wearing no shorts or panties with her vagina and anus exposed. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

On January 20, 2015, I, Det. Svajgl examined the additional image files uploaded on December 3rd, 2014 to the Microsoft Skydrive with email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3320099. Following is a description of the image files:

   a.  Image file named "409277812.jpg," which depicts a prepubescent white female wearing no pants or underwear. She is laying on the bed with her legs tied together and her vagina exposed. The female appears to be sleeping or unconscious. There is a yellow stuffed animal on the bed besides her. The female appears to be approximately 10 to 14 years of age. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Colorful Bedroom" Series. (CVIP report #84653)

   b.  Image file named "829555945.jpg" which depicts a fully nude white juvenile female approximately 12-14 years of age. She is sitting down with her legs off to her side with a portrait backdrop behind her. The female has long dark brown hair in piggy tails.

   c.  Image file named "1600471024.jpg" which depicts a white juvenile female approximately 10-12 years of age. She is wearing a pink shirt and no pants. She is sitting on the floor with her legs spread and her vagina exposed.

   d.  Image file named "1766201396.jpg" which depicts a white female approximately 14-18 years of age. She is wearing a teal shirt with no pants or underwear on. Her legs are spread and her vagina is exposed.

   e.  Image file named "864858517.jpg" which depicts a fully nude white juvenile female approximately 11-14 years of age. She is sitting on top of a towel on a rock holding her knees to spread her legs exposing her vagina. She appears to be outdoors near water.

Based on my training and experience, I believe that the images described above are visual depiction of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, the possession of which is in violation of the Laws of the State of Nebraska.

Microsoft provided an IP address of 75.163.85.5 which was verified as belonging to CenturyLink. Microsoft reported the email wadith@hotmail.com uploaded the photograph. Nebraska State Patrol verified the email address belongs to Wadith S. Nader of 912 Hickory Hill Road.

On February 21, 2015, Detective Svajgl queried Nebraska Department of Motor Vehicles database for the name Wadith NADER, and located a person named Wadith S. NADER, DOB                    The address 912 Hickory Hill Road, Papillion, NE, Sarpy, Nebraska, is listed for Wadith S. NADER with the Nebraska Department of Motor

Vehicles. Additionally, Detective Svajgl observed the email wadith@hotmail.com linked with the Facebook profile of Paul NADER. Det. Svajgl compared the photograph on the Facebook profile of Paul NADER to the photo on file with the Nebraska Department of Motor Vehicles. Det. Svajgl determined the profile picture for Paul NADER depicts Wadith S. NADER, DOB

On February 10, 2015, Det. Bryan Svajgl served Century Link with a Sarpy County Attorney subpoena requesting records and information relating to the identification of their subscriber using Internet Protocol (IP) address 75.163.85.5 on December 3, 2014, at 1822 and 1830 hours UTC. This specific date and times are when Microsoft reported the apparent child pornography had been uploaded to Microsoft SkyDrive from said IP address using wadith@hotmail.com email address in CyberTips 3184694 and 3320099.

On March 3, 2014, I reviewed the response records that Century Link provided. The requested records, which show that Internet Protocol (IP) address 75.163.85.5 was issued to subscriber Wadith NADER 912 Hickory Hill Road, Papillion, Sarpy County Nebraska, with the user name naderwadith and telephone numbers (402) 505-3684. Based on several dates of surveillance of 912 Hickory Hill Road, Your Affiant has witnessed Wadith NADER leave said residence. Wadith NADER also declared his residence as 912 Hickory Hill Road, Papillion, NE Sarpy County, NE with the Nebraska Department of Motor Vehicles.

Additionally, Century Link provided Internet Protocol (IP) address logs for their customer Wadith NADER, 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, which showed that Wadith NADER was issued Internet Protocol (IP) address 75.163.85.5 on November 10, 2014, to the current date. For the specific dates and times aforementioned Microsoft was accessed and a photograph were uploaded as reported by Microsoft in CyberTips 3184694 and 3320099.

On March 17th, 2015 at 1105 hours your affiant conducted a search by way of a Sarpy County search warrant at 912 Hickory Hill Road in the city of Papillion, Sarpy County Nebraska. Wadith answered the door and was determined to be the sole occupant of the residence at the time of our arrival. Wadith was advised of his Miranda Rights which he stated he understood. He agreed to speak with your affiant.

Wadith immediately stated that he was not into child pornography or viewing children without clothing. He stated he does view adult pornography on a regular basis. He continued to explain that he looks at pornography and masturbates on a daily basis. He will usually view pornography multiple hours in a day. He said he likes viewing thin and fit females, older women, hairy women, threesomes, and dirty underwear. Wadith stated that he looks at pornography on the main computer which was located in the kitchen. He has a couple of external hard drives which he also stores downloaded pornography on including videos and photos.

I then explained to Wadith that we received cybertip from Microsoft for images he uploaded to Microsoft SkyDrive. He at first said he did not know how the photos were

uploaded and stated he does not use Microsoft SkyDrive. He later stated he believes back in December while he was attempting to move some 700 downloaded pornographic files he may have inadvertently uploaded them to Microsoft SkyDrive when he swiped them across the screen. He later learned from Microsoft that his Hotmail account (wadith@hotmail.com) was locked. I confirmed with him that those photos generated a cybertip and several were confirmed as known child pornography photos with identified victims. I then asked for him to assist in speeding the investigation up by telling me where he stores his child pornography. He again denied having child pornography and stated he never intended to download child pornographic photos.

Wadith explained that he views and downloads pornography from imgfap.com which is an electronic bulletin board website where users can post photos. Wadith explained he has downloaded thousands of pornographic photos from the web site believing all images and videos were of legal aged females. He stated it was possible some were not of legal age but that he was unaware of it.

Search of the residence produced three laptops computers, over 36 hard drives, thumb drives, micro SD cards, Asus computer tablet, Samsung Galaxy cell phone, and a Kyocera cell phone. All items were collected as evidence for forensic processing.

During the search affiant was assisted by Det. Ben Iverson of the LaVista Police Department in order to conduct preliminary scans of the hardware, computer software, and hard drives, etc as detailed in the search warrant. Det. Iverson began his examination on or around 1130 hrs using a forensic examination device. Det. Iverson examined the HP laptop in the kitchen along with external hard drive. Det. Iverson discovered one image was flagged as possible known child pornography. The laptop computer and hard drive will be examined further in a safe forensic environment.

At this time based on the information and evidence obtained, your affiant believes that probable cause exists for the arrest of Wadith Nader for the offense of 6 counts of possession of child pornography NE State Statute 28-813.01 as Wadith "*knowingly possessed any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers*".

Further Affiant sayeth not.

_____
Officer/Deputy Sheriff/Trooper

SUBSCRIBED and SWORN to before me this 17th day of March,
20 15.

(SEAL)

_____
Notary Public/Judge

GENERAL NOTARY - State of Nebraska
C. CORBETT
My Comm. Exp. May 13, 2015

Exhibit C to B. Svajgl Affd.
Exhibit B to Zachary Lutz-Priefert's Affidavit

004

Printed by: aliken
Printed date/time: 4/14/15 9:44

# Incident Report

Page 1 of 19

PAPILLION POLICE DEPARTMENT
000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

## Incident Summary

| | |
|---|---|
| Incident Type: CRIMINAL | Report Type: ARREST REPORT |
| Inc Occurred Address: 912 HICKORY HILL RD, PAPILLION, NEBRASKA 68046 | Sector/Beat: 01/P212 |
| Inc Occurred Start: 12/03/2014 00:00    Inc Occurred End: 12/03/2014 00:00 | Report Taken: 12/23/2014 08:07 |
| Domestic: N    Bias Motivation: NONE    Gang Related: N | Substance: N |
| Contact Nature: | Reported Date/Time: 12/23/2014 08:07 |
| Reporting Officer: SVAJGL, BRYAN | |
| Case Status: CLOSED - ADULT A Disposition: ARREST | Primary Assigned Officer: LIKEN, ALYCE |
| | Disposition Date: 03/17/2015 11:05 |

### Offenses

Statute Code: 28081301    Enhancers:
Statute Desc: POSSESSION OF OBSCENE OR SEXUALLY EXPLICIT MATERIAL
Counts: 6    Statute Severity: CLASS 4 FELONY

### Officers

| Event Association | Emp# | Badge# | Name | Squad# |
|---|---|---|---|---|
| PRIMARY REPORTING OFFICER | P468 | P468 | SVAJGL, BRYAN | |
| ASSISTING OFFICER | P469 | P469 | STIGGE, BRANDON | |
| ASSISTING OFFICER | P457 | P457 | MAAS, PRESTON | |
| ASSISTING OFFICER | 15059 | 15059 | DOOLING, SHAWN | |
| ASSISTING OFFICER | 15054 | 15054 | IVERSEN, BEN | |
| ASSISTING OFFICER | P446 | P446 | GOLEY, CHRIS | |
| ASSISTING OFFICER | P414 | P414 | KUSTKA, BRAD | |
| ASSISTING OFFICER | P405 | P405 | HIGGINS, RAY | |
| PRIMARY ASSIGNED OFFICER | 5 | | LIKEN, ALYCE | |



### Associated Events

| Association: | Event Type: | Event#: | Event Date (Start): | Event Date (End): | Agency: |
|---|---|---|---|---|---|
| INCIDENT TO ARREST | ARREST | LPP141223021009 | 3/17/2015 00:00:00 | 12/3/2014 00:00:00 | PP |
| INCIDENT TO INCIDENT | INCIDENT | LLP150318005282 | 3/17/2015 00:00:00 | 3/18/2015 16:02:00 | LP |

### List of Attachments

| Type: | Report ID: | Report Date: | Report Summary: |
|---|---|---|---|
| CITATION | | | A2348812 TO WADITH S NADER |
| AFFIDAVIT OF PROBABLE CAUSE FOR WAI | | | (4 PAGES) AFFIDAVIT OF PROBABLE CAUSE FOR WARRANTLESS ARREST |
| CYBERTIPLINE REPORT 3184694 | | | (18 PAGES) CYBERTIPLINE REPORT 3184694 |
| CYBERTIPLINE REPORT 3320099 | | | (19 PAGES) CYBERTIPLINE REPORT 3320099 |
| COUNTY ATTORNEY SUBPOENA & AFFIDA\ | | | (5 PAGES) COUNTY ATTORNEY SUBPOENA & AFFIDAVIT AND APPLICATION FOR ISSUANCE OF A COUNTY ATTORNEY SUBPOENA |
| CENTURY LINK SUBPOENA INFO | | | (5 PAGES) CENTURY LINK SUBPOENA INFO |
| PRESERVE LETTER | | | PRESERVE LETTER |
| SEARCH WARRANT (HOME) | | | (4 PAGES) SEARCH WARRANT (HOME) |
| AFFIDAVIT AND APPLICATION FOR ISSUAN | | | (12 PAGES) AFFIDAVIT AND APPLICATION FOR ISSUANCE OF A SEARCH WARRANT |
| SEARCH WARRANT (MICROSOFT) | | | (11 PAGES) SEARCH WARRANT (MICROSOFT) |
| JAIL INTAKE ASSESSMENT | | | JAIL INTAKE ASSESSMENT |

**Exhibit B to Zachary Lutz-Priefert's Affidavit**    PAP 000151

Printed by: aliken
Printed date/time: 4/14/15 9:44

# Incident Report

Page 2 of 19

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

## Persons Involved

| Person#: 0001 | MNI: 83462 | | Can ID Suspect: No |
|---|---|---|---|
| Event Association: SUSPECT | | Contact Date/Time: 03/17/2015 11:05 | |
| Name: NADER, WADITH S | | | |
| SSN: | DOB: 12/12/1973 | Age: 40 - 40   Sex: MALE | Race: WHITE/CAUCASIAN |
| Height: 5' 10" - 5' 10" | Weight: 175 - 175 lbs | Eye Color: BROWN | Hair Color: BROWN |
| Address: 912 HICKORY HILL RD, PAPILLION, NEBRASKA 68046 | | | Sector/Beat: 01/P202 |
| Phone Type 1: HOME PHONE | Phone# 1: (703) 909-0551 | Ext 1: | |
| Phone Type 2: | Phone# 2: | Ext 2: | |
| DL State: NEBRASKA | DL#: H12920538 | DL Exp. Date: 12/12/2017 | |
| Occupation: UNEMPLOYED | | Employer/School: | |

### Person Offenses

Statute Code: 28081301                     Enhancers:
Statute Desc: POSSESSION OF OBSCENE OR SEXUALLY EXPLICIT MATERIAL
Counts: 6

| Person#: 0002 | MNI: 724127 | | Can ID Suspect: No |
|---|---|---|---|
| Event Association: OTHER | | Contact Date/Time: 03/17/2015 11:05 | |
| Name: NADER, STACEY N | | | |
| SSN: 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 | DOB: 10/23/1973 | Age: 41 - 41   Sex: FEMALE | Race: WHITE/CAUCASIAN |
| Height: | Weight: | Eye Color: | Hair Color: |
| Address: 912 HICKORY HILL RD, PAPILLION, NEBRASKA 68046 | | | Sector/Beat: 01/P202 |
| Phone Type 1: HOME PHONE | Phone# 1: (402) 505-3684 | Ext 1: | |
| Phone Type 2: | Phone# 2: | Ext 2: | |
| DL State: | DL#: | DL Exp. Date: | |
| Occupation: LT COL | | Employer/School: AIR FORCE | |

| Person#: 0003 | MNI: 725904 | | Can ID Suspect: No |
|---|---|---|---|
| Event Association: OTHER | | Contact Date/Time: 03/23/2015 09:00 | |
| Name: NADER, RAIYAH | | | |
| SSN: | DOB: 03/22/2007 | Age: 7 - 7   Sex: FEMALE | Race: WHITE/CAUCASIAN |
| Height: | Weight: | Eye Color: | Hair Color: |
| Address: 912 HICKORY HILL RD, PAPILLION, NEBRASKA 68046 | | | Sector/Beat: 01/P202 |
| Phone Type 1: | Phone# 1: | Ext 1: | |
| Phone Type 2: | Phone# 2: | Ext 2: | |
| DL State: | DL#: | DL Exp. Date: | |
| Occupation: | | Employer/School: | |

Exhibit B to Zachary Lutz-Priefert's Affidavit

Printed by: aliken
Printed date/time:  4/14/15 9:44

# Incident Report

Page 3 of 19

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

## Persons Involved

| | | | |
|---|---|---|---|
| **Person#:  0004** | **MNI:** 725905 | | **Can ID Suspect:**  No |
| **Event Association:**   OTHER | | **Contact Date/Time:**  03/23/2015 09:00 | |
| **Name:**  NADER, RHYS | | | |
| **SSN:** | **DOB:** 08/31/2009 | **Age:** 5 - 5    **Sex:** MALE | **Race:**  WHITE/CAUCASIAN |
| **Height:** | **Weight:** | **Eye Color:** | **Hair Color:** |
| **Address:** 912 HICKORY HILL RD, PAPILLION, NEBRASKA 68046 | | | **Sector/Beat:**   01/P202 |
| **Phone Type 1:** | **Phone# 1:** | **Ext 1:** | |
| **Phone Type 2:** | **Phone# 2:** | **Ext 2:** | |
| **DL State:** | **DL#:** | **DL Exp. Date:** | |
| **Occupation:** | | **Employer/School:** | |

## Businesses Involved

**Business #   0001**
**Event Association:**   VICTIM
**Business Name:**  SOCIETY                                                    **Business Type:**  SOCIETY/PUBLIC
**Address:**  ,                                                                        **Sector/Beat:**
**Phone Type 1:**                        **Phone# 1:**                **Ext 1:**
**Phone Type 2:**                        **Phone# 2:**                **Ext 2:**

## Property Involved

| **Property #  0001** | | **Evidence:**  Yes | | **Evidence#:**  14-021009-1 |
|---|---|---|---|---|
| **Event Assoc/Orig status:** | | **Original Status Date:**   12/23/2014 08:07:57 | | **Original Value:** |
| **Current Status:**  EVIDENCE | | **Current Status Date:**   12/23/2014 08:07:57 | | **Current Value:** |
| **Property Type:**   RECORDINGS - AUDIO/VISUAL | | | | |
| **Description:**  DVD CYBERTIP FROM ICAC | | | | |
| **Make/Brand:** | | **Model:** | | |
| **Color:** | | **Quantity:**  1 | | |
| **Serial/Lot#:**  A14-23198 | | **Owner Applied#:** | | |
| **NCIC Date:** | | **NCIC Reported By:** | | |
| **NCIC#:** | | **NCIC Cancelled:** | | |

| **Property #  0002** | | **Evidence:**  Yes | | **Evidence#:**  14-021009-2 |
|---|---|---|---|---|
| **Event Assoc/Orig status:** | | **Original Status Date:**   12/23/2014 08:07:57 | | **Original Value:** |
| **Current Status:**  EVIDENCE | | **Current Status Date:**   12/23/2014 08:07:57 | | **Current Value:** |
| **Property Type:**   RECORDINGS - AUDIO/VISUAL | | | | |
| **Description:**  DVD CYBER TIP | | | | |
| **Make/Brand:** | | **Model:** | | |
| **Color:** | | **Quantity:**  1 | | |
| **Serial/Lot#:**  3320099 | | **Owner Applied#:** | | |
| **NCIC Date:** | | **NCIC Reported By:** | | |
| **NCIC#:** | | **NCIC Cancelled:** | | |

Exhibit B to Zachary Lutz-Priefert's Affidavit                    PAP 000153

**Incident Report**

PAPILLION POLICE DEPARTMENT
000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

## Property Involved

| | | |
|---|---|---|
| Property # **0003** | Evidence: Yes | Evidence#: 14-021009-3 |
| Event Assoc/Orig status: | Original Status Date: 12/23/2014 08:07:57 | Original Value: |
| Current Status: EVIDENCE | Current Status Date: 12/23/2014 08:07:57 | Current Value: |
| Property Type: COMPUTER HARDWARE/SOFTWARI | | |
| Description: FB MAAS 457: WHITE DATA TRAVELER 1 GB | | |
| Make/Brand: | Model: | |
| Color: | Quantity: 1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

| | | |
|---|---|---|
| Property # **0004** | Evidence: Yes | Evidence#: 14-021009-4 |
| Event Assoc/Orig status: | Original Status Date: 12/23/2014 08:07:57 | Original Value: |
| Current Status: EVIDENCE | Current Status Date: 12/23/2014 08:07:57 | Current Value: |
| Property Type: COMPUTER HARDWARE/SOFTWARI | | |
| Description: FB STIGGIE 469: MATSUNICH HARD DRIVE WITH CABLE | | |
| Make/Brand: | Model: DM256 | |
| Color: | Quantity: 1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

| | | |
|---|---|---|
| Property # **0005** | Evidence: Yes | Evidence#: 14-021009-5 |
| Event Assoc/Orig status: | Original Status Date: 12/23/2014 08:07:57 | Original Value: |
| Current Status: EVIDENCE | Current Status Date: 12/23/2014 08:07:57 | Current Value: |
| Property Type: COMPUTER HARDWARE/SOFTWARI | | |
| Description: FB STIGGIE 469: HDD EXTERNAL HARD DRIVE SILVER | | |
| Make/Brand: | Model: HDD WLX-393UB | |
| Color: | Quantity: 1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

| | | |
|---|---|---|
| Property # **0006** | Evidence: Yes | Evidence#: 14-021009-6 |
| Event Assoc/Orig status: | Original Status Date: 12/23/2014 08:07:57 | Original Value: |
| Current Status: EVIDENCE | Current Status Date: 12/23/2014 08:07:57 | Current Value: |
| Property Type: PORTABLE ELECTRONIC COMMUNI( | | |
| Description: FB MAAS 457: KYOCERA BLK CELL PHONE | | |
| Make/Brand: | Model: | |
| Color: | Quantity: 1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

Exhibit B to Zachary Lutz-Priefert's Affidavit

# Incident Report

**PAPILLION POLICE DEPARTMENT**
000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

## Property Involved

| Property # 0007 | | Evidence: Yes | | Evidence#: 14-021009-7 | |
|---|---|---|---|---|---|
| Event Assoc/Orig status: | | Original Status Date: | 12/23/2014 08:07:57 | Original Value: | |
| Current Status: EVIDENCE | | Current Status Date: | 12/23/2014 08:07:57 | Current Value: | |
| Property Type: COMPUTER HARDWARE/SOFTWARI | | | | | |
| Description: FB MAAS 457: GRAY HP LAPTOP | | | | | |
| Make/Brand: | | Model: HP | | | |
| Color: | | Quantity: 1 | | | |
| Serial/Lot#: SCH135135M | | Owner Applied#: | | | |
| NCIC Date: | | NCIC Reported By: | | | |
| NCIC#: | | NCIC Cancelled: | | | |

| Property # 0008 | | Evidence: Yes | | Evidence#: 14-021009-8 | |
|---|---|---|---|---|---|
| Event Assoc/Orig status: | | Original Status Date: | 12/23/2014 08:07:57 | Original Value: | |
| Current Status: EVIDENCE | | Current Status Date: | 12/23/2014 08:07:57 | Current Value: | |
| Property Type: PORTABLE ELECTRONIC COMMUNI | | | | | |
| Description: FL DOOLING LVPD:SAMSUNG GALAXY PLAYER 4.0 CELL PHONE | | | | | |
| Make/Brand: | | Model: | | | |
| Color: | | Quantity: 1 | | | |
| Serial/Lot#: | | Owner Applied#: | | | |
| NCIC Date: | | NCIC Reported By: | | | |
| NCIC#: | | NCIC Cancelled: | | | |

| Property # 0009 | | Evidence: Yes | | Evidence#: 14-021009-9 | |
|---|---|---|---|---|---|
| Event Assoc/Orig status: | | Original Status Date: | 12/23/2014 08:07:57 | Original Value: | |
| Current Status: EVIDENCE | | Current Status Date: | 12/23/2014 08:07:57 | Current Value: | |
| Property Type: COMPUTER HARDWARE/SOFTWARI | | | | | |
| Description: FB GOLEY P446: BLACK EXTERNAL HARDDRIVE 3 TB | | | | | |
| Make/Brand: | | Model: WD | | | |
| Color: | | Quantity: 1 | | | |
| Serial/Lot#: EJAJJHD300258 | | Owner Applied#: P/N HX-D301T0BIG | | | |
| NCIC Date: | | NCIC Reported By: | | | |
| NCIC#: | | NCIC Cancelled: | | | |

| Property # 0010 | | Evidence: Yes | | Evidence#: 14-021009-10 | |
|---|---|---|---|---|---|
| Event Assoc/Orig status: | | Original Status Date: | 12/23/2014 08:07:57 | Original Value: | |
| Current Status: EVIDENCE | | Current Status Date: | 12/23/2014 08:07:57 | Current Value: | |
| Property Type: COMPUTER HARDWARE/SOFTWARI | | | | | |
| Description: FB STIGGIE 469: PURPLE 32 GB THUMBDRIVE DT101G2 | | | | | |
| Make/Brand: | | Model: | | | |
| Color: | | Quantity: 1 | | | |
| Serial/Lot#: | | Owner Applied#: | | | |
| NCIC Date: | | NCIC Reported By: | | | |
| NCIC#: | | NCIC Cancelled: | | | |

Exhibit B to Zachary Lutz-Priefert's Affidavit

# Incident Report

PAPILLION POLICE DEPARTMENT
000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

## Property Involved

| | | |
|---|---|---|
| **Property #  0011** | **Evidence:**  Yes | **Evidence#:**  14-021009-11 |
| **Event Assoc/Orig status:** | **Original Status Date:**  12/23/2014 08:07:57 | **Original Value:** |
| **Current Status:**  EVIDENCE | **Current Status Date:**  12/23/2014 08:07:57 | **Current Value:** |
| **Property Type:**   COMPUTER HARDWARE/SOFTWARE | | |
| **Description:**  FB STIGGIE P469: BOX OF HARD DRIVES | | |
| **Make/Brand:** | **Model:** | |
| **Color:** | **Quantity:**  31 | |
| **Serial/Lot#:** | **Owner Applied#:** | |
| **NCIC Date:** | **NCIC Reported By:** | |
| **NCIC#:** | **NCIC Cancelled:** | |

| | | |
|---|---|---|
| **Property #  0012** | **Evidence:**  Yes | **Evidence#:**  14-021009-12 |
| **Event Assoc/Orig status:** | **Original Status Date:**  12/23/2014 08:07:57 | **Original Value:** |
| **Current Status:**  EVIDENCE | **Current Status Date:**  12/23/2014 08:07:57 | **Current Value:** |
| **Property Type:**   COMPUTER HARDWARE/SOFTWARE | | |
| **Description:**  FB STIGGE 469: WD EXTERNAL HARD DRIVE | | |
| **Make/Brand:** | **Model:**  WD | |
| **Color:** | **Quantity:**  1 | |
| **Serial/Lot#:**   WX21E42APP51 | **Owner Applied#:**   P/N RG360UA #ABA | |
| **NCIC Date:** | **NCIC Reported By:** | |
| **NCIC#:** | **NCIC Cancelled:** | |

| | | |
|---|---|---|
| **Property #  0013** | **Evidence:**  Yes | **Evidence#:**  14-021009-13 |
| **Event Assoc/Orig status:** | **Original Status Date:**  12/23/2014 08:07:57 | **Original Value:** |
| **Current Status:**  EVIDENCE | **Current Status Date:**  12/23/2014 08:07:57 | **Current Value:** |
| **Property Type:**   COMPUTER HARDWARE/SOFTWARE | | |
| **Description:**  FB DOOLEY LVPD: BLACK HP PAVILLION LAPTOP | | |
| **Make/Brand:** | **Model:**  HP PAVILLION | |
| **Color:** | **Quantity:**  1 | |
| **Serial/Lot#:**   CNF64319QL | **Owner Applied#:**   P/N RG360UA ABA | |
| **NCIC Date:** | **NCIC Reported By:** | |
| **NCIC#:** | **NCIC Cancelled:** | |

| | | |
|---|---|---|
| **Property #  0014** | **Evidence:**  Yes | **Evidence#:**  14-021009-14 |
| **Event Assoc/Orig status:** | **Original Status Date:**  12/23/2014 08:07:57 | **Original Value:** |
| **Current Status:**  EVIDENCE | **Current Status Date:**  12/23/2014 08:07:57 | **Current Value:** |
| **Property Type:**   PORTABLE ELECTRONIC COMMUNI | | |
| **Description:**  FB IVERSON LVPD:CELLPHONE IN WHITE CASE NADER PHONE | | |
| **Make/Brand:** | **Model:**  SAMSUNG GALAXY 4 | |
| **Color:** | **Quantity:**  1 | |
| **Serial/Lot#:** | **Owner Applied#:** | |
| **NCIC Date:** | **NCIC Reported By:** | |
| **NCIC#:** | **NCIC Cancelled:** | |

PAP 000156

# Incident Report

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

## Property Involved

**Property # 0015**

| | | |
|---|---|---|
| Event Assoc/Orig status: | Evidence:  Yes | Evidence#:  14-021009-15 |
| Current Status:  EVIDENCE | Original Status Date:  12/23/2014 08:07:57 | Original Value: |
| Property Type:   COMPUTER HARDWARE/SOFTWARI | Current Status Date:  12/23/2014 08:07:57 | Current Value: |
| Description:  FB IVERSON LVPD: HP ENVY LAPTOP | | |
| Make/Brand: | Model: | |
| Color: | Quantity:  1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

**Property # 0016**

| | | |
|---|---|---|
| Event Assoc/Orig status: | Evidence:  Yes | Evidence#:  14-021009-16 |
| Current Status:  EVIDENCE | Original Status Date:  12/23/2014 08:07:57 | Original Value: |
| Property Type:   COMPUTER HARDWARE/SOFTWARI | Current Status Date:  12/23/2014 08:07:57 | Current Value: |
| Description:  FB STIGGIE P469: MICRO DISC SD 1 GM | | |
| Make/Brand: | Model: | |
| Color: | Quantity:  1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

**Property # 0017**

| | | |
|---|---|---|
| Event Assoc/Orig status: | Evidence:  Yes | Evidence#:  14-021009-17 |
| Current Status:  EVIDENCE | Original Status Date:  12/23/2014 08:07:57 | Original Value: |
| Property Type:   COMPUTER HARDWARE/SOFTWARI | Current Status Date:  12/23/2014 08:07:57 | Current Value: |
| Description:  FB STIGGIE 469: TABLET ASUS WITH CASE | | |
| Make/Brand: | Model: | |
| Color: | Quantity:  1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

**Property # 0018**

| | | |
|---|---|---|
| Event Assoc/Orig status: | Evidence:  Yes | Evidence#:  14-021009-18 |
| Current Status:  EVIDENCE | Original Status Date:  12/23/2014 08:07:57 | Original Value: |
| Property Type:   RECORDINGS - AUDIO/VISUAL | Current Status Date:  12/23/2014 08:07:57 | Current Value: |
| Description:  PHOTOS | | |
| Make/Brand: | Model: | |
| Color: | Quantity:  1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Incident Report**

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

## Property Involved

| Property # | 0019 | | | Evidence: | No | | 14-21009-19 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Event Assoc/Orig status: | Original Status Date: 12/23/2014 08:07:57  Original Value: |
| Current Status: | Current Status Date: 12/23/2014 08:07:57  Current Value: |
| Property Type:  COMPUTER HARDWARE/SOFTWARE | |
| Description:  ITEMS FOR FORENSIC CHECK OUT 3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18 | |
| Make/Brand: | Model: |
| Color: | Quantity:  1 |
| Serial/Lot#: | Owner Applied#: |
| NCIC Date: | NCIC Reported By: |
| NCIC#: | NCIC Cancelled: |

| Property # | 0020 | | | Evidence: | Yes | Evidence#: | 14-021009-20 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Event Assoc/Orig status: | Original Status Date: 12/23/2014 08:07:57  Original Value: |
| Current Status: | Current Status Date: 12/23/2014 08:07:57  Current Value: |
| Property Type:  RECORDINGS - AUDIO/VISUAL | |
| Description:  DVD PROJECT HARMONY INTERVIEWS | |
| Make/Brand: | Model: |
| Color: | Quantity:  2 |
| Serial/Lot#: | Owner Applied#: |
| NCIC Date: | NCIC Reported By: |
| NCIC#: | NCIC Cancelled: |

Exhibit B to Zachary Lutz-Priefert's Affidavit

PAPILLION POLICE DEPARTMENT
)00 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

## Narratives

ENTERED DATE/TIME: 3/19/2015 09:16:35
SUBJECT: POSS OF CHILD PORNOGRAPHY 6 COUNTS
AUTHOR: SVAJGL, BRYAN

PAPILLION POLICE DEPARTMENT
NARRATIVE INCIDENT REPORT

CR#:PP14-21009

OFFENSE: Possession of Child Pornography (28-813.01) x 6 counts

PERSONS REFERRED TO:
Wadith NADER (w/m 12-12-73)Suspect
Stacey NADER (w/f 10-23-73)Suspect's Spouse
Raiyah NADERChild
Reese NADERChild
Detective Stigge #469Assisting Officer
Det. Iverson LVPD #15054LaVista Police Officer
Det. Dooling LVPD #15059LaVista Police Officer
Det. Maas #457Assisting Officer
Todd DUDAS Papillion Police Evidence Tech
FBI John HallockBomb Agent
Sgt. Matt Manhart OPD Bomb Response Team

PLACES REFERRED TO:
912 Hickory Hill Road

PRPOPERTY REFERRED TO:
DVD of images from Cybertip #3184694
DVD of images from Cybertip #3320099
White Travelor 1GB thumb drive
Matsunichi HD (Hard Drive) Model #DM256
Black Western Digital HD S/n #WXNX088D811
Silver HDD external Hard drive Model #WLX-393UB
Black Kyocera cell phone
Gray HP laptop serial #SCH135135M
Samsung Galaxy 4.0 Cell Phone
Black external hard drive 3TB S/n #E3JAJJHA300258
Purple 32 GB thumb drive DT10162
Western Digital external hard drive S/n #WX21E42APP51
31- Box containing 31 internal hard drives
Black HP Pavillion S/n# CNF64319QL
Samsung Galaxy 4 in white case
Micro SD Card 1GB
HP Envy Laptop
Asus tablet w/case

REPORT:
I, Detective Bryan Svajgl #468, while on duty in plain clothes for the Papillion Police
Department in Sarpy County Nebraska on December 22, 2014, was assigned to conduct

Exhibit B to Zachary Lutz-Priefert's Affidavit

# Incident Report

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035                                    Incident Number: LPP141223021009

follow-up on a possible possession of child pornography report.

On December 12, 2014, the Nebraska State Patrol received a CyberTip (3184694) from the National Center for Missing and Exploited Children (NCMEC). The CyberTip was generated by Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with email address wadith@hotmail.com uploaded two images to Microsoft SkyDrive, which Microsoft reported as child pornography. The reported images were included within the CyberTip.

On December 20, 2014, the Nebraska State Patrol received additional CyberTip (3320099) from the National Center for Missing and Exploited Children (NCMEC). This tip was deemed by NCMEC to be related to previous tip (3184694). CyberTip (3320099) was generated by information from Microsoft. Within the CyberTip, Microsoft reported that on December 3, 2014, their customer with email address wadith@hotmail.com uploaded five images to Microsoft SkyDrive, which Microsoft suspected was child pornography. The reported images were included with the CyberTip.

On December 22nd, 2014, I, Detective Svajgl with the assistance of Detective Stigge #469, examined the image files uploaded on December 3rd, 2014 to the Microsoft SkyDrive with email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3184694. Following is a description of the image files:

a.The Image file named "1850260232.jpg," which depicts a white juvenile female (presumably between the ages of 11 and 14). That female depicted is sleeping on her stomach with her head on a blue pillow. The female has long dark hair. She is wearing a green shirt which is pushed up exposing a white bra. The green shirt appears to have white lettering on the top back along with a large number label on it. She is also wearing white shorts and no panties exposing her vagina. Her exposed vagina does not have any pubic hair. The female also has small hips appearing to be prepubescent. Included in the Cybertip was information from the Child Victim Identification Program (CVIP) which reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

b.Image file named "1773334201.jpg" which depicts the same apparent juvenile female now wearing no shorts or panties. She is still on her stomach and holding the front of her genital area with her hands. The female's vagina and anus are exposed. Again no signs of pubic hair growth are present. Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Blue Pillow" Series. (CVIP report #84278)

On January 20, 2015, I, Detective Svajgl with the assistance of Detective Stigge examined the additional image files uploaded on December 3rd, 2014 to the Microsoft SkyDrive with email address wadith@hotmail.com, as reported by Microsoft in CyberTip 3320099. Following is a description of the image files:

a.Image file named "409277812.jpg," which depicts a prepubescent white female wearing no pants or underwear. She is lying on the bed with her legs tied together by pink and yellow material and her vagina exposed. The female appears to be sleeping or unconscious. Pink and blue bed sheets are on the bed above her. There is a yellow stuffed animal on the bed besides her. The female appears to be approximately 10 to 14 years of age. The female has

Exhibit B to Zachary Lutz-Priefert's Affidavit

**PAPILLION POLICE DEPARTMENT**
**1000 EAST FIRST STREET**
**PAPILLION, NEBRASKA 68046**
**(402) 597-2035**

Incident Number: LPP141223021009

a scrape on her elbow and a mark on the left side of her face.  She also appears to be missing a tooth.  The female has no signs of pubic hair growth in the vaginal area.  The Child Victim Identification Program (CVIP) reported the file appears to contain a child victim who has been identified by law enforcement as the "Colorful Bedroom" Series. (CVIP report #84653)

b.Image file named "829555945.jpg" which depicts a fully nude white juvenile female approximately 12-14 years of age.  It appears to be a production photo with coral and seashells on the back drop behind her.  She is sitting down with her legs off to her side.  Her vagina is partially exposed showing light development of pubic hair.  The female has long dark brown hair in piggy tails.  Three colorful clips are in her hair.  The females exposed breasts appear to be developing although her hips appear undeveloped.

c.Image file named "1600471024.jpg" which depicts a white prepubescent juvenile female approximately 10-12 years of age.  She is sitting on the floor wearing a pink shirt and no pants or underwear.  Her legs are spread exposing her vagina.  Her vagina does not appear to have developing pubic hair.  The female's hips appear small and undeveloped.  She has shoulder length brown hair.  The female is holding a camera in her left hand as if she is taking a picture of herself.  She appears to be in a room with a white door and orange wall.  Up against the wall is an older space heater.  Next to the space heater is a couple of gym bags.

d.Image file named "1766201396.jpg" which depicts an age difficult white female possibly 14-18 years of age.  She has shoulder length uncombed hair.  She is wearing a teal shirt with an outline of a small puppy on it.  She is sitting on a bed wearing no pants or underwear.  Her legs are spread and her vagina is exposed.  She is also wearing pink socks.  The female has some pubic hair and slightly developed hips.  Behind the female is a book shelf and two posters on the wall.  One poster reads: Diplom.  The second poster is of Hannah Montana but has foreign writing on it.

e. Image file named "864858517.jpg" which depicts a fully nude white juvenile female approximately 11-14 years of age.  She has dirty blonde shoulder length hair.  The female is sitting on top of a towel on what appears to be a rock.  She is holding her knees to spread her legs exposing her vagina.  She is outdoors near water.  The female has small developing breasts and slim hips.  She does have visible pubic hair on top of her vagina.

Based on my training and experience, I believe that the images described above are visual depiction of sexually explicit conduct or erotic nudity, which has a child as one of its participants or portrayed observers, the possession of which is in violation of the Laws of the State of Nebraska.

Microsoft provided an IP address of 75.163.85.5 which was verified as belonging to CenturyLink.  Microsoft reported the email wadith@hotmail.com uploaded the photograph.  Microsoft verified the email address belongs to Wadith S. Nader of 912 Hickory Hill Road.

On February 21, 2015,  I queried Nebraska Department of Motor Vehicles database for the name Wadith NADER, and located a person named Wadith S. NADER, DOB 12/12/1973, age 41.  The address 912 Hickory Hill Road, Papillion, NE, Sarpy, Nebraska, is listed for Wadith S. NADER with the Nebraska Department of Motor Vehicles.  Researching further I observed the email wadith@hotmail.com linked with the Facebook profile of Paul NADER.  I compared the photograph on the Facebook profile of Paul NADER to the photo on file with

**Exhibit B to Zachary Lutz-Priefert's Affidavit**

**Incident Report**

PAPILLION POLICE DEPARTMENT
)00 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

the Nebraska Department of Motor Vehicles. I determined the profile picture for Paul NADER depicts Wadith S. NADER, DOB 12/12/1973.

On February 10, 2015, I served Century Link with a Sarpy County Attorney subpoena requesting records and information relating to the identification of their subscriber using Internet Protocol (IP) address 75.163.85.5 on December 3, 2014, at 1822 and 1830 hours UTC. This is the specific date and times when Microsoft reported the apparent child pornography had been uploaded to Microsoft SkyDrive from said IP address from email address wadith@hotmail.com according to CyberTips 3184694 and 3320099.

On March 3, 2014, I received response from Century Link. I then reviewed the response records that Century Link provided. The requested records, which show that Internet Protocol (IP) address 75.163.85.5 was issued to subscriber Wadith NADER 912 Hickory Hill Road, Papillion, Sarpy County Nebraska, with the user name naderwadith and telephone numbers (402) 505-3684. Additionally, Century Link provided Internet Protocol (IP) address dates for their customer Wadith NADER, 912 Hickory Hill Road, Papillion, Sarpy County, Nebraska, which showed that Wadith NADER was issued Internet Protocol (IP) address 75.163.85.5 on November 10, 2014, to the current date. This shows Wadith NADER was the Century Link customer on the specific dates and times aforementioned Microsoft was accessed and the seven photographs were uploaded as reported by Microsoft in CyberTips 3184694 and 3320099.

On February 24, 2015 I made email contact with Air Force OSI agent Peter Vandamme. He confirmed Wadith NADER was formerly with the Air Force but no longer is with the department. They had since lost contact with him. Wadith's spouse Stacey NADER (w/f 10-23-73) is still active Air Force as a Lieutenant Colonel. Agent Vandamme was briefed on the facts of the case.

Preservation letter was drafted and faxed to Microsoft Corporation Online custodian of Records on March 13, 2015. Microsoft confirmed the preservation request on March 17, 2015.

Based on several dates of surveillance of 912 Hickory Hill Road I was able to witnessed Wadith NADER outside of the residence on March 11, 2015 at 1310 hours. I also observed Wadith NADER and his two children arrive at the residence and exit his red Hyundai Veloster NE plate #TJI831 at 1540 hours.

On March 16, 2015 I completed an affidavit and application for issuance of a search warrant for 912 Hickory Hill Road. I presented said application in front of the Honorable Judge Hutton of the Sarpy County Court, which he subsequently signed. A copy of that warrant will be added to this report.

I also completed an affidavit and application for issuance of a search warrant for Microsoft Corporation Online including wadith@hotmail.com e-mail account. The Honorable Judge Hutton of the Sarpy County Court read the warrant and signed that warrant as well. A copy of that warrant will be added to this report as well.

On March 17th, 2015 at 1105 hours, Detective Ben Iverson of the LaVista Police Department, Detective Shawn Dooling of the LaVista Police Department, Detective Brandon Stigge #469, Detective Preston Maas #457, Officer Goley #446, Officer Kustka #414, and

# Incident Report

**PAPILLION POLICE DEPARTMENT**
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

**Incident Number: LPP141223021009**

Officer Higgins #405 and I conducted a search by way of a Sarpy County search warrant at 912 Hickory Hill Road in the city of Papillion, Sarpy County Nebraska.  Wadith NADER answered the door after initial announcement.  I advised him the nature of my visit and provided him a copy of the search warrant.  He confirmed his date of birth as 12-12-73.  He advised he was the sole occupant of the residence at the time of our arrival.  Wadith was searched for weapons by Officer Goley.  Officer Goley then completed a cursory search of the front living room observing no weapons.  Wadith informed us there were several hand guns in the closet by the front door.  He also advised there were more firearms upstairs in the master bedroom and downstairs in a closet.

I then requested Wadith have a seat on the couch in the front living room.  He provided me permission to use the desk chair near the couch.  Wadith informed me that his two children Raiyah NADER age 8 and Reese NADER age 5 were at school and that his wife was out of town in Georgia.  He explained that he worked for the military doing counter terrorist work until he was discharged four years ago.  Since that time he has not worked.  He instead completed a doctorate program through Putnam University in California.  Wadith explained that he was just speaking to his attorney as he is trying to complete documentation to get his job back.  Wadith advised he is from Columbia and Orthodox.  Wadith said he is married to Stacey (Nikki) NADER and that they met in the Air Force years ago.

I then explained that our search warrant was for electronic devices that may contain data relating to the possession, distribution, or dissemination of child pornography.  Wadith was then advised of his Miranda Rights which he stated he understood.  I then removed my tactical vest so I could interview Wadith while the other Officers completed the search.

This portion following is a synopsis of our interview at 912 Hickory Hill Road and is not intended to encapsulate the entireties of the interview.  In all, the interview lasted for approximately 105 minutes.  The interview was recorded and entered as evidence.

Initially I asked Wadith in effort to speed our search up, where we should be looking.  He advised the computer in the kitchen.  I asked him where the items were stored.  He then asked what items.  I specifically said the child pornography.  Wadith stated there was none that he was aware of.  He followed it up by saying there is a lot of pornography but that he is not interested in children.  He said, "Children are dirty, I don't find that sexy.  I then asked Wadith what he does when he looks at pornography.  He stated that he masturbates.  I asked Wadith what types of pornography he likes.  He informed me that he likes fit girls, thin girls, older women, women with hair, threesomes, and dirty underwear.  Wadith elaborated that he does not like females with no hair.  He likes women more his age.  I asked where he got his pornography from.  He said he downloads it from websites.  He said he does not go to specific forums or search for children.

Wadith explained that about three months ago he was locked out of his Microsoft Hotmail account wadith@hotmail.com.  He stated he was unsure why he was locked out and was concerned because his email had been hacked before causing spam to be sent to his friends from his email.  He attempted to contact Microsoft to find out why he was locked out.  Microsoft told him it was something to do with something called SkyDrive.  Wadith explained that when he tried to take a picture and slide it over it went into SkyDrive which tipped Microsoft.  He thinks Microsoft then probably called police.  I asked if he knew what picture it was.  He said he had no idea.  He explained that they would not tell him anything.  He again stated he had no idea what picture it was.  I informed him it was several pictures.  He then

PAP 000163

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

asked, "So you know this?" He remarked it was SkyDrive. He again stated he did not know what pictures it would be. He said he does not search for Child pornography on the internet. He said he does not trade with others or chat with people on the internet. He added that chatting might lead to other things that he is not interested in doing because he is married. He continued to explain that he does not email anyone about trading and requested we check his emails. He said he does not talk to people online. I asked if he used torrent to download the images from other users and he said, "No." He again said he likes women of age. He will usually view pornography during the day for a couple of hours at a time. Wadith stated that he looks at pornography on the main computer which was located in the kitchen. He has a couple of external hard drives which he also stores downloaded pornography on including videos and photos.

Wadith explained that he views and downloads pornography from imgfap.com which is an electronic bulletin board website where users can post photos. He explained that he learned of the website after viewing pictures on picturehunter.com that came from imgfap.com. Wadith explained he has downloaded thousands of pornographic photos from the imgfap. com believing all images and videos were of legal aged females. He stated it was possible some were not of legal age but that he was unaware of it. At one point I told Wadith I did not believe him. I told him that I did not believe he pulled the images from imgfap.com but got them from somewhere else. He again denied having traded child pornography and stated he never intended to download child pornographic photos. He again stated that he does not know which images were uploaded to Microsoft SkyDrive. He said he may have been attempting to move some 700 downloaded pornographic files with unknown child pornography when he inadvertently uploaded some to the Microsoft SkyDrive. I asked Wadith if he views the photos on his phone, tablets or anything else. He said he does not view pornography on his phone or any tablets. He did advise that he stores it on an external hard drive which was either in the basement or his bedroom.

Search of the residence produced the following items which were collected as evidence:

1-DVD of images from Cybertip #3184694
1-DVD of images from Cybertip #3320099
1-White Travelor 1GB thumb drive
1-Matsunichi HD (Hard Drive) Model #DM256
1-Black Western Digital HD S/n #WXNX088D811
1-Silver HDD external hard drive Model #WLX-393UB
1-Black Kyocera cell phone
1-Gray HP laptop serial #SCH135135M
1-Samsung Galaxy 4.0 Cell Phone
1-Black external hard drive 3TB S/n #E3JAJJHA300258
1-Purple 32 GB thumb drive DT10162
1-Western Digital external hard drive S/n #WX21E42APP51
31- Box containing 31 internal hard drives
1-Black HP Pavillion S/n# CNF64319QL
1-Samsung Galaxy 4 in white case
1-Micro SD Card 1GB
1-HP Envy Laptop
1-Asus tablet w/case

During the search I was assisted by Detective Ben Iverson of the LaVista Police Department

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Incident Report**

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

in order to conduct preliminary scans of the hardware, computer software, and hard drives, etc as detailed in the search warrant.  Detective Iverson began his examination on or around 1130 hrs using a forensic examination device.  Detective Iverson examined the HP Envy laptop in the kitchen.  He located several large files of pornography downloaded on the computer hard drive.  The files were all categorized by style of pornography.  Scanning the HP Envy laptop Detective Iverson discovered one image was flagged as possible known child pornography.  The HP Envy laptop computer and hard drive will be examined further in a safe forensic environment.

While searching the residence we also observed that there were several watches disassembled throughout the home including watch parts and tools.  Firearms were also located throughout the residence in almost every room.  Some were loaded and others were not.  In the master bedroom, basement, and garage there was a significant amount of alcohol both empty and full or partially full.  There was also several computer boards, old cell phones, cameras, old video games, and hard drive disks.  In the garage we located nitric and sulfuric acid.  Near the chemicals was a large trash can with a PVC pipe coming out of the top and leading to several other buckets and tubes.  Unsure what the items were we contacted FBI Bomb Tech John Hallock and Omaha Police Department Bomb Tech Matt Manhart.

I then spoke to Wadith about the other items we observed in the house.  He explained that since he lost his job he has been depressed and does drink alcohol.  He explained that he does fix watches and tinkers with them.  He then sells them on ETSY which is an online store.  They will also occasionally sell jewelry on the website.  He continued to explain the chemicals and set up in the garage are for breaking down items such as computer boards to extract the gold.  He then will sell the gold.  He advised the process is called "aquaregia".  He explained that he learned how to do it from the internet.  He also purchased the chemicals over the internet.  The FBI and Omaha Police Bomb Techs responded to confirm the chemicals were safe in their current state and it did not appear he was attempting to make explosives.

I had contact with Sarpy County Attorney Jennifer Miralles and briefed her on the circumstances revolving around this case.  She agreed to take custody of Wadith NADER based on the previous confirmed photographs that were reported to be uploaded to Microsoft SkyDrive.  Miralles advised that the County Attorney's Office would amend additional counts after the analysis of the digital evidence was complete if needed.

I then informed Wadith that he was under arrest for possession of child pornography based on the three confirmed images by (CVIP).  Wadith was handcuffed and transported to the Sarpy County Jail by Officer Kustka.  I was able to contact Wadith's mother-in-law Judy SWEIGARD who agreed to pick up the kids from school and care for them until Stacey's return.  Wadith Nader was issued State of Nebraska Uniform Citation and Complaint #A2348812 for possession of child pornography NE State Statute 28-813.01, as Wadith "knowingly possessed any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers".  Wadith's court date is set for April 29, 2015 at the Sarpy County Courthouse.

The computers, hard drive devices, and other electronic devices seized at his residence of 912 Hickory Hill Road were logged in as evidence.  All evidence was seized by Officers of the Papillion Police Department and LaVista Police Department.  Copy of the search warrant and

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Incident Report**

PAPILLION POLICE DEPARTMENT
1000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

property forms of items collected were left on the kitchen table.

Upon returning to the Papillion Police Department I, with the assistance of Detective Stigge, viewed the images from the CyberTips 3184694 and 3320099 again for reporting purposes. After reviewing the images an additional time I can determine with high level of confidence that all reported images except image "1766201396.jpg" (which is age difficult) are clearly depicting juvenile females under the age of 18 years old. I therefore request at this time charges be amended to reflect 6 counts of possession of child pornography NE State Statute 28-813.01 as Wadith "knowingly possessed any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers".

Additional reports will be filed under this incident. These reports will provide a detailed list of images and origination of criminal evidence. Please clear this case as an adult arrest and forward a copy of this report to the County Attorney's office for review.

END OF REPORT
Det. B. Svajgl/468///aml

---

ENTERED DATE/TIME: 4/14/2015 09:21:23
SUBJECT: SUPPLEMENTAL
AUTHOR: SVAJGL, BRYAN

PAPILLION POLICE DEPARTMENT
SUPPLEMENTAL REPORT

CR#:PP14-21009

OFFENSE: Possession of Child Pornography (28-813.01) x 6 counts

PERSONS REFERRED TO:
Wadith NADER (w/m 12-12-73)Suspect
Stacey NADER (w/f 10-23-73)Suspect's Spouse
Raiyah NADER (w/f 3-22-07)Child
Rhys NADER (w/m 8-31-09)Child
Tom PETERSONWadith's defense attorney
April ANDERSONForensic Interviewer
Jamie ANDERSONDHHS

PLACES REFERRED TO:
912 Hickory Hill Road
Project Harmony 11949 Q St, Omaha

REPORT:
I, Detective Bryan Svajgl #468, while on duty in plain clothes for the Papillion Police Department in Sarpy County Nebraska, on March 17, 2015 was conducting follow-up reference possible possession of child pornography report concerning the arrest of Wadith NADER.

At 1955 hours I made phone contact with Wadiths's spouse Stacey NADER. I informed Stacey that a search warrant was executed of their residence earlier that day based on a

PAPILLION POLICE DEPARTMENT
000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

cybertip which was received from Microsoft concerning identified child pornography. I advised her that the cyber tip also provided probable cause for the arrest of her husband Wadith NADER.

Stacey said she was made aware of the situation. She explained that Wadith has had the same Hotmail account for years. It was his main email address. Then a couple of months ago, around January, it was shut down with no explanation other than he violated the user agreement. She explained that Wadith went back and forth with Microsoft but they would not reopen his account. They would never confirm with him the exact reason it was closed. She added that they learned it had something to do with him downloading something to Microsoft Skydrive. Stacey stated the Wadith never used Microsoft Skydrive.

Stacey advised that she had her own laptop and tablet that she had with her while she was out of town. She confirmed Wadith was the sole user of the laptop which was located in the kitchen area of the residence.

I then asked Stacey if she was aware her husband views pornography. She stated that she was aware and has seen him viewing it on his laptop before as she glanced over his shoulder. She stated that it was clearly adult pornography and not any child pornography. I asked if she knows when he usually views it. She explained that she observed him viewing it either on an evening or weekend but she was unsure exactly when. She believes he usually does when she is out of the house. Stacey has no clue what websites he views. I asked her what computer he will usually view it from. She said that she assumes it is on his laptop. I then asked Stacey if Wadith comes to bed late or wakes up early to possibly view pornography. She answered that they go to bed together late.

I then explained to Stacey that while executing the search warrant of their residence we observed several items of concern as they have two younger children in the house. I asked her about the Nitric acid and similar chemicals in the garage. She simply answered, that her husband smelts gold. I inquired about the watch pieces throughout the house. She advised that Wadith tinkers with them and sells watches and jewelry on an online store from the website 'Etsy'.

I then asked her about the large amount of loaded and unloaded firearms in the residence. We estimated there were over seventy firearms in the residence. Stacey did not understand an issue with the amount of firearms in the residence. She explained that her father collected guns and the collection was passed to them when he died in 2010. She and Wadith both have concealed carry permits. The handguns near the front door are so they can grab what they want as they leave the residence. She continued to explain that their children have been taught gun safety from an early age as was she. She said they know not to touch a gun for any reason unless their parent's life depends on it. I then asked her about the easy access to the handguns. Providing her an example, I explained to her that while searching the desk in the front room Detective Stigge #469 opened the door on the back of the desk and a 9mm handgun fell out. The handgun was unloaded but very easy to access for a child. Stacey replied, "I don't know why my husband put the gun in the desk, if he was working on it or what, but he must have a good reason."

I then informed Stacey I would like to set up Project Harmony interviews for their children Raiyah NADER (w/f 3-22-07) and Rhys NADER (w/m 8-31-09). She stated that she wanted to consult with Wadith's attorney but planned on cooperating. I contacted Stacey on Friday

Exhibit B to Zachary Lutz-Priefert's Affidavit

**Incident Report**

PAPILLION POLICE DEPARTMENT
'000 EAST FIRST STREET
PAPILLION, NEBRASKA 68046
(402) 597-2035

Incident Number: LPP141223021009

to confirm the interviews were scheduled for March 23, at 0900 hours.  She agreed to meet there with the kids.  Wadith's attorney Tom PETERSON also made contact with me advising he would be present at the request of Stacey.

On March 23, 2015 at 0900 hours I met with Stacey and her children in the lobby area of Project Harmony for check-in.  Stacey was shown the observation room and asked if she had any concerns with her children.  She stated that she had no concerns and that her children have been taught inappropriate touching at school known as, "The Circle of Grace."  Stacey was then escorted back to the waiting area to stay during the interviews.  At 0937 hours the interview began with Raiyah and Forensic Interviewer April ANDERSON.  DHHS Jamie Anderson and Jenni Thompson were present to observe the interview.  The following is a summary of the interview:  April began by telling Raiyah she could talk in the room and was expected to only tell the truth.  Raiyah stated her mother told her what to expect in the interview.  She told her that she may be asked things such as, what her father does while she is in the shower.  She added that she will play with her little brother.  Raiyah then began by talking about her recent Birthday party.  Raiyah stated that when in trouble she will have to stand by the wall or go to her room.  If she is super bad she may get spanked by dad or mom.  She added when mom spanks her it hurts worse and may leave a red mark for a couple of days.  Raiyah advised that her father lost his job for something he did not do.  She also recalled her father, who is Columbian, told her that when he was young the Farc terrorist group attempted to kidnap him, his sister, and his mother.  She added that her dad is a doctor and smart.  Her mother is the Inspector General on base.

Raiyah said that her parents will drink a couple of glasses of alcohol but not drink in excess.  They do not smoke or do drugs.  Raiyah also has not observed her parents watch any movies with naked people.  However she did watch a movie once with them in which one female did get naked.  She believed it was called Coming to America.  Raiyah was later asked about the "Circle of Grace" and if anyone has ever touched her private parts.  She stated that her brother once accidentally touched her butt while playing tag.  She explained her father maybe touched her when she was a baby but not since.  Raiyah said once her father had her look at a picture on his phone of a young teenage model posing nude but covering up her private parts.  He told her to never pose or post such photos.  She then stated that no one has ever taken inappropriate pictures of her.  She was asked if anyone wanted to touch her and she stated, "No."  Raiyah was then asked about the chemicals in the garage.  She said she knows not to go near the chemicals or play in the garage.  Raiyah said the guns in the house are protection and she knows not to touch them.  The interview was then concluded at 1010 hours.

At 1014 hours the interview began with Rhys and Forensic Interviewer April ANDERSON.  The following is a summary of the interview:  Rhys said he knows his dad is in jail.  He thinks i was because police thought he was setting off bombs but he is just making gold.  Rhys also said he knows there is no playing in the garage because of the chemicals.  He knows not to touch the guns unless mom or dad is in trouble.  Rhys was asked if anyone has ever touched his private parts.  He stated that Isiac from school once touched his butt.  Other than that no one has touched him or asked him to touch anyone else.  Rhys also has not observed his parents watch any movies with naked people.  However he did watch a movie once in which one female did get naked.  Shortly after the interview was then concluded.

Based on the interviews it does not appear that Wadith has had inappropriate contact with Raiyah or Rhys.  DHHS Jamie ANDERSON met with Stacey at their residence later the

# Incident Report

**PAPILLION POLICE DEPARTMENT**
**1000 EAST FIRST STREET**
**PAPILLION, NEBRASKA 68046**
**(402) 597-2035**

**Incident Number: LPP141223021009**

same day to create a safety plan for the family.

On April 10, I received and logged in as evidence DVDs from the recorded forensic interviews.  No further testing was completed.  Please add this supplemental report to case file PP14-21009 and forward to the Sarpy County Attorney's Office.  Please also forward a copy of this report to DHHS Jamie ANDERSON.

END OF REPORT
Det. B. Svajgl/468///aml

Exhibit B to Zachary Lutz-Priefert's Affidavit