| NUMBER: O2200 | PAPILLION POLICE DEPARTMENT - General Order | |
|---|---|---|
| **SUBJECT:**<br><br>**General Investigation Management** | **CALEA Standards Addressed:**<br>42.1.1    42.1.5<br>42.1.2    42.2.1<br>42.1.3    42.2.2<br>42.1.4    42.2.9<br>83.1.1    55.2.3 d | |
| **ISSUED BY:**<br>**Chief Leonard Houloose** | NOTE:  Replaces O2200, 11/01/2011 | |
| SIGNED: | | **EFFECTIVE DATE:**<br>May 1, 2012    **A.** |

I.    **POLICY**

It is the policy of the Papillion Police Department that most preliminary investigations be conducted by uniformed patrol officers.  Follow-up investigations will be conducted by uniformed patrol officers to the point of resolution, or the nature of the investigation is of such seriousness, intensity or logistic challenges that follow-up should be turned over to and conducted by the Investigations Unit.

II.    **PURPOSE**

No outline of procedures can be so encompassing to provide a list by which every criminal investigation may be completed or successfully concluded.  When the need arises for additional follow-up investigation, officers and investigators should rely on their own past experiences, individual training, and inherent talents in addition to any guidelines listed herein.  Supervisors are responsible for ensuring their subordinates conduct appropriate case follow-up and/or referral.

Other general orders in the O2200 series provide guidance for investigation of specific reported incident types.  All officers must be knowledgeable of those procedures and refer to them when appropriate.

III.    **PROCEDURE** (42.1.4)

    **A.**    **Initial Response**: Under normal circumstances, preliminary criminal investigations will be conducted by the initial responding uniformed officer(s).  The preliminary investigation is often sufficient to bring the case to a satisfactory conclusion.  In addition, follow-up criminal investigation will be conducted by the initial responding uniform officer whenever possible, to the point of resolution, or until their ability to investigate the case is exceeded at which point the case may be forwarded for follow-up to the Investigations Unit.  Although no policy or procedure can list every eventuality, the guidelines below may serve as a checklist for officers in conducting preliminary investigations:

        1.    Respond to the scene promptly, but safely and provide aid to the injured.  Consider establishment of the Incident Command System (ICS) and assume Incident Commander status until relieved by higher authority.  See G.O. O2115 for further guidance on ICS.

        2.    First Responder Notifications: (41.2.4)

            a.    There are several events where assistance from outside entities are needed during a call for service.  Examples include:

                (1)    Medically injured parties (PFD)<br>                (2)    Deceased persons (Sarpy County Sheriff's Office for Coroner)<br>                (3)    Hazardous Material Incidents (Omaha Fire Dept.)<br>                (4)    Animal Complaints (Nebraska Humane Society)<br>                (5)    Fire complaints (PFD)<br>                (6)    Roadway Hazards (Public Works, NDOR, OPPD)

- 1 -

EXHIBIT A

PAP 000265

      b.      Procedures to make first responder notifications are as follows:

          (1)     Contact dispatch via radio or phone
          (2)     Advise the need for outside assistance and request contact be made.
          (3)     Dispatch will make the required notification and advise on their status.
          (4)     Upon arrival of the assistance, advise dispatch of their arrival

3.     Observe all conditions, events, and remarks to determine whether an offense has actually been committed and, if so, the exact nature of the offense.  (42.2.1 a)

4.     Determine the identity of the suspect(s) and affect an arrest if it can be accomplished at the scene or through immediate location by furnishing other units information concerning the wanted person(s), i.e.; descriptions, method of travel and direction, vehicle(s) involved, etc. Notify Sarpy County Communications regarding status of the call and relay any information which may assist in the apprehension of any suspect(s).

5.     Locate, identify, and complete information on witnesses, and victims, and determine what information is known by them. (42.1.1 b)

6.     Interview the complainant, witnesses, and suspects to determine in detail the exact circumstances and elements of the offense. Obtain written or recorded statements as soon as practical. (42.2.1 d)

7.     Maintain/protect the crime scene and arrange for the collection of evidence, including photographs of the scene, injuries, property damage, etc. and the collection of physical evidence.  The first officer to arrive at the scene shall have primary responsibility to manage and protect the scene and collect and preserve evidence, until: (42.2.1 c)

      a.     Relieved by a Detective or Douglas County Crime Scene Investigator.
      b.     Otherwise directed by a supervisor or command officer.

8.     Initiate a chronological record of his/her activities at the scene.  For serious crimes, this should take the form of a crime scene log, and should include:

      a.     Names and times of relevant notifications.
      b.     Names and times of arrivals and departures.
      c.     Description and times of significant events.
      d.     Notation of weather and lighting, presence or absence of persons at the scene, and nearby vehicles, if applicable.

9.     Complete all other required paperwork, including initial and supplemental reports, criminal charges, booking and incarceration forms when applicable, etc.

10.    There are circumstances which require the presence of a patrol supervisor at the scene for the purpose of assuming command.  Officers will request a patrol supervisor through the communications center for the following incidents. (81.2.4 f)

      a.     Homicides
      b.     Fatal Accidents
      c.     Public Disasters
      d.     Abductions
      e.     Officer involved shootings/accidents
      f.     Armed robberies with injuries or shots fired
      g.     Any event which would generate high public interest.

**B.**    **Investigator Response:**

1.     The Papillion Police Department provides 24-hour response for criminal investigations through a detective call-out roster.  Uniformed patrol officers may contact a Detective to seek guidance, inform case status, or request on-scene response.  The decision to request a Detective on-scene should be based on the Officer's abilities, experience, and available resources. (42.1.1)

PAP 000266

2.  Call-Out Procedure: When a decision has been made to utilize the investigations unit, the shift supervisor/patrol officer shall contact the Uniformed Services Commander to make notification and request a detective call-out. In the absence of the Uniformed Services Commander, the Administrative Services Commander or Chief should be contacted. Once authorization is received, the shift supervisor/patrol officer should contact dispatch and request the on-call detective be notified. It is the responsibility of the responding detective to notify the Investigations Supervisor of the call-out and summary of the investigation.

C.  **Crime Lab Response:** The department utilizes the Douglas County Sheriff's Office CSI Division to process crime scenes by qualified personnel on a 24-hour basis. They are equipped with a mobile crime lab and will provide photography, diagramming, latent recovery, evidence collection, ballistics, and other services as necessary. The mobile lab also contains an AFIS workstation and all technicians are AFIS certified. Officers should evaluate the situation and plan accordingly so there is no loss of evidence or information. The following steps shall be used where applicable:

1.  Based upon the seriousness of the crime and the complexity of the crime scene, the investigator and/or the shift supervisor/officer shall determine whether to utilize the Douglas County CSI Division. Generally, the unit should not be called out for relatively minor crimes or those with evidence that is readily retrievable by a road patrol officer or investigator. Callout is appropriate for major crime situations in which any or all of Douglas County's mobile crime lab capabilities would be substantially useful in gathering evidence.

2.  Shift supervisors and investigators should contact the Uniformed Services Commander (or any command staff officer in his/her absence) prior to summoning the Douglas County unit. In the event a supervisor is not on duty, the senior shift officer shall request permission from the Uniformed Services Lieutenant or other command staff officer to call out the unit. Criminalists can be reached on a 24-hour basis by request through the Douglas County dispatch center. The direct non-emergency number is 402-444-6621. (83.1.1)

D.  **Evidence Preservation and Collection:** If able to process the crime scene or the Douglas County CSI Division is unavailable, refer to GO O2205 for evidence collection procedures.

E.  **Follow-up Investigations:** Follow-up investigation will be conducted by the Investigations Unit on cases where the ability of uniformed patrol officers to continue an investigation has been exceeded, or the nature of the investigation is of such seriousness or intensity that follow-up should be turned over to and conducted by the Investigations Unit. The decision to forward a case to the Investigations Unit is determined by the Patrol Supervisor.

1.  Each investigating officer should review and analyze all preliminary reports, laboratory results, physical evidence, and department records which exist having to do with the investigation to which they are assigned. This is especially important with referral cases, or those initiated by other agencies. (42.2.2 a)

2.  Plan, organize, and conduct searches for the collection of evidence, obtaining search warrants as needed. (See G.O O2211 for guidance in Covert Operations). (42.2.2 d)

3.  Obtain any additional information from the officer who conducted a preliminary investigation, officers who may have information to offer, or from informants. (42.2.2 c)

4.  Obtain background information on suspects, witnesses, victims that may be pertinent to the investigation, such as past criminal history, reports of prior complaints leading up to the offense, reliability of witnesses, etc. (42.2.2 g)

5.  Conduct follow-up interviews with the victim, and witnesses, clarifying the details of the offense to ensure that all elements of the offense are met. (42.2.2 b)

6.  Verify the identity of the suspect. Check all available records to ensure the correct identification of the suspect, ascertain the suspect's involvement in other crimes. (42.2.2 f)

7.  Identify and apprehend suspect when applicable law allows, or file appropriate paperwork with the prosecutor for review. (42.2.2 e)

PAP 000267

8. Prepare all reports, statements, and evidence for court presentation. (42.2.2h)

9. Maintain regular contact with the victims and witnesses and make sure they have a means to contact the investigator to supply more information when necessary. Ensure that the victims are provided information on victim's rights as required. (55.2.3 d)

F. **Case Screening:** Uniformed Officers or Detectives assigned criminal cases will continue to assess solvability factors when determining whether to continue or suspend an active investigation. The following criteria should be used when making this determination: (42.1.2)

1. **Follow-up Criteria:** The extent of follow-up investigation to be conducted is based on the documented experiences and research of the department and other law enforcement agencies, and involves the continued application of solvability and degree-of-seriousness factors, along with input from periodic reporting by officers on the progress of assigned cases. These criteria include but are not limited to the following:

   a. The seriousness of the known or potential offense
   b. The availability of investigative resources
   c. Whether there is a reliable witness to the crime
   d. Whether a suspect can be identified, named, and located
   e. Whether a suspect vehicle can be identified
   f. Whether stolen property is traceable, or has been recovered
   g. Significant physical evidence is present
   h. Whether there is unique modus operandi

2. **Suspension Criteria:** First line supervisors will continually monitor follow-up investigations being conducted by officers and/or detectives and will periodically evaluate cases to determine if continued investigation is prudent. This evaluation will be conducted using the screening methods and the following additional criteria:

   a. Lack of further leads or solvability factors
   b. Lack of investigative resources (internally and externally)
   c. Insufficient degree of seriousness

G. **Case File Management:** Cases forwarded to the Investigations Unit may be active for extended periods of time. To assist in accountability the following procedures will be used: (42.1.3)

1. **Case Log:** The Investigations Supervisor maintains an Excel case status control system located at F:Investigations\Investigator Logsheets. Information recorded for each case assigned to the Investigations Unit for follow-up includes the following: (42.1.3 a)

   a. Incident Number of original report
   b. Date the case was received by Investigations
   c. Type of investigation (alleged criminal violation)
   d. Name of detective assigned as primary investigator
   e. Case administrative designation (active/inactive/closed) (42.1.3 b)

2. **Types of Records:** A file is maintained by the primary investigator and should contain the following if available: (42.1.3 c)

   a. Copy of preliminary investigative report
   b. Written Statements obtained from victims, witnesses, suspects, etc.
   c. Reports of laboratories on the results of physical evidence examination
   d. Any case managements made by primary investigators to supervisors
   e. Supplementary reports
   f. Any other reports or records needed for investigative purposes
   g. Copies of photographs and negatives. (Digital photos stored in computer)
   h. Video/Audio recordings will only be kept in the Investigations Unit if it is a copy.

3. **Accessibility:** Case files are maintained in a "Master File Cabinet" and available upon request. Specific files may be kept with the Detective during follow-up duties. (42.1.3 d)

PAP 000268

4. **Purging Procedures:**

    a. All supplemental reports, statements, and official documentation not previously submitted will be routed through a supervisor prior to final filing.

    b. Case files will be submitted to the records unit upon closing or suspensions of a case using the clerical in-basket located in the patrol room. (42.1.3 e)

H. **Cold Cases:** Any criminal investigation that has not been solved for a period of at least one year and has been closed to active follow up will be designated as a cold case. These cases include serious felony violations which have no statute of limitations including Homicide, Sexual Assault, and Arson. (42.2.9 a)

    1. Detectives assigned serious felony cases will investigate all available leads until the case is inactive. If a case becomes "inactive" the Investigations Supervisor will use the following cold case evaluation criteria to determine if it should be flagged as a cold case: (42.2.9 b)

        a. available technology (software advances, DNA testing)
        b. available resources (forensic, medical, laboratory innovations)
        c. Officer expertise
        d. current evidence and witness availability
        e. changes in suspect status (recently incarcerated/released/arrested)

    2. Upon designation of "cold case" the Investigations Supervisor will enter the IR number, date of incident, date of inactive case status and a brief description of the incident and reason for "cold case" status.

    3. On an annual basis the Investigations Supervisor will examine the "cold case" log-sheet and determine the need for a thorough review by the original or appointed investigator.

    4. If a review is ordered to determine new leads and case solvability, the assigned investigator will examine the case reports, evidence submissions, and witness statements. Continued investigation efforts will be noted in a supplemental report and added to the case file through the records unit. (42.2.9 c)

IV. **RECORD OF CHANGE:**

05/01/2012    Removed Habitual Offender requirements.
11/01/2011    Added First Responder Notifications (A-2), Supervisor requests (A-9)
07/29/2011    New Policy – Incorporates Elements of Crime Scene Response O2205

| NUMBER: O2407 | PAPILLION POLICE DEPARTMENT - General Order | |
|---|---|---|
| SUBJECT:<br><br>Interview and Interrogation | CALEA Standards Addressed:<br><br>1.2.3<br>42.2.10 | |
| ISSUED BY:<br>Interim Chief Chris Whitted | NOTE: Replaces O2407, 10/08/2012 | |
| SIGNED: *Chris E Whitted* | | EFFECTIVE DATE:<br>February 9, 2015 |

## I.     POLICY

It is the policy of the Papillion Police Department to treat individuals being interviewed or interrogated in a fair and professional manner. No statements or confessions will be taken in a manner that is in violation of any individual's constitutional rights.

## II.     PURPOSE

Interview and interrogation are distinct from one another. The effective use of interview and interrogation is often crucial in solving many types of crimes. Investigators should remember that by using innovative, yet proper methods, valuable evidence can be obtained from victims, witnesses and suspects. A flexible and effective interview technique can elicit valuable evidence that might otherwise be lost.

## III.     DEFINITIONS

   A.     **Interview** - An interview is a non-accusatory, structured conversation during which specific, behavior-provoking questions are asked with the purpose of eliciting interpretable behavior symptoms considered typical of truth or deception. Additional factual information concerning the case and/or suspects may also be developed during this non-accusatory exchange.

   B.     **Interrogation** - An interrogation is a conversation between the interrogator and the suspect, during which the suspect is accused of involvement in a particular incident or group of incidents. The accusatory tone of the exchange is what distinguishes the interrogation from the interview.

   C.     **Custodial Interrogation** – Has the meaning prescribed to it under the 4th and 5th Amendments to the Constitution of the United States and Article 1 and sections 3 and 7 of the Constitution of Nebraska, as interpreted by the U.S. and Nebraska Supreme Courts. Practically speaking, all questioning in any situation in which a person in his/her position would not feel free to leave under the attendant circumstances.

   D.     **Electronically Record:** To record using an audio recording device or video recording device.

   E.     **Place of Detention:** Police station, sheriff's office, troop headquarters, courthouse, county attorney's office, juvenile or adult correctional facility or building under the permanent control of a law enforcement agency.

## IV.     PROCEDURE

   A.     **Interview, Interrogation, and Right to Counsel.**

      1.     **Field Interviews** - Officers must be cognizant of the limitations associated with the field interview. An officer may not stop a person for the sole purpose of completing a field interview report. The following are factors that should be taken into account when establishing reasonable cause for the detaining of a person for the purpose of conducting a field interview: (1.2.3 a)

O2407
February 9, 2015

- 1 -

PAP 000344

      a.    Reasonable articulable suspicion by the officer that some activity out of the ordinary is occurring or has taken place;

      b.    Some indication should exist to connect the person under suspicion with the unusual activity;

      c.    There should be some suggestion the activity may be related to a crime.

**2.**    **Interviews:** (1.2.3 a)

      a.    Victim and witness interviews require detailed notes or tape recording.

      b.    Written statements should be made for further reference listing the time, date, location, officers present, etc.

      c.    The trauma/stress to which the victim or witness has been subjected should be considered and the interview conducted in such a manner as to reduce stress and minimize further problems.

      d.    The age, physical limitations, and credibility of witnesses should also be considered.

      e.    Miranda: Because the interview is a non-accusatory conversation, Miranda Warnings are not required.

**3.**    **Interrogation** (1.2.3 b)

      a.    Miranda: Interrogations may require Miranda warnings be given to the suspect. For Miranda to apply to an interrogation, it must meet two criteria.

            (1)    First, the setting must be custodial in nature. The Court has defined custody to mean that the suspect's freedom of action has been curtailed in some significant way (i.e. the suspect is not free to leave.)

            (2)    Second, for Miranda to apply, the individual conducting the questioning must be a law enforcement officer or acting as an agent for law enforcement.

      b.    When these two criteria exist, the suspect must be advised of the following:

            (1)    His/her right to an attorney, (1.2.3 c)
            (2)    His/her right against self-incrimination, and
            (3)    His/her right to remain silent.

      c.    The Department's *Rights Advisory Form* should be used when practical. (1.2.3 b)

      d.    If a suspect makes an <u>unequivocal</u> request for counsel, all questioning must stop until the suspect's attorney is present.

**4.**    **Considerations:** Suspect interrogations must be conducted only after the following have been considered: (1.2.3 b)

      a.    All Constitutional precautions must be taken and documented if the interview is to be admitted into court. (1.2.3 c)

      b.    Detailed notes and/or a written statement should be made for future reference and court use, listing the time, date, location, officers present, waiver of rights, and time the interrogation ended.

**O2407**
**February 9, 2015**

- 2 -

  c. Statements obtained during an interrogation must not be based on coercion, promises of leniency or special consideration, inducements, delays in arraignment, or deprivation of counsel. (1.2.3b,c)

  d. Incriminating Statements must be given freely and voluntarily.

  e. A free and voluntary statement may be given spontaneously or after reading the suspect his/her Constitutional protections per Miranda.

  f. The Investigator must be able to demonstrate that the suspect understood those rights and made a knowing and intelligent waiver of those rights. (1.2.3 b)

  g. If the suspect makes an unequivocal request for counsel during the interrogation, the investigator will terminate questioning until the suspect's attorney is present. (1.2.3 c)

  h. If there is more than one suspect in a crime, the suspects should be separated and interrogated individually.

 5. Right to Counsel Procedure (1.2.3 c):

  a. When an accused person has invoked his right to have counsel present during custodial interrogation, the questioning must be terminated until counsel has been made available or until the accused initiates further communication.

  b. Coming back to the accused person after he has invoked his right to counsel and giving him the Miranda Warning again can invalidate any subsequent confession if the accused person has neither initiated further communication nor spoken to counsel in the time between the first meeting and the second meeting.

  c. If an accused person waives his right to counsel, and agrees to answer questions, a written waiver should be obtained when practical.

  d. **Juvenile** victims, witnesses, and suspects must be given the same constitutional protections afforded adults. Additional safeguards and procedures regarding juveniles may be found in the *Arrest and Detention of Juveniles* G.O. O2403.

**B. Electronic Recording**

 1. Nebraska law requires electronic recording for all custodial interrogations (including Miranda warning) which occur at a place of detention associated with investigations for crimes that relate to the death of another or felony offenses involving sexual assault, kidnapping, child abuse or strangulation. In addition, the law also requires that any interrogation about collateral offenses being investigated simultaneous to the above crimes also be recorded (i.e., use of a weapon to commit a felony, burglary, etc.)

  When possible, officers should electronically record <u>all</u> custodial interrogations for all felony cases.

 2. Inside the police department, officers can meet the requirements of the statute by using the various interview/interrogation rooms throughout the department. Each is equipped with digital video/audio recording equipment which streams to a secure server, and is automatically activated when motion is detected in the room. Should an officer become aware of equipment malfunction, he/she shall obtain a tape recording device as a substitute.

**O2407**
**February 9, 2015**

PAP 000346

3. **Reasonable Exceptions**

    a.    The law allows exceptions to the electronic recording requirement. However, the prosecutor on a case must show, by a preponderance of evidence, that the exception is "reasonable". A reasonable exception means circumstances in which:

        (1)    A statement was made when it was not practicable to electronically record the statement.

        (2)    Equipment to electronically record the statement could not be reasonably obtained.

        (3)    The person in custody refused to have the statement recorded.

        (4)    The equipment used to record the statement malfunctioned.

        (5)    The law enforcement officer conducting the interrogation reasonably believed that the crime he/she was investigating was not one of the designated crimes requiring electronic recording.

    b.    Statements not recorded, and not falling into one of the reasonable exceptions, may still be used to impeach a defendant's testimony if they were knowingly, voluntarily, and intelligently made. The existence of inaudible portions of an electronic recording, which are not the product of bad faith, shall not, in and of itself, render a statement out of compliance with the statute. Any statement made during a custodial interrogation shall be admissible against such person in a criminal proceeding in Nebraska if:

        (1)    The statement was obtained in another state and was, obtained in compliance with the laws of that state; or

        (2)    The statement was obtained by a federal law enforcement officer and was not obtained to circumvent Nebraska law.

    c.    Any exception encountered by an officer (and known to the officer at the time) shall be noted in his/her official report.

## C.    Interview Rooms Procedures

1. **Weapons Control** (42.2.10 a)

    a.    Officers are not required to secure their firearms in lockers prior to an interview or interrogation.

    b.    Less lethal weapons may be worn in any of the interview/interrogation rooms.

    c.    Weapons, which are inside interview rooms, will be secured in the officer's holster/holder and worn, as designed, on the body of the officer. If an officer desires to remove weapons prior to entering an interview room those weapons must be secured in a weapons locker or other secure location.

2. **Security** (42.2.10 b)

    a.    **The Investigations Interview Rooms** are located behind key card access doors, the most secure area of the PPD.

        (1)    Officers will inspect the room before and after conducting an interview/interrogation. Officers should be aware of the contents of the room prior to utilization.

**O2407**
**February 9, 2015**

- 4 -

       (2)    Suspects with a history of violence should be pat searched prior to entering the room. Pat searches of the opposite sex will be conducted in accordance with PPD policy.

    b.    **The Lobby Interview Rooms** are soft interview rooms located in the public lobby area of the PPD. This room is not secure and is generally used to conduct non-suspect related interviews, receive complaints from the public, and to complete reports.

       (1)    Because the room is in an unsecured area, if an interview/interrogation is required, all suspects should remain under officer observation.

       (2)    Suspects with a history of violence should be pat searched prior to entering the room. Pat searches of the opposite sex will be conducted in accordance with PPD policy.

    c.    All Interview/Interrogation rooms are equipped with audio/video recording equipment and may be monitored from the Viewing Room behind the one-way mirrors or the terminal. Recording equipment for each room is operational 24/7.

       (1)    All pertinent interviews will be recorded onto a disk and treated as evidence. To assure an interview has been downloaded and logged into evidence, any assigned officer will complete an Interview Download Request (OF-205) and place in the Evidence Tech's in-basket within 14 days of the interview. The Evidence Tech will forward all requests to Clerical after processing the video evidence.

       (2)    Requests for a hard copy recording from the evidence technician are completed by sending an email to the evidence technician or in his absence, the Administrative Services Lieutenant.

       (3)    The original disk will be handled, labeled and stored in accordance with the PPD's evidence handling and processing procedures.

       (4)    All malfunctions shall be reported immediately to their supervisor.

**3.**    **Number of Personnel in Room (42.2.10 c)**

    a.    No more than two Officers will occupy the room during an interview/interrogation.

    b.    Other Officers will not interrupt an Interview/Interrogation unless it is necessary to relay additional information.

**4.**    **Summoning Assistance:** In the event of emergency Officers may need to request assistance. If the need for assistance arises: (42.2.10 d)

    a.    Uniformed personnel may request assistance by way of their portable radio.

    b.    Non-uniformed personnel may request assistance by way of their portable radio or mobile phone.

    c.    Emergency assistance may be summoned through the use of the orange emergency button or "panic button" located on the top of the radios.

**5.**    **Equipment/Items in the Room (42.2.10 e)**

    a.    Lobby Interview Rooms are equipped with a table and three chairs. One room has a sink and fingerprint stations used for citizens who receive fingerprint cards from PPD personnel.

O2407
February 9, 2015

- 5 -

       b.      Investigations Interview Rooms are equipped with a table and three chairs. One of these interview rooms has been modified to become child-centered with a day bed, children's toys and television/DVD player.

**6.**      **Access to Water, Restrooms, or Comfort Breaks** (42.2.10 f)

       a.      Restrooms and drinking fountains for all Interview/Interrogations are located in the front lobby.

       b.      Suspects will be provided access to the restroom, drinking water and other needs, as requested within reason.

       c.      Comfort breaks are permissible when practical. Officers will maintain observation of the suspect during this time to ensure the suspect's safety.

## V.    RECORD OF CHANGE:

02/09/2015     Added procedures to weapons in interview rooms and added 14 day timeline to interview downloads.

10/08/2012     Added Interview Request Download (OF 205)

11/01/2011     Emergency Assistance Added (C-4)

02/04/2011     Add Interview and Interrogation Procedures, add interview room procedures/update for CALEA

08/11/2008     New issue.

PAP 000349

| NUMBER:  O2404 | PAPILLION POLICE DEPARTMENT - General Order | |
|---|---|---|
| **SUBJECT:**<br><br>Search and Seizure | **CALEA Standards Addressed:**<br>1.2.4<br>1.2.8 | |
| **ISSUED BY:**<br>Interim Chief Chris Whitted | **NOTE:  Replaces O2404, 11/01/2011** | |
| SIGNED: *Chris E. Whitted* | | **EFFECTIVE DATE:**<br>February 9, 2015 |

I.     **POLICY**

All persons detained or arrested by Papillion Police Officers will be afforded full use of their constitutional rights, and will be treated in a professional manner.  No person shall be subjected to an unreasonable search and/or seizures as set forth by the United States Constitution under the Fourth Amendment.

II.    **PURPOSE**

A.     This order sets forth the legal authority, guidelines, and prerequisites regarding warrantless searches and seizures and arrests with and without warrants.

B.     Definitions:

1.     Reasonable suspicion is having enough facts to suspect criminal activity.

2.     Temporary detention is depriving a person or persons of movement to sort out a confusing situation.  Such action must be reasonable.

3.     Arrest is defined as depriving a person or persons of movement to charge him/her with a crime.

4.     Probable cause is defined as when an officer has enough facts to believe a crime has occurred and that the defendant probably committed the crime.  An arrest on less than probable cause is not justified.

5.     A frisk is a search within the meaning of the Fourth Amendment of the Constitution of the United States, but is limited in purpose to the detection of concealed weapons and must be supported by reasonable suspicion that a crime involving weapons has or is about to be committed.

III.   **PROCEDURE**

A.     Fourth Amendment

1.     The Fourth Amendment Guarantees the right for people to be free from unreasonable searches and seizures of their homes, persons, and things.

2.     Illegally conducted searches invite civil suits under the Civil Rights Act, and illegally seized items of evidence will not be admitted in court and may cause dismissal of a criminal case.

**O2404**
**February 9, 2015**

- 1 -

3.     As search and seizure laws are continually evolving, Papillion Police Department personnel will seek the most current information available from one or more of the following sources:

      a.     Training bulletins and publications
      b.     In-service training
      c.     Sarpy County Attorney's Office
      d.     Current case law found on-line

## B.     Search and Seizure Without a Warrant

### 1.     Traffic Stops

a.     Traffic Infraction - A vehicle should not be searched solely on the basis of traffic infraction. Requesting permission to search on a random basis and absent any articulable suspicion is prohibited. Officers must be able to articulate the suspicion that led to the request for permission to search.

    (1)     Initial Investigation - Following a stop, Officers may conduct a preliminary investigation, of the driver and passengers, reasonably related to the stop.

    (2)     The preliminary investigation may include requesting identification, vehicle information, and running data checks.

    (3)     The driver is required to provide a driver's license or identification, vehicle registration, and/or proof of ownership and insurance.

b.     Passengers - Passengers may not be ordered from a lawfully stopped vehicle without 'reasonable suspicion' that the passenger violated the law. However, the passenger may be ordered from the vehicle if they interfere with the search of the vehicle or the conducting of an investigation.

    (1)     An adult, front seat passenger, not wearing a vehicle restraint is required to provide identification.

    (2)     An Officer may request identification from any other passengers in a vehicle, however, it is not required that the passenger comply, unless there is probable cause or reasonable suspicion that the passenger violated the law.

    (3)     If a passenger is in close proximity to contraband in plain view, the Officer has probable cause to arrest the passenger.

c.     Further Detainment - Reasonable suspicion of criminal activity allows an officer to detain a person stopped for a traffic offense in order to obtain additional information regarding the Officer's observations and or suspicions. Absent any additional articulable reasonable suspicion, continued detention of a motorist is prohibited.

### 2.     Consent Searches: (1.2.4 a)

a.     The consent must be voluntarily and expressly given by someone who has the authority to relinquish that right.

b.     Officers must be mindful that the individual can stop the search at any time.

### 3.     Stop and Frisk: (1.2.4b)

a.     Officers may make an investigatory stop when there is reasonable suspicion supported by specific facts that a crime has been or is about to be committed by the person stopped.

**O2404**
**February 9, 2015**

- 2 -

    b.    A stop and frisk search is only allowed for the purpose of discovering a suspected weapon and only in situations where a crime of violence involving a weapon is suspected.

    c.    Stop and Frisk Search: Procedure

        (1)    The frisk procedure must be a non-manipulative search of the outer clothing for weapons only. The use of a stiff ridge hand through the pat down honors this non-manipulative mandate.

        (2)    Officer/Suspect Same Gender: The palm and the ridge of the hand are acceptable surfaces to use when searching a suspect that is the same gender as the searching officer.

        (3)    Officer/Suspect Opposite Gender: The back of the hand and the ridge of the hand are acceptable surfaces to use when searching a suspect that is the opposite gender as the searching officer

    d.    The frisk shall be confined to outer garments, e.g., coats, jackets, shirts and trousers. At no time shall the frisk of any person include any inappropriate procedure or comment.

    e.    The authority for a 'STOP and FRISK' search of the person is seated in State Statute and affirmed by court opinion, e.g., TERRY vs. OHIO.

4.    Movable Vehicle Exception: (1.2.4 c)

    a.    Motor vehicles, by nature of their mobility, may be searched without warrant under certain circumstances.

    b.    The U.S. Supreme Court has recognized the impracticality of securing a search warrant prior to every search of a vehicle and has established exceptions to the warrant requirement (Carroll Doctrine).

    c.    An officer may conduct a warrantless search of a vehicle if he/she has probable cause to believe that the vehicle contains evidence of a crime or contraband, and there are exigent circumstances that would make obtaining a search warrant impracticable.

    d.    Exigency may be created by the mere mobility of the vehicle, and the likelihood that the vehicle's occupants will remove or destroy evidence or contraband.

    e.    The scope of a warrantless search is defined by the existing probable cause.

    f.    Officers may search any place in the vehicle that the items, for which they have probable cause, could be kept. (ex. An officer could search a glove box for drugs that he/she had pc to believe were in the car, but an officer could not search the glove box if they had pc that the car contained only a stolen TV set)

    g.    If evidence of a crime or contraband is discovered, notation of the search and inventory of items seized will be documented.

5.    Crime Scenes: (1.2.4 d)

    a.    A warrantless search at a crime scene may be made when exigent circumstances exist, evidence is in plain view, or with consent (Consent to Search form should be used whenever practical).

**O2404**
**February 9, 2015**

- 3 -

  b.  At the "Scene of a Crime" the U.S. Supreme Court has ruled there are no exceptions to the 4th Amendment for crime scene searches. However, in responding to a homicide or serious assault scene, officers may:

    (1)  Make warrantless entry where they reasonably believe a dead body or injured person will be found. A suspected dead body may still be alive and entry is justified under the Emergency Doctrine.

    (2)  Examine the body itself.

    (3)  Search the premises for other victims or suspects.

  c.  Seize any evidence in plain view while inside the residence pursuant to any of the above permissible activities.

6.  Exigent (Emergency) Circumstances: (1.2.4 e)

  a.  Exigent circumstances exist when there is an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence

  b.  Absent exigent circumstances, Officers are prohibited from making a warrantless and nonconsensual entry into a private residence in order to make an arrest

  c.  Emergency (exigent) entry is allowed only to prevent destruction/loss of evidence or when there is danger to the public

  d.  The United States Supreme Court and the Nebraska Supreme Court have addressed situations regarding law enforcement officers' entry into private residences in arrest situations. Both courts have held that *"absent exigent circumstances, the threshold may not reasonably be crossed without a warrant."*

7.  Inventory Searches: (1.2.4 f)

  a.  Motor Vehicles:

    (1)  Officers will conduct an inventory search of all vehicles that are lawful custody of the Papillion Police Department

    (2)  The Nebraska Supreme Court has ruled that a warrantless search of a vehicle, while in the possession of the police, violates neither state nor federal constitutional prohibitions of unreasonable searches.

    (3)  The intent is to provide Officers with guidelines for conducting vehicle inventories, not to give Officers a general means of discovering evidence of a crime.

    (4)  The inventory search only serves to protect an owner's personal property while it is in the custody of the Papillion Police Department, to ensure against claims of lost, stolen, or vandalized property, and to guard the Papillion Police Department from danger.

    (5)  All vehicles impounded by the Papillion Police Department will be inventoried by the arresting or towing Officer.

    (6)  All compartments and containers accessible to the Officer will be inventoried. The only exception will be those containers whose contents

**O2404**
**February 9, 2015**

- 4 -

can be easily determined by the shape, size, or other characteristics of the container itself. For purposes of this order, "container" will mean an object capable of storing or concealing another object.

b.   Personal Property:

(1)   An Inventory search is conducted after the arrest, in detention, as a standard routine part of the booking procedure, preparatory to incarceration.

(2)   It is for the purpose of inventorying and "taking" of personal property for safekeeping.

(3)   Any evidence found as a result of this 'standard practice' is admissible as evidence.

(4)   The courts have held that the authorities are entitled not only to search but also to take a prisoner's property and keep it in official custody.

(5)   The courts have also held that law enforcement officers are entitled to take "...any evidence of the crime in his [the prisoner] immediate possession, including his clothing."

(6)   Inventory searches of prisoners will be conducted by Sarpy Jail staff members and any/all items discovered which hold evidentiary value will be property of the Papillion Police Department for investigation.

c.   Abandoned Property:

(1)   Officer may search and seize abandoned property without a warrant after determining that the property has been abandoned and articulate their findings in a report.

(2)   Officers recovering abandoned property should make an effort to locate the owner of the property at a reasonable time.

8.   Other Situations:  (1.2.4 g)

a.   Plain View

(1)   The Officer must be legally (ie. Because of a call or a consensual contact) in space protected by the fourth amendment against warrantless searches (ie. A dwelling) where he or she can discover fruits, instruments, evidence, or contraband, and the seizure must be inadvertent. (Ex. #1 Smelling marijuana in a car on a traffic stop establishes PC but the roadway beside the car, where the officer is standing, is not protected space. This does establish PC but not because of plain view/plain smell. Ex. #2 An officer inside a house working a DV (protected space) sees evidence of another unrelated crime this would create PC according to the plain view doctrine, and may likely still require a warrant especially if a further search of the premises is desired.)

(2)   The property must be recognized as fruits, instruments, evidence of a crime, or contraband.

b.   Incident to Arrest

(1)   When an Officer has made a lawful physical arrest where the statutes of

O2404
February 9, 2015

- 5 -

the State of Nebraska and the policies of the Papillion Police Department dictate the physical custodial incarceration of the violator, the Officer may make a thorough search of the person and the surrounding area under the person's direct control.

(2)     Areas readily accessible to the person, as determined by his/her ability to 'grab' a weapon or to destroy evidence incident to the arrest, may also be searched.

(3)     Search incident to arrest will consist of a full search of the clothing and personal property in his/her actual possession, e.g. briefcase, suitcase, or other items within his/her reach, e.g. a desk drawer if he/she is sitting at a desk.

(4)     As a general rule, if the arrestee is in a house, the room where the arrestee is may be searched. If the arrestee is in an auto, the part of the auto which is under the suspect's direct control may be searched IF it is reasonable to believe the arrestee might access the vehicle at the time of the search OR that the vehicle contains evidence of the offense of the arrest, e.g. an unlocked glove compartment and/or under the seat.

(5)     A search may be made for items that could be used for escape, to protect oneself, and/or to prevent destruction of evidence.

9.     Strip Search

a.     A complete strip search shall be made only at the place of detention or a medical facility. This search shall be made in a closed room with only the prisoner and one (1) other police officer, the same sex as the prisoner, present to witness the search. Only one (1) prisoner shall be strip searched at a time. (1.2.8 b)

b.     The strip search is accomplished by requiring the prisoner to remove all of his/her clothing. The prisoner's clothing and personal effects should be checked carefully for evidence, contraband and instruments of escape.

c.     The strip search shall be conducted only by permission of the Lieutenant or Chief of Police. (1.2.8 a)

d.     A strip search is highly invasive and police officers must be able to clearly articulate reasons for requesting a strip search.

10.     Body Cavity Search

a.     The body cavity search is accomplished in conjunction with a strip search, but continues with a careful search of the body crevices and cavities for concealed objects.

b.     In the case of a body cavity search, there must be a clear indication that there is evidence concealed which should be removed.

c.     A body cavity search shall be conducted by warrant only, and in a hospital setting by medical personnel. (1.2.8 a)

d.     An officer of the same sex as the suspect being searched shall be present in the room during the search to collect any evidence recovered by the medical personnel.

e.     Any Strip or Body cavity Search initiated by a Papillion Police Officer will be

O2404
February 9, 2015

documented in a field interview or report for review by a Supervisor.  (1.2.8 c)

IV.    **RECORD OF CHANGE:**

| | |
|---|---|
| 02/09/2015 | Updated Stop & Frisk, MV Exception, & Plain View |
| 11/01/2011 | Strip Search Language changed (B-9-a) |
| 08/05/2009 | Periodic Review, Update to conform with CALEA requirements. |

PAP 000331

| NUMBER: O2405 | PAPILLION POLICE DEPARTMENT - General Order | |
|---|---|---|
| SUBJECT:<br><br>Arrest/Citation in Lieu of Arrest | CALEA Standards Addressed:<br><br>**1.2.5   74.3.1**<br>**1.2.6**<br>**1.2.7** | |
| ISSUED BY:<br>**Chief Leonard Houloose** | NOTE: Replaces O2405, 11/01/2011 | |
| SIGNED:<br>*Leonard C. Houloose* | | EFFECTIVE DATE:<br>**January 31, 2014**<br><br>A. |

## I.    POLICY

It is the policy of the Papillion Police Department to adhere to arrest and release guidelines established by the Nebraska Legislature. Officers will adhere to the Nebraska Revised Statutes and the procedures of the Papillion Police Department governing (1) custodial arrest, and (2) the issuance of citations in lieu of custodial arrest.

## II.    DISCUSSION

### A.    Reasonable Cause to Arrest without a Warrant

Section 29-404.2 RRS of Nebraska states:

Except as provided in section 42-928 (protection orders), a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed:

1.    A felony

2.    A misdemeanor and the officer has reasonable cause to believe that such person either:

    a.    Will not be apprehended unless immediately arrested

    b.    May cause injury to himself or herself or others or damage to property unless immediately arrested

    c.    May destroy or conceal evidence of the commission of such misdemeanor, or

    d.    Has committed a misdemeanor in the presence of the officer, or

3.    One or more of the following acts to one or more household members:

    a.    Attempting to cause or intentionally, knowingly, or recklessly causing bodily injury with or without a dangerous instrument, or

    b.    Placing by physical menace, another in fear of imminent bodily injury; or

    c.    Engaging in sexual contact or sexual penetration without consent as defined in section 28-318.

O2405
January 2014

- 1 -

d.    For purposes of this section, household members shall include spouses or former spouses, children, persons who are presently residing together or who have resided together in the past, persons who have a child in common, whether or not they have been married or have lived together at any time, other persons related by consanguinity or affinity, and persons who are presently in a dating relationship with each other or who have been involved in a dating relationship with each other.

**B.**    **Citation In Lieu of Arrest**

Section 29-422 R.R.S. of Nebraska provides that any officer may issue a citation in lieu of arrest or continued custody for any offense which is a traffic infraction, a misdemeanor or a violation of a city ordinance.  Section 29-427 R.R.S. of Nebraska as amended in 1974, reads as follows: (1.2.6)

**Detention of accused; grounds:**  Any peace officer having grounds for making an arrest may take the accused into custody or, already having done so, detain him further when the accused fails to identify himself satisfactorily, or refuses to sign the citation, or when the officer has reasonable grounds to believe that:

1.    The accused will refuse to respond to the citation

2.    Such custody is necessary to protect the accused or others when his continued liberty would constitute a risk of immediate harm

3.    Such action is necessary in order to carry out legitimate investigative functions

4.    The accused has no ties to the jurisdiction reasonably sufficient to assure his appearance, or

5.    The accused has previously failed to appear in response to a citation

Except as noted in General Order O2302, Driving Under the Influence of Alcohol or Other Drugs, <u>at no time shall officers make custodial arrests on violations that are less than Class III misdemeanors or which are only infractions.</u>

## III.   PROCEDURE

**A.**    A custodial arrest will be made and the accused booked into jail in all adult felony cases.  (See General Order O2403, Arrest and Detention of Juveniles, for disposition of juvenile felony suspects.)  Anytime an individual is incarcerated pursuant to this General Order, the officer shall:

1.    If a felony arrest is made, the officer shall complete an Affidavit of Probable Cause for Warrantless Arrest form.

2.    If misdemeanor arrest is made, the officer shall complete a 48 hour waiver for probable cause hearing or, if the arrestee does not sign the waiver, complete an Affidavit of Probable Cause for Warrantless Arrest form.

3.    Incident and Supplemental Reports will be submitted according to GO O2103. (1.2.5 a)

**B.**    Any officer referring an accused to county court for a misdemeanor or traffic violation will issue a citation to the accused even if he is held in jail.  In addition, persons committing the following misdemeanor offenses will be taken into custody and booked into jail unless otherwise directed by a supervisor:

1.    Resisting arrest

**O2405**
**January 2014**

- 2 -

2.    Interfering with an officer (physical)

3.    Sex related offenses.  On all sex related offenses, the suspect shall be mugged and printed.

4.    Disturbing the peace and assault cases where the release of the accused would constitute a risk of harm to himself or others.

5.    Other exceptions cited in section 29-427 of the Revised Statutes of Nebraska

6.    DUI

7.    DUS (LICENSE REVOCATION ONLY)

8.    Domestic violence assault

9.    Protection order violations

C.    Persons taken into physical custody shall be handcuffed.  Certain exemptions to this rule may be considered appropriate.  Such exemptions would be juveniles of such age and physical ability as to present little danger to the officer(s) or others, e.g., young juveniles, the elderly, pregnant women and persons with physical disabilities.

D.    If not prohibited by Section III, Paragraphs A and B of this general order, any officer referring an accused to county court for an infraction, misdemeanor, or traffic violation shall issue a citation and release the individual.

In cases other than felonies and other offenses outlined above, where a custodial arrest is made, the arresting officer is accountable for assuring that at least one of the conditions of Section 29-427 RRS of Nebraska Revised Statutes is applicable as a condition necessitating such custodial arrest.

E.    Discretion: (1.2.7)

1.    **Definition** - Discretion is the ability to govern and discipline one's activities by the use of reason and prudence and includes concepts, including:
   a.    Skill and judgment in the use of resources,
   b.    The power of free decision,
   c.    The latitude of choice, wisdom, experience, training, and
   d.    The direction provided by law, Department policy, procedures, regulations, written directives and orders.

2.    PPD sworn personnel are encouraged to exercise discretion when dealing with their many duties.
   a.    Use of discretion must be soundly based upon and be limited by the law, departmental directives, experience, and training.

   b.    Officers must correctly interpret the law and directives and realize that the use of discretion is not permitted when certain activities are mandated by statute, Department policy, or supervisory direction.

   c.    Department members will seek direction from their Supervisor when the appropriate course of action is in doubt.

**O2405**
**January 2014**

- 3 -

PAP 000334

3.  Alternatives to arrest, such as mediation or referral to the appropriate social service agency may be considered whenever the employment of an alternative would facilitate a departmental objective or community need and would not conflict with the law. An alternative to arrest may be used in cases such as: (1.2.6)

   a.  Juvenile's offenses of a minor nature (lecture and release)

   b.  Disputes between family members, neighbors/friends, customers/business owners, landlord/tenant, etc.

   c.  Misdemeanor cases where the victim only wants restitution

F.  A valid arrest warrant eliminates the officer's discretion to employ alternatives to arrest; the person named on the criminal process of an arrest warrant must be taken into custody using the following procedures: (74.3.1)

   1.  Any officer who has suspicion that a person has an active warrant will conduct a warrants and records check through dispatch.

   2.  The officer will contact dispatch on the "Info" channel and provide the name and date of birth.

   3.  Dispatch will notify the officer if the warrant is "confirmed."

   4.  If a warrant has been "confirmed" through dispatch the officer will restrain the suspect and search incident to arrest prior to transport.

   5.  Warrant arrests are processed at the Sarpy County Jail.

G.  Booking Procedures

   The Sarpy County Sheriff's Office processes all custodial arrests which take place in Sarpy County. Booking procedures are developed by the Sheriff's Office and PPD Officers will follow these outlined procedures unless directed at the Jail by on-scene staff.

   1.  Upon taking a party into custody the arresting Officer will advise dispatch of a prisoner and update dispatch at the jail when they have arrived.

   2.  Upon arrival at the Sarpy County Jail officers will announce their purpose and reason for requesting access to the parking garage. SCSO control will then provide access and advise which door to enter.

   3.  When parked in the garage the primary arresting officer will remove all weapons from their person and place them in the designated lockers near the pedestrian entry to the booking facility.

   4.  Officers will then remove the detainee and escort them to the pedestrian entrance and await a SCSO designee. At that time the SCSO will have control of the detainee and conduct all thorough searches and inventories (for DUI testing at the SCSO Jail refer to O2302 DUI).

   5.  Officers from the PPD will not obtain official photographs (i.e. mugshots). This function is conducted by SCSO personnel. (1.2.5 c)

**O2405**
**January 2014**

- 4 -

PAP 000335

6.      Officers from the PPD will not obtain official fingerprints.  This function is conducted by SCSO personnel. (1.2.5 b)

H.    Mass Arrests

A mass arrest situation exists when the number of persons to be arrested in a single incident exceeds the department's ability to perform normal arrest, booking and reporting procedures.

1.      The on-duty supervisor (if no supervisor is on duty, then the lieutenant shall be consulted) must approve, coordinate and direct all incidents involving mass arrests occurring within the city limits.

2.      Sufficient personnel should be gathered before any enforcement action is taken.  Outside law enforcement assistance may be used.

3.      The Sarpy County Jail shall be notified of the possibility of mass arrests being processed.

4.      Officers shall not act alone unless failure to act could result in loss of life or great bodily harm.

5.      Arrestees will be immediately removed from the arrest scene and transported to the Sarpy County Jail for processing.

6.      If cited and released, arrestees will be released from the scene as soon as field processing is completed.

7.      Arrestees transported during mass arrests will be handcuffed in the same manner as other prisoners taken into custody.  In the event that buses or other mass transit vehicles are used, care shall be taken to ensure all arrestee\detainees are secured with handcuffs or flex cuffs, and a sufficient number of officers are present to maintain security.

I.     Field Processing - Mass Arrests

1.      If arrests are to be cited and released in the field, officers will be assigned as needed to maintain order in the field processing area.

2.      The arresting officer will complete a citation listing all necessary information and the charges.

3.      The arrestee/detainee will be released with his/her copy of the citation with the remaining copies remaining in the field processing center.

4.      Any evidence seized as a result of an arrest incident should be photographed at the scene and turned in as evidence by the arresting officer prior to the end of the officer's tour of duty.  The on-scene supervisor may designate one person to process all evidence at the field processing center.  Should one person be designated to process evidence at the scene, the officer will complete a property report noting the time, date and officer from whom the evidence was received.  The evidence will be placed in a secure place by the officer and transported to the police facility at an appropriate time.

5.      The arrestee/detainee will be processed at the field processing area by a minimum of two officers who will have the necessary equipment to provide positive field identification for court purposes.

**O2405**
**January 2014**

PAP 000336

6.    One photo will be taken of the arrestee/detainee (except those under fourteen (14) years of age).  The digital image will be saved using the date and suspect name in the file name.

7.    Upon completion of the field processing, the arrestee/detainee will be taken to a place of release.

8.    Sanitation and medical needs of the arrestee/detainee will be met when possible.

9.    On-scene supervisors shall ensure all elements of mutual aid identified in applicable interagency letters of agreement, as well as any general or special orders regarding mutual aid are adhered to.

10.   The commanding officer of the Uniformed Services Division will be responsible for court and prosecutorial liaison relating to cases referred for prosecution of mass arrests.

11.   The on-scene supervisor shall ensure that all media and public information responses and actions taking place at the scene of mass arrests are in compliance with General Order P3102, News Media.

## IV.    RECORD OF CHANGES

01/31/2014    Removed requirement to report cruiser mileage to dispatch.  Updated Mass arrest photo to Digital verbiage.

11/01/2011    Added Warrant Arrest Procedures (F)

02/04/2011    CALEA update

01/01/2004    Periodic Review, Affidavit Requirements, DUS Changes

PAP 000337

| NUMBER:    M1301 | PAPILLION POLICE DEPARTMENT - General Order | |
|---|---|---|
| SUBJECT:<br><br>**Training and Career Development** | CALEA Standards Addressed:<br><br>Chapter 33 | |
| ISSUED BY:<br>**Interim Chief Chris Whitted** | NOTE:  Replaces M1301, 01/31/2014 | |
| SIGNED: *Chris E. Whitted* | | **EFFECTIVE DATE:**<br>**February 9, 2015**   β |

## I.    POLICY

It is the policy of the Papillion Police Department to efficiently utilize available funding to provide meaningful training for all employees to maximize competency within their respective positions, and offer career development opportunities to enhance individual skill sets and cultivate future policing leaders.

## II.    PURPOSE

Law enforcement training must be a continuous process and cannot end after completion of basic academy and field training.  Increasingly complex legal, social, and technology challenges require all employees to reinforce and enhance previously acquired knowledge.  To ensure a successful training program and wise use of available funding, career goals and objectives should be determined by the employee and supervisor, documented during the performance appraisal process and used to determine department training priorities.

## III.    ROLES AND RESPONSIBILITIES

A.    Training Committee: A training committee will be formed to oversee department goals and objectives.

1.    Composition: The training committee will consist of the Administrative Services Commander, Training Coordinator, One Field Training Officer and at least one approved Instructor. (33.1.1 a)

2.    The committee members will be appointed by the Administrative Services Commander.  In the event a vacancy occurs, the Administrative Services Commander will replace the position with someone of the same classification.  (33.1.1 b)

3.    The training committee reports to the Chief of Police on any recommendations on changes in policy, procedure and initiatives which may have a fiscal impact. (33.1.1e)

4.    Requests and suggestions from individual P.P.D. members regarding training programs should be made to the committee via the training coordinator.  (33.1.1c)

5.    The Committee will serve in an advisory capacity to the training coordinator and the Chief of Police.  At a minimum, the committee will meet annually to review this policy.  In addition, its functions will include: (33.1.1d)

a.    Review current programs for possible changes and/or implementation.
b.    Evaluate training needs and serve as a focal point for input from employees.

B.    Training Coordinator:   The Investigative Supervisor is designated the department training

PAP 000367

coordinator. Under direction of the Administrative Services Commander, the training coordinator's duties include:

1. Plan, develop, coordinate and schedule recurring training requirements.
2. Plan, develop, coordinate and schedule entry-level orientation.
3. Supervise department Field Training Officer (FTO) program. (33.4.3c)
4. Maintain department training records.
5. Maintain master copies of all training lesson plans.
6. Maintain and document required Nebraska law enforcement certifications for all personnel.
7. Ensure and track training attendance for all personnel.
8. Assist with instructor selection.
9. Monitor and distribute training opportunity information.
10. Evaluate training effectiveness.
11. Other training functions as necessary and assigned.

C. Uniformed Services Commander: Maintains oversight of training schedules for all uniformed services personnel. Must ensure that adequate patrol coverage is not compromised due to training absences.

D. Evidence Tech/Quartermaster: When requested, may assist the training coordinator with lodging, transportation, and financial arrangements associated with department training requirements.

E. Sergeants: Responsible for identifying training needs and desires of subordinates. Shall also meet with subordinates regularly to discuss career development goals and to identify specialty areas of interest which may be developed through specialized training. Should document training priorities for each subordinate on annual performance evaluation.

F. Department training instructors: Selected officers obtain certification in specialized areas to train others within the department. Eligible instructors are responsible to maintain certification, develop lesson plans, and administer training as necessary.

G. All Employees: Responsible for communicating training needs and career development goals to supervisor or training coordinator.

H. Chief of Police: Final approval authority for all training expenditures, instructorships, and certifications.

IV. TRAINING

A. Training Types:

1. Recruit Orientation:

a. New officers undergo a one or two-week orientation period, depending on hire and basic academy training start dates. This program includes:

(1) Overview and issuance of department policies, procedures, rules and regulations. Detailed training of policies and procedures shall be conducted during field training (33.2.4)

(2) Completion of all required employment documentation.

(3) Issue of all available uniform and equipment items

(4) Completion of required pre-NLETC certifications (pepper spray, CPR/first aid, etc.)

(5) If time permits, firearm training and qualification.

M1301
February 9, 2015

-2-

(6)     Familiarization with city and other criminal justice functions/facilities.

(7)     Prep/outfit for basic academy

(8)     Other functions as required.

b.    The Training Coordinator is responsible for scheduling all facets of orientation, and will utilize department instructors and other personnel to assist.

c.    The recruit's orientation schedule will be created and maintained in the public folders section of Microsoft Outlook and viewable by all employees.

2.    Basic Law Enforcement Certification: (33.2.3)

a.    Pursuant to Nebraska statute 81-1414, all sworn officers must complete basic law enforcement certification training. All Papillion police officers attend this training at the Nebraska Law Enforcement Training Center (NLETC) in Grand Island, unless previously certified through another means. The NLETC provides a program with over 600 hours of classroom and practical instruction based on a job task analysis of required law enforcement functions within the State of Nebraska. The center also utilizes evaluation techniques which measure knowledge, skills and abilities.

b.    All officers must complete basic certification training before assignment to any department position in which the officer is required to carry a firearm or affect an arrest, unless assigned to the FTO program. (33.4.1)

c.    Whenever the department sends officers to basic law enforcement training, the training coordinator shall assume primary responsibility for monitoring their progress while at the academy. The Administrative Services Commander will coordinate the approval and submission of all required basic training admission documentation. The quartermaster will be responsible for purchasing all necessary student equipment and materials.

d.    Unless otherwise agreed upon or modified by statute, police recruits attend basic certification training at no cost to the city, except for:

(1)     Wages and benefits
(2)     Meal costs
(3)     Transportation costs (trainees are provided a city vehicle for trips to/from the training center. Limited personal use while at the training center is authorized; however, trainee(s) is/are responsible for purchasing fuel for personal use. Under no circumstances shall any recruit consume alcoholic beverages in conjunction with use of department vehicle).

3.    Field Training Officer (FTO) Program

a.    In conjunction with or following completion of basic law enforcement certification training, all officers are required to successfully complete FTO training. Our department utilizes the San Jose, CA model, which is nationally recognized and used by many U.S. law enforcement agencies. The curriculum of this program provides post-basic on-the-job training to probationary law enforcement officers.

b.    The FTO program and Curriculum is designed to:

(1)     Produce a highly trained and positively motivated officer capable of meeting or exceeding all required standards of performance.

(2)     Provide standardized training based on the most frequent tasks associated with the duties of an officer and remediation opportunities when

**M1301**
**February 9, 2015**

PAP 000369

deficiencies are identified.  (33.4.2 a)

(3)    Build on the foundation provided by the NLETC.

(4)    Provide for on-the-job observation by certified training officers.

(5)    Increase the overall efficiency and effectiveness of the department by enhancing the climate of professionalism and competency demanded by the ethical standards of law enforcement.

c.    Program Composition and Documentation

(1)    The FTO program consists of 3 phases, each lasting approximately 4 weeks after the classroom portion of their training. (33.4.3 a)

(2)    The recruit is assigned a different training officer for each phase, which is designed to expose the recruit to a variety of trainer personalities and techniques.

(3)    In addition to separate officers, the recruit will rotate field assignments by completing at least one phase on a day shift and one phase on a night shift. This requires the trainee to adapt to varying priorities and preferences. (33.4.3 f)

(4)    Following completion of phase 3 and upon recommendation of the field training officer(s), each recruit must undergo a final observation phase for a minimum of 2 weeks. During final phase, the recruit will be accompanied or shadowed by a training officer whose sole purpose is to evaluate the recruit on all aspects of performance.

(5)    The trainee's performance and process is documented and tracked on a daily basis.  Each FTO shall complete a Daily Observation Report (DOR) for every training day to include critique for: (33.4.2 b)

    (a)    Appearance
    (b)    Attitude
    (c)    Job Knowledge
    (d)    Performance
    (e)    Relationships

In addition, each trainer shall accomplish an end-of-phase report to be reviewed by training coordinator, Administrative Services and Uniformed Services Commanders, and Chief of Police.  (33.4.3 h)

(6)    All training officers shall utilize Adore FTO software to evaluate and rate trainees.  This system tracks all DORs, end of phase reports, phase 1, 2 and 3 training objectives, and documented field activity. The training coordinator and Uniformed Services Commander are responsible for Adore FTO software administration.  (33.4.3 g)

d.    FTO Selection, Requirements, and Supervision

(1)    Field training officers serve as role models for probationary officers in the development of the knowledge, skills, and abilities necessary to satisfactorily perform patrol duties.  It is imperative to select only our best officers to train others.

(2)    Field training officers receive extra compensation when assigned a trainee.  All FTOs must provide quality training that conforms with all

department general and special orders. It is incumbent upon all FTOs to serve as the model for how they wish the trainee to perform.

(3) Field training officers will be selected on an as-needed basis at the discretion of the Police Chief. The process for selection is: (33.4.3 b)

    (a) The Chief will advertise via email or memo of the need to select additional FTO's.

    (b) The announcement will include the qualities of an FTO as well as expectations.

    (c) Officers who are eligible will submit their interest via email directly to the Chief of Police for consideration.

    (d) The Chief of Police, or designate, will determine FTO selection based on work history, attitude, and performance. Recommendations from the training coordinator and other supervisors will be strongly considered.

    (e) Interviews and further testing may be employed during the selection process.

(4) All selected shall attend the FTO certification course at the earliest opportunity and attend in-service training to possess up-to-date training instruction. (33.4.3 e)

(5) FTO's are supervised by their direct supervisor in relation to daily activities and responsibilities when they are performing as an FTO. (33.4.3 c)

(6) FTO's may serve as a liaison with the training academy when applicable. (33.4.3 d)

4.    Recurring In-Service Training

   a.    Sworn personnel (command staff exempt unless required by statute) are required to complete mandatory annual training in the following areas: (33.5.1)

    (1) Use of Force and Defensive Tactics Training

    (2) Vehicle Pursuits (may be incorporated with Emergency Vehicle Operations Course-EVOC, but must minimally include an overview of Nebraska statute and department pursuit general order).

    (3) Firearms Qualification.

    (4) Active shooter training as planned and administered by active shooter instructors.

    (5) Legal Updates and/or current case law

    (6) Other topics as approved by the Chief of Police which may include.

        (a)   Policy, Regulations and Procedure Changes
        (b)   Consideration of Cultural Influences
        (c)   Interview and Interrogation
        (d)   EMS and Haz-Mat
        (e)   Crime Prevention Initiatives
        (f)   Investigation methods and Technology

PAP 000371

                (g)     Evidence collection

                (h)     Report writing and documentation

                (i)     Victim Assistance

(7)     Ethics training is mandatory for all employees and is completed at the time of employment and every two years.  (1.1.2)

b.     Sworn personnel (command staff exempt unless required by statute) are required to complete mandatory periodic training in the following areas:

     (1)     CPR

     (2)     Radar recertification

     (3)     LIDAR

     (4)     Preliminary Breath Test

     (5)     Data Master

     (6)     Mobile Data Computer

     (7)     National Incident Management (NIMS) training as required

     (8)     Other topics as approved by the Chief of Police

c.     Instruction: All in-service training will be subject to approval by the Training Committee or Training Coordinator after the lesson plan has been submitted by the part time Instructor and evaluated as to its effectiveness. All lesson plans will include at a minimum (33.1.4 c):

(1)     A statement of performance and job-related activities (33.1.4 a)

(2)     training content and appropriate instructional techniques, such as in-class lecture  or scenario based training (33.1.4 b)

(3)     identification of any tests used in the process (33.1.4 d)

d.     Documentation: All training courses conducted by a Papillion Police employee will provide the training coordinator with:

(1)     course content and lesson plans using Form MF-130 (Lesson Plan Outline) (33.1.7 a)

(2)     names of all attendees using Form MF-134 (Post Training Summary) (33.1.7 b)

(3)     test scores if performance is evaluated (33.1.7 c)

5.     Specialized/Advanced Training

a.     Core Training: Officers who have successfully completed probation may be required to attend certain courses which benefit all officers and lay the foundation for advanced skill development and success.  These courses include:

(1)     New Officer Domestic Violence Training conducted by the Coalition Against Sexual and Domestic Assault.

(2)     Basic Sexual Assault Training as provided by the Coalition Against Sexual and Domestic Assault.

(3)     Street Survival Seminars

(4)     Interview and Interrogation

**M1301**
**February 9, 2015**

- 6 -

PAP 000372

b.    Assignments Requiring Specialized Training: Many instructor and specialty positions require advanced training certifications and/or expertise.  Advanced external training opportunities will be maximized when the subject matter is useful to department operations and such courses are economically feasible.  Examples of specialized trainings include: (33.6.1 a, b ,& c)

(1)    DARE Instructor
(a) Required Training:  DARE Instructor Certification – currently an 80 hr. course in the DARE curriculum  and public speaking.
(b) Re-training:  The NLETC puts on free non-mandatory refresher training annually.
(c) Supervised on the job training: None outside of what is accomplished during the DARE Instructor Certification.

(2)    SRO
(a) Required Training:  NASRO Certification Course – 40 hour course in case law and juvenile psychology
(b) Re-training: None
(c) Supervised on the job training:  The outgoing SRO works alongside the incoming SRO for a short period.

(3)    Canine Handler
(a) Required Training:  NLETC Canine Certification – 3 month initial training with Dog and Handler
(b) Re-training: Annual Recertification and weekly metro Canine officer training
(c) Supervised on the job training:  This accomplished at the Canine Certification training and at their weekly training

(4)    SWAT Operator
(a) Required Training: SWAT Operator Course – 40 hr. course in firearms and tactical movement
(b) Re-training: SWAT team members attend 2 days of training a month
(c) Supervised on the job training: This is accomplished at the SWAT Operator Course and during the monthly training

(5)    Accident Reconstructionist
(a) Required Training:  40 hr. Accident Investigation Course and 24 hr. Edge FX training
(b) Re-training: None
(c) Supervised on the job training: No formal supervised OJT.  Informally this is accomplished on accident scenes.

(6)    Hostage Negotiator
(a) Required Training: 40 hour certification course on crisis and hostage negotiation
(b) Re-training:  4 hr. monthly team training
(c) Supervised on the job training: This is accomplished at the monthly training and on call outs.

(7)    Firearms Instructor
(a) Required Training: 40 hr. course in correct firearms technique, marksmanship, and presentation
(b) Re-training: 12 hr. annual recertification
(c) Supervised on the job training:  Accomplished in a follow up to initial certification where new instructors assist established  firearms instructors at the NLETC

PAP 000373

(8)    FTO
       (a) Required Training: 40 hr. certification course in field training techniques and fair and unbiased scoring
       (b) Re-training: None
       (c) Supervised on the job training: Accomplished during the initial course and through the FTO supervisor's oversight during an FTO period

c.    Accreditation Training: (33.5.3)

    (1)    All Agency personnel will receive training on the accreditation process during:

        (a)    The self-assessment phase of initial accreditation.

        (b)    Within 30 days of employment or 30 days after the completion of all recruit training.

        (c)    prior to any CALEA scheduled on-site assessment.

    (2)    Accreditation Managers will receive specialized accreditation training within one year of appointment to Accreditation Manager. (33.5.4)

d.    Supervisor Training: All first line supervisors serve as counselors and career developers for their subordinates. In order to develop officers in all services, a supervisor will complete a supervisor course in accordance with State Statute 81-1414 (3) which mandates all supervisors complete an approved supervisor's course within one (1) year of promotion. (33.8.2)

e.    Investigator training: Upon selection to serve as a Detective in the Papillion Police Department, certain courses which provide advanced training are beneficial to the specialized case work required by an advanced Investigator. These courses may include:

    (1)    Advanced Homicide Investigations
    (2)    Internet Crimes (Identity theft/crimes against children)
    (3)    Advanced Interview and Interrogation
    (4)    White Collar investigation (check fraud/credit card fraud/embezzlement)

f.    Retraining for specialized or advanced training will be approved by the Chief of Police or his designate. Retraining on specialized assignments include: (33.6.1 b)

    (1)    CPR/First Aid
    (2)    NIMS/ICS Courses
    (3)    LIDAR/Radar Re-certifications

g.    Clerical Training: Clerical training for new employees will be administered through on the job training. A specific clerical staff member will be assigned to provide the training during the course of a work day. (33.6.1 c)

h.    All Hazards Training: Agency personnel who are affected by the All-Hazards Plan will participate in documented annual training. The training may utilize first responders, command staff, civilian staff, or any combination thereof. (46.1.9)

6.    Shift Briefing Training: Narrowly-focused topics of interest may be instructed through roll-call training. In developing roll-call training, the instructor should: (33.5.2)

a.    Schedule training as to not adversely impact department operations;

b.    Utilize techniques that present the subject matter in an interesting, effective, and

PAP 000374

efficient manner;

    c.    Establish objectives and present material which achieves the objectives;

    d.    When applicable, utilize instructional personnel well versed in the subject matter;

    e.    Ensure proper training documentation is accomplished and forwarded to the training coordinator.

7.    Non-Sworn Training

    a.    All non-sworn employees will receive initial orientation commensurate with their position.  At a minimum, the orientation will include:

        (1)    an overview of city and police department operations to include the work environment and regulations (33.7.1 b)

        (2)    review of applicable contracts

        (3)    policy/personnel manuals including the agency's roles, purpose, and goals.   (33.7.1 a)

        (4)    Expected rights and responsibilities of the employee (33.7.1 c)

    b.    Training will be administered by designated personnel for all requirements as designated in the respective job description.  Examples Include: (33.7.2)

        (1)    Property Manager
        (2)    Clerical

    c.    Non-sworn personnel may also request specialized and advanced training for skills necessary to perform their duties. All such requests should be routed through their supervisors to the training coordinator.

8.    Remedial Training: (33.1.5)

    a.    Remedial Training may be required due to deficient performance based on observation by command staff or at the conclusion  of  a  sustained  Internal Investigation where further training may improve performance.  Remedial Training should be scheduled within 6 months of the observed deficiency.

    b.    Any Remedial Training will follow the appropriate process and be maintained with other training records as directed by this policy.

    c.    Failure of an employee to attend or respond to Remedial Training within a reasonable amount of time may initiate disciplinary measures when appropriate.

9.    NRSS 81-1414.07 - Continuing Education (CE) Requirements:

    a.    NRSS 81-1414.07 requires all full or part-time sworn personnel to obtain a minimum of 20 hours of continuing education annually; or risk having their state certification  suspended.  The statute specifies the annual period will run from January 1st to December 31st of a given calendar year and requires the police department to submit names of all officers having met this requirement to the NLETC on an annual basis.

    b.    All varieties of training, including in-service, seminar attendance, and regularly attended team-type training (SWAT, CNU, etc.) count towards the 20 hour annual requirement. College course work may also be used to meet the requirement  and

PAP 000375

will be recorded as 10 hours of C.E. credit for every one hour of completed college credit. Only 10 hours of internet based instruction can be used towards the 20 hour requirement and it must relate to the duties carried out by the officer.

c.    The training sergeant will be responsible for maintaining a spreadsheet documenting all completed classes and training that comply with the CE hour's requirement. This spread sheet will be located as an addendum to the training matrix and will be annotated each time a Completion of Training form or Mass Training Roster is submitted. It is imperative ALL OFFICERS submit Completion of Training forms in a timely manner; or risk not having completed training properly annotated in their file.

d.    In the event the annual 20 hour CE requirement is not met, the following will occur:

(1)    The officer will have his/her certificate suspended until they have successfully fulfilled the requirement for that reporting period. Supporting documentation of these hours will need to accompany any submittal of hours designed to remove a certificate suspension.

(2)    CE hours received by a suspended officer in a new reporting period will be credited to the previous reporting period (deficient year) until the deficiency is made up. CE hours used to clear up an old deficiency cannot be credited to the new reporting period; as these hours cannot be counted twice.

(3)    Any officer, who fails to fulfill CE requirements for two (2) consecutive reporting periods where waivers have not been granted for those periods, implies conduct which is indicative of incompetence, neglect of duty and physical, mental and emotional incapacity to perform the duties of a law enforcement officer. This will constitute grounds for revocation of his/her law enforcement certificate.

e.    The NLETC offers a waiver form which may be submitted in the event an officer fails to obtain the necessary 20 hours of continuing education in a given calendar year. The form, and reasons a waiver may be granted, are similar to those used for firearms certification waivers; however the reasons allowed are limited. The process for submitting a waiver is as follows:

(1)    The waiver request may be submitted by an individual officer or his/her department. Written justification supporting the waiver request must be submitted showing "good cause" for noncompliance.

(2)    Good cause shall include cases of extreme hardship as defined by Title 79 or for situations when an employee is on some form of extended leave (military, medical, etc.).

(3)    If the waiver request is denied, then the individual's certificate will be suspended.

B.    Training Attendance and Administration

1.    Attendance: (33.1.2)

a.    Scheduled training is considered a mandatory duty assignment. Proof of attendance with a completion of training form and Certificate (if provided) shall be forwarded to the training coordinator who shall document on the employee's individual training file. (33.1.6)

**M1301**
**February 9, 2015**

- 10 -

PAP 000376

      b.      Employees excused from scheduled training for court appearances, calls for service, or other emergency must coordinate make-up requirements with the training coordinator, their supervisor and applicable instructor. Unexcused absences shall result in disciplinary action.

2.      Requests for Training:

      a.      Employees may be selected for or make application to attend outside training. All who attend training seminars, conferences or workshops outside the department are required to submit a written training request (MF-131) through their supervisor to the training coordinator. No department funds may be expended unless advance approval is obtained.

      b.      Training request forms must detail all estimated costs, including registration fees, per-diem, lodging and other travel expenses. In addition, the requestor must provide justification (i.e. why he/she wishes to attend the training) and a short statement regarding outcome (i.e. how the department will benefit from the training). Requests consistent with individual training or career development tracks as identified during the performance evaluation process shall be given priority when available training funds exist. Forms must be routed to the training coordinator, who will then forward to the appropriate command staff officer(s) for final approval.

      c.      The training coordinator is responsible for training enrollment activities, to include registration, lodging, travel, and coordination of other financial arrangements. Once registration is confirmed, he/she will place the training on the PPD employee training calendar located in Outlook calendars. The requesting employee and supervisor will then be notified of the dates and times of the training via an email through the "Invite Attendees" Outlook feature. The employee and supervisor will click on the "accept invitation" button to place the training on their calendar and to signify acknowledgement.

      d.      Once training is completed, all employees must submit a "Completion of Training" (MF-132) form along with a copy of any certificate provided.

      e.      Training Expenses: In the event unexpected fees are incurred while attending training within or outside of the city complete form CF-508. Eligible expenses include fuel, rental fees, transport fees, and fees associated with unexpected travel delays. The form and all receipts should be submitted via the chain of command to be processed by the Administrative Services Commander. (33.1.3)

      f.      All training materials provided for the course except personal notes should be submitted to the training coordinator for review. These materials may be retained in the department library or returned to the attendee, whichever is more beneficial to the department. In addition, if the subject matter is deemed important to the entire department, the training coordinator may require the attendee to submit a training summary (including critique) which may be disseminated to other employees or used to determine future consideration of continued department attendance.

## V.    CAREER DEVELOPMENT

A.    Roles and Responsibilities:

1.      Supervisors: All employees with supervision responsibilities should assist subordinates in planning their career paths through the utilization of formal schooling opportunities and law enforcement related training courses to improve their skills, knowledge, and abilities. This includes: (33.8.3)

PAP 000377

a.  Identification and assessment of individual skill sets.  For example, an officer who has an interest in accident investigation and possesses a high math aptitude should be channeled toward accident reconstruction.  Another officer who might demonstrate high ability knowledge of information systems and computers may be extremely valuable to the department for cyber and computer based criminal investigation.

b.  Documentation of specific talent sets and preferences.  During the performance feedback and evaluation process, supervisors should annotate career development progress.  The immediate supervisor is always in the best position to recognize unique skill strengths and determine the most appropriate pace of progression.

c.  Annual review of subordinate's training record.  This should be done in conjunction with performance feedback or evaluation process.

2.  Individual Employees:  It is incumbent upon all employees to make their career preferences known.  In the ever-changing field of law enforcement, everyone should strive to continually improve their skills and expand their knowledge base.

3.  Command Staff:  Responsible for assessing department needs and balancing training and career development requests with available funding.

B.  Job Rotations and Temporary Assignments:

1.  Temporary assignments and job rotations may be used to provide career development opportunities.  Such assignments will be made in compliance with the collective bargaining agreement, civil service rules and regulations, and at the discretion of the Chief of Police.

2.  When in the best interests of the department, shift assignments and duty hours may be scheduled to compliment approved academic study.

C.  Higher Education:  The city offers an attractive tuition assistance program and this department encourages all sworn personnel to achieve a minimum of a bachelor's degree from an accredited college or university.

VI.  **RECORD OF CHANGE:**

| | |
|---|---|
| 02/09/2015 | Added Training Expenses, Clerical training, and Ref to training for specialized positions, changed LB817 to 81-1414.07 |
| 01/31/2014 | Changed Instructor Language in IV-A-4-a-(4). |
| 08/20/2013 | Updated with information and requirements pertaining to LB 817; mandates a minimum of 20 hours of continuing education annually for sworn personnel. |
| 10/08/2012 | Replaced annual mandatory All Hazards to "Affected Personnel"; Added MF132 form to completion of training. |
| 05/01/2012 | Updated in-service training to include standardized forms. |
| 11/01/2011 | Added FTO Selection Procedures, Specialized classes, Non-sworn classes |
| 02/03/2010 | Updated for CALEA requirements |

F:\Officers\SOP\General Orders\Management\ M1301 – Training and Career Development

**M1301**
**February 9, 2015**

- 12 -

PAP 000378