IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WADITH STOCKINGER NADER, and STACEY NICHOLE NADER,<br><br>              Plaintiffs,<br><br>       v.<br><br>THE CITY OF PAPILLION,  SARPY COUNTY, BRYAN SVAJGL, BENJAMIN IVERSEN, SCOTT A. LYONS, L. KENNETH POLIKOV, and JENNIFER MIRALLES,<br><br>              Defendants. | **8:17CV83**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on motions for summary judgment filed by defendants City of Papillion, Nebraska ("Papillion"), Bryan Svajgl, Scott Lyons, and Benjamin Iversen, Filing No. 49 (collectively referred to as the "Papillion Defendants"), and by defendants County of Sarpy ("Sarpy County"), L. Kenneth Polikov, and Jennifer Miralles (collectively "the Sarpy County Defendants"), Filing No. 39.  This is an action for deprivation of rights under 42 U.S.C. § 1983.  This court has jurisdiction under 28 U.S.C. § 1331.

Plaintiffs Wadith Nader ("Mr. Nader" of "Nader") and his wife, Stacey Nader ("Mrs. Nader") (collectively "Plaintiffs") are citizens of New Jersey, but reside in Papillion, Nebraska. Papillion and Sarpy County are political subdivisions of the State of Nebraska.  Polikov is the Sarpy County Attorney.  Miralles is a former Deputy Sarpy County Attorney.  Chief Lyons is the Chief of Police of the Papillion Police Department.  Detective Benjamin Iversen is an employee of the Police Department of La Vista,

Nebraska, but was working as an agent of the Papillion Police Department at the time of the incident at issue.  Detective Svajgl is a Papillion Police Department officer who was the lead detective.   All of the individual Defendants are sued in their individual capacities.

The Naders allege a violation of their civil rights under 42 U.S.C. § 1983 in connection with Mr. Nader's arrest and subsequent 28-day detention.   Mr. Nader contends he was subjected to an unlawful arrest and seizure in violation of the Fourth Amendment.  He alleges that he was arrested in his home, after execution of a valid search warrant, and detained without probable cause.   Further, he alleges that defendants Svajgl, Iversen, Lyons and Miralles conspired to deprive him of his constitutional rights.  He also asserts a state-law claim for malicious prosecution.  He alleges that Chief Lyons failed to properly train the investigators and alleges the defendants acted pursuant to customs and policies of Papillion and Sarpy County.  Mrs. Nader asserts she was harmed by the defendants' allegedly unlawful conduct in that she had to abandon her military career.

Sarpy County moves for summary judgment on the plaintiffs' § 1983 claims on the basis of qualified immunity and asserts it is immune from suit for the plaintiffs state law claim under the Nebraska Political Subdivisions Tort Claims Act, ("PSTCA"), Neb. Rev. Stat. §13-910(7).[1]  Defendants Polikov and Miralles contend they are entitled to a judgment of dismissal on the ground of prosecutorial immunity.  The Sarpy County defendants also assert that Mrs. Nader lacks standing to assert her claims.

---

[1] The Political Subdivisions Tort Claims Act sets forth general waiver of immunity subject to certain limited exceptions.   Neb. Rev. St. §§ 13-908, 13-910.

2

Defendants Svajgl, Iversen, and Lyons move for summary judgment based on the defense of qualified immunity and, alternatively, on the merits. Papillion asserts that, in light of the qualified immunity of the individual defendants, it has no independent liability. It also asserts immunity under the NPSTCA on the plaintiffs' state law claims and argues Mrs. Nader lacks standing.

I.     FACTS

The following facts are gleaned from the respective statements of facts in the parties' briefing and from the evidence submitted in connection with the motions. *See* Filing No. 40, Sarpy County Brief; Filing No. 45, Plaintiff's Brief ; Filing No. 47, Affidavit of Zachary Lutz-Priefert ("Lutz-Priefert Aff."); Filing No. 48, Sarpy County Reply Brief; Filing No. 50, Papillion Brief; Filing No. 52, Plaintiffs Brief; Filing No. 55, Papillion Reply Brief; Filing Nos. 40-1 to 40-19, evidence attached to Sarpy County Brief; Filing Nos. 46, 51 and 53, Indices of Evid.; and Filing No. 54, Affidavit of Wadith S. Nader.

In December, 2014, the National Center for Missing and Exploited Children ("NCMEC") sent a cybertip to the Nebraska State Patrol that suspected child pornography had been uploaded to the Microsoft's Skydrive. The Nebraska State Patrol passed the tip on to the Papillion Police Department. Filing No. 47, Lutz-Priefert Aff., Ex. B, Deposition of Bryan Svajgl ("Svajgl Dep."). Detective Svajgl then conducted an investigation and later obtained a warrant to search the Naders' home. Filing No. 40-12, Affidavit of Bryan Svajgl ("Svajgl Aff.") at 2-5. The Sarpy County Court issued the warrant based on Detective Svajgl's affidavit of probable cause for a search warrant to locate evidence of suspected child-pornography violations under Neb. Rev. Stat. § 28-813.01 (possession of child pornography) and Neb. Rev. Stat. § 28-813.03

3

(distribution of child pornography).  *Id.* at 5; Filing No. 40-13, Affidavit in support of application; Filing No. 40-14, Search Warrant.  The search warrant authorized the seizure of certain identified electronic devices that were the subject of the suspected criminal activity described above as revealed by Detective Svajgl's investigation. Filing No. 40-12, Affidavit of Bryan Svajgl ("Svajgl Aff.") at 7; Filing No. 40-14, Ex. B, Search Warrant.  The Naders do not challenge the legality of the search warrant.

Detective Svajgl assembled a team of detectives from Papillion and La Vista to perform the search of the Nader home.  Filing No. 47, Lutz-Priefert Aff., Ex. B, Svajgl Dep. at 45, 53.  Svajgl sought and obtained the assistance of Detective Benjamin Iversen, under an intra-local agreement between local police departments.  *Id.* at 53; *id.*, Ex A, Deposition of Benjamin Iversen ("Iversen Dep.") at 47-54.  Detective Svajgl testified that Iversen was utilized because of his skills with regard to analyzing and previewing computers.  Filing No. 47, Lutz-Priefert Aff., Ex. B, Svajgl Dep. at 46.

On Tuesday, March 17, 2015, at approximately 11:05 a.m., Detective Svajgl and several other police officers from the Papillion and La Vista Police Departments served the search warrant at the Nader residence on Wadith Nader when he answered the door and officers were able to confirm his identity.  Filing No. 40-18, Affidavit of Vincent Valentino ("Valentino Aff."), Ex. B, Deposition of Wadith Nader ("Nader Dep.") at 61-63; Filing No. 40-12, Svajgl Aff. at 7.  The search of the Nader home was the first time Svajgl had conducted a search in connection with possession of child pornography and the first search he conducted as lead detective.  Filing No. 47, Svajgl Dep. at 34-37.

During the execution of the search warrant, Deputy Iversen began his evaluation of the computers and other hardware owned by Mr. Nader.  *Id.*  Deputy Iversen testified

he visually scanned file names and noted file folders with names associated with pornography. Filing No. 47, Lutz-Priefert Aff., Ex. A, Iversen Dep. at 106-10. He used software known as OS-Triage to run scans of one of the HP Envy computers found in the residence, and 23 keyword hits and one hash value of interest. [2] *Id.* at 111-15. Iversen verified that a very large volume of pornographic image files were contained therein, and he flagged one image as possible known child pornography. *Id.* Iversen testified the image was located using OS-Triage, which is a tool Iversen was using for the first time during the course of an investigation. *Id.* at 66. He identified the image by its hash value but he was unable to see the image. *Id.* at 48, 111-12. Iversen testified that a hit on a hashtag tells the officer that there is suspected child pornography on the computer, it does not show that a crime has been committed. *Id.* at 64-65, 76-77; 114. In order to determine if a hash value of an image is actually child pornography, it is necessary to review the image itself and Iversen did not do so at the Nader home. *Id.*

Iversen was the only individual involved in the analysis of technology at the Nader home. *Id.* at 82. Detective Iversen left the residence before Mr. Nader was removed from the premises. *Id.* at 128. Detective Iversen testified that no one asked his advice as to whether or not he believed there was probable cause to arrest Mr. Nader. *Id.* at 133-34. Svajgl stated that he had no working knowledge of OS-Triage. Filing No. 47, Lutz-Priefert Aff., Ex. B, Svajgl Dep. at 50.

---

[2] Iversen testified that a hash value is "a 32- to a 44-alpha-digit alphanumeric number that is used as a digital fingerprint or digital signature for a file." Filing No. 47, Ex. A, Iversen Dep. at 10-11. He testified that it was his understanding that Microsoft and other technology companies "have a database of the hash values [that are known to be child pornography] and they're running their computers against the hash values that are loaded into their drives. And that's how they identify images that have been tagged as child pornography." *Id.*

Detective Svajgl testified that Iversen informed him of the results of his analysis and told him that he found a hashtag of interest and 23 keyword matches.  *Id.* at 65-66. Detective Svajgl also stated that while executing the warrant, he spoke to Nader.  *Id.* at 76.  He testified Nader told him that Nader had not searched for child pornography, but acknowledged that he had adult pornography.  *Id.* at 99.   Nader also told Detective Svajgl that he had uploaded files of the Skydrive and might have accidentally uploaded child pornography.  *Id.* at 99; Filing No. 40-12, Svajgl Aff. at 9-10.  During the course of interviewing Nader, Svajgl learned that Nader's email account, which allegedly had child pornography uploaded from it, had previously been hacked.  Filing No. 47, Ex. B, Svajgl Dep. at 96; Filing No. 40-12, Svajgl Aff. at 9.  Nader testified that he and his wife were gun collectors and 35 to 40 guns were found in his house.  *Id.*  He also testified that five-gallon buckets of nitric oxide were found in his yard.  *Id.*

Svajgl testified that the arrest of Nader was "[b]ased on Mr. Nader confirming during the execution of the search warrant that he had moved some images to the Microsoft SkyDrive."  *Id.* at 104.  Svajgl conceded that a later forensic analysis showed that none of the images that had been identified in the NCMEC tip were located in the Nader home.  *Id.* at 73.  Detective Svajgl testified in his deposition that he additionally was concerned about minor children then in the care of Mr. Nader.  Filing No. 47, Ex. B, Svajgl Dep. at 100.

Before he arrested Nader, Svajgl called Sarpy County Deputy Attorney Miralles.  *Id.* at 92.  He explained to the County Attorney that he had verified the computer that was used, the e-mail address that was used, the person who uploaded and the method how the images were uploaded.  *Id.* at 93.   He testified he was asking the county

6

attorney's office "what their thought was on the situation, if they agreed there was probable cause or had some ideas of something else we may need to look at." *Id.* at 97.   The Sarpy County Attorney's Office assigns one of its several Deputy County Attorneys in its Criminal Division to be "on call" to answer any calls from law enforcement officers that commonly arise in the ordinary course of business, such as questions regarding active investigations, enforcement of court orders, search warrants, bond hearings, court appearances, or similar matters.   Filing No. 40-3, Affidavit of Lee Polikov("Polikov Aff.") at 3.   Deputy County Attorney Miralles stated in an affidavit that she did not "order" or effectuate the arrest of Plaintiff Wadith Nader, she was not physically present when the search warrant and arrest was executed at the Nader residence, and she was not personally involved in the subsequent criminal prosecution of Wadith Nader by the Sarpy County Attorney's Office.   Filing No. 40-1, Affidavit of Jennifer Miralles Hessig at 2-3; Filing No. 40-2, Incident Report at 2.   Sarpy County Attorney Polikov stated in an affidavit that he ensures that his staff of Deputy County Attorneys are trained by shadowing more experienced members of the prosecutorial staff and through continuing legal education and other training.   Filing No. 40-3, Polikov Aff. at 1-2.

Detective Svajgl arrested Wadith Nader on March 17, 2015, at the Naders' residence, and served him with a Uniform Citation and Complaint for possession of child pornography in violation of Neb. Rev. Stat. §28-813.01.   Filing No. 40-12, Svajgl Aff. at 12.   Following the arrest of Wadith Nader on March 17, 2015, Detective Svajgl prepared an Affidavit in Support of a Warrantless Arrest and presented it to a Sarpy County Court Judge.   *Id.* at 12-13.   The reviewing Judge signed a Probable Cause Detention Order on

7

March 18, 2015, authorizing the detention of Wadith Nader.  Filing No. 40-15, Svajgl Aff., Ex. C, Affidavit of Probable Cause for Arrest.  Formal criminal charges of seven counts of Possession of Child Pornography, a Class III Felony, were filed on March 18, 2015 by Deputy Sarpy County Attorney Laurie Burgess.  Filing No. 40-6, Perlman Aff. at 2; Filing No. 40-7, Perlman Aff., Ex. A, Criminal Complaint.  Deputy County Attorney Ben Perlman was assigned to prosecute the case.  Filing No. 40-3, Polikov Aff. at 1-2. After Mr. Nader waived preliminary hearing, an information was filed in the District Court of Sarpy County under Case No. CR15-184, alleging the same seven counts of possession of child pornography.  Filing No. 40-6, Perlman Aff. at 2.

Mr. Nader was represented by attorney Thomas Peterson from first appearance on March 19, 2015, until this matter was dismissed without prejudice on October 7, 2015.  Id.  Nader's attorney was unable to secure Nader's release from custody until April 13, 2015, at which time Nader posted bond and agreed to certain conditions of his release.[3]  Filing No. 40-18, Valentino Aff., Ex. B, Nader Dep. at 53, 56-57.

The record shows the Sarpy County Attorney's Office did not receive the complete forensics examination from the Nebraska State Patrol criminal forensic laboratory until on or about September 1, 2015, at which time it provided the CD relative to the examination to defense counsel.  Filing No. 40-6, Perlman Aff. at 2.  A partial examination of Nader's computer hard drives was performed by the Douglas County

---

[3] Nader testified at his deposition that his bond was originally set at $200,000.00.  Filing No. 40-18, Nader Dep. at 57.  He stated that deputy County Attorney Perlman told his attorney that Nader was regarded a flight risk.  Id.  He is a native of Colombia.  Id. at 14.  At Nader's deposition, the parties alluded to some sort of dispute about Money kept in a Russian box, hidden passports and potential travel to Russia as topics raised in connection with bond hearings.  Id. at 55-57.  There is also evidence that, in recorded conversations with his wife from jail, the Naders discussed Mr. Nader's ethnicity as a reason for allegedly unfair treatment.  See Filing No. 40-19, Mrs. Nader Dep. at 85-86.

Sheriff's crime lab and three images of child pornography were reported found, but Douglas County was unable to complete the rest of the examination and requested it be completed by another agency.  *Id.*  Sometime prior to October 7, 2015, Sarpy County was informed by lab examiner Shelby Mertins and her supervisor at the Nebraska State Patrol crime forensics lab that they would not be able to testify that the possession of the child porn images were "knowingly possessed" by Mr. Nader.  *Id.*; *see* Filing No. 40-8, Affidavit of Shelby Mertins at 3.  Deputy County Attorney Perlman dismissed the criminal charges against Wadith Nader on October 7, 2015, based on his assessment that the evidence could support a defense of "accidental download."  Filing No. 40-6, Perlman Aff. at 3.  The record shows that Mrs. Nader's military career may have been hampered by her husband's arrest.  *Id.*

II.    Law

    A.    Standard of Review

At the summary judgment stage, this court must viewing the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party.  *Mendoza v. United States Immigration & Customs Enf't*, 849 F.3d 408, 416 (8th Cir. 2017).  A party is entitled to summary judgment only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right."  *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013).

    B.  Qualified Immunity

Courts conduct a two-part inquiry to determine whether qualified immunity protects a government official from liability:  1) whether the facts taken in a light most favorable to the non-moving party make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017). The court has discretion in deciding which part of the inquiry to address first. *Id.* "'The determination of whether an officer is entitled to qualified immunity requires consideration of the "objective legal reasonableness" of the officer's conduct in light of the information he possessed at the time of the alleged violation.'" *Id.* (quoting *Winters v. Adams,* 254 F.3d 758, 766 (8th Cir. 2001).

"'[I]n the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001). "If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity." *Id.* "If not, however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Id.*

10

Also, "liability under § 1983 is personal." *White v. Jackson*, 865 F.3d 1064, 1080 (8th Cir. 2017); see *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (*en banc*). "[V]icarious liability is inapplicable to § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).  "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation. *White*, 865 F.3d at 1081; *see Madewell v. Roberts*, 909 F.2d 1203, 1208 ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.").  "Thus, '[t]he doctrine of qualified immunity requires an *individualized* analysis of *each* officer's alleged conduct.'" *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (emphasis in original)(quoting *Walton v. Dawson*, 752 F.3d 1109, 1125 (8th Cir. 2014)).

It was clearly established at the time of the incident at issue that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment. *Hoyland,* 869 F.3d at 652.  "If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment." *Manuel v. City of Joliet, Ill.*, — U.S. —, —, 137 S. Ct. 911, 919 (2017) (stating that if a plaintiff was initially arrested without probable cause, he can bring a claim for wrongful arrest under the Fourth Amendment, as well as a claim for wrongful detention—because any subsequent time in custody is also unsupported by probable cause and also constitutionally unreasonable.)

"'A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least

arguable probable cause.'"   *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017) (quoting *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008–09 (8th Cir. 2017) (internal quotation marks omitted)).   "Probable cause exists when the totality of facts known at the time of the arrest would justify a reasonable person in believing that the individual has committed or is committing an offense."   *Id.*   Probable cause exists when, in light of the circumstances at the time of arrest, a law enforcement officer has "trustworthy" information that would cause a reasonable person to believe that the suspect committed or was committing a crime.   *United States v. Luke*, 686 F.3d 600, 605 (8th Cir. 2012). Arguable probable cause "is a mistaken but objectively reasonable belief the suspect committed a criminal offense.'"   *Dowell v. Lincoln Cnty.*, 762 F.3d 770, 777 (8th Cir. 2014); *see also Borgman*, 646 F.3d at 523.

A court considers the totality of the circumstances faced by the officer at the time of arrest, giving the officer "substantial latitude in interpreting and drawing inferences from factual circumstances."   *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012). "'When an officer is faced with conflicting information that cannot be immediately resolved, he may have arguable probable cause to arrest a suspect."   *Hosea*, 867 F.3d at 956 (quoting *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)).   In considering information given, "an officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect."   *Borgman*, 646 F.3d at 523 (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999).

"Probable cause is a question of law that is determined at the moment the arrest is made, and 'any later developed facts are irrelevant to the probable cause analysis.'"

12

*Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017) (quoting *Gilmore v. City of Minneapolis*, 837 F.3d 827, 833 (8th Cir. 2016)); *see also Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) ("The fact that the person arrested is later found innocent is not material.").

C.    Supervisory Liability

"'When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.'" *Mendoza*, 849 F.3d at 420 (quoting *Krigbaum*, 808 F.3d at 340).  "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right" and "allegations of generalized notice are not sufficient." *Krigbaum*, 808 F.3d at 340.  "When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard that 'entails a level of culpability equal to the criminal law definition of recklessness.'" *Id.* at 341 (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012).  "To be deliberately indifferent, an 'official must both be aware of facts from which the inference could be drawn that a substantial risk of [unconstitutional] harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

There must first be an obvious need for the training before a failure to have it will be considered a constitutional violation.  *Mendoza,* 849 F.3d at 420.  If there is

13

generalized training, lack of particularized training that might have prevented the alleged violation does not establish a constitutional violation. *Id.* Liability for failure to supervise will not attach in section 1983 actions unless individual liability is first found on an underlying substantive claim. *Schoette v. Jefferson Cty.*, 788 F.3d 855, 861–62 (8th Cir. 2015); *see Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011).

  D. Municipal liability

  "In *Leatherman* [*v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993)] the Supreme Court made it 'quite clear that, unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983.'" *Sample v. City of Woodbury*, 836 F.3d 913, 917 (8th Cir. 2016). A municipality may be liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Municipalities, however, "are responsible only for 'their own illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). A municipality cannot be held liable solely because of the acts of its employees, but "the municipality may be held liable 'when execution of a government's policy or custom . . . inflicts the injury.'" *Los Angeles County v. Humphries*, 562 U.S. 29, 36 (2010) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. at 658, 691, 694 (1978). A municipality cannot be held liable under on a respondeat superior theory. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. at 658, 692 (1978); *see also Sample*, 836 F.3d *at* 917 n.3 (holding that municipalities can only be liable under section 1983 if municipal policy or custom

14

caused the unconstitutional injury and noting that "immunity from suit and freedom from respondeat superior liability are separate doctrines").

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. "[O]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Municipal liability will not attach in section 1983 actions unless individual liability is first found on an underlying substantive claim. *Schoettle,* 788 F.3d at 861-62.

E.     Conspiracy

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff "must show: that the defendant[s] conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). A plaintiff is required to prove "a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.*

For a claim of conspiracy under Section 1983, the plaintiff "need not show that each participant knew 'the exact limits of the illegal plan . . . ,' but the plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights." *White*, 519 F.3d at 816 (quoting *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996)). "Evidence of 'an agreement to deprive [a] plaintiff of constitutionally guaranteed rights' typically is

circumstantial." *Livers v. Schenck*, 700 F.3d 340, 361 (8th Cir. 2012) (alteration in original) (quoting *White,* 519 F.3d at 816). "'The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims.'" *White*, 519 F.3d at 816 (quoting *Larson by Larson*, 76 F.3d at 1458).

      F.    Prosecutorial Immunity

Prosecutors enjoy absolute immunity in their review of and decisions to charge a violation of the law. *Sample*, 836 F.3d at 916; *see Imbler v. Pachtman*, 424 U.S. 409, 420–27, 431 (1976). Absolute immunity protects prosecutors against claims arising from their initiation of a prosecution and presenting a criminal case "insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler*, 424 U.S. at 430). Absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application, but does not apply when a prosecutor gives advice to police during a criminal investigation. *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009); *see also Burns*, 500 U.S. at 482 (involving a prosecutor advising law enforcement officers to proceed with hypnosis as an investigative technique and advising that results of the hypnosis as providing probable cause to arrest).

Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State—including "the professional evaluation of the evidence assembled by the police—

are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (noting the difference "between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand."); *see also McGhee v. Pottawattamie Cty.*, 547 F.3d 922, 929 (8th Cir. 2008) (stating that "before the establishment of probable cause to arrest, a prosecutor generally will not be entitled to absolute immunity").   "A determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards," even after that determination, "a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Buckley*, 509 U.S. at 274 n.5; *see Brodnicki v. City of Omaha*, 75 F.3d 1261, 1266 (8th Cir. 1996) (holding that a prosecutor is entitled to qualified immunity when he or she pursues actions in an investigatory capacity).[4]

In determining whether particular actions of government officials fit within the absolute or qualified immunity standard, courts use a functional approach that looks to

---

[4] In *Buckley*, the Supreme Court stated:

[I]t would be anomalous, to say the least, to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested.  That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial.  A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.  When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

*Buckley*, 509 U.S. at 275-76.

the nature of the function performed, not the identity of the actor who performed it. *Buckley*, 509 U.S. at 269. The official seeking absolute immunity bears the burden of showing that it is justified by the function in question. *Burns,* 500 U.S. at 479.

G.     Malicious Prosecution – PSTCA

The PSTCA eliminates, in part, the traditional immunity of political subdivisions for the negligent acts of their employees. *Doe v. Omaha Pub. Sch. Dist.*, 727 N.W.2d 447, 453 (Neb. 2007). The Act, "which provides that in suits brought pursuant to the PSTCA, 'the political subdivision shall be liable in the same manner . . . as a private individual under like circumstances,' sets forth a general waiver of sovereign immunity subject to certain limited exceptions stated in § 13–910." *Wise v. Omaha Pub. Sch.*, 714 N.W.2d 19, 22 (Neb. 2006) (quoting Neb. Rev. Stat. § 13-908). The exceptions set forth in Neb. Rev. Stat. § 13-910 are affirmative sovereign immunity defenses to claims brought pursuant to the PSTCA. Neb. Rev. Stat. §§ 13-908, 13-910. One of those exceptions is "[a]ny claim arising out of assault, battery, false arrest, [or] false imprisonment." Neb. Rev. Stat. § 13–910(7); *see Policky v. City of Seward*, 433 F. Supp. 2d 1013, 1027 (D. Neb. 2006). If a political subdivision proves that a plaintiff's claim comes within statutory exception to the PSTCA, then the claim fails based on sovereign immunity, and the political subdivision is not liable. Neb. Rev. Stat. § 13-910. *Doe v. Omaha Public School Dist.*, 727 N.W.2d 447, 454 (Neb. 2007). Under Nebraska law, the general rule is that when a public employee has been found to be immune from liability . . . such immunity extends to the political subdivision. *Hatcher v. Bellevue Volunteer Fire Dep't*, 628 N.W.2d 685, 695 (Neb. 2001) (involving the discretionary function exception).

18

III.    DISCUSSION

The court first finds that the Sarpy County defendants have either absolute or qualified immunity from suit.   The court is inclined to believe that Deputy County Attorney Miralles's conduct is entitled to absolute immunity.   The record shows that Miralles did nothing more than confirm to Detective Svajgl that the evidence he amassed during his investigation and search amounted to probable cause to arrest. Her function was essentially to conduct a professional evaluation of the evidence already assembled by the police.   She was not part of the investigation, nor did she prepare any affidavits in connection with the search warrant or later, the arrest warrant. The evidence shows that the detectives functioned as investigators and Miralles and other members of the Sarpy County Attorney's Office functioned as prosecutors.   The plaintiffs' allegation that Miralles "ordered" Detective Svajgl to arrest Mr. Nader is not supported by the record.   Under the functional approach, the record shows that the Sarpy County attorneys' actions were performed in connection with prosecutorial functions, and not in any investigatory capacity.

To the extent that Miralles's conduct could be construed as outside the ambit of conduct that is "intimately associated with the judicial phase of the criminal process," that is—not conduct that would occur in the course of her role as an advocate for the State—she would nonetheless be entitled to qualified immunity for that conduct. Viewing the evidence in the light most favorable to the Naders, the court is unable to draw any reasonable inference of liability for a constitutional wrong from Miralles's conduct.   The plaintiffs have not shown that either confirming Detective Svajgl's assessment of the evidence or advising him that the evidence was sufficient to establish

probable cause clearly violated any constitutional right. The court's finding, *infra*, that there was probable cause to arrest Mr. Nader forecloses the plaintiffs' argument in this regard.

Similarly, because the plaintiffs' state-law claim of malicious prosecution or false arrest is asserted against political subdivisions of the State of Nebraska and their employees in the course and scope of their duties, the plaintiffs' claim is governed by the PSTCA. It is clear from the record that the claim falls within the exception to the general waiver of tort liability provided under Neb. Rev. Stat. § 13–908. Thus, Neb. Rev. Stat. § 13–910(7) affords the defendants a complete defense to the plaintiffs' state law claim. Therefore, the defendants are entitled to summary judgment in their favor on the plaintiffs' state-law claims.

With respect to the plaintiffs' § 1983 claims against law enforcement officers Iversen and Svajgl, the question before the court is whether it was objectively reasonable for the officers to believe, under the totality of the circumstances, that Nader possessed child pornography. The court finds that it was. The information that Detective Svajgl possessed at the time of the arrest amounted to arguable probable cause for arrest. Notably, the plaintiffs do not contest the validity of the search warrant, nor do they allege that Nader was not promptly brought before a judge and charged after the arrest. The court's review of the evidence shows that Mr. Nader was not subjected to an unreasonable arrest or detention.

Though it is unfortunate that Mr. Nader was arrested on charges that were ultimately dismissed, that does not mean there was not probable cause to arrest him in the first place. The Naders have shown nothing more than that the officers were

relatively inexperienced in child pornography investigations.  Although the search was Deputy Svajgl's first search as lead investigator and the computer analysis was Deputy Iversen's first experience using certain technology to look for digital evidence, their actions do not show "plain incompetence" or any knowing violation of the law.  The officers' conduct in the search and arrest are the sort of reasonable, even if mistaken, judgments that are insulated from liability under the qualified immunity doctrine.

Although the plaintiff was arrested and detained on a charge that the government would ultimately be unable to prove, the officers were in possession of evidence at the time of the arrest that provided arguable probable cause to arrest Nader.  There is no dispute that there was probable cause to obtain the search warrant.  That information, together with the evidence supporting the warrant, was sufficient to lead a reasonable person to conclude that a crime was committed.

Significantly, a judge reviewed and approved Detective Svajgl's affidavit in support of the arrest and found probable cause to detain Mr. Nader.  The information and knowledge conveyed to the Judge was in Detective Svajgl's possession at the time of the arrest.  In his affidavit, Detective Svajgl described the cybertip, relayed Nader's statements at the time of the search, and reported that one image had been flagged as possible child pornography.  Those facts are sufficient to justify a reasonable person's belief that Nader had committed or was committing the crime of possessing child pornography on his computer.  The officers were in possession of knowledge from Microsoft that child pornography had been downloaded onto Nader's computer.  They verified the IP address and traced the account to Nader.  There are no allegations that anyone else used the computer.  Further, there is no evidence to suggest that the

21

cybertip from Microsoft was untrustworthy.   Nor have the plaintiffs shown that the officers' reliance on the preliminary computer scan was unreasonable.

The officer was not obliged to believe Nader's explanation that his computer had been hacked or his suggestion of an accidental download.  It stands to reason that every suspected possessor of child pornography would make such an assertion.  In the context of investigation of digital technology, the officers' conduct was not unusual.  A thorough forensic examination takes time.  Notably, Nader does not challenge the basis for the search warrant.  An officer faced with the tip from Microsoft, the officers' prior observation of the images at issue and verification of a connection to Nader's email address and IP address, evidence obtained in the search as the result of a valid search warrant—including software scans showing keyword and hashtag matches to possible child pornography, and Nader's statements to Detective Svajgl could reasonably conclude probable cause existed to arrest Nader for possession of child pornography. *Contra United States v. Garden*, No. 4:14CR3072, 2015 WL 6039377, at *4 (D. Neb. Oct. 15, 2015) (finding probable cause lacking, in a criminal prosecution, to seize a defendant from his place of employment, detain and interrogate him in a squad car while his residence was searched, and later transport him to the residence when the only evidence of a connection to a cybertip was an IP address (which although registered to the defendant, could have been used by other individuals at the residence—or even in the neighborhood, if a wireless router was connected to the modem) and the cybertip involved a fictitious user and email exchanges that were not known at the time to contain images of child pornography).  *See, e.g., United States v. Coulter, No. 6:12CR3095-01, 2014 WL 229199, at *6 (W.D. Mo. Jan. 21, 2014)*.

The fact that officers were later advised, after a thorough forensic examination of the computer files, that it would be difficult to prove the images were knowingly downloaded is not germane to the inquiry at issue.  Nader was not charged, presumably because law enforcement officers believed they could not prove the element of knowing possession.  Whether the government could prove the elements of its case beyond a reasonable doubt is a separate inquiry from whether there was arguable probable cause to arrest.  There has been no showing, such as proof of widespread inaccuracies, mistaken identification, or other deficiencies, that reliance on tips from technology companies is somehow unreasonable.  Though it may have been preferable to conduct the thorough forensic examination in a more timely manner, the delay does not make the officers "plainly incompetent" or in knowing violation of the law.

With respect to the plaintiffs' conspiracy claim, there is no evidence, circumstantial or otherwise, from which the court can infer a conspiracy or any discriminatory animus.  The plaintiffs have presented no evidence of the necessary meeting of the minds or concerted action from which to infer a conspiracy, nor has he presented evidence of overt acts in furtherance of the conspiracy.

Further, the evidence does not provide a basis for any imposition of either supervisory or municipal liability on Sarpy County, Papillion, County Attorney Polikov, or Detective Lyons.  The evidence does not establish any failure to properly train the officers.  The evidence shows that Detective Svajgl sought the aid of La Vista Detective Iversen, who, though relatively inexperienced in the procedures, had been trained in computer investigation.  There has been no showing that his training was somehow

deficient or that there was a need for such training in the Papillion Police Department, since Papillion officers were part of a joint task force.

Accordingly, the court finds the defendants' motions for summary judgment should be sustained.

IT IS HEREBY ORDERED:

1.     The motion for summary judgment filed by defendants City of Papillion, Nebraska, Bryan Svajgl, Scott Lyons, and Benjamin Iversen (Filing No. 49) is granted.

2.     The motion for summary judgment filed by defendants County of Sarpy, L. Kenneth Polikov, and Jennifer Miralles (Filing No. 39) is granted.

3.     A judgment of dismissal will issue this date.

Dated this 29th day of January, 2018.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge